j1s2mooC kjc

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,                  New York, N.Y.

4              v.                              18 Cr. 759(RMB)

5   JAMES MOORE,

6              Defendant.

7   ------------------------------x           Conference

8                                             January 28, 2019
                                              12:20 p.m.
9

10  Before:

11                    HON. RICHARD M. BERMAN,

12                                            District Judge

13

14                       APPEARANCES

15
    GEOFFREY S. BERMAN
16       United States Attorney for the
         Southern District of New York
17  BY:  JUSTIN V. RODRIGUEZ
         VLADISLAV VAINBERG
18       Assistant United States Attorneys

19

20  DAVID M. GARVIN, PA
         Attorney for Defendant
21

22  ALSO PRESENT:

23  STEWART BISHOP, Law360

24

25

2

j1s2mooC kjc

| 1 | (In the robing room) |

THE COURT:  So we are in the back because Mr. Moore is
on the phone.  Somebody from the press is interested to come
in, so it's a public proceeding, we will allow that to happen
as well in just one moment.

(Mr. Bishop present)

THE COURT:  So we are going to begin.  I will get
Mr. Moore on the phone here.

Mr. Moore, are you there?

THE DEFENDANT:  I am, I am, Judge Berman.

THE COURT:  How are you?

THE DEFENDANT:  Yes, good.  Thank you, your Honor.

THE COURT:  So we tried to arrange a video proceeding,
but I guess the facility at which you are at was not able to
accommodate us, so we have you here on speakerphone and I will
have the parties who are here introduce themselves so you know
who you are talking to.

THE DEFENDANT:  Thank you, your Honor.

MR. GARVIN:  Good morning, your Honor.  This is David
Garvin, Mr. Moore's attorney in this case.

MR. RODRIGUEZ:  Good morning, your Honor.  Justin
Rodriguez and Vlad Vainberg for the government.

MR. VAINBERG:  Good morning, your Honor.

THE COURT:  Okay.  So the matter was put on as a
status conference, but before we get to that, I was just handed

j1s2mooC kjc

```
1    up from the government, I guess it is a proposed protective
2    order.  Is that right?  Counsel, you are familiar with it?
3              MR. GARVIN:  Yes, your Honor, I am.  We have no
4    objection to it and, in fact, I have already signed the same.
5              THE COURT:  Okay.  And is Mr. Moore familiar with what
6    it is?  You might want to just mention it to him.
7              MR. GARVIN:  Yes.  And, Mr. Moore, this is David.
8              THE DEFENDANT:  Hi, David.
9              MR. GARVIN:  This is the confidentiality agreement or
10   protective order whereby we are agreeing not to disseminate the
11   information that is provided to us through discovery because
12   there may contain information that is confidential to
13   third-parties in that discovery.  We have agreed that we will
14   not disseminate it to anyone other than the defense team and at
15   the end of the case, these documents will be ultimately either
16   turned over or destroyed.
17             THE DEFENDANT:  I understand.  Thanks for the
18   explanation, David.
19             THE COURT:  You bet.
20             So perhaps we could hear from the government as to the
21   status of this case.
22             MR. RODRIGUEZ:  Yes, your Honor.
23             Mr. Moore -- I will just briefly give an overview of
24   the allegations in the indictment.
25             THE COURT:  Okay.
```

1          MR. RODRIGUEZ:  Mr. Moore was indicted on one count of

2     conspiracy to commit wire fraud.  As the indictment spells out,

3     he was involved with a company called Barworks.  Barworks was

4     in the business of soliciting from investors investments in

5     co-working spaces.

6          So the way the company worked is, they would take a

7     space -- it could be a bar or a restaurant -- and they would

8     sell leases on individual spaces in the place for people to

9     come and work from and have it be sort of their office.  So

10    those were what the customers were buying when they would buy

11    something in Barworks.

12         But on the investor side, what Barworks did was they

13    sold leases on each of these spaces.  The allegations in the

14    complaint state that these leases, which were obtained from

15    investors, were obtained based on material misrepresentations

16    and omissions in offering materials and that Mr. Moore was

17    involved in helping other people at Barworks solicit and

18    receive these investments based upon misrepresentations and

19    omissions.

20         One of the key misrepresentations that is alleged in

21    the indictment is the involvement of a person named Renwick

22    Haddow.  Renwick Haddow, the indictment alleges, had a very

23    central role in Barworks, but his involvement was concealed

24    from investors, and that is material because Renwick Haddow had

25    quite a significant history in the United Kingdom of engaging

j1s2mooC kjc

1    in fraudulent business practices.

2              So really one of the core allegations here is that

3    that was materially misrepresented and omitted in the offering

4    materials to investors, that Mr. Moore knew that, and that

5    Mr. Moore continued in his solicitation of investors despite

6    those misrepresentations and omissions.  So that's the core of

7    the allegations that we are talking about.

8              In terms of where we are in the case -- Mr. Vainberg

9    will correct me if I am wrong, but I believe it is fair to say

10   that we are pretty advanced in terms of the likelihood that

11   this will proceed to trial and that there have -- there was a

12   written plea offer that was made and rejected.

13             Discovery is in the process of being produced.  I will

14   give the court an overview of what's happened so far and what

15   is yet to happen.

16             There has been a parallel investigation into this

17   matter by the SEC, and so the first production included

18   approximately 22,000 pages of material from the SEC's parallel

19   investigation, among them approximately 18,000 pages of e-mails

20   that Mr. Moore had voluntarily provided to the SEC.

21             We still anticipate at least another 65,000 pages of

22   material from the SEC investigation, another 25,000 files from

23   various grand jury subpoenas in the criminal investigation, as

24   well as images of approximately five electronic devices.  So

25   that's pretty much what's left.

j1s2mooC kjc

1          We expect that the material that I described will go

2     out the door this week.  We want to make sure that we have

3     everything that we need to have from the SEC.  They have

4     informed us that we may not, and so we want to compare lists,

5     so to speak, but we anticipate that we will be able to do all

6     of that within the next couple of weeks.

7          There was some slowdown with the government shutdown.

8     SEC attorneys weren't available.  But we are hopeful that, now

9     that they are back, we can get to work and finish up making

10    sure that we have everything we need from them to produce.  So

11    that's where we are in terms of discovery.

12         We have had extensive conversations with Mr. Garvin

13    about next steps.  I believe Mr. Garvin has an application or

14    some applications in that regard, and so perhaps at this point

15    it may make sense to turn it over to him.

16         MR. GARVIN:  Thank you.

17         Your Honor, I concur with what counsel has stated.  I

18    do not think that we really have many disagreements as to where

19    we stand as far as production is concerned, and the likelihood

20    that this matter will actually be tried I think is very high.

21    We have --

22         THE COURT:  It would be a trial of just your client?

23         MR. GARVIN:  Yes, your Honor, and I would envision

24    that the case really has two central points, the first being

25    whether or not Barworks committed fraud, and Mr. Moore never

7

j1s2mooC kjc

1   worked for Barworks and technically Mr. Moore never raised

2   investors for Barworks.  There was an independent group that

3   actually performed that function.  What may have happened is

4   that Mr. Moore was instrumental in introducing the parties to

5   each other and wanted to become a branch of Barworks in Europe

6   and to be a potential owner, but Renwick Haddow, while he paid

7   lip service to those thoughts, ultimately never honored any of

8   those representations.

9             What really --

10            THE COURT:  Renwick is Haddow?

11            MR. GARVIN:  Yes.

12            THE COURT:  That's his first name?

13            MR. GARVIN:  Renwick Haddow, yes, your Honor.

14            What is perhaps the most glaring representation in

15   this case is that Renwick Haddow represented to everyone,

16   including Mr. Moore, that a person by the name of Jonathan

17   Black was the CEO or president of the company.  Well, he

18   maintained this charade for months.  It ended up being

19   discovered at the very end that Renwick Haddow was in fact

20   Jonathan Black --

21            THE COURT:  I see.

22            MR. GARVIN:  -- even though there are e-mails written

23   by Renwick Haddow to Jonathan Black.

24            So the government's point is that this was a fraud,

25   and the government asserts that Mr. Moore at some point in time

j1s2mooC kjc

1    knew it was a fraud, but did not do anything to stop it, but

2    instead continued working.  It is the defense position that

3    Mr. Moore was duped just like everyone else, and that by the

4    time he learned that it was a fraud, he terminated his

5    relationship with Renwick Haddow and Barworks and should not be

6    held responsible for the improper conduct of Renwick Haddow and

7    Barworks under Renwick Haddow's control.  That's the case.

8              THE COURT:  I get it.

9              MR. GARVIN:  I anticipate that this case to be tried,

10   based upon representations of the United States and based upon

11   what I have just proffered to your Honor, is likely to be a

12   one- to two-week case, and of course that largely would

13   depend -- if Mr. Moore ultimately exercised his right to

14   testify, that may take a day or two by itself.  It is not a

15   very long case by some of the standards that this court has

16   handled in the past.

17             So we envision that as much as 75 percent of the

18   records will relate to the issue of whether or not Renwick

19   Haddow made false representations and whether Barworks is

20   guilty of presenting or raising capital without making the

21   proper presentation, representation, and disclosures.  I don't

22   anticipate that Mr. Moore is going to fight that that much

23   because he feels that he was as duped as anybody else was.

24             THE COURT:  I get it.

25             THE DEFENDANT:  Excuse me.  Excuse me.

j1s2mooC kjc

1          THE COURT:  Hold on one second, Mr. Moore.

2          THE DEFENDANT:  May I -- the prison provided me with a

3   pen, and it's run out of ink.  If I can just change it very

4   quickly?

5          THE COURT:  Sure.

6          THE DEFENDANT:  Thank you.  I will be right back.

7          THE COURT:  I didn't want him to speak without

8   conferring with you.

9          MR. GARVIN:  I thought he wanted to confer.  I don't

10   think he disagrees with what was said so much as he can't take

11   notes.

12          (Pause)

13          THE DEFENDANT:  Apologies.  I am back.

14          THE COURT:  No problem.

15          Counsel, when are you wanting to get to trial?  This

16   is a scheduling issue.  I want to make sure --

17          MR. GARVIN:  Yes, your Honor.  Mr. Moore has discussed

18   this with me.  The problem is that I don't have the last

19   production that the government will produce, but if it goes the

20   way things have in the past, even though 65,000 pages sounds

21   like a lot, I am not anticipating that once we go through it

22   all, you know, you eyeball each page for ten seconds and keep

23   on moving, you can cover a couple thousand pages a day.  So

24   that should take us a month to get through.

25          Mr. Moore is anxious to go to trial as soon as

10

j1s2mooC kjc

|   | |
|---|---|
| 1 | possible.  Respectfully, your Honor, I have -- and I know this |
| 2 | court has an extremely busy calendar, too, so I don't want to |
| 3 | be presumptuous, but I have four or five trials scattered |
| 4 | throughout the 2019 calendar now.  Mr. Moore had some thoughts |
| 5 | that he would like, if this court were so inclined, to go |
| 6 | sometime between May 20 and June 14.  If not during that period |
| 7 | of time, a fallback position would be between the middle of |
| 8 | August anywhere to the end of September. |
| 9 | THE COURT:  Okay. |
| 10 | MR. GARVIN:  So he would prefer the May, but if -- we |
| 11 | realize that it has to -- |
| 12 | THE COURT:  First, let me say this.  You never know |
| 13 | how long a trial is going to take, but almost invariably -- and |
| 14 | I don't mean to say -- every trial is different, but almost |
| 15 | invariably a one-defendant case I usually can do in a week.  I |
| 16 | mean, if it takes longer, it takes longer.  I could accommodate |
| 17 | that by giving you June 3 as a trial date. |
| 18 | MR. GARVIN:  That would be completely acceptable to |
| 19 | the defense, your Honor. |
| 20 | THE COURT:  Does that work for the government? |
| 21 | MR. RODRIGUEZ:  One moment, your Honor. |
| 22 | THE COURT:  Yes. |
| 23 | (Counsel confer) |
| 24 | MR. RODRIGUEZ:  That's fine for the government as |
| 25 | well, your Honor. |

j1s2mooC kjc

1          THE COURT:  Then we need to schedule a few other

2     items.

3          MR. GARVIN:  Your Honor, I apologize, but may I tell

4     you something that --

5          THE COURT:  Yes, sure.

6          MR. GARVIN:  Mr. Moore is currently incarcerated

7     because he is serving a sentence in an unrelated matter for a

8     misprision of a felony, that is, for failure to report an

9     illegal act conducted by someone else.

10          THE COURT:  So he is in federal prison?

11          MR. GARVIN:  That is correct.

12          THE COURT:  Because we were unable to --

13          MR. RODRIGUEZ:  Correct, your Honor.

14          MR. GARVIN:  And that has actually worked out to

15     everyone's benefit because my office is Miami and Mr. Moore is

16     in Miami, and which makes it easy to review the government's

17     discovery when they present it.

18          THE COURT:  I see.

19          MR. GARVIN:  Our concern is that Mr. Moore has been

20     designated to finish his 18-month sentence in a camp in South

21     Carolina.  We have no idea if or when that transfer will take

22     place.  But if that transfer does take place, that will

23     invariably slow down our ability to review the discovery.  It

24     hasn't taken place so far, and I have no indication that that

25     is the intention of any party, but I just feel that I need to

j1s2mooC kjc

1      bring that to the court's attention.

2              THE COURT:  Okay.  So that's something you all can

3      work on when that happens or not.

4              MR. RODRIGUEZ:  Your Honor, just to add one thing,

5      obviously we are happy to do that, but just for the sake of the

6      record and maybe for the sake of Mr. Moore, so that he could

7      hear this from us, our options are a little limited, which is

8      to say, I think what the government could do is have Mr. Moore

9      writted over to New York on a writ for the duration of these

10     proceedings.  Beyond that, it will be a little bit out of the

11     government's control and up to the BOP, but I just wanted to

12     make that clear.  But as your Honor directed, we will certainly

13     work with Mr. Garvin and do everything we can to find the right

14     accommodation here.

15             THE COURT:  So there are a few options.  One is

16     that -- did you all represent him in Florida?

17             MR. GARVIN:  His case was in Orlando, Florida.  He

18     resides in Miami, so -- and, yes, I represented him in the

19     Florida case, and that's why he surrendered himself voluntarily

20     in Miami and was never moved, which has worked out fine because

21     it makes it efficient to go over the government's discovery.

22     Every day it's a ten-minute people mover --

23             THE COURT:  I get it.  But sometimes the counsel who

24     represent, in this case, Mr. Moore in Florida might be able to

25     talk to the BOP there.  For example, here in New York, there is

1    a general counsel who is very accommodating usually to those

2    kinds of things.  So why don't you try that or --

3            MR. GARVIN:  I will certainly try that.  My reluctancy

4    is knowing that what we went through to try to get a video

5    conference was maddening, but I certainly will try to do that.

6            THE COURT:  And unsuccessful ultimately.

7            MR. GARVIN:  Yes.

8            THE COURT:  It's not a criticism, but anyway.  And

9    then, if need be, I guess even if he did get moved, you are

10   saying you could have him writted here even from some other

11   place if he were --

12           MR. RODRIGUEZ:  That's right, your Honor.  At any

13   point, we could have him writted here, and he could be in New

14   York for these proceedings.  Where it gets tricky is if he does

15   get moved to South Carolina, there is nothing that I am aware

16   of that our office could do to say to the BOP, please send him

17   back to Miami.

18           THE COURT:  I get it.  All right.  So I will leave it

19   in your hands.  If I can help you in any way, you will let me

20   know.

21           MR. GARVIN:  Thank you, your Honor.

22           THE COURT:  So I am going to give you, then, June 3.

23   Mr. Moore, are you hearing that?

24           THE DEFENDANT:  Yes, your Honor.  Thank you.

25           THE COURT:  That is the trial date.  I don't know if

j1s2mooC kjc

1    you heard, but my expectation is that a trial of this nature,

2    with one defendant, should be able to be done in about a week.

3    So we need to come up with some other dates in advance, the

4    pretrial submissions, for example, and then the pretrial

5    conference.

6           So let's say May 6 for the written pretrial

7    submissions, and that includes -- and I will explain these in a

8    moment -- that includes the joint jury instructions as well as

9    a joint verdict sheet, also a list of names and places that may

10   come up, and I need this for the *voir dire* of the jury during

11   the trial, and any motions *in limine* would be filed on that

12   date.  So that's May 6.

13          Joint jury instructions means that -- I do this in

14   civil and criminal cases.  In a criminal case, the government

15   would do a proposed draft of the instructions, including as

16   many of the so-called boilerplate instructions that I use, and

17   then would give it to you for comment.  If you agree, then we

18   are easy.  And they would do that before May 6, give that to

19   you.  If you have an objection to any instruction, you would

20   note that on the same document and propose an alternate

21   instruction if you have one.

22          MR. GARVIN:  Yes, sir.

23          THE COURT:  And then motions *in limine*, everybody

24   knows what they are, they need to be responded to on May 13, a

25   week after they are submitted.

j1s2mooC kjc

1          And then for final pretrial conference how about May

2    29, '19 -- that is a Wednesday -- at 11:00?  How does that

3    schedule sound to all of you?

4          MR. GARVIN:  That sounds fine, your Honor.

5          THE COURT:  Should be doable?

6          MR. RODRIGUEZ:  And good with the government as well,

7    your Honor.

8          THE COURT:  Okay.  So is there a speedy trial issue or

9    application that takes us to May 29?

10         MR. RODRIGUEZ:  Yes, your Honor.  The government moves

11   to exclude time under the Speedy Trial Act between now and May

12   29.  The government submits that the ends of justice served by

13   such an exclusion outweigh the best interests of the defendant

14   and the public in a speedy trial because such an exclusion will

15   allow the defendant to continue reviewing discovery with

16   counsel and otherwise allow counsel and the defendant to

17   effectively prepare for trial.

18         THE COURT:  So I am going to find, under 18 U.S.C.

19   Section 3161, that the request for adjournment, joined in by

20   both sides, through and includes May 29, 2019, is appropriate

21   and warrants exclusion of the adjourned time from Speedy Trial

22   calculations.  I further find that the exclusion is designed to

23   prevent any possible miscarriage of justice, to facilitate

24   these proceedings, including the completion of discovery and

25   pretrial preparation, and to guarantee effective representation

j1s2mooC kjc

```
 1    of and preparation by counsel for both parties.  Thus, the need

 2    for exclusion and the ends of justice outweigh the interests of

 3    the public and the defendant in a speedy trial pursuant to

 4    18 U.S.C. Section 3161(h)(7)(A) and (B).

 5              So unless you have further questions or issues,

 6    anybody?

 7              MR. RODRIGUEZ:  Your Honor, I guess just one question.

 8    Does your Honor sit a full trial day?

 9              THE COURT:  I do.

10              MR. RODRIGUEZ:  Thank you.

11              THE COURT:  Yes.  Good that you mention that.

12              So we usually start 9:15 and we go to 4:45 each day.

13    There is an hour break for lunch and usually short break if the

14    jury wants it and needs it, which they usually do, mid morning

15    and mid afternoon.  And we say if you run out of witnesses,

16    your case also runs out.  So we actually move things along

17    pretty quick, and you need to be ready, whoever's side is up,

18    with your next witness and the one after that, so that we don't

19    have any early, premature breaks in the trial.

20              MR. RODRIGUEZ:  And should we expect that the trial

21    will proceed on that Friday as well?

22              THE COURT:  Yes.  It depends where we are.  If we had

23    a lot to go, we would probably do Friday half day.  We might do

24    that anyway.  But if we were very close and, I don't know,

25    theoretically if the jury was deliberating, we would go the
```

j1s2mooC kjc

1    full day, I would imagine.

2            MR. RODRIGUEZ:  Thank you, your Honor.

3            THE COURT:  Good.  All right.  So nice to see you all.

4    And, Mr. Moore, good to talk to you as well.

5            THE DEFENDANT:  Thank you, your Honor.  You, too.

6            THE COURT:  Yup.  We will see you in May.  Thanks.

7            THE DEFENDANT:  Thank you.

8            THE COURT:  It would probably be a good thing if you

9    are planning to have Mr. Moore here by the time of the pretrial

10   conference anyway, and I think he should attend the pretrial

11   conference.

12           MR. GARVIN:  Yes.  We had already discussed that,

13   anticipating that.

14           THE COURT:  Okay.  Great.  Nice to see you all.

15           MR. RODRIGUEZ:  Thank you.

16           MR. VAINBERG:  Thank you, your Honor.

17                           oOo

18

19

20

21

22

23

24

25