J633MOO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                     New York, N.Y.

            v.                                18 Cr. 759(RMB)

JAMES MOORE,

                  Defendant.

------------------------------x               Jury Trial

                                              June 3, 2019
                                              9:30 a.m.


Before:

                    HON. RICHARD M. BERMAN,

                                              District Judge



                          APPEARANCES

GEOFFREY S. BERMAN
      United States Attorney for the
      Southern District of New York
BY:   MARTIN BELL
      VLADISLAV VAINBERG
      Assistant United States Attorneys


DAVID M. GARVIN, PA
      Attorney for Defendant

ALSO PRESENT:
Nathaniel Cooney, Paralegal for U.S. Attorney's Office
Special Agent Jordan Anderson, FBI
Alexandra Garvin, Law Clerk for Defense
Arlene Garvin, Paralegal for Defense

J633MOO1

|    |                                                                      |
|----|----------------------------------------------------------------------|
| 1  | (In open court; defendant not present)                               |
| 2  | THE COURT:  We have a couple of open issues here.  A                 |
| 3  | stipulation you were going to show me.                               |
| 4  | MR. BELL:  Yes.                                                       |
| 5  | THE COURT:  Number one.  And number two, you were                    |
| 6  | going to tell me how you were going to go about authenticating       |
| 7  | whatever it is that was covered in the last paragraph of your        |
| 8  | letter.                                                               |
| 9  | MR. BELL:  So, that would be --                                      |
| 10 | THE COURT:  This is your letter of May 31.  I want it                |
| 11 | all in one package.  These are the only open issues.  That's         |
| 12 | what I want to see.                                                  |
| 13 | And by the way, with the voir dire I think we can                    |
| 14 | speed it along, eliminating questions about what TV shows you        |
| 15 | watch, for example, and what you like to read, etc.                  |
| 16 | Principally those two suggestions.                                   |
| 17 | MR. BELL:  That's fine, your Honor.  We'll get you the               |
| 18 | stipulation, and Mr. Vainberg will be discussing that and can        |
| 19 | speak to you about 817, which is the article we need to              |
| 20 | authenticate.                                                        |
| 21 | THE COURT:  I wanted this all in one package, not half               |
| 22 | and half.  So I'll look at the stipulation that I guess you've       |
| 23 | entered into with that.                                              |
| 24 | MR. GARVIN:  Yes, your Honor.  I would say                           |
| 25 | approximately 10 stipulations, of which nine of them we agreed       |

J633MOO1

1    upon.  I think there is only one that counsel is making

2    reference to that I think that --

3              THE COURT:  You mean that 817 document or whatever

4    that is?

5              MR. GARVIN:  I believe that's the one they're

6    referring to; yes, sir.

7              THE COURT:  Let me know when you're ready to deal with

8    all of that.

9              MR. VAINBERG:  Thank you.  If you just give us a

10   minute to organize.

11             THE COURT:  Sure.

12             MR. BELL:  Judge, we'll give you two stipulations that

13   cover the materials.  One of the stipulations relates to the

14   judgment and press releases related to that judgment.  The

15   other one relates to other press releases.

16             THE COURT:  I want the whole package.

17             MR. BELL:  There you go.  That's them.

18             THE COURT:  And the authentication is covered in there

19   too?

20             MR. BELL:  No, Judge.  That's something as we noted in

21   the --

22             THE COURT:  As I noted on my endorsement of your

23   letter dated May 31, 2019, I said "The Court appreciates the

24   meet and confer.  It cannot, however, rule until it sees the

25   stipulation or stipulations, and learns of the government's

J633MOO1

1    plan to authenticate.  We can discuss on Monday."

2            MR. VAINBERG:  Your Honor, if I may --

3            THE COURT:  When you are ready to discuss all of that,

4    I'll be ready.  I don't think you are.

5            MR. VAINBERG:  Your Honor, the government's ready.

6            THE COURT:  I have one other question.  Is the thrust

7    of your case the failure to disclose the real identity of

8    Mr. Haddow?  Or are there other misrepresentations or omissions

9    that you are presenting?

10           MR. VAINBERG:  The thrust of our case against

11   Mr. Moore is the failure to disclose, and the affirmative

12   misrepresentations relating to the Jonathan Black fake

13   identity, and the offering materials and the concealment, which

14   sort of goes hand to hand.

15           THE COURT:  That's it?

16           MR. BELL:  That's it.

17           MR. VAINBERG:  There will be, just for the record,

18   there will be other evidence presented.

19           THE COURT:  I just asked for the thrust of your case

20   because I want to describe it that way in the voir dire.

21           MR. BELL:  Understood.

22           THE COURT:  You agree with that, counsel?

23           MR. GARVIN:  Yes, sir.

24           THE COURT:  Okay.  So why don't you tell me what

25   stipulations you've handed up here.

J633MOO1

| | |
|---|---|
| 1 | By the way, we don't have the defendant here.  Is that |
| 2 | okay with you? |
| 3 | MR. GARVIN:  Yes, sir. |
| 4 | THE COURT:  You waive his appearance? |
| 5 | MR. GARVIN:  Mr. Moore's appearance is waived, your |
| 6 | Honor. |
| 7 | THE COURT:  For the purpose of these evidentiary |
| 8 | discussions. |
| 9 | MR. GARVIN:  Yes, sir. |
| 10 | THE COURT:  Okay.  So what stipulations have you |
| 11 | handed up? |
| 12 | MR. VAINBERG:  The stipulations we've handed up deal |
| 13 | with judgments from the FCA regarding Mr. Haddow and press |
| 14 | releases from the FCA. |
| 15 | THE COURT:  The FCA, if you could. |
| 16 | MR. VAINBERG:  The Financial Conduct Authority, which |
| 17 | is a British regulator akin to our Securities and Exchange |
| 18 | Commission. |
| 19 | THE COURT:  Which stipulation is this one? |
| 20 | MR. VAINBERG:  That's in the stipulation regarding |
| 21 | judgment documents. |
| 22 | THE COURT:  Maybe you could better describe it.  It |
| 23 | has two paragraphs or three? |
| 24 | MR. BELL:  It's three, your Honor.  The caption reads |
| 25 | "Stipulation Regarding Online Judgment Documents." |

J633MOO1

1          THE COURT:  What does that stipulation purport to be?

2          MR. VAINBERG:  That stipulation seeks to admit on the

3     consent of both parties as authentic, true and accurate

4     essentially three exhibits.  One, Government Exhibit 803 is a

5     true and accurate copy of a press release from a different

6     British regulator.

7          THE COURT:  From a what?

8          MR. VAINBERG:  A different --

9          THE COURT:  Different from what?

10         MR. VAINBERG:  From the FCA.

11         THE COURT:  So you just told me that you have FCA's

12    actions covered.  Now you're saying -- who else are you

13    covering here?

14         MR. VAINBERG:  I'm sorry, your Honor.  One moment.  I

15    want to make sure I have the record straight.

16         MR. GARVIN:  If I may be heard, your Honor.  The

17    stipulation also covers British and Irish Legal Information

18    Institute, which is another reporting entity in Britain, and

19    we've agreed that that had enough authenticity and

20    trustworthiness to permit it to go forward.

21         THE COURT:  So you're on board with this stipulation,

22    which is a three-paragraph stipulation entitled "Stipulation

23    Regarding Online Judgment Documents."

24         MR. GARVIN:  Yes, sir, and I've signed it.

25         THE COURT:  Again, from the government's point of

J633MOO1

1   view, what documents are covered by that stipulation?

2           MR. BELL:  What's covered by that stipulation is a

3   judgment by a British court, and two related press releases.

4           THE COURT:  A judgment dated what?

5           MR. BELL:  A judgment dated March -- I'm sorry.

6   March 25, 2015.  I'll note for the record, I think this is the

7   chief thrust of the dates, that that predates when the

8   investment recruited effort --

9           THE COURT:  You don't have to make a speech, just tell

10  me what the document is that you're stipulating to.  That's

11  one, right?

12          MR. BELL:  That's one stipulation.  The other

13  stipulation, which I understand Mr. Garvin to also have

14  consented to --

15          THE COURT:  He already said he did.  I'm just asking

16  you to describe the documents.

17          MR. BELL:  Sure.  It relates to two I believe

18  additional press releases.

19          THE COURT:  What are those?  What are they dated?

20          MR. BELL:  Those are press releases that relate to --

21  I think I may have handed your Honor the copy that I had

22  immediately in hand.  But they relate to actions taken against

23  Mr. Haddow by the Financial Conduct Authority as well.

24          THE COURT:  Do they talk about the same actions that

25  the judgment discusses or are they something different?

J633MOO1

1    MR. BELL:  They are something slightly different.  The

2    judgment --

3    THE COURT:  You need to know your exhibits a lot

4    better when you get to the jury.

5    MR. BELL:  We will, your Honor.  One of the reasons --

6    THE COURT:  They're coming in about a half hour.

7    MR. BELL:  This has been stipulated to, so it will be

8    a little easier.

9    MR. GARVIN:  Your Honor, I can help counsel on this

10   issue.

11   THE COURT:  All right.

12   MR. GARVIN:  The judgment is Exhibit 803, and it is

13   dated March 25, 2015.  The press release by the FCA is Exhibits

14   805 and 801.  The first press release was also issued by the

15   FCA on or about January 28, 2015, that would be Government's

16   Exhibit 801.

17   THE COURT:  Does that press release refer to that

18   judgment?

19   MR. GARVIN:  No, because the judgment was not signed

20   until March 18, 2015.  But that was the followup press release,

21   and that is Government's Exhibit 805.  The Court will note it's

22   the same date as the judgment.

23   THE COURT:  I got it.  So there is a judgment and

24   press releases which talk about the judgment.

25   MR. GARVIN:  Basically.  Or the acts that ultimately

J633MOO1

| | |
|---|---|
| 1 | occurred in the judgment, because one press release predated. |
| 2 | THE COURT:  Okay.  Now we'll get to the second |
| 3 | stipulation, which is a two-paragraph document as opposed to a |
| 4 | three-paragraph document. |
| 5 | What does it cover? |
| 6 | No, the government.  These are your exhibits. |
| 7 | MR. BELL:  Your Honor, may I have my copy back for a |
| 8 | moment? |
| 9 | THE COURT:  Of your stipulation? |
| 10 | MR. BELL:  Yes, please.  Thank you. |
| 11 | So the second stipulation covers what your Honor has |
| 12 | as Government Exhibits 800 and 805.  One of them relates to a |
| 13 | press release that states, among other things -- |
| 14 | THE COURT:  Press release dated? |
| 15 | MR. BELL:  The press release was posted on or about |
| 16 | December 10 of 2008.  It announces, among other things, that |
| 17 | Mr. Haddow has been disqualified from service as a director of |
| 18 | a registered company in Great Britain.  The second bit of |
| 19 | content in 805 is the online remnants of a post from the |
| 20 | Financial Conduct Authority through a second government website |
| 21 | relating to further actions, a further action against |
| 22 | Mr. Haddow.  We split these up into two stipulations. |
| 23 | THE COURT:  It doesn't matter.  That's fine.  I just |
| 24 | want to understand what's covered. |
| 25 | MR. BELL:  This will help you understand, your Honor. |

J633MOO1

1    One of them relates -- one set of documents in the stipulations

2    relates to the judgment against him.  Others don't.  They

3    relate more to the disqualification.

4              THE COURT:  I get it.

5              Counsel, do you agree with that?

6              MR. GARVIN:  Yes, your Honor.

7              THE COURT:  So you're going to stipulate to those

8    documents, and you're going to describe them to the jury?

9              MR. BELL:  The stipulation covers their admissibility,

10   so they're actually going to come in.

11             THE COURT:  No, we know that.  But, are you not going

12   to tell the jury --

13             MR. BELL:  We are, within the text of the stipulation,

14   yes, your Honor.  In substantially the same way they've been

15   described here.  Very briefly.

16             THE COURT:  So all I would say, if anything, is that

17   the parties stipulated.

18             MR. BELL:  That's correct, your Honor.  And I would

19   think Mr. Garvin would agree, we are not asking for your Honor

20   to add anything beyond what's in the stipulation.  Merely to --

21   I don't know if it is your Honor's custom to upon the first

22   time a stipulation is released, just explain -- or admitted --

23   explain what that is.  But beyond that, we don't require

24   anything else from the Court.  Thank you.

25             THE COURT:  Mr. Garvin, these are stipulations of

J633MOO1

```
1    fact, right?

2              MR. GARVIN:  Yes, sir.  Your Honor, there is one

3    defendant's stipulation.

4              THE COURT:  Ah.

5              MR. GARVIN:  Which --

6              THE COURT:  Proposed.

7              MR. GARVIN:  No, it's been executed by the parties.

8              MR. BELL:  To be clear, Judge, it's not a stipulation

9    that relates to these issues.  We have several other

10   stipulations which were not --

11             THE COURT:  He wants to talk about it.

12             MR. BELL:  Sure.

13             MR. GARVIN:  I'm only reminding everyone that there is

14   one defendant's stipulation that we haven't talked about.

15             THE COURT:  You don't have you don't have to tell me,

16   and you don't have to do it.  I don't know if you're putting on

17   an affirmative case.  But do you want to do it at that point in

18   time?

19             MR. GARVIN:  I would prefer to do it at the inception

20   with all the other stipulations.

21             THE COURT:  Are they coming in at the same time?

22             MR. BELL:  They're not all coming in at the same time,

23   your Honor.

24             THE COURT:  You might remind me that -- well, does

25   your stipulation cover anything related to what their
```

J633MOO1

1    stipulations cover?

2              MR. GARVIN:  Well, to be candid, your Honor, what my

3    stipulation covers many of the exhibits of the defense that

4    will be referred to during the case, and I'd like to have this

5    stipulation read upon the reading of the government's first set

6    of stipulations, whichever ones they choose.

7              THE COURT:  Do you anticipate, is there an affirmative

8    case or are you going to rest probably on these stipulations?

9              MR. GARVIN:  At the present time I would anticipate

10   that the defense will call two or three witnesses.  At the

11   present time I'm not anticipating the defendant.

12             THE COURT:  Okay.  It doesn't help you to do the

13   stipulations at that time just before you call the witnesses so

14   the jury will be clear that your case consists of whatever

15   stipulation this is, plus the testimony of whomever will be a

16   witness?

17             MR. GARVIN:  This is what I had in my mind, your

18   Honor.  Is government's witness number one is on the stand, and

19   I want to show him Defendant's Exhibit 10 --

20             THE COURT:  Got it.  Okay, that's fine.

21             MR. BELL:  Judge, I think that makes a lot of sense.

22   When Mr. Garvin wants to refer to his exhibits, I think he can

23   read the stipulation then.

24             THE COURT:  On your cross.

25             MR. GARVIN:  Yes, sir.

J633MOO1

1          THE COURT:  Got it.

2          MR. BELL:  We have no objection to that, Judge.

3          I want to also address in answering your Honor's

4   earlier question the remaining document that we referred to in

5   our letter of last week.  This was an article that we were

6   going to authenticate, to answer your Honor's question, through

7   one of the witnesses.

8          So we anticipate our first witness today will be a

9   victim of the fraud that we allege took place and we allege

10  Mr. Moore took part in.  She invested money, and after a while,

11  came to realize in part because she saw this article that

12  something was awry.  That in turn changed her interactions with

13  the company.

14         The article, as with the other articles we've

15  stipulated admission to, is not being admitted for its truth.

16  But it is something that --

17         THE COURT:  I don't understand exactly what it is

18  being admitted for if it's not its truth, if she relied on

19  it --

20         MR. BELL:  She did.

21         THE COURT:  -- in making her decision.  Then you're

22  talking about the contents of the article.  No?

23         MR. BELL:  No, because separate and apart, your Honor,

24  from the article being admitted for its truth, is how --

25  whether or not it is true -- it affects the mindset of a person

J633MOO1

1    involved.

2             THE COURT:  She can just say that, which I take it is

3    what she is going to say.

4             MR. BELL:  She will and can say that.

5             THE COURT:  You're now talking about GX 817.

6             MR. BELL:  I am, your Honor.  It is a January 13, 2017

7    article which takes place substantially after all of the

8    recruiting has been done, but when a number of people are

9    trying to get paid as agreed upon under the investment

10   contracts that they were induced to enter.

11            THE COURT:  So she's someone who gave money.

12            MR. BELL:  That's correct, your Honor.

13            THE COURT:  But she already gave it.

14            MR. BELL:  Also correct, your Honor.

15            THE COURT:  So how could she rely on this if she gave

16   the money before the article?

17            MR. BELL:  The article is what essentially prompts the

18   collapse of Bar Works and what prompts a run on the part of

19   investors to attempt to get their money back.  So we would

20   respectfully submit, your Honor, that is a part of the

21   narrative, even if it's even if for a non-hearsay purpose.

22   This is a non-hearsay purpose.

23            THE COURT:  I'm going to reserve decision.

24            MR. BELL:  Understood.

25            THE COURT:  It seems to me you can get where you need

J633MOO1

```
 1    to go without that article, which comes after she's already
 2    invested.  But I'll take a look at it.
 3              What's your view of that article, counsel?
 4              MR. GARVIN:  Your Honor, that was one article that we
 5    objected to for a myriad of reasons.  One of them was
 6    relevance, because it took place in I believe counsel said
 7    December of 2017.  All parties here have --
 8              THE COURT:  The article you mean?
 9              MR. GARVIN:  Yes, sir.
10              THE COURT:  It's dated January 13, 2017.
11              MR. GARVIN:  I stand corrected on the date.  But it
12    was 2017.  I think that all the parties agree that Mr. Moore
13    had a parting of ways with Bar Works and Mr. Haddow in the
14    spring of 2016.  So, our position on it was, A, it's an
15    internet article that I don't know the accuracy of, B, we're
16    talking about nine months approximately after Mr. Moore severed
17    his relationship with Bar Works and Mr. Haddow.  And for those
18    reasons, I didn't stipulate to this particular stipulation.
19              THE COURT:  Okay.  So, I'm going to reserve decision,
20    look over the article.  But, I don't think it is going to
21    prejudice anybody in any way.  If you ask the witness the right
22    questions, how did she come to know the fraud, I suppose she
23    could say I read about it or whatever, and I don't know if you
24    you'll be prejudiced in any way by not admitting this article.
25              MR. BELL:  That's fine, Judge.  I think that even if
```

J633MOO1

1    that is your Honor's ruling ultimately --

2              THE COURT:  I want to read the thing first.  It is a

3    question of -- let me read the article.

4              MR. BELL:  Sure.  I could imagine, Judge, if

5    Government Exhibit 817 doesn't get in that way, which we would

6    understand, I would respectfully reserve the government's right

7    to do one or the other of the following things.  One of them

8    would be, to the extent that the witness doesn't recall what it

9    was, we may use it to refresh her recollection in the way we

10   would any other document as to what it is.

11             THE COURT:  That would be fine.  And counsel, you

12   agree with that?

13             MR. GARVIN:  Yes, sir.

14             THE COURT:  But that's a limited operation.  "I show

15   you."

16             MR. BELL:  In a very precise way.

17             THE COURT:  "Does that refresh your recollection."

18             MR. BELL:  For example, if she doesn't recall either

19   the publication or when this happened, that could be useful to

20   her.

21             The other note is you'll notice, your Honor, when you

22   do look over the article on page two, there is a graphic that

23   illustrates a snapshot from the website LinkedIn, one of those

24   résumé web pages that people put up.

25             THE COURT:  You mean the box on page two?

J633MOO1

1          MR. BELL:  That is the box on the top half of page

2     two.

3          THE COURT:  Okay, yeah.

4          (Defendant present)

5          MR. BELL:  As you'll see here, Jonathan Black, who we

6     allege is a contrivance, and I don't think the defense takes

7     much issue with this.  It had a LinkedIn profile, the picture

8     of which was taken from another unrelated individual named

9     Frank Jones.  It may very well be we mark just that portion,

10    separate and apart from the article's contents, a separate

11    exhibit so as to be able to illustrate that through

12    Mr. Haddow's testimony later on.

13         MR. GARVIN:  Your Honor, in the stipulated documents,

14    defense stipulated documents, there is one stipulation.  One of

15    the exhibits is the LinkedIn photo that is contained in that

16    e-mail.

17         THE COURT:  So you've got it.

18         MR. GARVIN:  The government is free to use that.

19         MR. BELL:  I reckon so.  I think it matters when it is

20    introduced.  That's fine.  We may take it out.

21         THE COURT:  If it's in already, you can excerpt it if

22    you wanted to.

23         MR. BELL:  We may do that separately or we may do that

24    through the stipulated documents.

25         THE COURT:  That's fine.  I think we closed the gap

J633MOO1

1    here.

2              MR. BELL:  Yes.  Your Honor, may I have the copy of

3    the remaining stipulation that I handed up earlier, please?

4              THE COURT:  So you need to make some for me and for

5    the court reporter.

6              MR. BELL:  We do.  These are new exhibits because they

7    were signed this morning.

8              MR. GARVIN:  Excuse me.  I just need to walk to my

9    briefcase to get some tablets and some pens.

10             THE COURT:  Sure.  I think we're done.  Unless you

11   have more issues.

12             MR. GARVIN:  No, I have no issues.  Let the record

13   reflect Mr. Moore is present.

14             THE COURT:  He's welcome.

15             MR. BELL:  Thank you, your Honor.

16             THE COURT:  I'd say we probably have a 15, 20 minute

17   wait.  15 anyway, before the jury panel is here.

18             MR. BELL:  Understood, your Honor.

19             MR. GARVIN:  Your Honor, then there is one

20   housekeeping matter.  Mr. Moore's clothes today went smoothly

21   thanks to the marshals, but they did ask me to ask you if you

22   would be kind enough to issue an order.

23             THE COURT:  Got it.  For the marshals' benefit.

24             MR. GARVIN:  Yes.

25             THE COURT:  Got it.

J633MOO1

1           MR. BELL:  Judge, there is one thing.  Because

2    Mr. Moore was not here for last week's conference, we did not

3    get to allocute him on the Lafler Frye questions as we noted.

4    That's essentially just whether we'll make a representation as

5    to whether there have been plea --

6           THE COURT:  Why don't you make the representation and

7    I'll ask of Mr. Moore if he agrees.

8           MR. BELL:  Yes, your Honor.  So, no formal, that is

9    complete in writing offer was made to Mr. Moore.  At numerous

10   points, including dating back to September 13 of 2018, we

11   e-mailed the rough contours of a potential offer to Mr. Garvin.

12   We've done the same since then, and Mr. Moore has not

13   demonstrated interest through his counsel in any of those

14   offers, so no formal plea offer was made in writing.

15          THE COURT:  Is that a correct statement of your

16   understanding of what's happened in terms of Mr. Moore being

17   offered a plea of any kind?

18          MR. GARVIN:  Yes, sir.

19          THE COURT:  Mr. Moore, you understand that they are

20   saying they sent you some drafts, never a final, but that

21   through counsel you rejected them?

22          THE DEFENDANT:  Yes, your Honor.  That's correct.

23          THE COURT:  Okay.  And anything else you wanted to ask

24   of Mr. Moore?

25          MR. BELL:  I don't believe so, your Honor.  I think

J633MOO1

1       that will do it.  Thanks very much.

2                 THE COURT:  That's great.  So, I'll ask another

3       question.  So you of course understand that you're here today

4       because you are going to have a trial, and that is at your

5       election to resolve this case via a jury trial, which we're

6       going to start today.

7                 THE DEFENDANT:  Yes, your Honor.

8                 THE COURT:  That's your desire and that's what we're

9       going to do.

10                THE DEFENDANT:  Certainly my understanding, your

11      Honor.

12                THE COURT:  Thank you.

13                THE DEFENDANT:   Thank you.

14                THE COURT:  Mr. Garvin, you're going to have two

15      assistants?

16                MR. GARVIN:  Yes, your Honor.

17                THE COURT:  And who would they be?

18                MR. GARVIN:  To the right standing now is Alexandra

19      Garvin who is my law clerk and also oldest daughter attending

20      law school, and also to my right is Arlene Garvin, who happens

21      to run my office and is a paralegal, but is also my wife.

22                THE COURT:  So we have three Garvins.

23                MR. GARVIN:  Yes.  There is an abundance today.

24                THE COURT:  So I'll mention them in the voir dire.

25                MR. BELL:  Of course, your Honor.  Your Honor, we

J633MOO1

1    realize it may also make sense now for us to ask for a similar

2    order as to Mr. Haddow who is in custody, and who will also be

3    testifying just with respect to clothing.

4               THE COURT:  With respect to clothing, okay.  We can

5    include it in one order.

6               MR. BELL:  Thank you, your Honor.

7               (Recess)

8               THE COURT:  I've reviewed GX 817.  I think it's best

9    that it not come in as the exhibit, but that the government

10   will of course, as we discussed before, have the opportunity to

11   refresh a witness's recollection about something she might

12   otherwise testify to.  And also that the photo that's contained

13   in this article can also come in because it's part of some

14   other exhibit.

15              And the principal reason for it not coming in is the

16   timing, as it were.  The article is dated after the person who

17   is going to be called to testify, allegedly a victim, had

18   already made her investment so she didn't rely on this document

19   in any way to make her investment.  That's the ruling.  Thank

20   you.

21              We're anticipating the jury will be here at 10:30.

22   You all understand when we get to the peremptory challenges,

23   the defense has 10, and the government has six.  And then you

24   get one each for one or two alternates.

25              MR. GARVIN:  It was understood.

J633MOO1

1      THE COURT:  All right.  And we will be shooting for 14

2  jurors.

3      (Pause)

4      THE COURT:  Did you want something?

5      MR. GARVIN:  Yes, sir.  Your Honor, yesterday evening,

6  counsel advised me by sending me a memorandum of interview of

7  Mr. Haddow that Mr. Haddow mentioned for the first time in this

8  case that he had done cocaine with Mr. Moore.  And I told

9  counsel that I vehemently object to that being blurted out

10  during this trial.  Counsel has advised me they also agree it's

11  not relevant, and I said, well, please instruct Mr. Haddow.

12  While I do trust counsel implicitly, I don't have the same

13  feeling for Mr. Haddow, that he doesn't decide to blurt it out.

14  Because I will move for mistrial if he does, and counsel has

15  said that --

16      THE COURT:  If he does, I will direct the jury to

17  disregard and strike that answer.

18      MR. GARVIN:  So --

19      THE COURT:  I got it.

20      MR. GARVIN:  Thank you, your Honor.

21      THE COURT:  Okay.

22      (Recess)

23      (Voir dire under separate cover)

24      (Continued on next page)

25

J633MOO1

1        THE COURT:  Next step we're going to ask the jurors to

2    stand for a moment while Christine swears you in and gives you

3    the oath that you have to take as jurors.

4        (A jury of 12 and two alternates is impaneled and

5    sworn)

6        THE COURT:  I'm going to give you some preliminary

7    instructions.  You remember I said earlier that at the end of

8    the case, you'll get the fuller jury instructions, but this may

9    help guide you along the way.  It won't take very long, and

10   then we'll have opening statements from the government and the

11   defense.  Then we'll have our first witness.

12       So, now that you're sworn, let me tell you something

13   about your duties as jurors and give you these preliminary

14   instructions.  As I mentioned, at the end of the trial, I'll

15   give you more detailed instructions, and those are the

16   instructions, along with these, that control your

17   deliberations.

18       At the end of the presentation of evidence and my

19   final instructions or charges to you, it will be your duty to

20   decide from the evidence what the facts actually are in this

21   case.  You, and you alone, are the judges of the facts.  You

22   will hear the evidence, decide what the facts are, and then

23   apply those facts to the law which I will give you at the end.

24   That's how you reach your verdict.  In doing so, you must

25   follow the law, whether you agree with it or not.

J633MOO1

1        Under the law, as I mentioned earlier, a defendant is

2   presumed to be innocent, and he or she cannot be found guilty

3   of the crimes charged in the indictment unless and until a

4   jury, after having heard all of the evidence in the case,

5   unanimously decides that the evidence proves his or her guilt

6   beyond a reasonable doubt.

7        In a criminal case, the burden of proof remains with

8   the prosecution.  In order for the jury to return a verdict of

9   guilty, the prosecution must prove beyond a reasonable doubt

10   that a defendant is guilty.  A person charged with a crime has

11   absolutely no burden to prove that he or she is innocent.

12        You must not take anything that I may say or do during

13   the trial as indicating what your verdict should be.  For

14   example, don't be influenced by my taking notes.  What I write

15   down may have nothing to do with the trial or with what you are

16   concerned about at the trial.  And you also may take notes and

17   we'll give you pads and pen and paper.  But you should know

18   that your notes are just your notes.  They are not evidence in

19   the case.  You can refer to them to refresh your own

20   recollections, but jury notes are not evidence.

21        You decide what the facts are from the evidence that

22   will be presented here in court while we're in session.  That

23   evidence may consist of the testimony of witnesses, it may

24   consist of documents or other things received into evidence as

25   exhibits, and it may include any facts which the lawyers agree

J633MOO1

on or stipulate or that I may instruct you to find.  You will

have some stipulations, for example, in this case.  And when

that comes up, I think you'll understand exactly what to do

about those stipulations.

There are two kinds of evidence.  One is called

direct, and the other is called circumstantial evidence.

Direct evidence is testimony by a witness about what that

witness personally saw or heard or felt or did.  Circumstantial

evidence is indirect evidence, that is, it is proof of one or

more facts from which you can find another fact.

You may consider as jurors both direct and

circumstantial evidence in deciding this case.  The law permits

you to give equal weight to both kinds of evidence or none at

all, because it's up to you, the jurors, to decide how much

weight, if any, to give to any particular evidence.

As the sole determiners of the facts, you, the jurors,

must determine which of the witnesses you believe, what portion

of their testimony you accept, and what weight you attach to

it.

At times during the trial I may sustain an objection

to a question that's asked.  When that happens, I will not

permit the witness to answer, or, if, as sometimes happens, the

witness has already answered, I will instruct that the answer

be stricken from the record and that you disregard it and

dismiss it from your mind.

J633MOO1

1              In reaching your decision, you may not draw any

2       inference from an unanswered question, where an objection has

3       been sustained, nor may you consider testimony that I have

4       ordered stricken from the record.  The law requires that your

5       decision be made solely based on the evidence that is presented

6       to you.  The items I excluded from your consideration will be

7       excluded because they are not legally admissible as evidence.

8              The law does not, however, require that you accept all

9       of the evidence that I do admit.  In determining what evidence

10      you will accept, you must make your own evaluation of the

11      testimony given by each of the witnesses, and of the documents

12      presented to you, and determine the weight you choose to give

13      to each witness's testimony or to an exhibit.

14             Let's talk a minute about credibility of witnesses.

15      There is no magical formula by which you should evaluate

16      testimony or exhibits.  I will, however, give you some

17      guidelines for determining the credibility of witnesses.

18      Suffice it to say that you bring to this courtroom all of the

19      experience and background of your lives, and you do not leave

20      your common sense outside of the courtroom.  The same types of

21      assessments that you use in your every day dealings are the

22      assessments that you will apply in your deliberations.

23             You are the sole determiners of the credibility of

24      each witness and of the importance of witness testimony.  So

25      how do you determine where the truth lies?  You should use all

of the tests for truthfulness that you would use in determining

matters of importance in your every day lives.  You should

consider any bias or hostility that a witness may have shown

for or against any party as well as any interest the witness

has in the outcome of the case.  It is your duty to consider

whether the witness has permitted any such bias or interest to

color his or her testimony.  You should consider the

opportunity that the witness had to see, hear, and know the

things about which they testified, the accuracy of their

memories, their candor or lack of candor, their intelligence,

the reasonableness and probability of their testimony and its

consistency or lack of consistency, and its corroboration or

lack of corroboration with other believable testimony.

You watched the witnesses testify.  Everything a

witness said or did on the witness stand counts in your

determination.  How did the witness appear?  What was the

witness's demeanor while testifying?  Often it's not what

people say, but how they say it that moves us.

In deciding whether to believe a witness, keep in mind

that people sometimes forget things.  You need to consider,

therefore, whether in such a situation, if it comes up, the

witness's testimony reflects an innocent lapse of memory or an

intentional falsehood.  And that may depend on whether it has

to do with an important fact or with only a small detail.

It's not the number of witnesses called in a case,

J633MOO1

but, rather, their credibility when called to the witness stand that is directly at issue.

In addition, the fact that a witness may be employed as a law enforcement official does not mean that his or her testimony is deserving of more or less or greater or lesser weight than that of any ordinary witness.

If you find that any witness has willfully testified falsely as to any material fact, that is as to an important matter, the law permits you to disregard completely the entire testimony of that witness upon the principle that one who testifies falsely about one material fact is likely to testify falsely about everything. But you are not required to consider such a witness as totally unworthy of belief. You must accept so much of the witness's testimony as you deem true and disregard what it is that you feel is false. As the sole judges of the facts, you must decide which of the witnesses you will believe and what portion of their testimony you accept and what weight you will give to it.

Now, what's evidence? The questions and objections of the attorneys are not evidence, and neither is any testimony that I may instruct you to disregard. The statements and arguments of the attorneys during any part of the trial are also not evidence. Further, anything you may see or hear when the court is not in session, even if what you were to see or hear is done or said by one of the parties or by one of the

J633MOO1

| | |
|---|---|
| 1 | witnesses, that would not be evidence.  Only what is admitted |
| 2 | into evidence here in court when the court is in session and |
| 3 | jurors are present can be considered competent evidence. |

One final instruction, then I'll outline the stages of
the trial, and then we'll hear from the lawyers.

Burden of proof and reasonable doubt.  I said that the
government must prove the defendant guilty beyond a reasonable
doubt.  So the question naturally is, what is a reasonable
doubt?  Well, the words almost define themselves.  It is a
doubt based upon reason and common sense.  It is a doubt that a
reasonable person has after carefully weighing all the
evidence.  It is a doubt which would cause a reasonable person
to hesitate to act in a matter of importance in his or her own
life.

Proof beyond a reasonable doubt must therefore be
proof of such a convincing character that a reasonable person
would not hesitate to rely and act upon it in the most
important of his or her own affairs.  A reasonable doubt is not
a caprice or a whim and it's not speculation or a suspicion.
It's not an excuse to avoid the performance of an unpleasant
duty as a juror, and it's not sympathy.

In a criminal case, the burden is at all times upon
the government to prove guilt beyond a reasonable doubt.  The
law does not require the government to prove guilt beyond all
possible doubt.  Proof beyond a reasonable doubt is sufficient

1    to convict.  The burden, as we've said, never shifts to the

2    defendant, which means that it is always the government's

3    burden to prove each of the elements of the crimes charged

4    beyond a reasonable doubt.

5         If, after fair and impartial consideration of all the

6    evidence, you have a reasonable doubt, then it's your duty to

7    acquit the defendant.  On the other hand, if, after fair and

8    impartial consideration of all the evidence, you are satisfied

9    of the defendant's guilt beyond a reasonable doubt, then you

10   should vote to convict.

11        Please remember, this is a criminal case, and the

12   standard by which you will assess the evidence is, as I've said

13   before, proof beyond a reasonable doubt.

14        So, what you can expect to happen next is the lawyers

15   will summarize what they intend that the evidence will show.

16   First, each side through counsel may -- doesn't have to, by the

17   way -- make an opening statement.  An opening statement is not

18   evidence.  It is an outline of what that party intends to prove

19   or what that party believes the evidence will show, and it's

20   offered to help you follow the evidence.

21        Next, the prosecutor will present witnesses, and the

22   defendant may cross-examine them.  And then the defendant may,

23   but doesn't have to, present witnesses, and the prosecutor gets

24   to cross-examine any defense witnesses.

25        After that, the attorneys will make their closing

J633MOO1                           Opening - Mr. Bell

1    arguments to summarize and give you their interpretation of

2    what the evidence that's been presented shows.  The prosecutor

3    will go first, defense counsel second, and then, in our system,

4    the prosecutor gets a brief reply, goes third.  So, like

5    opening statements, though, the closing arguments are not

6    evidence.

7            After these summations, I will give you instructions

8    in somewhat more detail on the law that applies, and then you

9    will retire to deliberate on your verdict.

10           So, please do not make up your mind about what the

11   verdict should be until after I have instructed you on the law

12   at the end of the case, and you've gone to the jury room, and

13   you and your fellow jurors have discussed the evidence.  Keep

14   an open mind until then.  Both sides deserve and the law

15   requires that you give them an opportunity to be fully heard.

16           So we'll hear now from the prosecutor, and then

17   defense counsel, then we'll have our first witness.

18           MR. BELL:  Thank you, your Honor.  With the Court's

19   permission?

20           THE COURT:  Yes, sir.

21           MR. BELL:  Good afternoon.  When someone tries to sell

22   you on an investment, it's important that they tell you the

23   truth about the business that they're trying to get you to

24   invest in.  And when someone does the opposite of that, when

25   they lie to you in order to convince you to invest, when they

J633MOO1                         Opening - Mr. Bell

1    lie to separate you from your money, there is a word for that.

2    It's called fraud, and it is a serious crime.

3          This is the case of one such fraud.  It's about how a

4    circle of business insiders used a lie, a very basic and

5    important lie, to separate investors from their money, and get

6    them to invest in a company called Bar Works.  And it is about

7    how that very basic lie, a lie about something as simple as who

8    was behind that company separated investors from their money,

9    and convinced those investors that they were sending their

10   hard-earned money to responsible businesspeople, rather than to

11   corrupt con men.

12         This man, the defendant, is one of those men.  His

13   name is James Moore.  Beginning in 2015, you'll learn,

14   Mr. Moore joined in a criminal enterprise to convince people,

15   through lies, to invest in that company, Bar Works.  And the

16   cornerstone of that fraud was one very basic lie:  The identity

17   of the company's CEO, the identity of who was in charge.

18   According to the lie, the person who was in charge of Bar

19   Works, the CEO, was a person named Jonathan Black.

20         But ladies and gentlemen, you're going to learn that

21   Jonathan Black wasn't the CEO.  Jonathan Black didn't even

22   exist.  The real CEO, the real person behind the curtain at Bar

23   Works, was an individual named Renwick Haddow, a known

24   fraudster.

25         Had the investors known that Mr. Haddow, who had a

J633MOO1                          Opening - Mr. Bell

1  lengthy record of fraud and suspicious business dealings, was

2  the real person behind Bar Works, they would not have touched

3  that company with a 10-foot pole.  They would never have

4  invested in it.

5         But invest they did.  And they did it, in part,

6  because the defendant, Mr. Moore, helped make it happen.

7  Mr. Moore put together the materials that advertised Bar Works,

8  including the lie that Mr. Black was the CEO, and so he helped

9  to package the lie.  He brought in a sales force, an army of

10 sales agents who would parlay that lie to potential investors

11 and use that, among other information, in order to get them to

12 invest.  And he helped Mr. Haddow navigate the sometimes

13 difficult territory of having an alias, of having a secret

14 identity, thus helping to conceal the truth that Mr. Haddow was

15 the real person behind Bar Works.

16        And he benefited.  He profited from this lie.  You're

17 going to learn that Mr. Moore personally received upwards of a

18 million and a half dollars over just over a few short months

19 over the course of this scheme.

20        Eventually, word got out about what the truth was.

21 The scheme fell apart.  Investors were more cautious, and as

22 sometimes happens in these schemes, the whole house of cards

23 came crashing down.  And Mr. Moore, he started a new competing

24 business, even before that, and he and Mr. Haddow had a falling

25 out.

1            But by the time it was all said and done, the sales

2     agents that Mr. Moore had enlisted had brought in almost 7 --

3     more than, rather, $7 million, and Mr. Moore's cut, as you

4     heard, was a million and a half of that.

5            So, ladies and gentlemen, this is a case fundamentally

6     about lies.  Lies to get money from innocent people.  That's

7     fraud, plain and simple.

8            In this opening statement, the government has an

9     opportunity to essentially create a preview for you of what it

10    is that you are going to see over just the next few days, and

11    there are really only two simple things that I wanted to

12    accomplish over the course of this opening statement.  First, I

13    want to give you a little bit of a more detailed sense of what

14    it is that the evidence is going to show you over the next few

15    days.  And second, I want to give you a sense of how it is that

16    the government is going to prove all of this to you.

17           So, what's the evidence going to show?  The evidence

18    is going to show that Mr. Moore had a history of involvement in

19    various real estate ventures and other business opportunities

20    that involved recruiting investors.  This is an experienced,

21    and something of an expertise that he had, and you'll learn

22    about exactly what that experience was.

23           Mr. Moore had been involved in a number of ventures,

24    both in the United States and in Great Britain, and some of

25    those ventures in Great Britain he had run with a friend of

J633MOO1                          Opening - Mr. Bell

1    his, and that friend was Renwick Haddow.  Mr. Haddow also had a

2    history of running these sorts of business ventures, but

3    Mr. Haddow particularly had a record of having all of those

4    ventures end in pretty much the same way:  With investors

5    losing most or all of their money.  What's worse, some of those

6    ventures weren't just failures, they were frauds.  They were

7    based on lies, they broke the law, and they wound up getting

8    Mr. Haddow, a native of Great Britain, into a lot of trouble

9    with the law in his native country.  These were facts that were

10   known; these were facts that were publicized.

11           And it's in part because of these facts that, in 2015,

12   Mr. Haddow essentially fled Great Britain to start a new

13   business opportunity in the United States, and that new

14   opportunity was a company called Bar Works.  Bar Works was

15   supposed to be one of those work share or work space companies,

16   like We Work, which we learned this morning a lot of people

17   seem to know a little bit about.  But for those of you who

18   don't, the way this these coworking spaces work to essentially

19   provide a space for young entrepreneurs and businesspeople to

20   get together and share common amenities and a sense of

21   community, and to use as workspaces for individual work or

22   meetings and the like.

23           And the way that Bar Works was supposed to work as a

24   business opportunity was for investors in Bar Works to

25   essentially develop, put in money, and get back a financial

J633MOO1                          Opening – Mr. Bell

1   interest in individual workspaces that could be rented out to

2   the public.  As the public rented those spaces, the investors

3   would supposedly make money.  And Bar Works promised that some

4   of that money was guaranteed, even if the spaces weren't

5   themselves rented.

6         It sounds like a pretty good idea, something that

7   might be appealing to an investor.  But there was a problem.

8   And that problem was Mr. Haddow's reputation.  If you Googled

9   Mr. Haddow at the time, you would have found out a number of

10  unfortunate things about his reputation.  That in the 2000s

11  Mr. Haddow had been barred, had been banned from serving as an

12  officer on any registered company in Great Britain.  You would

13  have also learned that Mr. Haddow, again in Great Britain, had

14  been cited for running what are called unauthorized collective

15  investment schemes.  If you're wondering what those are, your

16  suspicion is probably right.  Nothing good.

17        And so there was a real problem for Mr. Haddow and

18  people like the defendant who wanted to invest, who wanted to

19  get people, rather, to invest in this venture.

20        Now, that was the problem.  What was the solution?  It

21  was fraud.  The solution was for Mr. Haddow to develop an alias

22  that would wipe his slate clean and allowed him to start over

23  without the burden of his reputation.  And that solution was

24  the name Jonathan Black, who would be pitched as the CEO of Bar

25  Works.

1          But Mr. Haddow couldn't do that pitching job alone.

2     And so he reached out to his friend, the defendant, Mr. Moore.

3     Somebody who knew all about his past history, but didn't mind

4     getting together with him on what could be a profitable

5     venture.  Mr. Moore, among other things, helped Mr. Haddow

6     enlist a company and a small army, really, of sales agents, who

7     could help to get the word out with respect to Bar Works.

8          You see, Mr. Moore had a preexisting relationship with

9     a company called the United Property Group or UPG, a company

10    that basically existed to sell things for you.  And so, the

11    defendant brought in UPG in order to get the word out about Bar

12    Works.  And at the end of the day, he would get a commission

13    for each sale that UPG brought in, and UPG itself would get a

14    commission.

15         How important was the defendant to this sales

16    operation?  Well, you'll learn that for every dollar's worth of

17    investment that Bar Works picked up, UPG and Mr. Moore

18    personally, the defendant personally, would each get roughly

19    30 percent, 30 cents on that dollar.  65 percent all told

20    spoken for before any of that money got back to the likes of

21    Mr. Haddow.  That's how important the defendant was to making

22    this scheme work.

23         So you'll learn that the defendant and Mr. Haddow

24    worked together in order to put together materials that would

25    advertise Bar Works as an investment opportunity.  Materials

1    that would contain the same lie about Jonathan Black as CEO.

2    He would recruit and manage these salespeople on behalf of

3    Mr. Haddow, and he would help him negotiate those circumstances

4    where they might have trouble getting a CEO to show up where a

5    CEO might otherwise be expected to show up, because, in this

6    case, the CEO didn't exist.  And this was something that they

7    discussed, and they worked their way around together.

8          Why did Mr. Moore do this?  Well, you already know the

9    answer:  To profit.  And he was a sufficiently important part

10   of this scheme that he was able to take in, at the end of the

11   day, a million and a half of the investments that Bar Works

12   and, within that, UPG brought in.

13         This went on for a period of months from 2015 into

14   2016.  In 2016, Mr. Haddow and the defendant had a falling out,

15   and the defendant decided to start a competitor of sorts,

16   another business, and eventually their relationship broke down,

17   and the defendant was no longer actively involved in this

18   scheme.  But the scheme continued for a time, until it was

19   eventually and perhaps inevitably discovered that there were

20   real problems with the business, that Jonathan Black wasn't

21   real.  And so the whole thing fell apart.  The press got

22   involved, legal authorities got involved, and that was

23   essentially the end of Bar Works.

24         But at the end of the day, those investors, they

25   didn't get the money back that they were ultimately promised,

1   the periodic rental incomes that were supposed to start coming

2   in regularly.  And they lost, you'll hear, their initial

3   investments into the company.

4           So that, ladies and gentlemen, is essentially what

5   you're going to hear about the defendant and his role in this

6   criminal scheme.  So that's what we expect the evidence in this

7   case is going to show.

8           How is the government going to prove it?  Well, first

9   of all, you're going to see a pretty good number of e-mails,

10  e-mails involving Mr. Moore, e-mails involving Mr. Haddow,

11  e-mails involving other people who were involved with Bar Works

12  and UPG.  You are going to see upon reviewing these e-mails

13  that there was no doubt that the defendant knew that Jonathan

14  Black wasn't real, knew that, despite his not being real,

15  Jonathan Black was the lie that was being pitched to potential

16  investors, and knew that Renwick Haddow was really the person

17  who was in charge of Bar Works, the person who was behind the

18  curtain.  The person who had all of that history, the person

19  whose identity would have actually mattered to potential

20  investors into the company.

21          So this is stuff that you'll see in e-mails between

22  and amongst people.  I'll give you an example.  There is one

23  category of e-mails in which Mr. Haddow and the defendant

24  talked to each other about what they would call the Jonathan

25  issue.  That is to say, Jonathan should actually show up some

J633MOO1                    Opening - Mr. Bell

1    place, what are we going to do.  There was an obvious reason

2    for that question, because Jonathan Black didn't exist.  And

3    because the parties to that e-mail, including the defendant,

4    knew it.

5         What other evidence are you going to see and hear?

6    You're going to hear testimony from several victims, people who

7    invested in Bar Works based on the lie that was Jonathan Black.

8    Among other things, you'll hear from them that had they known

9    that Jonathan Black was fake, had they known that Renwick

10   Haddow or someone with Renwick Haddow's problems and history

11   was in fact behind the company, they would have never invested

12   thousands of their hard-earned dollars into that company.  So

13   that you'll hear from some of the investors themselves.

14        You'll also hear from people who worked at Bar Works

15   who came to realize, after time, that something was very wrong

16   with the leadership at the company, that Jonathan Black wasn't

17   who he seemed to be, and that there were reasons for people

18   like Mr. Haddow and the people who coordinated the sales

19   agents, like Mr. Moore, to have something to hide.

20        Ladies and gentlemen, you will also hear from

21   Mr. Haddow himself.  Mr. Haddow didn't appear in any of those

22   materials that were sent out in order to pitch investors on Bar

23   Works, but he will appear in this courtroom.  You'll learn that

24   Mr. Haddow was arrested at one point, and is now appearing

25   pursuant to a cooperation agreement, and he'll give you an

J633MOO1                    Opening - Mr. Bell

1    insider's view into this criminal scheme.  About how it

2    started, about how Mr. Moore got involved, about how they

3    nurtured and knew about and discussed the lie that was Jonathan

4    Black's presence at the helm of the company, and about how they

5    made this scheme work for months, collecting tens of millions

6    of dollars from hundreds of investors.

7         Mr. Black is -- Mr. Haddow, rather, is going to tell

8    you that there was no ambiguity, that there was no mistaking

9    that Mr. Moore knew about the Jonathan Black lie and helped to

10   support it by working with him on those investment pitch

11   materials, by helping to keep the sales army afloat through his

12   contributing the link to the UPG company.  And Mr. Haddow is

13   going to tell you how it all went down and how it ended.

14        Now, I mentioned that Mr. Haddow is going to testify

15   pursuant to a cooperation agreement.  He's going to be

16   testifying in the hopes of getting leniency at his own

17   sentencing.  Because as part of his cooperation, he pled

18   guilty, not only to fraud investing Bar Works, but to a

19   separate fraud.  And he told the FBI and the government about

20   his involvement in other frauds that he had been involved in in

21   the past.  You're going to hear about all of this from him.

22        I kind of wish we could have somebody without all of

23   that history testify to you about the frauds, but it is a

24   relatively rare thing to have priests and nuns involved in

25   these kind of schemes.  To get an insider's view of the fraud,

1    you have to talk to a fellow fraudster, so you are going to

2    hear about all of this from Mr. Haddow.

3              Now, make no mistake, Mr. Haddow has committed serious

4    frauds.  Not only here, but in the United Kingdom.  So you

5    should scrutinize his testimony very, very carefully, and you

6    should ask yourself whether it meshes with the other evidence

7    that you're going to see and hear.  With the e-mails, with the

8    testimony of victims, and of workers at Bar Works.  And when

9    you do, you're going to ultimately conclude, we expect, that it

10   does.  That it all corroborates Mr. Haddow's account.

11             You're also going to be able to follow the money.

12   There are going to be bank records put into evidence that give

13   you a sense of the tens of millions of dollars that Bar Works

14   took in over the life of this scheme, a significant amount from

15   UPG and Mr. Moore.  UPG was Mr. Moore's company.  And you're

16   also going to see through those records and some summaries of

17   those records, how much Mr. Moore, the defendant, took in as a

18   result of that fraud.  Upwards of one and a half million

19   dollars.  One and a half million dollars of investor money,

20   hard-earned money, taken under false pretenses.

21             So that, ladies and gentlemen, is what we expect the

22   evidence to tell you.  I should note one thing about

23   Mr. Haddow.  Mr. Haddow lied about Bar Works to the investing

24   public, aided by the defendant.  But that wasn't the only lie

25   that Mr. Haddow and the people who worked with him as part of

1    this scheme told while it was going on.  They told lies about

2    how well Bar Works was doing, about what investor money was

3    actually being used for.  A number of lies about whether Bar

4    Works was really viable as a longterm business.

5         You're going to learn that Mr. Haddow and Mr. Moore

6    were not the only people who were telling lies on behalf of Bar

7    Works.  But, ladies and gentlemen, I want to focus you here.

8    This case, this trial, is about one participant in this scheme,

9    the defendant.  And it's about one lie, the lie that was

10   Jonathan Black's supposed presence at the head of the company.

11   So focus on that.  Because that's what is at issue in this

12   trial.

13        At the end of the trial we'll have an opportunity to

14   speak with you once again.  But until then, I am going to ask

15   you to do just three things.  First, I'm going to ask you pay

16   careful attention to the evidence and the testimony as it comes

17   in, to the documents as they're put into evidence, and to the

18   witnesses as they take that witness stand.  Second, I am going

19   to ask you to listen closely to and to follow Judge Berman's

20   instructions on the law.  And third, and finally, I am going to

21   ask you to use your common sense.  The same common sense that

22   gets you through everyday life.

23        If you do those three things, I expect that we'll have

24   had a fair trial, and I expect that you'll reach the only

25   verdict consistent with the evidence and the testimony that you

J633MOO1                    Opening - Mr. Garvin

1   are about to see and hear.  That the defendant, Jim Moore, is

2   guilty as charged.  Thank you.

3            THE COURT:  Thank you.  Counsel?

4            MR. GARVIN:  Thank you, your Honor.

5            Good afternoon, ladies and gentlemen.  My name is

6   David Garvin.  It's my honor to represent James Moore in this

7   case.  And I'd like to also tell you what the facts in this

8   case will establish, and what the details are so that the

9   details aren't just swept over to get a conclusion.

10           James Moore, we will find, was indeed from England,

11  and we will know that in 2000 through 2008, James Moore didn't

12  even know who Haddow was.  Renwick Haddow did not register with

13  James Moore.

14           The evidence will show that what James Moore did was

15  quite remarkable.  Almost astounding.  James Moore started a

16  company called Inside Track Seminars.  And Inside Track

17  Seminars, what they did was, they held seminars for common

18  people to learn how to invest in real estate in England.

19  Because up until that period of time in England, the financial

20  structure was such that you could borrow money, get a mortgage

21  based upon your own income, but not the income from your rental

22  property.

23           When Margaret Thatcher took over as the prime

24  minister, James Moore saw an opportunity, because she ushered

25  in an era in England where you could get qualified for a

J633MOO1                          Opening - Mr. Garvin

1   mortgage to purchase rental property, that is property you

2   intend to rent out, and he started a seminar business.  And

3   that business grew to be one of the largest in all of England,

4   and perhaps even Europe, and ultimately employed over 400

5   people, and spent over a million dollars a month on

6   advertising.

7        And what happened, one day Mr. Moore saw in the back

8   of the room, he saw all of his students congregating around one

9   former student.  And he learns that that former student had

10  represented a developer, and that all the students that were

11  graduating from Mr. Moore's Inside Track Seminar business were

12  interested in buying a piece of property.

13       So Mr. Moore formed a second business, and that was

14  called Instant Access Properties.  And the way that Instant

15  Access Properties worked was they went to developers, and then

16  had the developer agree that the developer could present its

17  project at a Inside Track Seminar, if the developer agreed to

18  give a 10 to 15 percent what we would say discount on the price

19  to the students.  And what you do is you would purchase a

20  membership with Inside Track, and that membership would cost

21  you 3 percent.

22       And so, what happened?  What happened was that a huge

23  amount of people wanted to learn how to invest, and over 150

24  people weekly would come to the seminars, and then they would

25  join Instant Access Properties by paying a registration fee of

J633MOO1                          Opening - Mr. Garvin

1   3 percent, and they would acquire a property of their choice,

2   unrelated developer, at a 15 percent discount.  The developer

3   sold their units without paying any marketing expenses and any

4   real estate commissions.  The purchasers, the former students,

5   were buying the properties at a 15 percent discount, and

6   Mr. Moore's business would receive the 3 percent from the dues

7   from its participants.

8          Well, that business became so successful, by 2006,

9   that companies wanted to buy Mr. Moore's business.  But they

10  also told Mr. Moore that it would be attractive if Mr. Moore's

11  business was not limited to England, but also covered parts of

12  Europe and the United States.  And Mr. Moore would need to have

13  a professional management team, because if he sold the company,

14  no one wanted to buy a company in which it depended upon

15  Mr. Moore if Mr. Moore was going to retire.

16         So Mr. Moore took that advice and he formed two new

17  companies called Leadenhall and Darrencrest, and they handled

18  the sales of properties outside the United States.  So, the

19  management team was a former diplomat of the United Kingdom and

20  a lawyer from one of the leading law firms in all of England,

21  and a high-ranking member in Richard Branson's Virgin

22  conglomerate.

23         Well, they went ahead and ran this business and they

24  entered an agreement with a gentleman by the name of Paul

25  Oxley.  Paul Oxley had built a beautiful resort, and you will

1   learn this, and the problem was that it was getting near

2   completion but only 10 percent of the units were sold, in

3   Orlando, Florida, very near Disney World.  And Paul Oxley knew

4   of Inside Track and knew of Instant Access Properties because

5   he was British and he talked with Neil Storey, the former

6   diplomat who was part of Mr. Moore's team, and reached an

7   agreement to have a property that he had developed, Bahamas

8   Bay, introduced to the Instant Access people and it sold out.

9          And after that, you will learn that Paul Oxley then

10  wanted to do an even bigger project, the largest he had ever

11  done, and that was called Lake Austin Grand Palisades.  1750

12  unit resort.  Ladies and gentlemen, you will learn that

13  Mr. Moore and the management team approached Paul Oxley and

14  said we would like to do something of this scale with you, but,

15  instead of simply selling and being what would be considered

16  sales agents, we'd also like to have a percentage of the net

17  profit at the end.  And so Mr. Oxley agreed.

18         What you will learn from that, ladies and gentlemen,

19  is that Mr. Oxley formed Lake Austin, and he controlled Lake

20  Austin.  He owned 50 percent, he and his company, Maesbury

21  Homes of Lake Austin; James Moore and his companies owned

22  35 percent; and the management team that we had just discussed

23  and their companies owned 15 percent.

24         What you will learn is that everything appeared to be

25  going smoothly, and then it happened.  2007, 2008 the entire

J633MOO1                        Opening - Mr. Garvin

1    real estate market collapsed.  And when it collapsed, it

2    affected everybody and it virtually wiped out in a matter of

3    months Mr. Moore's business.  Inside Track Seminar no longer

4    had students.  Instant Access Properties no longer had

5    memberships.  And more troublesome, people who put deposits on

6    properties such as Lake Austin, those properties were no longer

7    valued at they were only a year before.  And as a result, the

8    banks did not want to close and Lake Austin went into

9    foreclosure.  $250 million worth of bank loans in those

10   foreclosures.

11          And what happened was that, as you will see, Paul

12   Oxley had dealt with the 1750 people and had put a provision in

13   his contracts that he would not use any part of that deposit

14   for anything other than construction, which means he would not

15   use it for marketing.  But, when everything failed, it came out

16   that Paul Oxley did use it for marketing.  And Paul Oxley knew

17   that he was in big trouble because of the size of the bank

18   losses.

19          You will learn, ladies and gentlemen, that Paul Oxley

20   came to Mr. Moore and said you need to sign documents saying

21   that all the money that was paid to Darrencrest, Leadenhall,

22   Inside Track, and Instant Access, your four companies, was just

23   a loan that would be refunded.  Mr. Moore, you will learn,

24   refused to sign the documentation, and a confrontation ensued,

25   and Mr. Oxley left.  That occurred, ladies and gentlemen, in

1   2009.

2          Now Mr. Moore was forced into bankruptcy, his wife

3   filed for divorce, and by and large he was retired out of work

4   in 2010.  In this time, 2010, 2011, he was introduced to

5   Renwick Haddow.  He didn't know Renwick Haddow.  Mr. Moore was

6   with somebody who said, oh, I got to go meet a person, and come

7   with me, so James Moore went with him.  And he said this is

8   Mr. Haddow, that's Mr. Moore, Mr. Moore said hi.  That was the

9   extent of their meeting at that time.

10         Mr. Moore attempted to get back on his feet in the

11  years that followed, and the way that he did that was that he

12  obtained some property in Spain and he was going to build 250

13  homes and call it Monterey.  You'll hear and learn that

14  Mr. Moore approached United Properties Group that counsel

15  referred to and asked them to sell the units.  But you will

16  also learn, ladies and gentlemen, that it was going very

17  slowly, because in Spain, the persons that were in the real

18  estate market hadn't fully recovered from the depression that

19  went into the real estate market in 2008, and they were having

20  a difficult time making sales.  As a result, UPG did not have

21  much in the way of enthusiasm.  You will learn that UPG is a

22  company that specializes in real estate sales, and employs

23  approximately 80 people.

24         Well, Mr. Moore decided to call Renwick Haddow.

25  Because a few years earlier, in or about 2012, Renwick Haddow

J633MOO1                         Opening - Mr. Garvin

1    was trying to market something called Room to Invest.  Room to

2    Invest was the rough equivalent of a timeshare for hotel rooms.

3    He had discussed this project with Mr. Moore.  Mr. Moore had

4    asked him if he would like to use a piece of property that he

5    got in his divorce that was located in Barbados to construct a

6    hotel for Room to Invest.  But Mr. Haddow told Mr. Moore he was

7    only interested in businesses he completely controlled, and he

8    wasn't interested in developing Mr. Moore's property in

9    Barbados.  Well, that lasted a few weeks, Mr. Moore tried and

10   tried and finally gave up.

11        Ladies and gentlemen, you will hear Mr. Haddow in this

12   case try to paint a story that he was somehow Jim Moore's

13   buddy.  That somehow Jim Moore went into business with him, and

14   that they shared commissions.  But you will not see any

15   credible evidence of that, and the credible evidence in this

16   case will show that they have an opportunity to be in business,

17   and Mr. Haddow rejected it, and they went their separate ways.

18        Well, now we are in 2015.  We are in the summer,

19   August, and Mr. Moore has called Mr. Haddow because he needs to

20   find somebody who has a sales group that will sell the houses

21   for Monterey, the developer.  And Mr. Moore recalls that when

22   Mr. Haddow visited Miami Beach he called him, and Mr. Haddow

23   said he was with his fiancée, and he knew that Mr. Moore lived

24   with his wife in South Beach.  And so, Mr. Moore had agreed to

25   meet him on the water at Smith & Wollensky for a drink.

J633MOO1                    Opening - Mr. Garvin

1     Mr. Moore took a picture of the two together.

2              And so Mr. Moore called him and said, hi, this is Jim

3     Moore, would you know anybody that wants to sell Monterey.  And

4     Mr. Haddow told him no, I've got a better idea.  Why don't you

5     come and try to help sell the business that I have, I have

6     something really special.  And what did he have?  He had Bar

7     Works.  And he told Mr. Moore that he was going to use the same

8     business plan as We Work, and Mr. Moore recognized We Work.

9     And so Mr. Moore said, well, I don't want to be anybody's sale

10    agent.  And Mr. Haddow said, well, think about it.

11             So Mr. Moore hung up the phone, and he researched We

12    Work.  And when he saw how explosive We Work's growth has been

13    over the past five years, he became very excited at the

14    prospect of being in that same industry.

15             Now, he approached UPG to see if they would be

16    interested, and he approached Neil Storey, the diplomat to see

17    what he thought.  You will learn, ladies and gentlemen, that

18    James Robinson, the head of UPG, United Properties Group, found

19    Haddow on the internet had some questionable dealings that were

20    under investigation by the Finance Control Authority of

21    England, and Haddow had been selling properties in Africa and

22    in the rain forest, and it was being questioned whether or not

23    the business that Haddow was in had to be registered.  So James

24    Robinson had his reservations about doing any business with

25    Mr. Haddow.

J633MOO1                    Opening - Mr. Garvin

1            So, you will hear that Mr. Moore inquired to

2    Mr. Haddow and said who is running your company?  And

3    Mr. Haddow said I know I have some luggage, but I'm confident,

4    my lawyers are confident that I am going to prevail, so I have

5    stepped back, like so many other companies with CEOs have, and

6    we have hired a professional to be the CEO of Bar Works, his

7    name is Jonathan Black.

8            Ladies and gentlemen, you will learn that Mr. Haddow

9    had Bar Works and predecessors to Bar Works and the private

10   placement offerings for those entities before August of 2015

11   when this conversation is taking place with Mr. Moore.  He had

12   them back early in 2015, and he used the name Jonathan Black.

13   But that wasn't the only alias he used.  You will learn that

14   his other entities that he used other aliases.  You will learn

15   that he has done some very outrageous things, all the while

16   telling people that he is steadfast, believes that everything

17   is being run properly.

18           Ladies and gentlemen, you will learn from the evidence

19   that Mr. Haddow does not deserve your respect.

20           Well, Mr. Moore was satisfied with Mr. Haddow's

21   explanation that Jonathan Black, whose main office was in

22   London, was operating the business.  And you will learn that

23   the overwhelming majority of the e-mails in this case were

24   provided by Mr. Moore voluntarily.  Even the e-mails where

25   counsel referred to you earlier about what are we going to do

1        about the Jonathan Black issue was provided by Jim Moore.

2                Well, Jim Moore arrived on or about October 11 of 2015

3        to see Bar Works in New York for himself.  Mr. Moore was living

4        in Spain and in Miami, Florida, and he came with his wife and

5        he saw, and he was extremely excited by what he saw.  You will

6        see that there was a facility that was on the verge of being

7        opened on 39th Street, and that the second one was incredibly

8        in the center of Times Square.  Mr. Moore could not hold back

9        his excitement.  He really thought this was going to be the

10       next We Works.

11               He told Mr. Neil Storey, the diplomat, and he told

12       James Robinson, who was reserved and had reservations about

13       Haddow, gentlemen, this is going to be a success beyond your

14       wildest dreams.  We're all going to make a lot of money.  Not

15       illegally.  Legally, like We Works did.

16               And Mr. Moore told Haddow, listen.  I don't want to be

17       a salesman, I want to be a part owner, I want to have equity.

18       This thing is going to be big.  Well, Mr. Moore only visited

19       Bar Works here in New York a handful of times.  And you'll

20       learn that when he visited, each time Haddow told Mr. Moore

21       that Jonathan Black was not here in New York, he was in his

22       office in London.

23               (Continued on next page)

24

25

1              MR. GARVIN:  Ladies and gentlemen, by March of 2016,

2     five short months later, Mr. Moore started to suspect that Mr.

3     Haddow was not being honest.  He couldn't prove it, but he

4     suspected it.  And as counsel earlier said, the facts will show

5     that Mr. Haddow was operating this business strangely.  That is

6     correct, the facts will show that.  What it will also show is

7     that Mr. Moore was the only one who was willing to call out.

8              So, Mr. Moore in March is coming for his approximately

9     third or fourth time to borrows, and on this occasion he and

10     Mr. Neil Storey were paying the way for a group of salespeople

11     from Dolphin Properties to visit.  And naturally they wanted to

12     meet with Mr. Haddow and -- excuse me -- and Mr. Black.  And so

13     when Mr. Moore spoke to Mr. Haddow -- because he had never

14     spoken with Mr. Black -- he wanted to arrange it, and then

15     Haddow told him once again Mr. Black isn't there, Mr. Black is

16     in London.  And Mr. Moore, you will find out, said, what do you

17     mean?  I'm paying out of my pocket thousands of dollars to

18     bring these people from Europe here, and now when they get here

19     you want me to tell them that the CEO is in Europe where they

20     just came from?

21              You will hear that Haddow had no answers; he just told

22     Mr. Moore heh.  And you will hear that Mr. Moore was writing

23     that e-mail saying, what are we going to do about the Black

24     issue.  That was the issue.  He wasn't there.  And Mr. Moore

25     sarcastically wrote to him saying, what do you want me to do,

1   tell them he is on his honeymoon?

2              Ladies and gentlemen, you will hear that a meeting

3   took place, and Mr. Haddow was standing here, and some 50 feet

4   away were the people from Dolphin, and he would not walk 50

5   feet over and introduce himself, despite Mr. Moore trying to

6   cajole him to do so.

7              Mr. Moore was not hiding Haddow.  You will see scores

8   of e-mails in this case that came from James Moore voluntarily,

9   and he writes them to Haddow.  He doesn't write them to Black.

10  And he carbon copies, ccs other people.  You will learn from

11  the evidence that Mr. Moore wasn't trying to hide Haddow.  If

12  anything he was exposing him.

13             But then the straw that broke the camel's back was

14  when Mr. Moore brought Sean Phillips to become the membership

15  manager candidate, Sean Phillips had in his resume that he

16  successfully worked at one of England's best physical fitness

17  centers and had enlisted hundreds of thousands of members, and

18  Haddow wouldn't even talk with Mr. Phillips.  He was so rude to

19  him after he came all the way to New York, and instead

20  Mr. Haddow said that his new wife of approximately 26 years old

21  with no experience would be the membership director and he

22  didn't need Sean Phillips.

23             At that point, Mr. Moore, Mr. Storey decided that's

24  it, let's go for a walk, and you will hear they went for a walk

25  and they decided we're done, this guy is a maniac, he's out of

J637MOO2                          Opening - Mr. Garvin

1    control, we're done.

2              Ladies and gentlemen, you will also learn that

3    Mr. Moore did something else.  He purposely changed the contact

4    information to Renwick Haddow, and he put it on an e-mail to

5    Jonathan Black at Renwick Haddow's e-mail address, so that you

6    had Black and Haddow side by side on that e-mail, and he sent

7    it, and he sent it to two employees in the business also.  He

8    sent it to call him out.  He was waiting for the reaction.  He

9    was in essence saying are you Jonathan Black?

10             What you will hear is no reply.  Jonathan Black

11   pretended -- excuse me -- that will show you how

12   interchangeable they really are -- Renwick Haddow didn't even

13   reply.  He pretended like it never happened.  And the two

14   employees, they didn't reply either.

15             Mr. Moore started to scratch his head and say, wow,

16   maybe I overreacted, maybe I've got this wrong.  But it didn't

17   matter; he was leaving.  And you will hear from the evidence

18   that they formed in March, approximately March 26, a company

19   called Our Space, and Our Space was going to do what We Works

20   does, but it was going to do it in Europe and Dubai.

21             Well, this was the spring of 2016, and in the spring

22   of 2016 there was no more money that was getting paid to

23   Mr. Moore, and there was very little if any money that was

24   getting paid to United Properties Group.  And you heard a few

25   moments ago how United Properties Group had raised about $7

1  million, well, I believe the evidence in this case is going to

2  show you that Haddow raised in total a lot closer to $38

3  million, and that we will see in this case what he spent the

4  money on:  Yachts and homes and fancy cars.

5          Ladies and gentlemen, Haddow found out about UPG, and

6  even though Mr. Moore tried to be civil and be nice as he

7  departed, Haddow confronted him.

8          Now, Mr. Moore and UPG were owed a lot of money for

9  the work they did.  They tried to be nice because they wanted

10  to get paid, but it didn't work.  So, by June it was over.

11  Mr. Haddow continued in business doing everything that he did

12  with Jonathan Black, etcetera, all through 2016 and into 2017,

13  and it had nothing, not a scintilla to do with Mr. Moore.

14          However, Mr. Moore had his own headaches.  You will

15  remember and you will learn that Mr. Moore's companies had sold

16  Bahama Bay and Lake Austin, and Paul Oxley had used deposit

17  money to pay working expenses he wasn't supposed to, which made

18  all 1750 of those contracts voided.

19          Well, Mr. Moore came to the United States on

20  Valentine's Day in 2017, and when he came he was arrested.  He

21  was not arrested for Bar Works; he was arrested because of Paul

22  Oxley.  And ultimately Mr. Moore when arrested sat down with

23  the agents and answered all questions for approximately two

24  hours.  And I believe that you will see excerpts from that

25  during this case.

1          Well, you will also learn that Mr. Moore voluntarily

2     was interviewed by the SEC who were investigating borrowers,

3     and he answered all their questions, and you will hear excerpts

4     of that during this trial also.

5          Ultimately, Mr. Moore was charged with a crime, but

6     the crime had nothing to do with Bar Works.  The crime was what

7     is called a misprision of a felony.  That is the failure to

8     report a federal crime but instead allowing it to stay

9     concealed.  You will learn that in England there is no such

10    crime and that Mr. Moore did not know there was such a crime.

11    But that doesn't matter, the bottom line is that when Paul

12    Oxley told Mr. Moore what he had done, Mr. Moore had found out

13    that that was against the law and he should have reported it.

14    Mr. Moore did not report that.  Instead, back in 2009 Mr. Moore

15    tried to be part of a team to resurrect Lake Austin, because

16    they thought that surely so close to Disney World that prices

17    will recover, and the only way for everyone to not be hurt by

18    investing in Lake Austin would be to close and hang in there

19    until the prices recovered, which they did.  Unfortunately,

20    that never happened.  Despite him agreeing to participate in

21    that promotional effort, the banks would not allow the

22    properties to close, and so Lake Austin failed.

23          THE COURT:  Counsel, you're going to have to wrap up

24    pretty soon.

25          MR. GARVIN:  Thank you, your Honor.

J637MOO2                        Opening - Mr. Garvin

1          Ladies and gentlemen, at the end of this case you will

2   learn that the overwhelming evidence shows that the person who

3   is responsible for the fraud was Renwick Haddow, and now

4   Renwick Haddow wants to get a reduction in his sentence, and so

5   he is going to say that Mr. Moore assisted him.  There will not

6   be any credible evidence to prove Mr. Haddow's claims, because

7   they are false.  The evidence will show resoundingly that

8   Mr. Moore is not guilty.  Thank you.

9          THE COURT:  Thank you, counsel.

10          Can we have the first witness.

11          MR. VAINBERG:  Yes, your Honor.  The government calls

12   Loreley Zavattiero to the stand.

13    LORELEY ZAVATTIERO,

14        called as a witness by the government,

15        having been duly affirmed, testified as follows:

16          DEPUTY COURT CLERK:  Spell your first name and last

17   name, please.

18          THE WITNESS:  Loreley, L-o-r-e-l-e-y.  And my second

19   name is Z-a-v-a-t-t-i-e-r-o.

20          DEPUTY COURT CLERK:  You may be seated.  Thank you.

21          MR. VAINBERG:  Your Honor, may I have permission to

22   tender a copy of the exhibits to the witness, as well as a copy

23   of a stipulation which we will read during the testimony?

24          THE COURT:  Sure.

25

J637MOO2                          Zavattiero – Direct

1   DIRECT EXAMINATION

2   BY MR. VAINBERG:

3   Q.   Good morning.

4   A.   Good morning.

5   Q.   Are you married?

6   A.   Yes.

7   Q.   Who are you married to?

8   A.   Marcelo Paulo Chenko.

9   Q.   Do you have any children?

10  A.   Yes.

11  Q.   How many?

12  A.   One.

13  Q.   Could you briefly describe your educational background for

14  the jury.

15  A.   OK.  So I studied in Brazil.  Then I attended computer

16  science in the University of Sal Paulo, and I have a master's

17  degree in technology as well.

18  Q.   What's your line of work?

19  A.   It's IT.

20  Q.   Could you briefly describe your professional background for

21  the jury.

22  A.   OK.  So I work at consulting firms like Price Waterhouse

23  Coopers and IBM, and later on in the industry with MetLife the

24  insurance company, all in IT.

25  Q.   And your husband, what line of work is he involved in?

J637MOO2                        Zavattiero - Direct

1    A.  The same as mine, we have the same background.

2    Q.  What's your country of citizenship?

3    A.  Argentina.

4    Q.  And where do you live now?

5    A.  In Calvary, Canada.

6    Q.  When did you move to Canada?

7    A.  Last August.

8    Q.  Where did you live before you moved to Canada?

9    A.  So before that I was in a sabbatical year with my husband

10   and my kids.  Before that I worked for two years in North

11   Carolina, U.S., MetLife, and before that we spent ten years in

12   Mexico working for IBM and MetLife.  And before I lived in

13   Brazil, and then before that I was born in Argentina, lived

14   three years there.

15   Q.  When did you live in inside the United States?

16   A.  It was from September 2015 to August 2017.

17   Q.  Did you make any investments in any companies while you

18   were living in the United States?

19   A.  Yes.

20   Q.  What company?

21   A.  Bar Works.

22   Q.  Now, we will talk about Bar Works in just a little bit, but

23   before we do that, could you tell us if you had invested your

24   money in any other investments other than a retirement plan or

25   a 401K before Bar Works?

J637MOO2                    Zavattiero - Direct

1  A.  Yes.  So, since my husband and myself met at university, we

2  decided and planned to invest most of what we make in the

3  corporate world, so before Bar Works we had invested for 18

4  years.

5  Q.  And what kinds of investments did you make before Bar

6  Works?

7  A.  We had invested in stocks, in properties, funds, bonds.

8  Q.  What kind of property investments did you invest in?

9  A.  We have residential properties; we have senior living

10  properties, student properties.

11  Q.  And did you invest by yourself or with someone else?

12  A.  With my husband.

13  Q.  Could you describe generally your process in going about to

14  select an investment opportunity?

15  A.  So, first we look at the industry, the trends, if it's

16  positive or not.  Then we go to the company, and we try to

17  understand the management and if there is any historical

18  record.  We also look at the competition, and the country where

19  that investment will take place, regulations and taxes.

20  Q.  And what type of information about an investment is

21  important to you?

22  A.  Mainly the forecast.  I mean is it -- does it have a good

23  business model to support many years ahead?  The management,

24  are they experienced, if we can find any information on the

25  people, and also the country where it will take place, if it's

1    regulated, what are the taxes.

2    Q.  How do you go about finding information on the company and

3    its management?

4    A.  So, we use Internet, and we also use some experts if they

5    are available for those investments.  So, we can use brokers or

6    even, you know, trusted advisors in that industry.

7    Q.  What, if any, information do you typically review before

8    you make the decision to invest?

9    A.  We look at the descriptions of the investments and all

10   information that is available.

11   Q.  And where do you find this information?

12   A.  From the Internet or experts, brokers or --

13   Q.  Are you familiar with a term offering materials?

14   A.  Yes.

15   Q.  What are those?

16   A.  It's a first approach material where they show you what is

17   a certain investment product about, what are the terms and

18   high-level business model.

19   Q.  And who do you understand generally publishes the offering

20   materials about a company?

21   A.  Can you repeat the question?

22   Q.  Who do you understand the offer materials, who do they come

23   from?  Who publishes the offering materials about a company?

24   A.  If I -- I don't understand the question.

25   Q.  Sure.  That's my fault.  I will rephrase it.

J637MOO2                        Zavattiero - Direct

1       Do you look at offering materials or investment

2   brochures before you make an investment?

3   A.  Yes.

4   Q.  Where do you get them from?

5   A.  Oh, from the brokers or from whom is offering that

6   investment.  It can come directly from the companies you are

7   going to invest on, or they can come through third parties.

8   Q.  And do you rely on investment brochures and offering

9   materials that you receive before making your decision to

10  invest?

11  A.  Yes.

12  Q.  Now, did there come a time when you learned of an

13  investment opportunity at a company called Bar Works?

14  A.  Yes.

15  Q.  When was that?

16  A.  That was in the beginning of 2016.

17  Q.  How did you learn about that opportunity?

18  A.  I received an e-mail from United Property Group.

19  Q.  What is United Property Group?

20  A.  United Property Group is a brokerage, it's a brokerage that

21  searches and filters investments, and then offers that to the

22  investor community.

23  Q.  I'm sorry.  What's your understanding of what United

24  Property Group does?

25  A.  So, they search and they filter, they analyze -- they have

J637MOO2                        Zavattiero - Direct

1   experts to analyze investments, and then once they go on the

2   short list, they offer through these offerings material to the

3   investor community.

4   Q.  Prior to Bar Works, had you made any other investments with

5   United Property Group?

6   A.  No.

7   Q.  You mentioned you had received an e-mail.  Do you know how

8   United Property Group got your e-mail address?

9   A.  No.

10  Q.  Did you receive more than one e-mail from United Property

11  Group?

12  A.  Yes.

13  Q.  Sorry, if you would just let me finish my question for the

14  court reporter.

15  A.  Sorry.

16  Q.  Did you receive more than one e-mail from United Property

17  Group encouraging you to invest in Bar Works?

18  A.  Yes.

19          MR. VAINBERG:  At this time, your Honor.  The

20  government would like to move in stipulation regarding certain

21  e-mails marked as Government Exhibit 1252 on the consent of the

22  defendant and read that stipulation into the record.

23          THE COURT:  Sure.

24          So, a stipulation I think I mentioned it this morning,

25  but if I didn't, it's an agreement between both sides, the

J637MOO2                          Zavattiero - Direct

1    government and the defense, and he is going to read what that

2    agreement was in this stipulation.  You will get to see the

3    stipulation.

4           MR. VAINBERG:  It's stipulated between the parties

5    that if called as a witness, a qualified and knowledgeable

6    representative of the Securities Exchange Commission, the SEC,

7    would testify as follows:

8           Documents marked with a control number within the

9    range of SEC-MooreJ-E-0000001 - SEC-MooreJ-E007812 consist of

10   true and accurate copies of e-mails produced by James Moore to

11   the SEC during its investigation of Bar Works and related

12   companies.

13          Government's Exhibits 1 through 143, 145 through 163,

14   177 through 180, 184, 185 and 400 through 407 are true and

15   accurate copies of certain e-mails and attachments from the

16   documents marked with the control numbers set forth in

17   paragraph 1(a) above.

18          Documents marked with a control number within the

19   range of SEC-Lake-E-0000001 - SEC-Lake-E-0006439 consist of

20   true and accurate copies of e-mails produced by Regis Vincent

21   Lake to the SEC during its investigation of Bar Works and

22   related companies.

23          Government Exhibit 308 is a true and accurate copy of

24   an e-mail from the documents marked with control numbers set

25   forth in paragraph 1(c) above.

1          Government's Exhibits 164 through 166 and 410 are true

2     and accurate copies of certain e-mails and attachments from

3     data on phones produced by Renwick Haddow to the F.B.I. and the

4     SEC during their investigation of Bar Works and related

5     entities.

6          Documents marked with control number within the range

7     SEC-HeeraJ-E-0000001 - SEC-HeeraJ-E10000145 consist of true and

8     accurate copies of e-mails produced by Jayvant Heera to the SEC

9     during its investigation of Bar Works and related entities.

10         Government's Exhibits 1004 and 1005 are true and

11    accurate copies of certain e-mails and attachments from the

12    documents marked with the control numbers set forth in

13    paragraph 1(g) above.

14         Documents marked with a control number within the

15    range of SEC-ZIMC-E-0000001 - SEC-ZIMC-E-0000170 consist of

16    true and accurate copies of e-mails produced by Craig Zimmerman

17    to the SEC during its investigation of Bar Works.

18         Government Exhibit 1050 is a true and correct copy of

19    an e-mail marked with a control numbers set forth in paragraph

20    1(i) above.

21         Documents marked with a control number within the

22    range of USAO-SDNY-00025798 - USAO-SDNY-00028429 consist of

23    true and accurate copies of e-mails produced by Loreley

24    Zavattiero to the United States Attorney's Office during its

25    investigation of Bar Works and related companies.

1          THE COURT:  Counsel, I'm not sure you need to read all

2     of this.  This is a stipulation that says where these documents

3     came from and they can be introduced into evidence for the

4     jury.

5          MR. VAINBERG:  Yes, your Honor.  If that's fine, we

6     will keep going.

7          THE COURT:  That's fine.

8          MR. VAINBERG:  Thanks very much.

9          Your Honor, the government formally offers Government

10    Exhibit 152 and the documents listed in the ultimate paragraph

11    of --

12         THE COURT:  1252?

13         MR. VAINBERG:  1252 into evidence, including Exhibits

14    1 though 143 --

15         THE COURT:  They're accepted.

16         MR. VAINBERG:  Thank you, your Honor.

17         (Government Exhibit 1252 received in evidence)

18         (Government Exhibits 1 through 143 received in

19    evidence)

20         (Government Exhibits 145 through 163 received in

21    evidence)

22         (Government Exhibits 164 through 166 received in

23    evidence)

24         (Government Exhibits 177 through 180 received in

25    evidence)

1          (Government Exhibits 180, 184, 185, 308 received in

2     evidence)

3          (Government Exhibits 400 through 410 received in

4     evidence)

5          (Government Exhibits 1004, 1005, 1050 received in

6     evidence)

7          (Government Exhibits 1100 through 1114 received in

8     evidence)

9          (Government Exhibits 1141 through 1145 received in

10    evidence)

11         (Government Exhibits 1150 through 1159 received in

12    evidence)

13    Q.  Ms. Zavattiero, let me turn your attention to Government

14    Exhibit 1100 in evidence.  And if we could, could you just

15    briefly scroll through this exhibit.

16         Do you recognize this exhibit?

17    A.  Yes.

18    Q.  What is it?

19    A.  This is an e-mail sent.

20    by United Properties about the Bar Works offering.

21    Q.  Is this one e-mail or a compilation of e-mails?

22    A.  A couple.

23    Q.  Let's look on the very first e-mail of page 1 of this

24    exhibit.  Could you just tell us what the subject is, who it's

25    from, too and the date of the e-mail.

J637MOO2                          Zavattiero - Direct

1   A.  So, the subject is Bar Works Times Square Launched - Up to

2   16% Returns.  From: United Property,

3   latestnews@theunitedpropertygroup.com.

4           To: Loreley Zavattiero, Loreleyzavattiero@gmail.com.

5           And it was Sent on Jan 7, 2016.

6   Q.  And if we could blow up what's underneath that e-mail.

7   What did this e-mail advise you about?

8   A.  So, this shows the highlights about Bar Works investment.

9   It talks about up to 16 percent of return.  The investment is

10  25,000 for ten years guaranteed.

11  Q.  What did you learn when you saw this mailer?

12  A.  So I understood there was an offering on the coworking

13  space, where the income was guaranteed up to 16 percent.  It

14  was in a prime area in Manhattan.  And there were no closing

15  costs.  And the minimum entry level was 25,000.

16  Q.  And directing your attention to the second bullet point on

17  the left side, what did it say about the returns on the

18  investment.

19  A.  So that they were contractually guaranteed up to 16 percent

20  a year.

21  Q.  And looking at the last bullet points, what did they say

22  about the track record of the business?

23  A.  Proven, established, high-performing business.

24  Q.  Did you decide to invest when you received this first

25  mailer?

J637MOO2                          Zavattiero - Direct

1    A.  No.

2    Q.  Did you receive any additional ones?

3    A.  Yes.

4    Q.  Let's go through some of those.  Can we go to page 3.  And

5    is this another mailer that you received from United Property

6    Group?

7    A.  Yes.

8    Q.  And when did you receive this one?

9    A.  On January 20, 2016.

10   Q.  And if we go to the next page, did it contain similar

11   information to the first mailer?

12   A.  Correct.

13   Q.  What did it tell you to do if you wanted to find out more

14   information about the investment opportunity?

15   A.  You had to follow the link, and it would start an e-mail to

16   United Property, and then you could send questions and ask for

17   more information.

18   Q.  Let's go to the next document.  Do you see an e-mail sent

19   on February 10, 2016 to you?

20   A.  Yes.

21   Q.  OK.  What was this about?

22   A.  More information about Bar Works offering and the industry

23   where it sits.

24   Q.  And let's go to the next mailing.  OK.  What's the date of

25   this mailer and who is it from?

J637MOO2                        Zavattiero - Direct

1   A.  This is February 12, 2016, and it's from United Property

2   investment.

3   Q.  What was your understanding of how United Property Invest

4   was associated with United Property Group?

5   A.  They were this brokerage, the experts that went to Bar

6   Works and understood the product and now are like the sales

7   channel for this project.

8   Q.  Was there any affiliation between United Property Invests

9   and United Property Group?

10  A.  I don't know.

11  Q.  What was the e-mail address that you received this e-mail

12  from?

13  A.  Latest News at the United Property Group.com.

14  Q.  And what location did this Bar Works mailer advertise?

15  A.  Time Square.

16  Q.  What was your understanding as to how the business was

17  structured based on these mailers?

18  A.  Could you rephrase the question?

19  Q.  Were there more than one locations for Bar Works?

20  A.  Yes.

21  Q.  And were those locations sold through different offering

22  documents?

23  A.  Yes.

24  Q.  And if we go to the second page of this Time Square

25  presentation, can you just read the bullet points on the

1    right-hand side.

2    A.  Earn up to 16 annual returns paid as monthly income, entry

3    level from as little as 25,000, harness the strength of the

4    dollar and the U.S. economy.  Your income is assured with a ten

5    year rental guaranty.  Diversify your real estate assets

6    without breaking the bank.  Commercial real estate consistently

7    outperforms residential.

8    Q.  Thank you.  And on the left side, what does the text in

9    bold say?

10   A.  You will not see returns as great as 16 percent for much

11   longer when word gets out.

12   Q.  What did you understand that to mean?

13   A.  That was a guaranteed return.

14   Q.  Directing your attention to the paragraph right above that,

15   do you see where it says investment markets work to the same

16   supply demand dynamic as the assets themselves, and as the

17   popularity increases for coworking investment, potential

18   returns will be sure to decrease in the short term?  Did you

19   have any understanding as to what would happen if you didn't

20   act quickly to purchase Bar Works?

21   A.  Yes, this urges the investors that were interested to

22   purchase before it was not possible anymore.

23   Q.  And just going to the next mailer, is this another Bar

24   Works mailer for a different location?

25   A.  Yes.

J637MOO2                        Zavattiero – Direct

1   Q.  And what location is this one for?

2   A.  West Village.

3   Q.  What if anything did you do after you received this last

4   e-mail?

5   A.  I sent -- I clicked on the e-mail to receive additional

6   information.

7   Q.  And why did you do that?

8   A.  First because coworking was a big thing back then, growing.

9   Their return although high, we thought they are coming to New

10  York, Manhattan, so the risk of not being real in our mind was

11  low, so because of these two points we decided to request more

12  information.

13  Q.  Did you receive more information from United Property

14  Group?

15  A.  Yes.

16  Q.  Let's go to Government Exhibit 1101 in evidence.

17          Just to orient ourselves, what is this generally?

18  A.  This is a thread of e-mails of questions and answers

19  between myself and United Property Group.

20  Q.  And if we go to page 2, does this e-mail begin on the

21  bottom and then go up with the responses?

22  A.  Yes.

23  Q.  So, is that the first e-mail on the chain on the bottom of

24  page 2?

25  A.  Yes.

J637MOO2                          Zavattiero – Direct

1    Q.  Who contacted you from United Property Group?

2    A.  Melanie Velarde.

3    Q.  And did you know who Ms.Velarde was prior to this?

4    A.  No.

5    Q.  Who did you understand her to be?

6    A.  One of the consultants or experts from United Property

7    Group.

8    Q.  And could you read what Ms.Velarde said to you and just

9    what's highlighted on the screen.

10   A.  Should I read?

11   Q.  If you could, please.

12   A.  Yes.  "Dear Mr. Zavattiero, thank you for your recent

13   inquiry relating to our exciting coworking offices space

14   investment located in the heart of Manhattan.  Just to give you

15   an update, we have now sold out our first Bar Works premises at

16   47 West 39th Street, Manhattan, in just six weeks, making it

17   our fastest-ever selling investment opportunity.  Investors who

18   took advantage of the first release have already seen a 12

19   percent increase on their investment since October 2015, as

20   these prices jumped from 22,000 to 25,000 from 1st of January

21   2016."

22   Q.  And could we blow up the second half of this e-mail.  And

23   what did Ms.Velarde write in the second half?

24   A.  "The good news is we are now taking investment on our

25   latest Bar Works location at Time Square, New York.  We have a

1   limited availability of 75 work spaces on first come, first

2   serve basis, so you will need to be quick to take advantage of

3   the fastest selling investment in New York.  This is a one-off

4   investment starting from just 25,000, with a guaranteed annual

5   income of up to 16 percent, with your returns paid monthly and

6   your initial capital returned in full after ten years.  We are

7   receiving unprecedented levels of interest in this investment,

8   and investors should move quickly before prices increase again

9   and the returns are lower.  If in your opinion you will benefit

10  from guaranteed monthly returns of up to 16, please contact me

11  to find out more."

12  Q.  And if we go up to page 1, did you write some questions to

13  the United Property rep?

14  A.  Yes.

15  Q.  And is that what we see in the black here?

16  A.  Yes.

17  Q.  And what's in blue?

18  A.  Melanie's responses.

19  Q.  Could we highlight the question marked number 2 and the

20  answer.  So, just focusing on number 2, what did you write and

21  what did the EPG rep respond with?

22  A.  What are the risks, liability associated?  That was my

23  question.  Melanie's answer was:  The risk is that all of a

24  sudden people stop working in Midtown Manhattan, there is no

25  debt on the building or to the company structure, so no risk of

1    going bankrupt; or the ever-growing population of self --

2    Q.  If you could open up the version in your binder in the

3    meantime while we try to get that back up on the screen.

4    A.  And which number?

5    Q.  It's number 1101.

6    A.  Yes.  Or the ever growing population of self-employed

7    workers soon to be 40 percent every the U.S. work force decides

8    that they want to pay $3,000 per month for a serviced office in

9    a subprime location in comparison to our sites.

10   Q.  Why did you ask about what the risk and liabilities were of

11   the business?

12   A.  Because that's a key criteria for our decision.

13   Q.  And what did you write in question 3?

14   A.  My question was:  The 25K -- meaning 25,000 -- buys what?

15   A bond?  A room?  A quote?

16   Q.  What was the answer that you got from United Property

17   Group's rep?

18   A.  The investment is very simple:  $25,000 American dollars

19   buys you a ten year lease on a work space unit at Bar Works' 41

20   West 46th Street office in Time Square.  That work space is

21   then rented out to a freelance entrepreneur or start-up company

22   at $584 per month.  You contractually are guaranteed 50 percent

23   of the rental income from that work space, which is $292 per

24   month or $3,504 per year, which is 14 percent return on your

25   investment annually (paid monthly).

1           The best part is that at the end of the ten years

2     lease, you get your initial capital returned in full.  Is that

3     make sense to you?

4     Q.  Ms. Zavattiero, what was your understanding of what you

5     would get as an investor if you put in $25,000 towards Bar

6     Works?

7     A.  That I would receive the 14 percent annually during ten

8     years, and at the end of ten years my money back, the $25,000

9     back.

10    Q.  Let's go to the top of the e-mail.  Do you see the portion

11    of the e-mail where the representative writes:  Please find

12    attached the Bar Works prospectus in Time Square.

13    A.  Yes.

14    Q.  Was that attached to this e-mail?

15    A.  Yes.

16    Q.  What's a prospectus?

17    A.  A prospectus is a more detailed description of the

18    offering, the business model, what is the target customers, so

19    it's a more detailed description about the offering.

20    Q.  And if we go to the prospectus, over on page 6 of this

21    exhibit, is that what was attached?

22    A.  Yes.

23    Q.  Did you review this prospectus?

24    A.  Yes.

25    Q.  Did you rely on it in deciding whether you were going to

J637MOO2                           Zavattiero - Direct

1    invest in Bar Works?

2    A.  Yes.

3    Q.  And what location is this one covering?

4    A.  Time Square.

5    Q.  Let's go to a portion of this document that's called Letter

6    from the Directors.  Do you see that?

7    A.  Yes.

8    Q.  Now, before we look at who signed the letter, in the middle

9    of the page when did this letter say that the first Bar Works

10   location would open?

11   A.  October 2015.

12   Q.  And what did it say about the profitability of that

13   location?

14   A.  Just reading this, this property is already profitable.

15   Q.  And what did it say about the second location?

16   A.  That the second location is due to open in February, and it

17   will be located near the famous Time Square.

18   Q.  And do you see that there is a portion of this that says

19   something in bold?  If we zoom back out.

20   A.  Yes.

21   Q.  What does that say?

22   A.  Bar Works' Wealth Builder Program is the brand owned by Bar

23   Works Inc. in which investors can purchase their own work space

24   on a 10 year lease and lease this back to Bar Works for a fixed

25   rental income.

1    Q.   And what does that very last paragraph with this letter

2    say?

3    A.   This purchase memorandum sets out our offer to investors

4    who are looking for solid, double-digit income returns over the

5    next decade.  Thank you for your time in considering this

6    proposal, and we look forward to you joining the Bar Works

7    network.

8    Q.   And who signed this letter to the investor?

9    A.   Jonathan Black.

10   Q.   What was Jonathan Black's position identified as?

11   A.   Chief executive Bar Works Inc.

12   Q.   All right.  Let's go to the next page, please.  Do you see

13   a portion here that says master agent at the top?

14   A.   Yes.

15   Q.   Who did you understand the master agent of Bar Works to be?

16   A.   So, United Property Investment Group.

17   Q.   What do you understand the master agent does?

18   A.   They evaluate, they analyze if the investment is solid, and

19   then they offer it to the investors.

20   Q.   Did you believe at the time that you were looking at these

21   materials that United Property Group had vetted this

22   investment?

23   A.   Yes.

24   Q.   Now let's go to page 11.  Let me ask you a question.  You

25   testified about the annual return being paid to investors.  Did

1   you understand that annual return to be guaranteed?

2   A.  Yes.

3   Q.  What did you understand would happen if you bought a work

4   space lease and nobody came from the street to use it?

5   A.  As far as the payment to investor, that would have no

6   impact; the investor would continue receiving the returns.

7   Q.  And what did you understand would happen at the end of your

8   ten year investment in Bar Works?

9   A.  I would receive my initial capital back.

10  Q.  All right.  How was the investment structured?  That is,

11  what were you actually getting in return for your investment?

12  A.  So, can you rephrase the question?

13  Q.  Sure.  What were you investing in?

14  A.  OK.  So I was investing in work space units.  I was leasing

15  the work space units, and then lease back to Bar Works, that

16  would administer those work space units and rent out to other

17  people, and then pay me a fixed return annually for ten years.

18  Q.  And let's go to Government Exhibit 1102.  And generally

19  what is this document?

20  A.  More e-mails between Melanie and myself.

21  Q.  And let's go to the e-mail all the way on page 3.  Is this

22  the e-mail chain that we were just looking at with your

23  questions and answers?

24  A.  Yes.

25  Q.  And is what follows after this the continuation of that

1    e-mail?

2    A.  Yes.

3    Q.  OK.  At some point did you ask for the application form to

4    invest into Bar Works?

5    A.  Yes.

6    Q.  And did you receive that form?

7    A.  Yes.

8    Q.  Did you make a decision to invest money into Bar Works?

9    A.  Yes.

10   Q.  How much did you decide to invest?

11   A.  At that point $125,000 American dollars.

12   Q.  Why did you decide to invests 125,000 into Bar Works?

13   A.  Because after reading all this information and performing

14   some due diligence, we thought it was a solid investment.

15   Q.  And after you decided to invest 125,000, how did you

16   actually invest that money?

17   A.  How did I transfer?

18   Q.  How did you actually get the money to the borrower?

19   A.  A wire transfer from my account to I believe it a JP Morgan

20   account.

21   Q.  So let's look at the last page of Government Exhibit 1103.

22   What's this here?

23   A.  That's the application form with all my husband and I, our

24   information.

25   Q.  Did the UPG representative know that you were based in the

1    United States?

2    A.  Yes.

3    Q.  And where did the application direct you to send your wire

4    transfer to, if we look on the left side?

5    A.  Yes, to the JP Morgan at New York, JP Morgan Chase bank.

6    Q.  And is that the bank account with the last four digits

7    1622?

8    A.  Yes.

9    Q.  Is that a bank right here on Broadway and 61st Street in

10   New York?

11   A.  Yes.

12   Q.  Did you actually begin sending wire transfers to that

13   account?

14   A.  Yes.

15   Q.  And did you ultimately send the entire $125,000 to that

16   bank account?

17   A.  Yes.

18   Q.  Now, what if any documents did you receive to sign in

19   connection with your investment?

20   A.  There was a contract sent via Docu-Sign.

21   Q.  Let's go to Government Exhibit 1103, please.  And if we go

22   to page 3, what is this?

23   A.  This is one part of the contract that's the lease

24   agreement.

25   Q.  Who is this lease agreement between?

1   A.  Between Bar Works Seventh Avenue Inc. and Loreley

2   Zavattiero and Marcelo Paul Chenko.

3   Q.  If we come back out, does it reference the leases that you

4   were buying?

5   A.  Yes.

6   Q.  Is that what the numbers are that we see in the middle

7   here?

8   A.  Correct.

9   Q.  Did you ever get any documents or information about what

10  these numbers actually are?

11  A.  In one of the -- I believe in the prospectus there was a

12  diagram, but I am not sure.

13  Q.  Do you know for sure whether any of these numbers were

14  actually associated with any physical work spaces anywhere?

15  A.  No, no.

16  Q.  Now let's go to page 5 of this wealth builder lease

17  agreement document.  Did you sign it?

18  A.  Yes.

19  Q.  Did your husband sign it?

20  A.  Yes.

21  Q.  How did you sign it?

22  A.  Via Docu-Sign.

23  Q.  What's that?

24  A.  Docu-Sign it's a digital platform where you can exchange

25  contracts based on digital signature.

1   Q.  Did you understand those electronic signatures to be just

2   as effective as ink signatures?

3   A.  Correct.

4   Q.  And who signed it on behalf of Bar Works 7th Avenue Inc.?

5   A.  Jonathan Black.

6   Q.  And what was the position of Jonathan Black according to

7   this lease agreement?

8   A.  CEO.

9   Q.  Let's go to page 6.  Directing your attention to the top,

10  do you see where it says Wealth Builders Sub-lease Agreement?

11  A.  Yes.

12  Q.  What's that?

13  A.  So, wealth builder, because it was an accelerator, if you

14  bought a certain amount of units you would receive more in

15  return, and sublease because I was subleasing back the work

16  space unit so Bar Works could manage and then pay me a

17  guaranteed rent in return.

18  Q.  So let's make sure we have it straight.  When you paid

19  $25,000, what's the first thing that you get from Bar Works?

20  A.  A lease.

21  Q.  OK.  And then what happens after you get a lease for that

22  work space?

23  A.  Then we sign a sublease where I say you now manage my work

24  space unit, you go to the market and rent to other people, and

25  then you pay me a fixed amount per month guaranteed within ten

J637MOO2                          Zavattiero - Direct

1    years.

2    Q.  And this contract is between you and an entity called Bar

3    Works Management Inc.  What did you maintain Bar Works

4    management Inc. to be?

5    A.  They would be the company that managed my work space units.

6    Q.  Let's look at paragraph 13 on this.  Do you see where it

7    says here rent, the sublease holder agrees to pay the lease

8    holder a monthly rent of $1667 per month, with payments

9    beginning upon execution of this agreement?

10             Who is paying whom 1667?

11   A.  Bar Works is paying my husband and myself.

12   Q.  And does this amount equate to what 16 percent out of

13   $125,000 would be every year?

14   A.  Correct.

15   Q.  And is that because you thought you were getting 16 percent

16   annual returns on your investment?

17   A.  Correct.

18   Q.  Let's go to paragraph 15.  According to this document, what

19   was supposed to happen on the tenth anniversary from the

20   effective date of this sublease?

21   A.  We should receive our $125,000 back.

22   Q.  And who signed the sublease agreement?

23   A.  My husband, myself and Jonathan Black.

24   Q.  Now, have you ever met Jonathan Black?

25   A.  No.

J637MOO2                         Zavattiero - Direct

1    Q.  Ever talk to him on the phone?

2    A.  No.

3    Q.  Do you believe that Jonathan Black was Bar Works' CEO?

4    A.  Yes.

5    Q.  And let's go to the next document in this package.  Do you

6    see where it says on the top "warranty deed, joint tenants with

7    rights of survivorship?

8    A.  Yes.

9    Q.  What is this document?

10   A.  That's a clause that we include in the contract so if one

11   of the tenants dies, then the surviving owner receives the part

12   of the deceased person without having to go through legal

13   process.

14   Q.  And who are you talking about?

15   A.  My husband and myself.

16   Q.  Does this mean that if you or your husband dies, the other

17   person has a benefit in this contract?

18   A.  Correct.

19   Q.  And who signed this document on behalf of Bar Works?

20   A.  Jonathan Black.

21   Q.  All right.  Let's go to the next document, and then let's

22   go past this letter to the very last thing.  What is this?

23   A.  This is the certificate of ownership.

24   Q.  Who did you get the certificate of ownership from?

25   A.  From Bar Works.

J637MOO2                      Zavattiero - Direct

1    Q.  And at the top right, who is listed as the chief executive

2    of Bar Works Inc.?

3    A.  Jonathan Black.

4    Q.  Does this certificate of ownership include the specific

5    work space units that you were leasing?

6    A.  Yes.

7    Q.  All right.  Now, Ms. Zavattiero, do you know who Jim Moore

8    is?

9    A.  No.

10   Q.  Do you know anything about any connection between Jim

11   Moore, United Property Group and the certificate that you were

12   receiving?

13   A.  No.

14   Q.  Now, after you made this investment, did you begin to

15   receive returns on your investment, those monthly rents we were

16   looking at?

17   A.  Yes.

18   Q.  Were those always processed on time?

19   A.  No.

20   Q.  Let's look at Government Exhibit 1104.  What is this

21   generally?

22   A.  These are a thread of e-mails between myself, Melanie and

23   Bar Works, operation manager at that point Tahyira.

24              (Continued on next page)

25

1   Q.  Why were you e-mailing with the operations manager at Bar

2   Works?

3   A.  Because the payment and statements, they were not on time.

4   Q.  Did Melanie Velarde remain your point of contact for

5   everything Bar Works related throughout the life of your

6   investment?

7   A.  Not throughout the life.  For the beginning, just the

8   beginning.

9   Q.  Why didn't Ms. Velarde remain your point of contact with

10  Bar Works?

11  A.  At certain point, I was put in contact directly with Bar

12  Works, after care team, and Melanie and United Property, they

13  were not there anymore.

14  Q.  Did there come a time when United Property Group began

15  promoting a different coworking opportunity?

16  A.  Yes.

17  Q.  Approximately when was that?

18  A.  I believe August 2016.

19  Q.  What was the name of the company that United Property Group

20  began promoting?

21  A.  Our Space.

22  Q.  I'm sorry, what was it?

23  A.  Our Space.

24  Q.  Let's look at Government Exhibit 1105.  Did there come a

25  time when the UPG representative sent you an investment

1    brochure for Our Space?

2    A.   Yes.

3    Q.   Is that what this is?

4    A.   Yes.

5    Q.   Have you looked through this brochure?

6    A.   Yes.

7    Q.   Were there any features of Our Space that were similar to

8    Bar Works?

9    A.   Yes.

10   Q.   What were they?

11   A.   It was a coworking space, so basically the same business

12   model, returns were very similar, and they also had the wealth

13   builder strategy there, and the returns were guaranteed.

14   Q.   If we look on the last page of this brochure just flipping

15   through it.  Who was the lead agent for Our Space?

16   A.   United Property Invest.

17   Q.   Did you have any discussions with your United Property

18   Group representative about why they'd gone from selling Bar

19   Works to selling Our Space?

20   A.   Yes.

21   Q.   Let's look at Government Exhibit 1108 in evidence.  Just to

22   situate us, is this a set of e-mails between you and Melanie

23   Velarde?

24   A.   Yes.

25   Q.   Did you ask some questions in black and get some answers in

J633MOO3                          Zavattiero - Direct

1    blue?

2    A.  Yes.

3    Q.  Let's look on page two of this.  Over at the top, what did

4    Ms. Velarde say about why United Property Group was no longer

5    selling Bar Works?

6    A.  "Long story short, we pride ourselves on client care being

7    the cornerstone of "good business" and could not let Bar Works

8    damage that in any way.  Please do not get me wrong, we stand

9    by the fact that Bar Works is a stable investment but they

10   were, and are not, the best that they can be so it made our

11   decision a simple one, not easy, but certainly simple.  In

12   direct answer to your question we believe, with lots of

13   certainty, that Our Space will be a vastly more successful

14   company for the short, medium, and long term."

15   Q.  Did you decide to invest any money with United Property

16   Group's newest coworking opportunity, Our Space?

17   A.  No.

18   Q.  Did you stay with Bar Works?

19   A.  Yes.

20   Q.  Did there come a time when you invested additional money

21   into Bar Works?

22   A.  Yes.

23   Q.  Approximately when was that?

24   A.  August 2016.

25   Q.  How much additional money did you invest?

J633MOO3                          Zavattiero - Direct

1     A.  1,075 –– 175,000 American dollars.

2     Q.  Before you did that, did you receive brochures for new Bar

3     Works locations?

4     A.  Yes.

5     Q.  Which locations?

6     A.  Tribeca, Jacks building San Francisco.

7     Q.  Let's look at Government Exhibit 1106.  Can you identify

8     who this e-mail is from and to?

9     A.  From Stephen Williams, Bar Works.

10    Stephen.williams@BarWorks.NYC.  To LoreleyZavattiero@Gmail.com.

11    To myself.

12    Q.  Who is Stephen Williams?

13    A.  He was Singh's agent from Bar Works.

14    Q.  Looking on page 17 of this brochure, what was this?

15    A.  Those were press articles of Bar Works in the media.

16    Q.  Did these articles indicate and quote the CEO of Bar Works?

17    A.  Yes.

18    Q.  Who did they say that was?

19    A.  Jonathan Black.

20    Q.  Let's go to Government Exhibit 1107.  Is this another

21    brochure that you received from Stephen Williams at Bar Works

22    before you decided to invest additional money?

23    A.  Yes.

24    Q.  On page six, who was the letter for investors from?

25    A.  Jonathan Black.

1    Q.  On page 17, did you see a similar set of press articles

2    about Jonathan Black?

3    A.  Yes.

4    Q.  So, between San Francisco and Tribeca, which location did

5    you invest in?

6    A.  Tribeca.

7    Q.  Why did you decide to invest more money into Bar Works?

8    A.  Because all the information we received was about open

9    locations.  We actually had some people going to the locations

10   and they were actually open, so we thought it was a good

11   business.

12   Q.  Did you sign any documents in connection with the second

13   investment?

14   A.  Yes.

15   Q.  If we go to Government Exhibit 1110 on page three.  What is

16   this?

17   A.  That's the lease agreement for Tribeca.

18   Q.  Who signed this lease?

19   A.  So, my husband, myself, and Jonathan Black.

20   Q.  Was there also a sublease for investment just like the

21   other one?

22   A.  Yes.

23   Q.  Can we take a look at that.  Who signed the sublease?

24   A.  My husband, myself, and Jonathan Black.

25   Q.  So, after you invested the additional $175,000, what was

J633MOO3                     Zavattiero - Direct

1    the total sum you had invested in Bar Works as of about August

2    of 2016?

3    A.   $300,000.

4    Q.   As of that moment, were you generally receiving returns

5    from Bar Works?

6    A.   Yes.

7    Q.   Did there come a time when you began experiencing concerns

8    about the safety of your investment?

9    A.   Yes.

10   Q.   About when was that?

11   A.   January 2017.

12   Q.   Why did you start experiencing concerns?

13   A.   I read an article from a reporter stating doubts on this

14   investment.

15   Q.   What did you learn as a result of reading that article?

16   A.   That was a high probability that this was a Ponzi scheme.

17   Q.   What, if anything, did you learn about the identity of Bar

18   Works CEO?

19   A.   That it was not the real name, and there was a specific

20   point about a photograph at that they were duplicating in

21   LinkedIn, so Jonathan Black had the same photo ID of another

22   person in Texas.

23   Q.   Can you just explain that?  There was a photograph of

24   Jonathan Black on LinkedIn?

25   A.   Exactly.  And that same photograph, the reporter was able

J633MOO3                        Zavattiero - Direct

1   to find under the name of another person in U.S. in Texas.  I

2   think his name was Peter -- I don't know exactly his name.

3   Peter.

4   Q.  What did you learn as to who was behind Bar Works as a

5   result of that article?

6   A.  Can you rephrase the question?

7   Q.  Sure.  What, if anything, did you learn about who was the

8   person in charge of Bar Works?

9   A.  Then I heard for the first time the name of Haddow Renwick.

10  Q.  Had you heard the name Renwick Haddow prior to January of

11  2017 in this article?

12  A.  No.

13  Q.  Did the article include a photograph of Renwick Haddow?

14  A.  Yes.

15  Q.  Was that photograph different than the photograph of the

16  Jonathan Black LinkedIn profile on the internet?

17  A.  Yes.

18  Q.  Did you learn anything about Renwick Haddow's prior

19  dealings with other investment projects?

20  A.  Yes.  By that -- with that article.

21  Q.  What did you learn?

22  A.  That he was also -- he -- he was also involved on other

23  frauds in U.K.

24  Q.  Ms. Zavattiero, how did you react when you saw this

25  article?

J633MOO3                          Zavattiero - Direct

1    A.  Depressed.  Sorry.

2    Q.  I'm sorry.

3             THE DEPUTY CLERK:  Would you like water?

4    A.  Because --

5    Q.  Take your time.

6    A.  Okay.  I'm sorry.  So, my husband and myself, we postponed

7    many plans because we were trying to save money so we could

8    have gave more time to our kids.

9             I couldn't tell him that day.  Then the next day, I

10   show him, and he said we lost the money.  I mean, it's obvious

11   we lost the money.  So, after a few days, we started to think

12   if there was a way to recover something.  And then I called the

13   agent from Bar Works saying that I had house emergency, my

14   family.  But nothing happened.  Then I tried to push for the

15   trading, and they said we could sell the units.  But then they

16   started to say, yeah, next Monday, next Monday.  Nothing

17   happened.

18            By then, other investors started to group, so we got

19   into the one of the groups of the investors.  And then we paid

20   a lawyer in New York to try to recover something.  That didn't

21   work.  Then we tried to hire a collector in U.K., we hired a

22   collector in U.K. and that didn't work.  And then we are now in

23   the third attempt, we hired another lawyer in U.K., and he's

24   suing CFX, which was the financial service provider.

25   Q.  Ms. Zavattiero, did you ask Bar Works for your money back?

1    A.  Yes.

2    Q.  Did they give you any money back?

3    A.  No.

4    Q.  Did there come a point when your monthly rental payments

5    from Bar Works stopped?

6    A.  Yes.

7    Q.  When did that happen?

8    A.  We never received May 2017's and on.

9    Q.  Did Bar Works provide any explanations for why payments

10   stopped?

11   A.  Yes.

12   Q.  What did the company say?

13   A.  They said they were having trouble with the bank.  That for

14   some reason, the bank was not allowing the money to go out.

15   Q.  What, if anything, happened to the Bar Works business after

16   that, as far as you know?

17   A.  It collapsed.

18   Q.  What do you believe to be the value of the work space

19   leases you purchased?

20   A.  Nothing.

21   Q.  Let's take a step back.  What company pitched to you to

22   make your investments in Bar Works?

23   A.  United Property.

24   Q.  When you had questions about that investment, the first

25   investment, whose company representative did you send them to?

1   A.  Melanie Velarde.

2   Q.  For which company did she work?

3   A.  United Property Group.

4   Q.  What company provided you with Bar Works offering

5   materials?

6   A.  United Property Group.

7   Q.  Who did those materials say was Bar Works' CEO?

8   A.  Jonathan Black.

9   Q.  If you had known at the time that Jonathan Black was a

10  made-up identity, would you have invested any money into Bar

11  Works?

12  A.  No.

13  Q.  Why not?

14  A.  Because then it's a clear indication of a fraud.

15  Q.  Prior to investing into Bar Works, had you heard the name

16  Renwick Haddow?

17  A.  No.

18  Q.  If you had known that the person running Bar Works had been

19  disqualified from serving as a director of any U.K. company for

20  eight years, would you have invested into his company?

21  A.  No.

22  Q.  If you had known that the person in charge of Bar Works had

23  a pending lawsuit in the United Kingdom for running an

24  unauthorized collective investment scheme, would you have

25  invested into his company?

1    A.  No.

2    Q.  If you had known that the person running Bar Works had

3    operated other property investments in which investors lost

4    substantially all of their money, would you have invested

5    anything into Bar Works?

6    A.  No.

7              MR. VAINBERG:  Nothing further at this time.

8              THE COURT:  Could counsel approach just for a moment.

9              (Continued on next page)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J633MOO3                          Zavattiero – Direct

1              (At the sidebar)

2              THE COURT:  Do you have an estimate of how long you're

3    going to be?

4              MR. GARVIN:  Actually, I was contemplating between no

5    questions or one or two questions, but right now I'm thinking

6    no questions probably be better.

7              THE COURT:  Oh.  Because I'm going to let her go home.

8    She doesn't have to come back.  No, it's up to you though.

9              MR. GARVIN:  No, certainly, your Honor.  I was on the

10   verge of saying no questions, but then they rehashed plowed

11   ground and raised the 125,000.

12             THE COURT:  Absolutely, you can ask.

13             MR. GARVIN:  Two or three questions and that's it.

14             MR. BELL:  Judge, if we can we have another 15

15   minutes, we'd like to start our next witness.

16             THE COURT:  I don't think we'll have a chance for

17   that, but I think we'll finish this one.

18             (Continued on next page)

19

20

21

22

23

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1                (In open court)

2                THE COURT:  Mr. Garvin, cross-examination.

3                MR. GARVIN:  Thank you, your Honor.

4     CROSS-EXAMINATION

5     BY MR. GARVIN:

6     Q.  Good afternoon, ma'am.  My name is David Garvin.

7     A.  Good afternoon.

8     Q.  I only have a few questions for you, just to be clear.  I'm

9     sure you were clear, but I might not have heard well.  The

10    first question was, counsel just finished by asking you about

11    United Property Group, and I thought that I had heard that the

12    first investment of the 125,000 was United Property Group.  Is

13    that correct?

14    A.  Yes.

15    Q.  But at some point, United Property Group, I believe you

16    stated in or about August of 2016, they went a different

17    direction with the company called Our Space.  Was that correct?

18    A.  Yes.

19    Q.  Okay.  And then from that point on, you were dealing

20    directly with somebody at Bar Works.  Is that correct?

21    A.  Yes.

22    Q.  Was it in or about January of 2017 that you decided to

23    increase your investment in Bar Works?

24    A.  No.

25    Q.  Could you tell us when that was, please.

J633MOO3

1  A.  August 2016.

2  Q.  Okay.  It was 2017 is when you read the article.  Thank you

3  for correcting that.

4  A.  Yes.

5  Q.  Finally, there was some question about a gentleman by the

6  name of James Moore.  I believe you said you never heard of

7  James Moore throughout this process.  Is that correct?

8  A.  Correct.

9          MR. GARVIN:  I have no further questions, ma'am.

10 Thank you.

11         THE COURT:  Thank you.

12         MR. VAINBERG:  No redirect, your Honor.

13         THE COURT:  So we're going to excuse the witness.

14 Thank you very much.

15         (Witness excused)

16         THE COURT:  I think we're going to end for today.  We

17 are doing well in terms of time.

18         Let me give you some instructions between now and when

19 I see you again tomorrow.  We'll pick up tomorrow at 9:15.  So

20 first instruction is please do not talk to each other about the

21 case or about anyone who has anything to do with it until the

22 end of the case when you go to the jury room to deliberate on

23 your verdict.  And second, please do not talk with anyone else

24 about the case or about anyone who has anything to do with it

25 until the trial has ended and you've been discharged as jurors

J633MOO3

by me.  And by "talk" I mean all kinds of talk, either by

e-mail, texting, in person or tweeting or blogging.  Referring

to any kind of communication which includes, among others,

Facebook, MySpace, Twitter, Snapchat, etc.

And additionally, in this regard, do not remain in the

presence of other persons who may be discussing this case,

either face to face or orally.  Face to face, orally or online.

And "anyone else" includes members of your family and your

friends and also embraces social media.  You may tell them that

you are a juror in a case, but please don't tell them anything

about the case until the trial has ended and you've been

discharged.

And third, please do not let anyone talk to you about

the case or about anyone who has anything to do with it.  And

if someone should try and talk to you about the case, please

report that to Christine or me immediately.

Fourth, please do not read any news or internet

stories or articles or blogs or listen to any radio or TV or

internet reports, assuming there were any, about the case or

about anyone who has anything to do with it.

And fifth, please do not try and undertake any type of

research or any type of investigation about the case on your

own.  For example, please do not go online to visit any of the

issues or places described during the trial.

The reason for these instructions is this.  The

J633MOO3

1    parties are entitled to have you personally render a verdict in

2    this case on the basis of your own independent evaluations of

3    the evidence presented here in the courtroom.  So obviously,

4    speaking to others about the case, including family, before you

5    deliberate or exposing yourself to evidence outside the

6    courtroom in any way could compromise your jury service and

7    fairness to the parties.

8            So we'll have the second witness first thing in the

9    morning.  We're off to a good start in terms of timing and

10   please leave your notes on your chair.  Christine will secure

11   them for you and return them back to you in the morning.

12   Thanks very much.  Nice to see you.

13            (Jury excused)

14            THE COURT:  Okay, everybody.  Thanks a lot.  We'll see

15   you first thing tomorrow morning.  9:15.

16            MR. BELL:  Thank you, Judge.

17            THE COURT:  You bet.

18            (Adjourned until June 4, 2019, at 9:15 a.m.)

19

20

21

22

23

24

25

1                       INDEX OF EXAMINATION

2    Examination of:                              Page

3     LORELEY ZAVATTIERO

4    Direct By Mr. Vainberg . . . . . . . . . . . .60

5    Cross By Mr. Garvin  . . . . . . . . . . . . 101

6                       GOVERNMENT EXHIBITS

7    Exhibit No.                               Received

8     1252    . . . . . . . . . . . . . . . . . .68

9     1 through 143   . . . . . . . . . . . . . .68

10    145 through 163   . . . . . . . . . . . . .68

11    164 through 166   . . . . . . . . . . . . .68

12    177 through 180   . . . . . . . . . . . . .68

13    180, 184, 185, 308  . . . . . . . . . . . .69

14    400 through 410   . . . . . . . . . . . . .69

15    1004, 1005, 1050  . . . . . . . . . . . . .69

16    1100 through 1114   . . . . . . . . . . . .69

17    1141 through 1145   . . . . . . . . . . . .69

18    1150 through 1159   . . . . . . . . . . . .69

19

20

21

22

23

24

25