J647MOO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

              v.                             18 Cr. 759(RMB)

JAMES MOORE,

                  Defendant.

------------------------------x              Jury Trial

                                             June 4, 2019
                                             9:30 a.m.


Before:

                    HON. RICHARD M. BERMAN,

                                             District Judge



                              APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MARTIN BELL
     VLADISLAV VAINBERG
     Assistant United States Attorneys

DAVID M. GARVIN, PA
     Attorney for Defendant

ALSO PRESENT:
Nathaniel Cooney, Paralegal for U.S. Attorney's Office
Special Agent Jordan Anderson, FBI
Alexandra Garvin, Law Clerk for Defense
Arlene Garvin, Paralegal for Defense

J647MOO1

| 1 | (Trial resumed, jury not present) |

THE COURT:  So, I understand that there is an issue --

a clothing issue not with respect to Mr. Haddow but with

respect to Mr. Moore, which is in the process of hopefully

being resolved.  I don't know how long that's going to take.

Perhaps one of you knows.

MR. BELL:  It sounded like it might be resolved pretty

quickly, Judge, having spoken to the marshals who are not here

because they're resolving it, but we don't have an exact ETA.

THE COURT:  OK.

MR. BELL:  May I raise one small matter, Judge, that I

think is purely administrative?

THE COURT:  Yes, go ahead.

MR. BELL:  That is, we were going to suggest -- so our

first witnesses today are going to be in order Regis Vincent

Lake II and Julian White.  We expect that they will be

witnesses who are each relatively short, and I say that meaning

direct examinations probably a bit shorter than Ms. Zavattiero

was yesterday.  And it sounds as though Mr. Garvin probably

won't cross them at great length.

THE COURT:  These are victims?

MR. BELL:  One of them, Mr. White is a victim.  The

other, Mr. Lake, is a former Bar Works employee.

What we were going to suggest was that given that Mr.

Haddow is in custody, it may make sense for us to stage the

J647MOO1

1   midmorning break after those two have testified and before Mr.

2   Haddow does.  That way we can get him in and out outside of the

3   jury's presence.

4           THE COURT:  I get it; it's a great idea; but let's see

5   where we are with the first two witnesses.

6           MR. BELL:  Sure.

7           THE COURT:  Do you have the witness outside?

8           MR. BELL:  We do.

9           THE COURT:  We are still missing one juror who is

10  about a minute or so away, so you can get the witness.

11          (Pause)

12          THE COURT:  So, we have our jury all assembled, so if

13  you would rise, we will bring in the jury.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

J647MOO1                           Lake - Direct

1              (Jury present)

2              THE COURT:  Good morning, everybody.  Nice to see you.

3     We have the second witness on the witness stand, and we will

4     introduce him to you in one second, so please be seated except

5     for the witness.

6      REGIS VINCENT LAKE II,

7          called as a witness by the government,

8          having been duly sworn, testified as follows:

9              COURT CLERK:  Please state your full name for the

10    record.

11             THE WITNESS:  Regis Vincent Lake II.

12             COURT CLERK:  Could you spell your last name, please.

13             THE WITNESS:  L-a-k-e.

14    DIRECT EXAMINATION

15    BY MR. BELL:

16    Q.  Good morning, Mr. Lake.

17    A.  Good morning.

18    Q.  Where were you born?

19    A.  Manhattan, New York.

20    Q.  Where do you live now?

21    A.  Long Island, New York.

22    Q.  What do you currently do for a living?

23    A.  I do data entry for a company called Westco.

24    Q.  How long have you been doing that?

25    A.  Beginning of April of this year.

J647MOO1                          Lake - Direct

1   Q.  What is the highest level of education you've completed?

2   A.  Bachelor's.

3   Q.  Where and when did you get that degree?

4   A.  At Boston College in 2001.

5   Q.  And what generally have you done in your career since

6   graduating from college?

7   A.  A variety of legal work at law firms as a paralegal;

8   Associated Press as an executive assistant; Legal Aid Society

9   as an investigator.

10          THE COURT:  Did you say Legal Aid Society?

11          THE WITNESS:  I did, yes.  And various temp jobs after

12  that.

13  Q.  With respect to those temp jobs, did there come a point in

14  that part of your career where you became familiar with a

15  company called Bar Works?

16  A.  That's correct.

17  Q.  And approximately when was that?

18  A.  April 20, 2016.

19  Q.  And how was it that you came to be familiar with Bar Works?

20  A.  I received an e-mail from my friend stating that the

21  position was available.

22  Q.  What sort of position was it?

23  A.  It was an administrative assistant position.

24  Q.  Did you interview for the job?

25  A.  I did.

1   Q.  Who interviewed you?

2   A.  Mr. Jason Rivera.

3   Q.  And did you get the job?

4   A.  I did.

5   Q.  Do you recall when you started?

6   A.  April 20, 2016.

7   Q.  And do you recall how long you held that job?

8   A.  For about three weeks.

9           THE COURT:  How many?

10          THE WITNESS:  Three weeks, yes.

11  Q.  Now, when you started out at Bar Works, what did you

12  understand that business to be?

13  A.  I understood it to be a coworking space.

14  Q.  And how did you understand Bar Works raised capital --

15  raised money?

16  A.  Through investors.

17  Q.  And when you started out at Bar Works, what were your

18  specific responsibilities as an administrative assistant?

19  A.  My specific job was to send contracts to investors and to

20  keep track of money coming in and coming out.

21  Q.  And so let's take that apart just a little bit.  You

22  mentioned contracts.  What was the nature of these contracts?

23  A.  Contract between the investor, say John Smith, and CEO.

24  Q.  And you processed them.  What did you do with them?

25  A.  Essentially I changed the date when I sent out, the

J647MOO1                          Lake - Direct

1    address, the investor's name and the work spaces that the

2    investor put in.

3              THE COURT:  And the what?

4              THE WITNESS:  The work spaces.

5              THE COURT:  The work spaces?

6              THE WITNESS:  Yes.

7    Q.  Did you do this with a specific program?

8    A.  Through DocuSign.

9    Q.  And did you use DocuSign to actually sign these contracts?

10   A.  It was an automated signature.  When I hit a button, it

11   filled in the signature.

12             THE COURT:  Wait.  It's an automated signature?

13             THE WITNESS:  Yes.

14             THE COURT:  Then you said after that?

15             THE WITNESS:  It automatically fills in the signature.

16   Q.  And whose signature did DocuSign automatically fill in when

17   you hit that button?

18   A.  Jonathan Black.

19   Q.  Who did you understand Jonathan Black to be at the time?

20   A.  I understood him to be the CEO of Bar Works.

21   Q.  Did you know Mr. Black personally?

22   A.  I did not.

23   Q.  Now, where physically did you work when you first began at

24   Bar Works?

25   A.  When I first began, it was the same location as a company

1   called In Crowd Equity.

2   Q.  What did you understand In Crowd Equity to be?

3   A.  I understood in Crowd Equity to be the fundraising company

4   for Bar Works.

5   Q.  Now, did the place where you worked physically change over

6   time during your three weeks with Bar Works?

7   A.  It did.

8   Q.  So tell us about that.

9   A.  I was at the location of In Crowd Equity for about a week.

10          THE COURT:  You were where?

11          THE WITNESS:  At the location for In Crowd Equity for

12  about a week's time.

13          THE COURT:  And what was that location?

14          THE WITNESS:  It was on 39th Street.  I forgot the

15  exact address.

16          THE COURT:  West?  East?

17          THE WITNESS:  I believe west.

18          THE COURT:  West 39th Street?

19          THE WITNESS:  Yeah, around that location.

20  Q.  And where did you wind up later on within your three weeks

21  at the company?

22  A.  On the 47th Street location of Bar Works.

23  Q.  And how did you come to change locations?

24  A.  I was just told they were moving locations.

25  Q.  During your time working for Bar Works, whom did you report

J647MOO1                              Lake - Direct

1   to?

2   A.  It was Tahyira Cordner.

3   Q.  Do you recall how to spell Ms. Cordner's name?

4   A.  To the best of my ability, T-a-h-y-i-r-a C-o-r-d-n-e-r.

5   Q.  And whom did you understand Ms. Corder to be?

6   A.  She was my manager.

7   Q.  Did there come a point where you came to know an individual

8   called Renwick Haddow?

9   A.  There was, yes.

10  Q.  Approximately how far into your time at Bar Works was that?

11  A.  It was in my first week.

12  Q.  And how did you come to meet him for the first time?

13  A.  First time I saw him around two or three times beforehand

14  he was sitting a few desks adjacent to me, and I introduced

15  myself.

16          THE COURT:  Was that West 39th Street location?

17          THE WITNESS:  That's correct.

18  Q.  When you introduced yourself to Mr. Haddow, did he

19  introduce himself to you?

20  A.  He did.

21  Q.  And what, if anything, do you recall how he introduced

22  himself to you?

23  A.  It was very quick; he just introduced himself as Rehn.

24  Q.  Now, did your responsibilities include keeping track of

25  outside agents that sold Bar Works to investors?

1   A.  Keeping track of outside agents?

2   Q.  Yes, outside companies that sold Bar Works to investors.

3   A.  It was basically just the money coming in.

4   Q.  And did there come a point in that work where you became

5   familiar with outside entities that sold Bar Works to

6   investors?

7   A.  There was, yes.

8   Q.  What sorts of entities were these?

9   A.  United Property Invest comes to mind.

10          THE COURT:  United --

11          THE WITNESS:  -- property Invest, yes.

12          THE COURT:  You mentioned you took care of the money

13  when it came in.  Could you just describe what you did and how

14  you did that.

15          THE WITNESS:  Of course.  When it came in I received a

16  Skype message saying this investor is investing $25,000 or

17  $100,000, and then I put the information on a spreadsheet

18  saying, you know, investor John Smith invested $25,000, and

19  then a pay date between 10 and 14 days later when their first

20  ROI -- return on investment -- was due.

21          THE COURT:  And did money come in as a check or a

22  wire?

23          THE WITNESS:  I'm not familiar how the money came in.

24  I was just informed that it did come in though.

25          THE COURT:  I get it.

J647MOO1                         Lake - Direct

1   Q.  You mentioned that you maintained that information in a

2   spreadsheet?

3   A.  Yes.

4   Q.  Where was that spreadsheet located?

5   A.  I believe it was Google Drive.

6   Q.  And did you have ready access to that Google Drive account?

7   A.  I did.

8   Q.  Did there come a point where you came to know an individual

9   named Sam Aura, A-u-r-a?

10  A.  There was, yes.

11  Q.  How did you come to know Mr. Aura?

12  A.  In my first week I met him at another location of Bar

13  Works.

14  Q.  And who did you understand Mr. Aura to be?

15  A.  He was another person raising money from investors.

16          THE COURT:  He was what?

17          THE WITNESS:  He was another person raising money from

18  investors.

19  Q.  When you say another person raising money from investors,

20  like United Property?

21  A.  That's correct, yes.

22  Q.  Did there come a time where you met an individual named

23  Jessica Mayo?

24  A.  That is correct.

25  Q.  Who was Ms. Mayo?

1    A.  Ms. Mayo was a former administrative assistant at Bar

2    Works.  I believe she was eventually fired.  I took her place,

3    and she went to work for Mr. Aura.

4    Q.  And how did you come to interact with Ms. Mayo?

5    A.  Much through Skype.  She introduced herself to me within

6    the first week.

7    Q.  And did you have job interactions with her?

8    A.  Some, yes.

9    Q.  What was the nature of those interactions?

10   A.  Via Skype, if I had questions.

11   Q.  Now, over the three weeks that you were at Bar Works, did

12   you ever interact, to your knowledge, with anyone named James

13   Moore or Jim Moore?

14   A.  No.

15   Q.  Now, about how many Bar Works locations did you become

16   familiar with during the time that you worked there?

17   A.  Two.

18   Q.  And what were you able to observe with respect to how busy

19   those Bar Works locations were?

20   A.  It was nearly empty, sir.

21            THE COURT:  It was what?

22            THE WITNESS:  It was nearly empty.

23            THE COURT:  Nearly empty?

24            THE WITNESS:  Yes.

25            THE COURT:  Both?

J647MOO1                          Lake - Direct

1          THE WITNESS:  Both, yes.

2    Q.  Now, at some point did you become familiar with the name

3    Howard Green?

4    A.  Yes.

5    Q.  And who did you understand Howard Green to be?

6    A.  Howard Green was another agent overseas raising money from

7    investors.

8    Q.  Do you recall having a conversation about Howard Green with

9    Ms. Cordner at one point?

10   A.  I do, yes.

11   Q.  Approximately how far into your employment at Bar Works was

12   this?

13   A.  Within my first week.

14   Q.  So, when Howard Green came up between you and Ms. Cordner,

15   what did you say to her and what did she say to you?

16   A.  The nature of the conversation was within my first week

17   there I said my full name is Regis Vincent Lake II, but I go by

18   Vincent, and she said Mr. Howard -- we have somebody overseas

19   who goes by a different name altogether.  And I thought in my

20   head that I don't go by a different name, I just said I go by

21   my middle name, so I thought it was odd.

22   Q.  Why did you think it was odd, sir?

23   A.  Because Ms. Cordner said the person overseas is an agent

24   and uses a different name.

25   Q.  Now, while working for Bar Works, did you come to know an

J647MOO1                        Lake - Direct

1    individual named Daryl Brown?

2    A.  I did, yes.

3    Q.  Who is Mr. Brown?

4    A.  Mr. Brown was the location manager at the 47th Street

5    location.

6    Q.  Did there come a time when you and Mr. Brown had a

7    conversation about who ran Bar Works?

8    A.  Yes.

9    Q.  And what was the nature of that conversation, sir?

10   A.  It was after meeting with Franklin Kinard.  Franklin Kinard

11   bought up the issue what should we call Jonathan Block, should

12   we call him Renwick or Jonathan.  After the meeting I asked

13   Daryl Brown who is Jonathan Black, and Mr. Brown informed me

14   that Mr. Black is Renwick Haddow.

15              THE COURT:  Is what?

16              THE WITNESS:  Mr. Brown informed me that Renwick

17   Haddow is Jonathan Black.

18              THE COURT:  Could I just interrupt?

19              MR. BELL:  Sure thing.  Yes, your Honor.

20              THE COURT:  Sometime this morning there is going to be

21   a building fire drill, but that does not affect us.  We can

22   stay and continue, but I don't want anybody to get alarmed, so

23   to speak.  It won't be a fire; it will just be a drill; and

24   we're not going anywhere.

25              Go ahead.

J647MOO1                         Lake - Direct

1           MR. BELL:  Thank you very much, your Honor.

2    Q.  Now, at that time did you look into Mr. Haddow's background

3    at all?

4    A.  I did.

5    Q.  How did you do it?

6    A.  Via Google.

7    Q.  And what, if anything, did you learn during that process,

8    and how did you react?

9    A.  That he was known for creating something called collective

10   investment schemes.

11   Q.  And what was your reaction to this?

12   A.  It sounded very similar to what a Ponzi scheme was.

13          THE COURT:  It was similar to what?

14          THE WITNESS:  It seemed very similar to what a Ponzi

15   scheme was.

16          THE COURT:  Ponzi?

17          THE WITNESS:  Yeah.

18   Q.  I will just ask you to slow down just a little bit,

19   Mr. Lake.

20   A.  Sure.

21   Q.  What, if anything, did you resolve to do after your

22   conversation with Mr. Brown and your research on Mr. Haddow?

23   A.  I resolved to expose Bar Works for what it was.

24   Q.  And why did you want to do that?

25   A.  Because I felt it was stealing from investors.

J647MOO1                          Lake - Direct

1   Q.  And so what, if anything, did you do in order to put that

2   plan into action?

3   A.  After the meeting with Franklin Kinard, either the next day

4   or the evening after, because I had actually DocuSigned the

5   system with the contracts, I started downloading the contracts

6   onto my own personal computer at home.

7   Q.  I should ask, by the way, you mentioned an individual named

8   Franklin Kinard?

9   A.  Yes.

10  Q.  Who is Mr. Kinard?

11  A.  Mr. Kinard was I believe the PR person for Bar Works.

12  Q.  Now, you mentioned going into the DocuSign program in order

13  to access and save contracts on your own personal space.  Did

14  you access other types of documents as part of that effort as

15  well?

16  A.  In the evening I was taking documents from DocuSign, but

17  during the day when I worked I took as many documents as I

18  could on my desk and near my desk, yes.

19  Q.  Did these include spreadsheets?

20  A.  Only the last day I took two spreadsheets.

21  Q.  And what was the nature of the spreadsheets you took?

22  A.  The two spreadsheets I took was of the money coming in and

23  going out from investors.

24  Q.  Now, what did you intend to do with these actual documents?

25  A.  My intention was to expose them.

1   Q.  How?  Were what were you going to do with the documents?

2   A.  I needed as much information as possible with the

3   contracts, because I knew they were fraudulent, collecting

4   first, with random documents I took from my desk, whatever I

5   could take.

6              THE COURT:  Wait.  Could you start that over again a

7   little more slowly?

8              THE WITNESS:  I'm sorry.

9              THE COURT:  No, I just didn't catch it all.

10  A.  The documents I took because the contracts were fraudulent,

11  that's the first thing I took.  Random documents I took during

12  the day.  And eventually my last day there, May 16, I took the

13  spreadsheets, because that had the money coming in and going

14  out.

15  Q.  Now, you mentioned that you worked for Bar Works for all of

16  three weeks.

17  A.  Yes.

18  Q.  And we'll get to how it was that you came to leave Bar

19  Works in a little bit.  After you left Bar Works, did you

20  continue to access Bar Works documents as part of that effort?

21  A.  I did.

22  Q.  And how did you go about doing that, Mr. Lake?

23  A.  I was able to figure out Ms. Cordner's password for her

24  e-mail.

25  Q.  And was that her Bar Works e-mail?

J647MOO1                          Lake - Direct

1    A.  It was, yes.

2    Q.  And how were you able to figure that out, sir?

3    A.  My first week there I realized that most of the passwords

4    were the same; they were either Bar Works as a password or

5    TEEBW100 that had been Ms. Cordner's e-mail.  So, after I left

6    I figured out that Ms. Cordner's e-mail password was TEEBW100.

7    Q.  And what sorts of documents did you obtain after you left

8    Bar Works?

9    A.  As much as I could, including two additional spreadsheets.

10

11   Q.  Did you eventually turn those spreadsheets over to law

12   enforcement authorities?

13   A.  Eventually, yes.

14        MR. BELL:  With the Court's permission, I would like

15   to read a stipulation right now.

16        THE COURT:  OK.

17        MR. BELL:  The stipulation has been marked for

18   identification as Government Exhibit 1256.

19        THE COURT:  Which one?

20        MR. BELL:  1256, your Honor.  And it's on the screen

21   right now, if that helps the Court.

22        THE COURT:  Yes.

23   Q.  And it reads:  It is hereby stipulated between the parties

24   that Government's Exhibits 172, 173, 310 and 311 are true and

25   accurate copies of documents provided to the Securities and

1   Exchange Commission, or SEC, by Vincent Lake during its

2   investigation of Bar Works and related entities in 2016.

3           It is further stipulated and agreed that the

4   stipulation is admissible and may be received as a Government

5   exhibit at trial.

6           Your Honor, the government offers the stipulation,

7   1256, and the Government's Exhibits 172, 173, 310 and 311.

8           THE COURT:  I will allow it.

9           MR. BELL:  Thank you, your Honor.

10          (Government Exhibits 1256, 172, 173, 310 and 311

11   received in evidence)

12  Q.  So, why don't we take a look, Mr. Lake, at some of these

13  documents.

14          And I will ask Mr. Cooney to put Government Exhibit

15  173, a spreadsheet, on the screen in its native form.

16          And so we're looking at one of these spreadsheets.

17  Are you familiar generally, Mr. Lake, with the columns on this

18  spreadsheet?

19  A.  I am, yes.

20  Q.  And how are you familiar with this spreadsheet?

21  A.  When one of the investors came through, let's say the third

22  flag on 12/10 -- that's before my time -- but the investor came

23  in, I marked the date of purchase, the lease number they

24  purchased, the date the payment is due, and I e-mailed Fed Ex

25  the certificate number.

1    Q.  And so why don't we just take a general look around the

2    spreadsheet first.

3            I want to direct your attention first to column A

4    which reads broker.  And there are several entries there,

5    including BW-Howard, United, ICE-Warren and the like.  What

6    does broker refer to in this spreadsheet, sir?

7    A.  The broker was the agent that contacted the investor.

8    Q.  And are you familiar with what United signifies here?

9    A.  Yes.

10   Q.  What's that?

11   A.  United Property Invest.

12   Q.  And then there is column B which is name.  And who do you

13   understand those to be names of, sir?

14   A.  Those are the names of the investors.

15   Q.  There is an entry that says date of purchase.  That may

16   speak for itself, but what do you understand that to be?

17   A.  The date they purchased the work space.

18   Q.  There is also a lease number column, column D.  Do you have

19   a familiarity with that is, sir?

20   A.  Yes, those should be the work spaces they purchased.

21   Q.  And then there is a date payments are due column that is in

22   a bright yellow.  What do you understand that to be?

23   A.  That was the first date that their ROI payment was due,

24   their return on investment.

25   Q.  That their return of investment?

J647MOO1                        Lake - Direct

1              THE COURT:  ROI, return on investment?

2              THE WITNESS:  Yes.

3    Q.  And are those the monthly payments that were supposed to

4    come from rent?

5    A.  Yes.

6    Q.  There is also a certificate number.  Are you familiar with

7    that number, sir?

8    A.  I am, yes.

9    Q.  What were the certificate numbers?

10   A.  Basically it looked like a diploma certificate.  Once an

11   investor brought the work space they get a certificate saying,

12   you know, congratulations, you've got your work space number

13   123, and a certificate number with it.

14             THE COURT:  And a what?

15             THE WITNESS:  And they get a certificate in the mail

16   with their work space.

17   Q.  Did you have any understanding of how those certificate

18   numbers were generated?

19   A.  I believe it was numerical, numerical order.

20   Q.  There is also a column that says bank name and routing

21   number.

22   A.  Yes.

23   Q.  What do you understand that to be to mean?

24   A.  The investor's bank and routing information.

25   Q.  And then account number.

1    A.  Their accounting information.

2    Q.  And then there is a column total investment in BW?

3    A.  I am not exactly familiar with that column.

4    Q.  Understood.  Let's shift back over.  Now, within column A,

5    you mentioned that you were familiar with United entries as

6    United Property Group.  I wanted to ask you about a couple of

7    others.  There are some entries there that say BW-Howard.  Do

8    you see that, Mr. Lake?

9    A.  Yes.

10   Q.  For example, what is currently listed as line 2.  So, did

11   you have an understanding of what BW-Howard referred to?

12   A.  I would assume it's Bar Works Howard Green.

13   Q.  And then at line 11 there is ICE-Warren.  What did you

14   understand ICE to refer to?

15   A.  I understood it to be In Crowd Equity.

16   Q.  And is that the same fundraising entity you alluded to

17   before?

18   A.  It is, yes.

19   Q.  And then --

20            THE COURT:  Excuse me.  Hold on a second.

21            What's the Warren mean in line 11?

22            THE WITNESS:  I don't know who Warren is.

23            THE COURT:  You think it's a person?

24            THE WITNESS:  I believe so, yes.

25   Q.  I want to direct your attention now to line 28, which is

J647MOO1                         Lake - Direct

1   BW-Samuel.  Do you have an understanding of who BW-Samuel was?

2   A.  Yes, refer to Bar Works Samuel Aura.

3                THE COURT:  A-U-R-A is that?

4                THE WITNESS:  That's correct.

5   Q.  And meanwhile at the very bottom of the page you can see

6   that this is one of a number of tabs.  This tab is labeled West

7   39th Street.

8                Can we take a look at west 46th, Mr. Cooney.

9                And 47 Seventh Avenue South, 20 West 33rd Street and

10  70 White Street.

11               Now, what do you understand each of those tabs that

12  we've put through to refer to?

13  A.  Various locations of Bar Works.

14  Q.  And do they contain essentially the same columns that the

15  first half did?

16  A.  They do.

17  Q.  Finally, there is a tab that says reserve spaces.

18               (Fire alarm)

19               MR. BELL:  Should I proceed, Judge?

20               THE COURT:  I'm trying to figure out if he is going to

21  turn that --

22               You can see we need a little more practice in these

23  notifications.

24               MR. BELL:  We will take our chances, Judge.  Thanks

25  very much.

J647MOO1                          Lake - Direct

1          THE COURT:  Yes.  I think the safest place to be is

2     where we are.

3     Q.  Mr. Lake, I had just directed your attention to the

4     reserved spaces tab on Government Exhibit 173.  There are

5     columns here for random number and for investor.  Are you

6     familiar with what random number meant here?

7     A.  I am, yes.

8     Q.  What was random number?

9     A.  If you keep going down the columns, the last number you

10    pick was the last work space.

11    Q.  And so what, if anything, was random about the process?

12    A.  Well, they stopped at the last green line.  So after

13    Alfonso Gimeno, if another investor invested in Bar Works, the

14    next work space would be number 9349.  And if you keep on going

15    down the column, all the numbers are still very random.

16    Q.  So, is it the case that the work space numbers would be

17    assigned randomly rather than based on some sort of physical

18    space -- some order of physical space?

19    A.  That's correct.

20          MR. BELL:  Why don't we take that down, Mr. Cooney.

21    Thank you.

22    Q.  Can we take a look at Government's Exhibits 172, which is

23    another one of the spreadsheets, payment via the stipulation.

24    So, why don't we start with the 39th tab.  So, this contains a

25    number of the same column headings that were in 1373.  Do these

1   have essentially the same meanings here?

2   A.  It looks like, yes.

3   Q.  That is to say name, date of purchase, broker, lease

4   number --

5            (Fire announcement)

6   Q.  And so those fields, do they look to be essentially the

7   same?

8   A.  They do.

9            (Fire announcement)

10  Q.  We will try to press on.  And so there are also a number of

11  tabs here, as before, that relate to a number of locations, 46

12  7th Avenue.  Do you understand those, as before, to relate to

13  Bar Works facilities?

14  A.  I do.

15  Q.  Let's go to the 39th tab, and let's scroll down to line 54.

16  So who is the investor noted in line 54?

17  A.  Julian White.

18  Q.  Let's go to the 7th Avenue tab, and let's scroll down to

19  line 10 -- scroll up to line 10.  And who is the investor

20  mentioned in line 10?

21  A.  Jayvant Heera.

22  Q.  And next to Mr. Jayvant Heera, who is the broker mentioned?

23  A.  Howard.

24  Q.  Let's scroll down within this same tab to line 74.  And

25  there is a line that says United.  By the way, you mentioned

1    United Property Invest.  Did you also around the office hear

2    that entity referred to as United Property Group?

3    A.  I believe so, yes.

4    Q.  And so with respect to the United entry at line 74, who is

5    the --

6            (Fire announcement)

7    Q.  We will get through this, Mr. Lake, with sheer tyranny of

8    will.

9    A.  That's fine.

10   Q.  On line 74 --

11           (Fire announcement)

12   Q.  So, who are the investors at line 74 that were brought in

13   by United Property Group?

14   A.  Loreley Zavattiero and Marcelo Paulo Chenko.

15   Q.  All right.  Now, there is an additional tab after the

16   locations that reads turnover by agents.  And so under turnover

17   by agent there is a line for United with sums broken down by

18   location, 39th, 46th and the like.  At the very end there is a

19   line that says agent total.  What is the listed agent total for

20   United?

21   A.  $7,499,000.

22   Q.  Let's take that down.  Can we now pull up Government

23   Exhibit 310, which also came in through that stipulation.  And

24   so we have tabs here that break things down by month, Jan, Feb,

25   March, April and May.  Let's take a look at April since we're

1    here and scroll down to United Property.  And there are a

2    number of names under United Property.  Mr. Lake, do you have

3    an understanding of what these names were?

4    A.   These are names of investors.

5    Q.   OK.  And let's scroll up just a little bit.  In addition to

6    United Property there is a group of names under Core

7    Agents-Sav.  Did you have an understanding of who or what Core

8    Agents-Sav was?

9    A.   That was an entity that was run by Savraj Gata-Aura.

10   Q.   And did Savraj Gata-Aura have another name by which you

11   knew him?

12   A.   He also went by Sam.

13   Q.   And that's the same Sam Aura you've been discussing?

14   A.   That's correct.

15   Q.   All right.  Why don't we take 310 now and briefly put up

16   311.

17          And is it fair to say that we have another version of

18   the chart that we were looking at before, with broker name,

19   date of purchase, lease, the other entries broken down by site?

20   A.   That's correct.

21   Q.   And --

22          (Fire announcement)

23   Q.   All right.  Now, why don't we look at the West 39th tab.

24          (Fire announcement)

25   Q.   All right.  With respect to Government Exhibit 311, the

J647MOO1                          Lake - Direct

1   West 39th Street tab, we'll note that these seem to be

2   organized by date.  What is the earliest date that you see --

3   date of purchase, that is -- that you see on the screen right

4   now?

5   A.   October 21, 2015.

6   Q.   Now let's go to the 7th Avenue South tab -- 47 7th Avenue

7   South.

8             (Fire announcement)

9             Can we scroll to the bottom.  You will note that the

10  dates are getting higher.  What's the latest date that you see

11  on this tab?

12  A.   May 10 --

13            (Fire announcement)

14  Q.   Can you give me the rest of that answer?

15  A.   Sure.  May 10, 2016.

16  Q.   Thank you.  And why don't we close this file.

17            Now, in addition to the spreadsheets and the

18  contracts, Mr. Lake, did you happen to get any personal

19  documents relating to Mr. Haddow?

20  A.   During my time there I got some bank statements from Wells

21  Fargo.

22  Q.   I want to put -- can we put just on the witness's screen

23  for the moment what has been marked for identification as

24  Government Exhibit 309.

25            Are you familiar with this document, sir?

J647MOO1                          Lake - Direct

1   A.  I am, yes.

2   Q.  How are you familiar with that?

3   A.  I retrieved that through Ms. Cordner's e-mail.  I'm

4   sorry -- a 2017 e-mail -- I don't remember which e-mail I

5   retrieved it from, but it was one of Bar Works employees.

6   Q.  Whichever e-mail you retrieved it from, was this your same

7   efforts to gather evidence that we described before?

8   A.  It was.

9   Q.  And what is this document?

10  A.  That's Renwick Haddow's passport.

11  Q.  And I will note at the very top of the exhibit there is a

12  label explaining what it is.

13  A.  I'm sorry.  Driver's license.

14          MR. BELL:  The government offers Government Exhibit

15  309.

16          MR. GARVIN:  There is no objection, your Honor.

17          THE COURT:  OK, I will allow it.  Show it to the jury,

18  please.

19          MR. BELL:  Thank you, your Honor.

20          Let's publish it to the jury, Mr. Cooney.

21          (Government Exhibit 309 received in evidence)

22  Q.  So that's an image of Mr. Haddow's driver's license that

23  you got from Bar Works employee e-mail?

24  A.  That's correct.

25  Q.  Let's take that down.  While you were doing all of this,

1   Mr. Lake, did you talk to other employees at Bar Works about

2   your concerns?

3   A.  I did.

4   Q.  Who did you talk to?

5   A.  I talked to Mr. Daryl Brown, Ms. Jessica Mayo.

6   Q.  When you spoke to Mr. Brown, how did those conversations

7   go?

8   A.  He was willing to help me catch Renwick Haddow.

9   Q.  And what if anything did Mr. Brown do?

10  A.  He gave me one of his e-mails showing the members at Bar

11  Works, and he gave me a map, a schematic of the locations of

12  Bar Works.

13  Q.  You mentioned that you spoke to Ms. Mayo about your

14  concerns as well.  What did you say to her, and what did she

15  say to you?

16  A.  On my last day there I was retrieving information -- I'm

17  sorry -- I was retrieving just random documents, paperwork for

18  my day-to-day activities.  I went to the 39th Street location,

19  Ms. Mayo started acting very nervously.  We went to the back,

20  and she asked me what's wrong.  I said this is a Ponzi scheme,

21  and Ms. Mayo said, yes, I know.

22  Q.  Now, did there come a time when you attempted to draw press

23  attention to Bar Works as part of your effort to expose what

24  you thought was going on there?

25  A.  I did, yes.

J647MOO1                          Lake - Direct

1    Q.  How did you go about doing that?

2    A.  With some of the information I received, I was giving it to

3    a friend of mine who happened to be a journalist for The

4    Huffington Post.

5              (Fire announcement)

6    Q.  And did you attempt to get other people at Bar Works to

7    talk to The Huffington Post?

8    A.  I did.

9    Q.  Who did you attempt to get to talk to The Huffington Post?

10   A.  Mr. Daryl Brown.

11   Q.  Now, how if at all did your discovery of the Jonathan Black

12   problem and your concerns about the business affect your job

13   performance?

14   A.  I was just very nervous.

15   Q.  Did that translate to difficulties in the job?

16   A.  It did.

17   Q.  Of what sort?

18   A.  I got notification that I was doing sloppy work.

19   Q.  Who did you get that notification from?

20   A.  Ms. Tahyira Cordner.

21   Q.  Was that an oral notification?  A written notification?  Or

22   both?

23   A.  Both.

24   Q.  And what happened after that?

25   A.  I tried to do the best that I could, because I wanted to

J647MOO1                        Lake - Direct

1    stay to collect more evidence.

2    Q.  And how did that work out?

3    A.  The last day on May 16 I was caught taking the

4    spreadsheets.

5    Q.  And what happened after you were caught taking the

6    spreadsheets?

7    A.  On May 16 I took the last two spreadsheets.  The following

8    morning I got a phone call from Ms. Cordner saying I was let

9    go.

10   Q.  Now, after you were fired, did you attempt to get a

11   severance package from Bar Works?

12   A.  Much later, yes.

13   Q.  About how much later?

14   A.  By September of 2016.

15   Q.  Did you retain a lawyer for that purpose?

16   A.  I did.

17   Q.  So without going into any conversations that you may have

18   had with your attorney, are you aware of any communications

19   that your attorney had with Bar Works on your behalf?

20   A.  I am.

21                (Continued on next page)

22

23

24

25

J643MOO2                          Lake - Direct

1    Q.  What sort of communications were those?

2    A.  Electronically sent a severance package.

3    Q.  Did you approve of all those communications?

4    A.  I did.

5    Q.  Did you receive as part of that further correspondence from

6    Bar Works?

7    A.  I did.

8            MR. BELL:  So, Mr. Cooney, can we put just on the

9    witness's screen for the time being what's been marked for

10   identification as Government Exhibit 312.

11   Q.  I'd ask you to take a look at that.  Are you familiar with

12   that document, sir?

13   A.  I am.

14   Q.  How are you familiar with it?

15   A.  That was the letter that the attorney sent to me via from

16   Bar Works.

17           THE COURT:  That?

18           THE WITNESS:  That the attorney sent to me from Bar

19   Works.

20           THE COURT:  To you?

21           THE WITNESS:  Yes.

22   Q.  Who was it addressed to?

23   A.  To me -- to Patrick J. Boyd.

24   Q.  Who is Mr. Boyd?

25   A.  Mr. Boyd is a partner for that law firm.

J643MOO2                        Lake - Direct

1              MR. BELL:  The government offers Government Exhibit

2     312.

3              THE COURT:  I'll allow it.

4              Mr. Boyd is who?

5              THE WITNESS:  The partner for the Boyd Law Group.

6              (Government's Exhibit 312 received in evidence)

7              THE COURT:  Is that your lawyer?

8              THE WITNESS:  I worked with William Lee, but the head

9     was Patrick Boyd.

10             MR. BELL:  Can we publish 312 to the jury, please.

11    Q.  Just to save a bit of time, I'll read for a moment from

12    where it begins:

13             "Dear Mr. Boyd.  Re Regis Vincent Lake.  Further to

14    your letter dated October 6, 2016.  I thought it would be a

15    good idea to set out the series of events that led up to

16    Mr. Lake's termination on May 17, 2016, as there is a different

17    version and interpretation of events from the point of view of

18    Bar Works than you have set out in your letter.  On May 11,

19    Mr. Lake was given a written warning for 'sloppy errors' and

20    'not following orders.'  The written warning was signed by

21    Mr. Lake and his manager Ms. Cordner.  The consequences of a

22    repeat of these 'offenses' was the termination of his

23    employment.  We are happy to provide this information if you

24    are not in possession of this.  On May 16, Mr. Lake

25    communicated with Jessica Mayo who is an employee of Core

Agents Limited, not Bar Works, and in a Skype message he wrote

to her 'I have been here for about three weeks and I can tell

you this place is fucked.'"

    Did you indeed have that communication with Ms. Mayo?

A.  I did.

Q.  The next paragraph:  "Further, we were also informed on

May 16 or thereabouts that Mr. Lake had been in contact with

the Huffington Post about his concerns about Bar Works and had

provided one of the members of Bar Works' cell number without

his authorization."

    I'd like for you to go down now to the very bottom and

the last two paragraph -- that will do nicely, the last full

paragraph and the signature.  It ends:  "We would welcome you

bringing your client's half-baked allegations to the SEC or a

similar body as you/your client has threatened us with as we

have nothing to hide and this will assist in clearing this

matter up.  The payment demand of Mr. Lake are and never will

be accepted by Bar Works, but I am willing to discuss a much

reduced financial approach as we as a company recognize that

the employment contracts at the start of our business were not

up to the professional standards we required.  These contracts

have been addressed but that was post Mr. Lake's employment."

    And who signs this, sir?

A.  It was signed by Jonathan Black.

Q.  Did you ever get a severance package from Bar Works?

J643MOO2                              Lake - Cross

1    A.  I did not.

2    Q.  Finally, sir, you were in contact with the SEC.  Are you

3    familiar with what's called a whistleblower program?

4    A.  I am.

5    Q.  What is a whistleblower program as it pertains to an entity

6    like the SEC?

7    A.  You get a reward for blowing the whistle for criminal

8    behavior at an organization.

9    Q.  Is it your hope that you will be the beneficiary of a

10   whistleblower reward for having reported these events and

11   providing documents to the SEC?

12   A.  Hopefully, yes.

13   Q.  Did you at any point after your termination from Bar Works

14   ever see or interact with Jonathan Black?

15   A.  No.

16   Q.  Did you ever see Mr. Haddow again?

17   A.  After my termination?

18   Q.  Yes, sir.

19   A.  No, I did not.

20          MR. BELL:  One moment, please.  No further alarms and

21   no further questions.

22          THE COURT:  Well, no further questions anyway.

23          MR. BELL:  It is a hope, your Honor.

24   CROSS-EXAMINATION

25   BY MR. GARVIN:

1   Q.  Good morning, Mr. Lake.  My name is David Garvin, I have

2   the privilege of representing Mr. Moore in this case.

3           Sir, I understand that based upon the last exhibit

4   that Bar Works wrote back to your lawyer after he had written a

5   first letter to them.  Is that correct?

6   A.  That's correct.

7   Q.  In the first letter that he wrote on October 6 of 2016, he

8   requested on your behalf a severance package because it was not

9   proper the way that Bar Works treated your case.  Is that fair

10  to say?

11  A.  I'm sorry, can you repeat the question?

12  Q.  Yes.  Let me break it down.  There was a letter of

13  October 6 of 2016 that was written by your lawyer.  Correct?

14  A.  That's correct.

15  Q.  And in that letter, your lawyer addressed the issue that

16  you were improperly terminated.  Isn't that true?

17  A.  That's correct.

18  Q.  Because of that improper termination, your attorney felt

19  and displayed in his letter that it would be appropriate for

20  you to receive a severance payment.  Isn't that true?

21  A.  That is correct.

22  Q.  So, representing your interests as attorneys are supposed

23  to, he requested a lump sum settlement for you on your behalf.

24  Correct?

25  A.  That's correct.

1    Q.  Do you recall, could you tell the ladies and gentlemen of

2    the jury what the initial amount that your lawyer requested on

3    your behalf, sir?

4    A.  Yes.  It was two years, two years' salary.

5    Q.  What was the dollar amount of two years' salary, sir?

6    A.  It was 15 an hour I was making.  I want to say $36,000 a

7    year maybe.

8    Q.  So approximately $70,000, give or take?

9    A.  That's about right.

10   Q.  Okay.  It was in response to that letter that Bar Works

11   wrote this letter that was just placed into evidence this

12   morning, correct?

13   A.  That's correct.

14   Q.  Bar Works I would say defiantly said, well, go ahead, and

15   report us to the SEC.  Basically what they said, right?

16   A.  That's correct.

17   Q.  In fairness, some period of time after that, you did in

18   fact turn them in to the SEC, correct?

19   A.  That's also correct.

20   Q.  And I guess that goes under the definition of be careful

21   what you wish for, right?

22   A.  Yes.

23            THE COURT:  Well.

24   Q.  Sir, I'd like to go to Jonathan Black and Renwick Haddow.

25   Would it be accurate to say that, based upon your experience

J643MOO2                              Lake - Cross

1    with Mr. Haddow, that he is not a person who can be trusted?

2                MR. BELL:  Objection.

3                THE COURT:  If you have a basis for having an opinion.

4    A.  I have no basis for an opinion.

5    Q.  This is somebody that you just testified that was signing

6    documents as Jonathan Black.  Is that correct?

7    A.  That is correct.

8    Q.  This is a person that you just testified who was operating

9    Bar Works, correct?

10   A.  That is correct.

11   Q.  This is the person who was operating Bar Works which in

12   reality was a Ponzi scheme; isn't that correct?

13   A.  That is correct.

14   Q.  This is a person that you were clandestinely collecting

15   evidence because you know running a Ponzi scheme is wrong,

16   correct?

17   A.  That is correct.

18   Q.  And you had every intention, once you had enough evidence,

19   to expose this; isn't that correct?

20   A.  Yes.

21   Q.  And if that required you to go to the SEC, then so be it,

22   correct?

23   A.  Yes.

24   Q.  If that required you to go to the police or even the FBI,

25   so be it, correct?

1  A.  Yes.

2  Q.  And that was all because what Renwick Haddow was doing was

3  wrong, correct?

4  A.  That is correct.

5  Q.  He was lying to investors, correct?

6  A.  That's correct.

7  Q.  In fact, he was lying to you, because you would have never

8  taken that job had you known that Renwick Haddow was signing

9  documents as Jonathan Black, correct?

10          MR. BELL:  Objection.

11          THE COURT:  Overruled.

12  A.  That's correct.

13  Q.  So, sir, I ask you again, based upon what you saw, and what

14  you were thinking, would it be fair to say, and accurate to

15  say, that Renwick Haddow was someone that you could not trust?

16          MR. BELL:  Same objection, Judge.

17          THE COURT:  Overruled.  If you have an opinion on

18  that.

19  A.  After I did my research about who Renwick Haddow was, yes;

20  that's not somebody I could trust.

21          MR. GARVIN:  Thank you, sir.  I have no further

22  questions.

23          THE COURT:  Anything else?

24          MR. BELL:  No redirect.

25          THE COURT:  Thanks very much.  The witness is excused

1    and we'll have the next witness, please.

2              (Witness excused)

3              MR. VAINBERG:  Yes, your Honor.  The government calls

4    Julian White.

5     JULIAN WHITE,

6          called as a witness by the Government,

7          having been duly sworn, testified as follows:

8    DIRECT EXAMINATION

9    BY MR. VAINBERG:

10   Q.  Good morning, Mr. White.

11   A.  Good morning.

12   Q.  Mr. White, how old are you?

13   A.  53.

14   Q.  Can you describe your educational background for the jury.

15   A.  Could you just raise your voice a little please, sir.

16   Q.  Certainly.  Could you describe your educational background.

17   A.  My background?

18   Q.  Your educational background.

19   A.  Education background, yes, sure.  I took O levels, A

20   levels, and a degree in biological sciences.

21   Q.  What line of work did you go into after you finished your

22   schooling?

23   A.  I took a two-year related biology job, and then moved into

24   software and IT.

25   Q.  Could you describe your professional background.

J643MOO2                          White - Direct

1    A.   Yes.  I've been in software sales for a couple of decades,

2    and I've been running my own business since 2010.

3    Q.   What business are you running?

4    A.   Advertising.

5           THE COURT:  That's your own business?  Is it your own

6    business?

7           THE WITNESS:  It is my business, yes.

8    Q.   What's the name of your advertising company?

9    A.   AdMetrics Media.

10   Q.   What kind of advertising do they do?

11   A.   So, online advertising, company distributes display video

12   and mobile ads across the internet.

13   Q.   What country are you a citizen of?

14   A.   What country?

15   Q.   What is your country of citizenship?

16   A.   I'm British.

17   Q.   Where do you live?

18   A.   I beg your pardon?

19   Q.   Where do you live, sir?

20   A.   I live in Stockholm, Sweden.

21   Q.   How long have you lived in Sweden?

22   A.   Since 2005.

23   Q.   Mr. White, have you ever invested your money into any sort

24   of investment, other than retirement plan?

25   A.   Yes, I have.

J643MOO2                         White - Direct

1   Q.  How long have you been making investments?

2   A.  Probably for the best part of 20 years.

3   Q.  What kinds of things have you invested your money in?

4   A.  I've invested in property for property development,

5   property for rental, I invested in a Swedish company as a

6   co-owner and director along with two other Swedish directors,

7   and I've also invested in my own company, AdMetrics Media.

8   Q.  In addition to those companies, did there come a time when

9   you invested in a company called Bar Works?

10  A.  Yes.

11  Q.  Before we talk about Bar Works, can you just generally

12  describe your process when deciding when to invest into a

13  company.

14  A.  Yes.  So, normally, I look at the industry in which I'm

15  looking to invest in, I look at the company and the business

16  plan, I look at the directors involved in the company, and look

17  at the general return on investment.

18  Q.  Is the management of the company important to you, sir?

19  A.  Yes, it is.

20  Q.  Why is that important?

21  A.  It gives an indication of how the business may be run.

22  Q.  Do you perform any due diligence on the company before you

23  invest?

24  A.  Yes.

25  Q.  What kinds of information do you typically review as part

1    of your own due diligence?

2    A.  I look at the company background, I look at the industry

3    and the return on investment, along with just general research.

4    Q.  Are you familiar with the term "investment brochure"?

5    A.  Yes.

6    Q.  What is that?

7    A.  So that would be like a general overview of the business

8    plan or the investment potential.

9    Q.  Is the investment brochure issued by the company itself?

10   A.  Yes.

11   Q.  Do you rely on the company's investment brochure before you

12   decide to invest?

13   A.  Yes.

14   Q.  You mentioned that you had invested in a company called Bar

15   Works.  Is that right, sir?

16   A.  Yes, it is.

17   Q.  How did you come about learning about the opportunity to

18   invest in Bar Works?

19   A.  So, originally, I was looking on the internet for some

20   property investment opportunities, and I came across -- I think

21   I visited several sites, looked at several different ideas, and

22   I came across a property investment idea for I think it was

23   commercial offices in the U.K.  I think they were like perhaps

24   three or four different types of investments, and there may

25   well have been others attached to that.

1   Q.  After you saw those different types of investment

2   opportunities, what did you do?

3   A.  Could you just say that one more time, please?

4   Q.  I'm sorry, sir.  Let me try to get a little closer to the

5   mic.

6           Is it the case you have a mild hearing issue?

7   A.  Yes, a little bit.

8   Q.  I'll try to do better.  If you can't hear me at any point,

9   please feel free to interrupt me.

10  A.  I sure will.

11  Q.  You mentioned you had gone on the internet and you found

12  some real estate investment opportunities.

13  A.  Yes.

14  Q.  What did you do after that to learn more about those

15  investment opportunities?

16  A.  So I requested some more information on the opportunity.

17  Q.  Who did you request the information from?

18  A.  That would be from United Property Group.

19  Q.  Had you made any prior investments with United Property

20  Group?

21  A.  No.

22  Q.  Let's pull up if we could, Mr. Cooney, Government Exhibit

23  1140 in evidence.

24          Mr. White, do you see that on the screen?

25  A.  Yes.

1    Q.  This exhibit?  If we just focus on the top portion of this

2    page.  What is this generally?

3    A.  So this is an e-mail to me from Timothy Connell, sent

4    November 2015.

5    Q.  Who is Timothy Connell?

6    A.  Timothy Connell is an employee at United Property Group.

7          MR. VAINBERG:  If we zoom back out, Mr. Cooney, and go

8    through some of these pages.

9    Q.  Is this a chain of e-mails between you and Timothy Connell

10   at United Property Group?

11   A.  Yes, it is.

12   Q.  So let's orient ourselves.  Could we look at the very first

13   e-mail on that chain, on page eight at the bottom going on to

14   page nine.

15   A.  Yes.

16   Q.  What did Timothy Connell write to you here?

17   A.  So he's describing the Daniel House residential investment

18   opportunity in Liverpool, which I believe was one of the

19   investment opportunities I was looking at, at the time.

20   Q.  At some point did Mr. Connell advise you of the investment

21   opportunity with Bar Works?

22   A.  I beg your pardon?  One more time.

23   Q.  At some point, did you shift your conversation from this

24   investment opportunity to Bar Works?

25   A.  Yes, we did.

1   Q.  Let's go to page four.  Is that an e-mail from you to

2   Timothy Connell as part of the same chain?

3   A.  Yes.

4   Q.  Could you read what you wrote to Mr. Connell.

5   A.  Yes.  "Hi Timothy.  Can you provide some more information

6   on the New York commercial investment?  What are the terms for

7   this investment?  What guarantees are in place for a 15 percent

8   annual return?  What sums can be invested?  What is the exit

9   strategy, both short and long term?"

10  Q.  If we go to page one.  Did Timothy Connell respond to your

11  questions?

12  A.  Yes, he did.

13  Q.  If we look on the bottom, are those your questions in the

14  bullet points and his answers right below that?

15  A.  Yes, and sorry?

16  Q.  I was just asking if those are your questions and his

17  answers?

18  A.  Yes, those are the questions.

19  Q.  So let's look at a couple of these.  You wrote "What

20  guarantees are in place for a 15 percent annual return."

21  A.  Yes.

22  Q.  Did you understand Bar Works to be offering 15 percent

23  annual return to investors?

24  A.  I did.

25  Q.  Why did you ask what guarantees were in place for that

J643MOO2                          White - Direct

1    return to be paid?

2    A.   I wanted to make sure that it was forthcoming.

3    Q.   Could you read what Timothy Connell said to you in the

4    first two paragraphs.

5    A.   Yes.   "The rental guarantee is clearly shown and stated in

6    the terms and condition and worth noting that America is the

7    most regulated country in the world for any form of investment.

8    The U.S. laws for T & Cs and legally binding contracts give

9    huge amounts of consumer and investor protection.  Bar Works

10   operates in this U.S. highly regulated arena and must abide by

11   any terms offered.  It is not flippant to say that if they

12   breach those terms, then they can fail huge fines and even

13   imprisonment.  The CEO Jonathan Black has set up and

14   financially controlled PLCs in the U.K. previously.  One

15   example being Regent Inn PLC who owned and managed the

16   Walkabout Estate, a chain of London High Street bars and

17   hospitality venues.  His professional track record is exemplary

18   and that can be validated online and therefore clearly in the

19   public domain."

20   Q.   Who did the UPG representative identify as the CEO of Bar

21   Works?

22   A.   That's Jonathan Black.

23   Q.   Was Jonathan Black's track record important to your

24   decision to invest?

25   A.   Yes.

1   Q.  Did you do any due diligence on the company Regent Inns PLC

2   that's listed here?

3   A.  I did.

4   Q.  What did you do?

5   A.  I looked them up on the internet, just to find out a little

6   bit more about them.

7   Q.  What did you learn?

8   A.  I found that they ran a chain of entertainment bars and

9   restaurant.

10  Q.  Did what you learned on the internet about the Regent Inns

11  give you enough comfort to move forward with proceeding with

12  this investment?

13  A.  Yes.

14          MR. VAINBERG:  Let's zoom out if we could, Mr. Cooney,

15  and focus on the continuation of this e-mail from United

16  Property Group, the portion that says "in conclusion."

17  Q.  Did the United Property Group representative discuss with

18  you the risks of this investment?

19  A.  Could you just repeat that one more time?  I'm sorry.

20  Q.  Certainly.  I'm sorry.  Did the United Property Group

21  representative, Mr. Connell, did he make any statements to you

22  about the risk of the Bar Works investment?

23  A.  Yes.

24  Q.  Could you read what he wrote here in this paragraph.

25  A.  Certainly.  "In conclusion, when you look closely at this

1    the investment model, its prime location, the paradigm shift in

2    how office space is now used and the demand and influence

3    coming from members of Bar Works (end users), then the chance

4    of the business going bust is really a World War III scenario."

5    Q.  Let's go to the next paragraph after that.  Could you read

6    the next paragraph, please.

7    A.  "However, if investors want zero risk, then, as always, we

8    recommend they should leave their capital residing in the bank,

9    as long as they are aware of the zero rate of return or even

10   less due to the effects of inflation.  I'm sure you agree,

11   Julian, for any investor losing money on their savings in this

12   way does not make financial sense."

13   Q.  Let's go back to page one.  If we can zoom in on the

14   header.  What, if anything, did Timothy Connell attach to this

15   e-mail?

16   A.  So, he also attached an application form and a prospectus.

17   Q.  What do you understand a prospectus to be?

18   A.  Basically an overview of the business opportunity.

19   Q.  Did you read this prospectus?

20   A.  I did, yes.

21   Q.  Did you rely on this prospectus before investing into Bar

22   Works?

23   A.  Yes.

24   Q.  Based on the prospectus, what did you understand Bar Works

25   to be?

1   A.   Bar Works was an opportunity to invest into leases for

2   coworking space.

3   Q.   How would Bar Works generate revenue?

4   A.   By subscriptions for individuals who wanted to take seats

5   in the coworking space environment.

6   Q.   Let's go to page 16 of the prospectus -- of the exhibit.

7   I'm directing you to a portion of the prospectus titled "letter

8   from the directors."  It begins with "dear investor."

9           Who is this letter signed by?

10  A.   It's signed by Jonathan Black, CEO of Bar Works.

11  Q.   Did this letter explain the investment potential to

12  investors like you?

13  A.   Could you just repeat that?  I'm sorry.

14  Q.   Certainly.  What did this letter describe?

15  A.   What does what describe?

16  Q.   What did this letter generally describe about the

17  investment?

18  A.   This is describing the investment opportunity for potential

19  investors.

20  Q.   Let's go to the next page.  Who was the master agent on the

21  Bar Works prospectus?

22  A.   That would be United Property Group.

23  Q.   If we keep on going to the next page and just highlight the

24  two middle columns, please.

25          Could you describe the terms of the offer made to

1   investors like yourself.

2   A.  Yes.  So, basically, there was an offer for the

3   availability of leases over a 10-year period for the purchase

4   sum of $22,000.

5   Q.  How much would you receive each year if you purchased one

6   of those leases?

7   A.  15 percent.

8   Q.  What did you understand would happen at the end of the

9   10-year lease period?

10  A.  There would be a buyback policy guaranteeing a buyback.

11  Q.  Does that mean you would be given back whatever money you

12  put into Bar Works?

13  A.  Yes, that's correct, plus 15 percent.

14  Q.  And it says that Bar Works guarantees to buy back your

15  lease at 125 percent of the initial cost.

16         Did you understand that to mean whatever you put in,

17  you'd get your money back plus another 25 percent?

18  A.  I'm sorry, yes, that's correct.

19  Q.  That would be on top of your 15 percent annual returns?

20  A.  Yes, that is correct.

21  Q.  Is that what's stated in the next paragraph beginning with

22  "So you are guaranteed 15 percent a year income"?

23         THE COURT:  You have to answer for the record.

24  A.  Could you just repeat the question one more time then so I

25  get that right?

1   Q.  Sure.  You were just nodding, but for the court reporter we
2   need to hear yes or no or your full answer.
3   A.  Okay.
4   Q.  So, are the terms of the offer, the 15 percent return and
5   the buyback, is that what's stated in this paragraph?
6   A.  Yes.
7   Q.  What did you understand would happen if the work space
8   leases you purchased didn't have any customers coming in on the
9   street and use them?
10  A.  That wouldn't affect the guarantee.
11  Q.  Is that why you wanted to know what was behind the
12  guarantee?
13  A.  Yes.
14  Q.  Let's go to and flip through the end of this brochure.  Did
15  it give you a lot of information about Bar Works and coworking
16  spaces and comfort about the business model?
17  A.  Yes, that's correct.
18  Q.  After receiving this information and this prospectus, what
19  happened next in your discussions with UPG?
20  A.  So, I wanted to find out more information about the company
21  and the people behind it.
22  Q.  Did you send and receive more e-mails with United Property
23  Group?
24  A.  Yes.
25  Q.  Let's go to Government Exhibit 1141.  Is this another chain

1  of e-mails between you and Timothy Connell of United Property

2  Group?

3  A.  Yes.

4  Q.  Let's just look on the bottom, Timothy Connell's e-mail to

5  you, which I'll read to save us a little bit of time.

6          "Hi Julian.  I hope this e-mail finds you in good

7  health.  I was hoping to touch base with you before James and

8  three other members of the board fly to NYC tomorrow."

9          What was your understanding as to who was flying in to

10  New York City?

11  A.  The directors of United Property Group.

12  Q.  What was your understanding of who they would meet in New

13  York City when they visited?

14  A.  That would be Jonathan Black, Bar Works.

15  Q.  Did you have an understanding of who the name James refers

16  to?

17  A.  I assumed that James was a director of United Property

18  Group.

19  Q.  Do you know the last name of the James that's being

20  referred to here?

21  A.  No.

22  Q.  Did the representative of UPG that you were talking to say

23  the name James Moore at any point?

24  A.  I don't believe so.  I couldn't say with 100 percent

25  certainty.

1    Q.  If we go to page two of this e-mail.  Could we highlight
2    the paragraph beginning with -- just the first two paragraphs.
3    So the first sentence, the UPG representative is writing
4    "600,000 GBP is a considerable sum of money to invest."
5            Do you see that?
6    A.  Yes.
7    Q.  By that point, had you told UPG about how much money you
8    were thinking of investing?
9    A.  Yes.
10   Q.  How much was that?
11   A.  600,000 pounds.
12   Q.  Could you read what the representative wrote to you in the
13   second paragraph.
14   A.  You'd like me to read the second paragraph?
15   Q.  If you wouldn't mind.
16   A.  Yes, certainly.  "I don't want to push you, Julian, but
17   with an average of seven deals a day for the last 11 days, and
18   with only 150 leases available on 37th Street, you don't need a
19   genius to figure out that it's been well received by our
20   investors, and to be brutal, we have hardly had to do any work
21   on the marketing.  However, it's worth noting that next week,
22   there will be a flood of new inquiries for Bar Works Inc. as we
23   have readied a marketing campaign to go out imminently.  You
24   are also aware that the next offer will be priced at $28,000
25   per lease, offering a slightly reduced 11 percent return."

1    Q.   What did you understand might happen if you didn't move

2    quickly to purchase the Bar Works opportunity?

3    A.   The amount would go up, and there would be low return.

4              THE COURT:  You mean the cost of investment would go

5    up?

6              THE WITNESS:  That the?

7              THE COURT:  Cost of investment would go up?

8              THE WITNESS:  The cost of the investment would go up;

9    that's correct, sir.

10   Q.   Let's go to your response to Mr. Connell on page one.

11   Could you read for the jury what you wrote.

12   A.   Yes.  "Hi Timothy, thanks for the update.  I think we need

13   to go through the opportunity in more detail before rushing

14   into this.  I can't invest that sort of sum without knowing

15   every piece of the puzzle.  If you want, we can set up a

16   GoToMeeting to go through a Q and A tomorrow as I have a lot of

17   questions and haven't moved out of the fact finding part of

18   this.  I can send you an invite if you let me know a convenient

19   time."

20   Q.   What additional fact finding did you need to do before you

21   could proceed with the investment?

22   A.   I wanted to get more detail about the opportunity.

23   Q.   Let's go to Government Exhibit 1143, if we just start with

24   the header information.  Could you identify who this e-mail is

25   from and to?

1   A.   Yes.   This is from myself to Timothy Connell dated

2   November 24, 2015.

3   Q.   Mr. Cooney, if we focus on the bottom half.

4           Was that responding to an e-mail Timothy Connell sent

5   to you?

6   A.   Which bit would you like me to focus on?

7   Q.   Sure.   After you needed to do more fact finding, did

8   Timothy Connell send you additional e-mails?

9           Let me just rephrase that.   I'm sorry that I'm not

10  being clear.

11          If we focus on the bottom half of this e-mail, could

12  you tell us who this e-mail is from?

13  A.   The e-mail is from Timothy Connell to myself dated 24

14  November 2015.

15  Q.   Could you just please read Mr. Connell's e-mail.

16  A.   Yes.   "Hi Julian, I hope you are well and you enjoyed a

17  pleasant weekend.   Julian, the chaps got back yesterday

18  afternoon, and by all accounts it seems Bar Works actually went

19  way beyond their expectations.   I can tell you a third site in

20  New York has been identified.   I will be sitting down today

21  with the guys to work over your account so I can prepare the

22  next steps for you.   The guys will indicate a time that suits

23  for our next conference call, and I can confirm that members of

24  the board will be present to discuss all things Bar Works with

25  you.   Once I know when is good for them, I can come back to you

1    and make sure it is a good time for you too.  By all accounts,

2    the trip was super positive and the guys were blown away with

3    how it went.  Also within the next 24 hours or so we will have

4    an official letter from Bar Works to say that from December 20

5    the prices will go up and returns will be dropping slightly.  I

6    will come back to you later in the day to see if we can confirm

7    our next conference call."

8    Q.  The references here to the chaps coming back from New York,

9    what did you understand that to be about?

10   A.  So, the trip was basically to discuss different sites in

11   New York with Bar Works.

12             THE COURT:  You need a break?

13             A JUROR:  Yes.

14             THE COURT:  We're going to take a five-minute break.

15   The jurors are excused.

16             (Jury excused)

17             THE COURT:  We'll take a five-minute break as well.

18   If anyone needs to use the restroom you can, or you can stay in

19   place if you'd like.

20             MR. BELL:  Thank you, your Honor.

21             (Recess)

22             (In open court; jury present)

23             THE COURT:  We'll continue with the examination of

24   Mr. White.

25             THE DEPUTY CLERK:  Sir, I'd just like to remind you

1      that you are still under oath.

2                      THE WITNESS:  Yes.

3                      MR. VAINBERG:  If I may?

4                      THE COURT:  Yes.

5      Q.  Mr. White, when we broke, we were looking at some e-mails

6      between you and Timothy Connell from United Property Group.

7      I'd like to pull up another one of those e-mails, Government

8      Exhibit 1142, and let's focus on the bottom half of this

9      portion.

10                     Is this an e-mail from Timothy Connell to you?

11     A.  Yes, this is an e-mail from Timothy Connell to me.

12     Q.  Mr. Connell writes, "Hi Julian.  As promised, here is the

13     e-mail I have prepared for my clients asking about Bar Works

14     Inc.  I have included everything I have available for Bar Works

15     Inc."

16                     And then there it says FAQs and number one, what

17     guarantees are in place to "assure" the 15 percent annual

18     return?

19                     Is that essentially the question you asked of

20     Mr. Connell?

21     A.  It is, yes.

22     Q.  And in that e-mail, does Mr. Connell provide you much of

23     the same information about Jonathan Black, the CEO?

24     A.  Yes.

25     Q.  If we go to page four, the last two paragraphs on page four

J643MOO2                         White - Direct

1    and the first two on page five.  In this portion of

2    Mr. Connell's e-mail, he writes, "But again, back to We Work,

3    and it's good to note that they are planning a floatation of

4    10bn on the New York Stock Exchange and do not own a single

5    building.  Their full estate is leased and the model for Bar

6    Works Inc. is identical.  Thus, Bar Works Inc. is a new company

7    which now owns the long lease for the 39th Street building that

8    we can invest into.  The CEO, Jonathan Black, has a sterling

9    reputation and was previously the finance director and

10   comptroller for Regent Inns PLC.  In regards to security then,

11   as far as we can tell, having delved very deeply into the Bar

12   Works model (when my directors flew to meet Jonathan and his

13   team in NYC, they visited the building, and looked at some of

14   the competitor spaces -- We Work sites) that the investment is

15   not only safe, but very much a game changer for any

16   individual's portfolio.  It would be similar to investing in a

17   property next to Piccadilly Circus and being very much a part

18   of the fundraising for the first round.  In that regard, the

19   benefit is being in before the economies of scale kick in.  The

20   incentive certainly seems to benefit the early bird, which is a

21   key reason why my investors are buying in numbers and procuring

22   multiple leases.  The only risk we can establish is a World War

23   III doomsday one whereby NYC shut down as a global capital of

24   business and commerce.  The chance of that is massively

25   unlikely, just as unlikely as it would be for us at home here

1    in London."

2              Did Mr. Connell write all that to you?

3    A.  Yes.

4    Q.  Directing your attention to the second paragraph where it

5    says, "Having delved very deeply into the Bar Works model when

6    my directors flew to meet Jonathan and his team in NYC," who

7    did you understand the Jonathan to be that is referred to here?

8    A.  Jonathan Black.

9    Q.  Now, let's go to Government Exhibit 1144, and let's look on

10   the bottom.  Did there come a time when you started taking

11   calls with representatives of United Property Group?

12   A.  Yes.

13   Q.  And looking at this e-mail, could you tell us who the

14   e-mail is from, to whom, and the date?

15   A.  Yes.  It's from Timothy Connell, to myself, copied

16   individual JR, and it's sent on 24 November 2015.

17   Q.  Do you know what JR stands for?

18   A.  No, I don't.

19   Q.  Who did you understand JR was?

20   A.  I don't know.

21   Q.  Did you understand whether or not JR was somebody

22   associated with United Property Group?

23   A.  Yes.

24   Q.  In this e-mail, I'll direct you to the portion that reads

25   "Julian, it's been really difficult to get ahold of the guys

J643MOO2                          White - Direct

1    today.  However, I have now managed to get a time for our next

2    call.  James is available at 3 p.m. tomorrow or if not he can

3    make the 5 p.m. the following day, Thursday."

4              Was a call scheduled between you, Timothy Connell, and

5    somebody named James?

6    A.  Yes.

7    Q.  And let's go to page six.  Is that you scheduling a

8    conference call?

9    A.  Yes, it is.

10   Q.  Now, let's go up to page three in the middle.  And actually

11   let's go one page back, please.  Let's blow this up.

12             Who is this e-mail from and to?

13   A.  This is from myself to Tim Connell.

14   Q.  You write here, "Thanks to you and James for the discussion

15   yesterday."

16             Was that the conference call we were just talking

17   about?

18   A.  Yes.

19   Q.  You wrote here that you wanted to follow up on some points

20   that came out of our meeting that would assist with our due

21   diligence.

22             Did you still have additional facts you needed to

23   learn about Bar Works, even after that conference call?

24   A.  Could you just say that one more time, please, so I have

25   that correct?

1        THE COURT:  Why don't you move that closer to you.

2        MR. VAINBERG:  I will.  Can you hear me better now?

3        THE WITNESS:  Yes.

4   Q.  After the conference call with Timothy Connell and James,

5   did you have additional due diligence that you needed to

6   perform?

7   A.  Yes.

8   Q.  OK.  And are these the questions that you asked of United

9   Property Group?

10  A.  Yes.

11  Q.  On the very first bullet point you write, "Can you forward

12  the appropriate contact details for In Crowd Equity that

13  manages the $500,000 invested in Bar Works for a discussion?"

14        Could you help explain this, what was In Crowd Equity?

15  A.  Yes.  So I wanted to speak directly with one of the

16  directors of In Crowd Equity, that being the company that had

17  managed the 500,000 invested in Bar Works.

18  Q.  What was the company that had invested $500,000 into Bar

19  Works?

20  A.  U.S. Tech Startup.

21  Q.  And how did you learn that U.S. Tech Startup had invested

22  500,000 into Bar Works?

23  A.  I can't remember the exact origin of that, but I think it

24  was in part of the discussions.

25  Q.  Why was it important to you to learn that another company

J647MOO3                         White - Direct

1   had invested $500,000 into Bar Works?

2   A.   It was another way of helping to validate the company and

3   the opportunity.

4   Q.   Let's now go up to page 1.  You write here that you are

5   attaching a letter of intent.  What is that?

6   A.   The letter of intent was requested, for me to show my

7   intention to move forward with the opportunity.

8           THE COURT:  Is that a letter that you signed?  The

9   letter of intent, did you write one?

10          THE WITNESS:  I did write the letter of intent.

11          THE COURT:  You signed it?

12          THE WITNESS:  Yes, I did.

13          THE COURT:  And sent it to whom?

14          THE WITNESS:  I believe I sent that to United Property

15  Group.

16  Q.   Is that the letter of intent that's attached to this

17  e-mail?

18  A.   Yes, it is.

19  Q.   OK.  And could we look at the letter of intent on the last

20  page of this e-mail.  Was that the letter of intent that you

21  signed?

22  A.   That is the letter of intent, yes.

23  Q.   And could you just read the first paragraph of your letter

24  of intent.

25  A.   Yes.  "To whom it may concern.  It is the intention of

1    AdMetrics Media Limited to invest in the Bar Works property

2    lease opportunity in central New York for a sum of 600,000

3    pounds on the basis that requested information is forthcoming,

4    operations are fully transparent and terms are tailored to

5    ensure that all promises are met."

6    Q.  Did you request some changes to the standard lease terms?

7    A.  Yes.

8    Q.  And is that what is listed in the second half of this

9    letter of intent under "addition to terms"?

10   A.  That's correct.

11   Q.  Going back to page 1 -- actually if we can orient

12   ourselves, let's go to page 2, under U.S. Tech Startup.  Is

13   what is in black Timothy Connell's answer to you?

14   A.  Could you say it one more time, please.

15   Q.  Is what you see in black underneath your question, is that

16   what Timothy Connell replied to you?

17   A.  Yes, it is.

18   Q.  And Mr. Connell wrote, "Julian, when e-mailing In Crowd

19   Equity, can you please entitle the e-mail Bar Works Inc.,

20   Robert Haslem -- CEO and founder -- info@incrowdequity.com."

21   Who did you understand Robert Haslem to be?

22   A.  The CEO and founder of In Crowd Equity.

23   Q.  And if we go to page 1 and zoom in on the same bullet

24   point, what did you write in response to getting that

25   information?

J647MOO3                        White - Direct

1   A.  I wrote bullet point, "U.S. Tech Startup.  For this level

2   of engagement I'm expecting a personal e-mail address and

3   direct line, rather than an 'info@' e-mail address."

4   Q.  Why did you write that?

5   A.  I would expect to have a personalized e-mail address so

6   that I'm dealing directly with the person rather than the

7   generic address.

8   Q.  This is talking about In Crowd Equity, the company that you

9   thought managed a $500,000 investment; is that right?

10  A.  Could you say that one more time?  I'm sorry.

11  Q.  Sure.  This is relating to In Crowd Equity, right?

12  A.  Yes.

13  Q.  Let's go to bullet point 2, please.  What did you write

14  here?

15  A.  Bullet point 2, "Contact with Bar Works:  I would

16  appreciate a phone call, or conference webinar with Bar Works

17  to speak directly with them."

18  Q.  Why did you want to speak directly with Bar Works?

19  A.  I wanted to speak to the directors of the company because

20  of the amount of money that was being invested.

21          THE COURT:  And your plan was to invest approximately

22  600,000 Pounds; is that right?

23          THE WITNESS:  Yes, it is.

24  Q.  Let's go to Government Exhibit 1150.  Is this an e-mail

25  from Timothy Connell to you responding to your questions?

J647MOO3                            White – Direct

1   A.  Yes.

2   Q.  It reads, "Hi, Julian.  Good morning.  Some good news.  We

3   have had a response from New York.  Please see the comments I

4   have placed next to your own.  Thank you."

5            Let's take a look at the two bullet points we were

6   just looking at.  Could you read what Mr. Connell wrote to you

7   under the first bullet point?

8   A.  "Robert Haslem will be available to give you a call next

9   week.  I have been asked to pass your number on, I am assuming

10  I have your permission?  Please confirm a time and day that is

11  suitable whilst bearing in mind the time difference to Eastern

12  Standard Time."

13  Q.  Let's look at the second bullet point.  What did

14  Mr. Connell write in response to your request to speak with

15  someone directly at Bar Works?

16  A.  "Mr. Jonathan Black will be able to speak with you

17  directly.  He has time on Tuesday if that is suitable for you

18  (?) but once more, please consider the time difference."

19  Q.  Did you have a call with an with an individual identified

20  as Robert Haslem?

21  A.  Yes.

22  Q.  And did you have a call with an individual identified as

23  Jonathan Black?

24  A.  Yes.

25  Q.  We will talk about those calls in just a minute, but I want

1    to take a quick look at the portion of this e-mail that says

2    Bar Works accounts financials for the Bar Works accounts.  You

3    wrote here, "I would like to have some visibility of the

4    existing Bar Works accounts.  A profit/loss, or some similar

5    spreadsheet would help in providing transparency with the

6    existing financial health of the company."

7             Why was that important to you?

8    A.  I wanted to look into the financial records of the company

9    as part of the decision-making process.

10   Q.  And what did United Property Group write to you?

11   A.  "We appreciate your question, however, please note that the

12   first unit only opened in October and there is nothing of note

13   to demonstrate at this time.  Again, look for the seed capital,

14   it went into structuring the unit on 39th Street.  All costs

15   etcetera will have been taken into account via the seed

16   capital.  Again quoting from Bar Works if I may?

17            "The unit only opened in October so this really isn't

18   going to show anything meaningful."

19   Q.  And if we go to the next paragraph of that.  What did

20   Mr. Connell write to you in the next paragraph?

21   A.  "I believe that overall, we are making positive forward

22   steps here.  As I am sure you can appreciate, there are certain

23   areas of Bar Works that remain highly guarded.  Whilst I know

24   James made light of this when he asked you if you were planning

25   on opening a coworking space in Stockholm, there is a high

1    degree of security that surrounds the full financials and

2    working models of the business.  My feeling is that all will

3    become much clearer next week once you have been able to speak

4    to Robert and Jonathan."

5    Q.  Mr. White, did anyone provide you with any financial loss

6    figures or accounts information that you had requested?

7    A.  Could you repeat that, please.

8    Q.  Certainly.  Did anyone provide you with a financial loss --

9    any profit/loss figures that you requested?

10   A.  No.

11   Q.  What did you understand to be the reason that they couldn't

12   give you that information?

13   A.  I guess they were pushing back and saying that if they gave

14   that type of information, it might enable me to open some sort

15   of competitive coworking space in Sweden.

16   Q.  Were you planning on opening any sort of coworking space in

17   Sweden?

18            THE COURT:  Did you ultimately make the investment?

19            THE WITNESS:  Yes, I did.

20            THE COURT:  In what amount?  How much did you invest?

21            THE WITNESS:  In what amount?

22            THE COURT:  Yeah, how much did you invest?

23            THE WITNESS:  $600,000.

24            THE COURT:  Dollars?

25            THE WITNESS:  Dollars.

J647MOO3                      White - Direct

1    Q.  And let's look at Government Exhibit 1151.  On the second

2    page, let's blow this up.

3              When was the call with Jonathan Black scheduled?

4    A.  So that would be 10 a.m. Eastern Standard Time, and that

5    would be the 1st of December 2015.

6    Q.  And did you have a call with Jonathan Black on December 1,

7    2015?

8    A.  Yes.

9    Q.  What was discussed on that call?

10   A.  We talked about the investment fund company.  I wanted to

11   have direct contact details so that I could call them.  We

12   talked about the existing sites and proposed sites.  We also

13   talked about future expansion.  We talked about tax, as I was

14   an overseas investor; and also looking at the potential return

15   on investment and the exit strategy.

16   Q.  Did the person who identified themselves as Jonathan Black

17   answer all of your questions?

18   A.  Yes.

19   Q.  And what did you do as a result of that call?

20   A.  I invested in the company.

21   Q.  How much did you decide to invest overall?

22   A.  $600,000.

23   Q.  Now, I know earlier you had mentioned that you were

24   thinking of investing 600,000 Pounds.  How did you decide to

25   invests $600,000 instead?

1   A.  I felt more comfortable reducing the amount in line with

2   some of the other larger investors.

3   Q.  Did you have a call with Robert Haslem of In Crowd Equity?

4   A.  Yes.

5   Q.  And what was discussed on that call?

6   A.  We talked about the shared platform, the functionality of

7   the platform, how we're able to trade, what sort of amounts

8   might be appropriate, and also the exit strategy for available

9   for investors.

10  Q.  When you say share platform, did In Crowd Equity have

11  anything to do with soliciting investments into shares into Bar

12  Works?

13  A.  Yes.

14  Q.  Is that different than workspace leases?

15  A.  Yes, it is.

16  Q.  What did you invest in?

17  A.  I invested both in the Bar Works leases and also in the

18  shares of the company.

19  Q.  And who did your investment into shares of the company go

20  through?

21  A.  Could you please repeat the question?

22  Q.  Sure.  What entity did your investment into the shares go

23  through?

24  A.  That would be In Crowd Equity.

25  Q.  Let's go to Government Exhibit 1157.

J647MOO3                          White - Direct

1              THE COURT:  Counsel, can we have a quick sidebar.

2              (Continued on next page)

1              (At the sidebar)

2              THE COURT:  I think everybody has got the picture

3     here, you know, and if you could figure out a way to bring it

4     home so we can finish with this witness, that would be very

5     helpful.

6              MR. VAINBERG:  OK.

7              MR. GARVIN:  Your Honor, there is one thing I want to

8     bring up.  This morning when they tested the computer it

9     worked.  Then we pushed the button and it didn't work.  They

10    wiggled some wires and they got it to work again.  I'm a little

11    bit apprehensive that when I push the button I'm praying that

12    it's going to be working for me.

13             THE COURT:  Who is doing -- who is helping you?

14             MR. GARVIN:  That's why I brought Alexandra.

15             THE COURT:  She is helping you with the computer?

16             MR. GARVIN:  Right.  So I might have to switch it over

17    to the Elmo if we have a problem.

18             THE COURT:  Oh, OK, I get you.  OK.

19             (Continued on next page)

20

21

22

23

24

25

J647MOO3                      White - Direct

1                     (In open court)

2    BY MR. VAINBERG:

3    Q.  All right, Mr. White, if we can just look at Government

4    Exhibit 1159.  This is an e-mail from you to Timothy Connell

5    attaching two lease agreements and a Bar Works application

6    form.  Why do you have two lease agreements with Bar Works?

7    A.  The investment was structured across two different sites.

8    Q.  Was one of those sites on 41 West 46th Street and another

9    on 47 West 39th Street?

10   A.  Yes, that's correct.

11   Q.  And did those two leases have to do with the $300,000 that

12   was going into the workspace leases?

13   A.  That's correct.

14   Q.  OK.  Let's look at Government Exhibit 1157, and this is an

15   e-mail from Jason Rivera to you, attaching a Bar Works

16   convertible note and offer e-mail which states, "Dear

17   Mr. White, as per your conversation with the CEO of In Crowd

18   Equity Inc., Robert Haslem, please find your invoice relating

19   to your agreed purchase enclosed."

20                  Did that have to do with the additional $300,000 that

21   you invested into Bar Works shares?

22   A.  That's correct.

23   Q.  And if we go to -- who signed the leases on behalf of Bar

24   Works?

25   A.  Sorry, one more time.

1   Q.  Who signed the leases with you on behalf of Bar Works?

2   A.  Jonathan Black.

3   Q.  OK.  Did you make your $600,000 payment to Bar Works for

4   that investment?

5   A.  Yes.

6   Q.  Now, did you begin to receive returns on your investment?

7   A.  Yes.

8   Q.  Were those returns always processed on time?

9   A.  Were they?

10  Q.  Were the returns always processed on time?

11  A.  No, they came in a little bit irregularly.

12  Q.  Did United Property Group remain your point of contact with

13  Bar Works?

14  A.  Could you say that one more time?

15  Q.  Who was your point of contact when you needed to talk to

16  somebody at Bar Works?

17  A.  It would be Timothy Connell.

18  Q.  Did that change at some point?

19  A.  Yes, it did.

20  Q.  Why did that change?

21  A.  It changed because Timothy Connell wrote to me and said

22  that United Property Group was ceasing their relationship with

23  Bar Works and that they were starting a relationship with

24  another company I think called Our Space.

25  Q.  And if we look at the last page of Government Exhibit 1156,

J647MOO3                        White - Direct

1   did you get a share certificate for your $300,000 investment

2   into Bar Works?

3   A.  Yes, I did.

4   Q.  And who is that certificate signed by?

5   A.  It's signed by Jonathan Black, president.

6   Q.  Now, Mr. White, did there come a time when you began

7   getting worried about your investment?

8   A.  Yes.

9   Q.  About when was that?

10  A.  About spring 2017.

11  Q.  Why did you become worried about your investment?

12  A.  Payments to me ceased.

13  Q.  Did Bar Works give you any explanation as to why payments

14  stopped?

15  A.  No.

16          THE COURT:  How long was that after you made the

17  investment?

18          THE WITNESS:  That would be about 15 months.

19  Q.  At the time that you made your investment, if you had known

20  that Jonathan Black was a made-up identity, would you have

21  invested money into Bar Works?

22  A.  No.

23  Q.  Why not?

24  A.  It would make no financial sense.

25  Q.  And prior to investing in Bar Works, had you known the name

1    Renwick Haddow?

2    A.   Could you say that again, please?

3    Q.   Prior to investing in Bar Works, had you known the name

4    Renwick Haddow?

5    A.   No.

6    Q.   If you had known that the person running Bar Works had

7    previously lost substantial amounts of money in other

8    investment ventures, would you have invested?

9    A.   No.

10   Q.   If you had known that that person had been disqualified

11   from serving as a director of any company in the UK, would you

12   have invested into this company?

13   A.   No.

14          MR. VAINBERG:  Nothing further.

15          THE COURT:  Counsel?

16          MR. GARVIN:  Thank you, your Honor.

17   CROSS EXAMINATION

18   BY MR. GARVIN:

19   Q.   Good afternoon, sir.

20   A.   Good afternoon.

21   Q.   My name is David Garvin.  I represent Mr. Moore in this

22   case.

23          Sir, I want to go back over just a few things to try

24   to clarify them.  Give me one moment.  I have to switch the

25   computers over.

J647MOO3                         White - Cross

           Now, sir --

           THE COURT:  Mr. Garvin, speak into the microphone.

           MR. GARVIN:  Yes, sir.

Q.  The first thing I wanted to talk about was it would be fair

to say that you understood that United Properties Group was an

independent sales company; is that correct?

A.  Yes.

Q.  And as you stated earlier, initially you were looking at a

different investment before you started talking about Bar

Works, correct?

A.  Yes.

Q.  And it also would be accurate to say that United Property

Group was located in Spain, correct?

A.  I believe they were located in more than one location, but

Spain, yes, also.

Q.  And let's see if we can pull up Government Exhibit 1151,

please.

           So, it appears that from what I'm reading here that

there are --

           THE COURT:  Could you speak into the microphone.

Q.  There are two addresses listed.  Do you see that, sir?

A.  Yes.

Q.  And do you see that one of them is in Marbella, Spain,

correct?

A.  Yes.

J647MOO3                          White - Cross

1   Q.  So neither address that's listed here -- the first address

2   actually is listed in London, correct?

3   A.  Yes.

4   Q.  So neither address that is listed here is in New York City,

5   correct?

6   A.  Could you just repeat the last part of it?

7   Q.  Yes, sir.  The addresses that are listed for United

8   Properties is not New York City; it's London and Marbella.

9   A.  You're asking --

10             THE COURT:  He is asking you if there is a New York

11  City address.

12             THE WITNESS:  Is United Property Group in New York

13  City; is that what you're asking me?

14             MR. GARVIN:  Yes, sir.

15             THE WITNESS:  No.

16  Q.  Now, you had also talked to us a little bit about when you

17  spoke to somebody there was somebody named James.  Do you

18  remember that?

19  A.  Yes.

20             MR. GARVIN:  And I'd like to at this time, your Honor,

21  read the stipulation.

22             THE COURT:  Go ahead.

23             MR. GARVIN:  This is Government Exhibit 1260, but it's

24  actually a joint exhibit, and it reads as follows:  Stipulation

25  regarding --

J647MOO3                          White – Cross

1           THE COURT:  Just talk into this microphone.

2           MR. GARVIN:  Stipulation regarding decks.  It's hereby

3   stipulated and agreed by and between the United States of

4   America by Geoffrey S. Berman, United States Attorney for the

5   Southern District of New York, Vladislav Vainberg and Martin S.

6   Bell, assistant United States Attorneys, and James Moore, the

7   defendant, by his attorney David M. Garvin, Esq., that:

8           Defendant's Exhibits 5001 through 5017, 5020 through

9   5054 and 5056 through 5084 are true, accurate and authentic.

10          It is further stipulated and agreed that Defendant's

11  Exhibits 5001, 5002, 5005 through 5017, 5020 through 5054, 5056

12  through 5062 and 5064 through 5083, along with this

13  stipulation, are admissible and may be received as defendant's

14  exhibits at trial.

15          Your Honor, respectfully I ask --

16          THE COURT:  Sure, no problem, we will take it in, and

17  the exhibits.

18          (Government Exhibit 1260 received in evidence)

19          (Government Exhibits 5001, 5002, 5005 through 5017

20  received in evidence)

21          (Government Exhibits 5020 through 5054 received in

22  evidence)

23          (Government Exhibits 5056 through 5062 received in

24  evidence)

25          (Government Exhibits 5064 through 5083 received in

J647MOO3                         White - Cross

1    evidence)

2    Q.  Now, sir, I'm going to direct your attention to Defendant's

3    Exhibit 5031, and I'm going to read to you the top.  It says,

4    "Good stuff, James I look forward to meeting you in due

5    course."  And the next line states on October 22, 2015 at 9:18

6    a.m., JR.  JR@unitedpropertygroup wrote..."

7           Now, sir, does it refresh your memory that the person

8    who Tim Connell stated was James had the initials JR?

9    A.  Yes, it seems so.

10   Q.  And so if you would scroll down a little bit, please.  Stop

11   there.  Thank you so much.

12          It says, and I will read to you, "Thanks Renwick.

13   Great product and structure by the way, very impressive indeed.

14   My very sincere compliments.

15          "Funnily enough I am looking at dates to fly over and

16   it would be great to meet you but obviously will let you know

17   to see if it suits your schedule before anything is booked.

18          "Look forward to a long and very prosperous

19   relationship.

20          "Cheers, James."

21          And below it it says, "Best records, James Robinson,

22   chief operating officer."

23          Does that refresh your memory, sir, as to who James

24   was?

25   A.  It's possible, but I cannot say with any certainty who the

J647MOO3                          White - Cross

1    individual James was.  Most of the e-mails that came through

2    only referred to the individual James.

3    Q.  Yes, sir.  And you will recall on direct examination there

4    was a discussion about three of the directors of United

5    Property Group were going to travel to New York to see Bar

6    Works for the first time, correct?

7    A.  Yes.

8    Q.  And this is something important because it's part of due

9    diligence, correct?

10   A.  Yes.

11   Q.  And when the United Property Group people arrived in New

12   York, they were expected to visit the site of Bar Works.

13   A.  Yes.

14   Q.  And as you stated earlier today in an e-mail from Tim

15   Connell, they were also expecting to visit We Work while they

16   were in New York also, correct?

17   A.  That I'm not sure about, but possibly.

18   Q.  OK.  So if we can continue scrolling down, please.

19        OK.  Now I'm showing you the second page of this

20   particular exhibit, and you will see that this also talks about

21   the first of many, and that is just for the next couple of

22   days.  In this particular e-mail, sir, does it indicate that

23   October 22 that United Property Group is communicating with Bar

24   Works and saying that it was the first of the agreements that

25   they were sending?

J647MOO3                          White - Cross

1    A.  Is that a question?

2    Q.  Yes, sir.

3    A.  Could you repeat it.

4            THE COURT:  Maybe you can rephrase it.  It was a

5    little hard to follow.

6    A.  Can you repeat it, please.

7    Q.  I apologize.

8            Sir, the document in front of us on October 22, 2015

9    states, "The first of many Renwick, and that is just for the

10   next couple of days."

11           Did you understand that to mean that they were

12   starting to -- just starting to do business with --

13           MR. VAINBERG:  Objection, your Honor.  I don't think

14   there is any foundation that this witness knows anything about

15   this e-mail.

16           THE COURT:  I think he's right.

17           MR. GARVIN:  I will move on.

18           THE COURT:  OK.  Or you could ask him if he knows

19   about the e-mail.

20   Q.  I will move on.  Now, sir, I'd like to now turn to the fact

21   that you were told that $500,000 had been invested by a tech

22   company, correct?

23   A.  Yes.

24   Q.  And if you could please put Defendant's Exhibit 5011 up and

25   go to page 2.

```
 1            You stated that there were some materials that you
 2   received relating to Bar Works, correct?
 3   A.  I'm so sorry.  Do you mind repeating that?
 4   Q.  Yes.  There were materials that you received from Bar
 5   Works, correct?
 6   A.  I was told some things were received from Bar Works.
 7   Q.  And did you receive a private placement memorandum, sir?
 8   A.  I did, yes.
 9   Q.  And I am showing you what is the private placement
10   memorandum, and directing your attention to the second
11   paragraph from the bottom that reads, "Bar Works has received a
12   commitment to invest $500,000 at 75 cents a share from a united
13   based tech start-up fund located in Silicon Valley?
14            THE COURT:  U.S. based?  You don't think it says that?
15            MR. GARVIN:  Yes, it does, sir.  Thank you.
16   Q.  Do you see that, sir?
17   A.  I do see it, yes.
18   Q.  And was that the $500,000 that you were referring to
19   earlier?
20   A.  That was the $500,000 from U.S. Tech Startup.  That was my
21   understanding.
22   Q.  And that is one of the reasons why you had asked to speak
23   with the person who was in charge, I believe it was Robert
24   Haslem; is that correct?
25   A.  Yes.
```

190

1    Q.  And you actually ultimately did have a telephone conference

2    with Robert Haslem, correct?

3    A.  I did.

4    Q.  And you also had a telephone conference with Jonathan

5    Black, correct?

6    A.  Yes.

7    Q.  Now, sir, when you received the information in the private

8    placement memorandum, is it true that at that time Mr. Connell

9    told you that this is the information that they had been

10   provided from Bar Works, correct?

11   A.  Yes.

12   Q.  So, what was happening was that United Properties Group

13   were sales agents, correct?

14   A.  Yes.

15   Q.  And United Properties Group was located in London and

16   Marbella, Spain, correct?

17   A.  Amidst other places, yes.

18   Q.  And at least in their letterhead, that's the places they

19   listed, correct?

20   A.  Yes.

21   Q.  And that they had taken on an investment which was Bar

22   Works, correct?

23   A.  Yes.

24   Q.  And that they were providing you with the information they

25   had been provided by Bar Works.

1   A.   Yes.

2   Q.   And one of the things that the information that they

3   received said was that Bar Works had received a commitment for

4   a $500,000 investment, correct?

5   A.   From U.S. Tech Startup, yes.

6   Q.   Yes.  So now you had a call with someone who is named

7   Jonathan Black.  Did you later learn that Jonathan Black did

8   not exist?

9   A.   That Jonathan Black was?

10  Q.   Did not exist?

11  A.   One more time.

12  Q.   Did not exist?

13  A.   Did not exist?

14  Q.   Yes.

15  A.   Did I know that Jonathan Black did not --

16  Q.   No, sir.  Did you later learn that?

17  A.   -- I honestly don't know.

18  Q.   Did anyone ever tell you -- sitting here today, have you

19  been advised that there is no person named Jonathan Black?

20  A.   Could you repeat the question one more time, please.

21  Q.   Yes.  Has anybody advised you that there is no person named

22  Jonathan Black?

23  A.   I can't recall that.

24          MR. GARVIN:  I have no further questions.  Thank you.

25          THE WITNESS:  Thank you.

J647MOO3                        White – Cross

 1              THE COURT:  Great.  Is that it?

 2              MR. VAINBERG:  No redirect, your Honor.

 3              THE COURT:  OK.  Thanks very much, Mr. White.  You are

 4    excused.

 5              (Witness excused)

 6              (Continued on next page)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J647MOO3                          White - Cross

1                (At the side bar)

2                THE COURT:  Is Haddow the next witness?

3                MR. BELL:  Yes, your Honor.

4                THE COURT:  Do you want to take the lunch break now or

5       do you want to start him?

6                MR. GARVIN:  I think it makes sense to take the lunch

7       break, your Honor.

8                MR. BELL:  That's fine with us.

9                THE COURT:  So it's about 12:20.  Let's start up at

10      1:20, give them an hour.

11               (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          THE COURT:  So we're going to take the lunch break

3     now.  It's 12:20.  We will ask you to be back at 1:20.  Mr.

4     Haddow is the next witness.  And you can use the cafeteria or

5     to go outside.  And I will ask the lawyers and people

6     associated with the case not to use the cafeteria.  That's all.

7          So, good progress.  We will see you later.

8          (At the side bar)

9          MR. GARVIN:  Your Honor, because of time constraints I

10    was going to respectfully ask if we could walk in and out of

11    the cafeteria.  Yesterday I didn't eat, and I didn't want to do

12    it again today.

13         THE COURT:  You mean go to the front of the line, so

14    to speak?

15         MR. GARVIN:  No.  Just yesterday you said stay out of

16    the cafeteria.

17         THE COURT:  Oh, you guys, OK.

18         MR. BELL:  There is --

19         THE COURT:  Well, you know, there is a cafeteria right

20    across the street here, another court.

21         Can you show him?

22         MR. BELL:  I can.  The other thing I would note,

23    Judge, and we have observed this a number of times and it's

24    true now, there is actually a sign in the cafeteria that says

25    jurors are prohibited from eating there.

J647MOO3                          White - Cross

```
 1              THE COURT:  Oh.

 2              MR. BELL:  And what I think folks customarily do is

 3   have the jurors go outside.

 4              THE COURT:  I am OK with them eating there.

 5              MR. BELL:  I will show him.

 6              THE COURT:  It's right across the alleyway.

 7              MR. GARVIN:  I was willing to just go in and leave.

 8              MR. BELL:  I will take care of him.

 9              THE COURT:  He will help you out.  OK, good.

10              (Luncheon recess)

11              (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

J643MOO4

          AFTERNOON SESSION

          1:30 p.m.

1    (In open court; jury not present)

2    THE COURT:  We are ready for the next witness.  And

3    I've been advised that counsel want to enter some stipulations

4    in connection with the next witness.  I think it's not

5    necessarily required that you read all the Exhibit 13, 17, 12,

6    whatever.  Just the stipulation.  And if you want, if it's sort

7    of a narrative stipulation, to give the gist of or even if it

8    is a document stipulation, say that this stipulation covers a

9    series of documents which both parties agree will be entered

10   into evidence as exhibits.

11   MR. VAINBERG:  Yes, your Honor.  Our plan was just to

12   read the stipulation numbers and admit the stipulations and the

13   documents in evidence.  And then at a later point, there is

14   some substance in one of the stipulations, we'll read that

15   later, but not right now.

16   THE COURT:  So the jury is ready, and Christine will

17   go get them.  When they come in, we do all stand.

18   MR. GARVIN:  Your Honor, I don't recall ever invoking

19   the rule or requesting that the rule be invoked, but may I make

20   that request at this time?

21   THE COURT:  Which rule?

22   MR. GARVIN:  The rule of sequestration so the

23   witnesses don't talk to each other as to what was testified

J643MOO4

 1    today.

 2              THE COURT:  I'm missing something.

 3              MR. GARVIN:  I'll withdraw --

 4              THE COURT:  No.  I'm not trying to get you to withdraw

 5    it, I just don't entirely understand.

 6              MR. GARVIN:  That --

 7              THE COURT:  Is the government familiar with this?

 8              (Counsel conferring)

 9              MR. GARVIN:  Your Honor, I'm simply referring to the

10    rule that when a witness testifies, a witness should not tell

11    another witness what they testified about.

12              THE COURT:  You mean when he or she is finished?

13              MR. GARVIN:  Yes.

14              THE COURT:  Oh.  Should not tell another witness who

15    has yet to testify?

16              MR. GARVIN:  Correct.

17              THE COURT:  I guess that makes some sense.

18              MR. BELL:  Judge --

19              THE COURT:  I don't know.

20              MR. BELL:  We have minimal concerns on account of

21    Mr. Haddow's incarcerated.  But if your Honor wishes to warn

22    Mr. Haddow not to talk to any other witness, that's fine.  We

23    have no objection to that.

24              THE COURT:  Is it likely he's going to come into

25    contact with any other witness?

J643MOO4

1              MR. BELL:  We cannot imagine who particularly this

2       concern attaches to, but we have no issue with the order.

3              THE COURT:  So, is that what --

4              MR. GARVIN:  Yes.

5              THE COURT:  I have no problem with that.

6              Mr. Haddow, what counsel is saying is they would like

7       you to not discuss your testimony with another witness,

8       assuming that possibility arose.

9              THE WITNESS:  All right.

10             THE COURT:  Is that okay?

11             THE WITNESS:  That's okay with me.

12             THE COURT:  So let's get the jury.

13             Does that take care of it?

14             MR. GARVIN:  Yes.

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

J643MOO4

1              (Jury present)

2              THE COURT:  We have our next witness, Mr. Haddow, and

3    I'll ask everybody to be seated, and then we'll swear in the

4    witness.

5              MR. VAINBERG:  Your Honor, the government calls

6    Renwick Haddow.

7              THE DEPUTY CLERK:  Sir, if you can stand for a moment,

8    please, and raise your right hand.

9              (Witness sworn)

10             THE DEPUTY CLERK:  Could you please state your full

11   name for the record.

12             THE WITNESS:  Renwick Haddow.

13             THE DEPUTY CLERK:  Could you spell your first name as

14   well as your last name.

15             THE WITNESS:  R-E-N-W-I-C-K H-A-D-D-O-W.

16             MR. VAINBERG:  Your Honor, the government moves in

17   stipulations marked Government Exhibit 1251, 1254, and 1257,

18   and the underlying documents listed therein.

19             THE COURT:  So those are agreements between counsel

20   that those documents can be admitted into evidence.  Is that

21   right?

22             MR. VAINBERG:  Yes, your Honor.

23             THE COURT:  Sure.  I'll allow that.

24             (Government's Exhibit 1251, 1254, 1257 received in

25   evidence)

J643MOO4                          Haddow - Direct

1    RENWICK HADDOW,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    DIRECT EXAMINATION

5    BY MR. VAINBERG:

6    Q.  Good afternoon, Mr. Haddow.

7    A.  Good afternoon.

8    Q.  Mr. Haddow, how old are you?

9    A.  I'm 50 years old.

10   Q.  What's your country of citizenship?

11   A.  U.K.

12   Q.  Where have you lived most of your life?

13   A.  In the U.K.

14   Q.  Did there come a time when you came to the United States?

15   A.  Yes, I did.

16   Q.  When was that?

17   A.  That was in around October 2014.

18   Q.  Why did you move to the United States in October of 2014?

19   A.  I came here for a fresh start.

20   Q.  Why did you need a fresh start?

21   A.  I had a very bad reputation in the U.K., for a number of

22   financial misendeavors which was covered on the internet, and

23   it meant that I couldn't really operate further in the U.K.

24   Q.  We'll talk about those financial misendeavors, as you put

25   it, in a little more detail.  But generally, can you describe

1    what you did in the U.K.

2    A.   Yeah, I had two operations in particular.  One was selling

3    a land project in Africa, and the other one was selling some

4    carbon credits in Africa and Brazil.  And they were both, the

5    FCA, who were the regulator in the U.K. equivalent to your SEC,

6    decided that they were potentially collective investment

7    schemes, which meant they would have to regulate them.

8            So, they took us to court and won, and they also made

9    it quite clear that these were also mis-sold with material

10   misstatements, which meant that investors lost all their money.

11   Q.   Generally, what was your line of work in the U.K., other

12   than raising money for those two companies?

13   A.   I was mainly, from about 2008, I was mainly involved in

14   operating -- I suppose the word is boiler room between 2008

15   until I came over here, where we raised money for land projects

16   and property projects.

17           Boiler rooms are a kind of rooms where you have high

18   pressure salespeople selling to private investors.

19           And prior to that, I had a stockbroking firm, and

20   prior to that I was an accountant.

21   Q.   Who did you raise money from in those U.K. businesses?

22   A.   From private investors.

23   Q.   How did private investors learn about your businesses?

24   A.   Well, I just mentioned the boiler room.  So we had two

25   ways, really.  One was through direct salespeople.  These are

J643MOO4                        Haddow - Direct

1    the experienced sales guys who would call up private investors.

2    Then the other method was through -- through offering documents

3    material, things like something called a PPM, which is a

4    private placement memorandum, which is documents that go to

5    investors to induce into purchase.

6    Q.  Did you generally control what information was being put

7    into those offering materials?

8    A.  Yes, I did.

9    Q.  Was all the information in those offering materials

10   truthful?

11   A.  No, they weren't.

12   Q.  Generally, what kinds of information in the offering

13   materials for your U.K. businesses was not truthful?

14   A.  A number of things, really.  From memory, things like

15   projections, most of these documents had projected returns.

16   Projected time when people would get their money back.  Most of

17   those were untruthful and weren't going to happen.  There also

18   many of them had a -- a buyback option, where investors could

19   sell their investment, a guaranteed buyback, sell their

20   investment at the end of the duration of the investment.  Most

21   of those, again, were unrealistic.  They weren't going to

22   happen.  And in some cases, the management's experience was --

23   didn't match up with the prospectus.

24   Q.  Generally, did investors in your companies receive their

25   returns that you guaranteed or projected to them?

1   A.  Generally, no, they didn't.

2   Q.  What happened to investors' money, generally?

3   A.  Generally, they lost their money.

4   Q.  Were you subject to any sanctions from British regulators?

5   A.  Yes, I was.

6   Q.  Were you subject to any lawsuits from those regulators as

7   well?

8   A.  Yes, from the FCA.

9   Q.  I think you mentioned it, but were those lawsuits published

10  in the press and online?

11  A.  Yes, extensively.

12  Q.  Did that create any reputational problems for you?

13  A.  It caused me a great deal of reputational problems.

14  Q.  How so?

15  A.  How so.  Well, it meant that I couldn't realistically raise

16  money from investors any longer using my name, so I had to make

17  alternatives.

18  Q.  What was that alternative?

19  A.  Well, I had two alternatives, really.  One alternative, I

20  used people to front my businesses up.  And the second

21  alternative, I used another name.

22  Q.  What did you do as a result of your reputational problems

23  in the U.K.?

24  A.  I used a number of people to front my businesses up.  They

25  kind of run my businesses, but I was behind, giving

1    instructions.

2    Q.  You mentioned earlier that you moved to the United States

3    for a fresh start?

4    A.  Yes.

5    Q.  Is that right?

6         What did you do with the fresh start in the United

7    States?

8    A.  The first thing I did in January, around about 2015, I set

9    up a company called In Crowd Equity, which is an unregulated

10   crowd funding business, which is basically a brokerage selling

11   startup companies to private investors.

12   Q.  Did you raise money for any companies using In Crowd

13   Equity?

14   A.  Yes, I did.

15   Q.  Was one of those companies called Bar Works?

16   A.  Yes, it was.

17   Q.  What's Bar Works?

18   A.  Bar Works was a coworking space operator.  So we took over

19   old restaurants or bars, refurbished them, and then let the

20   space out to entrepreneurs at a fixed monthly fee.

21   Q.  How did Bar Works generate money?

22   A.  Bar Works generated money in two ways, really.  Firstly,

23   every desk we tried to rent out to entrepreneurs at $550

24   roughly a month.  That was one method.  And the other method

25   was we came up with an investment program where we would raise

1    money and sell the desks to individual investors.

2    Q.   How long was Bar Works in business for?

3    A.   It was in business from around about summer of -- well, not

4    summer.  From about September 2015 to summer of 2017.

5    Q.   Was Bar Works ever profitable as a business?

6    A.   No, it wasn't.

7    Q.   Did you commit any crimes in connection with Bar Works?

8    A.   Yes, I did.

9    Q.   What did you do?

10   A.   To start with, I used a fictitious name, I used the name

11   Jonathan Black.  When, in fact, Jonathan Black was on most of

12   the documentation to the investors, to the leases signed for

13   investors, and in fact it was me.  I didn't disclose that to

14   anyone, to any of the investors.

15        I also put together an investment memorandum, and

16   there was many fictitious situations within that investment

17   memorandum.  Things like the monthly return was unrealistic,

18   wasn't going to happen.  The buyback, we had a buyback at the

19   end of the term of the project which was 10 years, that again,

20   wasn't going to happen.  And yeah, those are the main ones,

21   really.

22   Q.   When you were soliciting investments in Bar Works through

23   misrepresentations, did you know that you were committing a

24   crime?

25   A.   I did, yes.

J643MOO4                           Haddow - Direct

1    Q.  Did you commit that crime alone or with others?

2    A.  With others.

3    Q.  Did you see anyone in the courtroom that you committed that

     crime with?

5    A.  Yes.

6    Q.  Can you speak into the microphone?

7    A.  Yes, I can.

8    Q.  Who do you see in the courtroom that you committed this

9    crime with?

10   A.  Jim Moore.

11   Q.  Can you identify Mr. Moore by an article of clothing?

12   A.  He's sitting over there.  So I can't see him because he's

13   behind a screen.  He has a tie on and a blue jacket.

14           THE COURT:  And he just stood up.

15           THE WITNESS:  And he just stood up.

16           MR. VAINBERG:  Thank you, your Honor.

17   Q.  How long have you known the defendant James Moore?

18   A.  I've known Jim for about 10 years.

19   Q.  What was Mr. Moore's role at Bar Works?

20   A.  He was my business partner.

21   Q.  What were his responsibilities as your business partner?

22   A.  He had a number of responsibilities.  He, he brought along

23   the agent network to sell the investment, one in particular

24   which was a company called United Property Group, which is the

25   major network, agent network recruiter.  They also had their

1    own sales operation.  He also brought along other partnerships

2    and other networks.  He also helped with the brochure,

3    structuring the product, putting together the wealth management

4    program, which maybe we'll talk about later, and some of the

5    language for that product.  And he also helped me front the

6    Jonathan Black name.  So he would deal with many of the

7    inquiries coming from other parties.

8    Q.  Did you tell James Moore that you were Jonathan Black?

9    A.  Yes, I did.

10   Q.  Why did you tell him that?

11   A.  Because we were business partners, so it was necessary to

12   have him be involved in the whole business, rather than just

13   keep him compartmentalized.

14   Q.  Did you explain to him why you adopted the alias?

15   A.  Yes, I did.

16   Q.  What did you tell him about that?

17   A.  I didn't need to go into a huge amount of detail, because I

18   believed that Jim was very much aware of my activities in the

19   U.K., I discussed my activities with him in the U.K., and so,

20   but yes, I did discuss the fact I was Jonathan Black with him,

21   and my reasoning for doing that.

22   Q.  Did the defendant help you to promote Bar Works and mislead

23   investors after he learned that you were Jonathan Black?

24   A.  Yes.

25   Q.  How did he help you do that?

1   A.  He continued promoting it through his contacts, mainly UPG,

2   and other contacts he had.  And UPG continued to sell it, and

3   agents continued to get involved.

4   Q.  You mentioned a minute ago that he helped front you.  Is

5   that the word you used?

6   A.  I did, yes.

7   Q.  What did you mean by that?

8   A.  I mean that I didn't want to use my own name, and obviously

9   I was using the name Jonathan Black.  So, Jim would contact me

10  and ask me questions and say, you know, what does Jonathan

11  Black have to say about this or can Jonathan Black answer this

12  question.  And I would respond sometimes as Renwick Haddow, and

13  he would pass on the message coming from Jonathan Black, or

14  sometimes I would respond from Jonathan Black, and he would

15  respond from Jonathan Black.

16  Q.  During all those communications, did you understand the

17  defendant to know that you were Jonathan Black?

18  A.  Yes, I did.

19  Q.  Generally, what was the business arrangement between you

20  and the defendant?

21  A.  He had an equity stake in the business; in other words, he

22  owned shares in the business.  And he also earned a personal

23  commission from each sale that UPG or other agents brought in.

24  Q.  We'll talk about it in some detail later, but generally how

25  much did you pay the defendant in return for helping you with

1   this scheme?

2   A.  Around one -- between one and a half and two million

3   dollars.

4   Q.  Did there come a time when your business relationship with

5   Jim Moore ended?

6   A.  Yes, it did.

7   Q.  About when was that?

8   A.  Around June 2016.

9   Q.  Why did it end?

10  A.  Well, basically, for want of a better word, Jim swindled

11  me, and took my business idea and set up in direct competition.

12  Q.  What was the name of the direct competition?

13  A.  He set up a company called Our Space.

14  Q.  What did Our Space do, as far as you understood it?

15  A.  Our Space did exactly the same as us.  It raised -- it had

16  coworking spaces in various locations, and it raised money

17  through a similar investment scheme.

18  Q.  Did there come a time when Bar Works collapsed as a

19  business?

20  A.  Yes.

21  Q.  When was that?

22  A.  That was around about June of 2017.

23  Q.  Why did it collapse?

24  A.  Well, there was some bad publicity appeared from January of

25  2017, and that led to a lot of agents who were selling the

1    product to stop selling, led to a lot of investors also to stop

2    reinvesting, and it meant that we couldn't repay -- not repay.

3    We couldn't pay the interest from the desks that we'd sold and

4    we couldn't pay the running costs.  So it collapsed.

5    Q.  Mr. Haddow, out of what money were investors paid their

6    returns?

7    A.  From new money coming in.  From new investors.

8    Q.  Was there ever enough money in the Bar Works business to

9    pay the returns promised to investors?

10   A.  No.

11   Q.  What kind of scheme was Bar Works?

12   A.  It was a Ponzi scheme.

13   Q.  What do you know a Ponzi scheme to be?

14   A.  Ponzi scheme is when returns from -- from an investment or

15   a company are paid not from the company itself, but from new

16   money coming in from investors.

17   Q.  Were you charged with any crimes in connection with Bar

18   Works?

19   A.  I was, yes.

20   Q.  What were you charged with?

21   A.  I was charged with two crimes.  One for wire fraud, and one

22   for conspiracy to commit wire fraud.

23   Q.  At the time that you were charged with those crimes, were

24   you charged with any other crimes?

25   A.  I was, yes.

J643MOO4                          Haddow - Direct

1    Q.  What were those?

2    A.  I was also charged for a company called Bitcoin Store, the

3    two counts.  Again, one of them was wire fraud and the other

4    one was conspiracy to commit wire fraud.

5    Q.  Did the defendant have the anything to do with the Bitcoin

6    Store scheme?

7    A.  No, he didn't.

8    Q.  Let me show you Government Exhibit 170 which is not in

9    evidence yet.

10          Mr. Haddow, can you just tell us if you recognize this

11   document.

12   A.  Yes, these are my -- this is my --

13   Q.  Can you speak into the microphone.

14   A.  Sorry.  This is my list of crimes.

15   Q.  Is this list of crimes contained in some sort of charging

16   instrument?

17   A.  Yes, it is.

18   Q.  Is that the charging instrument?

19   A.  It is.

20          MR. VAINBERG:  The government offers Exhibit 170.

21          MR. GARVIN:  No objection.

22          THE COURT:  I'll allow it.

23          (Government's Exhibit 170 received in evidence)

24   Q.  How did you plead to everything that you were charged with

25   in this document?

1   A.  I pled guilty.

2   Q.  Did you plead guilty because you were guilty?

3   A.  I pled guilty because I was guilty.

4   Q.  Did you plead pursuant to any agreement with the

5   government?

6   A.  Yes.

7   Q.  What kind of agreement is that?

8   A.  A cooperation agreement.

9   Q.  Was the agreement oral or written down?

10  A.  It was written down.

11  Q.  Before you signed the cooperation agreement, did you meet

12  with the government?

13  A.  I did, yes.

14  Q.  Generally speaking, who attended those meetings?

15  A.  The FBI, the SEC, and the prosecutors.

16  Q.  Did you have any of your own counsel at those meetings too?

17  A.  Yes, and my own counsel.

18  Q.  Let me show you Government Exhibit 171, which is not yet in

19  evidence.

20          What is this document?

21  A.  That is the cooperation agreement.

22  Q.  Turning to page six, is that your signature?

23  A.  Yes, that's my signature.

24          MR. VAINBERG:  The government offers 171.

25          THE COURT:  I'll allow it.

J643MOO4                         Haddow - Direct

1        (Government's Exhibit 171 received in evidence)

2   Q.  Mr. Haddow, does this document -- we can publish that to

3   the jury.

4        Does this document contain all of the terms and

5   conditions of your agreement with the government?

6   A.  Yes, it does.

7   Q.  Mr. Haddow, under your agreement, what's your understanding

8   of what you have to do?

9   A.  I have to be honest and truthful, I can't commit any

10  further crimes, and I have to attend meetings with the

11  government.

12  Q.  If you were to be called in to court to testify, what's

13  your obligation with respect to that testimony?

14  A.  To tell the truth.

15  Q.  Mr. Haddow, turning to page two.  Could you read the last

16  paragraph in the cooperation agreement on page two.

17  A.  Yes, I can.  "It is understood that the defendant (a) shall

18  truthfully and completely disclose all information with respect

19  to the activities of himself and others concerning all matters

20  about which this office inquires of him, which information can

21  be used for any purpose; (b) shall cooperate fully with this

22  office, the Federal Bureau of Investigation, and any other law

23  enforcement agency designated by this office; (c) shall attend

24  all meetings at which this office requests his presence; (d)

25  shall provide to this office, upon request, any document,

1    record, or other tangible evidence relating to matters about

2    which this office or any designated law enforcement agency

3    inquires of him; (e) shall truthfully testify before the grand

4    jury and at any trial and other court proceeding with respect

5    to any matters about which this office may request his

6    testimony; (f) shall bring to this office's attention all

7    crimes which he has committed, and all administrative, civil or

8    criminal proceedings, investigations or prosecutions in which

9    he has been or is a subject, target, party, or witness; and (g)

10   shall commit no further crimes whatsoever."

11   Q.  Mr. Haddow, if you do everything you're supposed to do

12   under this agreement, what's your understanding of what the

13   government may do for you?

14   A.  It may give me a 5K1 letter.

15   Q.  What's your understanding of what the government writes in

16   a 5K1 letter, if it writes one?

17   A.  If it writes one, it contains a list of all the crimes I've

18   committed, and also lists all the assistance I've helped with.

19   Q.  Even if the government writes that letter, what's your

20   understanding of the maximum sentence that you could be

21   sentenced to?

22   A.  My maximum sentence is 80 years.

23            THE COURT:  How much?

24            THE WITNESS:  80.

25            THE COURT:  Eight-zero?

1          THE WITNESS:  Yes.

2     Q.  Who do you understand the 5K letter to go to if the

3     government writes one?

4     A.  The judge.

5     Q.  Who decides your sentence?

6     A.  The judge.

7     Q.  What's your understanding of how low your sentence could

8     possibly be?  You mentioned the maximum was 80 years.  What

9     could be the least amount of jail time that you could get?

10    A.  I potentially could get time served.

11    Q.  What do you mean by time served?

12    A.  Well, I've been incarcerated now for nearly two years, so

13    that would count as my time served.

14    Q.  What's your understanding -- withdrawn.

15          As you sit here today, has the government promised you

16    that it would write you the 5K1 letter?

17    A.  No.

18    Q.  Has anyone promised you that you will get a reduced

19    sentence?

20    A.  No.

21    Q.  As far as you understand, is the government going to

22    recommend any specific sentence to the judge?

23    A.  No.

24    Q.  As far as you understand, does your cooperation agreement

25    protect you from committing the crime of perjury?

1    A.  No.

2    Q.  What do you understand will happen if you don't fulfill

3    your obligations under this agreement?

4    A.  I will have another charge for perjury.

5    Q.  Well, leaving aside you lying, which that's perjury, right,

6    Mr. Haddow?

7    A.  Yes.

8    Q.  What do you think would happen if you break any of the

9    other violations in this agreement?

10   A.  My cooperation agreement will be torn up.

11   Q.  Do you get the 5K1 letter if your agreement is torn up?

12   A.  No.

13   Q.  Now, what do you believe will specifically happen to you if

14   you testify untruthfully and with perjury?

15   A.  Again, my cooperation agreement will be torn up.

16   Q.  Do you understand you could be charged with additional

17   crimes if you commit perjury?

18   A.  Yes.

19   Q.  What's your understanding of whether your testimony has to

20   result in a conviction in order for you to get a letter from

21   the government?

22   A.  There's no such requirement.

23   Q.  So, let's just be clear about this.  If you tell the truth,

24   and the government does not obtain a conviction at any trial

25   you testified, have you satisfied your obligations under this

1    agreement?

2    A.  I have.

3    Q.  If you lied, and the government does obtain a conviction,

4    what's your understanding of what you've done?

5    A.  My agreement will be torn up again, yeah.

6    Q.  All right.  Now, let's take a step back and talk a little

7    bit about your past, Mr. Haddow.

8    A.  Okay.

9    Q.  Where were you born?

10   A.  I was born in the U.K.

11   Q.  Where exactly in the U.K.?

12   A.  In London.

13   Q.  Where did you grow up?

14   A.  I was brought up just outside London.

15   Q.  Are you married?

16   A.  I am, yes.

17   Q.  To whom?

18   A.  To a lady called Zoia Haddow.

19   Q.  When did you get married?

20   A.  In April 2015.

21   Q.  Where did you get married?

22   A.  I got married just across the street here in New York.

23   Q.  Do you have any children?

24   A.  Yes.

25   Q.  How many?

1    A.   I have four children.

2    Q.   How are you educated?

3    A.   I have a degree in accounting, and I also have some

4    professional qualifications in stockbroking and fund

5    management.

6    Q.   Where did you get your degree in accounting from?

7    A.   Well, in fact I've missed one out there. I've got a degree

8    in accounting from Thames Valley University, and I also have

9    the equivalent of what you call here a CPA.

10   Q.   You mentioned some certifications?

11   A.   Yes.

12   Q.   Which certifications do you have?

13   A.   I have two certifications.  One was to operate as a

14   stockbroker in the U.K., and the other one was to operate as a

15   fund manager in the U.K.

16   Q.   Are those certifications still valid?

17   A.   No, they've -- they've been withdrawn.

18   Q.   What line of work did you go into after finishing your

19   schooling in the U.K.?

20   A.   I went into accounting and finance.

21   Q.   Where did you work?

22   A.   Initially I worked at a company called British Telecom,

23   which is the large telecom provider in the U.K.

24   Q.   How long were you there for?

25   A.   I was there for three years.

1   Q.  What did you do after that?

2   A.  After that, I joined a pub company, and I was their

3   financial controller there for about five years.

4   Q.  Did you say a pub company?

5   A.  Yes.

6   Q.  What was that company called?

7   A.  It was called Regent Inns.

8   Q.  What were your responsibilities as a financial controller

9   of Regent Inns?

10  A.  I looked after all the finances, I looked after reporting,

11  I looked after payroll, I looked after all the financial

12  controlling side of the business.

13  Q.  Who did you report to?

14  A.  I reported to the financial director.

15  Q.  Did there come a time when you left Regent Inns?

16  A.  Yes.

17  Q.  What did you do next?

18  A.  After that, myself and the finance director set up another

19  pub company called Top Inns.

20  Q.  What was your position at Top Inns?

21  A.  I was a finance director there.

22  Q.  How long did you stay at Top Inns?

23  A.  I was there for 18 months.

24  Q.  What did you do after that?

25  A.  After that, I purchased a health club, and I owned that for

1   a short period, and then I merged it with a listed company.  A

2   company on a junior stock market, and became the CEO of that

3   company.

4   Q.  What was the name of the company that you became the CEO

5   of?

6   A.  The company was called Fit Stop PLC.

7   Q.  Did you raise any money for Fit Stop?

8   A.  Yes.

9   Q.  How did you do that?

10  A.  We engaged services of a stockbroker, company called Wall

11  Street Investments at the time.  And they raised money through

12  their database of private investors.

13  Q.  Mr. Haddow, just to situate us, around what time period are

14  we talking about here?

15  A.  That was around about 2000, 2001.

16  Q.  Is this the first time that you raised money for a company?

17  A.  That was the first time, yes.

18  Q.  What was the name of the broker used to raise money?

19  A.  Wall Street Investments.

20  Q.  Did you have a familiarity of how Wall Street Investments

21  operates?

22  A.  Yes, I did.  After that, yes.

23  Q.  How would you characterize their sales operation?

24  A.  Yeah, they, they pretty much had a boiler room operation.

25  They had a number of very experienced salespeople who would

1  talk to new clients and existing clients, and sell them various

2  startup investment opportunities, and would be compensated by

3  high commissions.

4  Q.  You said by high commissions?

5  A.  Yes.

6  Q.  How much money did Wall Street Investments raise for Fit

7  Stop?

8  A.  Around about 700,000 pounds.

9  Q.  What ultimately happened to investors' money in Fit Stop?

10  A.  They lost their money in that company.

11  Q.  Did there come a time when you started a new business?

12  A.  Yes.

13  Q.  What was the next business that you started?

14  A.  Myself and my business partner from Fit Stop set up a

15  company called Catalyst Investment Group.

16  Q.  What's Catalyst Investment Group?

17  A.  That was a corporate financed stockbroking business, where

18  we raised money from small investors.

19  Q.  What kinds of businesses did you raise money for using

20  Catalyst?

21  A.  Many startup businesses in different fields, from

22  technology to leisure.

23  Q.  Did you raise investments in a company called Branded

24  Leisure?

25  A.  I did, yes.

J643MOO4                              Haddow - Direct

1    Q.  What was Branded Leisure?

2    A.  Branded Leisure was a company that I started with a couple

3    of other people, it was a licensing agreement with Cosmopolitan

4    Magazine, and the idea was to open a number of retail outlets

5    in the High Street, Main Street as you call it here.  And where

6    we'd offer like a restaurant, a bar, and a beauty salon.

7                    (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1  BY MR. VAINBERG:

2  Q.  How did Catalyst raise money for Branded Leisure?

3  A.  It raised money through its network of private investors

4  that we had established.

5  Q.  And did you control Branded Leisure?

6  A.  Yes, I did.

7  Q.  And did you control Catalyst?

8  A.  I did.

9  Q.  The information given to investors regarding Branded

10  Leisure, was that given in the form of prospectus or some

11  offering materials?

12  A.  It was provided in the form of prospectus.

13  Q.  Was all the information in those prospectuses or prospectus

14  truthful?

15  A.  No, it wasn't.

16  Q.  What kind of information was not truthful there?

17  A.  There was a number of different things.  In fact there was

18  over about eight different things, because as a result of that

19  I was banned as a director for eight years.

20       There were things like misleading statements to

21  investors, accounting policies which were incorrectly applied,

22  past performance and accounts were fictitious, and some of the

23  projections were also fictitious.

24  Q.  What happened to Branded Leisure?

25  A.  Branded Leisure went bust.

1    Q.  What do you mean by that?

2    A.  It went out of business.

3    Q.  How much money did you raise for Branded Leisure and

4    Catalyst?

5    A.  Around about 1.2 million pounds.

6    Q.  What happened to the investors' money?

7    A.  They lost all their money.

8    Q.  When you say they lost their money, what actually happened

9    to their money?

10   A.  Well, the business went out of -- it went out of business,

11   and the stock lost its value.

12   Q.  And what about the money that the investors put in the

13   business, who did that go to?

14   A.  Well, all that money came to develop the business that we

15   had misrepresented in the brochure, the cost of actually

16   establishing the business.  Some of the money came to me, some

17   of the money came to other people involved.

18   Q.  Did you suffer any consequences from any regulator as a

19   result of Branded Leisure going bust?

20   A.  Yes.

21   Q.  From whom?

22   A.  From it's called the -- from the government, the Insolvency

23   Service in the UK.

24   Q.  And what did they do to you?

25   A.  They banned me as a director for eight years.

1    Q.  What companies can you not serve as a director of for eight
2    years?
3    A.  Any UK company.
4    Q.  Was that ban published online?
5    A.  It was, yes.
6            MR. VAINBERG:  If we could show Government Exhibit 800
7    in evidence.
8    Q.  Is this an example of a press release published about your
9    disqualification as a director?
10   A.  Yes.
11   Q.  And could you read the title.
12   A.  Yes.  "Second director disqualified in Branded Leisure
13   PLC."
14   Q.  And can you read just the first full paragraph there.
15   A.  "Second director disqualified in Branded Leisure PLC.
16   Insolvency Service news release issued by COI News.
17           "The second of two director of Branded Leisure PLC has
18   been disqualified following an investigation by companies
19   investigation branch of the Insolvency Service.  In November,
20   this year, Mr. Renwick Haddow became the second director of the
21   company to receive an eight year disqualification."
22   Q.  And you mentioned earlier that as part of the
23   disqualification you had to agree to a set of facts?
24   A.  Yes.
25   Q.  Was that set of facts publicized online?

1    A.  It was, yes.

2    Q.  If we go to the next page here.  Is that a summary of the

3    things that you agreed you had done with Branded Leisure?

4    A.  That's right.

5    Q.  Did you do the things you had agreed you had done?

6    A.  Yes.

7    Q.  You were disqualified in 2008.  How long did that

8    disqualification go until?

9    A.  To 2016.

10   Q.  Was that ban extended at some point?

11   A.  It was.

12   Q.  Is it still in place now?

13   A.  It is.

14   Q.  All right.  Now you mentioned that Catalyst also raised

15   money for other companies, right?

16   A.  Yes.

17   Q.  About how many companies did Catalyst raise money for?

18   A.  Approximately about 30.

19   Q.  Did you own some of those companies?

20   A.  I did, yes.

21   Q.  Was your connection to Catalyst and the companies that it

22   was raising money for always disclosed to investors?

23   A.  No.

24   Q.  Were there other misrepresentations made to investors?

25   A.  Yes, there were.

1  Q.  Did investors lose money in some of those businesses?

2  A.  They did, yes.

3  Q.  At least how many of the companies that Catalyst raised

4  money for would you say went bankrupt within three years of

5  them going public?

6  A.  At least 50 percent.

7  Q.  It was 50 percent of the 30 or so companies.

8  A.  Yes.

9  Q.  Are you still associated with Catalyst?

10  A.  No.

11  Q.  When did you leave Catalyst?

12  A.  I left Catalyst in around 2005.

13  Q.  Did there come a time when you got involved in a company

14  called Arc Fund Management Holdings?

15  A.  That's right, yes.

16  Q.  And what's Arc Fund?

17  A.  Arc Fund was -- well, it had two roles.  One, it was a fund

18  manager raising money from private investors for tax-efficient

19  investments; and, secondly, invested in start-up companies.

20  Q.  And where did Arc Fund obtain the money to invest in

21  start-up companies?

22  A.  All through private investors.

23  Q.  Did investors receive their returns promised or projected

24  to them by Arc Fund?

25  A.  In most cases, no.

1    Q.   What happened to Arc Fund?

2    A.   It went out of business in around 2008.

3    Q.   And after that, what did you do next to make money?

4    A.   I had -- I was a chairman of a company called Capital Ideas

5    PLC, which was another listed company, and we or I was involved

6    in that.

7              I had two sides of the business there.  One was

8    investing in distressed companies, companies that had gone out

9    of business and trying to resurrect them.  And, secondly, I was

10   raising money again through private investors for something

11   called alternative assets like nonmainstream investments.

12   Q.   How long were you helping to run Capital Ideas?

13   A.   From just maybe 2006 to 2009.

14   Q.   What happened in 2009?

15   A.   2009 the company went out of business.

16   Q.   When the company went out of business, did it owe any debts

17   to anyone?

18   A.   Yes, it did.

19   Q.   To whom?

20   A.   To the Inland Revenue.

21   Q.   Is that the British Revenue Service?

22   A.   Yes.

23              THE COURT:  How do you spell that?

24              THE WITNESS:  Inland Revenue.

25   Q.   About how much was Arc Fund's tax bill when it went out of

J647MOO5                        Haddow - Direct

1   business?

2   A.  About 500,000 pounds.

3   Q.  Did Arc Fund pay its taxes while you were in charge of the

4   company?

5   A.  Capital Ideas.

6   Q.  Sorry.  Capital Ideas?

7   A.  No, it didn't.

8   Q.  What if any investment projects did Arc Fund raise money

9   for?

10  A.  Arc Fund's?

11  Q.  Sorry, I got the two companies mixed up.  Capital Ideas.

12  What if any companies did Capital Ideas raise money for?

13  A.  We started off with a venture called Room To Invest, and

14  that was a hotel venture where we raised money again from

15  private investors, and we sold them a fraction of ownership of

16  a hotel.  So, we raised money for that; that was our first

17  investment opportunity.

18  Q.  What was the investment offer from Room To Invest

19  investors?

20  A.  It changed.  It started off with investors would get a

21  share of the revenue of any guests staying in their hotel room,

22  and it was projected at kind of about between 10 and 12

23  percent.  And then Jim Moore got involved, and we restructured

24  the project slightly and gave a guaranty, a guaranteed return.

25  Q.  You mentioned that Jim Moore got involved.  How did you

1    meet Jim Moore?

2    A.   Jim was introduced to me by someone who was selling another

3    project.  By this stage we had launched another -- the African

4    Land project that I mentioned earlier.  We were selling this

5    African Land project, and one of the agents who was selling it,

6    this guy called Steven Quayle, and he knew Jim, and he said

7    would you like to meet him, he has a hotel venture and maybe

8    you could sell the hotel venture through your Room To Invest.

9              THE COURT:  When was this that you met him?

10             THE WITNESS:  That was about -- maybe about 2009.

11   Q.   When you met the defendant for the first time, did you

12   discuss his prior line of work?

13   A.   Yes.

14   Q.   And generally what did you understand to be the defendant's

15   prior line of work?

16   A.   Well, the thing I knew most about was his ownership of a

17   company called Inside Track, which at the time was a very --

18   well not at the time -- prior to me meeting him it was a very

19   successful property seminar business.

20   Q.   What did you understand the property seminar business to

21   do?

22   A.   It used to hold educational seminars across the UK for

23   free.  People would come along and find out how to make money

24   in property investments, and then they would come along to a

25   second seminar, maybe two or three days, where they would pay

1   money to attend, and at the end of that seminar they would

2   purchase property in particular projects and schemes.

3   Q.  Did you know what ultimately happened to Inside Track?

4   A.  Yes, I do.

5   Q.  What happened?

6   A.  It went out of business.

7   Q.  And did you have any involvement with Inside Track before

8   it went out of business?

9   A.  No.

10  Q.  Now, you mentioned earlier that you were introduced to the

11  defendant because he had investment venture.  What was that?

12  A.  He had a project in Barbados.  He had a project in Barbados

13  which was he had some drawings of, you know, how it was going

14  to look, and at the time it was just bare land, but the idea

15  was for us to sell rooms in that project through Room To

16  Invest.

17  Q.  Let's be clear.  Was there any hotel built on the land in

18  Barbados that Mr. Moore owned?

19  A.  No.

20  Q.  And what did Mr. Moore want you to do with that land?

21  A.  He wanted me to market it through my Room To Invest, brand

22  it as Room To Invest, and sell the rooms in a similar way that

23  I had been selling the rooms in our other hotels.

24  Q.  Did you have other hotels that you were selling investments

25  for as far as Room To Invest?

1    A.  Yes, two hotels.

2    Q.  Were they real hotels?

3    A.  They were.

4    Q.  Where were they?

5    A.  One was in Slovenia and the other was in Moracco.

6    Q.  So, how could you raise money for investors for a Barbados

7    hotel that didn't exist?

8    A.  Well, we were going to sell it as an off-plan investment,

9    but it came with guaranteed returns on the rooms which

10   obviously didn't exist, so I passed on that investment.

11   Q.  And why did you pass on the opportunity to sell investments

12   into the Barbados hotel?

13   A.  I didn't think it would be that popular with my investors.

14   Q.  Did the defendant get involved with Room To Invest after

15   that?

16   A.  Yes, he did.

17   Q.  Can you describe what he did and how that went about?

18   A.  He was involved in a few ways.  He helped me restructure

19   the product.  It had been floundering.  It was doing OK but not

20   that great, and he helped me restructure the products,

21   introduce investment structure whereby investors would get a

22   guaranteed return, and their return would increase if they

23   invested in more rooms.  So, the incentive really was to get

24   investors to invest more money rather than just buy individual

25   single rooms.  And he helped me with that.

 1              He also introduced me to a guy called David Austin,
 2       who --
 3              THE COURT:  Who?
 4              THE WITNESS:  David Austin.
 5              THE COURT:  Spell the last name.
 6              THE WITNESS:  A-u-s-t-i-n.  Who was one of Jim's
 7       original managers at Inside Track.  He took over part of my
 8       office in London and recruited a small team of people to sell
 9       the investment.
10  Q.   What was Jim Moore's role in the Room To Invest project?
11  A.   Yeah, so he introduced me to David Austin so we could set
12       our own sales operation to sell it directly to investors.
13              He also introduced me to a few agents to again
14       distribute the product.
15              He introduced me to a company who were also involved
16       in Bar Works called OPP, which was a company called Overseas
17       Property Professionals, and they would promote it to their own
18       network of agents.  Yeah, that was his involvement.
19  Q.   What was the business arrangement between you and
20       Mr. Moore?
21  A.   He was my business partner in Room To Invest, so he took a
22       percentage -- we shared the profit from each Room To Invest
23       sale 50/50.
24  Q.   And about how much money did Room To Invest get from
25       investors after the defendant joined the investment project?

1   A.  Maybe between 300 and 500,000 pounds.

2   Q.  And about how much did you pay the defendant in return for

3   his assistance?

4   A.  Between 50 and 70,000 pounds.

5   Q.  How long did the defendant stay with Room To Invest?

6   A.  Maybe around six, six months or so.

7   Q.  And what happened to Room To Invest?

8   A.  Eventually it went out of business.

9   Q.  When Room To Invest went out of business, what, if

10  anything, happened to -- what, if anything, did you do with

11  respect to people who had already invested in Room To Invest?

12  A.  We switched them into another investment.

13  Q.  What do you mean by that?

14  A.  Well, we had another investment that we were selling to

15  private investors, a company called African Land -- at the time

16  it was called Agri Capital -- and we called up investors who

17  had invested in Room To Invest and suggested that they switch

18  their investment over to African Land.

19  Q.  Do you know a company by the name of Capital Alternatives?

20  A.  Yes.

21  Q.  Do you have any association with that company?

22  A.  Yes, that was my company.

23  Q.  What was Capital Alternatives?

24  A.  Well, when Capital Ideas went out of business, I set up a

25  company called Capital Alternatives.  Capital Alternatives was

1   a marketing company, so we used that to market these various

2   products, like the African Land product, and the Carbon Credits

3   product I mentioned earlier.

4   Q.  Did you run Capital Alternatives by yourself or with other

5   people?

6   A.  With other people.

7   Q.  And how would you characterize their sale of operation?

8   A.  It was a boiler room.

9   Q.  Did investors lose money in businesses promoted by Capital

10  Alternatives?

11  A.  Yes, they did.

12  Q.  Let's talk about two businesses specifically that you

13  mentioned, African Land and Carbon Credits.  What is African

14  Land?

15  A.  African Land was a project that I developed with a couple

16  of other people.  It was land that we had acquired a lease over

17  in Sierra Leone, West Africa, and the idea was to cultivate the

18  land and grow rice, and investors would buy one acre plots and

19  would get a share of the returns from those acre plots.

20          Then there was also another project which is the

21  Carbon Credits project, which was run in a similar method as

22  well.  We would acquire land on forestry, on a large forest in

23  West Africa -- this forest was called the Gullah Forest -- and

24  the idea was to protect the rain forest from deforestation, and

25  as a result of that investors would receive something called

1   carbon credits which had a value.

2   Q.  You've used the term Ponzi scheme with respect to Bar

3   Works.

4   A.  Yes.

5   Q.  Were African Land and Carbon Credit Ponzi schemes?

6   A.  Yes, they were.

7   Q.  Based on all the information you knew at the time you were

8   promoting those businesses, was it ever going to be possible to

9   pay investors out of the profits of the African Land or the

10  Carbon Credits?

11  A.  No, it wasn't.

12  Q.  Did you make any misrepresentations to investors in

13  connection with African Land and Carbon Credits?

14  A.  Yes, did.

15  Q.  What kind of misrepresentations?

16  A.  Well, a few really.  There was misrepresentations in terms

17  of the projected returns.  There was a projected return in the

18  African Land project of 15 percent.  That was never realistic.

19  There was a calculation in there about how that 15 percent

20  return was estimated, and most of the figures in there that we

21  used were overhyped.  Like, for example, the amount of money

22  you would get from the rice was double the market price, so

23  that was unrealistic.  There was a buy-back option in there,

24  again that was unrealistic.  There was a partnership in the

25  Carbon Credit projects with JP Morgan on the front cover, and

1    that didn't exist.  And there was also historic numbers in

2    there, historic numbers on previous harvests, and they were all

3    fictitious.

4    Q.  At least how much money was raised from investors in

5    African Land and Carbon Credits?

6    A.  At least 60 million pounds.

7    Q.  And did investors receive their promised returns?

8    A.  No, they didn't.

9    Q.  What happened to their money?

10   A.  Well, both projects went out of business, and they lost

11   their money.

12   Q.  And where did that money go?

13   A.  It went to pay commissions to the sales guys.  It went to

14   me.  It went to my business partner -- business partners -- and

15   a small minority went to the farm.

16   Q.  Did there come a time when the Financial Conduct Authority

17   began investigating African Land and Carbon Credits?

18   A.  Yes.

19   Q.  And what's the Financial Conduct Authority?

20   A.  The Financial Conduct Authority is your equivalent of the

21   SEC.  It's called the FCA, and they are a civil organization.

22   They were investigating me for -- not investigating -- they

23   were taking me to court for two things:  One, for running a

24   collective investment scheme, as in it should have been

25   regulated; and, two, for making materially misleading

1    statements to induce investors.

2    Q.   And did the FCA make any inquiries to you?  Did they ask

3    you questions as part of investigating this scheme?

4    A.   Yes, they did.

5    Q.   Did you give them responses?

6    A.   I did, yes.

7    Q.   Were all of your responses truthful?

8    A.   No, they weren't.

9    Q.   What kind of information did you tell the FCA that wasn't

10   true?

11   A.   The returns, again I really didn't explain to them how we

12   had calculated the projected 15 percent return.  I didn't go

13   into detail on that.  We exaggerated that to them.

14            We hid certain information from them.  We hid bank

15   statements and investor information from them.

16            We also lied about the exit strategy, how people were

17   going to get their money out.

18            And we also lied about the security of the asset, as

19   in it wasn't just a lease, it was a sublease.

20   Q.   Did you do anything to marginalize your role within the

21   organization?

22   A.   Yes.

23   Q.   What did you do?

24   A.   I used a number of people to front the businesses up.

25   Q.   Now, you mentioned that the FCA also ultimately ended up

1  suing you in connection with these two projects.

2  A.  Yes.

3  Q.  Were other people also named as defendants?

4  A.  Yes, they were.

5  Q.  What year was the FCA's lawsuit filed?

6  A.  About 2013.

7  Q.  Was the filing of that lawsuit publicized?

8  A.  It was, yes.

9  Q.  Were there court decisions issued in connection with this

10  lawsuit?

11  A.  There were court decisions, yes -- a number of court

12  decisions.

13  Q.  And can you just walk us through your understanding of what

14  those court decisions said.

15  A.  Yes.  So, the first court decision was in the High Court in

16  London.  This was to do with determining whether it was a

17  collective investment scheme.  The High Court found in the

18  FCA's favor.  We then appealed to the Court of Appeal, and the

19  Court of Appeal found in the FCA's favor.  And we then couldn't

20  take it any further, so the FCA got judgment, and then the FCA

21  took out a further court case against us regarding whether the

22  restitution on the original investment schemes and also on the

23  misleading material statements.

24  Q.  Were those court decisions that you just described, were

25  those published online?

1   A.  They were published online, yes.

2   Q.  And were they also published in the press?

3   A.  Yes, they were.

4   Q.  Were they published by the FCA as well?

5   A.  By the FCA as well, yes, on their website.

6   Q.  And did those decisions and press releases name you by name

7   Renwick Haddow?

8   A.  Yes, they did.

9   Q.  What effect, if any, did all of those decisions and press

10  releases have on your ability to run more businesses in the UK?

11  A.  I was finished in the UK.

12  Q.  What would happen if when you tried to launch businesses in

13  the UK?

14  A.  There was no way I was going to be able to raise money from

15  private investors using my own name.

16  Q.  You mentioned that you moved to the United States.  Can you

17  remind us when that was.

18  A.  Yeah, that was October 2014.

19  Q.  Did you move to the United States as a result of anything

20  that happened in the UK?

21  A.  Yeah, I moved as a result of all the bad press and the

22  problems I was having with the FCA.  I thought it would be good

23  to make a new start and leave all that behind me.

24  Q.  Did you live here by yourself or with anyone else?

25  A.  With my future wife.

1   Q.  And you mentioned that you started some businesses in the

2   United States.  Let's go through them in some detail now.

3   A.  Yes.

4   Q.  What was the first business that you started here?

5   A.  So the first business I started here was a company called

6   In Crowd Equity, which was a crowd funding website where we

7   raised money for start-up operations through the Internet and

8   also through a boiler room.

9   Q.  When did you start In Crowd Equity?

10  A.  Started around January 2015.

11  Q.  You said that In Crowd Equity was a crowd funding site.

12  What did it represent to investors that it was doing with

13  respect to the companies that it was promoting?

14  A.   It represented itself as an independent -- an independent

15  crowd funding platform whereby we would look for investment

16  opportunities, we would conduct extensive due diligence on

17  them, and we were purporting to be independent from the

18  companies themselves.

19  Q.  And was In Crowd independent from the companies that it was

20  raising money for?

21  A.  No.

22  Q.  Why not?

23  A.  Because I was the owner and founder of In Crowd Equity.  I

24  was also the owner and founder of all the companies we raised

25  money for.

1    Q.   Was your control over In Crowd Equity and the underlying

2    companies disclosed to investors?

3    A.   No.

4    Q.   Did In Crowd Equity have any bank accounts?

5    A.   Yes, it did.

6    Q.   Who had access to those accounts?

7    A.   Just me.

8    Q.   Did you hire any employees to help run In Crowd Equity?

9    A.   Yeah, we had -- I -- at one stage I had two administration

10   assistants, and I had a roomful of salespeople maybe numbering

11   about 20 people.

12   Q.   How did you find salespeople in the U.S. to work for you?

13   A.   I mainly used Craig's List.

14   Q.   What is that?

15   A.   Craig's List is an online magazine, I suppose, where you

16   advertise for vacancies you have.

17   Q.   And generally what were the backgrounds of the people you

18   hired to be your sales agents at In Crowd Equity?

19   A.   Generally these were experienced people who had sold penny

20   stocks before, people who sold oil and gas investments, those

21   types of people; they were used to working in a high pressure

22   environment, and, so, yeah, that had experience with this type

23   of thing before.

24   Q.   You mentioned that you were basically running a boiler

25   room.  Is that what you used with respect to In Crowd Equity?

1    A.  Yeah, I did.

2    Q.  Where was the boiler room located?

3    A.  When we first started, it was down in the Flatiron

4    District, and then we moved to 37th Street in Manhattan.

5    Q.  And let's walk through some of the companies that your

6    boiler room raised money for.  What was the first one?

7    A.  The first company we raised money for was a company called

8    Bitcoin Store.

9    Q.  And what was Bitcoin Store supposed to be?

10   A.  Bitcoin Store was supposed to be an online exchange where

11   you could purchase Bitcoin, and we would facilitate the storage

12   of your Bitcoin through a wallet, and in fact it didn't exist.

13   Q.  What didn't exist?

14   A.  The company existed, but there was nothing behind the

15   company.  There was no exchange, and there was no -- there was

16   no wallets.

17   Q.  Did you sell Bitcoin Store to investors here in the U.S.?

18   A.  Yes.

19   Q.  And were those investors given prospectuses to help them

20   make their investments?

21   A.  Yes, they were.

22   Q.  Were there misrepresentations in those prospectuses?

23   A.  There were.

24   Q.  It sound like there was one big one, but can you just walk

25   us through those misrepresentations.

J647MOO5                        Haddow - Direct

```
 1   A.   Yeah.   The few that stand out at this point in time are the
 2   management team.   There was three or four people on the
 3   management team, and none of those people existed.
 4          Obviously, the one I've just mentioned, there was no
 5   substance behind the brochure, the prospectus.   There was no
 6   app, and there was no exchange, so people couldn't buy Bitcoin
 7   if they had wanted to.
 8          And there was also fictitious historical numbers used
 9   in the brochure, and the op dates to investors.   And we also
10   made projections that were also fictitious.
11   Q.   About how much money did you raise for Bitcoin Store using
12   your In Crowd Equity boiler room?
13   A.   About $700,000.
14   Q.   How long did you sell Bitcoin Store investments?
15   A.   I sold from January 2015 to just after Christmas in 2016.
16   Q.   Did you sell investments in any companies other than
17   Bitcoin Store?
18   A.   Yes, I did, yes.
19   Q.   What were they?
20   A.   The second one we raised money for was a company called
21   U.S. Tech Startup Fund.   That was a -- well it was supposed to
22   be a fund that invested in U.S. tech start-ups.   And then we
23   also raised money for Bar Works.
24   Q.   About how much money did you raise for U.S. Tech Startup
25   Fund?
```

1    A.  We raised approximately $20,000.

2    Q.  Was there anything behind U.S. Tech Startup Fund?

3    A.  No, just a brochure.

4    Q.  Now, before we start talking about Bar Works, did there

5    come a time when you learned that you were being investigated

6    by the SEC?

7    A.  Yes.

8    Q.  When was that about?

9    A.  When they visited my office in 37th Street.

10   Q.  Can you describe what happened at that visit and what

11   happened afterwards?

12   A.  Yeah.  I was having a meeting at the time with my sales

13   manager, and then two gentlemen walked in in raincoats, showed

14   me their business cards which said SEC, said they wanted to

15   talk to me, and I then discussed with them -- they wanted to

16   talk about In Crowd Equity, so they sat with me for about three

17   hours and discussed how I operated In Crowd Equity.

18   Q.  And what happened after that?

19   A.  Well, after that I was a little bit worried and thought I

20   could see history repeating itself here, so I started winding

21   my activities down at In Crowd Equity, because many of the

22   things that they had been looking into we were doing, like

23   commingling funds, investors' money, with the expenses of the

24   business, and obviously my involvement in both companies made

25   me very, very nervous.

1    Q.  Did there come a time when you were served with

2    informational requests and subpoenas from the SEC?

3    A.  Yes.

4    Q.  And what kind of information did those requests and

5    subpoenas look for?

6    A.  Firstly, it started requesting information on In Crowd

7    Equity and the companies we were raising money for, which was

8    at the time Bitcoin Store, and then it extended to further

9    requesting information on the Bar Works project.

10   Q.  Were some of the subpoenas you received directed at

11   Jonathan Black?

12   A.  Yes, they were.

13   Q.  Did you tell the SEC that Jonathan Black wasn't real?

14   A.  No, I responded in the name of Jonathan Black.

15   Q.  And what happened after that?

16   A.  What do you mean?

17   Q.  Well, withdrawn.  After you responded to the SEC as

18   Jonathan Black, did you make subsequent statements about what

19   the company was doing and who you were as Jonathan Black?

20   A.  Yes, I did, yes.

21   Q.  Did the SEC ever ask to set up any face-to-face meetings

22   with Jonathan Black?

23   A.  Yes, it did.

24   Q.  And what did you tell them when they asked to meet with

25   Jonathan Black?

1    A.  I said he was unavailable -- well, Jonathan Black said he

2    was unavailable; he was out of the company.

3    Q.  Did you lie to the SEC?

4    A.  I did.

5    Q.  Let's look at Government Exhibit 175.  Do you recognize

6    this document?

7    A.  Yes, I do.

8    Q.  What is this?

9    A.  It's the letter from Jonathan Black to the SEC.

10   Q.  And who wrote this letter?

11   A.  Me.

12   Q.  What was the purpose of this letter?

13   A.  This is to answer the SEC's inquiries that they had

14   regarding Bar Works.

15   Q.  Let's go to the next portion.  Can we go to page 2.  Is

16   this the information that you were providing to the SEC about

17   In Crowd Equity and Bar Works?

18   A.  Yes, it is.

19   Q.  All right.  Let me direct your attention to kind of the

20   middle of the page where it says Bar Works has no further

21   involvement with ICE.

22   A.  Yes.

23   Q.  What do you write here?

24   A.  "Bar Works has no further involvement with ICE.  Mr. Haddow

25   helped found Bar Works and ICE as you are aware.  He was paid a

1     fee for his work establishing an agency network which was paid

2     from the proceeds from the sale of leases not securities."

3     Q.  And was this true?

4     A.  No.

5     Q.  Let's go to page 3, and let's look at what you wrote here

6     about Jonathan Black.  Could you read that.

7     A.  Yes.  "Jonathan is based predominantly overseas, any

8     documentation he has relating to ICE have already been included

9     as part of the Bar Works Inc. submission.  Mr. Black is

10    available for a meeting if that is still required and will

11    inform you of his availability in due course."

12    Q.  Why did you say that Mr. Black was available for a meeting?

13    A.  Just to buy time.

14    Q.  Did the SEC ask you for that meeting?

15    A.  I think they did, yes.

16    Q.  And did Jonathan Black ever meet the SEC?

17    A.  No.

18    Q.  Let's look at a few other names on this page.  Zoe Miller.

19    Who are you referring to here?

20    A.  I'm referring to my wife, Zoe Haddow.

21    Q.  And did your wife do the things that you are describing Zoe

22    Miller as doing?

23    A.  No.

24    Q.  Did your wife manage the membership acquisition for Bar

25    Works?

1    A.  She had some minor involvement.

2    Q.  And what is your wife's name?

3    A.  Zoe Haddow.

4    Q.  Why is the name that's listed here as Zoe Miller?

5    A.  Because if I had used her real name, then people would have

6    realized that in some shape or form I was involved, which would

7    have meant that this investment wouldn't have worked out.

8    Q.  And let's zoom back out from that and focus on Robert

9    Munden.  What do you write here?

10   A.  "Robert is the finance manager based in the UK.  He holds

11   no records and his function has not commenced as yet."

12   Q.  Who was Robert Munden identified as in the borrowers'

13   materials?

14   A.  He was identified as the finance manager or finance

15   director.

16   Q.  Do you know of a Robert Munden?

17   A.  Yeah, he's a friend of mine.

18   Q.  Did he have anything to do with Bar Works?

19   A.  No, he didn't.

20   Q.  All right.  Let's go to Government Exhibit 176.  I believe

21   Government Exhibit 175 may have been in evidence as part of the

22   stips, but just in case I will offer it into evidence.

23            MR. GARVIN:  No objection.

24            THE COURT:  I will allow it.

25            (Government Exhibit 175 received in evidence)

1    Q.  Mr. Haddow, what is this document?

2    A.  This is another letter from Jonathan Black, myself, to

3    Maureen Peyton.

4    Q.  Is that an individual at the SEC?

5    A.  Yes, it is.

6    Q.  Who did you sign this letter as?

7    A.  I signed it as Jonathan Black.

8    Q.  And the letter references certain agreements, an agreement

9    between Bar Works Ltd. and In Crowd Equity.  Did you attach an

10   agreement like that?

11   A.  Yes, I did.

12   Q.  Can you describe the nature of that agreement.

13   A.  Yeah, the agreement was an agreement that I had put

14   together between Bar Works London Limited and In Crowd Equity

15   to make it look like there was a genuine agreement between the

16   two parties.  And the agreement related to fees, so it was

17   there to cover the amount of money that we received from

18   investors.

19   Q.  Why did you need an agreement to cover the fees out of the

20   money that was raised from investors?

21   A.  Because that was my only way of making it look like Bar

22   Works was an independent company from myself and there was a

23   genuine agreement between Bar Works and In Crowd Equity.

24   Q.  Can we just blow up the agreement.

25            Is that the agreement you attached to the SEC?

1    A.  Yes, it is.

2    Q.  And noting at the top where it says "The following service

3    agreement is effective as of October 1, 2015" --

4    A.  Yes.

5    Q.  -- did you create this agreement on or about October 1,

6    2015?

7    A.  No.

8    Q.  About when did you create it?

9    A.  I created it slightly after the inquiries came in from the

10   SEC.

11   Q.  Did you create it to paper over the money that you were

12   spending out of investor funds?

13   A.  I did, yes.

14   Q.  Did the SEC also ask you information about how money raised

15   for Bitcoin Store was spent?

16   A.  It did, yes.

17   Q.  And what did you do in response to those inquiries?

18   A.  I also put together another service agreement between

19   Bitcoin Store and In Crowd Equity, where I manipulated the

20   amount of money on the service agreement to match how much

21   money we had received from private investors, again to make it

22   look like the companies were independent of myself.

23   Q.  And was that agreement also backdated?

24   A.  Backdated too, yes.

25   Q.  Let's talk about Bar Works.  How did you come up with the

1   idea for Bar Works?

2   A.  I had the idea quite a few years ago when I was in London,

3   when I had my company Catalyst Investment Group, we were

4   searching for an office.  With my experience in pubs, I came

5   across a pub that would have made a really good office space.

6   For one reason or another that didn't happen, but I always had

7   the idea of, you know, thinking that actually a bar environment

8   would be really good as a working environment.  I know that

9   sounds quite funny now, but at the time it seemed like a good

10  idea.

11          When I first moved to New York with a fresh start, I

12  came across a property -- someone dropped me off at the wrong

13  location, and I was like, oh, this could be blessed; this

14  place, you know, it looks like it's vacant, it's just off Fifth

15  Avenue; I wonder how much this is; this could be a really ideal

16  coworking space.  So, that was the start of the journey.

17  Q.  As of August 2015, what was the state of play with respect

18  to Bar Works?

19  A.  Well, it took me a while to track down the owner of the

20  property, so by August I think we had just about signed a lease

21  on the property on 39th Street.

22  Q.  Were there any open locations at that time?

23  A.  No, not at that time.

24  Q.  What was the nature of the investment that was sold by In

25  Crowd Equity into Bar Works?

J647MOO5                        Haddow - Direct

1    A.  Yeah, so to start with we were raising money by selling

2    shares in the company.  Basically it was two choices:  You

3    could either buy shares in the company, or you could buy

4    something called loan notes where investors would have the

5    opportunity to convert into shares at a later date, but they he

6    would get an interest payment every year.

7    Q.  And what did you begin to market first?

8    A.  We began to market the loan notes from the shares first.

9    Q.  Did there come a time where you also began to market work

10   space leases?

11   A.  Yes.  Then at a slightly later date I came up with the idea

12   of selling an asset rather than shares, so where people would

13   buy a lease over the desk or work space.  So, yes, we started

14   marketing that as an investment.

15   Q.  Did you maintain contact with the defendant James Moore

16   after your Room To Invest venture in 2010?

17   A.  Yes.

18   Q.  Can you just describe the nature of your interactions with

19   the defendant throughout the years leading up to about August

20   of 2015.

21   A.  Yeah.  Well, we mainly contacted each other socially; we

22   met up a few times.  We would always discuss what we were both

23   doing, what activities, what businesses we were involved in,

24   what looked interesting at the time.  I went to visit him once

25   in Miami.  He introduced me to a guy who was interested in

J647MOO5                              Haddow - Direct

1    getting involved in my Capital Alternatives business in Dubai.

2    That never really happened, but we kept in contact over a few

3    years.

4    Q.  Did the defendant ever visit you?

5    A.  Yeah, we met in London quite a few times for drinks.

6    Q.  Did he ever visit you in any locations other than London?

7    A.  Yeah, he visited me in Dubai.

8    Q.  And what was in Dubai?

9    A.  So we had -- Capital Alternatives had a branch office in

10   Dubai.  We had a few branch offices across the world in fact,

11   but that was one in particular.  He came to visit me with this

12   guy.  I met with him in Florida.  He came over with him to

13   discuss maybe getting involved in my Capital Alternatives

14   operation.

15   Q.  Did Jim Moore get involved in your Capital Alternatives

16   operation?

17   A.  He did not, no.

18   Q.  What if any businesses did the defendant tell you he was

19   involved in during this time period?

20   A.  He had been -- he was involved in selling -- I think he had

21   a partner who he introduced me to in London who was selling

22   discounted property, UK property, where people would buy

23   property at discount, and he would arrange financing to

24   purchase the property, and they would have an immediate equity

25   in the property because they were buying it at a discount.

1   That was one project he told me about.

2              He was also involved with this guy who he introduced

3   me to in Florida who came to Dubai with a seminar business, but

4   from the sound of it that didn't really take off, from what he

5   told me.

6              And I'm sure there was other stuff as well, but those

7   were the two that stand out.

8   Q.  Did he ever tell you about being involved in any businesses

9   in the United States?

10  A.  Yes, he did.

11  Q.  And what did you learn from the defendant?

12  A.  I learned he had some properties that he was marketing

13  through Inside Track, some large apartment blocks in Florida,

14  and he did approach me at one stage to -- a lot of money was

15  held in escrow because these people couldn't get mortgages

16  because the projects went into receivership, and he asked me

17  whether I was interested in seeing if I could flip those

18  deposits out and into another investment.

19  Q.  And did you join him in that venture?

20  A.  No.  I looked at it, but I couldn't work out how I was

21  going to achieve that, so I passed on that opportunity.

22  Q.  Did you consider James Moore a friend?

23  A.  Yes, I did.

24  Q.  You mentioned you had gotten married sometime earlier.

25  When did you get married?

1  A.  I got married in 2016.  March 2016 -- sorry, April 2016.

2  Q.  Your wife's not here to hear you hesitate on that, right?

3  A.  No, I'm a bit hazy on that.  It's been a while.

4  Q.  Where did you have your wedding reception?

5  A.  I had my wedding reception in Greece.

6  Q.  Did you invite Jim Moore to your wedding?

7  A.  Yes, I did.

8  Q.  Did he go?

9  A.  He didn't, no.

10  Q.  Did he tell you why he couldn't go?

11  A.  Yeah, he didn't have any money at the time.

12  Q.  Did he ask you for anything in connection with those

13  conversations?

14  A.  He asked me for a loan or whether I would be willing to

15  sell his Spanish -- he had a Spanish property investment.

16  Q.  And, Mr. Haddow, did you go on your honeymoon immediately

17  after your wedding?

18  A.  No, I went the following year.

19  Q.  When did you go on your honeymoon?

20  A.  In June -- sorry -- about March 2016.

21  Q.  OK.  We'll come back to that in a bit.

22      Did you tell the defendant about In Crowd Equity in

23  the summer of 2017?

24  A.  Yes, I did.

25  Q.  How did that come about?

1    A.  He called me.  I was actually in my office, I remember.

2    It's distinct for one reason really, because he was talking to

3    me -- it's the first time I told him about not so much In Crowd

4    Equity but Bar Works.  It's the first time I mentioned Bar

5    Works to him.

6            He called me predominantly to discuss his Spanish

7    property investment and whether I would be interested in that

8    and whether I would be interested in selling that through this

9    In Crowd Equity floor I had -- floor being the name for a

10   boiler room -- and I said I wasn't really interested; I had

11   this other project I was working on; I had signed a lease or

12   about to sign a lease on a property in Manhattan, and I was

13   going to sell coworking space, and I was looking to sell shares

14   through my In Crowd Equity.

15   Q.  And how did Mr. Moore react when you told him about Bar

16   Works?

17   A.  He was visibly -- not visibly -- but audibly interested and

18   said I think I can help you out on that, and told me about his

19   involvement in UPG, United Property Group, and that maybe they

20   could help sell a few of these investments.

21   Q.  And can you describe the nature of your conversations with

22   the defendant in the early goings of Bar Works leading up to

23   say October 2015.

24   A.  Yeah.  So, I sent him -- after that conversation I sent him

25   some information through a colleague of mine, Jason, who sent

1   over the documentation In Crowd Equity we're promoting Bar

2   Works with.  I think I sent over a private placement memorandum

3   and some press releases that we had and some other press

4   material.  And he went off and talked to UPG, spoke to a few

5   other agents.  We had some interaction.  He was saying, you

6   know, this is really a good project, and arranged to come over

7   and see it for himself.

8   Q.  Prior to the defendant coming over to see the project for

9   himself, did you have any conversations about what a business

10  arrangement between the two of you could look like?

11  A.  Yes, we did, yes.

12  Q.  What was the nature of those conversations?

13  A.  He said he wasn't interested in just straightforward like a

14  glorified agency recruiter.  He wasn't interested in just

15  getting agents onboard and being paid a flat commission.  He

16  was interested in a partnership.  He was interested in a share

17  in the business so he could benefit from any upside in the

18  business.  He also wanted to have a percentage payment on each

19  investment that we sold.

20  Q.  And what was the share of the business that the defendant

21  talked to you about having?

22  A.  Well, in the beginning we were talking about 50/50.

23  Q.  And what did it ultimately land on?

24  A.  Ultimately through a bit of horse trading we went from

25  50/50 to about 35 percent on the U.S. business and 50 percent

1  on non-U.S. business.

2  Q.  And what do those numbers represent?

3  A.  What do you mean?

4  Q.  When you say 50 percent of the U.S. business -- 50 percent

5  of the foreign business and 35 percent of the domestic

6  business, what does that mean?

7  A.  So, in other words, he would have 35 percent of the shares

8  in that company and 50 percent of any shares in the non-U.S.

9  company.

10  Q.  What if anything did the defendant tell you about what he

11  would bring to the partnership?

12  A.  He was going to bring his agency network which consisted of

13  UPG -- United Property Group we talked about briefly.  As I

14  said, they had their own sales operation in Spain.  His idea

15  was to expand that so it would have a large direct sales

16  operation selling directly to private investors.  That was one

17  prong of the sales method.

18          Secondly, he was going to bring the agency network,

19  which was predominantly run by UPG, and they were going to

20  expand their network to, you know, a wider audience, more

21  countries.  He was also going to bring along other networks

22  outside UPG.

23          He was going to help me structure the product, make it

24  more marketable to investors.

25          He was also going to help me front the business in

1    terms of not so much him but through him and others, another

2    guy, Neil Storey, they were going to front the business for

3    Jonathan Black, myself, to deal with questions from agents, and

4    generally, you know, the terms and conditions, the language,

5    all those types of things like the brochure, he was going to

6    help me with that too.

7    Q.  Did you want Jim Moore and UPG to raise money for Bar Works

8    for you?

9    A.  Yes, I did.

10   Q.  Why did you want that?

11   A.  Because I thought that he would -- they had an existing

12   operation.  They had been -- he told me that the UPG operation

13   was selling I think it was either 2 million a month on certain

14   projects, and that they potentially could all switch over --

15   some of those could switch over to selling Bar Works.  So, I

16   could see the significance of having them -- having him and UPG

17   involved, yes.

18                   (Continued on next page)

19

20

21

22

23

24

25

1          THE COURT:  Can I interrupt for a minute.  Does

2   anybody want a five-minute break?  Anybody need?  You got it.

3          (Recess)

4          (In open court; jury present)

5          THE DEPUTY CLERK:  Sir, before we begin, I'd like to

6   remind you, you are still under oath.

7          THE WITNESS:  Okay.

8          THE DEPUTY CLERK:  Thank you.

9          THE COURT:  So we'll continue with the direct

10  examination.  Counsel.

11  BY MR. VAINBERG:

12  Q.  Mr. Haddow, prior to the break we were talking about your

13  early conversations with the defendant about having him join

14  Bar Works.

15          Did there come a time when the defendant visited you

16  in New York City?

17  A.  Yes, there was a time.

18  Q.  When was that?

19  A.  That was about October 2015.

20  Q.  Did you exchange a number of e-mails between you and him

21  leading up to that meeting?

22  A.  Yes, we did.

23  Q.  Let's look at some of those e-mails.  And Mr. Haddow, with

24  your permission, I'm going to focus on specific portions of the

25  e-mails I'd like you to direct your answers to.

J643MOO6                        Haddow - Direct

1    A.  Okay.

2    Q.  Government Exhibit 1.  Who is this e-mail from?  The e-mail

3    address that's listed here?

4    A.  This is from Jim Moore.

5    Q.  Just for the record, what's the e-mail address?

6    A.  It's AnaKP2014@gmail.com.

7    Q.  Did you know when you received an e-mail from

8    AnaKP2014@gmail.com, who did you understand it to come from?

9    A.  From Jim.

10   Q.  Did you understand it to come from anyone else?

11   A.  No.

12   Q.  Who is in the "to" field?

13   A.  That's to me, that's my personal e-mail address,

14   Renwick@RenwickHaddow.com.

15   Q.  So, if anyone e-mailed you at that e-mail address, they

16   would know exactly who they're talking to, right?

17   A.  Yes.

18   Q.  What's the date of this e-mail?

19   A.  That's dated August 21, 2015.

20   Q.  What's the attachment?

21   A.  He sent me over a brochure from a company called Regent 88.

22   Q.  What was the Regent 88?

23   A.  Regent 88 was another coworking business similar to Bar

24   Works, but based in the U.K.

25   Q.  What did Jim Moore write to you?

1   A.  He said "I would like to do one of these with you."

2   Q.  Let's go to Government Exhibit 2.  Did you respond to that

3   e-mail?

4   A.  I did, yes.

5   Q.  Let's just focus on your response and tell us what you

6   said.

7   A.  I said "Interesting.  I am already doing one on unit in

8   Manhattan I've just completed."

9   Q.  What are you talking about here?

10  A.  I'm talking about I was already planning to do a coworking

11  space on unit, and a project on the unit in 39th Street.

12  Q.  Have you talked about Bar Works at this point with

13  Mr. Moore?

14  A.  Yes, I had.

15  Q.  Let's blow up the top half of this e-mail and walk us

16  through how this conversation goes.  Let's include the one

17  right below that, too.

18          What did Mr. Moore say?

19  A.  He said "I know.  I'm suggesting expanding it quickly and

20  working on it together."

21  Q.  What did you say?

22  A.  I said "Happy to, mate.  I'm already looking at more units

23  in Manhattan once I have this one breaking even at least.

24  Shoreditch" which was a trendy area in London "is ripe for

25  this."

1    Q.  What did Mr. Moore reply with?

2    A.  Jim said "I'm right up for doing this with you.  We could

3    collectively sell the shit out of it and then, as you said,

4    keep the business and sell that.  Maybe share it 50/50 on sale

5    with the owner/investor."

6    Q.  Let's go to Government Exhibit 12.  And do you recognize

7    this set of e-mails?

8    A.  Yes, I do.

9    Q.  In this set of e-mails, are you complaining about paying a

10   rental deposit for someone?

11   A.  Yes, I am, yes.

12   Q.  Who are you talking about here?

13   A.  I'm talking about one of our sales guys at In Crowd Equity

14   who I had recruited.

15   Q.  Why did you have to pay the rental deposit for one of your

16   In Crowd sales guys?

17   A.  Because this guy came with a very big, good reputation, he

18   was kind of a very successful salesperson in the U.K. for

19   selling land investments.  And in order to get him on board, he

20   was out money, so I lent him some money for his rental deposit

21   on his property.

22   Q.  Let's just focus on the middle of the page.  Directing your

23   attention to what Jim Moore wrote on August 31, 2015 at 10:24.

24   In the middle of that, what did he write?

25   A.  He said, "Look at the good side.  You have a fresh start, a

lovely new wife, nothing in life is ever perfect.  But if you
look at the positives, for most people what you have comes
pretty damn close."

Q.  When Mr. Moore tells you you had a fresh start, what did
you understand him to be referring to?

A.  He's referring to the fresh start in New York, fresh start
in new businesses, fresh start with the new wife.

Q.  Did Mr. Moore know about your troubles in the U.K. up to
this point?

A.  Yes, he did, yes.

Q.  How do you know that he knew?

A.  Because we discussed it on numerous occasions.

Q.  Let's go to Government Exhibit 3.  And if we just look at
the top portion.  Who is this e-mail from?

A.  This e-mail is from Jim Moore to myself.

Q.  Do you see where it says, "Hi Renwick.  For some reason it
wouldn't let me reply to this last message."

A.  Yes.

Q.  Did Mr. Moore copy and paste the body of a previous
exchange with you into this e-mail?

A.  Yes, he did, yes.

Q.  Did he ask you certain questions?

A.  Yes.

Q.  Did you provide certain answers?

A.  I did.

1   Q.  Let's look at Mr. Moore's questions on the second page.

2   Right where he says "I skim read it."  What was the "it" that

3   he was referring to?

4   A.  He's talking about the PPM on Bar Works that I sent him.

5   Q.  So, by August 26, 2015, had you sent him some marketing

6   materials for Bar Works?

7   A.  I had, yes.

8   Q.  What are the questions that he's asking you here?

9   A.  What is your target yield.  Which is the return on the

10  investment.  I've replied 15 percent.  Second question was what

11  do We Work get?  And I said Bar Works you mean, and 50 percent.

12  And then he said how can we work together.

13  Q.  Is what follows, are those your responses to that last

14  question?

15  A.  It is, yes.

16  Q.  What did you tell him?

17  A.  I said "Good question.  So I have a team selling stock on

18  this.  We will sell this out quickly I think based on our

19  current run rate of 500,000 this month.  I have a few floors

20  who want to sell the unitized product.  The best way to make

21  money from selling these units are, one, recruiting sales

22  floors to sell this.  Particularly target the guys selling car

23  park spaces.  Two, set up a floor to do this.  I don't really

24  want to do it myself but I could consider it.  Let me know your

25  thoughts."

1   Q.  You are saying you have a team selling stock on this.  Who

2   are you referring to?

3   A.  I was referring to the In Crowd Equity business I had.

4   Q.  That's your boiler room, In Crowd Equity?

5   A.  It is, yes.

6   Q.  When you said you will sell this out quickly, based on your

7   current run rate of 500K a month.  Is that actually how much In

8   Crowd Equity was doing per month?

9   A.  No, it wasn't.

10  Q.  Did you lie to Mr. Moore about that?

11  A.  I did, yes.

12  Q.  Why did you lie about that?

13  A.  I think I was trying to impress him.

14  Q.  Down below, you write the best way to make money from

15  selling these units are, one, recruiting sales floors to sell

16  this.

17          What's a sales floor?

18  A.  A sales floor is a nice word for a boiler room.

19  Q.  Targeting the guys selling car park spaces.

20          Who was selling car park spaces?

21  A.  So, there was another investment, similar kind of structure

22  to the Bar Works investment, called Park First, which was

23  selling car park spaces to investors.  And that was promoted by

24  a number of agents, similar to how Bar Works operated or was

25  going to operate.  And so I was saying we should target the

J643MOO6                          Haddow - Direct

1   same agents who were selling the car parking spaces.

2   Q.  Did you have anything to do with the car park investment

3   project?

4   A.  No, I didn't.

5   Q.  Did Mr. Moore have anything to do with that?

6   A.  No, he didn't.

7   Q.  You're just talking about the agents who are selling that

8   investment project?

9   A.  That's correct.

10  Q.  You're talking about ways to sell the unitized product.

11  What are you referring to?

12  A.  I'm talking about selling the leases on the desks, rather

13  than the shares in the business.

14  Q.  And finally you say one way is to set up a floor to do

15  this.  I don't really want to do this myself, but I would

16  consider it.

17          Why didn't you want to do it yourself?

18  A.  Because I thought there was more potential in selling this

19  on an agency network, and I'd kind of had enough of selling my

20  own sales floors.

21  Q.  Let's go to the defendant's response on page one.  Is that

22  the response?

23  A.  Yes.

24  Q.  Could you read the portion that begins with "my interest is

25  in being in business with you"?

1    A.  Yes.  This is from Jim saying "My interest is in being in

2    business with you.  I'm not good at the glorified sales agent

3    bit.  I reckon we can bring a lot to the party if you feel it's

4    worth giving something up to grow very fast."

5    Q.  What did you understand him to be asking you to do?

6    A.  He wanted to be my business partner and get involved in the

7    business itself.

8    Q.  Let's go to the next line.  What did he say then?

9    A.  "All that said, and I can explain when we speak, I own

10   25 percent of a business doing 30 deals a month at an average

11   of 85,000 GBP per deal."

12   Q.  What business did you understand Jim Moore to own

13   25 percent of?

14   A.  That was his UPG business.  United Property Group.

15   Q.  What did you understand doing 30 deals a month meant?

16   A.  Selling 30 investments a month.

17   Q.  Let's go to the next portion that begins with one half the

18   sales.  Did Jim Moore explain to you how UPG did its sales?

19   A.  Yes.

20   Q.  Could you read what he said.

21   A.  "Half the sales are made from our own room.  Half are made

22   from our agent base.  We have a broad spread of agents that

23   were kindly provided by Xavier in a JV which now appears to

24   have gone wrong for him.  Couldn't happen to a nicer bloke.

25   But we have access to all the OPP agents and are utilizing them

J643MOO6                          Haddow - Direct

1  successfully.  We're also just about to embark on expanding the

2  sales staff and I have brought in a fierce ex sales manager of

3  mine from Dubai starting mid September.  He will subsequently

4  bring more people."

5  Q.  What do you understand Mr. Moore to mean when he said half

6  the sales are from our own room and half are from our agent

7  base?

8  A.  So UPG has a -- had their own sales floor of salespeople

9  who went direct to clients under the UPG brand.  And then had

10 an agent network with the other 50 percent where they would

11 recruit agents with their own brands who would sell the Bar

12 Works investment.

13 Q.  Is that basically like free-agents agents?

14 A.  Yes.

15 Q.  All right.  What does he say in the next line there?

16 A.  "We can cover the costs of leads and markets materials etc.

17 as required.  Leads being the biggie of course.  And could

18 launch this product quickly and convincingly across Asia,

19 Middle East and Europe."

20 Q.  What did that mean to you?

21 A.  That means that he could acquire leads.  Leads are

22 prospects, interested clients, people who were interested in

23 buying the investment.  He was -- he could cover the cost of

24 that, and allow us to launch this across the Asia and Middle

25 East and Europe.

J643MOO6                              Haddow – Direct

1   Q.  Have you ever heard of the term "suckers list"?

2   A.  Yes, I have.

3   Q.  What is that?

4   A.  That's a list of people who have invested in kind of land

5   investments, penny stocks, all those types of scam investments.

6   Q.  Do leads have any association with sucker lists?

7   A.  In the main, they do, yes.

8   Q.  I'm sorry?

9   A.  In the main they do, yes.

10  Q.  Let's go to the next line that says "I've hired the

11  diplomat to front everything and given him a piece of the

12  action.  He also invested his own money."

13          Who did you understand the defendant to be talking

14  about here?

15  A.  He is talking about a guy called Neil Storey.

16  Q.  What did you understand this to mean?

17  A.  Well, Neil Storey was a diplomat and he had a good

18  reputation, and his idea was to use Neil to front up Jim's

19  involvement and obviously my involvement as well.

20  Q.  And then if we look toward the bottom, the sentence that

21  begins with "I will forward you a summary sent to finance guy

22  today that gives him an overview of what we're looking at in

23  terms of raising mezzanine investment for projects such as

24  this."  Do you see that?

25  A.  Yes.

J643MOO6                        Haddow - Direct

1   Q.  Did the defendant send you the summary that he had sent to

2   a third party that's referred to here?

3   A.  Yes, he did.

4   Q.  Let's go to Government Exhibit 7.

5           I'm sorry.  Let's take that down for a moment and

6   let's goes to Government Exhibit 5 if you could.

7           Do you recognize this document?

8   A.  Yes, I do.

9   Q.  What is this?

10  A.  This is an e-mail from Jim to myself in August 26 which is

11  forwarded from an e-mail he sent to this guy called Marty.

12  Q.  Who do you understand Marty to be?

13  A.  Marty was involved in a network, like an agency network

14  that could help us.

15  Q.  Is that the summary that Mr. Moore was referring to in the

16  prior e-mail?

17  A.  Yes, it was.

18  Q.  Let's look at what this e-mail to Marty showed.  Could you

19  read the portion that begins with "what we learned from Inside

20  Track"?

21  A.  Yes.  "What we learned from Inside Track.  We identified

22  that Inside Track started life as an educator.  It evolved into

23  a property supplier and sold product supplied by developers,

24  usually to the developers, design, spec, price point, etc.

25  Because the market was good we could sell pretty much anything,

1    and we effectively honed down product we chose to fit our buyer

2    criteria at that time.  As time progressed, we learned more

3    about the client and what they wanted, moved more upmarket

4    towards packaging product in ways that would make themselves

5    more appealing to clients.  Rental guarantees, furniture packs,

6    tour operators, one stop shop, etc.  As you will remember, Neil

7    was heavily involved in the sourcing and packaging of these

8    products at this time.  With business being so damned good, it

9    never crossed anyone's mind that maybe one day people wouldn't

10   be able to get mortgages and that of course was the real

11   Achilles heel of the business."

12   Q.  What does it say right below that?

13   A.  "Grand Palisades was a victim of exactly that."

14   Q.  Is what Jim Moore writing here to a person named Marty

15   consistent with what he told you about Inside Track and the

16   business?

17   A.  Yes, it is consistent.

18   Q.  There is a reference here to Grand Palisades.  What is

19   that?

20   A.  Grand Palisades was the Florida residential property that I

21   was looking at to get these deposits to flip over to other

22   investments.

23   Q.  Let's go to the next page.  And let's just highlight the

24   portion beginning with "And now the latest off the block which

25   could be particularly exciting."

1      Could you read what Mr. Moore is writing here.

2   A.   Yeah.   "And now the latest one off the block which I feel

3   could be particularly exciting, serviced work space offices.

4   The New York City market especially is on fire with few

5   companies getting stratospheric valuations in this sector.   The

6   ideal scenario would be to sell off the work spaces, keep the

7   business, and give them some kind of lease that creates their

8   guaranteed returns, then sell the whole business on with us

9   taking the upside or offering to share a small slice of it with

10   the unit owners.   I see a great ongoing story for this being

11   the world is recovering from recession.   Whether recovering or

12   growing, it is great for new business and everyone needs

13   somewhere to work from.   There will be plenty of growth stats

14   in the IMs or documents of the U.S.A. companies."

15   Q.   And then in the second paragraph, what does the defendant

16   write to Marty?

17   A.   He says "I've attached details of two that I am aware of,

18   Regent 88, Daniel Johns seem to have also identified the

19   pattern of what sells and are busy duplicating it in different

20   segments, this being their latest which is selling like crazy,

21   and one in New York City that is owned and being promoted by a

22   pal of mine, BarWorks.NYC.   He has leased an old restaurant for

23   15 years and is refitting it to do this."

24   Q.   Who is Jim Moore referring to when he said that there was

25   one in NYC that's owned and being promoted by a pal of mine?

1    A.  The pal is me.

2    Q.  What e-mail address does he send the body of this e-mail

3    to.  If we go back to page one.

4    A.  He sends it to my personal e-mail address,

5    Renwick@RenwickHaddow.com.

6    Q.  Let's go to Government Exhibit 7.  What's this?

7    A.  This is originally an e-mail from Jim to me, dated the 27th

8    of August with some ideas for marketing headlines for our

9    brochure.

10   Q.  Could you read a couple of these headlines that he was

11   offering to you?

12   A.  Yeah.  Let your NYC property investment pay for your

13   holidays.  Everything bigger in America, including returns on

14   property investment.  Earn 15 percent or more on 22,000

15   invested in this exciting NYC property investment.

16   Q.  Did the defendant provide you with other ideas for

17   marketing materials for Bar Works?

18   A.  Yes, he did.

19   Q.  Let's go to Government Exhibit 8.  And let's focus on the

20   bottom half of that e-mail to you on August 27 at 6:05 p.m.

21   So, to orient ourselves, why don't we go down from your

22   response to see what you're responding to.  And let's look at

23   Mr. Moore's e-mail.

24          Do you see the e-mail from AnaKP that says, "Renwick,

25   I've had in principle discussions today with my pal about

1    running some of the page adverts."

2              Mr. Haddow, do you see the portion that says Renwick?

3    A.   Yes.

4    Q.   "I've had in principle discussions today with my pal about

5    running some off the page adverts at his expense.  He is

6    prepared to commit to 200 to 500 leads as a trial."

7              What did you understand this to be referring to?

8    A.   This is to do with him providing generating leads for Bar

9    Works.

10   Q.   Let's go up to your response.  Can you explain what you

11   responded with?

12   A.   Yeah.  So I've said a few things.  "We must have a few

13   examples of adverts he can send me so we can work something

14   around that.  Re CRM" which is relationship management

15   software, "and leads and numbers.  Remember I'm not promoting

16   this directly, so any leads that are promoted are yours, so you

17   may as well set up all this up from your end and we just add to

18   the adverts and material we produce.  This is different to

19   selling something we are already selling, as I have no

20   intention of setting up a floor to do this if you guys are

21   going to do it."

22   Q.   At this time, did you intend to have UPG sell work space

23   leases for Bar Works?

24   A.   Yes.

25   Q.   Did you have any intention to set up your own sales floor

J643MOO6                           Haddow - Direct

1    to sell Bar Works work space leases?

2    A.   No.

3    Q.   Did there come a time in this time period when the

4    defendant began to provide info to outside agents?

5    A.   Yes.

6    Q.   How did you know that?

7    A.   Because he forwarded me e-mails with questions he needed

8    answers on.

9    Q.   Did you need the defendant to start corresponding with

10   outside agents at this time?

11   A.   Sorry, can you repeat that?

12   Q.   Did you need the defendant to correspond with outside

13   agents at this time?

14   A.   Yes, I did.

15   Q.   Why is that?

16   A.   Because they're his contacts, and obviously I couldn't use

17   my name.

18   Q.   Let's go to Government Exhibit 9 and let's just focus on

19   the bottom of the page here.  Do you see an e-mail from

20   Nicholas@capitalassured.com to AnaKP, which you had identified

21   as Jim Moore's address on August 28, 2015?

22   A.   Yes, I do.

23   Q.   Who is Nicholas@capitalassured?

24   A.   He is an agent.

25   Q.   When you say an agent, what do you mean?

1    A.   He basically sells other people's products.

2    Q.   What did Nicholas write to Jim Moore here?

3    A.   He said, "Yep, makes sense but point 12 in the FAQs" which

4    are answers and questions, "states that full documentation and

5    title is provided.  That's the main thing my guys at Elysian

6    will pick up when I see them next week."

7    Q.   Let's go up the chain.  Can you explain what happened after

8    this.

9    A.   So, Jim sends me an e-mail the 28th of August.  "Hi

10   Renwick.  How do we answer this one?  We refer to title when

11   there isn't one."

12   Q.   What did you say?

13   A.   I said "They will receive a certificate of ownership and

14   full terms and conditions."

15   Q.   Now, were the work space leases that you were selling, were

16   they registered on any sort of title?

17   A.   No, they weren't.

18   Q.   Was the documentation around those leases registered in any

19   municipal office or with any other government agency?

20   A.   No.

21   Q.   What were you giving to investors who invested money into

22   Bar Works?

23   A.   They were getting a certificate, which was just a piece of

24   paper with some words on it.

25   Q.   Did you have a certificate at this point that you could

1   give to investors?

2   A.  No, I think we were in the process of making one up at that

3   stage.

4   Q.  All right.  And what did Mr. Moore say in response to your

5   e-mail?

6   A.  "Question is what do they own.  It's described as a lease

7   in the brochure."

8   Q.  What did you say?

9   A.  I said "Bar Works takes a lease on the premises, but the

10  unit owner owns the rights to the space and the income from the

11  space."

12  Q.  So, just generally, what are you doing here with respect to

13  these questions and answers?

14  A.  I'm providing the answers to his questions.

15  Q.  Who did you understand that your answers would go back to?

16  A.  To this -- to the agents, whoever he's in correspondence

17  with.

18  Q.  Let's go to Government Exhibit 10.  Directing your

19  attention to the second page in the second half.  And is this

20  the same e-mail that we just saw in the prior exhibit asking

21  about the title?

22  A.  Yes.

23  Q.  And then back to page one, how does Jim Moore respond to

24  that to the agent?

25  A.  He's forwarded over his answers to this Nicholas guy.

1   Q.   Does he say "answer below"?

2   A.   "Answer below," yes.

3   Q.   If we look at what he writes to the agent on the second

4   page.  What does he say there?

5   A.   He said "Bar Works takes a lease on the premises, but the

6   unit owner owns the rights to the space and the income from the

7   space."

8   Q.   Is that what you had just told Jim Moore?

9   A.   Yeah, those are my words pretty much.

10  Q.   Is what he writes below that, is that his question to you?

11  A.   Yes.

12  Q.   Okay.  And right below that, is that your answer to his

13  prior question?

14  A.   Yes.

15  Q.   Is this text going to Nicholas, the outside agent?

16  A.   Yes, it is.

17  Q.   The way the defendant sent it, is your name or your from or

18  to field included anywhere on this chain that's sent to the

19  agent?

20  A.   No, it isn't.

21  Q.   Does it look like the defendant is having a conversation

22  with himself?

23  A.   Yes, it does.

24  Q.   All right.  Now, let's look at Government Exhibit 10.  And

25  let's look at the top half of the page, please, including the

1    e-mail right below.  So, Nicholas@capitalassured writes to

2    AnaKP2014 "who issues the certificate of ownership."  And then

3    does the defendant forward that e-mail to you?

4    A.  Yes, he did.

5    Q.  What did he say?

6    A.  He said "I get exhausted with this shit."

7    Q.  What did you understand that to mean?

8    A.  Well, he gets exhausted dealing with all these questions

9    from agents.

10   Q.  What did you write?

11   A.  I said "Who is this guy.  Bar Works does.  Hey, one point I

12   don't think I have got over and maybe I should put in flashing

13   lights is that 15 percent is the guaranteed return for the life

14   of the investment, 10 years.  Bar Works covers the void

15   periods.  We will ensure that these seats are prioritized.  The

16   Car Parks guarantees 9 percent for two years.  I can guarantee

17   that two years the return drops to 5 percent if they are

18   lucky."

19   Q.  Was Car Parks the competing product?

20   A.  Yes, it was.

21   Q.  You write that 15 percent is a guaranteed return for the

22   life of the investment.  Do you have any open locations at this

23   point?

24   A.  No.

25   Q.  Did you have any members signed up for any locations?

1    A.  Nothing at that stage, no.

2    Q.  Did you have any capital or money in place that would be

3    sufficient to guarantee people 15 percent for the life of the

4    investment?

5    A.  No, not at that point.

6    Q.  Did the defendant know that you didn't have any locations

7    open at that time?

8            MR. GARVIN:  Your Honor, object to the form of the

9    question.

10           MR. VAINBERG:  I'll rephrase, your Honor.

11   Q.  Based on your discussions with the defendant, did you

12   believe that he knew that you had no locations open at that

13   time?

14   A.  He did know, yeah.

15   Q.  All right.  Now, let's look at Government Exhibit 13,

16   please.  And directing your attention to the middle, there is

17   an e-mail from AnaKP, the defendant's e-mail account.  "Do you

18   we have a cert we can show him or the wording of it."

19           Did you understand the defendant to be asking you for

20   a certificate?

21   A.  I did, yes.

22   Q.  What did you write at the top?

23   A.  I wrote "not yet."

24   Q.  What did he write?

25   A.  And then he said "Any idea when or something similar?"  And

J643MOO6                          Haddow - Direct

1   then I've responded "Any day.  Was going to get a few units

2   sold first and then knock something out."

3   Q.  Was your plan to sell Bar Works leases without having the

4   certificate even prepared at that point?

5   A.  Yes.

6   Q.  Did you ask the defendant for any help in doing that?

7   A.  Yes, I did.

8   Q.  Let's look at Government Exhibit 14.  Directing your

9   attention to the bottom of the page.  Do you see an e-mail from

10  NathalieKent1@AOL.CO.UK?

11  A.  Yes.

12  Q.  To two e-mail addresses?

13  A.  Yes.

14  Q.  Who is the sender, Nathalie Kent?

15  A.  Nathalie Kent is one of my assistants.

16  Q.  Is that her real name?

17  A.  No.  I think she uses -- she uses two names:  Nathalie Kent

18  and Nathalie Kent Brown.

19  Q.  Who is she sending this e-mail to?

20  A.  She's sending it -- I have two e-mail addresses, she's

21  sending it to both e-mail addresses.  One is a Russian e-mail

22  address and the other one is my normal

23  Renwick@RenwickHaddow.com.

24  Q.  Who controlled these addresses?

25  A.  Me.

1   Q.  What did your assistant Ms. Kent attach to you?

2   A.  She sent over the certificate and terms and conditions as

3   requested.

4   Q.  Who put together the certificate?

5   A.  Her, under my direction.

6   Q.  Let's go up.  What did you do with that e-mail?

7   A.  I forwarded it to Jim.

8   Q.  Why did you forward it to the defendant?

9   A.  To get his input on it.

10  Q.  Going up.  At the top, this is an e-mail from the

11  defendant's e-mail account to a number of people,

12  JR@theunitedpropertygroup.com, DK@theunitedpropertygroup.com,

13  and NeilStorey1@gmail.com.

14        Did there come a time when you learned who was

15  associated with those e-mail addresses?

16  A.  Did there come a time, sorry?

17  Q.  When you learned who was associated with each e-mail

18  address?

19  A.  Yes.

20  Q.  Okay.  Can you walk the jury through who was behind each

21  e-mail address?

22  A.  Yes.  JR is James Robinson.  He is one of the owners of

23  United Property Group, UPG.  David Kennedy, DK, is the other

24  owner, they're both co-owners of United Property Group.  And

25  Neil Storey is the diplomat we discussed earlier who was going

1  to front up the investment for Bar Works.

2  Q.  Can you just read what the defendant wrote to those people.

3  A.  Yes.  "Guys.  Can you give us a heads up on how quickly you

4  feel we can get DJ generating leads for this and also get it

5  out to the agent networks please.  It's still possible we can

6  have minor input into these attachments if we feel that there

7  is something significant missing."

8  Q.  Did the defendant and UPG provide input on the certificate?

9  A.  Yes, they did.

10  Q.  Let's look at Government Exhibit 15.  And let's just

11  orient, who is the e-mail from and to?

12  A.  This e-mail is from James Robinson at UPG to Jim, copying

13  in David Kennedy, UPG and Neil Storey.

14  Q.  You're not on this e-mail, right?

15  A.  I'm not on this e-mail, no.

16  Q.  Let's go to the bottom of this e-mail, the last three

17  paragraphs on page one.  What does James Robinson write in

18  here?

19  A.  James Robinson said "In terms of those attachments, I am a

20  little lost in regards to what they actually are and who they

21  are intended for.  It is obvious that the first attachment is

22  some sort of attempt at a client feeling like they hold a deed,

23  but as it's a certificate, it reminds me of carbon credits in a

24  big way, but, hey, that worked, so no reason to redesign the

25  wheel being round I suppose.  The T&Cs appears to be a rather

1   simple yet crude attempt at a form of contract for a buyer.

2   Again, the very simple play that the carbon credit market used

3   when it came to client facing documentation.  Again, if that

4   worked, which it did, then no issues from me.  K.I.S.S."

5   Q.  Just briefly remind us, what's carbon credits?

6   A.  Carbon credits is the -- the kind of investment that was

7   sold mainly in the U.K. to private investors selling these

8   securities over carbon emissions, which turned out all to be

9   scams.

10  Q.  And who ran that scam?

11  A.  I had my own carbon credit product, so yes, I ran one of

12  those scams.

13  Q.  In what way did the certificate and the terms of conditions

14  that you were planning on using for Bar Works similar to the

15  ones you had used for carbon credits?

16  A.  It was pretty much a copy of what we'd used in the previous

17  incarnation.

18  Q.  Just direct you to the line that says "It is a certificate.

19  It reminds me of carbon credits in a big way, but, hey, that

20  worked so no reason to redesign the wheel being round I

21  suppose."

22          What, if anything, worked about carbon credits?

23  A.  It was very successful in terms of selling to investors.

24  Investors found it an attractive proposition, and they invested

25  quite heavily in it.

1    Q.  Was it successful in getting returns to investors?

2    A.  It was not successful in getting returns to investors, no.

3    Q.  Let's go to Government Exhibit 17.

4           THE COURT:  I have a question.  So when you develop a

5    product -- just yourself, not speaking about anybody else --

6    and you decide that you need to give the customers some

7    certificate or something as evidence that they have an interest

8    in whatever it is you're selling.

9           THE WITNESS:  Yes.

10          THE COURT:  Do you ever consult with a lawyer or

11   someone who would know whether a certificate is legally valid

12   or do you just make it up?

13          THE WITNESS:  That's a good question.  So, these

14   certificates originally came from the Room to Invest product,

15   which we did consult with a lawyer on.  But, there was no title

16   in the Room to Invest.  It was just, it was just a share of

17   ownership of the room.  So, we basically used those on multiple

18   times afterwards with no further reference with lawyers.

19   Q.  Mr. Haddow, there is a portion here that says, "Again, the

20   very simple play that the carbon credit market used when it

21   came to client facing documentation.  Again, if that worked,

22   which it did, then no issues from me.  K.I.S.S."

23          What does that mean?

24   A.  Keep it simple stupid.

25   Q.  Let's go to Government Exhibit 17, please.  Can you tell us

1    what this e-mail is, and what, if anything, is attached to the

2    e-mail.

3    A.   So this is me sending over, me sending over to Jim on

4    September 21, 2015, the private placement memorandum that Bar

5    Works was -- that In Crowd Equity was promoting Bar Works

6    through.   There is a typo that says Brand Works but it should

7    say Bar Works.   And an offer document as well.

8    Q.   Let's look through this private placement memorandum.   Can

9    we go to the portion that includes a letter.   What is this?

10   A.   This is a letter from Jonathan Black to investors.

11   Q.   And who signed this letter in reality?

12   A.   Me.

13   Q.   How did you get a signature that said Jonathan Black?

14   A.   How did I get a signature?

15   Q.   Yeah.

16   A.   I just made it up.

17   Q.   Okay.   Just so we're clear, was there ever any person with

18   a name Jonathan Black?

19   A.   No.

20   Q.   So you just sent the defendant this prospectus that

21   includes the name Jonathan Black.   What happened next?

22   A.   I sent him this, I sent him a few other things.   And then

23   we had a conversation.   He called -- I can't remember whether

24   he called me or I called him, but we had a conversation after

25   he received this information.

J643MOO6                         Haddow - Direct

1    Q.  Did there come a time when you had a discussion with the

2    defendant about the Jonathan Black that appears in marketing

3    materials for Bar Works?

4    A.  Yes.

5    Q.  Can you describe in as much detail as you can remember how

6    that conversation went.

7    A.  Yeah.  As I said, I'm not sure who called who.  But, we

8    spoke about the prospectus in general, and one of the questions

9    he asked me was who is Jonathan Black.  I said it's me.  And I

10   just left it at that.  I didn't really want to discuss it any

11   further, because -- I was very paranoid about other people

12   finding out about this.  And we moved on to another subject.

13   Q.  Was this a conversation in person or on the phone?

14   A.  That was on the phone.

15   Q.  What were you paranoid about?

16   A.  I was paranoid about a lot of things.  I was paranoid about

17   people overhearing conversations, people getting hold of

18   e-mails that had my name on, so I was just being very cautious.

19   Q.  After you told the defendant that you were Jonathan Black,

20   did he tell you that he wasn't going to work with you on Bar

21   Works?

22   A.  No.

23   Q.  Let's go to a portion of this prospectus that includes some

24   other directors.  Let's zoom in on what the prospectus said

25   about Jonathan Black.  Could you read what that said, please.

1    A.   "Jonathan has a background in finance and startup ventures.

2    He was a finance director/financial controller of two chains of

3    bars in the U.K., Regent Inns PLC market value $400 million.

4    He has also set up a number of startup ventures, including

5    recently car share with a car sharing app.  Jonathan saw the

6    potential of shared work space and has fine tuned the model to

7    overcome the deficiencies in the current offerings which he

8    encountered when renting serviced office space.  His focus on

9    building a marketable brand and ensuring above all that the

10   first two sites are successful before rolling out the brand."

11   Q.   Is there a portion of this biography that's consistent with

12   your personal background as Renwick Haddow?

13   A.   Yes.  The first three lines, excluding the car share app.

14   Q.   So when we look at those first three lines, is that about

15   consistent with what you did at Regent Inns?

16   A.   That's consistent about me, yes.

17   Q.   Then what about the next line.  What is that?

18   A.   That's made up.

19   Q.   Does this include any information about African land or

20   carbon credits or any of the other schemes you've discussed

21   with us this morning?

22   A.   No, it doesn't.

23   Q.   Then right down below that, operations executive Chloe

24   Miller.  Is that your wife?

25   A.   That's my wife, yes.

1   Q.  Again, what was your wife's legal name?

2   A.  Her legal name was Zoia Haddow.

3   Q.  Why didn't you want to put her real name in an offering

4   materials?

5   A.  Because people would have figured out quite quickly that I

6   was involved if they saw the name Haddow on that brochure.

7   Q.  Let's go to the next director.  Robert Munden.  Is this

8   your friend who you said had nothing to do with Bar Works?

9   A.  It is, yes.

10  Q.  Did he know his name was being used in these offering

11  materials?

12  A.  He didn't.

13  Q.  Let's go to Government Exhibit 18.  Looking at the bottom

14  of this e-mail, including the attachment.  So if you look on

15  the bottom of page one, do you see an e-mail from the

16  defendant's e-mail address to his e-mail address, it seems to,

17  be with an attachment that's called Brand Works private memo

18  27.08.15 v4.

19          How does that file name compare to what you had sent

20  the defendant?

21  A.  That's the same attachment I sent to him.

22  Q.  According to this e-mail, does your name appear anywhere on

23  the from field?

24  A.  No, he's deleted it.

25  Q.  So, let's look at who the e-mail is forwarded to.  Can we

1   look at the header.  What was JR@theunitedpropertygroup.com

2   again?

3   A.   That was James Robinson, one of the co-owners of UPG.

4   Q.   What does that e-mail address write?

5   A.   Sorry?

6   Q.   What does that e-mail address write here?

7   A.   Oh.  JR@unitedpropertygroup.com.

8   Q.   What's the text below the e-mail?

9   A.   "Just seen this.  Looks tasty and very reputable, although

10  a loan note structure which we both have experience with.  New

11  York City might overcome that issue we have see."

12  Q.   And --

13  A.   "Have you had a chance to look through it yet."

14  Q.   Let's go up to the top.  And just to identify this.  Do you

15  see in the from there is JR, the to was the defendant's e-mail

16  address, and the CC is David Kennedy and Neil Storey?

17  A.   Yes.

18  Q.   Right.  You're not on this chain, right?

19  A.   No.

20  Q.   So in this conversation between those individuals, do you

21  see where there is an e-mail from the defendant on

22  September 22?

23  A.   Yes.

24  Q.   Can you read what this e-mail says, please.

25  A.   Yes.  From the top, yeah?

J643MOO6                          Haddow - Direct

1   Q.  Yes, please.

2   A.  "Guys I've read this thoroughly.  It's very well put

3   together using very expensive and specialized lawyers.  The

4   mini prospectus should conform any necessary DD that any client

5   would need."

6   Q.  Mr. Haddow, what is DD?

7   A.  Due diligence.  That's the kind of investigation that goes

8   on behind the scenes to check out the validity of the leases

9   and the structure of the product.

10  Q.  Can you read the next paragraph.

11  A.  Yeah.  "It's not a product that we can sell.  It is a form

12  of prospectus and very heavily regulated both in U.K. and

13  U.S.A.  Especially U.S.A.  This will be covered by reg D filing

14  or similar, which is effectively small company exemption for

15  fundraising up to 5 million from memory.  This is the

16  documentation they are using as a company to sell shares."

17  Q.  Let's go to the next paragraph.  What does the defendant

18  write here to the individuals at the top?

19  A.  "The point here is that U.S.A. has some of the most

20  punitive securities laws in the world.  The penalties for

21  breaking them are absolutely onerous.  Think up to 150 years in

22  jail.  Seriously."

23  Q.  What does he say after that?

24  A.  "So the raise on the part of the company is a loan note.

25  The product we would offer would be more of a lease.  That's

1    very common in real estate worldwide.  Head leaseholder issues

2    sublease."

3    Q.  Now, did there come a time when you learned that investors

4    or agents wanted to see something called a head lease?

5    A.  Yes.  There was a time.

6    Q.  What is a head lease?

7    A.  A head lease is the actual lease that Bar Works entered

8    into on the property itself.

9    Q.  Did you want to provide your head lease on the location to

10   agents and investors?

11   A.  No.

12   Q.  Why not?

13   A.  Because it had Renwick Haddow, my name, all over the

14   document.

15   Q.  Can you read what the defendant writes in the next

16   paragraph that begins with "they won't show things like the

17   head lease in full."

18   A.  Yeah.  "They won't show things like the head lease in full

19   because (a) they don't need to; (b) it's nobody else's

20   business.  If they are lying in their prospectus, they are

21   potentially guilty of securities fraud, wire fraud, mail fraud,

22   and a host of other offenses in U.S.A. that ensure a very

23   lengthy stretch in a very unpleasant place.  Nobody would dream

24   of doing something so foolish.  If you were going to do it in

25   the U.S.A. would be the last place you'd go ever."  I'm sorry,

1    there is a big mix up there.  But "place you'd go ever to go

2    to; and (c) if they do, then all it does is assist competitors

3    to reverse engineer their business model."

4    Q.  Did you have conversations with the defendant about head

5    leases?

6    A.  Yes, we did.

7    Q.  What was the nature of those conversations?

8    A.  That it was, it was very risky to send over head leases to

9    any agents or investors, and that an alternative would just be

10   to produce a summary letter confirming the main terms that an

11   investor would be interested in.

12   Q.  You read a portion of this e-mail that said if they are

13   lying in their prospectus, they're potentially guilty of

14   securities fraud, wire fraud, mail fraud, etc.  Had you sent

15   the prospectus to the defendant by that point?

16   A.  Yes, I had.

17   Q.  Is that the prospectus that had the Jonathan Black name in

18   it?

19   A.  It did.

20   Q.  Had you had a conversation with the defendant by that point

21   that you were Jonathan Black?

22   A.  Yes, by that point we'd discussed Jonathan Black, yes.

23   Q.  Let's go to Government Exhibit 19, please.  As of September

24   of 2015, had the United Property Group committed themselves to

25   promoting Bar Works for you?

1   A.  Yes, they had already started promoting it.

2   Q.  Had they sold any leases at that point, in September of

3   2015?

4   A.  No, I don't think they had at that stage.

5   Q.  Who was your contact between UPG and yourself?

6   A.  Jim.

7   Q.  Did UPG raise any questions about the track record of who

8   was running Bar Works in and around this time?

9   A.  Yes, it did.

10  Q.  Did the defendant ask you for any help in answering those

11  questions?

12  A.  Yes, he did.

13  Q.  Let's look at page one on this e-mail.  You see where the

14  defendant's e-mail address writes "Hi mate.  Help me out here

15  please.  Give me the ammunition to answer his questions."

16  A.  Yes.

17  Q.  Is that sent to you?

18  A.  Yes, it was.

19  Q.  And who did you understand the questions that were copied

20  here to come from?  If we go all way down on this e-mail.

21  A.  From James Robinson, UPG.

22  Q.  On page one, did you provide the defendant with ammunition

23  to answer those questions?

24  A.  I did, yes.

25  Q.  Where you write "see below my responses," does that refer

1    to text that follows on page one and two?

2    A.  Yes, it does.

3    Q.  Let's look at some of these questions.  On page two, so we

4    can situate ourselves, what's in the middle of the page and

5    what's to the left of the page?

6    A.  Middle of the page to the kind of off to the right is James

7    Robinson's questions, and then underneath that to the left is

8    my answers.

9    Q.  And let's zoom out and look at the lead up to these

10   questions.  Do you see the paragraph that begins with "I speak

11   with plenty of experience"?

12   A.  Yes.

13   Q.  Can you read what the e-mail associated with Mr. Robinson

14   wrote here.

15   A.  Yes.  "I speak with plenty of experience in that the last

16   four years of agency network building, it is time and time

17   again the element that agents are all over, to protect their

18   reputations, and rightfully so.  We need to placate agents and

19   partners alike with some sort of legal pack that shows the

20   investor has some form of security in their investment."

21   Q.  What does the next paragraph say?

22   A.  "Happy to be wrong but if what I have seen so far is all he

23   has, namely a carbon credit like certificate and a page or two

24   of T&Cs as a contract, then more than likely good agents and

25   OPP will not want to sell the product.  More recent experience

1   with R88 -- with Regent 88 has proved that to be the case.

2   With some key accounts, Dave I speak of Brookhouse and

3   Broadgate to name just two, which just backs up the longer term

4   experience."

5   Q.  What is OPP?

6   A.  OPP is called Overseas Property Professionals.  It is a

7   database of agents, property agents.

8   Q.  What did you understand Mr. Robinson to mean in this e-mail

9   forwarded to you when he wrote "if what I seen so far is all he

10  has, namely carbon credit like certificate and a page or two of

11  T&Cs, then more than likely agents and OPP will not want to

12  sell the product"?

13  A.  He's saying exactly that.  That what I've provided is

14  documentation that fits with the carbon credit product, and

15  quality agents won't be interested.

16  Q.  Let's go to the next page.  And directing your attention to

17  the top.  What does James Robinson write in the top paragraph

18  here?

19  A.  "Ideally some sort of track record from the developer of

20  what they have done previously.  I very much doubt this can be

21  provided which means we need to overcome that concern that

22  clients and agents always raise, with the above list of

23  documents."

24  Q.  And is that your response below to give to Jim Moore?

25  A.  Yes, it is.

1   Q.  What is it?

2   A.  "Bullshit.  They need to overcome this one.  It won't even

3   be an issue."

4   Q.  Why did you write that?

5   A.  Because I felt that we had already covered the track record

6   in the résumés that were in the brochure.  And that, you know,

7   they had enough ammunition to be able to cover that objection

8   from clients or agents.

9   Q.  As of the time of this e-mail, did you understand UPG to

10  know that you, Renwick Haddow, were behind Bar Works?

11  A.  Yes.

12  Q.  What did you understand UPG to mean when Mr. Robinson

13  writes "I very much doubt this can be provided"?

14  A.  Because he knew that I was behind it, and that any mention

15  of me and my résumé, people would add one and one together and

16  get two.

17  Q.  Let's look at Government Exhibit 20.  And is this the

18  e-mail that we had just looked at after you had provided the

19  ammunition to answer those questions with a response from Jim

20  Moore?

21  A.  Yes.

22  Q.  What did the defendant write at the top?

23  A.  Yeah.  Jim wrote to me "I agree with all that and have also

24  explained that it wouldn't be likely anyone would get a copy of

25  the actual lease, and I understand fully why that would be.

J643MOO6                              Haddow - Direct

1   Any chance we could get the terms and conditions that the

2   investor receives?  Presumably they are effectively buying a

3   sublease."

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. VAINBERG:

2    Q.  Did you know what the defendant understood would be the

3    reason why anyone wouldn't likely get a copy of the actual

4    lease?

5            MR. GARVIN:  Object, your Honor.  It calls for

6    speculation.

7            THE COURT:  Could you rephrase.

8    Q.  Did you have an understanding of the basis for the

9    defendant's knowledge as to why anyone likely wouldn't get a

10   copy of the actual lease?

11           MR. GARVIN:  It's same objection.

12           THE COURT:  Yes, it's the same question.  Think about

13   that a little bit.

14   Q.  Did you have discussions with the defendant about providing

15   the head lease to investors?

16   A.  Yes.  Yes, I did.

17   Q.  And what did you tell the defendant?

18   A.  I said it was unwise because my name appeared all over it.

19   Q.  Let's go to -- let's put that aside.  You mentioned that

20   there came a time when the defendant visited you in New York.

21   When was that?

22   A.  Around October 2015.

23   Q.  And how long did the defendant's visit go?

24   A.  About a couple days.

25   Q.  What was the purpose of the visit?

1    A.  He wanted to check out the Bar Works operation and then

2    talk to me about, you know, longer term -- a longer future.

3    Q.  And where if anywhere did you meet on the first day?

4    A.  First day we -- me and him went out just the two of us --

5    because he came with his wife -- me and him came out for some

6    drinks in Manhattan somewhere.

7    Q.  And what was the nature of the conversations you had over

8    drinks that night?

9    A.  I was telling him about the project, you know, my plans for

10   the future.  He was telling me how he could help and, yeah,

11   that was kind of about it really.

12   Q.  Did you meet with him again after that?

13   A.  Yes, we met -- we met the next day where -- we met -- I'm

14   not sure exactly where we met, but I remember taking him to my

15   operation, In Crowd Equity operation.

16   Q.  You took the defendant into In Crowd Equity?

17   A.  Yes.

18   Q.  Were there people working there at the time?

19   A.  Yes.

20   Q.  Did the defendant see people making sales out of In Crowd

21   Equity?

22   A.  Yes, he did.

23   Q.  And what happened after that?

24   A.  His wife was with him as well.  I took him and his wife to

25   the Bar Works operation a couple blocks up.

J647MOO7                          Haddow - Direct

1   Q.  And what was there?

2   A.  Well, the place was under construction, so I took him

3   around.  It didn't take too long because there is only three

4   floors.  So I showed him around the location and then headed

5   out from there.

6   Q.  What did the defendant see at that Bar Works location?

7   A.  He saw a location that was currently being painted,

8   stripping out the kitchen at the time.  I think I might have

9   taken him down to the rat infested basement.  We didn't hang

10  around there for too long.  And that was it really.  It was

11  maybe a 15 minute visit.

12          THE COURT:  Counsel, could I see you for just a

13  minute.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          (At the sidebar)

2          THE COURT:  I'm trying to figure out timing.  Do you

3   have any idea how much you have left?

4          MR. VAINBERG:  Probably about three hours left, so we

5   are definitely going to break into the next day.

6          THE COURT:  Over three hours?

7          MR. VAINBERG:  Maybe a bit little less, maybe about

8   two and half hours, because we have been going quicker than

9   anticipated.

10         THE COURT:  And then are there other witness, or are

11  you done?

12         MR. VAINBERG:  There's three or four smallish

13  witnesses, and then we have some video clips to play that will

14  take about an hour and a half.  So, depending how much time Mr.

15  Garvin will take on cross, we envision the direct finishing

16  tomorrow, you know, at around 11 o'clock or 12 o'clock at the

17  latest.  The cross will take --

18         THE COURT:  Probably be a little longer than that, I

19  mean based on what you just mentioned, right?  You said three

20  hours, and then you're into lunch and then into the afternoon.

21         MR. VAINBERG:  I think it's going to be closer to the

22  two hour side for the rest of direct, just based on how this is

23  going.

24         THE COURT:  Well, whatever.  I am just trying to get a

25  feel.  I think I'm going to stop pretty soon though.  Let's do

1   another five minutes or so.

2           MR. VAINBERG:  I will finish with this meeting in New

3   York, and then we can just stop right there.

4           THE COURT:  OK.  Is that OK with you?

5           MR. GARVIN:  Yes, that's OK with me.

6           I'm starting to become a little concerned because I

7   thought Mr. Haddow's projected direct was going to be somewhere

8   in the four to five hour range.  I have very few witnesses, but

9   they're flying in one from London arriving Wednesday evening.

10  I'm hopeful that we will still be on track.

11          THE COURT:  Oh, you will be OK.

12          MR. GARVIN:  OK.

13          THE COURT:  I mean if somebody is coming in -- you

14  don't have to be immediately ready.  I mean it's great if you

15  could be, but you don't have to be.  It's the individual, the

16  direct of someone has to keep flowing.  OK, so five more

17  minutes or so.

18          (Continued on next page)

19

20

21

22

23

24

25

1                  (In open court)

2     BY MR. VAINBERG:

3     Q.  Mr. Haddow, we were just talking about the second day of

4     the defendant's visit in New York, and you were telling us

5     about the visit to the Bar Works location that hadn't been

6     opened yet; is that right?

7     A.  That's right.

8     Q.  What if anything did you do with the defendant after that

9     visit?

10    A.  We went for dinner after that with his wife, my wife, at a

11    place called SoHo House.

12    Q.  And where is that?

13    A.  That's in Lower Manhattan.

14    Q.  What if anything was discussed at that dinner?

15    A.  We discussed UPG's involvement in the project, and

16    particularly how Jim had the idea of convincing UPG to switch

17    out the investors who had made commitments to buy Regent 88,

18    the coworking space back in the UK, into the Bar Works

19    investment.

20    Q.  Did you discuss the financial arrangement with Mr. Moore

21    during his visit to New York?

22    A.  Yes, we did.  We discussed it briefly that night as it

23    related to Regent 88, and then the next day we met and

24    discussed in more detail then.

25    Q.  And what was the nature of those discussions?

1    A.   The nature of those discussions I think I alluded to

2    earlier, that he wanted a 50/50 equity stake in the business,

3    and I thought that was a bit high, so eventually we agreed on

4    him taking a 35 percent stake in the business, and as a

5    compromise he would get 50/50 of any business outside the U.S,

6    and also he would get a 35 percent share of any money that came

7    in from UPG investors.

8    Q.   And did you discuss the commission that UPG the company

9    would get for bringing in investors?

10   A.   Yes.

11   Q.   And what, if anything, was discussed there?

12   A.   We agreed that on the Regent 88, if they were successful --

13   if UPG was successful in switching them into Bar Works, they

14   would receive 35 percent, and on straightforward sales they

15   would get 30 percent.

16   Q.   Let me make sure that I'm following you.  Were those

17   figures for UPG and the defendant on top of one another?

18   A.   Yes.

19   Q.   So putting Regent 88 aside for a moment, could you walk the

20   jury through what you offered would happen for every dollar of

21   new investor money brought in by UPG.

22   A.   So, for every dollar of new investment money from UPG, 30

23   percent would go to UPG, and 35 percent would go to Jim.

24   Q.   So, out of every dollar that an investor would commit to

25   Bar Works after being solicited by UPG, what's the total amount

1    that would go to UPG and defendant?

2    A.   65 percent.

3    Q.   Why did you agree to pay 65 percent to UPG and the

4    defendant out of investor money?

5    A.   Because I knew that they would bring in significant

6    business.   I also made commitments on a number of locations

7    which needed rent paying and development costs provided to roll

8    those projects out.   And, if I want to be totally honest, you

9    know, I would much prefer 30 percent in my pocket than in

10   someone else's.

11   Q.   What do you mean by that?

12   A.   Well, I mean the cost of refurbishing a location is, say,

13   $200,000, is a very small minority type of cost.   The majority

14   of the 35 percent was coming to me directly.

15   Q.   At the time when you offered the defendant and UPG 65

16   percent of -- a 65 percent commission -- is that an accurate

17   word to describe what you were offering?

18   A.   Commission?

19   Q.   Yes.

20   A.   Yes.

21   Q.   Did you have any need to get this project off the ground

22   quickly?

23   A.   Yes, I had made commitments.   We obviously had the

24   refurbishment cost at 39th Street to pay for.   I was running

25   over budget, otherwise it would have come out of my own pocket,

 1    and I didn't like that.  I also signed a lease or was close to

 2    signing a lease on a property on 46th Street that was a lot

 3    more expensive, the rent was a lot higher, the refurbishment

 4    cost was a lot higher, and I didn't really want to pay for that

 5    myself.  And there were other locations -- there was a location

 6    on White Street around here, again where there would be a large

 7    cost.  So, it was in my interest to raise as much money as

 8    quickly as possible.

 9    Q.  What did you think about UPG's ability to raise money as

10    quickly as possible?

11    A.  I thought they had an excellent track record from what Jim

12    had told me, and that they would be ideal for helping us

13    achieve that objective.

14    Q.  One last question, Mr. Haddow, before I suspect we will

15    break for the day.

16          Did you think it would be possible for Bar Works to be

17    able to generate enough revenue to pay for its expenses, the

18    guarantees given to the investors and anything else that Bar

19    Works had to spend money on if it was giving 65 percent of

20    investor money to UPG and the defendant?

21    A.  Not unless we continued raising new money.

22          MR. VAINBERG:  Nothing further at this time, your

23    Honor.

24          THE COURT:  Great, great.

25          So, we're going to break for today, and we will pick

1    up Mr. Haddow tomorrow at 9:15.

2              Let me remind my instructions to the jurors:  Please

3    don't talk with each other about the case or about anyone who

4    has anything to do with it until the end of the case when you

5    go to the jury room to deliberate on your verdict.

6              Second, don't talk with anyone else about the case or

7    about anyone who has anything to do with it until the trial has

8    ended and you have been discharged as jurors.

9              Third, do not let anyone talk to you about the case or

10   about anyone who has anything to do with it.  And if someone

11   should try and talk to you, please advise Christine or myself

12   immediately.

13             Fourth, do not read any news, or Internet stories, or

14   articles, or blogs, or listen to any radio or TV or Internet

15   reports about the case -- assuming there were any such

16   reports -- or about anyone who has anything to do with it.

17             Lastly, please don't do any type of research or

18   investigation about the case on your phone.

19             So, we are making good progress, and we will see you

20   tomorrow at 9:15.  You can leave everything there; Christine

21   will take care of it.

22             (Jury not present)

23             THE COURT:  OK.  Let's see everybody at 9:15.

24             (Trial adjourned to June 5, 2019 at 9:15 a.m.)

25

                          INDEX OF EXAMINATION

Examination of:                                      Page

 REGIS VINCENT LAKE II

Direct By Mr. Bell . . . . . . . . . . . . . 109

Cross By Mr. Garvin  . . . . . . . . . . . . 141

 JULIAN WHITE

Direct By Mr. Vainberg . . . . . . . . . . . 146

Cross By Mr. Garvin  . . . . . . . . . . . . 182

 RENWICK HADDOW

Direct By Mr. Vainberg . . . . . . . . . . . 200

                         GOVERNMENT EXHIBITS

Exhibit No.                                     Received

 1256, 172, 173, 310 and 311  . . . . . . . . 124

 309  . . . . . . . . . . . . . . . . . . . . 134

 312  . . . . . . . . . . . . . . . . . . . . 139

 1260  . . . . . . . . . . . . . . . . . . . . 185

 5001, 5002, 5005 through 5017  . . . . . . . 185

 5020 through 5054  . . . . . . . . . . . . . 185

 5056 through 5062  . . . . . . . . . . . . . 185

 5064 through 5083  . . . . . . . . . . . . . 185

 1251, 1254, 1257  . . . . . . . . . . . . . . 199

 170  . . . . . . . . . . . . . . . . . . . . 211

 171  . . . . . . . . . . . . . . . . . . . . 213

 175  . . . . . . . . . . . . . . . . . . . . 249