J653MOO1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

UNITED STATES OF AMERICA,                    New York, N.Y.

            v.                               18 Cr. 759(RMB)

JAMES MOORE,

            Defendant.

------------------------------x              Jury Trial

                                             June 5, 2019
                                             9:15 a.m.


Before:

                    HON. RICHARD M. BERMAN,

                                             District Judge



                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MARTIN BELL
     VLADISLAV VAINBERG
     Assistant United States Attorneys


DAVID M. GARVIN, PA
     Attorney for Defendant

ALSO PRESENT:
Nathaniel Cooney, Paralegal for U.S. Attorney's Office
Special Agent Jordan Anderson, FBI
Alexandra Garvin, Law Clerk for Defense
Arlene Garvin, Paralegal for Defense

```
 1              (In open court; jury not present)
 2              THE COURT:  Let me just say a few things
 3   preliminarily.  First is that after yesterday's session, I
 4   asked one of my law clerks to ask the government if they could
 5   expedite.  They said they needed three more hours of direct
 6   examination of Mr. Haddow.  So, that's number one.  I hope they
 7   can.
 8              Second, we're still waiting for, it's 9:23 or so,
 9   we're still waiting for three jurors and Mr. Haddow, but we
10   understand Mr. Haddow is on the way.  The three jurors, I don't
11   know.  I'm sure they are on the way also.  So, that's all I
12   have.
13              MR. BELL:  Judge, I can report back on that first
14   issue.  It's our belief that we should be able to wrap
15   Mr. Haddow up inside of two hours from whenever we start today.
16   Assuming that that's the case, we don't obviously control the
17   length of Mr. Garvin's cross, but we have I think a very
18   good-faith assessment of how long he expects to go.  And I
19   think that having tried this case now for about a day and a
20   half, we're still very much on pace for us to rest tomorrow.
21   And that's to say tomorrow morning, not tomorrow afternoon.
22              THE COURT:  I understand.  So, you should understand,
23   I have no particular interest in speed for speed's sake because
24   I'm here, and this is what I'm expected to do.  But, my first
25   goal is to make sure that it is a fair trial, first to the
```

J653MOO1

1   defendant, but also to the government be able to present its

2   case.  But my next goal, which is high on the agenda, is to

3   make sure the jury is able to comprehend the evidence and is

4   able to get what each side is trying to communicate.

5          So, I think the suggestion I made through the law

6   clerk was is in that vein, to try and help ensure that the jury

7   understands what the testimony and what the evidence is.

8          MR. BELL:  We understand that, Judge.  Just to sign

9   post a little bit for you so you have an appreciation of what's

10  going to come in the next couple of hours.  We've trimmed our

11  presentation such that there are documents that are going to

12  come in, e-mails that are going to come in, that we don't have

13  to go through Mr. Haddow with.  A lot of them are

14  self-explanatory and we'll publish them once he's off the

15  stand.  I think there are --

16         THE COURT:  When you do that, were you planning to do

17  that in front of the jury?

18         MR. BELL:  Yes, your Honor.

19         THE COURT:  I think that's the appropriate way, so

20  they know there are other documents that are in evidence.

21         MR. BELL:  So what we'll do is we'll put those

22  documents in, I think for some documents, because so much has

23  been stipulated to in this case, we'll put them in, in the

24  absence of a witness, but publish them and read them so they

25  are a part of the record, but we'll be able to do so more

efficiently.

But there are a number of topics that Mr. Haddow does need to cover.  There are a couple of e-mails, for example, which I anticipate Mr. Garvin will try to essentially suggest an alternative interpretation for that we need to go through Mr. Haddow, some that just get at the chronology.  But it will be a tight two-hour presentation.

THE COURT:  Good.

MR. BELL:  I also think with respect to some of the multimedia that we mentioned playing before, per your Honor's ruling on the in limine motions, we're trimming somewhat our presentation of that as well.  Not only in an attempt to get these done in an economical fashion, but for the jury's ease of appreciation.

So we take your Honor's concerns, and we're trying to make sure that we accomplish those same ends.  Thank you, Judge.

THE COURT:  You're obviously certainly entitled to make your case.  I'm trying to ensure that happens as well.

We have draft jury instructions, so we're going to hand them out now.  And I thought it would be a good idea because, this way, whenever there is some break or appropriate break or time, we can have our charge conference.  So, if, for example, the government were to finish and the defense was not yet quite ready to present their case, we could do a charge

J653MOO1

1    conference then.  so we'll have it when you get a chance.  Go

2    over it and then you'll all be ready for a charge conference.

3           MR. BELL:  With the Court's permission, I may start to

4    go over that while we're hearing testimony here, because I

5    think that, I mean, candidly, Judge, it is a wire fraud and

6    wire fraud conspiracy case.  These are relatively pedestrian

7    charges and I suspect the charge conference will be relatively

8    brief.

9           THE COURT:  I think that's it from me preliminarily.

10   So I'll just stand by until the witness is here and the three

11   jurors are also here.

12          We do have all the jurors, but we're still waiting on

13   the witness.

14          (Pause)

15          (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1            (Jury present)

2            THE COURT:  We'll continue with the direct examination

3    of Mr. Haddow.

4            THE DEPUTY CLERK:  Sir, before we begin, I'd like to

5    remind you you're still under oath.

6            THE WITNESS:  Okay.

7     RENWICK HADDOW,

8         called as a witness by the Government,

9         having been previously sworn, testified as follows:

10   DIRECT EXAMINATION (Continued)

11   BY MR. VAINBERG:

12   Q.  Good morning, Mr. Haddow.

13   A.  Good morning.

14   Q.  Mr. Haddow, we still have a number of important topics to

15   cover today, but we'll try to go through them as efficiently as

16   we can.

17   A.  Okay.

18   Q.  When we broke at the end of the day yesterday, you were

19   testifying about a meeting you had with the defendant in New

20   York City in October of 2015.  Do you remember that?

21   A.  I do, yes.

22   Q.  Was that the meeting at which you discussed the commissions

23   you would pay the defendant and UPG?

24   A.  That's right.

25   Q.  Did you have an understanding as to whether the defendant

1  would be discussing that proposal with people at UPG?

2  A.  I did have an understanding.

3  Q.  Let's go to Government Exhibit 29.  Mr. Haddow, directing

4  your attention to the top of this exhibit.  Could you tell us

5  who the people on this e-mail chain are.

6  A.  Yes.  That's an e-mail from David Kennedy at UPG to Neil

7  Storey, copying in James Robinson at UPG, and Jim Moore.

8  Q.  Going further down, do you see an e-mail from Jim Moore on

9  this chain beginning with the words "hi guys"?

10  A.  Yes.

11  Q.  Could you read what Mr. Moore wrote to the people on this

12  chain beginning with the words "I'm extremely encouraged" to

13  the words "constantly full."

14  A.  "I'm extremely encouraged and motivated by what I've seen

15  here in Manhattan.  Bar Works have secured an absolutely prime

16  location for their first site.  I mean fantastic really.  The

17  footfall outside is incredible and they have already 20 people

18  signed up now as of this evening to rent desks/be members.

19  It's hard to see how they won't be constantly full."

20  Q.  Let's pause there for a second.  Mr. Haddow, did you tell

21  the defendant how many members you had signed up when he was in

22  New York?

23  A.  No.

24  Q.  At that point, did you have any locations opened yet?

25  A.  At that point we had no locations or no members.

1   Q.  Do you know where he got the 20 people signed up from?

2   A.  No.

3   Q.  Let's go to the paragraph that begins with the words "we

4   have good news I think" in the first part.  And highlight one,

5   two and three.

6   A.  "We have good news I think.  Here's what we have been

7   offered I think we potentially have an amazing deal, but it is

8   absolutely critical we deliver sales results or this will all

9   fall away."

10  Q.  Could you read part one under that.

11  A.  "One.  Any of the Regent 88 business we switch we can have

12  the agreed 25 percent commission on, plus a 10 percent bonus,

13  making a total of 35 percent on switched deals.  Three times

14  the commission we are earning from Regent 88."

15  Q.  Mr. Haddow, is what's written here from Mr. Moore to other

16  folks at UPG consistent with the discussions you had with him

17  in New York?

18  A.  Yes, it is.

19  Q.  Let's go to part two.  Can you read that part.

20  A.  "Two.  Ongoing -- provided we switch some Regent 88 now

21  which will help Bar Works accelerate site acquisition and show

22  reasonable ongoing volume, we can have 30 percent of everything

23  we take from here moving forward."

24  Q.  And is the 30 percent from everything going forward, is

25  that consistent with what you discussed as far as UPG's

1    commission?

2    A.  Yes, it is.

3    Q.  Could you read part three.

4    A.  "Three.  More importantly long term, subject to us

5    delivering now, I have in principal secured the operational

6    investment sales licenses for Bar Works Europe and possibly

7    Asia.  This will be performance driven, but any Bar Works we

8    launch ourselves as the development license holder/developer we

9    will be able to keep 100 percent of the funds taken from

10   investors minus any money needed to operate the business, of

11   course, which should be minimal.  And minus either a license

12   fee or an operating contract.  This is to be discussed but I

13   don't see it as a deal breaker."

14   Q.  During your meeting with the defendant in New York, did you

15   discuss potentially giving UPG licenses to franchise out Bar

16   Works Europe and Asia?

17   A.  We did discuss it, yes.

18   Q.  Did you make any agreements on that score?

19   A.  No.

20   Q.  Let's go to the middle of the page on the next page, and

21   let me direct your attention to the line that begins with "if

22   you're wondering how they can pay so much commission."

23   A.  "If you're wondering how they can pay so much commission

24   it's simple the --"

25             THE COURT:  You can slow down just a little bit.

1          THE WITNESS:  Sorry.  Let me start again.

2    A.  "The running costs and investor returns are actually

3    covered by real paying clients of which there seems to be an

4    eager and plentiful supply.  The money from investors will

5    mainly be used for expansion and staffing."

6    Q.  Had you discussed this topic with the defendant when he was

7    in New York?

8    A.  Yes.

9    Q.  What was the nature of the discussion?

10   A.  Well, we discussed that the -- an investment should be --

11   the pitch of the investment was that for every investment we

12   sold, theoretically there should be a person in that desk

13   renting the desk from us.  And therefore, theoretically, the

14   running costs of the business will be quite low.

15   Q.  When you discussed whether or not you would be able to

16   cover commissions, did you discuss it in terms of it being a

17   pitch?

18   A.  Just a pitch, yeah.  A pitch is the most important thing.

19   Q.  Who is the pitch to?

20   A.  The pitch is to investors and agents.

21   Q.  If we go further down on this e-mail.  Let's highlight the

22   portion beginning with "10 units and going to 9,900,000."  And

23   I'll just read this.

24          "10 units with 150 work spaces each would be 1500 work

25   spaces times 22,000 equals 33 million.  Our end of that would

J653MOO1                          Haddow - Direct

1     be 9.9 million."

2             Do you see that?

3     A.  Yes.

4     Q.  What's your understanding as to what this is referring to?

5     A.  That's referring to us opening Bar Works, opening 10 units

6     with approximately 150 work spaces in each unit, and that will

7     generate $9.9 million for UPG.

8     Q.  Is $9.9 million a certain percentage of $33 million?

9     A.  Yes, 30 percent.

10    Q.  In this e-mail, did the defendant inform UPG of the

11    commission you had negotiated with him?

12    A.  No.

13    Q.  What was that separate commission to the defendant?

14    A.  That was 35 percent we discussed.

15    Q.  Let's go to the bottom here, and could you read the please

16    "let me know ASAP" paragraph.

17    A.  "Please let me know ASAP how much of the Regent 88 business

18    you feel we can move over.  If we need to employ an incentive

19    for clients, let's discuss this and do so ASAP.  The

20    commissions are too good to miss agree.  Thanks guys.  Have a

21    good Sunday.  P.S. --"

22    Q.  All right.  Now, at the time of the defendant's visit to

23    you in New York, had anyone at UPG definitively told you that

24    they were going to be raising money for you?

25    A.  Sorry.  Can you repeat that?

1    Q.  Certainly.  Did the other people on this e-mail associated

2    with UPG, such as James Robinson and David Honeyman, had they

3    told you at this point that they would be definitively raising

4    money for you?

5    A.  No, not definitively, no.

6    Q.  When you met with the defendant in New York, did you

7    discuss giving UPG an exclusive right to sell Bar Works?

8    A.  Yes.

9    Q.  At the same time, did you offer that exclusive right to

10   anyone else?

11   A.  Yes, I did, yes.

12   Q.  Who did you offer the second exclusive right to?

13   A.  Well, I actually offered it to a company called Pan

14   Pacific.

15              THE COURT:  That was what?

16              THE WITNESS:  Pan.  P-A-N.

17              THE COURT:  Pacific?

18              THE WITNESS:  Yes.

19   Q.  What's Pan Pacific?

20   A.  It was run by an old manager of mine, back in the U.K., it

21   was a one-man operation.

22   Q.  What did you understand Pan Pacific to be able to do for

23   you?

24   A.  Well, at the beginning, he was quite excited by the

25   opportunity, and kind of requested an exclusive to sell the

J653MOO1                          Haddow - Direct

1   product.  And I, you know, because I had no other offers at the

2   time, I took that up.

3   Q.  Did UPG find out that you had given away a conflicting

4   exclusive to theirs?

5   A.  It did, yes.

6   Q.  Did the defendant question you about that?

7   A.  Yes, he did.

8   Q.  What did he say and what did you say?

9   A.  He said it was -- I was making life very difficult for him,

10  and that having not -- he was my business partner, and I hadn't

11  told him about this particular exclusive I granted.  And it was

12  making him look a bit stupid with UPG and demotivating him and

13  UPG.

14  Q.  What did you say in response to that?

15  A.  I said who cares, it's just a one-man operation, it doesn't

16  really matter.

17  Q.  Let's go to Government Exhibit 179.  Just to orient

18  ourselves, who are the people at the top of this e-mail chain.

19  A.  That's an e-mail from James Robinson at UPG to Jim Moore,

20  copying in Neil Storey and David Kennedy.

21  Q.  You're not on this e-mail, right?

22  A.  I'm not on that e-mail, no.

23  Q.  This is internal to the defendant and UPG, right?

24  A.  Yes.

25  Q.  All right.  If we just take a look on page two, beginning

1   on the bottom of page one, do you see an e-mail from the

2   defendant?

3   A.  Yes.

4   Q.  And the line that says "I did ask your question about Pan

5   Pacific alternatives and got exactly the response you and I

6   discussed was likely.  It's one person who cares."

7          Do you see that, sir?

8   A.  Yes, I do.

9   Q.  Is that essentially what you had told the defendant when he

10  asked you about Pan Pacific's exclusive?

11  A.  That's right, yes.  That's what I told him.

12  Q.  If we can go back up to page one.  Is this a response from

13  James Robinson to the defendant?

14  A.  It is, yes.

15  Q.  Can you read the first two paragraphs, please.

16  A.  Yes.  "I do not want to labor the point as it is

17  unproductive, but the response of who cares is both

18  shortsighted and totally unprofessional.  Obviously, they do

19  not, as it is not their brand and reputation.  I wonder if

20  Renwick could care more about people knowing Bar Works is his

21  and his history in carbon credits and lost investments for huge

22  amounts of clients would damage his Bar Works reputation.  We

23  could easily say who cares to that, but would not be so

24  unprofessional in doing so."

25  Q.  Mr. Haddow, did you care about people knowing that Bar

J653MOO1                         Haddow - Direct

1   Works was yours?

2   A.   Yes, I did.

3   Q.   Did you care about people knowing that the person behind

4   Bar Works had a history of losing investments for a huge number

5   of investors?

6   A.   Yes, very much so.

7   Q.   Did you believe that if word got out about that, that you

8   were behind Bar Works, that that would damage Bar Works'

9   reputation?

10  A.   Yes, it would.

11  Q.   Did you believe that the defendant and UPG knew about all

12  of those facts?

13  A.   Yes, for sure, yes.

14  Q.   Did there come a time when you and UPG began directing --

15  excuse me.

16         Did there come a time when you began communicating

17  directly with principals from UPG?

18  A.   Yes.

19  Q.   Did you talk to them from your RenwickHaddow.com e-mail

20  account?

21  A.   Yes, I did.

22  Q.   Did you use your real name when you talked to the

23  principals at UPG?

24  A.   I did, yes.

25  Q.   Let's go to Government Exhibit 31.  If we look at the top

1    of the page.  Could you identify this e-mail for the jury.

2    A.  Yes.  This is an e-mail from Jason Rivera, who was my

3    assistant, to Nathalie who is also one of my old assistants.

4    Copying myself at my personal e-mail address, James Robinson,

5    David Kennedy, Neil Storey, and Jim Moore.

6    Q.  What, if any, documents did your assistant Mr. Rivera

7    attach to this e-mail?

8    A.  He attached, from the looks of it, the whole suite of

9    documents off a document PPM, questions and answers, and a

10   couple of articles.

11   Q.  Did any of those materials have your name in them?

12   A.  No.

13   Q.  Did those materials have Jonathan Black's name as the CEO

14   of Bar Works?

15   A.  Yes, it did.

16   Q.  After receiving these offering materials, did there come a

17   time when UPG began making sales of Bar Works?

18   A.  Yes.

19   Q.  Approximately when did they sell their first investment?

20   A.  Approximately end of October, beginning of November.

21   Q.  When did Bar Works open its first location?

22   A.  In October I think.

23   Q.  After you had told the defendant that you were Jonathan

24   Black, what, if anything, did he do to help you cover up that

25   fact?

1   A.  Well, he continued doing what we agreed at the beginning,

2   which was to front -- front Bar Works up with himself and Neil

3   Storey.  So he dealt with most -- most of the inquiries from

4   agents and UPG.

5   Q.  Let's look at Government Exhibit 43.  Is this an e-mail

6   from the defendant to you on November 5, 2015?

7   A.  Yes.

8   Q.  Do you see where the defendant writes, "Mate, see what you

9   think to this please, and if it's okay let's get it on pen and

10  paper as a PDF"?

11  A.  Yes.

12  Q.  What did the defendant write below that, if you could just

13  summarize it rather than reading it.

14  A.  Yeah, so it is a letter that he's put together for general

15  consumption for lease sales to investors at Bar Works.  So just

16  an information to go to agents, mainly, covering queries,

17  potentially queries and questions on leases, available leases.

18  Q.  Had agents asked questions about the maximum number of

19  leases you could sell?

20  A.  Yes, they had.

21  Q.  And who is this letter supposed to come from that the

22  defendant put in an e-mail to you?

23  A.  This letter was supposed to come from Jonathan Black.

24  Q.  Did you have a copy of this letter created?

25  A.  I did, yes.

1    Q.  Let's do a split screen between this exhibit --

2              THE COURT:  Do you mean that you converted the text of

3    this e-mail into a formal letter?

4              THE WITNESS:  Yes.

5              THE COURT:  Which had the same language in it?

6              THE WITNESS:  Yes.

7    Q.  If we quickly just put up Government Exhibit 181.  What is

8    this?

9    A.  That's the letter that's gone on to headed paper.

10   Q.  Could we go back to Government Exhibit 43, Jim Moore's

11   request to you for that letter, and Government Exhibit 44.  All

12   right.  Let's look at who is on the e-mail chain for Government

13   Exhibit 44.

14             Could you tell us who is on this chain?

15   A.  Yes.  So that's an e-mail from Jim Moore, to Nick Reagan

16   who was an agent, copying in James Robinson, David Kennedy, and

17   myself.  I'm blind copied.

18   Q.  And when you say you're blind copied, what does that mean

19   for the other people's availability to see if you are on this

20   chain, other than the defendant?

21   A.  It means they can't see I've been copied in.

22   Q.  What day did the defendant send this e-mail?

23   A.  That e-mail was sent on the 11th of May -- sorry.  The 5th

24   of November.

25   Q.  We put our month before the date here, Mr. Haddow.

1          How did that compare to Government Exhibit 43?

2    A.   That's the same, same day.

3    Q.   Could you read the sentence in the defendant's e-mail to

4    this agent that begins with "unless you believe" and then the

5    next sentence that says "I have asked Jonathan Black."

6          THE COURT:  You are now looking at 44?

7          MR. VAINBERG:  On Government Exhibit 44, yes, your

8    Honor.

9    A.   "Unless you believe that the company is about to commit

10   outright fraud, then it's not possible for them to oversell the

11   leases without directly contravening their own terms and

12   conditions.  In addition to this, I have asked Jonathan Black,

13   the CEO, if he would be so kind as to issue a formal legal

14   statement to further clarify this, on company headed paper, of

15   course, that you can use for your own comfort and that of your

16   clients.  Although, to be honest, I'm struggling to see how it

17   can be made any clearer."

18   Q.   Who did the defendant say he had asked to produce a legal

19   letter about the maximum number of leases?

20   A.   Jonathan Black.

21   Q.   And who did he actually ask to produce that letter?

22   A.   Myself.

23   Q.   Who did the defendant represent that he actually talked to?

24   A.   Jonathan Black.

25   Q.   Let's go to Government Exhibit 45.  If we look at the

1   people on this e-mail chain, could you identify those.

2   A.  Yes.  This is Jim Moore from -- to Richard Edmonds who is

3   at United Property Group, copying in James Robinson and David

4   Kennedy, and again blind copying me at my personal e-mail

5   address.

6   Q.  Who was Richard Edmonds, as far as you know?

7   A.  As far as I knew, he was a broker, salesperson at United

8   Property Group.

9   Q.  Did you understand whether that broker had a client

10  interested in seeing Bar Works?

11  A.  Yes, I did.

12  Q.  Where did that potential investor live?

13  A.  He was local.  I think he lived in Queens.

14  Q.  What was the broker asking Mr. Moore to do with respect to

15  that potential investor?

16  A.  He was looking to arrange for this potential investor to

17  come along to the location and meet someone.

18  Q.  And directing your attention to this portion of the e-mail

19  where it says "Just come off the phone to him, any chance of a

20  name for the meeting either later today or tomorrow."

21          What did you understand that to mean?

22  A.  That he wanted to have a point of contact when he visited

23  the location.

24  Q.  And let's look at the defendant's response.  Let's just

25  focus on the top line.  Do you see where it says "Hi Ricky, I

1    would leave him a while"?

2    A.  Yes.

3    Q.  What did you understand that to mean?

4    A.  Well, at the time I don't think we had a point of contact

5    to meet the investor at the location.  And obviously, it wasn't

6    a good idea that I met the investor.

7    Q.  Let's go to Government Exhibit 49.  Let's just look on the

8    bottom half of this e-mail chain.  Is that Mr. Edmonds again,

9    the broker from UPG?

10   A.  It is, yes.

11   Q.  And do you see that he's writing to James Moore and James

12   Robinson?

13   A.  Yes.

14   Q.  And in the first line here, he writes "Hi Jim, sorry to

15   bother you again.  This guy is really difficult.  He's old

16   school and wants to invest, but he wants a name for somebody to

17   meet him."

18           Did the defendant forward this e-mail to you?

19   A.  Yes, he did.

20   Q.  What did he write?

21   A.  "Mate, what do you want to do this one?  Sounds like

22   trouble to me."

23   Q.  What did you understand him to mean by that?

24   A.  Well, we're very nervous about people who lived close by,

25   just walking in off the street and then bumping into me or

1   finding out the full, you know, full story of me being

2   involved.  Rather than having a planned and controlled meeting

3   with someone, other than -- someone other than myself.

4   Q.  Going to your response, did you come up with a potential

5   proposal on this issue?

6   A.  Yes.

7   Q.  What did you say?

8   A.  I said "My sales manager is positioned there, he can meet

9   him.  Just let me know when."

10  Q.  Who are you talking about here?

11  A.  I was talking about sales director we had recruited called

12  Sam Aura.

13  Q.  What did Sam Aura do for you?

14  A.  He was in charge of establishing a sales network for Bar

15  Works.

16  Q.  Did Mr. Aura succeed in that endeavor?

17  A.  Yes, he did.

18  Q.  Did Mr. Aura know you were Jonathan Black based on

19  conversations you had with Mr. Aura?

20  A.  Yes, he did.

21  Q.  Let's go to Government Exhibit 58.  At the top do you see

22  that it is an e-mail from the defendant to yourself on

23  November 10, 2015?

24  A.  Yes.

25  Q.  There is a line in here about Asset Folio.  Who is Asset

J653MOO1                        Haddow - Direct

1   Folio?

2   A.  Asset Folio was an agent.

3   Q.  What did Asset Folio want?

4          THE COURT:  Is it A-S-S-E-T?  Is that what you are

5   saying at the top there?  F-O-L-I-O?

6          MR. VAINBERG:  Yes, your Honor.

7          THE WITNESS:  Sorry.  What was the question?

8   Q.  Mr. Haddow, directing your attention to the third line.  Do

9   you see where it says "They want something on BW letterhead"?

10  A.  Yes.

11  Q.  And then on the bottom, did the defendant write "Words as

12  follows maybe.  Asset Folio are an agent of UPG and Bar Works,

13  duly authorized by Bar Works to offer Bar Works product for

14  sale."

15  A.  Yes.

16  Q.  What does it say right after that?

17  A.  "Signed M. Mouse."

18  Q.  How did you perceive that remark?

19  A.  Well, M. Mouse is a made-up person.

20  Q.  Let's go to Government Exhibit 70, please.  In the middle

21  of the page, do you see an e-mail from the defendant that says,

22  "Nat, can you please do me another of these cut and paste

23  letters as below."

24  A.  Yes.

25  Q.  And down below, was there a request for another letter from

1    Jonathan Black?

2    A.  Yes.

3    Q.  This is a letter relating to Asset Folio, right?

4    A.  It is, yes.

5    Q.  Could you take us through what happens after the defendant

6    asked -- first of all, who is Nat?

7    A.  That's Nathalie Kent, who is my assistant.

8    Q.  Did the defendant know that Ms. Kent was your assistant?

9    A.  Yes, he did.

10   Q.  What did Ms. Kent write?

11   A.  She's responded to that request, "Yep, that's fine if okay

12   with Renwick for me to do."

13   Q.  What did you write?

14   A.  I said yes.

15   Q.  Is there any Jonathan Black on this e-mail?

16   A.  No, there isn't.

17   Q.  Did the defendant know that when he needed a letter from

18   Jonathan Black, your assistant would create it as long as you

19   authorized it?

20   A.  That's right.

21   Q.  Let's go to Government Exhibit 59.  Could you tell us who

22   this e-mail is from and to and what it says in the first line.

23   A.  Yes.  That's an e-mail from Jim to myself, at my personal

24   e-mail address.  And it says "Mate, send us this letter please

25   to me."

J653MOO1                          Haddow - Direct

1    Q.   Did he forward you an e-mail requesting a certain type of

2    letter?

3    A.   He did, yes.

4    Q.   Directing your attention to the second paragraph of the

5    e-mail he forwarded.  And the lines, "If we just get a BW

6    letter that states UPG are authorized to sell BW."

7         Does that refresh your recollection as to what kind of

8    letter you were asked to produce?

9    A.   Yes.

10   Q.   And is that consistent with what is stated on the page

11   here?

12   A.   It is, yes.

13   Q.   Did you produce that letter immediately?

14   A.   I can't recall, to be honest.

15   Q.   Do you recall there had been times when it took some time

16   for you to respond to requests like this and produce Jonathan

17   Black letters?

18   A.   Yes, it did sometimes take some time.

19   Q.   Did you ever receive any signs of frustration from the

20   defendant and others at UPG when it would take time for you to

21   produce UPG letters?

22   A.   Yes.

23   Q.   Let's stay on Government Exhibit 59.  Can we focus on the

24   last full paragraph.  Who is writing here?

25   A.   This is James Robinson.

1   Q.  Who is he writing this to?

2   A.  He's writing this to Jim.

3   Q.  What did James Robinson write to the defendant?

4   A.  "Time and time again it seems there is no wriggle room for

5   something that actually benefits the vendor here.  Basic things

6   that allow people to sell without Renwick being exposed at all.

7   A/k/a what Honeyman asked for yesterday could easily have just

8   said UPG will act as your point of contact for us here at Bar

9   Works."

10  Q.  Why would an authorization letter to UPG allow people to

11  sell without you being exposed?

12  A.  Because it would mean that the agents or the -- yeah, the

13  agents wouldn't be -- wouldn't have to go back to Bar Works to

14  ask if these agents had permission to sell from us.

15  Q.  Let's look at Government Exhibit 63.  And is that a

16  response from the defendant to James Moore's request for that

17  letter?

18  A.  Yes.

19  Q.  I'll just read it into the record.  "Write what you need.

20  Renwick is in full agreement with this.  He will put it on

21  headed paper for you."

22          Did you agree to produce that letter as well?

23  A.  I did, yes.

24  Q.  Let's go to Government Exhibit 64.  Let's just look at the

25  top half portion.  Did the defendant send you text that should

1    go into that letter as well?

2    A.  Yes, he did.

3    Q.  What did he write here?

4    A.  "Morning, Renwick.  Please see to follow letters for

5    Jonathan's approval."

6    Q.  What did you understand that to mean?

7    A.  That he wanted me to sign a letter from Jonathan.

8    Q.  Why did you understand the defendant was saying "Please see

9    to follow letter for Jonathan's approval"?

10   A.  Because the idea was to make sure that Jonathan appears a

11   real person, just in case that e-mail or other correspondence

12   ended up in the wrong hands, maybe ended up in the hands of an

13   agent who didn't know about the -- my situation.  Could end up

14   in the hands of yourself.

15   Q.  Had you had conversations with the defendant about making

16   sure that e-mails were not explicit that you were Jonathan

17   Black?

18   A.  Yes, I had, yes.

19   Q.  Did there come a time when you had those conversations in

20   person with the defendant?

21   A.  Yes.

22   Q.  When was that?

23   A.  Specifically regarding what I would call e-mail etiquette.

24   We had that discussion when the guys from UPG came over for the

25   first time back in November.

J653MOO1                              Haddow - Direct

1    Q.  Was that in November 2015?

2    A.  Yes.

3    Q.  Let's look at Government Exhibit 51.  Let's just see who is

4    on this e-mail.  Could you tell us who this e-mail is between?

5    A.  Yes.  This e-mail is from Jim to Neil Storey, James

6    Robinson, and David Kennedy.  And copying me in at my personal

7    e-mail address.

8    Q.  What is this e-mail about?

9    A.  This is about their forthcoming trip to New York.

10   Q.  Who were they expecting to meet in New York?

11   A.  Myself.

12   Q.  Is there any Jonathan Black that's listed on this e-mail?

13   A.  No.

14   Q.  Approximately when did that visit take place?

15   A.  That occurred mid -- mid November.

16         MR. VAINBERG:  We can take that down.

17   Q.  How long did the defendant and UPG's visit to New York

18   last?

19   A.  I think about two or three days.

20   Q.  Let's talk about the first day.  How did that day begin?

21   A.  That day began, they -- James Robinson, David Kennedy, and

22   Jim and I think Neil was there as well, met us at -- met me at

23   the location on 39th Street.

24   Q.  What did you show them at that location?

25   A.  At the time it was -- the location was open.  It was a few

J653MOO1                          Haddow - Direct

1    members in there.  I showed them around the location.  And

2    just, you know, talked about how the project worked, introduced

3    them to my wife, who was there.  There was also an assistant

4    manager who was there, introduced them to them.  And, yeah,

5    that was about it.

6    Q.  And what name did you use to introduce yourself?

7    A.  Renwick.

8              THE COURT:  Did you know these people before the

9    meeting?

10             THE WITNESS:  I never met them before.

11             THE COURT:  You had not?

12             THE WITNESS:  I had a few e-mails with them.

13   Q.  Other than Mr. Moore, had you ever met David -- James

14   Robinson, David Kennedy and Neil Storey in person before this

15   meeting?

16   A.  No.

17   Q.  After meeting them at Bar Works, how did the day proceed?

18   A.  Well, after that, they came -- I think from memory, they

19   came in the afternoon.  We then retired to this restaurant

20   which was a couple of blocks behind the location in Bryant

21   Park, which we had a dinner there.  My wife was there, James,

22   Neil, David and Jim.

23   Q.  Was there any agenda for this dinner?

24   A.  Sorry?

25   Q.  Was there any agenda for that dinner?

J653MOO1                            Haddow - Direct

1   A.  No real agenda.  Just to get to know each other and just,

2   you know, discuss the project.

3   Q.  Was Jonathan Black discussed at that dinner?

4   A.  Not that I can remember, no.

5   Q.  Let's go to the second day.  How did that day begin?

6   A.  That day began with a breakfast, breakfast meeting which

7   was around the corner, held around the corner from where they

8   were staying in Times Square.  And the purpose of the meeting

9   was for Jim to give a presentation, and for the guys from UPG

10  to give a presentation.

11  Q.  What were the presentations that were given?

12  A.  Jim was -- had been up all night, so he said, and he was

13  working hard on putting a presentation together for the new

14  structure of Bar Works.  Came up with something called the

15  wealth builder program.  And it was a presentation with a graph

16  with a tiered increase in returns, incentivizing investors to

17  invest in more locations.  That more locations they invested

18  in, the higher the returns.  And then the idea was to minimize

19  or discourage people from just buying one location.  So we were

20  trying to get people to buy two and three locations.  So he

21  gave a presentation on that.

22          And after that, the guys at UPG gave a presentation on

23  how many units, how many locations they expected to sell over

24  the next -- I think it went up to about March of the following

25  year.

J653MOO1                          Haddow - Direct

1    Q.  Approximately how many units did UPG project that they

2    could sell?

3    A.  Two figures spring to mind.  One was I think they said

4    they'd could probably sell around about 40 in December.  And

5    they expected to be selling around about 200 by March of the

6    following year.

7    Q.  Now, what, if anything, happened after that breakfast

8    meeting?

9    A.  After the breakfast meeting, we -- I think they then went

10   to look at the new location we were close to signing.  I don't

11   think we had signed yet because we didn't have the keys,

12   because we didn't go inside.  But we went to the 46th Street

13   location.

14   Q.  Was the defendant part of that meeting as well?

15   A.  Yes.

16   Q.  What did the defendant see at the 46th Street location?

17   A.  So, we went to the location, the -- we couldn't get inside,

18   so we looked through the windows and we had a little tour of

19   the area. I think James Robinson took a video of the walk from

20   46th Street to Times Square to show the proximity to Times

21   Square.  In fact, he came up with a good idea which I liked at

22   the time, which was to call it the Times Square location.

23   Before that it was just going to be called 46th Street.  So we

24   incorporated that into the brochure.

25   Q.  How did the rest of the day proceed?

1    A.   Later on, I think we all went our separate way after the

2    46th Street meeting.  And then later on we met up at a bar

3    called Tao near Central Park.

4    Q.   What did you do at Tao?

5    A.   Well, really, it was a -- turned out to be a very social

6    evening, a few shots, a few cocktails, that type of thing.

7    But, we had discussion on their visit, how much they liked the

8    project.  They were very, you know, excited about the prospect.

9    They loved the 46th Street location.  And we talked about a

10   couple of other -- well, probably talked about a few things,

11   but two things in particular.  We spoke about --

12   Q.   Mr. Haddow, was the defendant -- can you tell us who was at

13   this dinner at Tao?

14   A.   So it was myself, James Robinson, David Kennedy, and Jim

15   Moore.

16   Q.   All right.  And go on, please, how did the rest of that

17   dinner go?

18   A.   Yeah, we discussed two things in detail that stand out.

19   The first one we were discussing conflicts.  I -- where Sam

20   Aura who was the sales director of Bar Works or we had another

21   sales guy, guy called Jack Bone.

22              THE COURT:  Jack B-O-N-E?

23              THE WITNESS:  Yes.

24   Q.   Who was also selling Bar Works, but directly on behalf of

25   Bar Works.  There was sometimes conflicts between them making a

J653MOO1                          Haddow - Direct

1    sale and UPG making a sale.  I, for example, UPG may have

2    spoken to someone, but Jack Bone ended up closing him.  So,

3    there needed to be some sort of sharing of the commission,

4    otherwise people would get upset.  So that's one thing we

5    discussed, how we would share the commission out where there

6    was disputes on sales.

7              And the second thing we discussed, which is something

8    that Jim initiated, he gave me a little kick under the table

9    and said let's discuss -- let's discuss our friend.  We used to

10   call him our friend, Jonathan Black was called our friend.

11   That was his nickname.

12             (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

1    BY MR. VAINBERG:

2    Q.  Whose nickname was our friend?

3    A.  Jonathan Black.

4    Q.  Was that a joke that you had with the defendant?

5    A.  Yeah, just like an internal joke.

6    Q.  So, after he kicked you under the table and said something

7    like let's discuss our friend, what did you do?

8    A.  I said to the group, the three guys, that we needed to

9    discuss Jonathan Black and how we deal with e-mails and

10   communication.

11   Q.  And what did you say?

12   A.  The focus really was on making sure that we treated

13   Jonathan as a real person, that we made sure if we send e-mails

14   to each other, we talked about Jonathan as he existed just in

15   case e-mails ended in the wrong hands.  And at the time into

16   the wrong hands meant it could go to an agent and blow the

17   whole situation.

18          Also, we discussed -- I was using my own e-mail

19   address, my renwick@renwickhaddow.com, but I had also

20   instituted another e-mail address which was

21   jonathanblack@barworks.nyc, and I was explaining how we needed

22   to start using that just in case the Renwick Haddow e-mail got

23   forwarded by mistake to someone else.  It's an easy mistake to

24   make.  And everyone agreed with that, and that was the end of

25   that conversation.

1  Q.  Based on how James Robinson and David Kennedy reacted when

2  you started talking about Jonathan Black, did you believe that

3  they had known previously that you were Jonathan Black?

4  A.  Yes, there was no adverse reaction.

5          THE COURT:  Are those gentlemen all from the UK?

6          THE WITNESS:  Yes.

7  Q.  So, as a result of having that conversation about e-mail

8  etiquette, as you put it, did you begin referring to Jonathan

9  Black as a real person in e-mails with the defendant and others

10 from UPG?

11 A.  Well, I'd say not started because I was doing it before --

12 we were doing it before -- but it became a bit more

13 disciplined.

14 Q.  Were you and the defendant always successful in making it

15 seem like Jonathan Black was a real separate person in your

16 e-mails to each other?

17 A.  No, there was a few slip-ups.

18 Q.  As part of that visit to New York, did you also separately

19 meet with an individual by the name of Neil Storey?

20 A.  Yes.

21 Q.  And can you describe the nature of that meeting.

22 A.  Yes.  I think that meeting was -- I don't know exactly when

23 it was, but it was during that period Jim said to me that he

24 wanted me to meet up with Neil, with him, and he wanted Neil to

25 come onboard, but it was important for Neil to hear it from me,

1    from the horse's mouth, my background, what happened with the

2    FCA, what happened with my directorship ban, so he could

3    ascertain whether he wanted to get involved with Bar Works.

4    Q.  What did you tell Mr. Storey as part of that meeting?

5    A.  I gave him a full run-down of my background, you know, from

6    qualifying as an accountant, to working at Regent Inns, the pub

7    company, to working at the regulated busy I had, the Arc Fund

8    Management and Catalyst, all the way up to the land projects,

9    which was under the Capital Alternatives situation, so I told

10   him about me being banned as a director for eight years.

11          I did gloss over the seven or eight issues that the

12   Insolvency Service had with me.  I didn't really go into a huge

13   amount of detail on that, so I glossed over that, but I did

14   tell him about the ban.

15          I also told him about the FCA action and how they were

16   successful with the high court action and the decision that it

17   should have been a collective investment scheme.  So, I

18   explained that.

19          I did gloss that over as well and kind of blame it a

20   little bit on the FCA and say, well, we did ask for permission.

21   So, it was my positive side of the story rather than the whole

22   truth, so to speak.  And that's all.  But I gave him the full

23   information, you know, on my background.

24          Then I talked a little bit about Bar Works and, yeah,

25   that was pretty much it.

1    Q.  Was the defendant present at this meeting?

2    A.  He was, yes.

3    Q.  Did you have any follow-up calls with the defendant about

4    that meeting?

5    A.  Yeah, I told him I was quite anxious to find out what Neil

6    had said, what his feedback was, because I hadn't -- he didn't

7    really say anything during the meeting; he just listened.

8    Q.  And what did the defendant tell you?

9    A.  He said it went really well and that Neil is onboard.

10   Q.  Let's go to Government Exhibit 75, please, and let's look

11   on page 2 of this exhibit.  Is this an e-mail from you?

12   A.  Yes.

13   Q.  And if we go back to page 1, can you just tell us who you

14   wrote this e-mail to.

15   A.  I'm not sure that's the right e-mail.  Is it?

16   Q.  So, if we look at -- is this an e-mail chain between you

17   and a number of people?

18   A.  Yes, it is, yes.

19   Q.  And at the top can we see the people who are on this e-mail

20   chain?

21   A.  Yes.

22   Q.  Who are they?

23   A.  That's James Robinson, Jim Moore, myself, David Kennedy and

24   Neil Storey.

25   Q.  And if we go to the beginning of this e-mail chain, on page

1    2, is that an e-mail from you?

2    A.  It is, yes.

3    Q.  And is that an e-mail from you to them?

4    A.  Yes.

5    Q.  Where you say, "Hi, guys.  Good to meet/see you all

6    yesterday," what's that all about?

7    A.  That's to do with the meeting we had the day before.

8    Q.  And then further on the bottom could you read the last

9    three lines, please.

10   A.  "Also, the price on Jim's presentation needs to increase to

11   25,000 per unit on the next one, in fact as it is a premium

12   site maybe we should even increase this to 27.5k plus obviously

13   ten year use of any Bar Works in the world.  Let me know your

14   thoughts.

15        "Hope you all had a good evening last night!!!"

16   Q.  Let's go to page 1, please.  Did you get a response from

17   James Robinson?

18   A.  Yes, I did.

19   Q.  And could you read the last two lines of that response.

20   A.  "Great to meet you too.  David and I were really impressed

21   with what you have done and the model you have built is simply

22   exceptional.  On another note we have already had over 30 Bar

23   Works leads in from LG" -- which is Lead Galaxy -- "so the

24   campaign has started with a flourish."

25   Q.  And, Mr. Haddow, who was Mr. Robinson referring to when he

1   said "we were really impressed with what you have done and the

2   model you have built is simply exceptional"?

3   A.   He was referring to me.

4   Q.   Let's go to -- you mentioned that the defendant had come up

5   with a Wealthbuilder Program?

6   A.   Yes.

7   Q.   And if we go to Government Exhibit 79, page 2, do you see

8   e-mails from the defendant to someone named Celian that says in

9   part, "we need to alter the numbers on the wealth builder

10  presentation please as follows."

11  A.   Yes.

12  Q.   If we go to the next page.

13          THE COURT:  Is that spelled C-e-l-i-n-n?  C-e-l-i-a-n,

14  is that the first name?

15          THE WITNESS:  Yes.

16  Q.   And then if we go to page 3, what is that?

17  A.   That is a presentation that Jim gave at that breakfast.

18  Q.   Is this a presentation, or is this a draft of a slide?

19  A.   It's the -- it's a draft of the slide, but it's also the

20  presentation for the Wealthbuilder Program.

21  Q.   And is this what you incorporated in some form into the Bar

22  Works offering materials?

23  A.   Yes, we did.

24  Q.   Let's go to Government Exhibit 86.

25          Mr. Haddow, did you have any debates with the

J657MOO2                          Haddow - Direct

1    defendant about the numbers associated with the Wealthbuilder

2    Program?

3    A.  Yeah, we had a debate on the returns that matched the

4    number of locations that were sold.

5    Q.  And what was that debate generally?

6    A.  I wanted the returns to be a little bit higher than his

7    initial presentation.

8    Q.  And who is this chain of e-mail between?

9    A.  This chain of e-mails is from Jim Moore to myself and James

10   Robinson, David Kennedy and Neil Storey.

11   Q.  And directing your attention to page 3, do you see the

12   portion that says on the bottom "of course" -- sorry, at the

13   bottom of the e-mail, kind of at the top half -- "Of course it

14   is your business, and ultimately you can do what you want.

15   This approach will improve volume.  Every time."

16   A.  Yes.

17   Q.  Did the defendant know -- whose business is the defendant

18   referring to?

19   A.  My business.  Renwick Haddow.

20   Q.  All right, we can take that down, please.

21           Mr. Haddow, are you familiar with the name Julian

22   White?

23   A.  Yes, I am, yes.

24   Q.  Who is Julian White?

25   A.  Julian White was an early investor in Bar Works.

J657MOO2                         Haddow – Direct

1   Q.  How much money did Julian White invest?

2   A.  He invested I think it was $600,000.

3   Q.  And do you recall how he invested that $600,000?

4   A.  Yes, I am aware of how he invested it.

5   Q.  Who recruited Mr. White to invest in Bar Works?

6   A.  UPG did.

7   Q.  Let's go to Government Exhibit 184, please.

8             And as part of recruiting Mr. White, what, if

9   anything, did representatives from UPG ask you to do?

10  A.  They asked me to arrange a couple of calls to Mr. White to

11  convert him.  They wanted to speak -- he wanted to speak to

12  Jonathan Black, and he wanted to speak to someone from In Crowd

13  Equity.

14  Q.  And prior to setting up that call with Julian White, did

15  anyone from UPG pass on questions that Julian White had about

16  Bar Works?

17  A.  Yes, they did.

18  Q.  And did you provide answers to those questions?

19  A.  I did, yes.

20  Q.  If we look on page 2, the e-mail beginning with "Hi Ren"

21  from JR at the United Property Group.com.

22  A.  Yes.

23  Q.  Is this an e-mail from James Robinson asking you questions

24  from Julian White and you providing the answers to that e-mail?

25  A.  It is, yes.

J657MOO2                          Haddow - Direct

1   Q.  And do you see the bullet point that says "U.S. Tech

2   Startup" and a sentence that is in a lighter shade of gray?

3   A.  Yes.

4   Q.  Who did you understand that text to be from?

5   A.  That text is from Julian White.

6   Q.  And then right below that, do you see it says, "As long as

7   the wall with Robert Haslem goes well as it show independence

8   and backs up the seed capital from U.S. Tech Startup then we

9   feel that his request below for accounts can be overcome ..."

10          Who is writing that?

11  A.  That's James Robinson's response.

12  Q.  And right below that where it says, "I can get Robert to

13  call him next week.  Let me know his number and I will

14  arrange," who is that from?

15  A.  That's from me.

16  Q.  Who is Robert Haslem?

17  A.  Robert Haslem was a made-up person who was the supposed CEO

18  of In Crowd Equity.

19  Q.  And was that the crowd funding platform that was raising

20  the money into Bar Works shares?

21  A.  That's correct.

22  Q.  Let's look on the next bullet point below where it says

23  "contact with Bar Works."  Where it says, "I would appreciate a

24  phone call, or conference webinar with Bar Works to speak

25  directly with them," is that from Julian White?

1   A.  It is, yes.

2   Q.  And the next sentence, "Whoever you think has the best

3   quality on the phone your end ..." is that from James Robinson?

4   A.  That's right.

5   Q.  And what did you respond with?

6   A.  I said, "Yes JB."

7   Q.  Is that Jonathan Black?

8   A.  That's Jonathan Black.

9   Q.  By the time you were writing these e-mails, had you already

10  had your meeting about e-mail etiquette and making Jonathan

11  Black look like a real person?

12  A.  Yes, I think we had.

13  Q.  Let's go up to page 1.  Do you see Mr. Robinson's response?

14  A.  Yes.

15  Q.  "Just to clarify when you said JB do you mean Jonathan

16  Black?"  Do you see that written there?

17  A.  I do, yes.

18  Q.  And then what did Mr. Robinson ask you next?

19  A.  "I would like to set up that call for Julian, he is quite

20  flexible so if you let me know what time/day suits JB, bearing

21  in mind Julian is in Sweden at present, it would be

22  appreciated."

23  Q.  And what's your understanding for why Mr. Robinson is

24  asking you to find a date and time that suits Jonathan Black?

25  A.  Well, he is keeping the pretense up that Jonathan Black is

J657MOO2                      Haddow - Direct

1   a real person.  I mean, you know, it's very likely that this

2   e-mail could quite clearly go into the hands of someone like

3   Julian White, the agent who was involved in this transaction,

4   or any other party, so it's sticking with the etiquette that we

5   had devised.

6   Q.  And what did you respond with?

7   A.  I said, "Yes Jonathan.  How about Tuesday?"

8   Q.  What are you doing here, Mr. Haddow?

9   A.  I'm continuing with the pretense that, you know, Jonathan

10  is a real person.

11  Q.  And are you setting up a call for Jonathan Black to take

12  with Julian White?

13  A.  Yes.

14  Q.  Is there any Jonathan Black e-mail address on this e-mail?

15  A.  There is no Jonathan Black e-mail on there.

16  Q.  Let's go to -- did you end up having that call with Julian

17  White?

18  A.  Yes, I did.

19  Q.  And what was discussed on that call?

20  A.  Well, Julian White had a few concerns.  He was a little bit

21  concerned that the location was a bit dark.  He had a few

22  esthetic issues in terms of the color scheme, the lighting, a

23  few things like that, and so he wanted reassurance really that

24  the market we were going for wasn't really the uber core

25  market, it was the general entrepreneur kind of freelance

1   market, which is what I gave him reassurance about, that we

2   were going for that freelance general market.

3          And he had a few other concerns in terms of

4   projections, checking on the projections, and also working out

5   whether he wanted to invest in shares or whether he wanted to

6   invest in these leases.

7          THE COURT:  In what?  Leases?

8          THE WITNESS:  Leases.

9   Q.  Who was on that call?

10  A.  Just myself as Jonathan Black.

11  Q.  Did you report on your conversation with Julian White to

12  anyone?

13  A.  Yes, I did.

14  Q.  Who did you tell about that conversation?

15  A.  I called Jim pretty much directly afterwards.

16  Q.  When you say Jim, do you mean the defendant?

17  A.  Yes, Jim Moore.

18  Q.  Go ahead, Mr. Haddow.  How did that conversation go?

19  A.  Well, I was very excited because this guy sounded very

20  interested; it looked like he was going to potentially invest

21  upwards of 600,000, maybe even more.  He was offering maybe up

22  to a million dollars, so I was very excited that I had made a

23  big contribution in this conversion.  So, I rang up Jim and

24  said to him that Jonathan has just got off the phone with

25  Julian White and he's had a really good call.  And Jim's

1   immediate response was, you mean you did.  I said, no, no,

2   Jonathan did.  And then I giggled and laughed about it a little

3   bit, and we moved on to another subject.

4   Q.  When you told the defendant, "No, Jonathan did," in what

5   manner did you say those words?

6   A.  In a sarcastic manner.  I understood he knew what I was

7   talking about when I said Jonathan did.

8   Q.  We also saw in that e-mail that Mr. White had wanted to

9   speak to Robert Haslem at In Crowd Equity.

10  A.  Yes.

11  Q.  Did you arrange for that call to happen?

12  A.  I did, yes.

13  Q.  How did you arrange that to happen?

14  A.  Well, there was no Robert Haslem, so I had to find someone

15  to make the call, and considering I was also Robert Haslem I

16  couldn't make that call as well.  So, I arranged a salesperson

17  in the room -- one of the best sales guys in the In Crowd

18  Equity room -- to make that call, and that happen to be a guy

19  called Joe Rivera, who made the call to Robert Haslem -- to

20  Julian White.

21  Q.  After those calls, what, if anything, did Julian White

22  decide to do with his investment?

23  A.  He made the investment.

24  Q.  And let's look at Government Exhibit 95.

25          THE COURT:  So, is it accurate to say that Mr. White

J657MOO2                              Haddow - Direct

1    spoke to two people who were not --

2              THE WITNESS:  Yes, that's accurate.

3              THE COURT:  -- who were not people?

4              THE WITNESS:  Not people.

5    Q.  Let's look at Government Exhibit 95.  Could you identify

6    who this e-mail is from and to?

7    A.  Yes, that e-mail is from James Robinson at UPG to two

8    e-mail addresses at Bar Works, one an info rep and another is a

9    membership rep, and copied to Tahyira, who is one of the admin

10   people at Bar Works, Jason Rivera, who is my assistant, David

11   Kennedy and blind copied in Jim Moore.

12   Q.  What's the subject of the e-mail?

13   A.  Deal file - Julian White - 13 leases.

14   Q.  What's the deal file?

15   A.  It's all the information on a particular investor,

16   application form, ID and proof of payment.

17   Q.  And can you please tell us what was attached to this

18   e-mail.

19   A.  Yes.  So, proof of his ID was there, signed lease

20   agreement, information on the bank transfers he made, and the

21   share agreement.

22             THE COURT:  This reflects that he sent money?

23             THE WITNESS:  Yes.

24             THE COURT:  How much?

25             THE WITNESS:  600,000.

1      THE COURT:  And how did he send that?

2      THE WITNESS:  He sent it in six transfers of 100,000

3  each.

4  Q.  And if we just quickly scroll through those attachments,

5  can you just identify what they are as we go through them.

6  A.  Yes.  The first one is a lease agreement with Bar Works for

7  the investment in the Time Square location.

8  Q.  Tell us the next one.

9  A.  The next one is a lease agreement for an investment in the

10  39th Street location.

11  Q.  And were those agreements supposed to be signed by Jonathan

12  Black on your side?

13  A.  Yes, they were.

14  Q.  Keep going.  Is that Mr. White's passport?

15  A.  It is, yes.

16  Q.  And what's the next thing that was attached here?

17  A.  That's a proof of payment for 100,000.

18  Q.  What's the beneficiary name for that payment?

19  A.  Bar Works Inc.

20  Q.  And what's the beneficiary address?

21  A.  47 West 39th Street, New York.

22  Q.  And could you just read into the record the last four

23  digits of the beneficiary account number.

24  A.  Yes, 1172.

25  Q.  Was this an account at Bar Works that you controlled?

1   A.  Yes, it was.

2   Q.  And was that account located in New York?

3   A.  Yes.

4   Q.  All right.  Are you familiar with the name Loreley

5   Zavattiero?

6   A.  Yes, I am, yes.

7   Q.  Who is that?

8   A.  That was an investor, another investor in Bar Works.

9   Q.  Were you made aware of Ms. Zavattiero's investment?

10  A.  Yes, I was.

11  Q.  Let's look at Government Exhibit 128, please.  And just

12  like the prior e-mail with Mr. White, can you identify who this

13  e-mail is from and to?

14  A.  Yes, that's from James Robinson to two e-mail addresses

15  again at Bar Works, info and membership, copying in Tahyira,

16  the administrative assistant, Jason Rivera, David Kennedy and

17  blind copying in Jim Moore.

18  Q.  And what was attached as part of this e-mail?

19  A.  There was an application form from the investor, passport

20  for the ID and transfer information.

21  Q.  Was the defendant being made aware of which investors UPG

22  recruited to spend money into Bar Works?

23  A.  Yes, he was.

24  Q.  All right.  Let's go to Government Exhibit 104, please.

25  Did there come a time when you took another call with an

1   investor pretending to be Jonathan Black?

2   A.  Yes, there was a time.

3   Q.  And was one of those investors named Christer Mattson?

4   A.  Yes.

5   Q.  Did you report on that call to the defendant and others?

6   A.  I can't recall reporting to the defendant, but I seem to

7   remember reporting to UPG.

8   Q.  And let's look on this e-mail starting from the middle to

9   the bottom, beginning with "Hi all."  Could you read what you

10  wrote here.

11  A.  "Hi all.  Just had a catch up with JB.  This investor is

12  big but is not really interested in buying workspaces.  He is

13  interested in making an equity investment, a sizeable one.  JB

14  will send over the PPM and start a dialog with him.  I'll let

15  you know how he get on."

16  Q.  And, again, why are you referring to Jonathan Black as a

17  separate person who had this call in your e-mail?

18  A.  Well, that's our standard protocol by now.

19  Q.  If we go to the top of this e-mail, and going on to

20  including the response to Mr. Moore right below that, that

21  begins "How does that dilute you and me?"  What effect would

22  another investor's contribution to Bar Works potentially have

23  on your business arrangement with Mr. Moore?

24  A.  Well, as it turned out, this investor wasn't so interested

25  in investing in the leases under the Wealthbuild Program; he

1    was more interested in investing in the company and buying

2    shares in the business.  So, the investor had a large figure in

3    mind to invest, and that potentially would have diluted the

4    equity.  When I say diluted, say he took 20 percent, it would

5    mean that everyone else's shares would be reduced by 20

6    percent.

7    Q.  And you see that he writes "wants someone on the board".

8    I'm sorry, that's you writing that the investor wanted someone

9    on the board?

10   A.  Yes.

11   Q.  What did the defendant write in response to that?

12   A.  He said, "Sounds potentially worse.  Give me a call please

13   - mainly other stuff.  Thanks.  Yeah, I got that impression

14   about this guy.  Seemed like a stuffy prick, and no way is he

15   having anyone on any board -- an ironing board maybe."

16   Q.  Would you have allowed any investor to have a

17   representative on the board of Bar Works?

18   A.  No.

19   Q.  Why not?

20   A.  Because any board member other than the people in the know

21   would quickly ascertain that I was Jonathan Black.

22   Q.  Let's move on to Government Exhibit 111, please, on page 1.

23   Do you see in the middle of the page an e-mail chain with

24   nick@gbp-consultants.com, the defendant's e-mail address,

25   jonathanblack@barworks.com and another person from

1    gbp-consultants.com?

2    A.   Yes.

3    Q.   Who was nick?

4    A.   Nick was a master agent for a Chinese network of real

5    estate brokers.

6    Q.   And focusing your attention on the portion of this e-mail

7    that reads, "If you recall I wanted to understand the rationale

8    behind this offering for 125 percent of the original purchase

9    price," what is that referring to?

10   A.   That's referring to nick trying to understand the exit

11   strategy, how investors were going to get their money back.

12   Q.   Let's go off on this chain and let's focus on the top half,

13   including Mr. Moore's forward.  Did Mr. Moore forward this

14   e-mail to your personal e-mail address?

15   A.   Yes, he did.

16   Q.   And what did he write?

17   A.   He said, "Although the structure" -- Oh, sorry, no.

18            "This twat is a lot more civil now.  Can we please

19   send him his high resolution pictures for brochure 2 (the Time

20   Square prospectus) how does Jonathan want to explain the

21   buyback rationale to him?"

22   Q.   What did you write?

23   A.   I wrote, "Although the structure takes the form of a lease,

24   because it is a short lease then a residual element has been

25   built into the lease so that the owner receives his initial

1    capital back (not 125 percent) it is effectively a reversionary

2    interest.  Some old shit like that anyway."

3              THE COURT:  The subject matter on here is "see China

4    agreements."  What does that mean?

5              THE WITNESS:  That relates to this agent who was

6    focused on the Chinese real estate market.

7    Q.  We saw earlier that the e-mail chain that this agent was on

8    had a Jonathan Black e-mail address.  Did the defendant know

9    that was you?

10   A.  Yes, he did.

11   Q.  And when the defendant e-mailed you asking how does

12   Jonathan want to explain the buyback rationale to him, who did

13   he want to answer that question?

14             MR. GARVIN:  Object, your Honor.  It calls for

15   speculation.

16             THE COURT:  If you can rephrase.

17   Q.  What was your understanding of what the defendant was

18   asking you to do?

19   A.  Respond to him, as I did, from Renwick Haddow.

20             THE COURT:  Respond to the?

21             THE WITNESS:  To that question.

22   Q.  Did there come a time when you took that information and

23   responded to the agent?

24             THE WITNESS:  Yes.

25   Q.  Let's look at Government Exhibit -- let's keep that

1    actually on the side screen and look at Government Exhibit 110,

2    and let's just focus on the top half.  Is that an e-mail from

3    you to the agent, the top being the defendant and that

4    additional person Ellen?

5    A.  Yes.

6    Q.  And what is here right below that?  What do you write?

7    A.  On the one on the right?

8    Q.  Mr. Haddow, if we could maybe blow up on the e-mail on the

9    left the top two lines.

10   A.  OK.

11   Q.  How does what Jonathan.black@barworks.nyc e-mailed to the

12   agent compared to what you from your own personal e-mail

13   addressed to the defendant about what Jonathan should say?

14   A.  It's pretty much the same as the one on Exhibit 111.

15   Q.  And was that you responding to the agent that way?

16   A.  That is, yeah.

17   Q.  All right.  We can take that down, please.

18              Did that agent sign on to sell Bar Works?

19   A.  He did sign on, yes.

20   Q.  What order of magnitude of investments did that agent bring

21   in to Bar Works?

22   A.  He was one of our largest agents; he bought in millions of

23   dollars.

24              THE COURT:  Were they Chinese investors?

25              THE WITNESS:  Chinese investors.

J657MOO2                         Haddow - Direct

1   Q.  Did there come a time when you met an individual named Sean

2   Phillips?

3   A.  Yes.

4   Q.  Who was that?

5   A.  Sean Phillips was one of the founding directors of a UK

6   company called Fitness First, which is one of the largest

7   fitness health club operations in the UK.

8   Q.  Where did you meet Sean Phillips?

9   A.  I met him in New York.

10  Q.  Who introduced you to Sean Phillips?

11  A.  Jim Moore did.

12  Q.  What was the purpose of your meeting Sean Phillips?

13  A.  There was an obvious need to increase the membership of

14  39th Street and to have someone onboard to take that

15  responsibility.  That was one of the big failings of the

16  company, that we found it very difficult getting members into

17  those locations.  So, he was brought onboard for two reasons,

18  one, for helping build membership and, two, also his resume was

19  particularly impressive, so the idea was to put him in the

20  brochures and on the press releases so we could get more

21  investment from the investment program.

22  Q.  Approximately when did you have that meeting with Sean

23  Phillips?

24  A.  Approximately January 2016.

25  Q.  And who else was present at that meeting?

1  A.  There was my wife there, there was Sam Aura there, Jim

2  Moore and Sean Phillips, maybe Neil Storey.

3  Q.  What was generally discussed at that meeting?

4  A.  The focus really was on my wife who was running the

5  memberships side of things and what she was doing and the help

6  she needed, and he was offering to provide assistance and

7  support in terms of building membership up quickly, and the

8  conversation was mainly about how he could help.

9  Q.  What was your demeanor like at this meeting?

10 A.  I didn't really say a lot at that meeting.  It was very

11 much focused on my wife and himself, so, yeah, I didn't really

12 participate too much.

13 Q.  Were you rude to Sean Phillips in any way?

14 A.  No, I wasn't.

15 Q.  Did you hire Sean Phillips after this meeting?

16 A.  I did, yes.

17 Q.  And why did you hire him?

18 A.  I hired him because I thought he would do a great job at

19 recruiting members.  Also it would be one less thing I needed

20 to worry about, one less thing my wife would need to worry

21 about, and also he would significantly add some credibility to

22 the management team and help us sell more product.

23 Q.  After your meeting with Sean Phillips, did you have any

24 follow-up meetings with the defendant while he was in New York?

25 A.  Yes, I did.

1   Q.  And what, if anything, was discussed at those meetings?

2   A.  Well, we met across the street afterwards.  In fact during

3   the meeting I had a call from Sam Aura to say that the

4   defendant Jim was trying to get him to move over from selling

5   investments over to selling memberships and he would help Sean

6   Phillips run that side of the business.  So, wasn't very happy

7   about that, and I made that known to Jim that I wasn't happy

8   with Sam moving over.

9        And then Jim was spending most of the evening saying

10  how he wished to marginalize me, Renwick Haddow, because of,

11  one, my background and, two, the fact that I was half and half;

12  I was half Renwick and half Jonathan, and it was best -- if we

13  were going to take this forward -- have a proper team of

14  well-regarded people to run the business.  So, he put together

15  a structure where he could achieve that.

16  Q.  And what was the structure that the defendant presented to

17  you?

18  A.  It was presented verbally at that point, and the structure

19  was he was suggesting that we take the Bar Works brand and

20  intellectual property, it was in the U.S. in Bar Works Inc. and

21  move that overseas so it was protected.  And also he identified

22  two or three very well known guys in the property world, and

23  they were going to head the business up, and they were rapidly

24  going to -- he wanted to rapidly expand this through -- I think

25  he had a couple locations in Dubai that he wanted to roll this

1    out to quickly.

2    Q.  Did you agree to the defendant's proposal to restructure

3    Bar Works and, as you put it, marginalize you and Jonathan

4    Black?

5    A.  No, I played along with it.  I didn't say yes and I didn't

6    say no.  I said, put it in writing, let's take a closer look;

7    my major concern I said was losing control, let me see what

8    you've got to show me that I'm not going to be losing control.

9    Q.  And during that discussion was it clear to you that the

10   defendant knew that you were Jonathan Black?

11   A.  Yes, totally clear.

12   Q.  Let's go to Government Exhibit 125.  After you fired Sean

13   Phillips, did you have follow-up -- did you have conversations

14   with him?

15   A.  Yes, one or two conversations.

16   Q.  And generally what did Sean Phillips do for Bar Works and

17   how long did he stay with the company?

18   A.  He put a few marketing ideas together.  I think he had a

19   few calls with Zoe -- well, Zoe, my wife -- on recruiting new

20   members.  He was there probably maybe six to nine months.

21   Q.  Now, if we look on this e-mail, do you see in the front

22   field it's from Sean Phillips to neilstorey1@gmail.com?

23   A.  Yes.

24   Q.  Copying James Moore, anakp2014?

25   A.  Yes.

1   Q.  And the e-mail address listed on top, was that Sean

2   Phillips' e-mail address?

3   A.  Yes, it was.

4   Q.  And let's look at this e-mail and just focus on the third

5   paragraph, please.  Can you read what Sean Phillips writes to

6   the defendant and Neil Storey in the line that begins with "As

7   you know" and ends with "NYC"?

8   A.  OK.  "As you know, Renwick and I had an awesome

9   conversation, and I have a much better understanding of some of

10  the things that are happening.  I will reach out to Chloe (I

11  think that's her name) (do you have her number) and see what

12  other info I can get prior to getting my ass to NYC."

13  Q.  And can you read the next sentence that ends on "39th

14  Street".

15  A.  Yes.  "(2-3 days next week still works for me depending on

16  timings for the NYC crew) then I can plan some very thorough

17  implementation schedules for March with emphasis on opening

18  Time Square and the obvious need to fill 39th Street."

19  Q.  Was there an obvious need to fill 39th Street?

20  A.  Yes, there was an obvious need.

21  Q.  And is this referring to the membership business?

22  A.  This is referring to the fact that there were very few

23  members in 39th Street.

24  Q.  Let's go to Government Exhibit 126, and let's just blow up

25  the top half of this.  Did this e-mail -- did Neil Storey send

1   you an e-mail asking you about who Chloe was?

2   A.  Yes, he did.

3   Q.  And what did you tell him?

4   A.  I said, "Let me brief her first and let's arrange for

5   Monday.  Yes Zoe."

6   Q.  Where does the name Chloe come from with respect to the Bar

7   Works offering materials?

8   A.  Well, it's the same name that's in the Bar Works offer

9   documents.

10  Q.  And those are the documents that refer to Chloe Miller as

11  one of the directors of Bar Works?

12  A.  Yes, that's correct.

13  Q.  And that's a fake name that you had your wife use, right?

14  A.  That's right.

15  Q.  Let's go to Government Exhibit 121.

16          THE COURT:  We're going to take our short break.

17          MR. VAINBERG:  Thank you, your Honor.

18          (Recess)

19          (Continued on next page)

20

21

22

23

24

25

```
 1                (In open court; jury present)
 2                THE COURT:  We'll continue with the direct
 3     examination.
 4                THE DEPUTY CLERK:  Sir, I'd like to remind you that
 5     you're still under oath.
 6                THE WITNESS:  Okay.
 7                MR. VAINBERG:  Your Honor, with the consent of the
 8     defense, the government moves Exhibits 176 and 181 in evidence,
 9     which were previously referred to by Mr. Haddow but were
10     outside the stipulation.
11                THE COURT:  Okay.
12                (Government's Exhibit 176, 181 received in evidence)
13     Q.  Mr. Haddow, how did the defendant invoice you for his share
14     of the commission?
15     A.  He sent me an invoice shortly after UPG rendered their
16     invoice for 35 percent of the gross investment.
17     Q.  Let's look at Government Exhibit 141, on page two.  What is
18     this?
19     A.  That's one of his invoices.
20     Q.  Do you see the name of the company at the top, Universal
21     Voice Tech Inc.?
22     A.  Yes.
23     Q.  What is that?
24     A.  That's his wife's company's name.
25     Q.  Was that the company that you paid commissions to for the
```

1    defendant?

2    A.  It is, yes.

3    Q.  Did you make any deductions out of those 35 percent

4    commission payments?

5    A.  Yes, I did.

6    Q.  Could you explain those deductions?

7    A.  I made deductions based on his 35 percent of the U.S.

8    business to cover running costs, the capital costs of

9    refurbishing these locations, and any other associated costs.

10   Q.  Did you have discussions with the defendant about the

11   rationale for making those deductions?

12   A.  I did, yes.

13   Q.  What was the rationale as discussed with the defendant?

14   A.  Well, the rationale was because he was taking 35 percent,

15   he had 35 percent of the equity in the business, he should also

16   share 35 percent of the capital costs and running costs.

17   Q.  Even after deducting for those costs, approximately how

18   much did you pay the defendant?

19   A.  Between one and a half and two million dollars.

20   Q.  How did UPG invoice you for their 30 percent commission?

21   A.  They sent an invoice for 30 percent of the gross amount

22   from each investor.

23   Q.  If we look at Government Exhibit 131, directing your

24   attention to the header.  Is what's attached here an example of

25   an invoice sent to you by UPG?

J653MOO3                          Haddow - Direct

1    A.   Yes.

2    Q.   If we just go back to the first page.  Was the defendant

3    copied on this UPG invoice as well?

4    A.   Yes, he was.

5    Q.   If we look at the invoice, who is the investor listed in

6    the second line down to about the seventh line?

7    A.   That's the one we looked at earlier, Loreley Zavattiero.

8    Q.   What does the 7500 represent here?

9    A.   So that represents 30 percent of 25,000, which is the cost

10   of each work space.

11   Q.   All right.  We can take that down, please.

12        Mr. Haddow, did there come a time when you introduced

13   the defendant to a man named Steve Allen?

14   A.   Yes.

15   Q.   Who is that?

16   A.   Steve Allen is a guy I've been working with for a number of

17   years who used to set up all my overseas companies and bank

18   accounts.

19   Q.   What does Steve Allen do?

20   A.   He -- he puts -- he used to put structuring together for me

21   so that I could send money from my various projects outside the

22   jurisdiction I was usually working.

23   Q.   Was Steve Allen an accountant?

24   A.   He was, yes.

25   Q.   Generally, were the companies that he set up for you, were

1  they located offshore?

2  A.  They were all offshore, yes.

3  Q.  What did you use those companies for?

4  A.  I used those for sending money from -- if I was in the

5  U.K., I would send the money from the U.K. overseas.  And if I

6  was in the U.S., I would send the money from here to the

7  overseas accounts that he set up for me.

8  Q.  What was the source of the money that you sent to those

9  overseas companies?

10  A.  The source of the money was from the Bar Works investment

11  projects, and from also from the U.K. projects I was involved

12  in, the African land project and the carbon credit projects.

13  Q.  Did you launder money through the offshore companies set up

14  by Steve Allen?

15  A.  Yes, I did.

16  Q.  Why did you introduce Steve Allen to the defendant?

17  A.  Because Jim was after a similar structure to what I had.

18  And had talked to me about using -- he asked me if I had any

19  companies I wasn't using.  And I had one, but we kind of -- I

20  said, well, listen, I'm probably going to use that at some

21  point.  So I passed him over -- I said speak to this guy I've

22  been using called Steve Allen, and I put the two of them in

23  touch.

24  Q.  Did you send an e-mail to Steve Allen copying the

25  defendant, introducing them?

1    A.  Yes, I did.

2    Q.  Did there come a time when the defendant sent you an e-mail

3    discussing what Steve Allen was going to do for him?

4    A.  Yes.

5    Q.  Let's look at Government Exhibit 96.  Is this an e-mail

6    from the defendant to you, copying Neil Storey?

7    A.  Yes, it is.

8    Q.  Let's focus on the line that begins with "Neil and I are

9    going to be putting some infrastructure in place with the help

10   of your pal that you kindly recommended."

11           Who is that referring to?

12   A.  That pal was Steve Allen.

13   Q.  What is the infrastructure referring to, as far as you

14   understood it?

15   A.  The infrastructure is to take care of what we talked about

16   earlier, transferring the intellectual property offshore, and

17   also setting a structure up so we could -- he could transfer

18   his proceeds outside of the U.S.

19   Q.  Let's focus on a portion of this e-mail that begins with

20   "when we get your guy's report."  Let's just go down one line

21   down as well.

22           Could you read what the defendant was writing to you

23   here.

24   A.  Yes.  "When we get your guy's report, I'm sure it will

25   suggest that Bar Work contract is of course 'protected' in an

1  overseas company.  From there it's a short step to also put a

2  Spanish company in the middle that receives all the commissions

3  too.  Maybe it's Bar Works admin SL or whatever.  We will also

4  be moving carefully to establish separate marketing and sales

5  functions that aren't owned by UPG, they will be established

6  and controlled by Neil and myself, and possibly some of the

7  team that will run them day to day."

8  Q.  Directing your attention to the word "protected."  Is that

9  word in quotes in this e-mail?

10  A.  It is, yes.

11  Q.  What was your understanding as to why -- what the defendant

12  meant when he said that the Bar Work contract is of course

13  protected in an overseas company?

14  A.  So, it will be outside mainstream jurisdictions.

15  Q.  All right.  We can take that down, please.

16           Mr. Haddow, taking a couple of steps back.  You told

17  us at the beginning of this direct that you had gotten married

18  in the summer of 2015.  Did I remember that right?

19  A.  Yes, I do, yes.

20  Q.  When did you go on your honeymoon?

21  A.  Around about March 2016.

22  Q.  Where did you go on your honeymoon?

23  A.  I went to Bahamas.

24  Q.  Let's look at Government Exhibit 132.  Let's start on page

25  two.  Actually, just to orient ourselves, let's go back to page

J653MOO3                          Haddow - Direct

1   one just to see who this e-mail chain is between.

2            Could you tell us who this e-mail is from and to?

3   A.  Yes.  This e-mail is from Jim Moore to myself.

4   Q.  Is what we see here a chain of e-mails between the two of

5   you?

6   A.  Yes.

7   Q.  All right.  Going down to the bottom of page one, do you

8   see an e-mail from the defendant that begins with "hi Ren"?

9   A.  Yes, I do.

10  Q.  Just at the top, do you see where the defendant writes

11  "these are all outstanding and present and maybe last week's

12  too"?

13  A.  Yes.

14  Q.  What was your understanding of what he's talking about

15  here?

16  A.  He's talking about his invoices that were outstanding.

17  Q.  Can you read the last two lines of this e-mail.

18  A.  The last two lines?  "Shhh.  Enjoy the Bahamas.  We're

19  going to get rich."

20  Q.  Did the defendant know that you were celebrating your

21  honeymoon in the Bahamas?

22  A.  Yes, he did, yes.

23  Q.  And who was this e-mail directed to?

24  A.  It was directed to me.

25  Q.  Let's go to page one.  Can we take a look at your response.

1   What is your response generally about here?

2   A.  My response is that his billing was slightly out of sync

3   with my understanding of the figures, because I've made some

4   deductions and he wasn't taking those into account in his

5   invoices.

6   Q.  Let's go to his response.  Can you read what he wrote.

7   A.  He wrote, "Listen, don't worry.  I just want us to

8   reconcile everything so we're all on the same page.  It's all

9   good.  Karina will come with me next week with all the records.

10  Should she sit down with you and I or with Tahyira.

11  Deductions.  How's about paying last week in full and taking

12  deductions from the money before Christmas?  And most

13  importantly, of course, how's the honeymoon."

14  Q.  Let's go to your response.  What did you write in the last

15  line?

16  A.  "Honeymoon is good.  Starting to relax."

17  Q.  Let's go to the next e-mail from Jim Moore.  Can you read

18  that.

19  A.  Yes.  "Okay.  I'm sure it's easy to resolve when we sit

20  down.  Not rocket science.  New brochure looks great.  Glad you

21  are relaxing a little.  Where are you staying?  One and only?

22  Baha Mar?  At least the weather is okay too and some good

23  restaurants there from memory."

24  Q.  What's the date of these e-mails about your honeymoon in

25  the Bahamas?

1   A.  The date is March 1st, 2016.

2   Q.  Let's go to Government Exhibit 134, and let's just start at

3   the middle of the page here.  Do you see an e-mail from David

4   Lilley to Neil Storey, defendant's e-mail address, and some

5   additional people?

6   A.  Yes.

7   Q.  What's date of that e-mail?

8   A.  That's March 2.

9   Q.  Is that the day after the honeymoon in the Bahamas e-mail

10  we just looked at?

11  A.  Yes.

12  Q.  Who was David Lilley?

13  A.  David Lilley was a contact of Jim's who had an agency

14  network for real estate agents.

15  Q.  What, if anything, did you know that the defendant was

16  trying to do with respect to David Lilley?

17  A.  He was trying to get him on -- this David Lilley on board

18  as a promoter and to bring his agent network on board for Bar

19  Works.

20  Q.  Could you read what David Lilley wrote to the defendant and

21  others.

22  A.  Yes.  "So that we can prepare in the professional manner we

23  prefer, it would be helpful if you could offer us a rough

24  agenda and itinerary for next week, e.g. do we need to bring

25  some professional video equipment to record some clips with

1    Jonathan, etc."

2    Q.  Was this e-mail forwarded to you at some point?

3    A.  Yes, I think it was.

4    Q.  What was your understanding as to what David Lilley wanted

5    to do?

6    A.  He wanted to come to New York and put together some video

7    clips of the location and some interviews with Jonathan.

8    Q.  Who is the Jonathan referring to?

9    A.  Jonathan Black.

10            THE COURT:  He was coming from the U.K.?

11            THE WITNESS:  I think -- I'm not sure where he was

12   coming from, but I think he's U.K. based, yes.

13   Q.  Did you want to meet with David Lilley?

14   A.  No.

15   Q.  You mentioned this e-mail was forwarded to you.  Can we see

16   that forward.  Who was it forwarded from and to?

17   A.  It was forwarded from Jim to myself and to Neil Storey who

18   was copied in.

19   Q.  What did the defendant write here?

20   A.  "Guys, how do we feel we can overcome the Jonathan issue?

21   He's on honeymoon" question mark.

22   Q.  What did you understand the defendant to mean when he wrote

23   about the Jonathan issue?

24   A.  Well, the Jonathan issue as in Jonathan or myself couldn't

25   appear on a video, when a photo of Jonathan Black is already on

1   LinkedIn and doesn't look anything like me, so let's come up

2   with an excuse why Jonathan can't be there.

3   Q.  What about that line he's on honeymoon?

4   A.  That's his potential idea for an excuse why I can't be

5   there.  Jonathan can't be there.

6   Q.  Did you respond to the defendant's question in a subsequent

7   e-mail?

8   A.  Yes, I think I did.

9   Q.  Let's look at Government Exhibit 135.  Let's just blow up

10  the top half including the honeymoon e-mail.  Could you just

11  walk us through this e-mail beginning with your response.

12  A.  Yes.  "They can meet Sam and Zoe and our new PR.  That

13  should be enough and you guys can keep them occupied."

14  Q.  What did the defendant write in response to that?

15  A.  "Okay.  Would be great to find a way to get you involved

16  but equally understand your reticence.  We will need a story as

17  to why Jonathan isn't there.  You okay to meet up with Neil and

18  I on Tuesday though, right."

19  Q.  And Mr. Haddow, why did you need a story as to why Jonathan

20  isn't there?

21  A.  Because it would be dangerous for Jonathan to be there.

22  Because this guy obviously had every intent to produce a video

23  for his agent network, and his idea was to put Jonathan on that

24  video, and that would have been disastrous.

25  Q.  When the defendant wrote "he's on honeymoon" in quotes, did

1    you understand him to be serious or to be making a joke of some

2    sort?

3    A.   Making a joke of some sort.

4    Q.   Who was on their honeymoon at the time of this e-mail?

5    A.   I was on a honeymoon at the time of the e-mail.

6    Q.   Let's go to Government Exhibit 136.  And who is on this

7    e-mail and what's the date?

8    A.   That's an e-mail from Neil Storey to David Lilley, copying

9    in Jim Moore and a guy called Dion Jacobs, and Mike from

10   this -- the same business as David Lilley.

11   Q.   Is this a response to David Lilley's request to record some

12   clips with Jonathan?

13   A.   Yes, it is.

14   Q.   Is that request on the bottom?

15   A.   Yes.

16   Q.   Directing your attention to Neil Storey's response.  Who

17   did he arrange to record video clips with David Lilley?

18   A.   He arranged for Sean Phillips to be there instead.

19   Q.   All right.  We can take that down, please.

20         Mr. Haddow, while you were promoting Bar Works with

21   the defendant, in the 2015-2016 time period, what was happening

22   in the FCA's case against you involving African land and carbon

23   credits?

24   A.   The case was still ongoing, so they were -- it started

25   to -- that started to move on to a court case regarding

1  restitution to investors, and to work out who was responsible

2  for some misleading material, misleading statements were in the

3  many brochures that we produced.

4  Q.  Did the FCA provide updates to investors about the status

5  of its case against you?

6  A.  Yes, it did.

7  Q.  Let's pull up Government Exhibit 143 and look at the top to

8  see who this chain is between.

9  A.  So this -- sorry.

10  Q.  Could you identify this e-mail.

11  A.  Yeah, this is from Jim Moore to myself.

12  Q.  What's the subject?

13  A.  "The F word."

14  Q.  What did you understand the F word to be referring to in

15  this e-mail?

16  A.  The F word was the FCA, which is the Financial Conduct

17  Authority in the U.K.

18  Q.  Not the other F word?

19  A.  Not the other F word, no.

20  Q.  Let's go to the bottom on the second page and see how this

21  e-mail begins.  Is that an e-mail from the defendant to you?

22  A.  It is, yes.

23  Q.  What did he write here?

24  A.  "See you're still getting plenty of airplay from these

25  guys, seemingly this one was just last Friday."

1   Q.   What's shown right below that?

2   A.   That's a link to the FCA's website regarding an article on

3   the capital services investment schemes.

4   Q.   Let's look at your response.  What did you say?

5   A.   I said "It's like a stone in my shoe."

6   Q.   What did the defendant say to that?

7   A.   "I get a feeling unfortunately that it's about to turn into

8   a blister.  What entity owns Bar Works Inc."

9   Q.   What was your understanding as to why the defendant was

10  asking you who owns Bar Works Inc. in connection with the FCA

11  lawsuits against you?

12  A.   Well, Jim understood that I was receiving a lot of heat

13  from the FCA, which is obviously likely to continue, which

14  meant that any assets I had would be under risk.

15  Q.   Let's just keep going up on this e-mail chain.  You said

16  the word "probably."

17  A.   Yes.

18  Q.   And then let's go up to the defendant's response.  What did

19  he write here?

20  A.   Jim wrote "I'm off to Spain to kick some ass for a week or

21  two, also in London.  Tons happening and plenty of new starters

22  employed and otherwise.  So at least you should see extra

23  revenue.  Meanwhile, don't scrimp on the lawyers.  It would be

24  helpful if you can get off this one.  Have a good evening.

25  Boarding now."

J653MOO3                              Haddow - Direct

1    Q.  Was it "should" or "it would be"?

2    A.  It would be helpful.

3    Q.  Why would it be helpful -- what does that mean, Mr. Haddow?

4    A.  Helpful so that -- so that, you know, I wouldn't have the

5    stress and the pressure and the potential freezing orders and

6    confiscation orders that usually follow these types of actions.

7    Q.  How did you respond?

8    A.  "Bloody helpful."

9    Q.  Let's go to the next e-mail from Jim Moore.  Can you read

10   this e-mail beginning with the words "just worth considering."

11   A.  Yes.  "Just worth considering a few important points.

12   Great lawyers, good barrister, massive distance to special

13   place (hard to get back)."

14   Q.  Mr. Haddow, what did you understand the defendant to mean

15   when he wrote "massive distance to special place (hard to get

16   back)"?

17   A.  I understood that he was talking about finding a location

18   to disappear off to if things got hot.  And to make, you know,

19   plans that -- you know, contingency plans.

20   Q.  Had you had discussions with the defendant before about

21   making contingency plans and locations other than where you

22   were living?

23   A.  Yes, a few times.

24   Q.  Can you describe the nature of those conversations?

25   A.  Well, they started really because I had my problems with

1   the FCA.  And one of my biggest worries was that I had been

2   banned as a director for eight years.  And potentially I was --

3   could have been looked at as acting as a director whilst being

4   banned in the U.K., and that is a criminal offense in the U.K.

5   So, I was talking to Jim in particular about that situation.

6   And I was discussing, you know, ways of -- if I was living in

7   the U.S., would that protect me, and we were talking about

8   that.  And he said no.  We got something called Europol and

9   Interpol, so that wouldn't protect you.  And we discussed

10  different ideas of, you know, avoiding being arrested, for want

11  of a better word.

12  Q.  Had you discussed any specific countries or means of

13  identification to travel to those countries?

14  A.  Yes.  We talked in general.  I mean, the only specific one

15  I remember is he mentioned to me a scheme that was running in a

16  place called Dominica where they issue separate passports.  And

17  it was just a general conversation, other than that.

18  Q.  What was your understanding of the words "hard to get

19  back"?

20  A.  Hard for whoever is after me to get me back.

21  Q.  We can take that down, please.

22          Did there come a time when you had a falling out with

23  the defendant?

24  A.  Yes, there did come a time.

25  Q.  Can you describe what happened.

1   A.   Yeah, that was around about June 2016.  I think I alluded

2   to earlier that he had -- I found out from my sales director

3   Sam Aura that there was a brochure that his agents had been

4   sending to him, where there was a competing product called Our

5   Space.  And it was opening a first location, I think was in

6   Dubai, with other locations in the same locations as us, New

7   York, San Francisco, etc.  So I was pretty upset by that.  And

8   Sean Phillips was a director of the company, and all the agents

9   were saying that Jim was behind this.  So that resulted in a

10  falling out between the two of us.

11  Q.   What kind of company was Our Space, as far as you

12  understood?

13  A.   Our Space offered a similar concept to us.  It had a

14  coworking space business with also an investment program

15  attached to it, similar to ours.

16  Q.   Prior to your falling out with the defendant, did you have

17  any debates or disputes about agent poaching?

18  A.   Prior to that, we'd had many discussions, a few disputes,

19  mainly discussions about Sam Aura taking agents from UPG, and

20  also Jack Bone taking investors from UPG.

21  Q.   What was your role in those discussions?

22  A.   I was trying to placate the parties and trying to resolve

23  issues between the two.

24  Q.   Mr. Haddow, did you want agents to come over to the Sam

25  Aura side of the table?

J653MOO3                              Haddow - Direct

1    A.  I'd prefer if they were over there than over at UPG, yes.

2    Q.  Did you mind that Sam Aura was poaching agents from UPG?

3    A.  Not really.

4    Q.  Why did you prefer that?

5    A.  Because the commission was lower with Sam Aura than it was

6    with UPG.

7    Q.  Can you just explain that to us.  What was the commission

8    with Sam Aura and what would you have to pay for UPG?

9    A.  I was paying UPG 65 percent, and I was paying Sam Aura

10   30 percent.

11   Q.  When you say you were paying UPG 65 percent, are you

12   including the defendant's cut as well?

13   A.  I am, yes.

14   Q.  Did you pay all of the invoices sent by the defendant and

15   UPG?

16   A.  No.

17   Q.  Did the defendant try to get you to pay some of those

18   invoices before you had your falling out?

19   A.  Yes, he did, yes.

20   Q.  Let's look at Government Exhibit 160.  Can you just tell us

21   what's going on here?

22   A.  Well, other than the picture, "No, I won't pay your bloody

23   invoice, can't you see I'm drinking."  It was an e-mail from

24   Jim to myself.

25   Q.  When did he send you that e-mail?

1   A.   He sent me that on the 1st of June.

2   Q.   Who is pictured in this e-mail?

3   A.   That's the both of us enjoying a drink somewhere.

4   Actually, I think that was Miami.  I think he was trying to

5   appeal to my -- my -- pull my heartstrings.

6   Q.   Did that work?

7   A.   No, not really.  Not really, no.

8   Q.   Did you have a discussion with the defendant about him

9   starting a competing business in Our Space?

10  A.   Yeah.  I wouldn't call it discussion, I would call it more

11  of me getting angry with him.

12  Q.   What did you say to him?

13  A.   Well, he called up specifically asking for his invoice to

14  be paid.  And I confronted him with the fact that he had a

15  competing product on the market.  Firstly he said it wasn't

16  him.  Secondly, he then said it was him, but, it wasn't in --

17  in competing locations.  And then I identified that it was the

18  brochure had San Francisco, New York, and Miami in locations

19  that we were planning to open in.  And he said, well, whatever.

20  And just make sure you pay my invoice.

21  Q.   Let's look at Government Exhibit 162.  And let's just zoom

22  in on the first four lines or so.  Is this an e-mail from the

23  defendant to yourself, copying Neil Storey and another account?

24  A.   Yes.

25  Q.   It says, "Hi Renwick.  Hopefully now you've calmed down a

1   bit and stopped the accusations.  You will have worked out that

2   Our Space is not us or me.  Our Space is owned by the guys we

3   approached to help launch Bar Works internationally."

4           Is this related to what you were just testifying

5   about?

6   A.  That's correct, yes.

7   Q.  Let's go to the middle of this e-mail and where it begins

8   with "We shouldn't be competing with Sam or you."

9           I'll just read this and ask you a question about it.

10  The defendant writes "We shouldn't be competing with Sam or

11  you.  He's blatantly stolen from under our noses time and time

12  again, and mate, you've done nothing to stop it.  And you

13  should have.  If anything is unforgivable here, that's it.

14  Deliberately fucking your business partner who helped you put

15  this on the map."

16          Did the defendant and UPG help put Bar Works on the

17  map?

18  A.  Yes.  Yes, they did.

19  Q.  Let's go back out of this e-mail.  How much money did the

20  defendant claim you owed him?

21  A.  About a million dollars.

22  Q.  Did he offer to take a smaller amount as payment?

23  A.  Yes, he did.

24  Q.  How much?

25  A.  From memory, I think he would accept half.  Half a million

1    dollars.

2    Q.  Did you pay him any money that he claimed you owed him?

3    A.  No.

4    Q.  Did he make any statements about what might happen next if

5    you didn't pay?

6    A.  Yes.  But, there were kind of general, if you don't pay,

7    you know, it will get messy type statements.

8    Q.  Let's pull up Government Exhibit 172 and I just have a few

9    quick questions to you on this one.  While it's getting pulled

10   up, how did Bar Works keep track of investor money?

11   A.  Bar Works had an internal spreadsheet with all the investor

12   deals on and the information on each of the deals.

13   Q.  Were you generally familiar with those spreadsheets?

14   A.  Yes, I was.

15   Q.  Is this a version of one of those spreadsheets?

16   A.  Yes, it is.

17   Q.  Can you just quickly identify what's in the name, date of

18   purchase, broker lease number, and the next column after that.

19   A.  Yes.  So we just take the top one.  On row five, Fabio

20   Cimmenella.  His date of purchase was October 21, broker in

21   this case was Howard.  He purchased one lease for $22,000.  And

22   his first payment due was, rental payment due was November 4.

23   Q.  Let's go to, do you see a column --

24            THE COURT:  Before you do, and what does certificate

25   number mean?

J653MOO3                         Haddow - Direct

1          THE WITNESS:  That's the certificate, you know, the

2     proof of ownership certificate.

3          THE COURT:  That you prepared?

4          THE WITNESS:  Yes.

5          THE COURT:  So each one had a number on it?

6          THE WITNESS:  Yes.

7          THE COURT:  And what about bank name and routing

8     number?

9          THE WITNESS:  So that was where they would want their

10    returns paid to.

11    Q.  Do you see a tab that says turnover by agent?

12    A.  Yes.

13    Q.  What does turnover mean?

14    A.  Turnover is the amount of money invested by investors.

15    Q.  According to this spreadsheet, as of whatever date the

16    spreadsheet was prepared, how much money had United Property

17    Group brought into Bar Works?

18    A.  The total amount was seven and a half million dollars.

19    Q.  Did you have an opportunity to review this spreadsheet

20    before testifying here today?

21    A.  Yes, I did.

22    Q.  In what month did you see the last investor payment come in

23    from investors associated with United Property Group?

24    A.  June of 2016.

25          MR. VAINBERG:  We can take that down, please, thank

1  you.

2  Q.  Did there come a time when United Property Group stopped

3  selling Bar Works?

4  A.  Yes.

5  Q.  Approximately when was that?

6  A.  In June of 2016.

7  Q.  After UPG stopped selling Bar Works, did you continue to

8  raise money from investors?

9  A.  Yes, I did.

10 Q.  How did you do that?

11 A.  Mainly through Sam Aura's network, and network of agents,

12 and through Jack Bone who was running a sales operation for Bar

13 Works.

14 Q.  Did both Sam Aura and Jack Bone know the truth about

15 Jonathan Black and you?

16 A.  Yes, they did.

17 Q.  Did there come a time when Renwick Haddow's involvement in

18 Bar Works became more public?

19 A.  Yes.

20 Q.  When was that?

21 A.  That was in about January 2017, when an article appeared in

22 a real estate magazine in New York.

23 Q.  Generally, what did that article report regarding you?

24 A.  It reported my involvement, it reported that I was also

25 using a pseudonym called Jonathan Black, and reported that I

1    was a Ponzi scheme operator.

2    Q.  Did the article include the LinkedIn profile created for

3    Jonathan Black?

4    A.  Yes, it did.

5    Q.  Was that a LinkedIn profile created by somebody at Bar

6    Works for you?

7    A.  Yes.

8    Q.  I believe you've testified about it, but it didn't have

9    your picture on it, right?

10   A.  It didn't have my picture, no.

11   Q.  What, if anything, did you do to minimize exposure from

12   Jonathan Black in around this time period?

13   A.  We promoted a guy that we'd taken on who was a guy called

14   Frank Kinard.  Frank Kinard was taken on as a marketing

15   manager.  And myself and Sam decided to promote him as the

16   managing director of Bar Works.

17   Q.  What, if anything, happened to the signature on the leases

18   given to investors?

19   A.  Well, Jonathan Black came off most correspondence, and most

20   of the brochures, and Frank Kinard came on in his place.

21   Q.  Just so we're clear, did the defendant have anything to do

22   with Bar Works at this point?

23   A.  No.

24   Q.  Did there come a time when Bar Works stopped making

25   payments to investors?

1    A.   Yes.

2    Q.   When was that?

3    A.   That was probably around May 2017.

4    Q.   Why did you stop making payments?

5    A.   Because after that article, a number of other articles

6    appeared in Crain's and various other places, online in

7    particular.  Agents found out.  Clients found out.  Clients of

8    agents found out.  And we managed to keep them on board to a

9    certain extent, but, after a month or so, the fallout was too

10   much.  So investors stopped putting their money into the

11   product, and by this stage, the rental returns were pretty

12   high, I think they were kind of around a half a million a

13   month.  So, we just got to the point there was no new money

14   coming in to cover those investments, and obviously there was

15   no memberships to cover them, and we had to close shop.

16   Q.   Did you leave the United States at some point in June of

17   2016?

18   A.   I did, yes.

19   Q.   Where did you go?

20   A.   I went on a roundabout trip back to the U.K.  I started off

21   going to the Bahamas, and then I flew to the U.K.

22   Q.   Did you stay in the U.K.?

23   A.   I stayed in the U.K. for a week.  I was with my kids.  And

24   then I flew to Morocco for a short trip.

25   Q.   Did there come a time when you had learned that you were

1   charged with crimes in connection with Bar Works?

2   A.  Yes.

3   Q.  Where were you when you learned that?

4   A.  I was at the airport in Morocco, in Casablanca, ready to

5   fly back home to the U.K.

6   Q.  How did you learn that you were charged with crimes in

7   connection with Bar Works?

8   A.  When I managed to get a wi-fi reception, the first message

9   that popped up was from my wife, saying FBI, don't go back to

10  London.

11  Q.  What did you understand her to mean?

12  A.  I was in deep shit.

13  Q.  Where was the FBI?

14  A.  They had just raided her house or our house in the U.S.

15  Q.  What did you do after learning that the FBI was raiding

16  your house and there were charges against you?

17  A.  Well, my first reaction was call my lawyer.  My second

18  reaction was go to my house in Morocco.

19  Q.  Do you have property in Morocco?

20  A.  Yes.

21  Q.  And did there come a time when you were arrested?

22  A.  Yes, there was a time.

23  Q.  When was that?

24  A.  That was on the 26th of July, 2017.

25  Q.  Where were you arrested?

1  A.  I was arrested in a place called Tangier in Morocco.

2  Q.  What happened to you after that?

3  A.  After nine months in a very unpleasant prison in Morocco, I

4  was finally extradited back to the U.S.

5  Q.  Have you been in custody ever since you were arrested in

6  Morocco in July of 2017?

7  A.  Yes, I have.

8  Q.  Let's pull up Government Exhibit 143.  And directing your

9  attention to the portion of the e-mail where the defendant

10  writes "A few important points.  Great lawyers, good barrister,

11  massive distance to special place (hard to get back)."

12      Did you consider Morocco to be a special place that

13  would be hard to get you back from?

14  A.  Yes.

15      MR. VAINBERG:  Nothing further at this time.

16      THE COURT:  Okay.  Counsel, did you want to start

17  cross or?

18      MR. GARVIN:  Your Honor, in view of the fact that it

19  is the noontime, instead of starting and stopping, I'd

20  appreciate if we could break at this time.

21      THE COURT:  Is that okay with you?  We'll take lunch

22  now.  It's five past 12, and we'll pick up at five past

23  1 o'clock with the cross-examination.

24      (Jury excused)

25      (Continued on next page)

J653MOO3

1          THE COURT:  Mr. Garvin, did you work out lunch

2     yesterday?

3          MR. GARVIN:  Yes, your Honor.  I have a request for

4     the Court though.  Your Honor, if it would be permissible, I'd

5     like to stay in the courtroom during the lunch recess.  Because

6     I have access to the computer, and organize my thoughts so that

7     things move more smoothly when the jury comes back.

8          THE COURT:  I think that will be okay.  We have

9     somebody here during the lunch break.

10         MR. GARVIN:  Thank you.

11         THE COURT:  See you at five past 1.

12         (Recess)

13         (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

                        AFTERNOON SESSION

                            1:15 p.m.

1          (In open court; jury present)

2          THE COURT:  Mr. Garvin, we will begin with

3   cross-examination at this time.

4          MR. GARVIN:  Thank you, your Honor.

5          THE DEPUTY CLERK:  Sir, I'd like to remind you you're

6   still under oath.

7          THE WITNESS:  Okay, thank you.

8          MR. GARVIN:  Good afternoon, ladies and gentlemen.

9   CROSS-EXAMINATION

10  BY MR. GARVIN:

11  Q.  Good afternoon, Mr. Haddow.

12  A.  Good afternoon.

13  Q.  Mr. Haddow, my name is David Garvin.  I represent Mr. Moore

14  in this case.

15  A.  Okay.

16  Q.  Mr. Haddow, I'd like to start by asking how much have you

17  rehearsed for your testimony here before the ladies and

18  gentlemen of the jury?

19  A.  I haven't rehearsed.  There was no rehearsing.

20  Q.  Sir, you have met with the government in this case; isn't

21  that correct?

22  A.  That's correct.

23  Q.  You know that when the government meets with you, they

J653MOO3                              Haddow - Cross

1    prepare notes each time they meet with you; is that correct?

2    A.  I understand that, yes.

3    Q.  You know that those notes are then made available to

4    myself, because I represent Mr. Moore; you know that, right?

5    A.  Yes.

6    Q.  And you know that those notes reflect what you told the

7    ladies and gentlemen that represent the United States.

8    Correct?

9    A.  Yes, correct.

10   Q.  And isn't it an accurate statement to say that you met with

11   the agents in this case approximately 10 times over the last

12   roughly year and a half?

13   A.  It was actually more than that.  But that's -- yes.

14   Q.  When was the last time that you met with the agents in this

15   case?

16   A.  The last time was the weekend, on Saturday.

17   Q.  So, on or about June 3?

18   A.  Yes, on or about.

19        THE COURT:  June 3 was Monday I think.

20   Q.  So June 1st or June 2nd?

21   A.  Yes, approximately.

22   Q.  Sir, isn't it a fact that you went over the questions that

23   would be asked?  Isn't that true?

24   A.  No, we went through the evidence and the exhibits.

25   Q.  Isn't it a fact you also provided what your answers were

1    going to be?

2    A.   I reviewed the evidence, and I gave my understanding to the

3    evidence.

4    Q.   Sir, just so we're clear, the agents, and on occasion even

5    counsel, met with you, correct?

6    A.   Correct.

7    Q.   And when you met with them, you went over the evidence as

8    you just described.  Correct?

9    A.   Correct.

10   Q.   And they asked you questions, correct?

11   A.   Correct.

12   Q.   And you gave them your answers.  Right?

13   A.   I gave them the answers, yes.

14   Q.   And it was not the first time that you were reading these

15   exhibits that you've read today; isn't that true?

16   A.   Yes.

17   Q.   And it was not the first time that you read those exhibits

18   yesterday when you appeared before the ladies and gentlemen of

19   the jury; isn't that correct?

20   A.   That's correct.

21   Q.   In fact, on some occasions, you stopped halfway through a

22   paragraph, without ever being told stop.  Isn't that true?

23   A.   I don't know.  I can't remember, but if you say so.

24   Q.   Isn't it also true, sir, that you lied when you told this

25   honorable court and the ladies and gentlemen of the jury you

1    didn't rehearse, because you certainly rehearsed.

2    A.  No.  That's not true.

3    Q.  The first time that you met with the ladies and gentlemen

4    from the United States was approximately June 30 of 2017; isn't

5    that correct?

6    A.  I don't know for exact, but that sounds about right.

7    Q.  And then you met with them again on May 25 of 2018; isn't

8    that true?

9    A.  Possibly.  I don't have the dates to hand.

10   Q.  You met again with them on May 30 of 2018; isn't that true?

11   A.  Again, I can't confirm.

12   Q.  Isn't it also true that you met with them again in June of

13   2018, on or about June 14.  Isn't that true?

14   A.  Possibly, yes.

15   Q.  You met with them in July; isn't that right?

16   A.  Possibly.

17   Q.  I'm sorry, I can't hear you.

18   A.  Possibly.

19   Q.  In August; isn't that true?

20   A.  Again, possibly, yes.

21   Q.  And September 17, 2018; isn't that true?

22   A.  Again, possibly.

23   Q.  In October, isn't that true?  October 2018?

24   A.  If you have the date there, yes.

25   Q.  Well, sir, do you remember being there and answering

J653MOO3                         Haddow - Cross

1    questions, going over the evidence, in October of 2018 with the

2    ladies and gentlemen from the United States?

3    A.  I remember -- of course I remember being with them, but I

4    can't confirm the date.

5    Q.  But the other dates you were able to recognize?

6    A.  No, not really, no.  I'm in prison.  I don't remember the

7    dates as well as you have there.

8    Q.  Well, sir --

9             MR. GARVIN:  Please forgive me.  I'm turning on the

10   Elmo.  There we go.

11            Your Honor, this is not in evidence but is for a

12   demonstrative only.  I may seek permission to place something

13   on the Elmo just for demonstrative purposes.

14            THE COURT:  Prepared by?

15            MR. VAINBERG:  We just ask for an opportunity to see

16   what it is.

17            (Counsel conferring)

18            MR. GARVIN:  I'll do it a different way since there

19   seems to be an issue.

20   Q.  Sir, when you were testifying, you remembered all the

21   dates, didn't you?

22   A.  What dates are you talking about?  Meeting dates?

23   Q.  The dates, for example, that you met with James Robinson

24   from UPG, and David Kennedy from UPG.  You knew that date,

25   right?

1    A.  No, I never set it in the date.  I always remembered it was

2    roughly in November.  My dates have always been roughly because

3    I can't be sure the exact dates.

4    Q.  Sir, would it surprise you that virtually four out of five

5    dates that I just told you, you did not visit with the ladies

6    and gentlemen of the jury -- excuse me, with the ladies and

7    gentlemen of the government?

8              MR. VAINBERG:  Objection.

9              THE COURT:  I'm sorry, I didn't understand that.

10             MR. GARVIN:  Yes, I'll try to rephrase.

11   Q.  I had asked you moments ago if you had met in July of 2018,

12   August of 2018, September of 2018, and you indicated that you

13   had.  But --

14             THE COURT:  I'm not sure that was the testimony.

15   A.  That wasn't my testimony, no.

16   Q.  Sir, the point is that you have rehearsed over and over

17   again for your testimony here today; isn't that true?

18   A.  That isn't true, no.

19   Q.  All right.  You are currently under arrest; is that

20   correct?

21   A.  Sorry?

22   Q.  You are currently under arrest; is that correct?

23   A.  I'm currently in custody.

24   Q.  Right.  But you have not been sentenced yet?

25   A.  Not yet, no.

J653MOO3                         Haddow - Cross

1   Q.  And you've been charged on four counts?

2   A.  That's correct.

3   Q.  And each of those counts carries a maximum sentence of 20

4   years; isn't that correct?

5   A.  That's correct.

6   Q.  And I believe you told us that you are facing a maximum

7   sentence of 80 years in this case; is that right?

8   A.  That's correct.

9   Q.  But, you also testified that there is a possibility that

10  you'll get what's called credit time served.  Isn't that right?

11  A.  That's correct.

12  Q.  And credit time served means that if you receive that as

13  your sentence, the time that you have been held to date will be

14  deemed sufficient as your sentence; isn't that right?

15  A.  I think that's the definition, yes.

16  Q.  So that would mean no more jail time, right?

17  A.  That's the best case scenario, yes.

18  Q.  And you told us about something called a 5K1.  Do you

19  recall that?

20  A.  I do.

21  Q.  A 5K1 is a special portion of the federal sentencing

22  guidelines; isn't that correct?

23  A.  I think it is, yes.

24  Q.  And isn't it also correct that a 5K1 is a motion that has

25  to be filed by the ladies and gentlemen of the United States?

1   Isn't that also true?

2   A.   That's correct.

3   Q.   And what that means is that the defense can't file that

4   motion.  Isn't that true?

5   A.   What do you mean?  I don't understand the question.

6   Q.   Your attorney can't file that motion; isn't that true?

7   A.   My attorney can't, no.

8   Q.   In fact, not even his Honor can file that motion.  Isn't

9   that true?

10   A.   That's correct.

11   Q.   The only people that can file that motion is the

12   government; isn't that right?

13   A.   Yes.

14   Q.   In particular, the United States attorney's office.  Isn't

15   that true?

16   A.   That's correct.

17   Q.   So, the United States attorney's office has authority to

18   sign that motion, but first they have to make a finding that

19   you have provided the government substantial assistance in the

20   investigation or prosecution of another person who has

21   committed a crime.  Isn't that true?

22   A.   That's correct.

23   Q.   So that means that if you came in here and testified that

24   James Moore didn't know that Jonathan Black was fictitious and

25   did not exist, if you said that, that would not qualify for 5K1

J653MOO3                          Haddow - Cross

1   reduction of sentence.  Isn't that true?

2   A.  I don't really understand your question.

3   Q.  You understand, because you've told us that you are hopeful

4   to have a 5K1 motion filed on your behalf.  Isn't that right?

5   A.  Yes, I understand that, yes.

6   Q.  And you're hopeful that if that motion is filed, that this

7   Honorable Court will reduce your sentence, perhaps all the way

8   down to credit time served.  Isn't that true?

9   A.  That's possible, yes.

10  Q.  And it is also true that to qualify for that motion, you

11  have to substantially assist the United States.  Correct?

12  A.  Correct.

13  Q.  You have to substantially assist the United States in their

14  investigation or prosecution of another person who has

15  committed a crime.  Correct?

16  A.  Correct.

17  Q.  That means that if you came in here and said Jim Moore

18  didn't know that you made up Jonathan Black, if you said that,

19  you realize you would not get a motion.

20  A.  Incorrect.  The agreement is that I tell the truth.  That's

21  the overriding agreement.  Whether Jim Moore knew about

22  Jonathan Black or didn't know about Jonathan Black, it's my

23  recollection of the events that are important.

24  Q.  Sir, I want to make sure that I understood your answer.  So

25  your answer to the question is that if you came in here and

1   truthfully said that Jim Moore did not know about Jonathan

2   Black, that would you still qualify for a 5K1 reduction?

3               MR. VAINBERG:  Objection.

4               THE COURT:  I'll allow it.  Go ahead.

5   Q.  Is that your testimony?

6               THE COURT:  You said would qualify?

7               MR. GARVIN:  Yes.

8               THE COURT:  I think you mean in your question "could

9   qualify."

10              MR. GARVIN:  Yes.

11              MR. VAINBERG:  Just for the record, my objection is to

12  the characterization of the word "truthfully."

13              THE COURT:  You think what?

14              MR. VAINBERG:  To the use of the word "truthfully" as

15  vague, compound.

16              THE COURT:  Yeah.

17              MR. GARVIN:  He used --

18              THE COURT:  Go ahead.  Keep going.

19  Q.  Is that --

20  A.  Do you mind repeating the question please after that?

21  Q.  Yes.  You just testified that if you -- let me rephrase.

22              You've advised us that you are required to testify

23  truthfully.  Correct?

24  A.  That's correct.

25              (Continued on next page)

1    BY MR. GARVIN:

2    Q.  And I asked you if you truthfully said that Jim Moore was

3    not guilty because he did not know that Jonathan Black did not

4    exist, you would not qualify for a 5K1 because that would not

5    be considered a person who committed a crime, correct?

6              MR. VAINBERG:  Objection.  Compound.

7              THE COURT:  Sustained.  Sustained.

8    Q.  Sir, it would be fair to say that you have decided that

9    your best way to get a reduced sentence -- perhaps all the way

10   to credit time served -- is to say that you told Jim Moore that

11   you were Jonathan Black; isn't that true?

12   A.  No, that's incorrect.

13   Q.  Sir, do you have any proof that you told Mr. Moore that you

14   were Jonathan Black?

15   A.  There are many confirming e-mails where we both slipped up

16   on e-mails between the two of us.  I think there is ample

17   confirmation within the e-mail correspondence between the two

18   of us that Jim Moore clearly knew of Jonathan Black, that

19   Jonathan Black was myself.

20   Q.  Sir, is there an e-mail where you write I am Jonathan

21   Black?

22   A.  There would never be an e-mail like that.

23   Q.  You told the ladies and gentlemen of the jury that there

24   was a telephone call.  Do you recall that?

25   A.  Yes.

1    Q.  What was the date of that telephone call?

2            THE COURT:  Of which telephone call?

3    Q.  The telephone call in which he asked you are you Jonathan

4    Black.  Do you recall that, sir?

5    A.  I do recall that, yes.

6    Q.  And when was that?

7    A.  I think it's very unrealistic that you request me to give

8    you dates, specific dates.  I'm not able to do that, but I can

9    give you a rough idea of when that would be.  But, you know,

10   it's three years ago since then, and even if you had asked me

11   three weeks after the phone call, I still wouldn't give you the

12   date, just like we couldn't work out what day Monday was when I

13   was last with the prosecutor.

14   Q.  Sir, I want to try to move on from this area, but I would

15   like to ask you how old are you now?

16   A.  50.

17   Q.  50 years old, sir?

18   A.  50 years old, yes.

19   Q.  And as you told us earlier during your direct examination

20   your maximum sentence is possibly 80 years; is that correct?

21   A.  Yes, that's correct.

22   Q.  And if that happened, that would be the equivalent of life

23   in prison; isn't that correct?

24   A.  That's correct.

25   Q.  And you would agree, would you not, that no one wants to go

1 to prison for that period of time, correct?

2 A.  Correct.

3 Q.  And so you're not neutral in this case.  You have a bias in

4 this case for the government; isn't that true?

5 A.  I don't know about the word bias, no.

6 Q.  You're hoping that the government wins in this case because

7 that increases your chances of getting your 5K1; isn't that

8 true?

9 A.  Incorrect.  It makes no difference to me whether the

10 government wins or loses this case.

11 Q.  Let's talk about your history a little bit, sir.  You were

12 involved in the company called Branded Leisure?

13 A.  That's correct.

14 Q.  And is it fair to say that Branded Leisure raised money?

15 A.  It did, yes.

16 Q.  And is it fair to say that Branded Leisure raised

17 approximately 1.2 million pounds?

18 A.  That's right.

19 Q.  And that's roughly a million and a half dollars; is that

20 correct?

21 A.  That's correct.

22 Q.  And is it also fair to say that the investors who put up

23 that money lost all of it?

24 A.  That's correct.

25 Q.  But you kept part of it for your lifestyle; isn't that

J657MOO4                          Haddow - Cross

1   true?

2   A.  That's correct.

3   Q.  And isn't it also true that there was an investigation that

4   started in the United Kingdom as a result of Branded Leisure?

5   A.  That's correct, yes.

6   Q.  So, the net result of that investigation was that you

7   received a ban from being a director in the UK; isn't that

8   right?

9   A.  That's correct.

10  Q.  Now, during this period of time, in or about -- would this

11  be in or about 2006 when you were first banned by the

12  Department of Trade and Industry?

13  A.  No, it was in and around 2008.

14  Q.  OK.  And when did you operate Branded Leisure?

15  A.  That was in operation around 2002.

16  Q.  So when did Branded Leisure go out of business?

17  A.  Around maybe 2003.

18  Q.  And was there litigation that followed?

19  A.  Litigation -- yes, there was litigation with the Insolvency

20  Service.

21  Q.  And did you attend any of the hearings?

22  A.  Yes, I attended a few hearings, yes.

23  Q.  And as a result of those hearings, were you ever requested

24  to testify?

25  A.  No, I accepted a ban.

1   Q.  And the reason why you accepted the ban, sir, was because

2   you had in fact violated the law; isn't that correct?

3   A.  That's correct.

4   Q.  And during that period of time you did not know Jim Moore;

5   isn't that true?

6   A.  That was prior to knowing Jim Moore, yes.

7   Q.  When you met Jim Moore, did you know where Jim Moore had

8   previously worked?

9   A.  I did, yes.

10  Q.  Were you aware of Inside Track seminars?

11  A.  Yes, I was.

12  Q.  And were you also aware of the sister company Instant

13  Access Properties?

14  A.  At that time I don't think I knew of Instant Access

15  Properties, no.

16  Q.  Did there come a time when you learned that between 2000

17  and 2006 over 30,000 properties were sold by those companies?

18  A.  I didn't know the exact figures.

19  Q.  Well, you knew it --

20  A.  I knew it was a very successful business, yes.

21  Q.  When did you start to do Rooms To Invest?

22  A.  I started that around 2008.

23          THE COURT:  Is it rooms plural?

24          THE WITNESS:  No, room single.

25  Q.  Room To Invest?

1   A.   Room To Invest, yes, single.

2   Q.   You stated to the ladies and gentlemen that Jim Moore

3   contacted you about some land that he had in Barbados; is that

4   correct?

5   A.   That's not correct.  I was introduced to Jim Moore through

6   a mutual colleague of ours called Steven Quayle.

7   Q.   And when did the subject come up of the Barbados land?

8   A.   In our first meeting together.

9   Q.   And can you tell the ladies and gentlemen how many meetings

10  did you have with Jim Moore about that?

11  A.   I can't give you an exact number, but we did meet.  We met

12  a couple of times initially, and then he came to my office,

13  which was -- we met actually down the street from my office,

14  which was in a place called Old Street in a coffee shop there,

15  and then at some stage later, maybe a few weeks, maybe a month,

16  he came to look at my operation, and he also sent me over the

17  plan for the property, like a mock-up of what it was going to

18  look like and how many rooms the property looked like it was

19  going to have.

20  Q.   So, this was preconstruction.

21  A.   It was all preconstruction, yes.

22  Q.   And what year did you say this was?  I believe you just

23  testified on direct examination it was approximately 2009?

24  A.   Yes, approximately.

25  Q.   And in 2009 how many times was Jim Moore physically in your

1  presence?

2  A.   How many times?  Well, under ten and over five.

3  Q.   So you're saying approximately a handful of times?

4        THE COURT:  Between five and ten.

5  Q.   Is that right?

6  A.   Yes.  He came to our Christmas party, that was one of them.

7  You know, there was a few occasions, social occasions.  He was

8  known by my staff.

9  Q.   And at that time did you know where Jim Moore lived?

10  A.   Yes, he lived in Surrey, he told me, with no furniture.

11  Q.   Now, is it accurate to say that you got at some point

12  involved in selling African Land?  Is that correct?

13  A.   That's correct.

14  Q.   And let me be clear, ultimately you turned down the

15  proposal that Jim Moore had for the hotel in Barbados; isn't

16  that correct?

17  A.   I did turn that down, yes.

18  Q.   And he went his way and you went your way, correct?

19  A.   Not correct, no.  He continued -- he asked me -- he liked

20  the project Room To Invest as a brand and as a concept, and he

21  suggested a partnership where he would help me restructure the

22  product and introduce me to certain individuals and certain

23  third parties who could sell the project.

24  Q.   OK.  And did you pay Mr. Moore for working?

25  A.   I paid him a share of the profits, yes.

1    Q.  Do you have those bank records, sir?

2    A.  I don't have those bank records, no.

3    Q.  Well, do you have any business records that reflect that?

4    A.  Well, unfortunately this was over ten years ago and the

5    company has gone bankrupt.  I unfortunately ended up in a

6    federal prison here, so, no, I don't have any bank statements

7    handy at this precise moment.

8    Q.  How about e-mails?  We've seen lots and lots of e-mails in

9    this case.  Do you have any e-mails?

10   A.  There would be e-mails present, but I haven't seen any

11   evidence, but there were definitely e-mails, and there were

12   many WhatsApp communications, and there were very, very --

13   there was a huge amount of telephone calls, and no doubt you've

14   seen the WhatsApp communications.

15   Q.  At some point in time the Room To Invest project that you

16   had ended; is that correct?

17   A.  That's correct, yes.

18   Q.  And what year was that?

19   A.  That was -- after Jim -- after Jim left, we phased it out

20   really, because we were focused on the African Land project.

21   So, I would say roughly 2010.

22   Q.  Now, the African Land project, in that project you also

23   used false projections; isn't that true?

24   A.  That's correct.

25   Q.  You also falsely used the name of JP Morgan in some of your

1  literature; isn't that right?

2  A.  That's correct.

3  Q.  At some point in time you realized that you had raised

4  approximately 16 million pounds in that venture; is that

5  correct?

6  A.  Yes.

7  Q.  And isn't it true that African Land sales was also a fraud?

8  A.  That's correct.

9  Q.  And isn't it also true that you told Jim Moore all along

10  that the African Land deal was a fraud?

11  A.  I don't recall that conversation.

12  Q.  Did you ever tell Jim Moore that the African Land deal was

13  a fraud?

14  A.  I told Jim Moore the structure of the African Land deal.  I

15  told him why it was such a good pitch to investors.  I told him

16  that it was a simple investment.  But I never gave him the

17  information in terms of the projections were a lie and the

18  historic numbers were a lie, but I did tell him that the

19  structure was based on Carbon Credits, and I did give him

20  information on the overall scheme and why it was a good pitch

21  to investors.

22  Q.  Well, the African Land deal if done properly would not be a

23  fraud, right?

24  A.  Potentially if it was done properly, yes.

25  Q.  And so what you're telling us now is that the information

1  you provided Jim Moore would be also commensurate with a

2  legitimate business; isn't that true?

3  A.  Not really, because behind those figures -- which Jim Moore

4  was also privy to -- were the commissions we were paying

5  salespeople, and the commission we were paying agents.  The guy

6  who introduced us, a guy called Steve Quayle, he knew very well

7  that Steve Quayle was receiving 55 percent commission on those

8  land deals.  That, plus the share to me and the share to my

9  business partner, meant there was very little left to run the

10 business.  So, it didn't take a rocket scientist to work out

11 that with the commissions that one of his best friends was

12 earning, and the money that I was getting, there wasn't much

13 left to run the project.

14 Q.  But the question, sir, was not whether he could figure it

15 out.  When you talked to Jim Moore about the African Land deal,

16 you discussed the business as if it was a legitimate business;

17 isn't that true?

18 A.  That's true, yes.

19 Q.  In fact, you maintained to Jim Moore that when it was

20 investigated, that your lawyers had told you that you were

21 going to win; isn't that true?

22 A.  I did tell him that, yes.

23 Q.  And isn't it a fact that you told him that in the end the

24 FCA is going to realize that they made a mistake?  Isn't that

25 true?

1    A.  No, I don't think I said it that categorically.  No, I

2    wouldn't say that, because at the end of the day I had a very,

3    very strong feeling actually that we were going to lose.  What

4    I did say to him is that we received advice at the beginning to

5    say that this wouldn't be a regulated business, but I don't

6    think I speculated too much in terms of the success of the FCA

7    or my success.

8    Q.  Well, did you represent to Jim Moore at any time that you

9    had proven to the FCA that this was not a fraud?

10   A.  I don't recall that, no.

11   Q.  So that never happened?

12   A.  Can you repeat that question?

13   Q.  Yes.  I said, did you tell him at any time that you had

14   proven to the FCA that the African Land deal that you were

15   operating was not a fraud?

16   A.  I don't think I used those words, no.

17   Q.  Did you ever use anything close to those words?

18   A.  I recall talking to Jim about African Land and telling him

19   that I had problems with African Land, and obviously it was all

20   online for him anyway for him to see.

21        By 2009, when we had seen each other, obviously we

22   hadn't been subpoenaed, because obviously the case didn't start

23   until 2013, so it was a little bit premature for me to be

24   discussing African Land as a fraud at that stage.  We were

25   talking more of its potential to be sold to investors and, you

1    know, with Bar Works.  We weren't talking about the -- we

2    talked about the pitch rather than the reality, and that was

3    the same with African Land.

4    Q.   When you said it was premature at that point, but what

5    about after 2013?  Did you tell him afterwards that you had

6    proven to the FCA that the African Land operation that you were

7    conducting was not a fraud?

8    A.   I'm not sure where you got the word I had told him I had

9    proven.  I don't remember saying that to him, no.

10   Q.   Well, did you ever tell him that the African Land deal was

11   legitimate?

12   A.   He never asked, I never told him.

13   Q.   Did you ever tell him ever that the FCA now realized that

14   the African Land deal you were running was not a fraud?

15   A.   Sorry.  Can you repeat that?

16   Q.   Did you ever tell him that the FCA -- that's the

17   financial -- what does that stand for, by the way?

18   A.   Financial Conduct Authority.

19   Q.   The Financial Conduct Authority, that is the rough

20   equivalent of the SEC in England, correct?

21   A.   Correct.

22   Q.   And did you ever tell him that the Financial Conduct

23   Authority now realized that the African Land deal that you

24   operated was not a fraud?

25   A.   No, I didn't say that.

1   Q.  Sir, I am showing you an exhibit that is Government Exhibit

2   42, and this is an e-mail between yourself and Mr. Moore; is

3   that correct?

4   A.  That's correct.

5   Q.  In the e-mail it says ANAKP.  Do you see that, to?

6   A.  Yes.

7   Q.  And do you know that Anna Karina Pena was Mr. Moore's wife?

8   A.  Yes, I did.

9   Q.  So when you see ANAKP, that's Mr. Moore's wife's name or

10  initials, correct?

11  A.  Yes, that's correct.

12  Q.  And there is a discussion between you and Mr. Moore on

13  November 4, 2015; isn't that correct?

14  A.  Yes, that's correct.

15  Q.  And now in November of 2015 that would be the time that you

16  would be in the United States with Bar Works, correct?

17  A.  Yes.

18  Q.  And you told us before you went to the United States to get

19  a fresh start, correct?

20  A.  Correct.

21  Q.  You wrote to Mr. Moore, "It could be challenged.  If they

22  have the will."

23          And you're talking about another project, but just in

24  general that it could be challenged.  And then Mr. Moore

25  replied, "Couldn't everything?" at which point you answered,

1    "Pretty much.  They use it to close down things they think are

2    a fraud which is what they thought African Land was but turned

3    out it wasn't when they went to court."

4              Do you recall telling Mr. Moore that?

5    A.  That's true, yes.

6    Q.  Isn't it a fact, sir, that you told Mr. Moore that in court

7    it was established that the African Land deal that you were

8    operating was not a fraud?

9    A.  That's correct.

10   Q.  And just so we're clear, if you look at the subject, it

11   says PF and FCA.  That FCA stands for the Financial Conduct

12   Authority, correct?

13   A.  Correct.

14   Q.  That was a complete lie, wasn't it?

15   A.  What was a complete lie?

16   Q.  It was never established that the African Land deal that

17   you were operating was not a fraud.

18   A.  It was never established it wasn't a fraud, no.

19   Q.  In fact it was established that it was a fraud.

20   A.  That's correct.

21   Q.  Isn't that right?

22   A.  That's correct.

23   Q.  Sir, you also went to court in the African Land litigation.

24   Isn't that true?

25   A.  Yes.

1    Q.  And that litigation lasted a considerable period of time;

2    isn't that true?

3    A.  That's true, yes.

4    Q.  Now, was there an entity called Capital Alternatives

5    Limited?  Are you familiar with that entity?

6    A.  I am, yes.

7    Q.  And can you please tell the ladies and gentlemen of the

8    jury what is that entity.

9    A.  Yes, Capital Alternatives was a promotional company that I

10   set up with one other person, and that entity was set up to

11   promote various alternative investments, products like Land and

12   the Carbon Credits products we looked at.

13   Q.  So, the African Land has a relation to Capital

14   Alternatives; is that correct?

15   A.  A relation in that Capital Alternatives was selling that

16   product, yes.

17   Q.  And Capital Secretarial Limited, is that another entity

18   that you are familiar with?

19   A.  Yes, it is, yes.

20   Q.  And would that also have been involved in raising funds?

21   A.  Yes, that was also involved in raising funds.  Not raising

22   funds.  It was actually involved in the receiving the funds.

23   It acted as an escrow agent, for want of a better word.

24   Q.  And would it be accurate to say that there were numerous

25   dates in July of 2017, August of 2017 and a few in September

1   and October of 17 that were held that related to this

2   litigation?

3   A.   That's correct, yes.

4   Q.   And you were named as a defendant in that litigation; isn't

5   that correct?

6   A.   Correct.

7   Q.   And, sir, during this litigation did you have an

8   opportunity to testify?

9   A.   I was unfortunately arrested at that time, so I couldn't be

10  there to testify.

11  Q.   When were you arrested, sir?

12  A.   I was arrested on the 26th of July, 2017.

13  Q.   And had you attended any of the earlier hearing dates?

14  A.   The hearing started a week or so -- it had been on for a

15  week or two before I was arrested, and unfortunately I was

16  marooned in Moracco, so I couldn't be there for the testimony.

17  Q.   And were your lawyers there to represent you?

18  A.   I had no lawyers.  I was going to be personally

19  representing myself.

20  Q.   Ultimately did the High Court of Justice Chancery Division

21  render its decision with regard to that litigation?

22  A.   Yes, it did.

23  Q.   I am showing you what is in evidence as Defendant's Exhibit

24  5083, and I'm going to pan out a little bit so we can see more

25  of it.  Do you recognize this as being the cover sheet of the

1    approved judgment, sir?

2    A.  Yes, that looks like it.

3    Q.  And, sir, in this judgment -- it's quite lengthy, you

4    agree, fair to say?

5    A.  Yes.

6    Q.  It starts at 4988, and it ends several hundred pages later;

7    isn't that true?

8    A.  That's true, yes.

9    Q.  And isn't it a fact that the judge painstakingly goes

10   through all of the elements that were raised during the

11   litigation in this judgment?  Isn't that true?

12   A.  That's true.

13   Q.  And isn't it also true that the judge found that you were

14   guilty of operating a scheme, a collective investment scheme?

15   Isn't that true?

16   A.  That's correct.

17   Q.  And isn't it also true that the court found that in

18   operating that collective investment scheme you had made

19   numerous false representations to the investors?  Isn't that

20   true?

21   A.  That's correct.

22   Q.  Isn't it also true that you were found to have used names

23   of people without their permission, or names of people who

24   simply did not exist; isn't that true?

25   A.  That's correct.

1   Q.  Now, you told us that you had also committed basically a

2   fraud on the FCA because you hid bank statements from the FCA.

3   Isn't that true?

4   A.  That's correct.

5   Q.  And you lied about subleases to the FCA; isn't that true?

6   A.  That's correct.

7   Q.  Now, the fact that the FCA was a law enforcement agency did

8   not stop you from telling lies to the FCA; isn't that correct?

9   A.  That is correct.

10  Q.  And the African Land deal and the Carbon Credits resulted

11  in 16.9 million pounds of investors money being lost; isn't

12  that true?

13  A.  That's true.

14  Q.  And that would be because of the exchange rate that would

15  be pretty close to $20 million United States dollars, isn't

16  that right?

17  A.  That's right.

18  Q.  And, sir, the investors lost almost 100 percent of it,

19  correct?

20  A.  Correct.

21  Q.  However, you took a portion of it; isn't that right?

22  A.  Correct.

23  Q.  And you took a portion of that and you spent it; isn't that

24  right?

25  A.  Correct.

1    Q.  So, that brought you to October of 2014, when you told us

2    that you went to the United States for a fresh start, right?

3    A.  That's right.

4    Q.  So, one of the things that you did for your business was

5    you formed In Crowd Equity in or about December 3, 2014; isn't

6    that right?

7    A.  Yes, that would be about right.

8    Q.  Do you have a concern about the dates?

9    A.  That's probably the date we formed the company, yes.

10   Q.  OK.  I am showing you what is in evidence as Defendant's

11   Exhibit 5005.  Do you see the date, sir, of December 3, 2014?

12   A.  Yes.

13   Q.  And let's pan out a little bit so we can see more of what

14   it is.  It says that this is true and correct copy of the

15   certificate of incorporation of In Crowd Equity, correct?

16   A.  Correct.

17   Q.  And it says that Renwick Haddow residing in New York or

18   having a mailing address in New York is the incorporator,

19   correct?

20   A.  Correct.

21   Q.  And then you have a DocuSign signature; is that right?

22   A.  That's correct.

23   Q.  And so you came to get a fresh start, you formed this

24   company, and then you decided that you were going to sell

25   investments, right?

1   A.  That's correct.

2   Q.  And one of the things that you did was that you ran want

3   ads for employment of sales staff on Craig's List, right?

4   A.  Correct.

5   Q.  And then what you started to sell was Bitcoin Store; is

6   that right?

7   A.  Correct.

8   Q.  Now, sir, Bitcoin Store had no Bitcoins, right?

9   A.  Correct, yes.

10  Q.  A small technicality when you are selling to investors of

11  Bitcoin Store?

12  A.  A big technicality, yes.

13  Q.  So Bitcoin Store was just a complete fraud?

14  A.  Yes.

15  Q.  And you knew it.

16  A.  I did.

17  Q.  And In Crowd Equity was selling it.

18  A.  Correct.

19  Q.  Isn't that right?

20  A.  That's correct.

21  Q.  And you were lying to investors again, right?

22  A.  That's correct.

23  Q.  So, the question is:  In your mind, what kind of fresh

24  start was this?  Was it a fresh start that you give up your

25  problems in England, come to the United States and be a

J657MOO4                          Haddow - Cross

1   law-abiding citizen?  Was that the idea?

2   A.  It wasn't a very good fresh start.

3   Q.  Or was it simply let's find someplace where I can fleece

4   more investors?  Would that be fair to say?

5   A.  Possibly, yes.

6   Q.  But you will go to great lengths to have a fraud take

7   place; isn't that true?

8   A.  What do you mean a fraud take place?

9   Q.  Well, for example, if you're trying to get money from

10  investors, you are willing to use names of people who don't

11  exist, correct?

12  A.  Correct.

13  Q.  You are willing to use names of friends who don't even know

14  that you're using their name; isn't that correct?

15  A.  That's correct.

16  Q.  I'm sorry, I didn't hear you.

17  A.  That's correct, yes.

18  Q.  So, when you did this In Crowd Equity/Bitcoin transaction,

19  you used the name Gordon Phillips; isn't that right?

20  A.  That's correct.

21  Q.  Now, Jim Moore had nothing to do with this; isn't that

22  true?

23  A.  That's true, yes.

24  Q.  In fact, at this early stage in 2014 you hadn't physically

25  seen Jim Moore in a while; isn't that right?

1    A.  That's true, yes.

2    Q.  And you used the name Joseph Bilkhorn.  Is that a real

3    person?

4    A.  In relation to what?

5    Q.  To the Bitcoin transaction and the In Crowd Equity raise of

6    funds through or for Bitcoin.

7    A.  Can you show me something on that?  I don't recall that

8    now.

9    Q.  How about -- no.

10          The answer is, yes, I can look for it.  The small

11   problem is that the judgment is a few hundred pages long.

12          THE COURT:  Maybe we can come back to it.

13          MR. GARVIN:  Thank you, your Honor.

14   Q.  Sir, I do have something else that might refresh your

15   memory.

16          May I show the witness a document?

17          THE COURT:  Sure.

18          I think he might want to take a look.

19          MR. GARVIN:  Yes, definitely.

20   Q.  Sir, has that refreshed your memory?

21   A.  It has refreshed my memory, yes.  Thank you.

22   Q.  So, we were talking about Joseph Bilkhorn, and that was a

23   name that did not exist -- or the name existed but the person

24   didn't, correct?

25   A.  I think the name and the person didn't exist.

J657MOO4                          Haddow - Cross

1   Q.  And David Armstrong?

2   A.  The name and the person didn't exist there either.

3   Q.  And what about Neil Soloway?

4   A.  The person did exist; the name didn't exist.

5   Q.  OK.

6   A.  Well, what I mean by that is there is such a person as Neil

7   Soloway, but actually he wasn't involved in the company.

8   Q.  OK, so he didn't know.

9   A.  He didn't know.

10  Q.  What about Peter McKay?

11  A.  No, another made-up name.

12  Q.  What about David Burke?

13  A.  Person existed, but he didn't know I was using his name.

14  Q.  So, in your mind what is worse?  Using a person who doesn't

15  exist at all?  Or using somebody's name without their

16  permission?

17              MR. BELL:  Objection.

18              THE COURT:  I'll allow it, if you have an answer.

19  Q.  Can you answer that?

20  A.  Sorry, could you just repeat that again?

21  Q.  Yes.  Sometimes you use the name of a person who didn't

22  exist at all; isn't that true?

23  A.  That's correct, yes.

24  Q.  Sometimes you use the name of a person who existed but you

25  didn't tell them, right?

1    A.  Correct.

2    Q.  And you're using that person's name to obtain money through

3    misrepresentations; isn't that right?

4    A.  That's correct.  That's correct.

5    Q.  I'm going to take a moment, sir, to show you Defendant's

6    Exhibit 5009, which is basically an offering memoranda to raise

7    funds; is that correct?

8    A.  That's correct.

9    Q.  And this offering memoranda has misrepresentations in it,

10   correct?

11   A.  Correct.

12   Q.  And you knew that sales agents would be relying upon the

13   representations in this offering circular; isn't that correct?

14   A.  That's correct.

15   Q.  And you knew that the sales agents were going to repeat

16   what they read in these materials; isn't that true?

17   A.  Correct.

18   Q.  And that's common practice in the industry.  When you send

19   out offering materials you know that there are going to be

20   sales agents that rely upon them; isn't that right?

21   A.  Correct.

22   Q.  You also know that the sale agents are going to then call

23   the investor, and the investor is going to rely upon it; isn't

24   that true?

25   A.  Correct.

J657MOO4                          Haddow - Cross

1   Q.  Despite that, you put in this circular that Joseph Bilkhorn

2   was the chief operating officer and had vast experience, right?

3   A.  Correct.

4   Q.  And you just told the ladies and gentlemen of the jury that

5   Joseph Bilkhorn didn't exist, right?

6   A.  That's correct.

7   Q.  And we have a finance director whose name is David

8   Armstrong, who holds the Chartered Insurance Institute's

9   advanced financial planning certificate.  Do you see that, sir?

10  A.  I can see that, yes.

11  Q.  Again, another person who did not exist, right?  Is that

12  right?

13  A.  Correct.

14  Q.  Sir, but when it came to raising funds for Bitcoin and for

15  having people run In Crowd Equity, you even went so far as to

16  hire an actor to play the role of Gordon Phillips, the CEO of

17  In Crowd Equity; isn't that right?

18  A.  That's correct.

19  Q.  Now, let's take a step back for one second, because we're

20  using a lot of abbreviations that people who aren't in the

21  finance industry might not use every day.  So, what is a CEO?

22  A.  Chief executive officer.

23  Q.  Now, a chief executive officer would be in the hierarchy of

24  most entities the person at the top who would run the

25  day-to-day operations of the business; is that correct?

1   A.  That's correct.

2   Q.  And so some companies have a president; they don't have a

3   chief executive officer, correct?

4   A.  Right.

5   Q.  But if you have a chief executive officer, that person is

6   generally regarded to be at the top of the pyramid of the

7   hierarchy, right?

8   A.  Correct.

9   Q.  So, in this case Gordon Phillips, if he was listed as the

10  chief executive officer, he would be at the top, right?

11  A.  Right.

12  Q.  Now, that doesn't mean that Gordon Phillips is an owner,

13  correct?

14  A.  Correct.

15  Q.  The owner is something different, right?

16  A.  Right.

17  Q.  You can be an owner and not be involved in the official

18  operations of the company; isn't that correct?

19  A.  That's correct.

20  Q.  In fact, often big companies, if the owner has a problem,

21  he steps down as an officer but he remains an owner of the

22  company; isn't that true?

23  A.  Yes, that can happen, yes.

24  Q.  And in fact I think that somebody said the owner of Uber

25  recently stepped down.  Are you aware of that?

1  A.  Yes, I am, yes.

2  Q.  But he remains the owner of Uber, right?

3  A.  Well, he's not the owner, but he has a number of shares,

4  yes.

5  Q.  OK.  And so the fact that you were the owner of Bar Works

6  does not make Bar Works an illegal company; isn't that true?

7  A.  No.

8  Q.  The truth is that you can be the owner, but if you're going

9  to send out private placement memorandums and offering

10  materials, you have to be honest to the investor as to who is

11  in charge of running the company; isn't that right?

12  A.  I think you need to be honest about who is running the

13  company and who is the owner, yes.

14  Q.  There is no requirement in the private placement memorandum

15  to list who the owner is; isn't that true?

16  A.  I don't know that.  All I know is it's a material fact that

17  investors would probably want to know.

18  Q.  So, let's go back to Gordon Phillips.  You hired off

19  Craig's List an actor to pretend that he was Gordon Phillips,

20  the CEO of In Crowd Equity; isn't that true?

21  A.  No, you're getting slightly mixed up.  Gordon Phillips

22  relates to the Bitcoin Store.

23  Q.  I stand corrected, thank you.  So let me say that.  Bitcoin

24  Store's CEO was Gordon Phillips, correct?

25  A.  Correct.

1   Q.  And you knew that there was no such person as Gordon

2   Phillips.

3   A.  I did, yes.

4   Q.  And so you hired an actor from Craig's List to play the

5   part of Gordon Phillips the CEO; is that right?

6   A.  Correct.

7   Q.  And then you wrote a script for the actor to follow,

8   correct?

9   A.  Correct.

10  Q.  And then you filmed that; isn't that correct?

11  A.  Correct.

12  Q.  Pardon me?

13  A.  Correct.

14  Q.  And then you disseminated that to the public; isn't that

15  correct?

16  A.  Correct.

17  Q.  So, this was just a massive fraud; isn't that correct?

18  A.  That's correct.

19  Q.  Now, you said that at some point in time you got a -- or

20  received a call from Jim Moore in the summer of 2015; is that

21  right?

22  A.  Yes, around about that time.

23  Q.  And in the summer of 2015 Jim Moore did not realize that

24  you were dealing with Bar Works when he made that first call.

25  He was looking to see if you knew sales agents for a land deal

1    that he had called Monterey in Spain; isn't that right?

2    A.  Not entirely, no.  He knew nothing about Bar Works at that

3    time, that's correct.  He knew that I was running In Crowd

4    Equity, and at that time he wasn't interested in my ability to

5    get sales agents, because I didn't really have a huge ability

6    for that.  He was more interested in my floor, the boiler room,

7    selling his project.

8    Q.  So he was interested in whether or not you had sales agents

9    to sell his project.

10   A.  He was interested in whether my sales brokers working for

11   In Crowd Equity were interested in selling his project, yes.

12   Q.  And Jim Moore had never been to In Crowd Equity; isn't that

13   true?

14   A.  By that point, no, he hadn't.

15   Q.  So Jim Moore had no idea what the physical layout looked

16   like because he had never been there; isn't that true?

17   A.  He didn't know it was on the third floor, no, but he knew

18   the operation I was running, yes.

19   Q.  And to be clear, Jim Moore had nothing to do with the

20   operation of In Crowd Equity prior to the time of making that

21   telephone call; isn't that right?

22   A.  That's correct.

23   Q.  I'm showing you now what is Defendant's Exhibit 5014,

24   Starting on page 2.  We were just talking about Monterey, the

25   Monterey Wellness and Spa.  When you talked to Jim, when he

mentioned Monterey, did he talk to you about Monterey Wellness

and Spa?

A.  He didn't -- all I remember is he has always told me about

his land he has in Spain.  At that point he never really gave

me the name of the project.

Q.  OK.  Well, did you receive these materials?

A.  Yes, I did.

Q.  OK.  And at some point you had a chance to look through the

materials; is that correct?

A.  Yes, briefly.

Q.  And the bottom line was that you were not interested in

Monterey as a project; correct?

A.  That's correct.

Q.  And now you told Jim that you were keen to do the Bar Works

business; is that correct?

A.  Do you want to rephrase that?

Q.  Yes.  You turned down Jim's Monterey project, but you

mentioned to Jim your Bar Works project.

A.  That's correct.

Q.  And Jim was excited to hear about your Bar Works project;

isn't that right?

A.  That's correct.

Q.  And isn't it a fact that after you told him about it he

went and researched it a little bit; isn't that right?

A.  Probably.

J657MOO4                     Haddow - Cross

1   Q.  Well, he wrote you an e-mail saying that he had done some

2   research and had looked up We Works; isn't that right?

3   A.  That sounds correct, yes.

4   Q.  And when he saw We Works and he saw the growth of We Works,

5   he told you he'd like to be a participant in this project,

6   right?

7   A.  Well, he actually told me that when we first discussed it,

8   he was very interested.  And I was the one who told him about

9   the We Work and how We Work was so successful.  So, yes, he did

10  further research afterwards.

11  Q.  OK.  And so let's be clear for the ladies and gentlemen of

12  the jury.  At this point in time you are presenting this as a

13  legitimate business; isn't that right?

14  A.  That's correct.

15  Q.  At this point in time you're not saying to Jim Moore,

16  listen, let's go do a huge fraud.  Isn't that right?

17  A.  No.

18  Q.  So, Jim Moore became excited about it, and isn't it true

19  that Jim Moore told you that he did not want to be just a mere

20  sales agent, right?

21  A.  That's correct.

22  Q.  He told you that, look, I can do a lot more than just round

23  up sales agents; I want to be an equity partner.  Isn't that

24  right?

25  A.  Business partner I think was his phrase.

1    Q.  And isn't it true that you did reach an agreement in

2    principle with Jim Moore that he could be a part owner; isn't

3    that right?

4    A.  Yes, without the word "principle."  We shook hands on a

5    deal.

6    Q.  But let's be clear.  That equity, Jim Moore never received

7    it; isn't that true?

8    A.  That's correct, yes.

9    Q.  And you charged Jim Moore for that equity; isn't that true?

10   A.  That's correct.

11   Q.  But, in the end, you never gave it to him, right?

12   A.  That's correct.

13   Q.  And so, at some point in time, Jim Moore basically started

14   pleading with you to sit down and put something in writing;

15   isn't that true?

16   A.  He -- he did send me quite a few e-mails asking me to send

17   him paperwork over for the equity, yes.  The pleading, it was

18   separate.  The pleading was to be paid on his invoices.

19   Q.  And at the end, you didn't pay on the invoices, correct?

20   A.  I did pay on invoices.  I didn't pay on the last.

21   Q.  That's why I said the end.

22   A.  That's correct.

23   Q.  But for the ones you did pay on, you reduced as payment for

24   the equity, correct?

25   A.  Yes, and other deductions, yes.

J653MOO5                          Haddow - Cross

1   Q.  And that you never gave to Mr. Moore?

2   A.  Never gave --

3   Q.  You never gave any stocks or anything in writing that he

4   had any of the equity.

5   A.  We had an agreement, we had agreed in writing.  What he

6   didn't have was the actual shares certificate.

7   Q.  And you never issued it?

8   A.  I never issued a shares certificate.

9   Q.  Now, you told the ladies and gentlemen of the jury that one

10  of the first telephone calls that you had with Jim, he asked

11  you who Jonathan Black was, and you told him it was you?

12  A.  Hmm.

13  Q.  Is that correct?

14  A.  That's correct.

15  Q.  And that would have been early on, some time in August or

16  September, but definitely no later than October of 2015.

17  Correct?

18  A.  Correct.

19  Q.  And it's your testimony here today that you did not tell

20  him that Jonathan Black was somebody that you recruited because

21  you realized that, with your history, you had to stay out of

22  the limelight or the project would never be a success.  You

23  never told him that, correct?

24  A.  Repeat that first part of the question?

25  Q.  Yes.  You did not tell him that you recruited Jonathan

J653MOO5                           Haddow - Cross

1    Black, correct?

2    A.  I did not tell him that he was a real person, yes.

3    Q.  And you did not tell him that the reason why you recruited

4    Jonathan Black was because you realized, with your reputation,

5    if the company was going to be a success, you could not be an

6    officer.  You never told him that, right?

7    A.  I explained to Jim Moore that the reason why I was using

8    the name Jonathan Black was for the reasons you just mentioned.

9    Q.  Sir, at that time, you had never met the owners of United

10   Property Group, correct?

11   A.  Correct.

12   Q.  You had never met James Robinson, right?

13   A.  Correct.

14   Q.  You had never met David Honeyman, correct?

15   A.  Correct.

16   Q.  And you had never met the director of United Property

17   Group, David Kennedy; isn't that correct?

18   A.  Correct.

19   Q.  In addition, at that time, you had never met Neil Storey,

20   the former United Kingdom diplomat; isn't that correct?

21   A.  That's correct.

22   Q.  So, Jim Moore, however, told you that the key to get an

23   agreement from United Property Group was to go through Neil

24   Storey.  Isn't that true?

25   A.  No.  Not correct.

1    Q.  Do you remember meeting with the ladies and gentlemen from

2    the government in this case?

3    A.  Yes.

4    Q.  And do you remember discussing, as you've described it, the

5    evidence?

6    A.  Yes.  Yes.

7    Q.  With them?

8           And isn't it a fact that you told them at one of your

9    meetings that Jim Moore told you that it was important to go

10   through Neil Storey to get United Property Group's agreement?

11   A.  Possibly, but that wasn't my recollection.  That isn't my

12   recollection.  I think there is a bigger picture here.  That

13   was only a small part of the whole equation.

14   Q.  I understand there might be other parts, but I'm focusing

15   on this part at this moment.

16          Isn't it true, sir, that Jim Moore told you that it

17   was important to have Neil Storey on board?  Isn't it true?

18   A.  Yes, without United Property Group.  It was important to

19   have Neil Storey on board.  Hence the reason why I met up with

20   him for an hour to explain my background.  But it wasn't

21   imperative, and I don't remember Jim Moore saying it was

22   imperative that he was involved to get UPG on board, because

23   Jim was the one with the 25 percent equity in the company, in

24   UPG.

25   Q.  Did Jim Moore tell you that the person you needed to

1   convince regarding Bar Works was Neil Storey?  Did he tell you

2   that?

3   A.  Not in those words.  He said I want Neil Storey on board.

4   He would be very important, I'm not paying -- you're not paying

5   for him, I am.  Can you meet up with him and give him your, you

6   know, background, just blurt it all out, say your whole

7   history, and you know, and it would be a good thing if he came

8   on board.

9   Q.  All right, sir.  Did there come a time when an agreement in

10  principle was reached with United Properties Group?

11  A.  Yes.

12  Q.  And would it also be fair to say that that occurred in or

13  about the middle of October of 2015?

14  A.  Yes, that's about right.

15  Q.  And isn't it also fair to say that United Property Group

16  then took the package of offering materials that had been

17  provided by Bar Works, and started to call investors?  Isn't

18  that true?

19  A.  That's correct.

20  Q.  Now, isn't it also true that in the very inception of this,

21  you told Jim Moore that he could tell United Property Group

22  that they would have an exclusive?

23  A.  That's correct.

24  Q.  And isn't it also true that that was a lie, because you had

25  already given an exclusive to someone else?

1    A.   That's correct.

2    Q.   So, right off the gates, within the first week or two,

3    United Property Group discovered that you had given an

4    exclusive to someone else.  Isn't that true?

5    A.   That's correct.

6    Q.   And isn't it true that they wrote a letter, an e-mail to

7    Jim Moore, complaining that an independent sales agent had

8    called them, and used your name, Renwick Haddow, and said I'm

9    the one who has the exclusive.  Isn't that right?

10   A.   That's correct.

11   Q.   So, the point here is, Mr. Haddow, it didn't matter to you

12   if you had to lie to United Property Group to get them to bring

13   in investors.  Isn't that true?

14   A.   That's correct.

15   Q.   And it honestly didn't matter to you if you had to lie to

16   Neil Storey to get your project moving forward and get

17   investors to invest in it.  Isn't that true?

18   A.   That's correct.

19   Q.   And it didn't matter to you if you had to lie to Jim Moore,

20   if that's what it took to get your project going and to get

21   investor money.  Isn't that true?

22   A.   That's, yeah, that's true.

23   Q.   In fact, you knew that Sam Aura started, as I believe you

24   used the word "pilferaging," but he started to steal UPG's

25   investors; isn't that true?

1   A.  He started to -- not investors.  He started to poach some

2   of the agents, yes.

3   Q.  The agents that -- UPG was supposed to be the master agent.

4   Correct?

5   A.  That was the agreement, we agreed in principle, yes.

6   Q.  But you know you had given master agent status to other

7   people, correct?

8   A.  Yes, that's true.

9   Q.  So that was a lie, too.  And you knew that the other

10  agents, for example, Sam Aura, was stealing agents from UPG,

11  correct?

12  A.  Correct.

13  Q.  To be honest about it, as of October, you hadn't met James

14  Robinson, right?

15  A.  Not at that point, no.

16  Q.  The owner of UPG.  You hadn't met him?

17  A.  Not at that point.

18  Q.  You hadn't met his partner, David Honeyman; isn't that

19  true?

20  A.  That's correct.

21  Q.  And at that point, you hadn't yet met Neil Storey; isn't

22  that true?

23  A.  That's correct.

24  Q.  So they didn't mean anything to you at that point?

25  A.  What do you mean they didn't mean anything to me?

J653MOO5                          Haddow - Cross

1    Q.  In plain words, you didn't feel that you owed these people

2    anything.  It was simply a business opportunity and you needed

3    to get your company moving.  Isn't that right?

4              MR. VAINBERG:  Objection as to form.

5              THE COURT:  Well, if you can understand the question,

6    you can answer it.

7              THE WITNESS:  Well I don't really understand the

8    question.  Maybe he can --

9              THE COURT:  Rephrase it.

10             MR. GARVIN:  Yes, sir.

11   Q.  You had no long history with these people, so you had no --

12   well, you had no long history with these people, right?

13   A.  Correct.

14   Q.  Mr. Haddow, what was motivating you was an opportunity to

15   get more money for yourself; isn't that true?

16   A.  Correct.

17   Q.  And you have accumulated a lot of assets with investor

18   money; isn't that true?

19   A.  Correct.

20   Q.  For example, you have a boat that's in Miami; isn't that

21   true?

22   A.  It was in Miami.  I'm not sure where it is now, but yes.

23   Q.  Well, that boat is worth almost $2 million; isn't that

24   right?

25   A.  Correct.

1   Q.  I'm showing you what's in evidence as 5010.  Do you

2   recognize this document, sir, as the buying closing statement

3   from Denison Yacht Sales?

4   A.  Yes.

5   Q.  In Fort Lauderdale, Florida?

6   A.  Yes.

7   Q.  Do you see that this is for a yacht?  Is that true?

8   A.  That's true.

9   Q.  And also, was there a slip involved in this transaction?

10  A.  Yes, there was.

11  Q.  And what was the total price of the yacht and the slip?

12  A.  From the looks of this, it looks like two and a half

13  million dollars.

14  Q.  Is that consistent with your recollection?

15  A.  Yes, I think so.

16  Q.  Sir, you paid for that vessel; is that correct?

17  A.  That's correct.

18  Q.  A majority of the money that was used to pay for that

19  vessel was investor money; isn't that correct?

20  A.  That's correct.

21  Q.  You had previously told us that you have a house in

22  Morocco, correct?

23  A.  Correct.

24  Q.  And that house is worth three and a half million dollars,

25  isn't it?

1    A.  Correct.

2    Q.  And again, that house was purchased mainly with investor

3    money; isn't that right?

4    A.  Correct.

5    Q.  You have an apartment in Sandyport in the Bahamas; isn't

6    that right?

7    A.  Correct.

8    Q.  That's worth approximately a million dollars; isn't that

9    true?

10   A.  Correct.

11   Q.  That was acquired by you with investor money, isn't it?

12   A.  It was, yes.

13   Q.  And you also have a boat parked -- not the same boat, a

14   different boat -- parked in the Bahamas, or at least you did;

15   isn't that true?

16   A.  That's correct.

17   Q.  And that was worth $250,000; isn't that right?

18   A.  That's correct.

19   Q.  Again, investor money; isn't that true?

20   A.  Correct.

21   Q.  You have a house in the United Kingdom on Church Road;

22   isn't that true?

23   A.  Yes, correct.

24   Q.  And that house is valued at approximately $1,300,000; isn't

25   that true?

J653MOO5                          Haddow - Cross

1   A.  Yes, correct.

2   Q.  Again, that house was acquired mainly with investor money;

3   isn't that right?

4   A.  Yes, correct.

5   Q.  You have an Aston Martin car.  Isn't that true?

6   A.  Yes.

7   Q.  Approximately $150,000; isn't that right?

8   A.  That's correct.

9   Q.  Again, investor money.

10          Sir, in an attempt to save some time, there's Bahamas

11  bank accounts with approximately 150,000, various other bank

12  accounts with approximately 200,000, a trust worth 600,000, San

13  Francisco property that's worth 1.5 million net of mortgages,

14  house in Ecuador worth 140,000, Istanbul commercial property

15  worth 1.5 million, another house in trust worth 750,000, a home

16  in London, 13 Brook Mews worth approximately $2 million.

17          Is that all true?  You acquired all those assets at

18  some point in time prior to this case?

19  A.  All except the property in Brook Mews North.

20  Q.  Would it be fair to say, sir, that when you add up all of

21  this, except for the property in Brook Mews, you have spent

22  over $5 million, well over $5 million of investors' money on

23  assets for yourself; isn't that true?

24  A.  That's true, yes.

25  Q.  So all of this, all the lies, all the deception, has been

1    for money.  Isn't that right?

2    A.  That's correct.

3    Q.  And now, you have sat there knowing that your testimony in

4    this case may be the difference between getting a 5K1 and not.

5    Isn't that true?

6    A.  Can you rephrase that?

7    Q.  Yes.  You are testifying here today hoping that you will

8    get a 5K1 reduction.  Isn't that true?

9    A.  I'm hoping for a 5K1 letter, yes.

10   Q.  You've told us that your cooperation agreement requires you

11   to tell the truth, and you've also told us that there were only

12   two people on that telephone call in the summer of 2015:  You

13   and Jim Moore.  Correct?

14   A.  Correct.

15   Q.  And you know that Jim Moore has pled not guilty in this

16   case, correct?

17   A.  Correct.

18   Q.  Which means Jim Moore denies what you said, correct?

19   A.  Correct.

20          MR. GARVIN:  Your Honor, I've reached the part where I

21   need to reorganize to save time.  May I ask if this would be an

22   appropriate time to take a break?

23          THE COURT:  Sure, we'll take a short break.

24          (Recess)

25          (In open court; jury present)

1          THE COURT:  We'll continue with Mr. Garvin's

2     cross-examination.

3          THE DEPUTY CLERK:  Sir, again I'd like to remind you

4     you're still under oath.

5          THE WITNESS:  Okay, thank you.

6     BY MR. GARVIN:

7     Q.  Sir, when you were testifying on direct examination, you

8     had indicated that UPG and Jim Moore would occasionally send

9     letters to you that they wanted to come back on Bar Works

10    stationery.  Do you recall that?

11    A.  I do, yes.

12    Q.  If I understood your testimony, I believe that you

13    indicated that when they sent those letters, they knew that

14    Jonathan Black did not exist.  Is that correct?

15    A.  They did know, yes.

16    Q.  So, really what is happening here then, is when they're

17    sending a letter asking for Jonathan Black to sign it, they

18    know that the letter could not possibly have been signed by

19    Jonathan Black, right?

20    A.  Correct.

21    Q.  When I say "they," I'm talking specifically about United

22    Properties Group and Jim Moore, correct?

23    A.  Correct.

24    Q.  And so, one of the documents that I believe you discussed

25    is a Government's Exhibit, Exhibit 69 and this is -- okay.

1    This one is from David Honeyman.  Do you see that?

2    A.  Yes.

3    Q.  And David Honeyman is one of the owners of UPG, correct?

4    A.  Yeah, I think he's involved in UPG, yes.

5    Q.  And they have a request from somebody called Asset Folio.

6    Do you see that?

7    A.  Yes.

8    Q.  And it says "Hi Jim, I know this is a pain in the butt,

9    however just picking up on our e-mail exchange from last week,

10   can you please ask Jonathan to cut and paste the following text

11   on to an official Bar Works letterhead."

12          This is one of those letters, right?

13   A.  Correct.

14   Q.  And when I say "one of those letters," it is one of those

15   letters where they're asking for a letter from Jonathan Black,

16   but they're telling you, or suggesting to you what the language

17   should be.  Correct?

18   A.  Correct.

19   Q.  In this case, it's "To whom it may concern:  I'm happy to

20   confirm that Asset Folio" at an address in Spain, "are

21   authorized agents of Bar Works" and listing the address here in

22   New York.

23          But, at the bottom of the letter, they suggest that it

24   be signed by Jonathan Black, the chief executive officer.  And

25   this is an example of one of those letters that you were

1    referring to earlier, correct?

2    A.   Correct.

3              MR. GARVIN:  I'm sorry, your Honor.  My electronics

4    don't want to react and I don't want to waste time.

5              MR. BELL:  Can we put them up for you?

6              THE COURT:  Sure.

7              MR. BELL:  Do you want one and then the other?

8              MR. GARVIN:  Just bad luck.  I'll try to power forward

9    if I can get it back over to --

10             I apologize.  Do you have a hard copy of 70 and 64?

11             (Pause)

12   Q.   So, I want to talk about the first meeting with Jim was in

13   October of 2015.  That's the first time he came to see the

14   physical Bar Works, correct?

15   A.   Correct.

16   Q.   And then you told us that at some point in time in or about

17   November, there was a meeting in which UPG, David Robinson,

18   came; is that correct?

19   A.   That's correct.

20   Q.   And in addition to David Robinson coming, you also had his

21   partner, David Honeyman, correct?

22             THE COURT:  David --

23             MR. GARVIN:  Honeyman.

24   A.   Incorrect, no.  You mean David Kennedy.

25   Q.   David Kennedy was there, not David Honeyman?

1    A.  Not David Honeyman.

2    Q.  Okay.  And Neil Storey was also at that meeting; isn't that

3    true?

4    A.  Correct, yes.

5    Q.  I'm showing you what is Government's Exhibit 51, and this

6    is an e-mail, and you see it's from Jim Moore, correct?

7    A.  Correct.

8    Q.  And also on the e-mail is Neil Storey, right?

9    A.  Yes.

10   Q.  James Robinson?

11   A.  Yes.

12   Q.  And as you said, David Kennedy?

13   A.  Yes.

14   Q.  And yourself?

15   A.  Correct.

16   Q.  Right?

17   A.  Correct.

18   Q.  And it's talking about that the meeting will be scheduled

19   for November 18.  You see that?

20   A.  Yes, it does say that.

21   Q.  Now, you stated that during that meeting, not much happened

22   on the first day.  Is that true?

23   A.  Well, in terms of they looked at the location, and we

24   discussed -- we discussed the project.  So the "not much

25   happened" is a bit relative.  But nothing significant in

1  terms -- that was the first time I met them, so that was

2  reasonably significant.  It was the first time they saw the

3  property, that was reasonably significant.  The first time they

4  met my wife, Zoia Haddow, that was significant.

5          So there was a few important things that happened at

6  that first meeting, yes.

7  Q.  After that meeting took place, they wrote letters to you

8  thanking you for your hospitality; isn't that true?

9  A.  At the end of the -- at the end of the --

10 Q.  -- trip.

11 A.  End of the trip, yes.

12 Q.  You testified that the next day, you were at dinner when

13 you told them that there was no Jonathan Black.  Is that right?

14 A.  Yeah, I think you are getting a little bit mixed up with

15 the time.

16         So this was the last meeting I had with them at drinks

17 in this restaurant called Tao where I didn't tell them there

18 was no Jonathan Black.  They already knew there was no Jonathan

19 Black.  I was discussing with them what we called the e-mail

20 etiquette in terms of making sure that e-mails didn't go

21 astray, making sure that people didn't send e-mails to me,

22 making sure that we treated Jonathan Black as a real person.

23 So there was no question of talking about me announcing that

24 Jonathan wasn't a real person, because it was well understood

25 before that meeting.

1    Q.  Sir, I think we've gotten our days mixed up, and I

2    apologize, I may have contributed to this.

3    A.  That's okay.

4    Q.  Let me see if I can take us back a little.  There was a

5    meeting that they came to in November, which was the very first

6    time that they were ever in New York for Bar Works.  Isn't that

7    true?

8    A.  That's correct.

9    Q.  And at the meeting, very first time that they were at Bar

10   Works, you went to dinner with them on the first day.  Isn't

11   that true?

12   A.  Correct.

13   Q.  And then after you went to dinner with them on the first

14   day, there was some discussions about Bar Works, but an

15   agreement that you would meet the next day.  Correct?

16   A.  Correct.

17   Q.  And so, those dates would be, as we just saw, consistent

18   with approximately November 19 or November 20.  Correct?

19   A.  Correct.

20   Q.  Now, you stated on direct examination that the location was

21   open as of November 19, so you -- they had never been there

22   before, you showed them the location.  Correct?

23   A.  Correct.

24   Q.  And then you told us that you were having dinner with them,

25   and this is not the meeting at Tao.  And correct me if it is

1    the meeting at Tao.  But that you were having dinner with them,

2    and that's when you told James Robinson and Mr. Kennedy that

3    Jonathan Black did not exist.  Is that right?

4    A.  No, that's incorrect.  You're talking about the Bryant Park

5    dinner, which was the day they arrived.  That subject didn't

6    really come up at all in that meeting.

7    Q.  Okay.  How about the next day; is that when the subject

8    came up?

9    A.  It came up, but not in the way you're suggesting.  It came

10   up, they already knew that Jonathan Black didn't exist.  They'd

11   already been fielding e-mails and working on the basis that

12   there was no Jonathan Black.  It was all Renwick Haddow.  They

13   knew I was the owner.  They met me, they never asked once to

14   meet Jonathan Black.  There is no e-mails to suggest they've

15   asked to meet someone called Jonathan Black, which would go to

16   suggest if anyone worth their credit in this industry would

17   want to promote something, the first person they'd say is can

18   we meet Jonathan Black.

19          So that discussion at Tao was not about whether

20   Jonathan Black existed.  It was all about whether -- or there

21   was a number of other things, but they were very excited by the

22   project.  But the two particular points I recall were the

23   disputes because of the poaching that was going on, poaching

24   some of the agents.  And also, making sure that we were very

25   clear and precise with e-mails that were going out from various

1   e-mail addresses.

2   Q.  So, your testimony, sir, is that James Robinson and Neil

3   Storey and David Kennedy, before they ever met you, knew that

4   Jonathan Black did not exist?

5   A.  Yes.

6   Q.  And your testimony is that people who had never met you

7   before, including a former diplomat from the United Kingdom,

8   were joining in a massive fraud.  Is that your testimony?

9   A.  I wouldn't -- my testimony is that they knew that Jonathan

10  Black did not exist.

11  Q.  Well, let's analyze that for a moment, sir.  When did you

12  tell them Jonathan Black did not exist?

13  A.  Well, we've discussed when I told Jim Moore.  Specifically,

14  I told Jim Moore when he'd received the PPM, the private

15  placement memorandum and the offering documents.  He asked me

16  who it was.  He knew -- I understood he knew the answer to it

17  before he asked me the question, but I told him the answer.

18          After that, it was never raised really again as a

19  subject.  It was assumed.  As far as James Robinson and David

20  Kennedy was concerned, I never had a outright conversation with

21  them directly and said there was no -- there is no Jonathan

22  Black.  It's me.  But, I understood that Jim had had that

23  conversation, and when we had our dinner at Tao, or little

24  drinks at Tao, when I raised the subject of our friend, it was

25  no surprise to them that I was talking about e-mail etiquette,

1    and giving the pretense that Jonathan Black existed.

2            If there was, the other person at that lunch or that

3    dinner would have been Jonathan Black.  Considering I --

4    Jonathan Black wasn't there, it was me, then that would suggest

5    they knew a long -- you know, from a very early stage.

6    Q.  Sir, you said that would suggest.  But on direct

7    examination, you stated that at the Tao dinner, you told them.

8    Now you're telling us that they knew from the beginning.  Is

9    that correct?

10   A.  You've misinterpreted my words.  At the Tao dinner, I made

11   it very clear that we were there to discuss a number of

12   subjects, and the two that I remember are -- the first one was

13   about Jonathan Black's e-mail, and making sure that on all the

14   e-mails we sent to each other, and to other people, Jonathan

15   Black was to be made to look like a real person.  And that we

16   weren't -- we were to start using the Jonathan Black e-mail

17   address, and that we weren't to -- we had to be very careful

18   sending e-mails to the Renwick Haddow e-mail address.

19   Q.  I thought that you told us --

20           THE COURT:  We have a transcript, so you can look at

21   the transcript.

22           MR. GARVIN:  Yes.

23   Q.  So, sir, Neil Storey had never met you before, correct?

24   A.  Correct.

25   Q.  And you did not tell Neil Storey that Jonathan Black did

1   not exist before you met him, correct?

2   A.  Correct.

3   Q.  You did not tell James Robinson that Jonathan Black did not

4   exist before you met him, correct?

5   A.  Not specifically.

6   Q.  You did not tell him that Jonathan Black did not exist; is

7   that yes or no?

8   A.  Well, no, I didn't tell him that.

9   Q.  You did not tell David Kennedy that Jonathan Black did not

10  exist.

11  A.  Correct.

12  Q.  And you're saying that three people that you've never met

13  before, one of them a former diplomat, fly from Europe to New

14  York to inspect Bar Works, and for the first time, you tell

15  them that Jonathan Black does not exist.  Is that correct?

16  A.  Incorrect.

17  Q.  When did you tell them before?

18  A.  At the meeting at Tao, as I said, the subject matter that's

19  relevant to this is the discussion on e-mail etiquette between

20  myself and them and Jonathan Black and them.  Before they even

21  went to Tao, they knew of Jonathan Black's exist -- I was

22  Jonathan Black.

23              (Continued on next page)

24

25

H657MOO6                          Haddow - Cross

1   BY MR. GARVIN:

2   Q.  Well, did you tell them before they went to Tao?

3   A.  I didn't need to tell them.  That was Jim's job; Jim told

4   them.

5   Q.  So you have no idea whether they were told or not.

6   A.  Yes, I knew they knew, because I could see from the e-mails

7   that we were getting that it was clear -- and the WhatsApp

8   messages -- that it was clear -- it was blatantly obvious they

9   knew.

10  Q.  I'm putting back on the Elmo Government Exhibit 69, which

11  we just went over as one of the many letters -- I don't know

12  about many -- but one of the letters that asked for a folio.

13  Do you see the date on that letter?

14  A.  Yes.

15  Q.  November 16 is a few days before they met you; isn't that

16  true?

17  A.  If that date matches up with the visit, then yes.

18  Q.  So before they met you they wrote a letter requesting Bar

19  Works to put on its stationery for Jonathan Black to approve?

20  Isn't that true?

21        MR. VAINBERG:  Objection, your Honor, as to "they".

22        THE COURT:  Sustained.

23  Q.  David Honeyman from United Property Group made a request

24  for a letter from Jonathan Black, correct?

25  A.  Correct.

H657MOO6                         Haddow - Cross

1    Q.   And his conduct in doing this would be consistent with a

2    person not knowing that Jonathan Black did not exist; isn't

3    that true?

4    A.   I think you're getting David Honeyman mixed up with David

5    Kennedy.  David Honeyman isn't one of the cofounders of UPG, to

6    my knowledge.  The two people that knew this were David Kennedy

7    and James Robinson.  David Honeyman was outside that loop of

8    expertise, so it's reasonable to expect him to send an e-mail

9    like that.  But then again if that was coming from David

10   Kennedy, again I would expect an e-mail like that because he's

11   following, you know, the protocol of making sure that Jonathan

12   looks real.

13   Q.   Thank you.  He is following the protocol that you are going

14   to tell him in the future, when he goes to the Tao restaurant

15   three days later; isn't that correct?

16              MR. VAINBERG:  Objection.

17              THE COURT:  Overruled.

18              THE WITNESS:  Sorry.  Could you repeat that?

19   Q.   Yes.  You said to the ladies and gentlemen of the jury he

20   is following the protocol that you established with them.  But

21   the truth is there was no protocol because the Tao restaurant

22   meeting wouldn't have occurred yet; it was going to occur three

23   days later.

24              Everything that you just said was fabrication; isn't

25   that true?

1    A.  Not at all, no.

2              MR. VAINBERG:  Objection.

3              THE COURT:  Overruled.

4    A.  This was protocol for sure.  This was protocol that was

5    firmed up at that Tao meeting.  There was already a protocol in

6    place.  There didn't need to be a firm-up to say let's look

7    Jonathan Black look real.  This was if you're going to send

8    e-mails to each other, you need to make it look real.  So, the

9    Tao thing was just ironing out certain issues that had arisen,

10   certain slip-ups.  You know, there was still a protocol in

11   place beforehand; there was never not a protocol in place

12   before that meeting.

13   Q.  You never talked to these people about Jonathan Black not

14   existing so there could not be a protocol.

15   A.  Of course I was.  I was talking to Jim Moore on an

16   hour-by-hour basis.

17   Q.  And, sir, with regard to your statement that this is David

18   Honeyman, you will see that cc'd on this is JR & DK, standing

19   for Jason Robinson and David Kennedy?  Isn't that correct?

20   A.  That's correct.  But David Honey was sending the e-mail, so

21   I would expect this e-mail from David Honeyman because, as I

22   said, he was not in the know, he was not at the meetings, and

23   he was not one of the owners of UPG.

24   Q.  And just so we can make sure that our dates are right, we

25   see that this says November 16, 2015, correct?

1    A.   Right.

2    Q.   That is Government Exhibit 69.

3    A.   Correct.

4    Q.   And we see government's 51 is dated November 6 and makes

5    the arrangements for the meetings on Thursday, November 19,

6    correct?

7    A.   Correct.

8    Q.   And November 19 obviously is three days after November 16,

9    correct?

10   A.   Correct.

11   Q.   And, therefore, this alleged protocol as you've described

12   it at Tao restaurant could not have happened as of November 16,

13   because they had not arrived; isn't that true?

14   A.   That's incorrect.

15   Q.   And it could not have happened at Tao restaurant because

16   Mr. Robinson had not arrived at Tao restaurant yet; isn't that

17   correct?

18   A.   Mr. Robinson had not arrived?  I don't understand that

19   question.

20   Q.   Well, he had not arrived in New York yet.

21   A.   But there are two sides to this.  There is the preprotocol

22   meeting -- sorry.  There is the meeting at Tao restaurant.

23   Then there is the meeting -- then there is the general

24   discussions that went on through Jim and the UPG guys, and the

25   Tao restaurant thing was formalizing that.

1  Q.  Sir, I'm going to show you now what is Defendant's Exhibit

2  43.  And there was a question and it said, "Just to clarify,

3  like to set up that call for Julian.  He is quite flexible, so

4  if you let me know what time/day suits JB, bearing in mind

5  Julian is in Sweden at present, it would be appreciated."

6         Do you recall discussing this e-mail during your

7  direct examination?

8  A.  Yes, I do.

9  Q.  And there is an answer that was written -- or a question

10 that says, "Just to clarify when you said JB do you mean

11 Jonathan Black?"  Now, this is James Robinson writing this;

12 isn't that true?

13 A.  That's correct.

14 Q.  And you wrote back to him, "Yes Jonathan.  How about

15 Tuesday?"  Isn't that correct?

16 A.  That's correct.

17 Q.  Now, sir, who all was receiving this e-mail?  Would it be

18 fair to say that the only two people that we see here are

19 yourself and Jonathan Robinson?

20         THE COURT:  James Robinson?

21 Q.  James Robinson.

22 A.  Correct.

23 Q.  Who wrote this portion of the e-mail?

24 A.  That last answer is mine.

25 Q.  "Whoever you think" --

1    A.  No, the one below that is mine, sir.  "Yes JB."

2    Q.  Well, let's read what James Robinson said.  "I would

3    appreciate a phone call, or conference webinar with Bar Works

4    to speak directly with them?"  And then James Robinson wrote,

5    "Whoever you think has the best quality on the phone your end

6    ..."  Do you see that?

7    A.  Yes.

8    Q.  And your answer was "Yes JB," correct?

9    A.  Correct.

10   Q.  And that's why he says to you, "Just to clarify when you

11   said JB do you mean Jonathan Black?"  Correct?

12   A.  Correct.

13   Q.  There was no request for Jonathan Black specifically.  You

14   volunteered Jonathan Black; isn't that true?

15   A.  Correct.

16   Q.  And that's what you did to make it appear that Jonathan

17   Black existed; isn't that true?

18   A.  Yes, correct.

19   Q.  Now I want to talk to you for a second about Government

20   Exhibit 18.  And Government Exhibit 18 is a document that you

21   went over during direct examination.  Now, this is something

22   that Jim Moore wrote; is that correct?

23   A.  That's correct.

24   Q.  And they're talking about a mini prospectus that they

25   received from Bar Works; isn't that true?

1    A.  Correct.

2    Q.  And at that time Jim Moore states with regard to the mini

3    prospectus, "It's not a product that we can sell – it's a form

4    of prospectus and very heavily regulated both in UK and USA,

5    especially USA – this will be covered by a reg D filing or

6    similar which is effectively small company exemption for

7    fundraising up to 5 million from memory.  This is the

8    documentation they are using as a company to sell shares."

9            That was in fact what you were using to sell shares;

10   isn't that true?

11   A.  We were using a PPM to sell shares, yes.

12   Q.  "The point here is that the USA has some of the most

13   punitive securities laws in the world.  The penalties for

14   breaching them are absolutely onerous.  Think up to 150 years

15   in jail (seriously).  So the raise on the part of the company

16   is a loan note.  The product that we would offer would be more

17   of a lease."

18           Now, a lease is not a security, correct?

19   A.  It turned out it was a security, but in theory it wasn't

20   supposed to be a security, yes.

21   Q.  So what has happened here is an effort to try not to

22   violate the law in the United States; isn't that correct?

23   A.  Correct.

24   Q.  "That's very common in the real estate world – head lease

25   holder issues sublease.  They won't show things like the head

1  lease in full because:  A, they don't need to; B, it's nobody

2  else's business — if they are lying in their prospectus they

3  are potentially guilty of securities fraud, wire fraud, mail

4  fraud and a host of other offenses in USA that ensure a very

5  lengthy stretch in a very unpleasant place."

6         When they say "they," "if they are lying" he is

7  talking about Bar Works, right?

8  A.  Yes.

9  Q.  He is talking about the materials that Bar Works sent him,

10  correct?

11  A.  Correct.

12  Q.  He is talking about you, because he knows that you are

13  affiliated with Bar Works, correct?

14  A.  He knows I'm the owner and operator of Bar Works, yes.

15  Q.  And so he says, "Nobody would dream of doing something so

16  foolish — if you were going to do it the USA would be the last

17  place you would ever go to."

18         So, is it clear here from this document that Mr. Moore

19  is telling the people at UPG that we have these documents from

20  Bar Works and nobody in their right mind would mess around with

21  violating the law in the United States.  Isn't that his

22  message?

23  A.  That's what he is trying to say to them, yes.

24  Q.  We do not have a document from Mr. Moore to James Robinson,

25  David Kennedy or Neil Storey stating that Jonathan Black did

1    not exist, correct?

2                MR. VAINBERG:  Objection.  Lack of foundation as to

3    what documents exist between other people.

4                THE COURT:  Are you suggesting that -- you're asking

5    if there is any exhibit like that?

6                MR. GARVIN:  Right.

7                THE COURT:  If he knows.  If you know there is an

8    exhibit that says what counsel has suggested.

9    A.  It would be totally ridiculous for me to produce a document

10   or an e-mail on an e-mail system to say that Jonathan Black is

11   me.

12               If I fell out with Jim Moore, or anyone else who was

13   in the know, then the first thing they're going to do is

14   forward that e-mail to someone else like a newspaper -- which

15   is what happened later anyway -- or to law enforcement, and I

16   would be out of business in five minutes.

17               So, I wouldn't be surprised from what you've just said

18   there is no -- from memory there is no e-mail, but there are

19   plenty of What'sApps and verbal communication which convey

20   that.

21   Q.  Now, there was another meeting in which Sean Phillips

22   attended; isn't that true?

23   A.  Correct.

24   Q.  And is it your position that Sean Phillips also knew that

25   Jonathan Black did not exist?

H657MOO6                              Haddow - Cross

A.  I don't really have a position on Sean Phillips.

Q.  Well, did you tell the ladies and gentlemen from the United
States when they interviewed you that everyone at the
meeting -- that Sean Phillips attended -- knew?

A.  We didn't discuss whether Jonathan Black existed at that
meeting.  We didn't discuss whether Jonathan Black existed at
that meeting.  The meeting wasn't to discuss anything about
Jonathan Black.  The meeting was to discuss getting members
into the 39th Street location.

Q.  All right.  Can you please tell us who was at the meeting
with Sean Phillips.

            THE COURT:  Could you be a little more specific.

            MR. GARVIN:  Yes.

Q.  When was the first time that you met Sean Phillips?

A.  In and around January 2016.

Q.  And is it also true that at that meeting was Mr. Moore?

A.  Yes.

Q.  Mr. Storey?

A.  Also true.

Q.  And your wife?

A.  Yes, and a few other people.  Sean Phillips obviously was
there, and so was Sam Aura.

Q.  And I have asked you I believe -- and I will ask it again
to make sure -- isn't it a fact that you said that everyone at
that meeting knew that Mr. Black did not exist?

1   A.  I may well have said that, yes.

2   Q.  So then Sean Phillips knew that Mr. Black didn't exist;

3   isn't that correct?

4   A.  Also correct.

5   Q.  Well --

6   A.  I didn't tell him directly, and I didn't tell him directly

7   at that meeting.

8   Q.  So, you told the United States government when they

9   interviewed you that everybody at that meeting knew that there

10  was no Jonathan Black, correct?

11  A.  There is a difference between me telling them and them

12  knowing.  At that meeting, yes, they did know.  I didn't tell

13  them at that meeting.

14  Q.  Well, I'm just trying to establish --

15          THE COURT:  I think he is talking about your meeting

16  with the government lawyers, what you said to the government

17  lawyers.

18          Is that right?

19          MR. GARVIN:  Yes, sir.

20  A.  And at that meeting they did know -- the people at that

21  meeting did know that Jonathan Black was me.

22  Q.  Now, you have stated that the people at the meeting knew.

23  And one of the people at the meeting was Sean Phillips,

24  correct?

25  A.  Correct.

1  Q.  And did you tell Sean Phillips that there was no Jonathan

2  Black?

3  A.  No.

4  Q.  So, how did you know that Sean Phillips knew that there was

5  no Jonathan Black?

6  A.  Because my business partner who was the one who introduced

7  me to Sean Phillips -- I had never met Sean Phillips before --

8  he introduced me to Sean Phillips, and he was the one who said

9  Sean Phillips would be a very good person to join the board,

10  and he was the one who was sending me marketing material from

11  Sean Phillips in relation to this project.  He was the one who

12  communicated to Sean Phillips before I even spoke to him.

13       So, I'm of the understanding that Jim Moore told Sean

14  Phillips all the ins and outs of Bar Works, including

15  involvement of Jonathan Black; otherwise Jonathan Black would

16  have been at that meeting.

17  Q.  You were not present when Jim Moore told James Robinson

18  that there was no Jonathan Black, were you?

19  A.  I was not present, no.

20  Q.  You were not present when Jim Moore allegedly told David

21  Kennedy there was no Jonathan Black, correct?

22  A.  That's true, yes.

23  Q.  You were not present when Jim Moore allegedly told Neil

24  Storey there was no Jonathan Black, correct?

25  A.  Correct.

1   Q.  And now you were not present when Jim Moore allegedly told

2   Sean Phillips there was no Jonathan Black, correct?

3   A.  Correct.  Jim Moore lived in Miami, I lived in New York.

4   Q.  With regards to Bar Works, Jim Moore went to New York to

5   see Bar Works for the first time in October 2015, correct?

6   A.  Correct.

7   Q.  He returned approximately a month later on or about

8   November 18, 2015 because that's when UPG came and Neil Storey

9   came, correct?

10  A.  Correct.

11  Q.  So, those were two times he was there.  There was a third

12  time that he was there when Sean Phillips came, correct?

13  A.  Correct.

14  Q.  And that was either in February, possibly March of that

15  year, 2016, correct?

16  A.  Incorrect.  That was in January.

17  Q.  And were there any other times that Jim Moore saw you in

18  New York operating Bar Works other than those three times?

19  A.  Yes, he also attended with the guys from UPG, James

20  Robinson and David Kennedy, to the opening party of 46th

21  Street.  We met up beforehand.  There was a bar opposite the

22  46th Street location, and we met up there.  There was a party

23  going on across the street.  We unfortunately had a few too

24  many drinks in the bar, and then we went to the opening party

25  where my wife met us.  She wasn't happy because we were late.

1  And they looked around and had a great time at the opening of

2  46th Street.

3           So, they all, you know, took an interest and met up

4  with, you know, the various people there, and all of them knew

5  me as -- well, a mixture actually -- a few people knew me as

6  Jonathan, a few people knew me as Renwick.

7  Q.  So, sir, that was a fourth time that Mr. Moore was at Bar

8  Works?

9  A.  The fourth time that I'm aware of, yes.

10 Q.  What I'm trying to establish, sir, is Mr. Moore was not

11 there every day, correct?

12 A.  He was not there every day, no.

13 Q.  In fact he was there very few days, correct?

14 A.  Correct.

15 Q.  And Mr. Moore basically would arrive, walk through a

16 location and then make arrangements to have dinner with you or

17 with someone else, correct?

18 A.  Correct.

19 Q.  And so there were a few times during 2015 and early 2016

20 that Mr. Moore was there, right?

21 A.  Yes.

22 Q.  And I believe you stated earlier even when he was there it

23 didn't take very long to walk through one of these places;

24 isn't that right?

25 A.  That's right.

1   Q.  Now, there was a time when Jim Moore had to have some

2   people come from I believe it's called Dolphin.  Do you know

3   who I'm talking about?

4   A.  You may need to remind me.  I'm sorry.

5   Q.  In or about March, did Jim try to arrange for a person

6   named David Lilley to come to Bar Works?

7   A.  Yes, correct.

8   Q.  And in fact didn't Jim pay for the cost of that out of his

9   pocket, him and Neil Storey?  Isn't that true?

10  A.  I think so, yes.

11  Q.  So, what happened was these guys were coming to see Bar

12  Works, right?

13  A.  Correct.

14  Q.  And immediately before they came, after the arrangements

15  had been made, the airplane tickets had been purchased, they

16  wrote an e-mail stating that they wanted to meet with and in

17  fact take some pictures with Jonathan Black.  Isn't that

18  correct?

19  A.  Correct.

20  Q.  And your testimony was that Jim knew that Jonathan Black

21  did not exist, right?

22  A.  Correct.

23  Q.  And so this was a problem, correct?

24  A.  Yes.

25  Q.  And did you at any time tell Jim Moore that Jonathan Black

1   was in England in his office because he had a full schedule?

2   Did you ever say that?

3   A.  Possibly.  I can't recall.

4   Q.  Did you say that Jonathan Black could not appear because he

5   was in England with a full schedule?

6   A.  What are you relating?  Are you talking about the David

7   Lilley incident?

8   Q.  Yes.

9   A.  Possibly.

10  Q.  Now, isn't it a fact that Jim Moore asked if you would make

11  yourself present at this meeting?

12  A.  I don't think he did say that.  I think he said he

13  understood why I potentially couldn't be there.  He would never

14  say I should make myself available at that meeting.  There were

15  pictures of me -- there were pictures of Jonathan Black on the

16  Internet, and clearly if I turned up and said my name was

17  Jonathan Black, it would be a mismatch.

18  Q.  I'm not suggesting that he wanted you to appear as Jonathan

19  Black.  I'm asking if he asked you to appear or be at the

20  meeting as Renwick Haddow.

21  A.  No.

22  Q.  I'm going to come back to that in a second, but before we

23  do that, I'm going to show you Defendant's Exhibit 5047.  This

24  is an e-mail written by you; isn't that correct?

25  A.  The top e-mail, yes.

1   Q.  And you're stating here "Hi all.  Just had a catch up with

2   JB."  Isn't that correct?

3   A.  Correct.

4   Q.  And JB is Jonathan Black, right?

5   A.  Correct.

6   Q.  And so what you're doing here is you're representing to the

7   people who received this e-mail that you spoke with Jonathan

8   Black; isn't that true?

9   A.  Correct.

10  Q.  Now, that e-mail was written in December -- actually almost

11  on Christmastime -- but December 21, 2015.  Isn't that true?

12  A.  Yes.

13  Q.  And you purported as to what Jonathan Black's position was

14  when you spoke with him; isn't that correct?

15  A.  When I spoke to who?

16  Q.  This e-mail purports that you spoke with Jonathan Black.

17  A.  Oh, yes, sorry.

18  Q.  It says, "This investor is big, but he" -- meaning

19  Jonathan -- well, strike that -- "but he is not really

20  interested in buying work spaces.  He is interested in making

21  an equity investment, a sizeable one.  JB suggested $500,000 to

22  him which he said was of interest to him.  JB will send over

23  the PPM and start a dialogue with him.  I will let you know how

24  they get on."

25              So, you made it seem like you spoke with Jonathan

1    Black, correct?

2    A.  Correct.

3    Q.  And the people that are receiving this e-mail include Jim

4    Moore, right?

5    A.  Correct.

6    Q.  Include James Robinson, right?

7    A.  Correct.

8    Q.  Include David Kennedy.

9    A.  Correct.

10   Q.  And finally include Neil Storey, correct?

11   A.  Correct.  But you failed to mention it also included David

12   Honeyman.

13   Q.  Oh, it also included David Honeyman, correct?

14   A.  Who was outside the loop.

15   Q.  Now, isn't it a fact, sir, that David Honeyman is a

16   director of UPG?  Isn't that correct?

17   A.  I don't know if he is.

18   Q.  Now, sir, you said just now he is outside the loop.  You

19   just said that, right?

20   A.  Right.

21   Q.  You don't know if Jim Moore spoke to James Honeyman, do

22   you?

23            THE COURT:  David.

24   Q.  David Honeyman.  Do you?

25   A.  I can't be a hundred percent certain, no.

1   Q.  But you have suspected that Jim Moore spoke with his

2   partners James Robinson and David Kennedy, correct?

3   A.   Incorrect.  I didn't suspect.  I knew he had spoken to

4   them.  What I didn't know is whether he had spoken to David

5   Honeyman.  He never told me that he included David Honeyman in

6   the loop, so as far as I was concerned David Honeyman knew

7   nothing about Jonathan Black, nor did anyone else at UPG as far

8   as he told me.

9   Q.  Who told you?

10  A.  Jim told me.

11  Q.  You're now telling me that Jim Moore came to you and told

12  you that he spoke with James Robinson and told him what?

13  A.  I didn't say that.  I said Jim Moore informed me that the

14  only two people at UPG who knew of this were David Kennedy and

15  James Robinson; everyone else was outside this loop and,

16  therefore, didn't know.  If he told him, then that was news to

17  me.

18  Q.  So, sir, the way that you understood it was that James

19  Robinson and David Kennedy were the only people who knew that

20  Jonathan Black didn't exist.

21  A.  At UPG, yes.

22  Q.  Now, you had a discussion a little bit earlier on direct

23  examination about an e-mail that was sent by Sean Phillips.  Do

24  you recall that?

25  A.  Yes, I recall that.

1   Q.  And you had said that Sean Phillips had met with your wife

2   and was going to help as to memberships, right?

3   A.  Yes.

4   Q.  Now, I'm showing you the exhibit that's -- let me pick this

5   up for a second.

6          MR. GARVIN:  Your Honor, at this time there is no

7   objection, I'm going to offer into evidence Defendant's 5019, a

8   letter dated February 19, 2016.

9          THE COURT:  I will allow it.

10          (Defendant's Exhibit 5019 received in evidence)

11   Q.  OK.  So, this is a letter that's being written by Sean

12   Phillips to Neil Storey, and it's talking about that he will

13   reach out to Chloe and he says, "I think it's her name."  Do

14   you remember discussing this during direct examination?

15   A.  Yes, I do, yes.

16   Q.  And so he is confirming that he is going to reach out, and

17   he makes reference to Chloe.  And you had told us earlier that

18   Chloe was the name that your wife was using, Chloe Miller.  Is

19   that right?

20   A.  That's correct.

21   Q.  And you had placed her name in the offering materials of

22   Bar Works; isn't that correct?

23   A.  Correct.

24   Q.  You did not use your name Zoya Haddow because you did not

25   want that to come out; is that correct?

1   A.   That's correct.

2   Q.   Now, it was your position that Jim Moore knew that,

3   correct?

4   A.   Correct.

5   Q.   And Neil Storey knew that also, correct?

6   A.   Correct.

7   Q.   So, now we see that on February 19, the following day, Neil

8   Storey writes, "Does Chloe equal Zoya?  Or is there a Chloe?

9   Do you have a number?"  Because that's what's being requested

10  by Sean Phillips, correct?

11  A.   Correct.

12  Q.   And Jim Moore writes back to Neil Storey, "No idea about

13  Chloe sorry."

14        Sir, neither Neil Storey nor Jim Moore knew that your

15  wife was using an alias of Chloe Miller.  Isn't that a fact?

16  A.   They knew she was using an alias, but I'm sure the name --

17  the actual name she was using changed with the wind.  One

18  minute she was using Zoya, next minute she was using Zoe, next

19  minute she's using Chloe.  So, I imagine it confused.  It

20  confused me sometimes.

21  Q.   From this letter they did not know that she was using an

22  alias; isn't that true?

23  A.   I think that's --

24        MR. VAINBERG:  Objection.

25        THE COURT:  Overruled.  If you know.

1   A.  I think that letter, the e-mail exchange, demonstrates that

2   there is confusion about her name, yes.

3   Q.  Well, one thing for sure, she wouldn't use the name Haddow,

4   correct?

5   A.  Right.

6   Q.  Correct?

7   A.  Correct.

8   Q.  And because if you use the name Haddow, then that defeats

9   everything that you've set this up for, right?

10  A.  Correct.

11  Q.  And so the last thing that you would want to do is

12  circulate anything that said Zoya or Chloe Haddow on it, right?

13          MR. VAINBERG:  Objection.  Circulate as to where?

14  Q.  Circulate into the public.  I mean the whole purpose of

15  this Jonathan Black using a nonexistent name was to keep the

16  name Haddow out of the public; isn't that right?

17  A.  Correct.

18  Q.  It's to keep it away from potential investors; isn't that

19  right?

20  A.  And other key parties, yes.

21  Q.  So, when you went out of your way and did a private

22  placement memorandum -- which we can certainly pull -- you've

23  gone over it before -- there is a spot on it that says the

24  chief executive officer is Jonathan Black, right?

25  A.  Correct.

1   Q.  And there is another spot on it that describes the position

2   that Chloe Miller holds; isn't that right?

3   A.  Correct.

4   Q.  And the whole point of it was to keep the name Haddow out

5   of the public eye, right?

6   A.  Correct.

7   Q.  I am showing you Defendant's Exhibit 5050.  This is

8   regarding Zola Haddow.  That's your last name, right?

9   A.  Yes.

10  Q.  And this is to confirm that she is employed at Bar Works as

11  a marketing director.  She is the director, correct?

12  A.  According to this letter, yes.

13  Q.  Well, it's on Bar Works stationery.  Isn't that true?

14  A.  It's true, but it was sent to someone outside of Bar Works

15  so that she could get a visa or something along those -- I

16  think it was for a visa that she was applying for.

17  Q.  Well, sir, isn't it a fact that it was sent and UPG

18  received it?  Isn't that a fact?

19  A.  I'm not aware of that.

20  Q.  This flies in the face of everything that you've told us

21  for the last two days, doesn't it?

22  A.  No, not at all.  That's totally irrelevant to the business

23  of Bar Works.  That was done for something to help Zoya out,

24  where it wouldn't have any bearing as far as I was concerned

25  with Bar Works.

1   Q.  You have a document that's going out into the public

2   listing her as the marketing director; isn't that true?

3   A.  No, that didn't go out into the public.

4   Q.  All right, so let's go back to March.  This is Government

5   Exhibit 135.  And Jim Moore said, "We will need a story as to

6   why Jonathan isn't there."  Do you see that?

7   A.  Yes, I see that.

8   Q.  And now to put this in perspective, these are people who

9   are flying from Europe to meet Jonathan Black, right?

10  A.  Not specifically, no.  They were there to see other people,

11  and Jonathan was going to be there, yes.

12  Q.  Well, they had requested an opportunity --

13  A.  -- to meet Jonathan.

14  Q.  Not only to meet.  They wanted to bring professional video

15  equipment to record some clips with Jonathan, so one of the

16  primary purposes of this was to have Jonathan Black available;

17  isn't that correct?

18  A.  It was an important factor, yes.

19  Q.  All right.  And these are the people that Neil Storey and

20  Jim Moore were paying for their tickets to fly from Europe to

21  New York, and their hotel; isn't that correct?

22  A.  Yes.

23  Q.  And so now isn't it a fact that you told Jim Moore that

24  Jonathan Black was very busy in London and would not be making

25  the meeting?  Isn't that true?

1  A.  I haven't seen that e-mail.  Have you got that e-mail?

2  Q.  Well, do you recall saying that?

3  A.  No, I don't recall saying that.

4  Q.  And do you recall Mr. Moore saying to you:  How do you tell

5  people who just flew in from Europe to see Jonathan Black that

6  they could have seen him while they were in Europe?  Do you

7  recall that?

8  A.  No, I don't recall that, no.

9  Q.  So now Mr. Moore says, "We'll need a story as to why

10 Jonathan isn't there.  Would be great to find a way to get you

11 involved but equally understand your reticence."  Do you see

12 that, sir?

13 A.  Yes, I see that.

14 Q.  Do you remember a few moments ago I asked you if Jim Moore

15 had suggested that you be involved -- meaning involved as Mr.

16 Haddow?  Do you recall that?

17 A.  I recall that, but I didn't agree with that.  I actually

18 think that was invented.  I don't remember that being part of

19 the conversation whatsoever.

20 Q.  And not only have we moved on from the oral conversation,

21 he's placed it in writing.  "Would be great to find a way to

22 get you involved but equally understand your reticence."

23       Now, when he says "equally understand your reticence,"

24 did you understand that to mean that you had reservations of

25 being someone who is presenting the company, being too involved

H657MOO6                              Haddow - Cross

1    in the company?

2    A.  Can you repeat that?

3    Q.  Yes.  When he said equally understand your reticence, did

4    you understand him to mean that he understood if you had

5    reservations about being involved?

6    A.  He understood that I had major reservations of turning up

7    to a meeting as Jonathan Black.

8    Q.  Well, he doesn't say that he wants you to come as Jonathan

9    Black.  He is saying that he wants you to come as you.  It

10   says, "Would be great to find a way to get you involved."  It

11   doesn't say would be great to find a way to have Jonathan Black

12   involved.

13   A.  I think you're playing with the words there.  I mean the

14   basic understanding is I couldn't turn up whether I was

15   Jonathan Black or not, because if I turned up as Jonathan

16   Black, my face doesn't match the picture.  If I turn up as

17   Renwick Haddow, my name is all over the product and it fails.

18   Q.  So, the point is that Mr. Moore suggested for you to be

19   there as Mr. Haddow, right?

20   A.  That's how you interpret it.  I interpret it slightly

21   differently.

22   Q.  And when he wrote almost all of these e-mails that we've

23   seen, he always sends them to Renwick Haddow, right?

24   A.  The ones we've seen.  There are others as well that were

25   sent to Jonathan Black.

1   Q.  95 percent of the e-mails sent were sent to Renwick Haddow,

2   correct?

3   A.  Correct.

4   Q.  And that was literally -- as I think you said earlier, that

5   was a lot, because Mr. Moore has a tendency to be a prolific

6   writer of e-mails, doesn't he?

7   A.  Sure is, yes.

8   Q.  So, if he is having a thought, he's writing it to you,

9   correct?

10  A.  Correct.

11  Q.  So, you can tell what is going through his mind; just read

12  his e-mails.  Right?

13  A.  Correct.

14          MR. VAINBERG:  Objection.

15          THE COURT:  I'll allow it.

16  Q.  Now, did that meeting actually ever take place?

17  A.  I'm not sure if it did take place, but there was

18  arrangements in place, yes.

19  Q.  Well, isn't it a fact that not only did it take place but

20  Sean Phillips attended?

21  A.  Yes.

22  Q.  And this came to a head because this was the beginning of

23  the end between you and Mr. Moore, wasn't it?

24  A.  Things started to go wrong in about April time, so I'm not

25  sure what date this refers to.  Can you just remind me?

1    Q.  Yes.  I'm talking about on or about the week of March 11,

2    2016.

3    A.  No, we were still -- yeah, I was a bit slow paying his

4    invoices, but UPG was still selling profusely and Jim was still

5    heavily involved.

6    Q.  And you were -- you were aware that Jim Moore formed Our

7    Space in March of 2016, right?

8    A.  I became aware of that a lot later, yes.

9    Q.  And that was approximately March 16, 2016, correct?

10             THE COURT:  That what?

11   Q.  That Jim Moore formed Our Space.

12   A.  I don't recall the date, but I know it was formed a lot

13   earlier.

14   Q.  I'm going to show you Defendant's Exhibit 5062.  You see

15   the name Karina there?

16   A.  Yes.

17   Q.  And do you know that's James Moore's wife's name, correct?

18   A.  I do.

19   Q.  I am showing you page 2 of the exhibit, which is the

20   registration of a domain.  You see work domain registration?

21   A.  Yes.

22   Q.  And do you see above it it says OurSpace.work?

23   A.  Yes.

24             MR. GARVIN:  May I have one moment, your Honor?  It's

25   so fuzzy, I need glasses.

H657MOO6                         Haddow - Cross

1           I'm going to have to come back to this one because

2    it's too fuzzy.

3           THE COURT:  Can I see counsel for just a minute?

4           (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (At the side bar)

2              THE COURT:  I just want to get a rough sense of how

3    much more time you need.

4              MR. GARVIN:  Probably --

5              THE COURT:  I'm trying to determine when we stop

6    today.

7              MR. GARVIN:  Your Honor, if we were to stop in about

8    ten or 15 minutes, I could consolidate instead of fumbling

9    around, and finish first thing tomorrow morning in probably 15

10   or 20 minutes.  I'm concerned that I've got to the point where

11   exhibits that I lay down on the table have shifted.

12             THE COURT:  So, you want to do more now or not?

13             MR. GARVIN:  I'd like to terminate now because I'm

14   almost done.

15             THE COURT:  I see.

16             MR. GARVIN:  And I would like to get organized so I

17   don't waste the Court's time.

18             THE COURT:  I got you.

19             Is that OK with you?  OK.

20             (Continued on next page)

21

22

23

24

25

1              (In open court)

2              THE COURT:  OK, folks, we're going to stop for today,

3    and I will send you home with my same instructions, which are

4    these:  So, please don't talk with each other about the case,

5    or about anyone who has anything to do with it, until the end

6    of the case when you go to the jury room to deliberate.

7              Second, please don't talk with anyone else about the

8    case, or about anyone who has anything to do with it, until the

9    trial has ended and you have been discharged as jurors.

10             Third, please don't have anyone talk to you about the

11   case, or about anyone who has anything to do with it.

12             Fourth, please don't read any news or Internet stories

13   or articles or blogs or listen to any radio or TV or Internet

14   reports about the case -- assuming there were any -- or about

15   anyone who has anything to do with it.

16             And, please, fifth, do not do any type of research or

17   investigation about the case on your own.

18             So, we're still on schedule and making good progress.

19   My guess is -- well, I won't guess.  We will know better in the

20   morning when Mr. Garvin finishes how much time is left, so it

21   might move over into Friday.  I'm not sure.  But, anyway, we

22   are pretty much on target.  I will see you tomorrow morning at

23   9:15.  Thanks a lot.

24             Leave your notes right there.  Christine will take

25   care of them

1          (Jury not present)

2          THE COURT:  So, counsel could please be seated for a

3     minute.  I just want to get a sense of timing.

4          So, Mr. Garvin, you feel you'll end up tomorrow

5     morning?

6          MR. GARVIN:  Yes.

7          THE COURT:  With this witness?

8          MR. GARVIN:  Oh, yes, certainly.

9          THE COURT:  About how much time more do you need?

10         MR. GARVIN:  I was hopeful that it would be less than

11    an hour, so I'm hoping -- I just don't want to under promise

12    and say 15 minute and it turned out to be an hour.

13         THE COURT:  No, I got it.  OK.

14         Then we have how many more government witnesses?

15         MR. BELL:  Judge, I think that there are -- after Mr.

16    Haddow tomorrow, in some order we would have Mr. Pendelman who

17    is short, Mr. Rivera who is short, and a special agent from the

18    F.B.I.  Those are all short witnesses as far as testimony goes.

19         Mr. Vainberg at a previous side-bar also mentioned

20    that we have some audiovisual to play.  That may very well be

21    longer than the combined testimony, which is I think mostly a

22    testament to how short the directs should be.

23         All of that is to say, Judge, that I think that we are

24    still -- as your Honor told the jury -- on target.  In that

25    case this means that I think we're still in line to rest around

1    lunch tomorrow and probably before lunch tomorrow.  If that is

2    the case, your Honor --

3              THE COURT:  The government would rest.

4              MR. BELL:  If the government does rest before lunch

5    tomorrow, and if we all review the charge this evening, there

6    were a number of possibilities that come up for the charge

7    conference.

8              THE COURT:  Well, we are going to hear if there is a

9    defense case, if counsel wishes to share that information.

10             MR. GARVIN:  Yes, your Honor.  I anticipate at the

11   present time two relatively short witnesses, which I've already

12   discussed with counsel.  I'm hopeful that both of those

13   witnesses combined will be an hour to an hour and a half

14   maximum.  And the witnesses also have time constraints, so I'm

15   hopeful to get them on tomorrow afternoon or Friday morning.

16             THE COURT:  So, my feeling is we should press forward

17   tomorrow morning 9:15.  We will try and get all the witnesses

18   done, and we will worry about the charge conference after that

19   point has occurred.

20             MR. BELL:  That sound rights, given what Mr. Garvin

21   has told us.

22             A couple of related notes.  One -- and this may go

23   without saying, but I will note it anyway -- our understanding

24   is that neither of those witnesses is Mr. Moore, and so when

25   there is an appropriate point -- and perhaps better done

1    tomorrow than today -- it would make sense for the Court to

2    briefly allocute Mr. Moore on whether he understands that he

3    has the right to testify and whether he has discussed that with

4    his attorney.  That's five minutes.

5            The other thing that we would note is if -- as I

6    suspect is possible -- Mr. Garvin is able to put his materials

7    together and the remainder of the cross-examination of Mr.

8    Haddow is on the shorter side, we would ask for a short break

9    even then just to get Mr. Haddow back out, given that he is in

10   custody.

11           THE COURT:  We can arrange that.

12           So, we can take some time, Mr. Garvin and Mr. Moore.

13           Mr. Moore understands that he has the right, absolute

14   right to testify in this trial if he wishes to do so, but he

15   also has the absolute right not to testify if that's what he

16   wants to do.  And he doesn't have to tell me today what his

17   decision is.  I just want to make sure he understands.

18           THE DEFENDANT:  I'm here, I understand.  Thank you.

19           THE COURT:  You bet.  All right.  So, OK, we will see

20   where we are tomorrow.

21           MR. BELL:  Thank you, your Honor.

22           THE COURT:  Mr. Garvin, I think there is probably a

23   charge in the draft of the charges with respect to the

24   defendant's right to testify and what comes from that, so I

25   think maybe if you go over that with him, he will fully

H657MOO6                          Haddow – Cross

1    understand.

2              MR. GARVIN:   Thank you.

3              (Adjourned to June 6, 2019 at 9:15 a.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    INDEX OF EXAMINATION

2    Examination of:                        Page

3     RENWICK HADDOW

4    Direct By Mr. Vainberg . . . . . . . . . . . 317

5    Cross By Mr. Garvin  . . . . . . . . . . . . 400

6                    GOVERNMENT EXHIBITS

7    Exhibit No.                          Received

8     176, 181    . . . . . . . . . . . . . . . . 372

9                    DEFENDANT EXHIBITS

10   Exhibit No.                          Received

11    5019    . . . . . . . . . . . . . . . . . 482

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```