H667MOO1

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
3   UNITED STATES OF AMERICA,              New York, N.Y.
4              v.                          18 Cr. 759(RMB)
5   JAMES MOORE,
6              Defendant.
7   ------------------------------x       Jury Trial
8                                         June 6, 2019
                                          9:30 a.m.
9
10  Before:
11                  HON. RICHARD M. BERMAN,
12                                         District Judge
13
14                     APPEARANCES
15
    GEOFFREY S. BERMAN
16       United States Attorney for the
         Southern District of New York
17  BY:  MARTIN BELL
         VLADISLAV VAINBERG
18       Assistant United States Attorneys
19  DAVID M. GARVIN, PA
         Attorney for Defendant
20
    ALSO PRESENT:
21  Nathaniel Cooney, Paralegal for U.S. Attorney's Office
    Special Agent Jordan Anderson, FBI
22  Alexandra Garvin, Law Clerk for Defense
    Arlene Garvin, Paralegal for Defense
23
24
25
```

1           (Trial resumed; jury present)

2           THE COURT:  Good morning, everybody.  How are you

3    doing?  Nice to see you.  OK.  So we will pick up with the

4    cross-examination by Mr. Garvin.

5     RENWICK HADDOW, resumed.

6           DEPUTY COURT CLERK:  Before you begin, I would remind

7    you you are still under oath.

8           THE WITNESS:  OK.

9    CROSS EXAMINATION (Continued)

10   BY MR. GARVIN:

11   Q.  Good morning, Mr. Haddow.

12   A.  Good morning.

13   Q.  Mr. Haddow, we're going to back up just a little bit to

14   fill in some gaps so it's not confusing in case we've missed a

15   few items.

16           First I'd like to talk about Defendant's Exhibit 511.

17   You recognize this as the private placement memorandum for Bar

18   Works, sir?

19   A.  Yes, I do.

20   Q.  And for the benefit of all concerned who do not deal with

21   these documents at all times, a private placement memorandum is

22   a group of documents that are placed together to inform someone

23   about a company's financial aspects; is that correct?

24   A.  Well, a bit more than that.  It's there to induce people to

25   invest in the opportunity.

H667MOO1                          Haddow - Cross

1    Q.  And that is why at the bottom of the page, first page, it

2    says private equity placing and convertible loan note offer -

3    August 2015, correct?

4    A.  Correct.

5    Q.  Now, I turn your attention, sir, to page 7 of this

6    document.  And let's be clear, this is a document that you

7    caused to be published; is that correct?

8    A.  Correct.

9    Q.  And if we look on page 7, it tells us the key parties to

10   the document.  And you see that listed there as the attorney

11   for In Crowd Equity is Thompson Bukher.  Do you see that?

12   A.  I do.

13   Q.  Did Thompson Bukher authorize you to place their name on

14   your private placement memorandum?

15   A.  No, they didn't.

16   Q.  And on the bottom of the page it says the auditor of the

17   company is ProTax Center.  Did ProTax Center authorize you to

18   use their name on this private placement?

19   A.  No, they didn't.

20   Q.  Now I'd like to direct your attention to Defendant's

21   Exhibit 512.  That's 5012.  Do you recognize this as the

22   business account application for Wells Fargo?  Is that correct?

23   A.  Yes, it looks like it.

24   Q.  And this is for the customer Bar Works; is that correct?

25   A.  That's correct.

1    Q.  And you listed yourself, your real name, on the bank

2    documents; isn't that true?

3    A.  That's true, yes.

4    Q.  And you also represented that you are the sole owner of

5    this business; isn't that true?

6    A.  Yes.

7    Q.  You also represented that the annual gross sales of the

8    business for the year ending 2014 was $480,000.  Do you see

9    that, sir?

10   A.  I do see that, yes.

11   Q.  And isn't it a fact that that was a lie?

12   A.  That's true, yes.

13   Q.  And you signed that document; is that correct?

14   A.  That's correct.

15   Q.  In 2015; isn't that true?

16   A.  That's true, yes.

17   Q.  You were the only person who was the authorized signer on

18   that account for Bar Works; isn't that true?

19   A.  That's correct.

20   Q.  I want to circle back to Defendant's Exhibit 5014 which are

21   the Monterey materials.  There was a discussion about the

22   Monterey materials yesterday, and I want to make sure that it's

23   clear.  This is the e-mail that accompanied the materials.  It

24   was from Jim to you; isn't that correct?

25   A.  That's correct.

1    Q.  And in this he says, "Here is the materials we have so far

2    for this."

3            This was following a conversation that he had with you

4    where he was telling you about Monterey; isn't that right?

5    A.  It looks like that's the case, yes.

6    Q.  So he is saying here, "Could do with a bit of help here -

7    the buy back agreement seems to conflict a bit with the

8    prepurchase agreement - could you look and see what you think."

9            Now, was that being sent to you, or was that what

10   David Kennedy had sent to Jim and then Jim forwarded to you?

11   A.  I don't know.  All I know is it looks like I received a

12   copy of that e-mail, yes.

13   Q.  And with that copy of the e-mail were the materials -- only

14   we have in black and white.  What you received were the color

15   copies of the materials; is that correct?

16   A.  I don't remember receiving a color copy.  I do remember

17   receiving a brochure which looks similar to that, yes.

18   Q.  And, to be clear, those materials were sent to you on

19   September 1, 2015, right?

20   A.  Yes.

21   Q.  So that's before there was any agreement reached with UPG,

22   correct?

23   A.  Before any formal agreement was reached, yes.

24   Q.  Well, let's go to Exhibit 5035.  Isn't it fair to say that

25   as late as November 5 Jim still wasn't clear as to what deal

1   you had reached with him; isn't that correct?

2   A.   No, not totally correct, no.

3   Q.   I'm showing you Defendant's 5035.  On November 5, 2015 Jim

4   Moore wrote, "Hi Renwick.  When you have a minute please jot

5   down how you were proposing the international deal might work

6   between us."  He wrote you that on November 5, isn't that

7   correct?

8   A.   That's correct.

9   Q.   And then he ends it by saying, "I remember the 50/50 part.

10  What was the management element of it?  Neil and I want to

11  ensure that we have some ideas pulled together before we meet

12  in two weeks."

13          So, what he is talking about here, sir, is that they

14  were going to propose some ideas to you, and he wasn't clear as

15  to what had been proposed by you; isn't that true?

16  A.   The international element of the deal was only a small part

17  of the deal.  The major part of the deal as far as I was

18  concerned and as far as Jim was concerned at the outset was the

19  American side of the situation, because that's the one that had

20  the outlets ready to open; that's the one that had a structure

21  in place.

22          The 50/50 deal, which is in writing, was agreed

23  reluctantly by myself.  It was agreed.  Whether he had an

24  understanding of the management element, I don't know what that

25  refers to, but there was something in place, and there is

1    e-mails to that effect?

2    Q.  Sir, let's go back to what you just said.  You said the

3    deal was in writing; is that correct?

4    A.  Yes, there's an e-mail from Jim suggesting 50/50, and we

5    also agreed that in our meting.

6    Q.  OK.  So we're talking -- when you said there is a deal in

7    writing, there is no formal agreement signed by you, signed by

8    Jim Moore in writing; isn't that the truth?

9    A.  There is no signed agreement, but there is an e-mail to

10   that effect.

11   Q.  And that e-mail, as you just said, was written by Jim

12   Moore, suggesting what a deal would look like; isn't that true?

13   A.  I think it's actually confirming the 50/50 and the 35

14   percent for the U.S. business.

15   Q.  And the truth is that it never was 50/50, because you then

16   told him that you thought 35 percent was more in line, isn't

17   it?

18   A.  No, you're getting mixed up.  The 35 percent relates to the

19   U.S. business, and 50/50 relates to non-U.S. business.

20   Q.  Well, you said -- you just got done telling the ladies and

21   gentlemen of the jury that the non-U.S. business was a small

22   part of it.

23   A.  At the beginning it didn't exist.  At the beginning the

24   U.S. business was the one with the 39th Street location in

25   November that was open by then, and we also had a 46th Street

H667MOO1                          Haddow - Cross

1    location ready to start work on.

2    Q.  Sir, the fact is that as of November 5 there was no

3    agreement yet that had been formally executed.  That's the

4    truth, right?

5    A.  As far as I'm concerned, a handshake is a formal agreement.

6    A written down agreement, there wasn't -- there was never a

7    share certificate issued.  We established that.  But there was

8    an agreement in place, and that's why Jim ran around

9    introducing me to various partners on the basis there was a

10   deal in place.  He acted as if there was a deal in place; he

11   brought on partners as if there is a deal in place; and he

12   earned his 35 percent commission as if there was a deal in

13   place.

14   Q.  Well, actually a big portion of the commissions you never

15   paid.

16   A.  Well, that was toward the end of the situation.

17   Q.  And actually he kept on writing letters to you trying to

18   get paid at the end; isn't that true?

19   A.  That's correct.

20   Q.  And actually you simply didn't honor your agreements with

21   Jim.  That's the truth.

22   A.  That's correct.

23   Q.  So, let's take a look at 5037.  5037 is an e-mail from Jim

24   to Neil Storey, James Robinson, David Kennedy and yourself

25   concerning the upcoming trip to New York to visit.  Isn't that

1    true?

2    A.   That e-mail is about that, yes.

3    Q.   And that e-mail is dated November 6, which is one day after

4    the e-mail we just talked about, right?

5    A.   If you say so, yes.

6    Q.   And this e-mail schedules the meetings for November 18 and

7    November 19; isn't that correct?

8    A.   Correct.

9    Q.   And that was going to be the first time that you would meet

10   James Robinson and his partner David Kennedy, right?

11   A.   Correct.

12   Q.   Now, there came a time when you hired some lawyers in or

13   about the end of 2015, correct?

14   A.   You'd need to give me some more information on that.

15   Q.   Sure.  Let's take a look at Defendant's 5038.  Do you see

16   this is the stationery of Thompson Bukher?

17   A.   Yes.

18   Q.   And does that refresh your memory as to whether or not you

19   hired some lawyers?

20   A.   Yes, it does.

21   Q.   And in fact, sir, you lied to your own lawyers; isn't that

22   true?

23   A.   That's correct.

24   Q.   Sir, would it be fair to say that in the operation of the

25   businesses that you had been operating it was commonplace for

1    you to lie to people?

2    A.  It particularly was with Bar Works, yes.

3    Q.  And, well, even if we look at African Land deal, you lied

4    to people, correct?

5    A.  Yes, correct.

6    Q.  If we look at Branded Leisure, you lied to people, correct?

7    A.  Correct.

8    Q.  You had the FCA, you lied to them too, correct?

9    A.  Correct.

10   Q.  And now as you described you had Bitcoin, which just was a

11   total fraud, correct?

12   A.  Correct.

13   Q.  You lied to people in Bitcoin, correct?

14   A.  Correct.

15   Q.  It was so common that when speaking to investors, you had

16   the ability to talk to them and say things that were not true

17   without hesitation; isn't this true?

18   A.  Correct.

19   Q.  I'm sorry, I didn't hear you.

20   A.  Correct.

21   Q.  And you lied even to your own lawyers, correct?

22   A.  Correct.

23   Q.  And so we see that your own lawyers are writing a letter to

24   Jonathan Black.  Now, sir, when you went to see your lawyers,

25   did you tell them that you were Jonathan Black?

1   A.  When I originally engaged with Thompson Bukher I engaged

2   with them through In Crowd Equity, and I went there as Renwick

3   Haddow.

4   Q.  And they're writing this letter to Jonathan Black, so isn't

5   it a fact that you told them that Jonathan Black was the CEO of

6   Bar Works?

7   A.  That's correct.

8   Q.  And isn't it a fact that you told them that Jonathan Black

9   had an office in London and he was very busy so he couldn't

10  come to their law office?  Isn't that correct?

11  A.  I don't know that.

12  Q.  And isn't it a fact -- well, didn't it seem a little bit

13  strange to be hiring a lawyer as Renwick Haddow but making out

14  the engagement letter to Jonathan Black?  Didn't you find that

15  to be strange?

16  A.  I wouldn't call it strange.  I would call it fraudulent.

17  Q.  And did you cause a DocuSigned signature of Jonathan Black

18  to appear on the lawyer's representation agreement?

19  A.  Yes, I did.

20  Q.  Now, when lawyers represent somebody, they want to talk to

21  them; isn't that correct?

22  A.  In most cases, yes.

23  Q.  And in this case when Mr. Bukher wanted to speak with

24  Jonathan Black, isn't it true that he was told that Jonathan

25  Black was busy and unavailable?

1   A.  Quite possibly, yes.

2   Q.  Now, I want to revisit Defendant's Exhibit 5050.  We had a

3   discussion about this yesterday, and this was a document that

4   purportedly Jonathan Black, the chief executive officer, signed

5   for Zoya Haddow, correct?

6   A.  Correct.

7   Q.  And you stated yesterday that actually this was going to be

8   submitted to a government entity, correct?

9   A.  I remember it was for Zoya's use for something outside the

10  business so she could get either a loan or a visa or something

11  along those lines.

12  Q.  Well, yesterday you said visa; is that correct?

13  A.  I said visa, yes.

14  Q.  So, what you're telling the ladies and gentlemen of the

15  jury is that not only did you commit all of these other crimes

16  that we've talked about, but you were defrauding the U.S.

17  Immigration Service too, correct?

18  A.  If that relates to a visa, then, yes, correct.

19  Q.  I'm going to show you 5057, Defendant's Exhibit 5057 which

20  is in evidence.  You purchased on February 15, 2016 a new Aston

21  Martin; is that correct?

22  A.  That's correct.

23  Q.  And so the crimes that you are committing, they were

24  motivated by your effort to obtain money; isn't that correct?

25  A.  That's correct.

H667MOO1                          Haddow - Cross

1   Q.  And when you obtained other people's money, then you spent

2   that money on luxurious items; isn't that true?

3   A.  Correct.

4   Q.  And that as we saw, it didn't matter to you who you had to

5   lie to; isn't that true?

6           MR. VAINBERG:  Objection.  Vague.

7           THE COURT:  I'll allow it.

8           You can answer it.

9   A.  Sorry.  Can you repeat that?

10  Q.  Yes.  In your efforts to obtain money from investors, as we

11  stated before you often relied upon misrepresentations and

12  false statements; isn't that true?

13  A.  Yes.

14  Q.  Sorry.

15  A.  I said yes.

16  Q.  Could you speak up a little bit.  I'm having a hard time

17  hearing you.

18          Look at this for a second, meaning Exhibit 5057.  We

19  see that it's from Miller Motorcars, and to be clear, Aston

20  Martin is a luxury British sports car, isn't that right?

21  A.  That's correct.

22  Q.  And this particular car, by the time it got all said and

23  done with options, the total price was $283,000 for a single

24  car.  Isn't that true?

25  A.  That's correct.

1    Q.  And you were using money that investors were putting into

2    Bar Works to purchase this vehicle; isn't that correct?

3    A.  Correct.

4    Q.  That was money that could have gone for refurbishing the

5    locations; isn't that true?

6    A.  Correct.

7    Q.  That was money that could have gone for advertising to get

8    new members; isn't that true?

9    A.  Correct.

10   Q.  That was money that could have stabilized the company so it

11   could make its obligations; isn't that true?

12   A.  Correct.

13   Q.  But instead of any of that, you used the money on luxury

14   items for yourself; isn't that true?

15   A.  That's correct.

16   Q.  And that is what motivated you to tell these lies; isn't

17   that true?

18   A.  That's part of my motivation, yes.

19   Q.  Now I'd like to show you 5054.  This is a letter from Jim

20   to Jonathan Black at Jonathan Black at Bar Works.  Do you see

21   that?

22   A.  Yes, I can see that.

23   Q.  And this relates to some questions that were being

24   proposed; isn't that right?

25   A.  That's correct.

H667MOO1                        Haddow - Cross

1   Q.  And Jim Moore said to that question, "Jonathan, may be

2   better if you can answer his questions directly if you don't

3   mind?  Thanks."  Isn't that true?

4   A.  That's correct.

5   Q.  And you went ahead and answered those questions as Jonathan

6   Black, didn't you?

7   A.  I did.

8   Q.  Keeping up your charade that Jonathan Black was a real

9   person, correct?

10  A.  Correct.

11  Q.  And it fooled Nick; isn't that correct?

12  A.  It did, yes.

13  Q.  And it fooled Nick so much that Nick caused his clients in

14  China to invest money in Bar Works, correct?

15  A.  That and a number of other reasons, yes.

16  Q.  And Nick invested a lot of money in Bar Works for his

17  clients; isn't that correct?

18  A.  Correct.

19  Q.  And isn't it correct that Bar Works raised from its

20  inception until its end over $30 million of investors money?

21  A.  In excess of $30 million, yes.

22  Q.  Would it be approximately 38 million?

23  A.  It would be approximately 50 million.

24  Q.  50 million, of which, as we've seen previously, the few

25  months that UPG was involved their clients invested seven and a

H667MOO1                          Haddow - Cross

1   half million, correct?

2   A.  I'm not entirely sure how much they invested.

3   Q.  Well, remember the schedule that counsel for the United

4   States showed you?

5   A.  Yes, but that spreadsheet was at a point in time.  I'm not

6   sure if it was a final spreadsheet, but, yes, the figure was in

7   excess of seven and a half million.

8   Q.  $50 million, and almost all of it was lost; is that

9   correct?

10  A.  Correct.

11  Q.  Sorry, I can't hear you.

12  A.  Correct.

13  Q.  Let's go to Defendant's Exhibit 5056.  This time we're

14  seeing a bank document from Chase, correct?

15  A.  Correct.

16  Q.  And you will see that the account title is Bar Works,

17  right?

18  A.  Bar Works 7th Avenue Inc.

19  Q.  And you listed yourself using your real name, right?

20  A.  Correct.

21  Q.  And you listed yourself as the president of the company Bar

22  Works 7th Avenue, Inc., right?

23  A.  Right.

24  Q.  Although the business address says 47 West 39th Street

25  which is the first Bar Works location, isn't it.

1   A.  It is, yes.

2   Q.  And this was signed by you February -- it appears to be a

3   4 -- February 4, 2016.  Isn't that true?

4   A.  That's true.

5   Q.  Now I'm going to show you Defendant's Exhibit 5058.  There

6   came a time when the SEC started having questions about In

7   Crowd Equity; isn't that true?

8   A.  That's true, yes.

9   Q.  And just so that we can refresh our memories, In Crowd

10  Equity raised money for Bitcoin; is that true?

11  A.  It did, yes.

12  Q.  Sorry?

13  A.  Yes.

14  Q.  And after Bitcoin, In Crowd Equity raised money for Bar

15  Works, correct?

16  A.  That's correct.

17  Q.  And so you hired Thompson & Bukher LLP, a New York law

18  firm, to represent you with regard to the Securities and

19  Exchange Commission inquiry; isn't that true?

20  A.  That's true.

21  Q.  Now, there were a number of questions in which the SEC had;

22  isn't that also true?

23  A.  That's correct.

24  Q.  And as of February 18, 2016, they wanted to know about the

25  investors money that In Crowd Equity had with regards to the

1   companies it represented; isn't that true?

2   A.  That's correct.

3   Q.  And you provided that information to your lawyers; isn't

4   that true?

5   A.  That's correct.

6   Q.  Now, this is the last page of that exhibit, and it says

7   U.S. investor money for Bar Works Inc., $70,000.  Do you see

8   that, sir?

9   A.  I can see that, yes.

10  Q.  Is that a true statement, sir?

11  A.  I don't think it is a true statement, no.

12  Q.  Underneath that it says Bitcoin, U.S. investor money

13  $547,000.  That was not a true statement either, was it?

14  A.  I can't be sure about that, but possibly.

15  Q.  Sir, isn't it true that the information you provided your

16  lawyers to give to the SEC was false?

17  A.  In many cases, yes.

18  Q.  Now, there came a time -- well, let's go over that.

19          I'm going to show you Defendant's 5068.  This is a

20  letter on Bar Works stationery; is that correct?

21  A.  That's correct.

22  Q.  And it's dated May 9, 2016; isn't that correct?

23  A.  I don't know.  Can you --

24  Q.  Sure.

25  A.  Yes, it is.

1   Q.  And to be clear, this is after Jim Moore and you have had a

2   parting of ways; isn't that true?

3   A.  Slightly before actually.

4   Q.  So your position is that the argument or confrontation --

5   however word appropriately describes what happened -- occurred

6   after May 9.  Is that your position?

7   A.  Yes, it happened around June time.

8   Q.  In June.

9   A.  Yes.

10  Q.  Isn't it a fact, sir, that it happened in March?

11  A.  No, it isn't.

12  Q.  Well, let's focus on Maureen Peyton.  You realized that

13  your attorneys would be dealing with Maureen Peyton from the

14  SEC; isn't that correct?

15  A.  Correct.

16  Q.  And your attorneys are writing to her in response to her

17  April 28 letter, correct?

18  A.  Correct.

19  Q.  And isn't it true that they are attaching a private

20  placement memorandum for Bar Works?  Isn't that right?

21  A.  Correct.

22  Q.  And that private placement had false information in it,

23  correct?

24  A.  Correct.

25  Q.  And many of the documents that were produced to the SEC had

1  false statements in them, correct?

2  A.  Correct.

3          THE COURT:  I have a question just briefly.

4          Could you put that back up?

5          MR. GARVIN:  Certainly, your Honor.

6          THE COURT:  Is that number one, that private placement

7  memorandum for Bar Works, is that the one that lists the senior

8  officers as Jonathan Black in there?

9          THE WITNESS:  Yes.

10  Q.  Sir, so not only were you lying to the investors, as we've

11  established, you were lying to the banks, correct?

12  A.  Correct.

13  Q.  You were lying to your own lawyers, correct?

14  A.  I wasn't lying to the bank.  I actually put my correct

15  information on the bank application.

16  Q.  Well, you used your correct name.

17  A.  Yes.  But there was some lies within one of the

18  applications.

19  Q.  Thank you, sir.  So you were lying to the bank.  You were

20  lying to your own lawyers, correct?

21  A.  Correct.

22  Q.  You were lying to many of your agents such as Nick,

23  correct?

24  A.  Correct.

25  Q.  You were lying now to the SEC, correct?

1   A.  Now?

2   Q.  Well, as we see in this letter, meaning May of 2016.

3   A.  Not lying now, no.

4          MR. VAINBERG:  Objection as to now.  Unclear.

5          THE COURT:  He said he is not lying now.  He said he

6   was not lying now.

7          MR. GARVIN:  Let me try it again.  That was a poorly

8   worded question, and that's my fault.

9   Q.  You were lying to the SEC in the spring of 2016.

10  A.  Correct.

11  Q.  Now, there came a time when you hired another law firm;

12  isn't that true?

13  A.  You'll have to remind me again.  I'm sorry.

14  Q.  Well, I show you what is in evidence as Defendant's 5069,

15  which is on the letterhead of the law firm of I believe by the

16  name of Hughes & Hubbard.  Is that correct?

17  A.  Correct.

18  Q.  And Hughes & Hubbard was -- that firm was retained by you,

19  correct?

20  A.  Correct.

21  Q.  So another law firm that you retained with regard to the

22  SEC matter, correct?

23  A.  Correct.

24  Q.  And when you hired that law firm, isn't it fair to say that

25  you lied to them also?

H667MOO1                              Haddow – Cross

1    A.  Incorrect.

2    Q.  Well, you provided them with documentation to give to the

3    SEC, correct?

4    A.  Correct.

5    Q.  And you gave them a consultancy fee agreement to produce to

6    the SEC, correct?

7    A.  Correct.

8    Q.  And that consultancy fee agreement purported to be

9    authorized by Robert Haslem, correct?

10   A.  Correct.

11   Q.  Did Robert Haslem exist?

12   A.  No, he didn't.

13   Q.  So you were giving lawyers who are licensed fraudulent or

14   false documents to give to the SEC, correct?

15   A.  That's correct.

16   Q.  So when we say you were lying to your lawyers, you were

17   lying to them because you had them believe that the documents

18   you were giving them were legitimate; isn't that true?

19   A.  Correct.

20   Q.  And this document purports to be signed by Robert Haslem,

21   but you are the one who signed that, right?

22   A.  Yes, I did.

23   Q.  And you attached a bunch of invoices that look like this to

24   the letter to the SEC.  You provided these invoices, correct?

25   A.  Correct.

H667MOO1                          Haddow - Cross

1   Q.  And these invoices were just fraudulently prepared to cover

2   your trail; isn't that right?

3   A.  Correct.

4   Q.  And if it was necessary to cover your trail, well, that's

5   just the way it had to be, right?

6   A.  I don't understand that question.

7   Q.  Well, yes, when it came to covering your trail, if you had

8   to lie to your lawyers, you lied, right?

9   A.  Correct.

10  Q.  And now I'd like to go to 5072.

11          So, to cover your trail you opened a LinkedIn account;

12  isn't that correct?

13  A.  Correct.

14  Q.  And on that LinkedIn account it was opened for Jonathan

15  Black; isn't that true?

16  A.  It's true, yes.

17  Q.  And this is a picture of the LinkedIn -- the first page of

18  the profile; isn't that true?

19  A.  That's correct.

20  Q.  This is the LinkedIn account that you caused to be

21  prepared.  That's a fact, isn't it?

22  A.  That's a fact, yes.

23  Q.  And that picture there is not Jonathan Black; isn't that

24  true?

25  A.  That's correct.

1   Q.  And when people wanted to know who Jonathan Black was, you

2   would refer them to your LinkedIn account; isn't that true?

3   A.  In some cases, yes.

4   Q.  And they would see this picture of a person thinking that

5   it was Jonathan Black; isn't that right?

6   A.  That's correct.

7   Q.  The whole purpose of this was to deceive people, correct?

8   A.  Correct.

9   Q.  The person whose picture is there didn't even know that you

10  were using his photo; isn't that true?

11  A.  Correct.

12  Q.  Now, there came a time when Jim Moore approached you in or

13  about the beginning of March and suggested that you should

14  retire; isn't that right?

15  A.  That was in January actually.

16  Q.  In January.  So, did you tell -- have you told anyone that

17  that was in June?

18  A.  Not that I am aware of, no.  In June we had actually fallen

19  out with each other, so it wouldn't have happened in June.  In

20  March we may have continued the conversation, but the

21  conversation was initiated in January.

22  Q.  So, Jim Moore -- Jim Moore's first visit to Bar Works was

23  on or about October 11th of 2015, correct?

24  A.  Correct.

25  Q.  And he left, correct?  He left New York, correct?

1    A.  Correct.

2    Q.  And then he came back on or about November 18, 2015,

3    because that was the first visit with the United Properties

4    Group guys, correct?

5    A.  Correct.

6    Q.  And it's your testimony that in January Jim Moore was

7    already telling you that you needed to retire, correct?

8    A.  Correct.

9    Q.  And that literally means that Jim Moore was involved with

10   your company -- from the first time that he saw your facility

11   to the first time that he suggested you retire was

12   approximately 60 days; is that correct?

13   A.  Yes, correct.

14   Q.  Now, isn't it a fact that within the last week you were

15   interviewed by the agents for the United States?  Isn't that

16   correct?

17   A.  Correct.

18   Q.  And isn't it a fact, sir, that you told them that you went

19   to Zuma -- which is a restaurant -- in June of 2016?  Isn't

20   that correct?

21   A.  No, not correct.  That was in January of 2016.

22   Q.  You realize that when you tell the agents of the United

23   States something, they take notes.  You realize that, right?

24   A.  I realize that.

25   Q.  And you realize they're professionals, right?

1    A.  Yes.

2    Q.  They do this for a living, right?

3    A.  Correct.

4    Q.  They know that it's important.  And you know that, right?

5    A.  Right.

6    Q.  And they pride themselves on taking accurate notes; isn't

7    that true?

8    A.  Correct.

9              MR. GARVIN:  May I approach the witness to see if this

10   refreshes his memory?

11             THE COURT:  Sure, sure, sure.

12   Q.  Sir, does that document refresh your memory?

13   A.  No, it doesn't refresh my memory.

14   Q.  Is it your position that what you just told me, that it's a

15   mistake?

16   A.  Yes, it doesn't fit in with the schedule of what actually

17   happened.

18   Q.  So, your position is that that's a mistake and January is

19   the correct date, correct?

20   A.  Correct, yes.

21   Q.  And you never said June.  That's your position.

22   A.  I might have said June but it was a mistake.

23   Q.  Well, it's a significant mistake though from June to

24   January, you would agree, wouldn't you?

25             MR. VAINBERG:  Objection.

H667MOO1                          Haddow - Cross

1           THE COURT:  I will allow it.

2   A.  In reality June was never realistic.  In June I hadn't seen

3   defendant for months.

4   Q.  Why do you call him defendant?

5   A.  Because that's what he is.  Or Jim Moore.  You call him

6   defendant, so I've kind of gotten in the habit of calling him

7   defendant.  But Jim Moore.

8           I hadn't seen Jim Moore for a number of months.  And,

9   as you can tell from the e-mails and the correspondence, I owed

10  him a lot of money at that stage, and in June that's when I

11  found out about his double cross.  So, the last thing I would

12  have done is met up with him and Neil Storey in January --

13  sorry, in June -- but in January that's when Sean Phillips came

14  over, and that's when we met him -- that's when I met him to

15  discuss this so-called retiring, and the retiring conversation

16  obviously came up there.

17  Q.  So Sean Phillips was there.

18  A.  No, no, Sean Phillips wasn't there.  Sean Phillips was at

19  the 39th street location.  Zuma meeting was myself and him,

20  later attended by Neil Storey and my wife.

21  Q.  OK.  Sean Phillips was in New York in one of the Bar Works

22  locations, correct?

23  A.  Correct.

24  Q.  And you said that this did not occur in June, it occurred

25  in January; correct?

H667MOO1                              Haddow - Cross

1    A.  Correct.

2    Q.  And I had told you are you sure it wasn't March, and you've

3    told me, no, it was not March, correct?

4    A.  Correct.

5    Q.  Sir, isn't it a fact that the falling out happened in

6    March; that's why you hadn't seen Jim Moore for months as of

7    June of 2016?

8    A.  Definitely incorrect.  They had arrived in March to the

9    opening of the 46th Street.  Everyone got on like a house on

10   fire.  It's only yesterday when you presented me with the

11   screen shot of Jim's double cross of setting up a competing

12   company in March that I knew anything about that.  In March, as

13   far as I was concerned, things were going to plan apart from,

14   you know, some of the things you've come out with.

15   Q.  You're referring to Defendant's Exhibit 5062, the purchase

16   of the Our Space URL.  Is that what you're referring to, sir?

17   A.  That's what I was referring to, yes.

18   Q.  And you will remember yesterday that the system

19   malfunctioned and it was coming up very blurry, and we couldn't

20   see the exact date.  Do you remember that?

21   A.  You said to me it was March.

22   Q.  Yes, I'm not disputing I said that:  This is a document

23   that is in 5062, and as we discussed yesterday, and you see

24   that the order date was in fact March 16, 2016.  Is that

25   correct?

527

H667MOO1                          Haddow – Cross

1   A.   That's correct.

2   Q.   Now I'm going to show you Government Exhibit 136.  This is

3   Government Exhibit 136.  This is an e-mail regarding the agenda

4   for the New York City meeting.  Do you see that, sir?

5   A.   I do, yes.

6                    (Continued on next page)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

J66VMOO2                                 Haddow - cross

1    BY MR. GARVIN:

2    Q.  And the date of that email is March 6.  And it says:  "We

3    have arranged for Sean Phillips to also be on the ground this

4    week."  Do you see that, sir?

5    A.  I do, yes.

6    Q.  Isn't it a fact, sir, that Sean Phillips never met with you

7    in January of 2016; the first time that he came to New York for

8    Bar Works was on or about March 10th of 2016?

9    A.  In fact, I think that was his second time.

10   Q.  Sir, isn't it a fact that Sean Phillips was only there one

11   time?

12   A.  As far as I know, I met him one time.  I think he was there

13   two times.

14   Q.  Yesterday you said that Sean Phillips was -- met with you

15   in January of 2016.  Do you recall saying that?

16   A.  I recall saying that, yes.

17   Q.  Today you said that Sean Phillips met with you in January

18   of 2016; correct?

19   A.  Correct.

20   Q.  And the reality is that that was false?

21   A.  No, that's not false.  There's invoices and emails to back

22   up the January date.

23   Q.  In fact, sir, he sent you invoices for doing work in

24   Florida, minor work in Florida, that he was having difficulty

25   getting you to pay, isn't that true?

1    A.  Yes, but that doesn't clear the fact that I had a long

2    conversation with him over the phone which he clarified in the

3    email.  And he said he was looking forward to meeting me from

4    memory, which was shortly after the conversation I had with

5    him.

6    Q.  So the fact is that you had a conversation with him on the

7    telephone because he was in Florida, isn't that true?

8    A.  Correct.

9    Q.  And he was looking forward to meeting you, and that meeting

10   took place in March; isn't that correct?

11   A.  Incorrect.  January.

12   Q.  And the reason why you don't want to say March is because

13   you know that's when the fallout occurred, isn't that true?

14   A.  No.  Conflicts totally with the reality.  The reality in

15   March was if there would be no fallout -- if there was a

16   fallout, then the guys from UPG wouldn't have wasted thousands

17   of dollars to travel over here for an opening party on 46th

18   Street, the last thing they would have done.  They would have

19   been focusing on Jim's new fraudulent scheme, Our Space.

20           MR. GARVIN:  Your Honor, I'd like to move to strike

21   that last portion --

22           THE COURT:  I think it's responsive to the question.

23   Q.  So his fraudulent --

24           THE COURT:  Let's leave it at that.

25           MR. GARVIN:  I'm sorry?

1          THE COURT:  I said we should leave it at that.

2   Q.  You had no dealings in Our Space; isn't that correct?

3   A.  I had no dealings with Our Space; correct.

4   Q.  So you don't know if the people who were working at Our

5   Space today are good, honest, hardworking people or not, you

6   don't have no idea?

7   A.  I knew at the time when I did my own research the company

8   was a fraud.

9   Q.  And so, sir, isn't it a fact that you had a meeting in

10  March, and at that meeting David Lilley came to that meeting?

11  Isn't that true?

12  A.  He didn't meet me, no.

13  Q.  Well, you were in the same premises; isn't that right?

14  A.  I don't know.  I never met David Lilley.

15  Q.  Well, isn't it a fact, sir, that Jim Moore took the guys

16  from Dolphin with Sean Phillips, and they met at a Bar Works

17  location?  Isn't that true?

18  A.  I'm not aware of that meeting.

19  Q.  And isn't it true that you were at the location, but

20  refused to join the group?

21          THE COURT:  What time are we talking about?

22          MR. GARVIN:  March, your Honor, 2016.

23          THE COURT:  Is there a date?

24          MR. GARVIN:  I believe the email showed it was around

25  March 11th.

J66VMOO2                        Haddow - cross

1    Q.  Isn't that true, sir?

2    A.  You'll have to repeat it, I'm afraid.  Sorry.

3    Q.  Yes.  You were at the location, but you stayed 30 or 40

4    feet away from the meeting?

5    A.  Incorrect.

6    Q.  And Jim -- you remember the email that we talked about

7    yesterday where it said Jim Moore said it would be nice for you

8    if you would join us, but I know you are reticent.

9            Do you recall that email?

10   A.  I do recall that, yes.

11   Q.  And he's talking about this meeting that we are now talking

12   about; isn't that correct?

13   A.  He was, yes.

14   Q.  And isn't it a fact that that meeting took place; correct?

15   A.  I don't know if it took place.  I don't remember it taking

16   place.  All I remember is us meeting later on.  The reason --

17   my reason for meeting in the March meeting was to take them to

18   the 46th Street location.  In my mind, that week was focused on

19   opening 46th Street.  So I would never have sat in the same

20   room with someone who I'm trying to hide my identity; I would

21   have definitely left the location, such that those facts don't

22   make sense to me.

23   Q.  There was no effort to hide your identity, sir; you were

24   standing 30 or 40 feet away?

25   A.  No.

J66VMOO2                          Haddow - cross

1    Q.  They were in a long bar, do you remember that?

2    A.  Sorry?

3    Q.  The bar area?

4    A.  No, I don't remember that.

5                THE COURT:  "Bar" as in a bar?

6                MR. GARVIN:  Yes, drinking.  Like Bar Works, yes, sir.

7    A.  There was bars in all the locations.  And the bars were

8    very short.  There was no way I was sitting on the end of the

9    bar in that location.

10   Q.  And, sir, isn't it a fact that Jim Moore came over and

11   said, Come over.  I paid for these guys to come here, come meet

12   them.

13   A.  No, that's a lie.

14   Q.  And isn't it a fact that that was the final straw as far as

15   Jim Moore and Neil Storey and Mr. Robinson from United

16   Properties Group, that was the beginning of the end?

17   A.  That was totally fabricated.

18   Q.  Isn't it true, sir, that Jim Moore suggested that you

19   retire?  Isn't that true?

20   A.  That had been suggested in January.  And that wasn't

21   retiring me per se; that was retiring Jonathan black and myself

22   so that I could be working in the background and he would put

23   in other people, well-known people in the property industry, to

24   front up the company.

25               So retiring -- your idea of retiring and my idea of

1   retiring and Jim's idea of retiring are slightly different

2   here.  Retiring in the way that he was discussing was that he

3   would find new people to front the company up.  And that

4   Jonathan Black, who everyone wanted to retire, because he was

5   becoming a pain, causing the conflict that -- everyone finding

6   out -- people starting, you know, all these protocols and been

7   very careful in how we tread, was not a way to run a business.

8          So the idea of retiring, that's the reason for the

9   retiring, not he wanted me to go whence on a beach somewhere.

10  Q.  Well, actually, sir, yesterday you told the ladies and

11  gentlemen of the jury that Jim Moore wanted to phase you out;

12  isn't that correct?

13  A.  He wanted to phase Jonathan and myself out.

14  Q.  Well, you said you yesterday; isn't that correct?

15  A.  I said that yesterday, but it's Jonathan and -- Jonathan

16  and I are two of the same people.

17  Q.  And you also told the ladies and gentlemen from the United

18  States when they met with you last, that he wanted to expand

19  Bar Works, isn't that true?

20  A.  Correct.

21  Q.  And that he wanted -- that he had a team of professionals

22  ready, isn't that true?

23  A.  Correct.

24  Q.  And that he wanted to open units of Bar Works in Dubai and

25  other international locations, isn't that true?

1    A.  Correct.

2    Q.  And that you told them that in order to do that, he wanted

3    you, meaning Mr. Haddow, to retire, isn't that true?

4    A.  I think "you," as far as I'm concerned, could mean

5    Mr. Haddow, it could mean Jonathan Black.  We were both the

6    same people.  But, yes, he wanted me and Jonathan Black to

7    retire so that these guys could front a business.

8    Q.  Nobody ever used the word "front" except for you?

9    A.  I think it -- does it mention where Jim Moore has used the

10   word "front."

11   Q.  No.  When it came to this, you didn't -- you felt that Jim

12   Moore was trying to take over your company; isn't that right?

13   A.  He was attempting to take over the company, yes.

14   Q.  And that made you angry, isn't that true?

15   A.  "Angry" is a little bit of a strong word.  I would say it

16   made me -- it made me very cautious.

17   Q.  Now, sir, isn't it also true that in March of 2016, right

18   around the time of this meeting, that Jim Moore --

19   A.  Sorry, what meeting?

20   Q.  -- was becoming suspicious regarding Jonathan Black?

21   A.  You'll have to tell me which meeting, because from the

22   sounds of it, there has been quite a few meetings in March,

23   half of them I don't know about.

24   Q.  Well, let's say on or about March 4th.

25   A.  But which meeting?

J66VMOO2                              Haddow - cross

1    Q.  That would have been the precursor to the Dolphins meeting,

2    before --

3    A.  As I said, I know nothing about the Dolphins meeting.

4    Q.  David Lilley is a person who came over for The Dolphin

5    Group.  Do you recall that?

6    A.  I recall you telling me about it.  But I don't recall

7    meeting him, being in the same room as him, sitting at the bar

8    with him, or any of the other things you've mentioned here

9    today.

10   Q.  So on approximately March 11th, you did not see them at the

11   39th Street location; is that correct?

12              MR. VAINBERG:  Objection.  Asked and answered.

13              THE COURT:  I'll allow it.

14              By "them" you mean who?

15              MR. GARVIN:  Meaning the people who flew in --

16              THE COURT:  The names I'm talking about.  I'm asking

17   what names.

18              MR. GARVIN:  Yes.

19   Q.  So you did not see David Lilley and his partner meeting

20   with Jim, Neil Storey, and Mr. Robinson from UPG?

21              THE COURT:  On what date?

22   Q.  On or about March 11th at the 39th Street location.

23   A.  No.  I would have been in -- that day it was the opening

24   party; I would have been in 46th Street arranging the final

25   touches of that.

J66VMOO2                          Haddow - cross

1   Q.   Okay.  Did you see them at the 46th Street location?

2   A.   They never came to the party, as far as I know.

3   Q.   So is it your testimony that what we call The Dolphin

4   Group, which is David Lilley and his partner -- remember the

5   people who wanted to bring the recording equipment to have

6   Jonathan give some video recording, do you recall that?

7   A.   I recall that, yes.

8   Q.   That they flew all the way from Europe, but they did not go

9   to the opening.  Is that your testimony?

10  A.   I was never introduced to them at the party; they never met

11  with myself, Jim, David Kennedy, and James Robinson across at

12  the bar where we spent two or three hours before the party.

13  And I remember quite clearly when we went into 46th Street,

14  they were -- James and Jim and David spent a lot of time around

15  me.  I don't remember them peeling off and speaking to David

16  Lilley and his partner.  So if they were invited, it's news to

17  me.

18  Q.   Showing you now Government's Exhibit 39 -- 139.  And, sir,

19  I've already asked you this several times, but I just want to

20  lead into this.  And that is, do you recall on March 10th, that

21  Jim Moore spoke to you and became very, let's say, suspicious

22  of Jonathan Black?  Do you recall that --

23           THE COURT:  Do you have this -- mine is not centered.

24           MR. GARVIN:  Yes, I haven't moved it into focus yet.

25           THE COURT:  Oh, I'm sorry.

1    Q.  Do you recall that?

2    A.  Suspicious in what respect?

3    Q.  That you had been telling him that the three or four times

4    he had been to Bar Works, that Jonathan Black wasn't there

5    because he was busy in Europe in his office in London?

6    A.  No, that's just -- it's just rubbish.

7    Q.  So your position on this was that it would have been

8    nonsense, I think is what you said yesterday, for your name and

9    Jonathan Black's name to appear at the same time; isn't that

10   correct?

11   A.  Correct.

12          MR. VAINBERG:  Objection.  Mischaracterizes the

13   witness's testimony.

14          THE COURT:  If you have the testimony, you should read

15   it back.

16          MR. GARVIN:  He said "correct."

17          THE COURT:  No, you should read it back if you have

18   the testimony.  I'm going to strike the answer.  If you're

19   going to refer to something that was said, you need to refer to

20   the transcript.

21          MR. GARVIN:  Yes, your Honor.  I'll go back.

22   BY MR. GARVIN:

23   Q.  Sir, you told us that Jonathan Black was to help hide your

24   name; correct?

25   A.  Correct.

1  Q.  And that it would be counterproductive to put your name on

2  the same document as Jonathan Black's name; correct?

3  A.  It wouldn't be on the same document; they would be on

4  separate documents.

5  Q.  Well --

6  A.  I get what you're getting at, yes.

7  Q.  So let me give you an example so we're clear.

8        I think you've already answered, but just in case I'm

9  being not clear to the ladies and gentlemen of the jury, you

10  had a private placement memorandum.  You put Jonathan Black as

11  the CEO; correct?

12  A.  Correct.

13  Q.  It would be counterproductive to put on the same private

14  placement memorandum anywhere on the same page Renwick Haddow;

15  correct?

16  A.  Correct.

17  Q.  Because, according to you, the whole idea of using Jonathan

18  Black was to hide Renwick Haddow; correct?

19  A.  Correct.

20  Q.  And the reason why you wanted to hide Renwick Haddow is

21  because you had issues with the FCA in England; correct?

22  A.  That and many other things, yes.

23        THE COURT:  Excuse me.  Excuse me.

24        Do I remember correctly that you said that in the

25  description of Jonathan Black, the first three lines of that

J66VMOO2                          Haddow - cross

1   description actually mirrored your personal experience?

2             THE WITNESS:  Yes, that's correct.

3             THE COURT:  Do you recall what it was in those three

4   lines?

5             THE WITNESS:  Yeah, that Jonathan Black was a

6   financial controller at Regent Inns PLC.

7             THE COURT:  Regent Inns PLC.

8             THE WITNESS:  And I think it said another company.

9   And Region Inns was worth $400 million.

10            THE COURT:  Did you think that if there was a person

11  who was familiar with Regent Inns, they would figure out that

12  that was you instead of -- or they might suspect that that was

13  you?

14            THE WITNESS:  I thought there was a possibility, but I

15  thought it was a long shot.

16  BY MR. GARVIN:

17  Q.  The answer to the Court's question is you believed that

18  would be a long shot; correct?

19  A.  Correct.

20            THE COURT:  He said it would be a possibility, but he

21  believed it would be a long shot.

22  Q.  And just so we have on the page what this Honorable Court

23  has asked you as 5011, you see it says:  Jonathan Black has a

24  background in finance and start-up ventures.  That's pretty

25  mundane; correct?

J66VMOO2                          Haddow - cross

1          THE COURT:  Pretty what?

2          MR. GARVIN:  Mundane.

3   Q.  Meaning that could cover a lot of people, right?

4   A.  Yes.

5   Q.  Then you said he was a finance director/financial

6   controller of two chains of bars in the UK:  Regent Inns PLC,

7   market value 400,000; correct?

8   A.  Correct.

9   Q.  Now, one of the investors looked up Regent Inns; is that

10  correct?  Did you know that?

11  A.  I didn't know that.

12  Q.  So it would be fair to say that it would be

13  counterproductive to have your name on the same page as

14  Jonathan Black's; correct?

15  A.  Correct.

16          THE COURT:  Is Regent Inn a known quantity in London?

17          THE WITNESS:  It was, yes.  It was a -- had a

18  well-known chain of bars and it was listed on the London Stock

19  Exchange.

20          THE COURT:  It was listed on the London Stock

21  Exchange?

22          THE WITNESS:  Yes.

23  BY MR. GARVIN:

24  Q.  When you say it's listed on the London Stock Exchange, it

25  was a big company, right?

1    A.  It was a big company, yes.

2    Q.  And it had hundreds of employees, right?

3    A.  It had hundreds of employees, yes.

4    Q.  If not thousands?

5    A.  Possibly.

6    Q.  Possibly.

7          THE COURT:  You said before 400,000.  Did you mean 400

8    million or was it 400,000 in the brochure?

9          THE WITNESS:  400 million.

10          MR. GARVIN:  If I said thousand, I misspoke, because

11    it's 400 million.

12          THE COURT:  And who was involved in the financing of

13    that venture?

14          THE WITNESS:  Well, I was the financial controller at

15    the company, but that was raised through the markets.

16    BY MR. GARVIN:

17    Q.  To be clear, Regent Inn was not a fraud; correct?

18    A.  No, Regent Inns wasn't a fraud.

19    Q.  You had a job there; correct?

20    A.  Yes.

21    Q.  And that was a long time ago; correct?

22    A.  That was a long time ago, yes.

23    Q.  Could you give us the approximate year of when you started

24    there?

25    A.  I think I started there in 1995 and finished in 2000.

1    Q.  Okay.  So approximately 15 to 20 years before the events

2    we're discussing; correct?

3    A.  Well, 15 years, yes.

4           THE COURT:  If someone were to look up Regent Inns,

5    would they find Jonathan Black?

6           THE WITNESS:  No, they wouldn't.

7           THE COURT:  They would find you.

8           THE WITNESS:  They would find me, yes.  But they

9    probably wouldn't find me, because I wasn't a director of

10   Regent Inns, I was a financial controller, so I wasn't

11   registered anywhere really.

12   Q.  Okay.  So they wouldn't find you and they wouldn't find

13   Jonathan Black either; correct?

14   A.  They probably wouldn't, no.

15   Q.  All right.  So let's look now at an email that Jim Moore

16   sent.  This is Government's Exhibit 139 to is it Tahyira?

17   A.  Tahyira, yes.

18   Q.  Cordner?

19   A.  Yes.

20   Q.  And Tahyira Cordner worked at Bar Works; correct?

21   A.  Correct.

22   Q.  And you see there's Jonathan Black?

23   A.  Yes.

24   Q.  And right next to it it says renwick@renwickhaddow, isn't

25   that true?

1    A.   That's correct.

2    Q.   And it also says Jessica Mayo, isn't that true?

3    A.   Correct.

4    Q.   Sir, isn't it a fact that Jonathan Black never had the

5    email address of renwick@renwickhaddow.com?  Isn't that true?

6    A.   Yes, Jonathan Black had his own email address.

7    Q.   And what has happened here is that Jim Moore has purposely

8    placed Jonathan Black's name on an email directly next to your

9    name; isn't that correct?

10            THE COURT:  If you know.

11   A.   It looks like Jim Moore has actually slipped up there.

12   Q.   Well, it was a slipup --

13   A.   It was a big slipup.

14   Q.   -- or was it that Mr. Moore was calling you out by saying,

15   Are you Jonathan Black?

16   A.   Jim Moore didn't need to call him out, because Jim Moore

17   knew very, very clearly that I was Jonathan Black.  If he was

18   doing that for his own venture, which, from the looks of it, he

19   had it planned in March as ammunition, then maybe that's it.

20            But as far as I'm concerned, you mentioned earlier did

21   I recognize the fact that Jim Moore was getting suspicious, Jim

22   Moore was never suspicious.  Jim Moore knew exactly what the

23   situation was.

24   Q.   So you would agree that to do that, you have to

25   intentionally do that, right?

1              THE COURT:  To do what?

2              MR. GARVIN:  Put the two names together, your Honor.

3              THE COURT:  Well, he didn't, did he --

4              MR. VAINBERG:  Objection.  Foundation.

5              THE COURT:  He didn't do that.

6              MR. GARVIN:  I understand that.

7              THE COURT:  So you have to rephrase the question.

8    BY MR. GARVIN:

9    Q.  Sir, when you send somebody an email, you have to type in

10   the email address; correct?

11   A.  Correct.

12   Q.  Now, you can also go to your directory or address book and

13   input a name and send it that way; correct?

14   A.  If you say so, yes.

15              Can I -- Jim Moore has a track record in this case of

16   removing the Renwick Haddow email addresses and forwarding

17   emails over to parties who weren't in the know.  So this is

18   probably another example of him doctoring emails.

19   Q.  You would agree with me that emails from Jim Moore to you

20   immediately prior to that particular day do not have the name

21   Jonathan Black; isn't that correct?

22   A.  I don't think the question makes any sense to me, I'm

23   afraid.  Can you repeat that please?

24   Q.  Yes.  Jim Moore sent to you, Renwick Haddow, emails in

25   March that did not have the name Jonathan Black on it?

1    A.  You mean Jonathan Black and Renwick Haddow together?

2    Q.  Yes.

3    A.  Yes, I've never seen any emails like that.

4    Q.  When you say "like that," you mean the one --

5    A.  Where it says it's from Jonathan Black, and in brackets

6    from the Renwick Haddow email address.  That's very strange.

7    Q.  So the emails that were sent to you during the month of

8    March before the email we just looked at only had Renwick

9    Haddow on them; correct?

10   A.  Well, there were various emails.  There's some emails with

11   Renwick Haddow, and there's some emails specifically in

12   Jonathan Black.  So one or the other.

13   Q.  But there wasn't one that had both; correct?

14   A.  No, not --

15   Q.  And after March 10th, the emails were only to Renwick

16   Haddow; correct?

17   A.  Not correct.  I don't -- I don't know where you got that

18   from.

19   Q.  I was trying to establish, sir, that this practice did not

20   happen before March 10th and it did not happen after March

21   10th; that March 10th --

22            THE COURT:  Why don't you just ask that?

23            MR. GARVIN:  Yes, sir.

24   Q.  Is it true that this practice did not happen before March

25   10th or after March 10th, to your knowledge?

1    A.   To my knowledge, this is the first time I've seen that.

2    And it's obviously that's a question to Jim why he did that.

3    Q.   I'd like to show you Government's Exhibit 143.  Yesterday

4    during direct examination, you had a discussion about an email

5    that says "the F word."  Do you recall that, sir?

6    A.   I do, yes.

7    Q.   And you'll recall that the F word was the FCA, the

8    Financial Conduct Authority; correct?

9    A.   Correct.

10   Q.   And in that email, you wrote on March 20th:  "I agree with

11   you totally.  I am already seeking a good lawyer."

12            Now, to put this into context, what matter was this

13   relating to?

14   A.   This is relating to the FCA followup case regarding Capital

15   Alternatives and African land called credits.

16   Q.   And we had previously seen documentation on that case;

17   correct?

18            THE COURT:  Counsel, this is not very focused.

19            MR. GARVIN:  Yes, sir.  It's supposed to be on

20   automatic focus.  There we go.  Sometimes it comes in.

21   Q.   And you wrote:  "I agree with you totally.  I am already

22   seeking a good lawyer.  The other two parties, looks like they

23   are going to defend themselves, so this plays into hand, as the

24   gloves are off and I shall be laying any misselling directly at

25   them."

1          You wrote that; correct?

2     A.  Correct.

3     Q.  And what you are telling Jim Moore there was that you were

4     going to blame the other two parties, isn't that true?

5     A.  Correct.

6     Q.  And when you say "blame the other two parties," you were

7     going to take the position that you did nothing wrong; correct?

8     A.  Correct.

9     Q.  And you were going to take the position that if there was

10    any misselling, that it was the other two parties; correct?

11    A.  That wasn't -- these are your words, but partially what you

12    said is correct, yes.

13    Q.  And your position was going to be that you had no knowledge

14    of their misdeeds; isn't that correct?

15    A.  I hadn't decided at that stage what my position was.

16    Q.  Well, at that stage you had said:  "The other two parties,

17    looks like they are going to defend themselves so this plays

18    into hand, as the gloves are off and I shall be laying any

19    misselling directly at them."

20          That's what you said, right?

21    A.  That's correct, yes.

22    Q.  Now, let's go to this case, sir.

23          Mr. Moore is defending himself; correct?

24    A.  Defending himself?

25    Q.  He's defending himself in this case; correct?

1   A.  Correct.

2   Q.  And isn't it a fact that you believe that this plays

3   directly into your hands?  Isn't that true?

4   A.  Not correct.  Two different scenarios altogether.

5   Q.  And that the gloves are off, and that you are laying the

6   blame at Mr. Moore, isn't that what you've been doing?

7   A.  Incorrect.  I take full responsibility for what I did.  And

8   Jim knows what he did.

9   Q.  Sir, throughout the course of this fraud, you've been

10  motivated by money; correct?

11  A.  Correct.

12  Q.  You've been motivated by greed; correct?

13  A.  Correct.

14  Q.  You have lied to investors; correct?

15  A.  Correct.

16  Q.  You have lied to the authorities; correct?

17  A.  Correct.

18  Q.  You have lied to your own lawyers; correct?

19  A.  Correct.

20  Q.  You have lied to agents; correct?

21          MR. VAINBERG:  Objection.

22          THE COURT:  Sustained.

23          What do you mean by "agents"?

24  Q.  Sales agents such as Nick; correct?

25  A.  Correct.

1   Q.  All of that was motivated by money; correct?

2   A.  Partially, yes.

3   Q.  And here, your motivation is much, much more than just

4   money, isn't it?

5           MR. VAINBERG:  Objection.  "Here."

6           THE COURT:  I'll allow it.

7           What do you mean?

8   Q.  Here, what's at stake is --

9           THE COURT:  "Here" meaning --

10          MR. GARVIN:  In this case.

11  Q.  Here, in this case, what's at stake is your liberty, your

12  freedom; isn't that correct?

13  A.  Nothing to do with what we're talking about here.

14  Q.  And you would trade all of those assets that I spoke to you

15  about yesterday for your freedom; you'd gladly give them up for

16  your freedom.  Isn't that true?

17  A.  I think what you're saying is -- doesn't represent what

18  we're talking about here.

19  Q.  Sir, isn't it true that you would give up any and all of

20  those assets for your freedom?

21  A.  No, that's not relevant.

22  Q.  And isn't it true, sir, that money may have been a

23  motivation for you, but you value your freedom more than money,

24  isn't that true?

25  A.  My motivation here is very simple.  My motivation here is

J66VMOO2                         Haddow - cross

1    to be truthful and tell the facts as they stand.  That's it.

2    The assets, the freedom, yeah, we can talk about that, but the

3    fact is it is very simple:  Tell the truth and give the facts

4    as I know them.

5    Q.  Sir, is money more important to you or your freedom?

6              MR. VAINBERG:  Objection.

7              MR. GARVIN:  Can you just --

8              THE COURT:  Sustained.

9    Q.  And as far as telling the truth, the only two people that

10   were on that telephone call was you and Jim Moore, the one that

11   you say that you told Jim Moore that Jonathan Black did not

12   exist.  Isn't that true?

13   A.  One of many phone calls, yes.

14             MR. GARVIN:  I have no further questions.  Thank you.

15             THE COURT:  Okay.  Should we take a five-minute break?

16             JUROR:  Yes, please.

17             (Jury not present)

18             (Recess)

19             (Jury present)

20             THE COURT:  Please be seated.

21             So following cross-examination, the government has the

22   opportunity for what's called redirect --

23             THE LAW CLERK:  Hold on one second please.

24             THE COURT:  Are we missing somebody?

25             THE LAW CLERK:  Yes.

1           (Pause)

2           THE COURT:  So following cross-examination, the

3   government gets the opportunity for what's called redirect

4   examination.  Redirect is limited to what was gone into on

5   cross-examination, right?

6           MR. VAINBERG:  Yes, your Honor.

7           THE LAW CLERK:  Sir, I'd just like to remind you again

8   you're still under oath.

9           THE WITNESS:  Thank you.

10          THE LAW CLERK:  Thank you.

11  REDIRECT EXAMINATION

12  BY MR. VAINBERG:

13  Q.  Good morning, Mr. Haddow.

14  A.  Good morning.

15  Q.  Mr. Haddow, I have a few questions for you.

16          THE COURT:  If you pull that microphone a little bit

17  closer to you.

18          MR. VAINBERG:  Can we pull up Government Exhibit 139.

19  Q.  Do you recall being asked questions by defense counsel

20  about this email from the defendant?

21  A.  Yes, I do.

22  Q.  That's an email coming from the defendant's email system,

23  right?

24  A.  It is, yes.

25  Q.  And it's the defendant that's associating the word Jonathan

1   Black with renwick@renwickhaddow.com, right?

2   A.   That's correct.

3   Q.   Does it stand to reason that you knew you were Jonathan

4   Black?

5          MR. GARVIN:   Object to form.   Calls for speculation.

6          THE COURT:   Sustained.   Rephrase that question.

7   Q.   Mr. Haddow, did the defendant know, based on all of your

8   interactions with him and this document, that you were Jonathan

9   Black?

10  A.   Yes, for sure.

11         MR. VAINBERG:   Let's take that down.

12  Q.   Now, during cross-examination, you were asked a number of

13  questions about Bar Works, right?

14  A.   Correct.

15  Q.   Bar Works was a fraudulent scheme, right?

16  A.   It was, yes.

17  Q.   It was a Ponzi scheme?

18  A.   It was a Ponzi scheme.

19  Q.   And part of the fraud was that you were pretending to be

20  Jonathan Black to the outside world, right?

21         MR. GARVIN:   Your Honor, object to the leading nature

22  of the last question.

23         THE COURT:   Overruled.

24  Q.   And part of the fraud was that you were pretending to be

25  Jonathan Black?

1   A.  That's correct.

2   Q.  Now, to advance the fraud, you told some lies to cover up

3   that fact, right?

4   A.  I did, yes.

5   Q.  You told some lies without the defendant, right?

6   A.  Without the defendant?

7   Q.  Yes.

8   A.  Yes.

9   Q.  And you told other lies with the defendant, right?

10  A.  Correct.

11          MR. GARVIN:  Objection.  Leading.

12  Q.  Did you tell other lies with the defendant?

13  A.  Yes, I did.

14  Q.  And did you know that the defendant was advancing those

15  lies to promote the fraud himself?

16  A.  Yes.

17          MR. GARVIN:  Object to the leading --

18          THE COURT:  Overruled.  Sustained.

19          Can you rephrase that question?

20  Q.  To your knowledge, did the defendant tell lies to promote

21  the fraud?

22  A.  Yes, he did.

23          MR. VAINBERG:  Let's pull up Government Exhibit 135,

24  please.

25  Q.  This is the honeymoon email that you spent some time

1    discussing on cross-examination, right?

2    A.  Yes, it is.

3    Q.  That's the email that begins with David Lilley's request to

4    record some clips with Jonathan Black, right?

5    A.  Correct.

6    Q.  And the defendant wrote:  Guys, how do we feel we can

7    overcome the Jonathan issue?  He's on honeymoon.

8             Do you recall testifying about that on

9    cross-examination?

10   A.  Yes, I do.

11   Q.  And then right above that, when we look at the defendant's

12   response, do you recall defense counsel asking you questions

13   about the statement:  Would be great to find a way --

14           THE COURT:  Could you go slower please.

15           MR. VAINBERG:  Certainly.

16   Q.  The defendant wrote:  Would be great to find a way to get

17   you involved, but equally understand your reticence.  Right?

18   A.  Yes.

19   Q.  And defense counsel asked you if you understood that to

20   mean that the defendant wanted you to meet David Lilley as

21   Renwick Haddow, right?

22   A.  That's right.

23   Q.  What did you understand that to mean?

24   A.  What do you mean?

25   Q.  What did you understand the defendant to be asking you to

J66VMOO2                         Haddow - redirect

1   do here?

2          THE COURT:  In the email?

3          MR. VAINBERG:  In the email.

4   A.  He wanted me to show up at the meeting, but he understood

5   that I couldn't, because I was pretending to be Jonathan Black.

6   Q.  Did the defendant want you to show up at that meeting as

7   Renwick Haddow or Jonathan Black?

8   A.  I think he wanted me to show up as Renwick Haddow.

9   Q.  Did you have other email correspondence with the defendant

10  and David Lilley?

11  A.  I can't recall.

12         MR. VAINBERG:  Let's pull up Government Exhibit 121.

13  Q.  Now, Mr. Haddow, this is a document that we didn't look on

14  direct examination at right?

15  A.  No.

16  Q.  Who is this email chain with?

17  A.  The email is from David Lilley to Jim Moore, copying in

18  Leslie McCann, Jonathan Black, and Deon.

19  Q.  And were you copied in on that email as Jonathan Black?

20  A.  I was copied in as Jonathan Black, yes.

21  Q.  What's the date of this email?

22  A.  It's February the 11th, 2016.

23  Q.  And is that about three weeks before the March email about

24  recording some clips with Jonathan Black?

25  A.  That's correct.

1   Q.   Now, going to the bottom half of this email.  Do you see an

2   email from the defendant beginning with the words "Hello,

3   David"?

4   A.   Yes.

5   Q.   That's the defendant writing to David Lilley, right?

6   A.   That's correct.

7   Q.   Let's look on the second page.

8        MR. VAINBERG:  Could we blow up the portion that

9   begins with "I don't take things on lightly" and goes down to

10  the second paragraph, after Neil Storey.

11  Q.   Could you read the first sentence of this portion?

12  A.   "I don't take things on lightly and as you will have

13  identified, my previous two best-known businesses have both

14  successfully become sales unicorns, exceeded a billion dollars

15  in revenue.  This will do the same.  In fact, we believe the

16  industry is in its infancy, and it would seem that we share

17  that view with Morgan Stanley, Goldman Sachs, Fidelity, et al."

18  Q.   That's the defendant writing this to David Lilley, right?

19  A.   It is, yes.

20  Q.   To your knowledge, was the defendant trying to get David

21  Lilley involved in Bar Works?

22  A.   He was, yes.

23  Q.   Did the defendant make statements about who was running Bar

24  Works?

25  A.   He did.

J66VMOO2                        Haddow - redirect

1    Q.  Can you focus on the portion beginning with "perhaps" and

2    read that in the first paragraph.

3    A.  Yes.  Perhaps lesser-known aspects of our various careers

4    are a deep level of commercial and forensics experience which,

5    in summary, for your interest, is as follows:

6            One.  Jonathan Black, Regent Inns PLC.  Jonathan was

7    the primary originator of Bar Works prior to us becoming

8    involved at the formation stage with this small and tight team

9    who were previously responsible for successful rollout of

10   walkabout bars in UK.  He has experience of venture capital,

11   along with fundraising at a corporate and regulated level and,

12   of course, management of public companies at board level.

13   Q.  Is the defendant telling David Lilley that he was working

14   with Jonathan Black?

15   A.  Yes, he is.

16   Q.  Let's read the second paragraph here.

17   A.  Two.  Neil Storey.  When I first met Neil, he was a client

18   of mine and he was British Consul to Peru.  He subsequently

19   became HM Consul General to Brazil and then head of UK trade

20   and investment for Latin America.  He also had a parallel very

21   specialized and specific role with direct responsibility to

22   William Hague, who at the time was British foreign secretary.

23   Neil is a valued and significant partner in the business and

24   part of the strategic international expansion team, along with

25   myself and Jonathan.

J66VMOO2                         Haddow - redirect

1  Q.   What was the defendant representing to David Lilley was the

2  team of people running Bar Works?

3  A.   He was saying Jonathan Black is running Bar Works, and Neil

4  and Jim were working closely with Jonathan Black.

5             MR. VAINBERG:  Nothing further.

6             THE COURT:  Thank you.

7             Anything, counsel?

8             MR. GARVIN:  Yes.

9             May I see the last exhibit please?

10             (Continued on next page)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    RECROSS EXAMINATION

2    BY MR. GARVIN:

3    Q.  Sir, you were asked in the paragraph numbered 1 it says

4    Jonathan Black, you were asked if Mr. Moore stated that he was

5    working with Jonathan Black.  Does the word "working" appear

6    anyplace in paragraph 1, sir?

7    A.  Not in that paragraph.

8    Q.  I'm now showing you the second paragraph.  Does the word

9    "working" appear in that paragraph?

10   A.  No.  Those are pure descriptions of the individual's

11   experience.

12          MR. GARVIN:  Thank you.  I have further questions.

13          THE COURT:  OK.  We will excuse the witness -- thank

14   you -- and ask for the government's next witness.

15          (Witness excused)

16          MR. BELL:  Your Honor, the government will call Neil

17   handle man shortly, but we would like to read a stipulation

18   into the record first.

19          THE COURT:  So, this is something that's been agreed

20   to by the government and the defense.

21          MR. BELL:  Thank you, your Honor.  Government Exhibit

22   1250 has been marked for identification as such.  It's a

23   stipulation regarding interstate wires, and it reads:

24          It's agreed between the parties that if called to

25   testify, a qualified" --

1           THE COURT:  I'm sorry, you have to speak a little more

2      clearly.

3           MR. BELL:  Sure thing.

4           If called to testify, a qualified and knowledgeable

5      person would testify that e-mail exchanges between individuals

6      located in the United States and individuals located at

7      overseas locations of the United Property Group involved the

8      use of interstate wires at all times relevant to this case.

9           With that, your Honor, the government calls Neil

10     Hendelman.

11      NEIL HENDELMAN,

12          called as a witness by the government,

13          having been duly sworn, testified as follows:

14          MR. BELL:  Your Honor, before I proceed, I realize I

15     should offer the stipulation that we just entered.  Government

16     offers Government Exhibit 1250.

17          THE COURT:  I will allow it.

18          (Government Exhibit 1250 received in evidence)

19     DIRECT EXAMINATION

20     BY MR. BELL:

21     Q.  Good morning, Mr. Hendelman.  Where do you work?

22     A.  The Securities and Exchange Commission.

23     Q.  Is that also known as the SEC?

24     A.  Yes.

25     Q.  How long have you worked with the SEC?

1    A.   Since June 2001.

2    Q.   What is your title there?

3    A.   Supervisory staff accountant.

4    Q.   And how long have you had that specific role?

5    A.   Since the end of 2010.

6    Q.   What are your duties and responsibilities in that role with

7    the SEC?

8    A.   I work on investigations into violations of the federal

9    securities laws.  I analyze different sets of data.

10   Q.   And what did you do with the SEC prior to having that

11   specific title?

12   A.   I was a securities compliance examiner, but my role was

13   basically the same.

14   Q.   Now, in the course of your work with the SEC, have you been

15   asked to perform tasks regarding a business called Bar Works?

16   A.   Yes.

17   Q.   And generally speaking what did that work involve?

18   A.   I analyzed bank records; I traced the flow of money.

19   Q.   And generally speaking, what kinds of bank records did you

20   analyze as part of that work?

21   A.   I analyzed the bank records for accounts related to the

22   investigation.

23   Q.   Did you put together a chart of the bank records that you

24   used as part of your assignments?

25   A.   Yes.

1    Q.  And so I'd like to put just on the witness's screen for the

2    moment what has been marked for identification as Government

3    Exhibit 550.

4            Sir, are you familiar, Mr. Hendelman, with what is on

5    the screen right now?

6    A.  Yes.

7    Q.  How are you familiar with that, sir?

8    A.  These are the accounts I analyzed.

9    Q.  And are you familiar with who put together this list?

10   A.  I did.

11           MR. BELL:  Your Honor, the government offers 550.

12           THE COURT:  I will allow it.

13           (Government Exhibit 550 received in evidence)

14           MR. BELL:  Can we briefly publish that?

15           THE COURT:  Yes.

16   Q.  So here you have, is it fair to say, a list of accounts and

17   what is called a date range of data?  And is it fair to say

18   that you analyzed those accounts -- or records of those

19   accounts relating to the date ranges you have listed here?

20   A.  Yes.

21   Q.  There is a column at the very right end that says "analyzed

22   by Neil".  And the fields for each of those say yes, with one

23   exception towards the very bottom.  There is an account name

24   called Universal Voice Tech from a bank called Suntrust, and it

25   says, "Yes, but need to enter checks."  What does that mean,

J667MOO3                         Hendelman - Direct

1    Mr. Hendelman?

2    A.  At the time of the analysis I did not have the checks

3    written on the account, so I did not put those into my analysis

4    for that account.

5    Q.  Did you have records separate and apart from those actual

6    checks?

7    A.  Yes.

8           MR. BELL:  Let's take that down, Mr. Cooney.  Thank

9    you.

10           At this time, your Honor, I would like to read an

11    additional stipulation into the record; it's Government Exhibit

12    1255.

13           THE COURT:  OK.

14           MR. BELL:  It's stipulated and agreed by and between

15    the United States of America and the defendant that if called

16    to testify at trial, custodians of records from the following

17    financial institutions would testify that they are familiar

18    with the recordkeeping practices of their respective

19    institutions.  And just to shorten them to move things along,

20    they are JP Morgan Chase Bank, Wells Fargo, Bank of America,

21    Capital One, Citibank and Suntrust.

22           The custodians would testify that as to the following

23    Government's Exhibits associated with each institution, the

24    exhibits consist of true and correct copies of records of

25    regularly conducted activity made at or near the time of the

1    activity, or from information transmitted by a person with

2    knowledge of the matters set forth.

3            There is then a list of a number of exhibits between

4    Government Exhibit 500 and 526.  The custodians would further

5    testify as to their respective records that the records were

6    kept in the course of a regularly conducted business activity

7    and were created as a regular practice of that business

8    activity.

9            It is further agreed that those exhibits, 500 through

10   526, are business records and that they and the stipulation are

11   admissible at trial.

12           The government offers Government Exhibit 1255 and 500

13   through 526.

14           THE COURT:  I will allow it.

15           (Government Exhibits 1255 received in evidence)

16           (Government Exhibits 500 through 526 received in

17   evidence)

18   Q.  Now, generally speaking, Mr. Hendelman, do you understand

19   some of those exhibits to include exhibits that you reviewed

20   and included on that chart we mentioned moments ago, generally

21   speaking?

22   A.  Yes.

23   Q.  Now, in doing your work, did you create charts so as to

24   summarize the activity that you saw in those bank records?

25   A.  Yes.

1   Q.  And did those charts summarize records that otherwise might

2   be too voluminous or inconvenient to read in court?

3   A.  Yes.

4   Q.  So what I'd like to do is direct your attention to

5   Government Exhibit 527, which we will put up on your screen.

6            Mr. Cooney, can we do that?  And we will do it in

7   native form.

8            So, we are on a tab right now within this chart

9   labeled summary.

10           And I will ask Mr. Cooney for you to just cycle

11  through the other tabs very briefly, this one relating to a

12  1622 account, the next 1172, and the next 1379.

13           Now let's go to the summary once again.  And so are

14  you familiar with this chart, sir?

15  A.  Yes.

16  Q.  And how are you familiar with it?

17  A.  I made it.

18  Q.  And what does this chart -- what information does this

19  chart contain?

20  A.  It's a summary of the investors in the Bar Works accounts.

21  Q.  And is that based on the same bank records that you

22  reviewed as part of your work?

23  A.  Yes.

24           MR. BELL:  The government offers Government Exhibit

25  527.

 1              MR. GARVIN:  No objection.

 2              THE COURT:  I will allow it.

 3              (Government Exhibit 527 received in evidence)

 4              MR. BELL:  And if we could publish that, Mr. Cooney.

 5   Q.  Now, we are looking at -- and I think the jury can now see

 6   this -- we are looking at the summary tab within that chart,

 7   and so I'm going to ask a number of questions to draw out what

 8   it is that we're looking at here.

 9              First of all, you have listed a number of accounts in

10   column A.  What are those generally speaking?

11   A.  Those are the bank accounts.

12   Q.  And are each of those bank accounts belonging to Bar Works

13   or a related entity at a specific bank?

14   A.  Yes.

15   Q.  And do they contain account numbers that allow one to

16   understand which specific account we are looking at?

17   A.  Why.

18   Q.  There is then column B, a time period, and what does that

19   column denote?

20   A.  That is the time period of my review for those accounts.

21   Q.  The next two columns are listed as debits and credits,

22   column C and column D.  What do those tell us, sir?

23   A.  Credits are the total money received from investors; debits

24   are the total monies paid back to investors.

25   Q.  And so for purposes of this exercise let's run through line

1  2 very quickly.  For the JP Morgan Bar Works account that ends

2  in number 1622, is it the case that between -- based on your

3  review -- December 31, 2015 and December 30, 2016 you saw

4  roughly $30.1 million come in from investors over that time and

5  about half a million dollars go out?

6  A.  Yes.

7  Q.  And totaling all of these, let's look at line 6.  Are these

8  the total debits and total credits that we see in column C and

9  column D?

10  A.  Yes.

11  Q.  And then at the very end we have a grand total.  What is

12  that total?

13  A.  That's the total credits minus the total debits.

14  Q.  And so is it the result of your analysis that you saw over

15  these time periods a net of $37,086,355.61 come into Bar Works

16  from investors over the time periods covered?

17  A.  Yes.

18          MR. BELL:  One moment, please.

19  Q.  Now, recognizing, Mr. Hendelman, that you were limited to

20  the accounts that you were actually given, do you know

21  conclusively that that is all of the money that came into Bar

22  Works over these periods of time?

23  A.  No.

24  Q.  What else is possible by way of example?

25  A.  There could be additional accounts that received money that

1    I did not analyze.

2    Q.  Understood.  And then just to go through each of those

3    three tabs very briefly.  What do we have here?

4    A.  That's a list of the investors, the date of their

5    investment and the amount of their investment.

6    Q.  And so does that break out each of the transactions that

7    contributed to the summary tab that we just looked at?

8    A.  Yes.

9    Q.  So, can the jury, if they are so inclined, trace that

10   individual investment by individual investment transactions?

11   Mr. Hendelman?

12   A.  Yes.

13   Q.  OK, thank you.  We can take that exhibit down.  Now I'd

14   like to just put up on the witness's screen what has been

15   marked for identification as Government Exhibit 528, a

16   spreadsheet.

17          So, are you familiar, Mr. Hendelman, with this

18   exhibit?

19   A.  Yes.

20   Q.  And how are you familiar with it?

21   A.  I created it.

22   Q.  And in creating this spreadsheet, what was it that you were

23   looking to summarize for benefit of the jury?

24   A.  I was looking to identify all payments to Jim Moore and his

25   entities.

J667MOO3                          Hendelman - Direct

1    Q.  And what entity did you understand to be associated with

2    Mr. Moore in performing this task?

3    A.  Universal Voice Tech.

4              MR. BELL:  Your Honor, the government offers

5    Government Exhibit 528.

6              MR. GARVIN:  No objection.

7              THE COURT:  I will allow it.

8              (Government Exhibit 528 received in evidence)

9              MR. BELL:  So, if you can publish that to the jury,

10   Mr. Cooney.

11   Q.  And, so this is a chart that you put together.  I am going

12   to essentially run through the columns in a similar fashion to

13   what we did before.

14             First of all, there is a column A which is

15   abbreviated, but it appears to read "statement account number".

16   Is that right?

17   A.  Yes.

18   Q.  And what do we have here?

19   A.  The account number for the bank accounts.

20   Q.  And are those bank accounts Bar Works bank accounts?

21   A.  Yes.

22   Q.  Are those the same three bank accounts that we saw

23   summarized at the previous chart?

24   A.  Yes.

25   Q.  And are they named in column B?

1    A.   Yes.

2    Q.   There is then it appears to be in column C a TRN date

3    column.   What's that?

4    A.   Transaction date.

5    Q.   And is that just the date of an individual transfer?

6    A.   Yes.

7    Q.   You then you have in column D a description column.   What

8    is it that we have there?

9    A.   The bank provided that information, whether the transaction

10   was a debit, or a wire or a different type of transfer.

11   Q.   And to your knowledge and given your experience, are the

12   things listed there, debit wire out, electronic funds transfer,

13   outbound transfer, are those just different ways of sending

14   money?

15   A.   Yes.

16   Q.   There is then a debits column.   What do we see there?

17   A.   That's the amount of the transaction.

18   Q.   And there is a credits column, and what would credits mean?

19   A.   That would be money flowing from column G to column B.

20   Q.   And did you observe any such transactions in your review of

21   these records?

22   A.   No.

23   Q.   So, finally there is a counterparty.   Recognizing that

24   these were all debits, what does the counterparty show here?

25   A.   This is the account that received the money in column E.

J667MOO3                           Hendelman - Direct

1   Q.  Was that in all cases referenced here a Universal Voice

2   Tech -- or an account in the name of Universal Voice Tech --

3   ending in numbers 3379 at Suntrust Bank?

4   A.  Yes.

5   Q.  There is a notes column which is blank with the exception

6   of the bottom two entries, where your note I think in both

7   cases "We don't have May 2016 records for 3379."  What does

8   that mean, sir?

9   A.  I had records for the three Bar Works accounts and the

10  Universal Voice Tech account, and the transaction would involve

11  both accounts, so I would check both sets of accounts to cross

12  reference, to make sure the transaction appeared in both

13  accounts; but for the last two transactions we didn't have the

14  Universal Voice Tech data, so I just saw the transaction on the

15  Bar Works side.

16  Q.  So is it fair to say that for the bulk of these

17  transactions you were able to do sort of a belt and suspenders

18  check on both sides of the transaction but for those two you

19  only had belt?

20  A.  Correct.

21  Q.  Let's go back to the debits column.  For the time periods

22  referenced here, and for the transactions that you reviewed,

23  what is the total amount of money that you found that went from

24  the various Bar Works accounts to the Jim Moore entity in the

25  transactions that you laid out here?

J667MOO3                         Hendelman - Direct

1    A.  1.599 million.

2    Q.  And let's highlight it right there.

3           Now let's take that down, Mr. Cooney.  Thank you.

4           Now, I'd like to very briefly direct your attention to

5    Government's Exhibits 310 and 172.  These are already in

6    evidence.

7           Can we put up 310 first, please.

8           And so I will note that these are -- it has already

9    been stipulated within this trial -- documents that an

10   individual named Vincent Lake took with him from Bar Works when

11   he was employed there.  Were you asked to do work with

12   Government Exhibit 310?

13   A.  Yes.

14   Q.  And can we put 172 up very briefly.  That beep sounds

15   ominous, Mr. Cooney.

16          OK.  So the jury apparently did not see some of that.

17   So, is this the chart 310 that you were asked to do some

18   additional work with?

19   A.  Yes.

20   Q.  The chart that you understand to have come from Mr. Lake?

21   A.  Yes.

22   Q.  And can we put up 172 very briefly as well.  And can we run

23   through the --

24          And were you likewise asked to do work with these

25   tabs?

1   A.  Yes.

2   Q.  Or with this chart, rather.

3   A.  Yes.

4   Q.  So, can we put up just for the witness for the moment what

5   has been marked for identification as Government Exhibit 310X.

6        Now, Mr. Hendelman, what work generally were you asked

7   to do with the spreadsheets that had come from Mr. Lake?

8   A.  I was asked to cross reference the investors on Vincent

9   Lake's spreadsheet with the bank statements, the bank records,

10  to make sure that the Bar Works accounts received the money

11  that appeared on Vincent Lake's spreadsheet.

12  Q.  Put another way, is that to make sure that's what is in the

13  chart has some basis in the bank record transactions that

14  actually happened?

15  A.  Yes.

16  Q.  And did you create a chart or multiple charts to track what

17  you found?

18  A.  Yes.

19  Q.  And is Government Exhibit 310X currently on your screen one

20  of those charts?

21  A.  Yes.

22        MR. BELL:  Your Honor, the government offers 310X.

23        MR. GARVIN:  No objection.

24        THE COURT:  I will allow it.

25        (Government Exhibit 310X received in evidence)

1          MR. BELL:  So can we publish that to the jury,

2   Mr. Cooney.

3   Q.  So, I want to first go to the tabs at the bottom.  You will

4   see that there are what appear to be a number of months.

5   A.  Yes.

6   Q.  And were those the months that were covered in the original

7   document for Mr. Lake, that is to say, Government Exhibit 310?

8   A.  Yes.  I did not touch those work books.

9   Q.  Understood.  So, let's then stay where we are right now on

10  the chart that you did make at the end of those.  And so what

11  is it broadly speaking that you attempted to do here, Mr.

12  Hendelman.

13  A.  I attempted to cross reference the investors that Vincent

14  Lake provided with the bank records.

15  Q.  And so let's go through the information that's here.

16          First of all, there is a month column, and what's

17  there?  What is the significance of column A?

18  A.  That was taken from Vincent Lake's workbooks, the month

19  that the investor made their investment in 2016.

20  Q.  And that's how they were divied up in the original

21  spreadsheet?

22  A.  Yes.

23  Q.  There is then an investor column.  It may seem obvious, but

24  what is that?

25  A.  That is the name of the investor.

1    Q.   There are then two columns in column C and column D for

2    Vincent Lake amount and bank statement amount, and what are

3    those, sir?

4    A.   The Vincent Lake amount is the amount that was on Vincent

5    Lake's workbooks, and the bank statement amount is what I was

6    able to see in the bank records.

7    Q.   And then there is also a soliciting entity column.  Were

8    you asked to perform this analysis with respect to multiple

9    soliciting entities or just one soliciting agent?

10   A.   Just one.

11   Q.   Which was that?

12   A.   UPG.

13   Q.   And then there is also a bank record and date column.

14   Generally speaking, what are those?

15   A.   That is the account where I found the investments and the

16   date of the investments.

17   Q.   Now I'll note for the record that Government 310X consists

18   of what seems to be a pretty good amount of green print and a

19   modest amount of red print.  Was there meaning to the color

20   distinctions that you used here?

21   A.   Green means I was able to cross reference everything

22   nicely, and red means there was a small discrepancy.

23   Q.   And with respect to the discrepancies, generally what sorts

24   of discrepancies did you come upon when you were doing this

25   work?

1   A.   Some of the names didn't match up.  Once the amounts did

2   not match up; that's on row 8.

3   Q.   Got you.  So, let's take a look at row 8 just for example.

4   What discrepancy did you spot here?

5   A.   Vincent Lake reported that the investment was for $25,000,

6   but I was only able to find an investment for $44,000 by the

7   relevant person at the relevant time.

8   Q.   And then let's take a look at line 23, which also includes

9   some red ink.  What was the nature of the discrepancy that you

10  saw there?

11  A.   The name that I found for the investor did not match the

12  name provided by Vincent Lake.

13  Q.   By and large for the 2016 transactions, were the amounts

14  listed in the Vincent Lake-provided spreadsheet backed up by

15  the bank records?

16  A.   Yes.

17  Q.   So, let's go to the very bottom of this chart and focus in

18  for a moment on what is coming through as line 106.  There

19  appear to be grand totals beneath the Vincent Lake-reported

20  amount and the bank statement amount.  Can you tell us what

21  they are and what they mean.

22  A.   I totaled all of Vincent Lake's investments, and I totaled

23  all the investments I found in the bank records.

24  Q.   And it appears to be the difference of 5.09 million versus

25  5.11 million?

J667MOO3                              Hendelman - Direct

1    A.  Yes.

2    Q.  And to be clear, that's 5.09 million that were in the

3    spreadsheet that Mr. Lake took from Bar Works and 5.11 million

4    accounted for in the bank statements that you yourself

5    reviewed.

6    A.  Yes.

7    Q.  Let's take that down for just a moment.

8            Now, you mentioned that you did similar work with

9    Government Exhibit 172.

10           Can we put just on the witness's screen for the moment

11   172X.

12           So, are you familiar with this chart, sir?

13   A.  Yes.

14   Q.  And how are you familiar with it?

15   A.  I created it.

16   Q.  And was this intended to do essentially the same -- perform

17   essentially the same function as the chart that we just went

18   through?

19   A.  Yes.

20   Q.  But with respect to a different source chart.

21   A.  Yes.

22   Q.  Now, Government Exhibit 310 you mentioned had consisted of

23   just a number of months in 2016.  Did 172 have other months

24   prior to that?

25   A.  I don't recall.

1    Q.  So let's take a quick look.  This is 172X.  The months that

2    you are graphing here, what year did they take place in?

3    A.  2015.

4    Q.  And so is it fair to say that 172 covers 2015

5    transactions -- 172X covers 2015 transactions that you saw in

6    172?

7    A.  Yes.

8            MR. BELL:  Your Honor, the government offers

9    Government Exhibit 172X.

10           MR. GARVIN:  No objection.

11           THE COURT:  I will allow it.

12           (Government Exhibit 172X received in evidence)

13           MR. BELL:  So, let's publish that for the jury.

14   Q.  So, there is an initial list here that lists a number of

15   investors, date of purchase, and the green does it again

16   represent the areas where you saw that there was backup in the

17   bank records to what was in the chart?

18   A.  Yes.

19   Q.  And there were red lines that suggested discrepancies?

20   A.  Yes.

21   Q.  And so can we scroll down to the bottom of 23.

22           So, some of the discrepancies it seems were perhaps

23   self explanatory.  Can we go to line 11.  What was the nature

24   of the discrepancy there?

25   A.  The investor names were slightly different.

1   Q.  And so there is indeed a Dina Kreimer as a supposed to a

2   Kreimer Pavel.  Is that one such example?

3   A.  Yes.

4   Q.  And so within those it seems you were able to find backup

5   for another approximately $800,000 or so that went from

6   investors to UPG?

7   A.  Yes.

8   Q.  Let's now scroll down just a little bit.  There is a

9   section here that says "missing".  What does that mean?

10  A.  I could not find these transactions in the bank records.

11  Q.  Now, when you put together this missing tab, did you have

12  any other supporting documentation or outside evidence that

13  could potentially explain where there was missing information?

14  A.  Yes.

15  Q.  What sorts of other information did you have?

16  A.  An e-mail that contained I believe another e-mail which had

17  information that suggested that one of the names in red did in

18  fact invest the amounts that Vincent Lake reported.

19  Q.  So let's mosey on over in that direction.  But before we

20  do, I want to direct your attention to line 40 and line 43 and

21  172X which you put together.  Is there a common investor as to

22  those two lines?

23  A.  Yes.

24  Q.  And who is that investor?

25  A.  Julian White.

1   Q.  And what transaction amounts are represented on those

2   lines?

3   A.  So, row 40 references $154,000, and row 43 references

4   $150,000.

5   Q.  And the transaction date?

6   A.  December 28, 2015 for the first one.  And the second one is

7   December 28, 2015.

8   Q.  Now, Mr. Hendelman, the fact that this is in this section

9   and in red means that you didn't find a $154,000 transaction or

10  a $150,000 transaction corresponding to Mr. White on that date;

11  is that correct?

12  A.  In the bank records, correct.

13  Q.  In the bank records.

14  A.  Correct.

15  Q.  Now you mentioned an e-mail.

16          Can we, Mr. Cooney, publish Government Exhibit 1158,

17  which has already been admitted into evidence.

18          So, is this the e-mail that you mentioned a moment

19  ago?

20  A.  Yes.

21  Q.  So, why don't we focus in on the message at the top.  This

22  is a December 10, 2015 e-mail from Timothy Connell, United

23  Property Group -- I'm sorry.  The to and from fields are

24  inverted from what one might expect.  From Julian White to

25  Timothy Connell at the United Property Group, and it copies JR

J667MOO3                          Hendelman - Direct

1    at the United Property Group.  And on December 10, 2015

2    Mr. White writes, "Hi Tim.  Attached is a copy of my passport.

3    In addition, the first transfer has taken place today and

4    attached is the confirmation.  The daily amount is still being

5    exceeded at $150,000, so I will have to make six daily payments

6    of $100,000.  It's been a pleasure working with you too and

7    thanks for all the assistance to date."

8           So, it's the case that you didn't see the $150,000

9    transfers that according to this e-mail were made.  Is that the

10   case, Mr. Hendelman?

11   A.  Yes.

12   Q.  Let's take that down.

13          Now, were you provided with similar supporting e-mail

14   documentation for the other red e-mails in that section?

15   A.  No.

16   Q.  So, is it fair to say that you don't know one way or the

17   other what may account for a discrepancy like Mr. White's

18   between those transactions in the chart and the bank records

19   that we saw?

20   A.  Correct.

21   Q.  Now, if we can, Mr. Cooney, can we put up Government

22   Exhibit 172, that being the spreadsheet that Mr. Lake had

23   brought in.

24          So, this is from the document that you borrowed from

25   Mr. Lake, and I believe -- as has already been noted here at

1    trial -- it notes that $7,499,000 at this point has come in via

2    UPG to Bar Works.  And is it safe to say, Mr. Hendelman, that

3    you were able to account in the bank records for several

4    million of that?

5    A.  Yes, most of it.

6         MR. BELL:  No further questions for Mr. Hendelman.

7    Thank you very much, sir.

8         THE COURT:  Counsel?

9         MR. GARVIN:  Your Honor, we have no questions.

10        THE COURT:  OK, thank you very much.  We will excuse

11   the witness and ask for the government's next witness.

12        (Witness excused)

13        MR. BELL:  Your Honor, the government calls Jason

14   Rivera.

15    JASON RIVERA,

16       called as a witness by the government,

17       having been duly sworn, testified as follows:

18        DEPUTY COURT CLERK:  Please state your full name for

19   the record.

20        THE WITNESS:  Jason Anthony Rivera, R-i-v-e-r-a.

21        MR. BELL:  Your Honor, may I proceed?

22        THE COURT:  Sure.

23   DIRECT EXAMINATION

24   BY MR. BELL:

25   Q.  Good morning, Mr. Rivera, just under the gun.

J667MOO3                    Rivera - Direct

1    A.  Good morning.

2    Q.  Where do you work?

3    A.  I work for Maimonides Cancer Center.

4    Q.  And what do you do there?

5    A.  I am a PC tech.

6           THE COURT:  A what?

7           THE WITNESS:  PC tech.

8    Q.  What is your highest level of education?

9    A.  Some college.

10   Q.  And somewhere in between college and your current job did

11   there come a point when you came to work for a company called

12   In Crowd Equity?

13   A.  Affirmative.

14   Q.  How did you find -- well, how did you come to work at In

15   Crowd Equity?

16   A.  I applied for a position on Craig's List.

17          THE COURT:  Sorry?  On Craig's List, did you say?

18          THE WITNESS:  Yes, your Honor.

19   Q.  And who interviewed you for the job?

20   A.  Renwick Haddow.

21   Q.  Who did you understand Mr. Haddow to be when you

22   interviewed with him?

23   A.  High ranking officer within the company.

24   Q.  Did you get the job after the interview?

25   A.  Affirmative.

1   Q.  And approximately when was that?

2   A.  Around August 2015.  I'm sorry, the end of July 2015.

3   Q.  When you started to work at In Crowd Equity, what did you

4   understand In Crowd Equity to be as a business?

5   A.  Crowd funding platform.

6   Q.  And what do you mean by crowd funding?

7   A.  Where they raise funding for companies, sort of like Shark

8   Tank.

9         THE COURT:  Shark Tank is the TV show?

10         THE WITNESS:  Yes, your Honor.

11   Q.  So, what were your responsibilities when you first got the

12   job?

13   A.  I was the administrative assistant.

14   Q.  What did you do as administrative assistant there?

15   A.  Processed paperwork, send out marketing materials.

16   Q.  And did your responsibilities at In Crowd Equity change

17   over time?

18   A.  Affirmative.

19   Q.  And how did they change?

20   A.  The standing administrator was no longer with the company.

21   I was then promoted to administrator.

22   Q.  And what were your duties and responsibilities once you

23   were promoted to administrator?

24   A.  Along the same lines of responsibilities.

25   Q.  Now, through -- I should ask, where was In Crowd Equity

1    physically located when you started?

2    A.   When I started it was on Broadway.

3    Q.   And did that location change, or the location where you

4    worked change during the time you worked at In Crowd Equity?

5    A.   Affirmative.

6    Q.   And how and when did it change?

7    A.   Around August, and we moved to an office on 37th Street, I

8    believe.

9            THE COURT:   What year?

10           THE WITNESS:   Same year, 2015.

11   Q.   What were In Crowd Equity's offices like atmospherically?

12   A.   I would compare it to Wolf of Wall Street.

13   Q.   How would you compare it to Wolf of Wall Street?

14   A.   It was a very -- how would I compare it -- it was a live

15   environment, for lack of better words, working among

16   degenerates.

17   Q.   Now, over the course of your time working at I Crowd

18   Equity, did you become familiar with an entity called Bar

19   Works?

20   A.   Affirmative.

21   Q.   And how did you become familiar with Bar Works?

22   A.   It was one of the companies we were raising funds for.

23   Q.   What did you understand Bar Works to offer its customers?

24   A.   Leases on desks as well as shares within the company.

25   Q.   Did you have e-mail accounts while you were at In Crowd

1    Equity?

2    A.   Affirmative.

3    Q.   And did you use that e-mail account to conduct business?

4    A.   Affirmative.

5    Q.   I want to publish to you what has already been admitted as

6    Government Exhibit 408.  Sir, are you -- sir, just looking at

7    perhaps the signature, was that your e-mail signature for a

8    time when you were working at In Crowd Equity?

9    A.   Affirmative.

10   Q.   And do you remember sending out e-mails of this sort?

11   A.   Affirmative.

12   Q.   And generally speaking, what were these types of e-mails?

13   A.   Sent to possible investors.

14   Q.   And would this have been an example of the sort of e-mail

15   that you would send to a potential investor in Bar Works?

16   A.   Affirmative.

17   Q.   Now, there is a part in the first paragraph that references

18   a conversation of Mr. White with this CEO of In Crowd Equity

19   Robert Haslem.  Did you have any firsthand knowledge of that

20   conversation when you put together forms like this?

21   A.   Firsthand knowledge?

22   Q.   Yes.

23   A.   Negative.

24   Q.   And did you in fact know Mr. Haslem?

25   A.   Negative, not personally.

J667MOO3                    Rivera - Direct

1    Q.  Let's take that down.

2           So, did there come a point where law enforcement or

3    regulatory authorities visited In Crowd Equity's offices?

4    A.  Affirmative.

5    Q.  About how far into your time there did that happen?

6    A.  The following year, first quarter of 2016.

7    Q.  And what was it actually that happened?  Who showed up?

8    A.  From my understanding it was the SEC.

9    Q.  And did you actually see the folks show up?

10   A.  Affirmative.

11   Q.  What did they look like?

12   A.  I vaguely recall.  They were guys in suits.  I just

13   happened after the fact to be told.

14           THE COURT:  They were what?

15           THE WITNESS:  Wearing suits, and just after the fact I

16   was told that's what it was.

17           THE COURT:  After the fact you were told?

18           THE WITNESS:  Correct.  At the time I didn't know that

19   it was the SEC.

20   Q.  Understood.  Now, what, if anything, changed about the way

21   that the business was run after that visit took place?

22   A.  As far as changes, I would say more involvement in making

23   sure that the paperwork was obtained.

24   Q.  And when you say making sure the paperwork was obtained,

25   what do you mean by that?

J667MOO3                          Rivera - Direct

1   A.  Credited investor forms -- the necessary paperwork.  It

2   wasn't any changes to what I've done, just people were more

3   involved -- when I say people, Renwick Haddow was making sure I

4   was doing my job.

5   Q.  Had things been somewhat, for lack of a better term, loosey

6   goosey prior to that point?

7   A.  Not on my watch.  I was trusted to do my job.

8   Q.  Well, broadly speaking, not you in particular.

9   A.  Can you repeat the question?

10  Q.  Had things been somewhat looser in terms of that paperwork

11  being filled out?

12  A.  No, not in reference to my job.

13  Q.  OK.  So, when you got started at -- withdrawn.

14          When you became familiar with Bar Works while working

15  In Crowd Equity, did you have an understanding of who the CEO

16  of Bar Works was?

17  A.  Affirmative.

18  Q.  And what was your understanding?

19  A.  Jonathan Black.

20  Q.  And where did you get that understanding, sir?

21  A.  From the marketing materials.

22  Q.  And did you handle those marketing materials over the

23  course of your job responsibilities?

24  A.  Affirmative.

25  Q.  Now, did there come a time when In Crowd Equity shut down?

1    A.  Affirmative.

2    Q.  Approximately when?

3    A.  I would say weeks if not maybe a few months after SEC

4    showed up.

5    Q.  And after -- well, first of all, how did you come to learn

6    that In Crowd Equity was shutting down?

7    A.  I was told.

8    Q.  By who?

9    A.  Renwick Haddow.

10   Q.  And did Mr. Haddow direct you to do anything at the time

11   that In Crowd Equity was shut down?

12   A.  I don't understand the question.

13   Q.  Sure.  At the time that Mr. Haddow told you that In Crowd

14   Equity would be no more, did he ask you to do anything with

15   respect to the current employees at In Crowd Equity?

16   A.  Yes.

17   Q.  What did he ask you to do?

18   A.  Let go the employees who weren't going to stay.

19   Q.  And is that what happened?

20   A.  Affirmative.

21   Q.  After In Crowd Equity was shut down, what happened to you?

22   A.  I was then offered a position to be a project manager.  I

23   accepted only on the terms that I would be contracted and not

24   an actual employee.

25   Q.  When you were extended the opportunity to be a project

J667MOO3                              Rivera - Direct

1   manager, given that In Crowd Equity shut down, project manager

2   with whom?

3   A.  Bar Works.

4   Q.  And who extended you that offer?

5   A.  Renwick Haddow.

6   Q.  So, did you in fact sign on as a contractor?

7   A.  Affirmative.

8   Q.  Now, after In Crowd Equity closed -- oh, well, I should ask

9   this:  Once you became a contractor with Bar Works, what were

10  your job responsibilities with respect to Bar Works?

11  A.  Primarily was bringing up the locations as far as network

12  infrastructure, getting locations ready for members.  I also

13  dealt heavily with vendors as well as lawyers to get permits

14  for these locations.

15  Q.  Now, during your time with Bar Works, did you become

16  familiar with how Bar Works found investors?

17  A.  Repeat the question.

18  Q.  Sure.  Once you were onboard with Bar Works, did you have

19  an understanding of how Bar Works got investor money?

20  A.  I could have assumed, considering I came from In Crowd

21  Equity.

22          THE COURT:  Don't assume.  Did you know?

23          THE WITNESS:  No.

24  Q.  Did you become familiar with an entity called United

25  Property Group or UPG?

1    A.  Vaguely.

2    Q.  And what was your understanding at the time of what that

3    entity was?

4    A.  It was when I was with In Crowd Equity, I was advised to

5    send over marketing materials for potential investors.

6              THE COURT:  Send it to whom?

7              THE WITNESS:  To said company, United Property Group.

8              THE COURT:  To who?

9              THE WITNESS:  United Property Group.

10   Q.  You mentioned that there was a point during your time at In

11   Crowd Equity that you had understood the CEO of Bar Works to be

12   Jonathan Black.  Did there come a point during your time at Bar

13   Works where you questioned that information?

14   A.  With Bar Works?

15   Q.  Yes, sir.

16   A.  Affirmative.

17   Q.  And approximately when did that happen?

18   A.  I would say a few weeks to a few months as my tenure as

19   project manager.

20   Q.  And so what was it that prompted you to question whether

21   Mr. Black was in fact the CEO?

22   A.  There was someone who inquired to speak with Jonathan Black

23   that they made at a trade show by description of Renwick

24   Haddow.

25             THE COURT:  Could you read that back.

J667MOO3                          Rivera - Direct

 1            (Record read)
 2   Q.   And when you say description of Renwick Haddow, do you mean
 3   physical description?
 4   A.   Affirmative, the baldness as well as the accent.
 5   Q.   And you understood that description to correspond with Mr.
 6   Haddow?
 7   A.   Affirmative.
 8   Q.   Did you ask Mr. Haddow about this?
 9   A.   Negative.
10   Q.   Did there come at any point a time where you and Mr. Haddow
11   discussed the identity of Mr. Black?
12   A.   During my tenure at In Crowd Equity.
13   Q.   So going back to your time at In Crowd Equity, what
14   conversation had you had with Mr. Haddow?
15   A.   It was shortly after SEC showed up, I questioned the
16   credentials in regards to the company and those companies we
17   were raising funds for.
18   Q.   And why did you do that?
19   A.   The SEC showed up.
20   Q.   You said the SEC showed up.  And was Mr. Haddow able to
21   address your concerns?
22   A.   Affirmative.
23   Q.   Now, at the time that you worked at either In Crowd Equity
24   or Bar Works, did you know an individual named James Moore or
25   Jim Moore?

J667MOO3                          Rivera - Direct

1    A.  Vaguely.

2    Q.  How so?

3    A.  Through an e-mail exchange.

4    Q.  And what was the general nature of the e-mail exchange with

5    Mr. Moore?

6    A.  I was advised by Natalie to send over marketing materials.

7    Q.  And when you say -- let's break that down.  You say that

8    you were advised by Natalie.  Who was Natalie?

9    A.  Natalie, from my understanding, was from In Crowd Equity

10   UK.

11   Q.  And you were advised to send over marketing materials to

12   whom?

13   A.  To Jim.

14   Q.  And so can we publish what is already in evidence as

15   Government Exhibit 403.

16          THE COURT:  You were advised by Natalie to send Jim

17   marketing materials?

18          THE WITNESS:  Correct.  Either advise or was requested

19   that I send it to him by Natalie.  I was either requested or

20   advised to send the marketing materials to Jim.

21   Q.  And so let's take a look at 403.  This is an e-mail from

22   Natalie at Bar Works NYC.  Is that the same Natalie that you're

23   discussing?

24   A.  Affirmative.

25   Q.  And it's to AnaKP2014@gmail.com.  At the top is Jason

J667MOO3                         Rivera - Direct

1   Rivera and Renwick Haddow.  The body says, "Hi, Jim, I have

2   drop boxes populated to what Jason sent me but I did ask him to

3   complete a checklist of documents so I could be entirely sure

4   that every drop box contains the necessary documents, and I am

5   also awaiting the retail brochure.  Have not received that as

6   yet."

7            "Jason could you send me this back ASAP as or just

8   confirm to me that the contents for each drop box is sent."

9            By the way, what is a drop box, sir?

10  A.  Digital storage space.

11  Q.  And as a general matter, when you send things through drop

12  box, who were you sending it to?  What types of people?

13  A.  Based on this e-mail it was for Natalie.

14  Q.  But what types of people did you send drop box materials

15  to -- or materials via drop box to?

16  A.  Materials?  I'm sorry.  Can you repeat the question.

17  Q.  Well, I think a better way to do it would be to put up

18  Government's Exhibit 400, which is also already in.  And if we

19  can focus in on that top e-mail.  Actually, can we jump out of

20  the blow-up box for a moment and focus on the bottom exchanges.

21  All the way down.  Thank you, sir.

22           So, at the very bottom AnaKP writes, "Hi, Natalie.

23  Can you let us have that drop box link to the finished

24  documents.  We are trying to get a client onboard for a couple

25  of deals and ideally would speak with him first thing tomorrow

1  European time."

2        Natalie writes back, "Jason, can you send me any

3  documents I need to include in the drop boxes, and specify

4  which specify which drop box they are to be included in.  I'm

5  off to bed now, but if you can send ASAP I can complete the

6  drop boxes and do a contents page."

7        At which point AnaKP writes, "Thanks, Nat.  Appreciate

8  it."

9        Can we now go to the upper part.  In this e-mail you

10  say, "These are for customers" and there are some attachments,

11  it seems.

12        THE COURT:  Wait.  This is an e-mail from who to who?

13        THE WITNESS:  Oh, I'm sorry.  It's from myself to

14  AnaKP, cc'ing Natalie as well as Renwick Haddow and United

15  Property Group, several members.

16  Q.  And so when you sent materials --

17        THE COURT:  And which others?

18        THE WITNESS:  I'm sorry?

19        THE COURT:  You said several others.  Say who.

20        THE WITNESS:  David Kennedy, JR, and then Neil Storey

21  as well.

22  Q.  And so when you sent e-mails out with materials like these,

23  were these marketing materials, sir?

24  A.  This in particular were for the members, yes.

25  Q.  And let's go to 401 briefly.  And let's go to the middle

1   first.  Whereas in the earlier e-mail you said these are for

2   customers, you said these are for investors.

3              And let's go to the very top.  It's an e-mail from

4   AnaKP2014@gmail to you, copying Natalie at Bar Works, Renwick

5   Haddow, two people at the United Property Group and Neil

6   Storey.  And it says, "hi, Jason, thanks for this.  The

7   documents appear to be for sale of the share investment into

8   Bar Works strictly for accredited investors.  This is the type

9   of offer I know that will be made by in crowd etcetera.  Can

10  you also help us with the documentation and brochure ware for

11  the potential buyers of the workspaces themselves (the people

12  who buy the ten year lease on the workspace) as that is the

13  area we will be mainly focusing our attention.  Thanks, Jim."

14             Let's actually come out of this, if we can, and let's

15  put up Government Exhibit 410.  Government Exhibit 410 is a

16  June 20, 2016 e-mail regarding the June 29th opening event at

17  the West Village location, and it says it's from Jonathan

18  Black.  Now, at this point in June of 2016 had you actually met

19  Jonathan Black?

20  A.  Negative.

21  Q.  Did you know who he was?

22  A.  Other than the CEO of Bar Works, negative.

23             THE COURT:  Other than?

24             THE WITNESS:  The CEO of Bar Works.

25  Q.  And where did you think Mr. Black was operating out of at

1   this point?

2   A.  At that point?

3   Q.  Yeah, physically.

4   A.  Not at our locations.  Overseas perhaps.

5           THE COURT:  I'm sorry?

6           THE WITNESS:  Overseas perhaps.  I don't believe I

7   accurately recall.

8           THE COURT:  You don't want.

9           THE WITNESS:  I don't believe I can accurately recall

10  my train of thought at that time.

11  Q.  OK.  And so this is an e-mail from Mr. Black to project

12  manager, that's contractor@barworks.nyc.  Whose e-mail address

13  was that?

14  A.  That was my e-mail address during my tenure.

15  Q.  And was that at the time that you left In Crowd Equity and

16  you were a contract product manager at Bar Works?

17  A.  I'm sorry, repeat the question.

18  Q.  Is that after you left In Crowd and were with Bar Works?

19  A.  Affirmative.

20  Q.  And you were a contractor for them?

21  A.  Affirmative.

22  Q.  There were other people in the subject line.  Do you recall

23  who Janine Just was?

24  A.  Affirmative.

25  Q.  Who was she?

1    A.   She was the publicist we acquired.

2    Q.   Do you recall who Zoe Miller was?

3    A.   Affirmative.

4    Q.   Who was she?

5    A.   Cofounder of Bar Works.

6    Q.   And Franklin?

7    A.   Affirmative.

8    Q.   Who is he?

9    A.   Sales manager.

10   Q.   Then there is Jason R, jasonrivera@barworks, which I

11   imagine is also you.

12   A.   Affirmative.

13   Q.   Did you have an understanding of who info@barworks.nyc was?

14   A.   Negative.

15   Q.   Now, let's go into the body of that e-mail.  Do you recall

16   a June opening event of a West Village location?

17   A.   I recall preparing for it.

18   Q.   Let's jump out of that and take a look at the bottom part.

19   Janine Just writes, "Hi, Zoe.  I went down to see the space

20   yesterday and spoke to Jason who mentioned that permitting may

21   not be done in time in regards to the outdoor cafe to host the

22   June 29th event.  I will let Jason clarify a bit more since I

23   know he was dealing with the community board on a few issues.

24   Just want to make sure everything is in order before we started

25   inviting people over to the space."

J667MOO3                          Rivera - Direct

1          Can we go up to the next one.  Janine Just then says,

2    "Hi Jason.  Just confirming that we are good to go to have the

3    event on June 29.  Will we be OK to serve wine?  Let me know

4    when you have a moment so Franklin and I can put a strategy

5    together for the event."

6          And then project manager, that's you, responds, "Hi,

7    Janine.  I wasn't a part of the conversation after what we

8    discussed.  Can someone answer Janine please."

9          Now, you mentioned Zoe Miller was the cofounder of Bar

10   Works.  Did you understand her to have any particular

11   relationship with anybody else who worked under the Bar Works

12   umbrella?

13   A.  Affirmative.

14   Q.  And who did you understand her to have a relationship with

15   and what was the relationship?

16   A.  The wife of Renwick Haddow.

17   Q.  Now, was there a point at which your employment at Bar

18   Works came to an end?

19   A.  Affirmative.

20   Q.  What led to that?

21   A.  I was given an ultimatum to apologize to Zoe or part ways.

22          THE COURT:  For what?

23          THE WITNESS:  For --

24          MR. BELL:  I think Judge Berman was asking you what

25   you just said.

1          THE COURT:  Yes, I didn't hear.

2          THE WITNESS:  Sorry.  You want me to repeat?

3          (Record read)

4   Q.  Now, who gave you that ultimatum?

5   A.  Renwick Haddow.

6   Q.  And what led to that ultimatum?

7   A.  An altercation Zoe and I had.

8   Q.  And what happened in response to that ultimatum?

9   A.  She was disrespectful to my then assistant project manager.

10  Q.  And when Mr. Haddow gave you the ultimatum, what did you

11  do?

12  A.  I parted ways.

13         THE COURT:  You what?

14         THE WITNESS:  Parted ways.

15  Q.  Now, after you were let go from Bar Works, did you ever

16  contact Mr. Haddow again?

17  A.  Affirmative.

18  Q.  Approximately when?

19  A.  Approximately maybe the end of last year or earlier this

20  year.

21  Q.  And under what circumstances did you contact Mr. Haddow?

22  A.  I wrote him a letter.

23  Q.  Why did you write him a letter?

24  A.  To reach out.  I've thought about this.  I guess to let him

25  know although he has done some shitty things, I didn't think of

1    him to be a shitty person.

2    Q.  Now when you say you wrote him a letter, where did you

3    understand Mr. Haddow to be at the time?

4    A.   Incarcerated.

5    Q.  And what was the substance of the letter that you sent to

6    him?

7    A.  To let him know if he needed anything, I understand his

8    situation, I have been where he was, and to let me know.

9    Q.  And have you contacted him more recently?

10   A.  I believe --

11          MR. GARVIN:  Your Honor, may I respectfully request a

12   sidebar for one moment?

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1          (At sidebar)

2          MR. GARVIN:  Your Honor, we had previously discussed

3     this gentleman had a record and we were going to try to avoid

4     just talking about it.  I just heard him mention it.  And then

5     I was concerned that this is going to go into discussions,

6     personal discussion between him and Mr. Haddow in 2018, 2019

7     that are not relevant to what is going on here.

8          MR. BELL:  So this is relatively easily addressed.

9          THE COURT:  Counsel is correct.

10          MR. BELL:  Not quite.

11          I was just raising this only because -- I was raising

12     this because of the fact that Mr. Rivera had reached out to

13     Mr. Haddow and it potentially goes to bias --

14          THE COURT:  Goes to?

15          MR. BELL:  Goes to bias.  And I'd rather they hear it

16     from us.  But we are not intending to go any deeper into the

17     conversations.  And if Mr. Garvin is not intending --

18          MR. GARVIN:  I will not.

19          MR. BELL:  Then we are not going to touch it anymore.

20          THE COURT:  Is that okay?

21          MR. GARVIN:  Yes.

22          MR. BELL:  Great.

23          (Continued on next page)

24

25

1              (In open court)

2    BY MR. BELL:

3    Q.  Just finally, Mr. Rivera, you dealt with Mr. Moore through

4    email a number of times over the course of your work, but you

5    never actually interacted with him in person; is that correct?

6    A.  Affirmative.

7              MR. BELL:  I have no further questions for you.

8              Thank you very much, Mr. Rivera.

9              THE COURT:  Thank you.

10             Counsel, do you have any?

11             MR. GARVIN:  I have no questions, your Honor.

12             THE COURT:  Okay.  We'll excuse Mr. Rivera.

13             Thank you very much.

14             (Witness excused)

15             MR. BELL:  Your Honor, we'll call our next witness in

16   just a moment, but I would like to read a couple of

17   stipulations in, if I can.

18             THE COURT:  Okay.

19             MR. BELL:  The government is going to offer Government

20   Exhibit 1253, which has been so marked for identification and

21   it's on the screen right now.

22             It is stipulated and agreed between the parties that,

23   if called as a witness, a qualified and knowledgeable witness

24   would testify as follows:

25             First, that Government Exhibit 811 is a true and

J66VMOO4

```
1    correct video recording of an interview Moore gave to law

2    enforcement after he was arrested by federal law enforcement

3    authorities on or about February 15th, 2007; Government

4    Exhibits 811-A through 811-F are clips of Government Exhibit

5    811, that is to say that interview with law enforcement.

6            Further, on or about February 5th, 2018, James Moore

7    pled guilty in the United States District Court for the Middle

8    District of Florida, Orlando Division, to one violation of

9    Title 18 of the United States Code, Section 4, which makes it a

10   crime to conceal and fail to report to authorities, a crime

11   cognizable by a court of the United States.

12           Further, Government Exhibit 812 is a true and correct

13   copy of the superseding information containing the charge

14   against Moore in the plea proceeding referenced in paragraph

15   1(a).

16           Government Exhibit 813-A is a true and correct copy of

17   the excerpts in the plea agreement between Mr. Moore and the

18   United States Attorney's Office for the Middle District of

19   Florida in connection with the plea proceeding referenced in

20   paragraph 1(a).

21           Government Exhibit 815 is a true and correct copy of

22   excerpts of the transcript of the plea proceeding.

23           And so, your Honor, the government offers the

24   stipulation, 1253, and the exhibits referenced therein, the

25   811s, 812, 813-A, and 815.
```

1              MR. GARVIN:  Your Honor, just for the record, this is

2     as a result of the Court's rulings on the motions *in limine*

3     which --

4              THE COURT:  You're not objecting to this coming in?

5              MR. GARVIN:  That's correct.

6              THE COURT:  So I'll allow it.

7              (Government's Exhibits 811, 811-A through 811-F, 812,

8     813-A, 815, 1253 received in evidence)

9              MR. BELL:  Thank you, your Honor.

10             I'll also read in 1258 right now.

11             1258 is a stipulation that Mr. Cooney is about to put

12    up on the screen.

13             It's stipulated between the parties that Government

14    Exhibit 806 is a true and accurate audio recording of a

15    voluntary interview conducted by attorneys with the Securities

16    and Exchange Commission, or SEC, of James Moore, the defendant,

17    on August 11, 2016.  The interview was conducted over the

18    telephone, and Moore was represented by counsel during the

19    interview.

20             Further, Government Exhibits 806-A through 806-Q are

21    clipped portions of the audio of Government Exhibit 806.

22             Government Exhibit 807 is a true and accurate

23    transcript of that audio, the August 11th, 2016 interview of

24    James Moore by the SEC.

25             So, your Honor, the government offers this

1    stipulation, which is 1258, 806, 806-A through 806-Q, and 807.

2                MR. GARVIN:  Same position, your Honor.  Thank you.

3                THE COURT:  Okay.  I'll allow it.

4                (Government's Exhibits 806, 806-A through 806-Q, 807,

5    1258 received in evidence)

6                MR. BELL:  Finally, the government offers -- is going

7    to offer Government Exhibit 1259.  That's a stipulation

8    regarding certain prior acts.  And it's stipulated and agreed

9    between the parties that, if called as a witness, a qualified

10   and knowledgeable witness would testify as follows:

11               Government Exhibit 808 is a true and correct copy of a

12   set of promotional materials for a property investment business

13   called Inside Track, including a letter from James Moore,

14   generated in or around 2004.

15               Government Exhibit 810 is an excerpt of a promotional

16   video regarding a property called Lake Austin Reserve that was

17   distributed to investors in IAP Global in or around July 2009.

18               Government Exhibit 809 is a cover letter that was

19   distributed with Government 810, signed by James Moore.

20               And it is stipulated and agreed that those exhibits

21   and this stipulation are admissible.  Accordingly, we offer

22   808, 810 -- please go back, Mr. Cooney -- and 809, along with

23   the stipulation, 1259.

24               MR. GARVIN:  Same grounds, your Honor.

25               THE COURT:  I'll allow it.

1                (Government's Exhibits 808, 809, 810, 1259 received in

2     evidence)

3                MR. BELL:  Thank you.  One moment please.

4                (Counsel conferred)

5                MR. VAINBERG:  Your Honor, at this time the government

6     calls Special Agent Farima Haque of the FBI.

7     FATIMA HAQUE,

8           called as a witness by the Government,

9           having been duly sworn, testified as follows:

10               THE COURT:  Go ahead, counsel.

11    DIRECT EXAMINATION

12    BY MR. VAINBERG:

13    Q.  Good afternoon.

14    A.  Afternoon.

15    Q.  Where do you work, Agent Haque?

16    A.  The Federal Bureau of Investigation.

17    Q.  How long have you been with the FBI?

18    A.  Four and-a-half years.

19    Q.  What's your title there?

20    A.  Special agent.

21    Q.  What are your duties and responsibilities as a special

22    agent?

23    A.  To investigate crime, review evidence, and help with the

24    prosecution of cases.

25    Q.  Do you have any experience with investigations and

1    prosecutions involving investment fraud?

2    A.  Yes.

3    Q.  Do you have any experience in locating and reviewing

4    evidence associated with those investigations?

5    A.  Yes.

6    Q.  Did you have occasion to review evidence in connection with

7    the investigation and prosecution of the defendant, James

8    Moore?

9    A.  Yes.

10   Q.  What kind of evidence did you review?

11   A.  I reviewed press releases and documents related to Renwick

12   Haddow, documents related to James Moore's businesses and a

13   development project in Florida, documents related to James

14   Moore's convictions as part of the development project in

15   Florida, and a recording of James Moore's interview with the

16   SEC.

17   Q.  Special Agent Haque, you mentioned that you had reviewed

18   materials relating to Renwick Haddow.  What, if anything, did

19   you do to determine the accessibility of those materials to the

20   public?

21   A.  I conducted research to make sure that they were present

22   and easily accessible on the Internet.

23        MR. VAINBERG:  At this point, the government moves

24   into evidence Government Exhibit 800, which is a press release

25   authenticated in Government Exhibit 1257, a stipulation, but

1   has not yet been moved into evidence.

2                THE COURT:  I'll allow it.

3                (Government's Exhibit 800 received in evidence)

4   Q.  Special Agent Haque, do you recognize Government Exhibit

5   800?

6   A.  Yes.

7   Q.  What is it?

8   A.  It is a press release.

9   Q.  Who is this press release published by?

10  A.  Wired Gov.

11  Q.  And could you read the heading on the press release?

12  A.  "Second Director Disqualified in Branded Leisure PLC."

13  Q.  And right next to that, do you see an annotation that says

14  "The Insolvency Service"?

15  A.  Yes.

16  Q.  What is that?

17  A.  The Insolvency Service is a UK government entity that looks

18  into potential business corporate fraud.

19  Q.  Where was this news release published?

20  A.  On The Insolvency Service website.

21  Q.  Does this press release mention Renwick Haddow by name?

22  A.  Yes.

23  Q.  Is that what we see being highlighted in the first

24  paragraph?

25  A.  Yes.

1   Q.  Is this article still present on the Internet?

2   A.  Yes.

3   Q.  Could you tell us approximately when it was published for

4   the first time?

5   A.  December 10th, 2008.

6        MR. VAINBERG:  Let's bring up Government Exhibit 143

7   in evidence.  And let's look on the bottom of this email chain

8   please, on page 2.

9   Q.  Have you seen this exhibit before, Agent Haque?

10  A.  Yes.

11  Q.  I'm directing your attention to an email on March 20th,

12  2016, from anakp2014@gmail.com that reads:  See, you're still

13  getting plenty of air play from these guys.  Seemingly, this

14  was just last Friday.  And there's a link below that.  Do you

15  see that?

16  A.  Yes.

17  Q.  Have you located what, if anything, that link pointed to?

18  A.  Yes.

19  Q.  And what was that?

20  A.  A press release published on the FCA website.

21  Q.  Were you able to identify what that website looked like at

22  or near the time of this email?

23  A.  Yes.

24  Q.  How did you do that?

25  A.  Through a website called The Wayback Machine.

```
1              THE COURT:  The Wayback --

2              THE WITNESS:  Yes.

3              THE COURT:  -- did you say?

4   Q.  And what's The Wayback Machine?

5   A.  The Wayback Machine is a website that captures images from

6   a website at a given date or time in the past.

7              THE COURT:  Do I understand, so if that website is not

8   up today, the Wayback Machine can find it?

9              THE WITNESS:  Potentially, yes, if it happened to

10  capture it.  It doesn't capture every day.

11             THE COURT:  I got it.

12  Q.  Does the Wayback Machine website show the date on which it

13  captured any particular website?

14  A.  Yes.

15             MR. VAINBERG:  Let's pull up Government Exhibit 805,

16  Mr. Cooney, in evidence.

17  Q.  Did you compare the information you saw on The Wayback

18  Machine website with respect to that link with Government

19  Exhibit 805?

20  A.  Yes.

21  Q.  And how do they compare?

22  A.  They were the same.

23  Q.  This is what you saw on The Wayback Machine, other than the

24  government exhibit sticker?

25  A.  Yes.
```

1        MR. VAINBERG:  Just so we can understand, could we

2   zoom in on the bar at the top.

3   Q.  What's your understanding of what this bar means on The

4   Wayback Machine's website?

5   A.  It means that The Wayback Machine captured the link that's

6   listed there on March 21st, 2016.

7   Q.  So if that website was updated or changed or taken down

8   after March 21st, 2016, would this still show you what it

9   looked like on that date?

10  A.  Yes.

11       THE COURT:  Is this a tool of the FBI or it's a tool

12  of the Internet that anybody can access?

13       THE WITNESS:  Anyone can access it.

14  Q.  All right.  And now, let's just focus on that date for a

15  moment.  Can you tell us what date this website was saved?

16  A.  March 21, 2016.

17  Q.  And going back to Government Exhibit 143, is that the next

18  day after the email we were just looking at?

19  A.  Yes.

20       MR. VAINBERG:  So let's pull back up on 805 please.

21  Q.  Could you read the title of this FCA website release

22  please.

23  A.  "FCA Continues Action Against Capital Alternatives."

24  Q.  And if we go down, do you see where it says "the court

25  hearings"?

1    A.   Yes.

2    Q.   Could you please read what the website said there?

3    A.   The High Court decided in February 2014 that the above

4    schemes were collective investment schemes which could not be

5    lawfully operated by the defendants.  Some of the defendants

6    appealed, and in March 2015 the Court of Appeal rejected the

7    appeal and also found that the schemes were collective

8    investment schemes.  On 28 July 2015, the Supreme Court refused

9    to give the defendants permission to make a further appeal.

10   Q.   And if we keep on going, do you see a portion that says

11   "what happens next"?

12   A.   Yes.

13   Q.   Could you read just the first sentence under that portion.

14   A.   The FCA is now proceeding to deal with remaining aspects of

15   the case back in the High Court, including the issue of

16   misleading statements which the FCA alleges were made to

17   investors in relation to these schemes.

18   Q.   Thank you, Agent Haque.

19        Did this press release from the FCA identify Renwick

20   Haddow by name?

21   A.   Yes.

22   Q.   And if we go to the next page, will you point us to where

23   Mr. Haddow is identified?

24   A.   In the list under where it says, "We can confirm that the

25   defendants in these proceedings are," and Mr. Haddow is listed,

1   No. 7.

2   Q.  All right.  Let's go back to Government Exhibit 143, the

3   email from anakp with that link.  And let's just go to the top

4   of this email chain on the first page, to the portion that

5   says, "A few important points."

6          Could you read what this says in the email from

7   anakp2014.

8   A.  "A few important points.  Great lawyers, good barrister,

9   massive distance to special place (hard to get back)."

10  Q.  Special Agent Haque, as part of your work with the FBI, do

11  you have experience with extraditions?

12  A.  Yes.

13  Q.  Based on your experience with extraditions, is it harder or

14  easier to extradite someone from a country that does not have

15  an extradition treaty with the United States?

16  A.  It's harder.

17  Q.  Do you know where Renwick Haddow was arrested in connection

18  with this case?

19  A.  Morocco.

20  Q.  And does Morocco have an extradition treaty with the United

21  States?

22  A.  They do not.

23          MR. VAINBERG:  All right.

24          You can take that down please.

25  Q.  Agent Haque, you also mentioned that in preparing to

1  testify here today, you looked at some promotional materials

2  related to businesses operated by James Moore; is that correct?

3  A.  Yes.

4  Q.  And what companies' materials did you review?

5  A.  Inside Track Seminars and Instant Access Properties.

6  Q.  And what did you review specifically?

7  A.  I reviewed a brochure for Inside Track Seminars, a letter

8  from James Moore to investors for Instant Access Properties,

9  and a deed recording that was mentioned in the letter from

10 James Moore.

11 Q.  Do all three of those documents contain statements

12 allegedly made by James Moore about what his companies were

13 doing at that time?

14 A.  Yes.

15          MR. VAINBERG:  Could we pull up Government Exhibit

16 808.

17 Q.  Agent Haque, is this one of the documents that you

18 reviewed?

19 A.  Yes.

20 Q.  What is it?

21 A.  It's a brochure for Inside Track Seminars.

22 Q.  And based on the footnote on page 2, in approximately what

23 time period was this brochure published?

24 A.  Between autumn 2004 and summer 2005.

25 Q.  Let's go to page 2.

1        Do you see a letter that says "Message from the

2   Chairman"?

3   A.   Yes.

4   Q.   And who is it signed by?

5   A.   Jim Moore.

6   Q.   And what is Jim Moore's position as stated in this letter?

7   A.   Chairman.

8   Q.   Could you read the first three paragraphs please.

9   A.   Dear delegate, we are delighted to welcome you to the

10  Inside Track family and look forward to your participation in

11  our two-day property seminar.  This is designed to give you a

12  thorough insight into the property investment business and how

13  we can help you profit from it.

14       As the UK's leading property investment company, our

15  members have enjoyed paper profits of more than 80 million

16  pounds.  This figure represents a total value secured by our

17  members on purchases of top quality investment properties,

18  sourced entirely by the company.

19       We now want to share this success with you.  And with

20  this in mind and drawing from my personal experiences in

21  property investment, my colleagues and I have created

22  educational seminars in varying levels of investment

23  memberships that are suited to everyone.  From the novice

24  looking to buy their first investment, to the hardened expert

25  who knows what they want, but doesn't have the time to find it.

J66VMOO4                          Haque - direct

1    Q.  Thank you.

2              MR. VAINBERG:  Could we go to the next page of this

3    brochure.

4    Q.  And could you please read the paragraph above "We will help

5    you."

6    A.  From sourcing properties which offer significant growth

7    potential to securing finance and giving advice on attracting

8    quality tenants, Inside Track will provide you with the

9    education and the opportunity to build significant wealth

10   through property investment.

11   Q.  And do you see bullet points below that right there?

12   A.  Yes.

13   Q.  Could you read the first four bullet points.

14   A.  We will help you develop clear and achievable property

15   investment objectives; build the knowledge and skills to think

16   and act like a property professional; establish lucrative

17   contacts with a network of mortgage brokers, tax experts, and

18   solicitors; and get substantial discounts on new-build

19   properties.

20             MR. VAINBERG:  And if we could now move to page 5 of

21   this brochure.

22   Q.  Could you read the first sentence and the four bullet

23   points below that.

24   A.  Inside Track's track record is built on the success of our

25   members.  We are the largest and most successful property

1    investment company in the UK.  Each year we educate up to 7500

2    people at our weekly seminars.  Over 4500 members have bought

3    in excess of one billion pounds worth of UK and international

4    properties.  These members have made more than 80 million

5    pounds in equity from property deals through Inside Track.

6           MR. VAINBERG:  And now let's just go to page 10.

7    Q.  And could you read the large text on the right?

8    A.  Our international developments are thoroughly researched

9    and investigated for long-term growth and profit potential.

10   Q.  And could you read the second paragraph here please.

11   A.  However, as with many of our members, you may be thinking

12   about expanding your portfolio internationally where the

13   benefits are just as advantageous.  Like in the UK, our

14   international developments are thoroughly researched and

15   investigated for long-term growth and profit potential.

16           Currently, our overseas developments are focused on

17   Spain, the U.S. (Florida) and Portugal, all of which are

18   markets which have had and are continuing to have extensive

19   growth in the property sector.

20   Q.  Thank you, Agent Haque.

21           MR. VAINBERG:  We can take down this Inside Track

22   brochure.

23           Can we pull up Government Exhibit 809.

24   Q.  What is this, Agent Haque?

25   A.  This is a letter from Jim Moore to investors.

J66VMOO4                         Haque - direct

1   Q.  When is this letter dated?

2   A.  July 1st, 2009.

3   Q.  And I think you mentioned it, but who is it signed by?

4   A.  Jim Moore.

5   Q.  Could you read the first four paragraphs of this letter

6   from Jim Moore.

7            THE COURT:  Could you go up there and tell us what

8   it's about?  The re.

9            THE WITNESS:  Lake Austin Reserve.

10  Q.  Agent Haque, just before you read that, do you have an

11  understanding of what Lake Austin Reserve is on a general

12  level?

13  A.  A development project in Florida.

14  Q.  Could you read the next four paragraphs please.

15  A.  The attached information was sent to the first set of

16  completions on Grande Palisades on 26th June.  We are sending

17  you a copy for information only and as a result of you paying

18  the sales progression fee.

19            The world is a very different place from when we all

20  originally invested in Florida, and many of you have naturally

21  expressed your concerns, both directly to me at the events that

22  I have personally presented at and by talking to my staff.  I

23  heeded these concerns and put Florida top of my lift for

24  attention.

25            Subsequently, over the last six months, both Tony

1    McKay and I have spent many weeks in Florida with one aim:  To

2    make a number of dramatic changes and do all we possibly could

3    to actively protect and nurture our respective investments in

4    Lake Austin Reserve and Grande Palisades in particular.  These

5    activities have included ensuring the resort is completed,

6    liaising with all the stakeholders from the banks through to

7    the construction company and all suppliers of services to the

8    resort.  None of this has been easy.

9         The culmination of all this effort is the production

10   of the enclosed DVD.  It shows where we have got to and

11   introduces the experienced team which we have recruited to help

12   achieve our objectives.

13   Q.  Special Agent Haque, did you review the DVD that's

14   referenced in this letter from Jim Moore to investors in Lake

15   Austin Reserve?

16   A.  Yes.

17   Q.  And did you review excerpts of that video to confirm that

18   they were a portion of the fuller video?

19   A.  Yes.

20        MR. VAINBERG:  At this point, your Honor, the

21   government would like to play Government Exhibit 810, which is

22   an approximately minute and 20-second excerpt of the larger

23   video.

24        THE COURT:  Okay.  If I could just see you all for a

25   minute.

```
 1                (At sidebar)

 2                THE COURT:  I'm just trying to figure out time-wise

 3     how much more time do you need with this witness?

 4                MR. VAINBERG:  The plan with this witness is to play

 5     the short video.  After that, there's about ten minutes of

 6     testimony, and then we have the SEC audio, which is about 40

 7     minutes.

 8                THE COURT:  I think we'll take a break here then.

 9     We'll take a lunch break now.

10                MR. BELL:  The other option, Judge, would be to finish

11     with this witness in ten minutes, take a break, then come back

12     and just the witness list with the rest of the AV.

13                THE COURT:  No, we'll take a break then.

14                MR. GARVIN:  Your Honor, may I ask something before we

15     walk away?

16                Do you have a rough idea how much longer the

17     government's case will be?  Because I have two witnesses just

18     sitting, and I don't mind telling them first thing tomorrow

19     morning, but I don't --

20                THE COURT:  I think this afternoon.

21                MR. GARVIN:  I don't want to slow anything down.

22                MR. BELL:  We're going to be done within an hour of

23     when we get back.

24                MR. GARVIN:  Okay.  So if --

25                THE COURT:  This afternoon?
```

J66VMOO4                          Haque - direct

1          MR. BELL:  This afternoon.

2          MR. GARVIN:  If we get back at what time, sir?

3          THE COURT:  An hour from now.

4          MR. GARVIN:  I'm sorry, without my glasses I'm blind.

5          MR. BELL:  It's a quarter of one.

6          (In open court)

7          THE COURT:  So we'll take a lunch break now.  It's a

8    quarter to one.  And I'll ask you to be back here at quarter to

9    two.  You can use the cafeteria, sure, on the 8th floor.

10          JUROR:  Thank you.

11          (Jurors not present)

12          (Luncheon recess)

13          (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

J667MOO5

AFTERNOON SESSION

1:45 p.m.

1    (Jury not present)

2    (At the sidebar)

3         THE COURT:  So, there are two issues that I've been

4    discussing with counsel and wish to put on the record.  The

5    first is that during the course of Mr. Haddow's

6    cross-examination he answered a question, and in that answer he

7    indicated that Our Space was a fraudulent endeavor.  Mr. Garvin

8    objected.  I overruled the objection, but I think that Mr.

9    Garvin was correct, and so I'd ask counsel to see if they can

10   come up with a way to correct that ruling.

11        Number two, a juror has indicated that her son is

12   graduating from high school tomorrow.  She lives in

13   Westchester, and I guess she was asking if she can be excused.

14        So, I've asked counsel to think about that as well,

15   how do we deal with that.

16        OK?  Thanks.

17        MR. BELL:  Thanks, Judge.

18        MR. GARVIN:  Thank you, Judge.

19        (In open court)

20        THE COURT:  Counsel, we're going to continue with the

21   trial, so you should tell me whenever you can.

22        MR. GARVIN:  Your Honor, may we give you an answer to

23   one of your two questions?

1          THE COURT:  Sure.

2          MR. BELL:  We're happy to let the one juror go and

3     seat I guess it would be alternate 1.

4          THE COURT:  OK.  Well, we never designated as

5     alternates, but that's you're agreement too?

6          MR. GARVIN:  Yes.

7          THE COURT:  OK.  All right.

8          MR. BELL:  Your Honor, we have an answer to your other

9     question as well.

10         (At the side bar)

11         MR. BELL:  Your Honor, we have conferred with Mr.

12    Garvin, and we've got a joint proposal for language to address

13    Mr. Haddow's remark earlier, which we will hand to you now.

14         MR. VAINBERG:  Just to read it into the record,

15    "Earlier today you heard Renwick Haddow offered an offhand

16    characterization of Our Space, one of the defendant James

17    Moore's business ventures.  You should ignore that

18    characterization.  The legality of Our Space is not at issue in

19    this trial, as the government has made no allegations regarding

20    Our Space.  You should therefore put that particular remark out

21    of your mind."

22         THE COURT:  OK.  Do you want me to say that to the

23    jury?

24         MR. GARVIN:  Yes, your Honor.  And with regard to the

25    juror, the defense's position is that since one juror has to go

1     to a high school graduation, that she be excused.  It is our

2     understanding that the next juror in line was Juror 29, Ian

3     McBride, and we would like to confirm that.

4              THE COURT:  I don't understand.  You want to know who

5     the new 12 is?

6              MR. GARVIN:  Yes, because my list was the next one as

7     Mr. Ian McBride.

8              THE COURT:  Yes, that's correct.

9              MR. GARVIN:  Thank you, your Honor.

10             MR. VAINBERG:  Part of Agent Haque's testimony will

11     involve the conviction of Mr. Moore on the other offense at

12     issue.  We would suggest that it might be an appropriate time

13     for the Court to give a limiting instruction that the jurors

14     should consider that evidence for knowledge, intent or absence

15     of mistake.

16             THE COURT:  Write it out.

17             MR. BELL:  We will write something out right now,

18     Judge.

19             THE COURT:  Is that coming up soon?

20             MR. VAINBERG:  Yes, very soon.

21             THE COURT:  So work on that.

22             Show it to Mr. Garvin.  It can't be that complicated.

23     Do you want me to do it?

24             MR. GARVIN:  This is fine.

25             THE COURT:  I'm marking these each as stipulations for

J667MOO5

1    the record of the parties.

2              MR. GARVIN:  Yes, sir.

3              THE COURT:  Bring in the jury, Christine.

4              (Continued on next page)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (In open court)

2          (Jury present)

3          THE COURT:  Please be seated, and we will continue

4    with the direct examination of Agent Haque.

5          DEPUTY COURT CLERK:  Before we begin, I would like to

6    remind you you are still under oath.

7    FATIMA HAQUE, resumed.

8    DIRECT EXAMINATION (Continued)

9    BY MR. VAINBERG:

10   Q.  Agent Haque, when we broke for lunch you were testifying

11   about this letter from Jim Moore to investors in Lake Austin

12   Reserve dated July 1, 2009.

13   A.  Yes.

14   Q.  And previously you had testified that you had reviewed

15   court records relating to a conviction of James Moore; is that

16   right?

17   A.  Yes.

18   Q.  Was that conviction related to Lake Austin Reserve and the

19   condominium project therein?

20   A.  Yes.

21   Q.  Now, could you please read the last two paragraphs of this

22   letter.

23   A.  "The joining together of Lake Austin Reserve with David

24   Lloyd is, I believe, a real coup.  He is just the right

25   entrepreneur to help us establish an international approach and

J667MOO5                         Haque - Cross

 1   focus for delivering the required occupancy and rental rates

 2   for our investors.  His reputation for helping to establish

 3   quality international leisure brands is second to none, and we

 4   look forward to working alongside him to ensure we deliver not

 5   only on this return on investment but establish a world class

 6   resort of choice for holiday makers the world over.

 7           "I hope you are reassured by the DVD and enclosed

 8   information, and I honestly believe that the unusual yet

 9   courageous changes we've made" -- "with the unusual yet

10   creative changes we have made this investment can still be a

11   winner for us all."

12   Q.  I believe you had testified that you had reviewed the DVD

13   that's mention the in this letter.

14   A.  Yes.

15           MR. VAINBERG:  Could we play Government Exhibit 810 in

16   evidence?

17           THE COURT:  Sure.

18           (Video played)

19   Q.  We can take that down.

20           Your Honor now might be a good time for the

21   instruction the parties stipulated to.

22           THE COURT:  So, the parties have agreed as follows:

23   You will be hearing in a moment or two evidence that Mr. Moore

24   was previously convicted of a felony.  I am instructing you

25   that you may use that evidence with respect to Mr. Moore's

knowledge, intent, absence of a mistake, or that it was part of

a common scheme or plan as the conduct alleged in this case.

You may not simply consider this evidence as a substitute for

proof that Mr. Moore committed any of the crimes charged in

this indictment or simply assume that because Mr. Moore

committed a past offense he has a propensity to commit crime

and thus committed the offense here.

           I will have this typed up for you in case you want to

read it in the jury room.

Q.  Prior to testifying today, have you reviewed certain court

records related to a case called United States of America v.

James Moore, 17 Cr. 187 in the Middle District of Florida?

A.  Yes.

Q.  Who is the defendant in this case?

A.  James Moore.

Q.  Is that the same James Moore that's in the courtroom here

today?

A.  Yes.

Q.  Was James Moore charged in a superseding information in

that case?

A.  Yes.

Q.  And let's project Government Exhibit 812 previously in

evidence.  We seem to be having some technical difficulties.

           Did the superseding information charge James Moore

with a crime known as misprision of a felony?

1   A.  Yes.

2   Q.  And how did James Moore plead to that crime?

3   A.  Guilty.

4   Q.  Did he plead pursuant to a plea agreement?

5   A.  Yes.

6   Q.  And let's put up Government Exhibit 813A, please.

7            Is this the plea agreement that James Moore pleaded

8   guilty pursuant to?

9   A.  Yes.

10  Q.  And does this document as we scroll through it contain

11  excerpts from that agreement?

12  A.  Yes.

13  Q.  If we go to the first page, please.  Who is this agreement

14  between?

15  A.  United States of America and James Moore.

16  Q.  And if we go to page 11, what is this agreement dated?

17  A.  February 2, 2018.

18  Q.  And on page 12 who is it signed by?

19  A.  James Moore, Scott Rask, David Garvin and Deborah Barnett.

20  Q.  Let's go back to page 1, please.  Do you see the portion of

21  this agreement with the heading "count pleading to"?

22  A.  Yes.

23  Q.  Can you read that, please.

24  A.  "The defendant shall enter a plea of guilty to Count One of

25  the information.  Count One charges the defendant with

1    misprision of a felony, in violation of 18 U.S.C. 4."

2    Q.  And if we could go to page 2.  Do you see the heading

3    "Elements of the offense"?

4    A.  Yes.

5    Q.  Could you read this section, please.

6    A.  "The defendant acknowledges understanding the nature and

7    elements of the offense with which defendant has been charged

8    and to which defendant is pleading guilty.  The elements of

9    Count One are:  First, a federal felony was committed, as

10   charged in Count One of the information; second, the defendant

11   had knowledge of the commission of that felony; third, the

12   defendant failed to notify an authority as soon as possible.

13   An authority includes a federal judge or some other federal

14   civil or military authority, such as a federal grand jury,

15   Secret Service or F.B.I. agent; and, fourth, the defendant took

16   steps to conceal the crime."

17   Q.  Did the defendant, in addition to signing this agreement,

18   initial pages in the plea agreement?

19   A.  Yes.

20   Q.  And is that what we see on the bottom here?

21   A.  Yes.

22   Q.  If we could go to page 11, please.  And let's go to the

23   next page after that.  Actually, I'm sorry, let's stay on page

24   11.

25            Do you see the heading, 11, factual basis.

1    A.  Yes.

2    Q.  Could you please read that.

3    A.  "Defendant is pleading guilty because defendant is in fact

4    guilty.  The defendant certifies that defendant does hereby

5    admit that the facts set forth in attached 'factual basis'

6    which is incorporated herein by reference, are true, and were

7    this case to go to trial, the United States would be able to

8    prove those specific facts and others beyond a reasonable

9    doubt."

10   Q.  And did this plea agreement include a section called

11   factual basis?

12   A.  Yes.

13   Q.  Let's go to that section on page 14.  Is this the factual

14   basis section?

15   A.  Yes.

16   Q.  OK.  Can we go through this factual basis section from page

17   14 down to where it ends, just to see how many pages it is.

18   And how many pages is it?

19   A.  Pages 14 to 17.

20   Q.  Going down to the end of page 17.  Is this factual

21   statement initialed by Jim Moore on each page?

22   A.  Yes.

23   Q.  And now if we just blow up the last two paragraphs

24   beginning on page 16 and going down to page 17.  Could you

25   read -- could you read this paragraph first and then we will

1    move down.

2              THE COURT:  I'm sorry.  You're on 16?

3              MR. VAINBERG:  We're on the full paragraph beginning

4    on page 16 going down to page 17.

5              THE COURT:  OK.

6    A.  "During the fall of 2009 Mr. Moore met with Paul Oxley at

7    the Maesbury Homes offices.  At that time Paul Oxley requested

8    Mr. Moore to execute a document Oxley had prepared on behalf of

9    Darrencrest.  The document stated that Darrencrest agreed to

10   return any and all commissions it had been paid by Paul Oxley

11   on behalf of Lake Austin Properties.  Mr. Moore questioned what

12   the document was about.  Paul Oxley informed Mr. Moore that if

13   he did not sign the document he, Paul Oxley, would be likely

14   headed to jail.  Mr. Moore declined to sign the document.  Paul

15   Oxley insisted and stated that he had illegally used deposit

16   money that should have been held in escrow to pay virtually all

17   of the commissions earned by Darrencrest.  Mr. Moore then

18   realized what Paul Oxley had done in connection with the

19   financing for the development.  Mr. Moore declined to help Paul

20   Oxley."

21   Q.  And could you read the next paragraph, please.

22   A.  "In early 2009, Mr. Moore agreed to make a promotional

23   video for Grand Palisades, which was designed to encourage

24   investors/condominium purchasers to go through with their

25   closing.  Shortly thereof, in late 2009, early 2010, Mr. Moore

1  learned that Florida law prohibited developers from using any

2  portion of a deposit for the purchase of a condominium to be

3  paid for marketing or selling expenses.  Mr. Moore knew that a

4  crime had been committed by Paul Oxley.  However, Mr. Moore did

5  not report the crime to law enforcement.  Instead, Mr. Moore

6  permitted the crime to remain concealed."

7  Q.  After signing this plea agreement, did James Moore plead

8  guilty before a judge?

9  A.  Yes.

10  Q.  And did that guilty plea take place in or around February

11  of 2018?

12  A.  Yes.

13  Q.  Now, at the time of his arrest for that crime, was James

14  Moore interviewed by law enforcement agents?

15  A.  Yes.

16  Q.  When was he interviewed?

17  A.  February 15, 2017.

18  Q.  Is that about a year before the guilty plea?

19  A.  Yes.

20  Q.  Was the interviewed recorded?

21  A.  Yes.

22  Q.  And as part of the interview, did the defendant make

23  statements about his real estate and seminar business and about

24  Bar Works?

25  A.  Yes.

1              MR. VAINBERG:  Let's play clip Government Exhibit 811A

2    along with the corresponding transcript.  I don't believe there

3    is a corresponding transcript, is there?  OK.

4              (Video played)

5    Q.  As part of the interview did the defendant make statements

6    about Bar Works?

7    A.  Yes.

8    Q.  Let's play Government Exhibit 811F and the corresponding

9    transcript.

10             (Video played)

11             MR. VAINBERG:  At this time the government has no

12   further questions for Agent Haque.

13             THE COURT:  So, is the government resting?

14             MR. BELL:  No, the government still has some

15   multi-media to play before resting.

16             THE COURT:  Counsel, do you have any

17   cross-examination?

18             MR. GARVIN:  Your Honor, I only would like to revisit

19   Government Exhibit 813A, I think it's pages 15 through 17,

20   which is the factual basis that was read.  Perhaps if the

21   government could be kind enough to put that back on the screen.

22   Thank you very much.

23   CROSS EXAMINATION

24   BY MR. GARVIN:

25   Q.  Good afternoon, ma'am.

1    A.  Good afternoon.

2    Q.  My name is David Garvin, I represent Mr. Moore in this

3    case.  I'd like to go over the factual basis.

4           And if you would be kind enough, sir, could you please

5    put it on the same place that was read during direct, which I

6    think was page 17.  Yes.

7           So, ma'am, did you have any independent knowledge of

8    this case other than what was found in the court records?

9    A.  No.

10   Q.  So, would it be fair to say that your knowledge of the

11   facts are limited to what was introduced in evidence here

12   today?

13   A.  Yes.

14   Q.  So where this talks about that during the fall of 2009

15   Mr. Moore met with Paul Oxley, do you see that, ma'am, on page

16   16?

17   A.  Yes.

18   Q.  And he has now been kind enough -- the agent has been kind

19   enough to highlight it in yellow.

20   A.  Yes.

21   Q.  Now, the video that we saw a very small excerpt of, that

22   video was prepared in early 2009, correct?

23   A.  I'm sorry.  Which video?

24   Q.  Yes.  There was a video clip of Mr. Moore for the Grand

25   Palisades.

J667MOO5                          Haque - Cross

1    A.  Yes, I believe so.

2    Q.  Well, let's read it together then.  "During the fall of

3    2009, Mr. Moore met with Paul Oxley at Maesbury home offices.

4    At that time Paul Oxley requested Mr. Moore to execute a

5    document Oxley had prepared on behalf of Darrencrest."

6            Now, was it your understanding, ma'am, that the

7    document that Mr. Oxley was preparing was a false document, it

8    was a document that was purporting that Darrencrest was going

9    to be returning all the money that had ever been paid to it?

10   Did you understand that from reading this document?

11   A.  I'm sorry.  Can you repeat that second part of that?

12   Q.  Yes, ma'am.  It says that at the time Paul Oxley requested

13   Mr. Moore to execute a document Oxley had prepared on behalf of

14   Darrencrest.  So, let me break it down so it's not confusing.

15   Paul Oxley is with Maesbury Homes, correct?

16   A.  Right.

17   Q.  And Darrencrest is related to Mr. Moore, correct?

18   A.  Right.

19           MR. VAINBERG:  The government objects.  The witness

20   testified that her only knowledge is based on whatever is

21   written on this page.

22           THE COURT:  Right.  But go ahead, just a little bit

23   more.

24           MR. GARVIN:  Thank you.  I will try to keep it very

25   short.

1   Q.  So, having said that, you had Mr. Oxley preparing a

2   document to be signed by Darrencrest.

3           MR. VAINBERG:  Objection.

4           THE COURT:  By Mr. Moore.

5           MR. GARVIN:  By Mr. Moore, correct.

6   Q.  You understood that?

7           THE COURT:  She said that already.

8   Q.  The document is dated -- I will skip that.

9           Mr. Moore questioned the document.

10          Could we please scroll down half a page, sir.  OK.

11  Thank you so much, last paragraph.

12          The bottom paragraph says, "In early 2009" -- do you

13  see that, ma'am?

14  A.  Yes.

15  Q.  -- "Mr. Moore agreed to make a promotional video for Grand

16  Palisades, which was designed to encourage

17  investors/condominium purchasers to go through with their

18  closings."

19          So, the point is that that video was made before Paul

20  Oxley ever attempted to have Mr. Moore sign the false document.

21  Isn't that correct, ma'am?

22          THE COURT:  If you know.

23  A.  I'm not sure.

24          MR. GARVIN:  I have no further questions.  Thank you.

25          THE COURT:  Thanks.  Can we excuse the witness?

1              MR. VAINBERG:  Yes, your Honor.

2              THE COURT:  Thanks very much.

3              (Witness excused)

4              MR. VAINBERG:  Your Honor, at this time the government

5     would like to play excerpts from the defendant's interview with

6     the SEC marked on Government's Exhibits 807A, 807C, 807L --

7     excuse me -- 806A, 806C, 806L, 806K, 806M and 807O, and move

8     the corresponding transcripts into evidence which are marked as

9     807A, C, L, K, M and O.

10             THE COURT:  I will allow it.

11             MR. VAINBERG:  A, C, I.  Excuse me, your Honor.

12             (Government Exhibits 807A, 807C, 807I, 807K, 808M and

13     807O received in evidence)

14             (Audio played)

15             (Continued on next page)

16

17

18

19

20

21

22

23

24

25

1          MR. BELL:  Your Honor, because of the technical

2     difficulty we're having, we're going to put the remaining two,

3     I believe it is -- just the remaining one up on the screen, and

4     I'll simply read it.  It will actually make up some time.

5          Question is -- let me let you set that up.

6     "Q.  What were the terms of the leases?  So was there a fixed

7     cost for them and what were investors expecting in rents?

8     "A.  The initial lease terms, from memory, again, they were

9     selling the lease for $22,000 U.S., and they were expecting a

10    guaranteed amount of rent over a ten-year period.

11    "Q.  Of approximately how much?

12    "A.  Yeah, I'm going to say -- I'm going to say 15 percent, but

13    I would need to look.

14    "Q.  Okay.

15    "A.  The reason I would need to look is because we are doing

16    this kind of thing all the time ourselves with different

17    products.  So for me, Bar Works is now quite -- it's not new in

18    my mind.  I can't remember the exact number, but let's -- for

19    this point in time, I think 15 percent.

20    "Q.  What guaranteed the percentage?

21    "A.  Again, the explanation given to us was the fact that

22    the -- the logic or rationale given to us, Preethi, was that if

23    it was 100 workspaces, they will sell, as an example, 20 of

24    them to investors.  And when the members come in, the first 20

25    or the first ones to be occupied will always be the workspaces

1   belonging to the investors.  Therefore, Bar Works would always

2   be able to pay these returns.

3   "Q.  Well, what if workers -- sorry.  What if folks did not

4   come in to lease the spaces though?

5   "A.  Well, I don't think that kind of speculation is for me to

6   enter into right now.

7   "Q.  Okay.

8   "A.  From our point of view, you know, we visited We Work in

9   London, we visited We Work in New York.  When I say 'we,' I

10  did.  You know, my partner visited there with me.  The guys

11  from United Property did.  That's clearly a successful

12  business.  We went to other co-working locations.  And the

13  indication from Mr. Haddow was that he was going to

14  aggressively market to members and, therefore, that wouldn't be

15  a problem.

16        And by the way, it was on West 39th Street in

17  Manhattan which in tens looked extremely busy.  We went to look

18  at the site --

19  "Q.  Okay.

20  "A.   -- and it seemed extremely busy.  So there is another

21  element to this as well, Preethi.  And that is, you know, for

22  us, we would consider the United States to be the most

23  regulated place on earth.  And only some kind of stark raving

24  lunatic would open his business on West 39th Street and then,

25  you know, not do what he'd said he intended to do.  We assumed

1    that -- we assumed rightly or wrongly."

2              MR. BELL:  That would conclude that clip.

3              We have one more to play.

4              (Audio played)

5              MR. BELL:  With that, Judge, before the government

6    rests, we have two emails to read in.  But I also wanted to

7    inquire, would this be a good time for your Honor to read the

8    additional instruction regarding Mr. Haddow's testimony earlier

9    today?

10             THE COURT:  Sure.  And this is another stipulation

11   between the parties.  And it's as follows:

12             Earlier today, you heard Renwick Haddow offer an

13   offhand characterization of Our Space, one of the defendant

14   James Moore's business ventures.  You should ignore that

15   characterization.  The legality of Our Space is not at issue in

16   this trial, as the government has made no allegations regarding

17   Our Space.  You should, therefore, put that particular remark

18   out of your mind.

19             Okay.  We'll have this typed up too and given to you.

20             Go ahead.

21             MR. BELL:  Thank you, your Honor.

22             Your Honor, at this time the government is going to

23   publish, with the Court's permission, two final emails.  The

24   first of these is going to be Government Exhibit 147, 147,

25   which I'll ask Mr. Cooney to put up now.

1          And can we first go to the very top of the email.

2     This is an email exchange.  Top email is from Renwick Haddow,

3     renwick@renwickhaddow.com, to Mr. Moore at

4     thejamesmoore@me.com.  It's an exchange from March 27, 2016,

5     the subject line is "tough times."

6          Now, there is a forwarded email at the very bottom

7     that I'll ask Mr. Cooney to focus on now.  It's from Mr. Moore

8     at the same email address on February 16, to

9     kathy_haddow@hotmail.com.  Subject:  "Tough times."

10         And I'll read the email.

11         Hello, Kathy.  I hope you're well.  Remember me?  The

12    guy with the debts, including David Lloyd?

13         Well, this is a quick note with two intentions:  One,

14    to let you know that recently I've been working with Renwick.

15    As a parent, I know how nice it is when I hear something

16    positive about my kids.  I know he isn't a kid, but I just

17    wanted to say how refreshing it is to work with someone who is

18    obviously raised with similar values to me:  To keep his word,

19    do what he says, and honor agreements.  This obviously came

20    from whatever you instilled in him, so you did a great job.  He

21    is a pleasure to work with.

22         Next.  I'm on slightly better times financially.  I

23    also heard that David Lloyd had moved back to UK to his old

24    house in Oxshott (I can get his address and more info, if

25    necessary).  Wondered if you may still have any interest in

1      pursuing him.  Maybe this time with the aid of a private

2      detective and lawyer, if necessary?  He contributed to me being

3      made bankrupt in UK, so obviously we will need to locate that

4      agreement I signed that signed all the debt over to you, but

5      that should be easy enough.

6              Either way, I hope you're well, and to let you know

7      that your son has some attributes you can be very proud of.

8              Have a great day.  Jim Moore.

9              Now, if we can go up, Mr. Moore forwards that email

10     saying:  After what you said, that may explain why your mum

11     didn't reply.  Last thing she would want is to hear anyone

12     saying nice shit about you.

13              Then one up.  Mr. Haddow responds:  That was a very

14     nice message.  I haven't spoken to her in nearly a year.

15     Saying you have the same values as me may not have helped

16     either.

17              Up one.  Mr. Moore replies:  Yeah, sorry, mate.  I

18     sent it over a month ago before I knew you weren't speaking.

19     Should probably have asked first.  Apologies.

20              And then the very top, Mr. Haddow says:  Well, you

21     didn't know she is a mad old cow.

22              THE COURT:  Wait a minute.  This is on 3/7/2016?

23              MR. BELL:  3/27/2016, your Honor.

24              So that's Government Exhibit 147 which, Mr. Cooney,

25     you can take down.

1          Our final exhibit for publication is Government

2     Exhibit 129.  Let's just go to the very top here.  At the very

3     top, the final email, the top email, is from

4     jr@theunitedpropertygroup.  It's to Neil Storey, David Kennedy,

5     and Ana KP, previously identified as Mr. Moore.  The date is

6     February 25th, 2016.  And the subject is "Re:  Deal file –

7     Loreley Zavattiero – 5 leases."

8          Let's go, Mr. Cooney, to the bottom of that page.  And

9     so at the very bottom, JR writes:  The clients are not

10    Americans, Brazilian and Argentinian respectively.  We always

11    check the IDs.  Just looked at the app form again and spotted

12    the U.S. address.  We will check with the clients for their

13    official residency; and if they are full-time residents, we

14    will revert Ren for his accredited sign-off process.  He has

15    sent us the accreditation form previously, so we are now aware

16    of his process.

17          Thanks for the heads-up, Neil.

18          Best regards, James Robinson, co-founder.

19          And then the reply, which is right above within that

20    box, comes from Neil Storey.  Storey writes:  Thanks, James.

21    Importance can't be overstated.  Clients have a U.S. address

22    and funds being sent from a U.S. bank.  If also U.S. residents,

23    it gets worse.  Brazilian or Argentinian address and bank

24    transfer not an issue.  But as things stand, this is a real

25    concern.

1          Moving up one.  JR responds to Storey, Kennedy, and to

2     the defendant:  On it.

3          Best regards, James Robinson, co-founder.

4          That concludes Government 129.

5          Your Honor, the government rests.

6          THE COURT:  Thank you.

7          So now we turn to Mr. Garvin for a defense case.

8          MR. GARVIN:  Yes, your Honor.

9          First, just to preserve the record, the defense would

10    move pursuant to Rule 29 for a directed verdict.

11         THE COURT:  We can deal with that offline.

12         MR. GARVIN:  Thank you, sir.

13         As the first witness, we call Sean Phillips.

14         If I may, I'll walk out into the hallway to get the

15    witness.

16         THE COURT:  Sure.

17    DIRECT EXAMINATION

18    BY MR. GARVIN:

19    Q.  Good afternoon, sir.

20    A.  Good afternoon.

21    Q.  Sir, it would be fair to say that you know I'm David

22    Garvin; correct?

23    A.  Correct.

24    Q.  And that we have spoken a few times since I served a

25    subpoena on you or caused a subpoena to be served upon you?

1    A.  Yes, sir.

2    Q.  And, in fact, we met for the first time last evening; is

3    that correct?

4    A.  Correct.

5    Q.  And I told you where to be today?

6    A.  You did.

7    Q.  Is that correct?

8           Sir, can you please give the ladies and gentlemen of

9    the jury a little bit of your background first.  Let's start

10   with your educational background.

11          THE COURT:  Or where do you live?

12   A.  I live in southwest Florida currently.  I have always been

13   in the health and fitness world; and lucky enough -- was at the

14   right place at the right time, lived in Europe for 18 years,

15   floated a company on the London Stock Exchange, and built the

16   world's largest health club chain.

17   Q.  And before you did that, can you tell us a little bit about

18   your educational background?

19   A.  Educational background.  I have a masters degree in

20   exercise, physiology, and applied anatomy from Penn State

21   University; an undergraduate in health and fitness from

22   Slippery Rock University.

23   Q.  Okay.  I'm going to ask you to be mindful that the court

24   reporter has to take everything down, so please try to go at a

25   speed that makes that happen, okay?

1    A.   Apologies.

2    Q.   So, sir, tell us a little bit about your work experience.

3    A.   Like I said, I started off in -- working in health clubs

4    when I was 18.  From that I got pretty good at it and moved on

5    up to -- I ran a very large YMCA at the very beginning of my

6    career.

7    Q.   What year would that have been?

8    A.   1987, '88.

9    Q.   Okay.

10   A.   I played soccer at a high level as well; so I got a call

11   from a headhunter saying, Hey, Sean, you play soccer.  Want to

12   go to England?  And next thing you know, I was flying on

13   Concorde and ending up in Old Blighty, as they say.

14   Q.   And did you work in Europe?

15   A.   I did.  I worked in the health club field in England and

16   actually in 18 countries on five continents it ended up being.

17   Q.   When you say "I worked on," what positions did you hold,

18   sir?

19   A.   I started off running one health club that went from a

20   general manager to a regional manager to country manager to

21   being the COO of a publicly traded company.

22   Q.   And what was the name of that company?

23   A.   It was called Fitness First LLC -- or PLC, sorry, in

24   England.

25   Q.   And how long did you work with Fitness First?

1    A.  For 15 years.

2    Q.  And during those 15 years, did you have experience with

3    obtaining members for the business?

4    A.  1.8 million of them, yes.

5    Q.  And did there come a time when you had the occasion to meet

6    Jim Moore?

7    A.  Yes.

8    Q.  And did there also come a time when you had occasion to

9    meet a gentleman by the name of Neil Storey?

10   A.  Absolutely.

11   Q.  Please tell the ladies and gentlemen of the jury how it is

12   that you came to meet Jim Moore.

13   A.  Like I just said, I was living in Florida, I still do.  And

14   I ended up meeting Jim through Neil Storey, who are friends.

15   And our paths crossed because of my expertise in the fitness

16   industry and --

17          THE COURT:  You met him.  Do you remember what year

18   you met Mr. Moore?  Roughly.

19          THE WITNESS:  Probably five years ago, six years ago

20   now.

21   Q.  Approximately six years ago?

22   A.  Yeah.

23   Q.  So we're talking in or about 2013?

24   A.  Yes, give or take.

25   Q.  And how is it that you met Mr. Neil Storey?

1   A.  I met him with Jim.

2   Q.  And what business or background did you understand Neil

3   Storey to have?

4   A.  Neil was the consulate general to Peru and to Brazil for a

5   number of years.  So he was -- to me he's always been basically

6   a diplomat or ex-diplomat.  So I know he was responsible for a

7   lot of trade from the UK government into South America, as

8   well.  I know his family well now.

9   Q.  And did there come a time when either Mr. Moore or

10  Mr. Storey mentioned to you a company by the name of Bar Works?

11  A.  Yes.

12  Q.  And can you please tell the ladies and gentlemen how that

13  came about and when?

14  A.  I don't remember the exact dates.  I'm sure that there are

15  emails from myself showing those dates.  But I was asked just

16  to take a look at a concept that would be a smaller more

17  boutique offering to We Work, which is -- and I think still

18  is -- the world's largest co-working-working organization.  And

19  so I was asked to take a look at Bar Works and potentially get

20  involved on the membership side.

21  Q.  What was your understanding of the business model for Bar

22  Works?

23  A.  I was told at the beginning that Bar Works was looking at

24  defunct restaurants and bars in the New York City metro area

25  that had gone under; so landlords were very keen to rent the

J66VMOO6                        Phillips - direct

1    space, and basically turning those very quickly and easily, for
2    not a lot of money, into co-working sites.
3    Q.  Going to place in front of you or -- excuse me.  Let me
4    started over.
5           I'm going to place on the Elmo Defendant's Exhibit
6    5060 which is in evidence, and ask you if you recognize --
7    A.  I do.
8    Q.  -- this email?
9    A.  I sure do.  I remember it.
10   Q.  Can you tell us a little bit about the email before we
11   start to read from it?  What is going on about this time?
12   A.  This is an email communication between myself and
13   Mr. Haddow.  Just -- I think this was just talking about
14   membership.
15          THE COURT:  This is dated 2/19/2016?
16          THE WITNESS:  2016, yes, February, which would have
17   been right before I went to New York.  Yup.
18   Q.  Okay.  So can you tell us to the best of your recollection
19   how did you start doing work for Bar Works?  What kind of work
20   did you initially start with?
21   A.  I really didn't do any, quote, work for Bar Works.  I went
22   with the potential of getting involved, whether on a
23   consultancy basis or helping them with the membership side of
24   the organization, which is selling memberships to the sites
25   that they were looking at opening, and helping with that entire

1    process.

2    Q.  And can you recall what month it was when you started

3    spending some time looking at Bar Works, the inception?

4    A.  Probably October/November of 2015.

5    Q.  Let's read what was said in this.

6          It's from Sean Phillips, which would be you; is that

7    correct?

8    A.  Correct.

9    Q.  And your email address appears to be

10   sean@ijustgotbetter.com; is that correct?

11   A.  Yup.  And I think subsequently somebody had misspelled

12   that, that I had them use another email address, which was

13   sean@suresean.com.

14   Q.  And it's made out to Bar Works, info@barworks.nyc.  And you

15   see there's copies to Neil Storey and James Moore; is that

16   correct?

17   A.  Correct.  Because they were my contacts, those were the

18   people that I was in touch with and that I had met.

19   Q.  It says:  Hi, Renwick.  It was great speaking to you and

20   hearing your passion and enthusiasm for the Bar Works rollout.

21         Now, is that Renwick Haddow that you're making out

22   this email to?

23   A.  Yes.

24   Q.  And as of the time that you're writing this email, had you

25   ever met face-to-face with Renwick Haddow?

1   A.  No, sir.

2   Q.  At the time that you're writing this email, had you ever

3   been to New York City to inspect any of Bar Works's locations?

4   A.  No, sir.

5   Q.  I don't have anything I need to run by you yet, but I am

6   sure I will after speaking to Zoe on Monday.  I did not get her

7   email address, as I think you accidentally hit an "i" instead

8   of an "o" when sending your email to me, and I just got lucky

9   and received it, with a smiley face.  Zoe wasn't included on

10  the forwarded email from the server.  It is easier to use my

11  sean@suresean.com email then.  Feel free to throw stuff at me

12  that way.

13          My goal is to simplify the membership sales process,

14  like you have with pricing model, and the potential member's

15  ability to access joining.  What does that mean, sir?

16  A.  Basically, my goal was to help simplify the sales process

17  overall.  I didn't know what the sales process was at that time

18  because I hadn't been there, hadn't seen anything.  But I had

19  seen some of their pricing model, which was pretty

20  straightforward and very simple at the time.  I can't remember

21  it exactly, but I remember it being not that complicated.  And

22  the potential member's ability to access joining, basically

23  saying, Hey, I want to help you guys get members because that's

24  the key to this.

25  Q.  I apologize.

1    A.   That's all right.

2    Q.   When you say "members," are we talking about the actual

3    people who would use the space to work out?

4    A.   Correct.  Absolutely.

5              THE COURT:  Use to work out.

6              THE WITNESS:  To work out.  That's all I'll ever talk

7    about; that's the only side of the business that I know.

8    Q.   You were not talking about investors?

9    A.   No, sir.

10   Q.   But your goal or one of the goals of a business like this

11   is to attract as many members as possible; is that correct?

12   A.   To me, that's the only goal.

13   Q.   After speaking to Zoe at length, I would like to get NYC

14   quickly thereafter and then be able to quickly implement a plan

15   to start meeting, greeting, and filling seating.

16              Was that your objective, sir?

17   A.   Yeah.  My plan was to help with membership.  As you can

18   see, all through this email, that's all I talk about.  I was

19   keen to get -- the process had been going fairly slowly from

20   talking to people and being able to actually get to New York

21   City.  I was looking at other opportunities out there in my

22   world, and this was one that looked interesting, so I wanted to

23   pursue it.  But it was kind of being slow walked a little bit,

24   so that's why.

25   Q.   When you say it was dragging or lagging a little bit, are

1    you referring to you getting to New York --

2    A.  Yes, sir.

3    Q.  -- meeting the required people, and getting going with the

4    task at hand?

5    A.  Yes, sir.

6    Q.  Now, did there come a time -- by the way, who was it, if

7    anyone, who asked you to contact Bar Works?

8    A.  Jim and Neil were the conduits to my -- but that was --

9    Q.  Did there come a time when a meeting was scheduled to go to

10   New York?

11   A.  Yes.

12   Q.  And can you tell us when that was?

13   A.  I think it was in March sometime.  I think it was early

14   March, I believe, because I had a conference that I was

15   speaking at later on in March.

16   Q.  Okay.  I am going to show you now Government's Exhibit 136.

17   And it says:  Gentlemen, both Jim and I have traveled -- let me

18   see if I can get to the part that relates to you.

19          Okay.  We are both looking forward to seeing you in

20   New York City on Wednesday.  We have arranged for Sean Phillips

21   to also be on the ground this week.

22          And the date of this email is March 6, 2016.  The

23   subject is "Agenda for New York City."  Do you see that?

24   A.  I do.

25   Q.  Is that consistent with your recollection that you were

1  there the following week?

2  A.  Yes, sir.

3  Q.  So that would be approximately on or about March 11th

4  through -- well, I don't know, how many days did you stay in

5  New York?

6  A.  Just two.

7           THE COURT:  Did you come up from Florida?

8           THE WITNESS:  Yes, sir, I did.

9  Q.  Please tell the ladies and gentlemen what happened when you

10  arrived in New York to go to Bar Works in March.

11  A.  I went -- I came up the night before.  I flew in at night

12  and was going to meet the next morning.  I went and looked at

13  one of the sites.  It was closed.  Back to my hotel.

14          Next day I went.  And as I would do in any co-working

15  place, and with laptop in hand, and sat down.  And was going to

16  kind of get kind of a little recky on tape what I was dealing

17  with.  So seeing staff, anything else that was going on.  And

18  that kind of started my day and going, Okay.

19  Q.  Now, were you aware -- or let me ask it a different way.

20          Was Mr. Storey in New York City during that week?

21  A.  Yes.

22  Q.  And was Mr. Moore in New York City?

23  A.  Yes.

24  Q.  And Mr. James -- what is it, Mr. Robinson from UPG, was he

25  in town that week?

1    A.  I can't recall if he was at all.  I remember three other

2    gentlemen.  I think it was Dion Jacobs, Mike White, I believe

3    his name is, and David Lilley from Dolphin Capital were

4    definitely there.

5    Q.  And do you recall meeting with them?

6    A.  I do.

7    Q.  And when I say "them," was Mr. Moore and Mr. Storey part of

8    the group that met?

9    A.  Yes.

10   Q.  What about Renwick Haddow, was he physically present?

11   A.  He wasn't present in any meetings with -- that I was

12   involved in with Dolphin Capital.

13   Q.  Was there a time when you were at the facility, but while

14   Mr. Haddow did not attend the meeting, was he physically close

15   by?

16   A.  One night that we went to, I believe it was, Koi for

17   dinner, yes, Mr. Haddow was there, but not at our table.

18   Q.  Can you explain what happened on that occasion?

19   A.  On that occasion, we had gone out for dinner.  And

20   Mr. Storey, myself, and Dion, Mike, and David were all at a

21   table.  And I know that Mr. Haddow had come in and was standing

22   at the bar, which was from here to the courtroom doors away,

23   kind of obstructed from view.  And --

24             THE COURT:  You mean the back of the courtroom?

25             THE WITNESS:  The back of the courtroom.  I'm sorry.

1   So just 35, 40-feet-plus away.

2   A.  And as we sat around the corner at a table, and I know that

3   Jim had left our table to go and try to encourage Mr. Haddow to

4   join us.  Then that never happened.

5   Q.  Now, at any time did you meet a person by the name of

6   Jonathan Black?

7   A.  No, sir.

8   Q.  And who did you understand Jonathan Black to be?

9   A.  From what I know, Jonathan Black was a -- seemed like a

10  British aristocrat of some kind.  Never met the gentleman;

11  never spoke to the gentleman.

12  Q.  Do you know if he held any position or title with Bar

13  Works?

14  A.  I think I saw online something about him being involved at

15  the highest level, but I don't know what that position would

16  be, whether it was CEO or anything like that.

17  Q.  And did anybody ever tell you that Jonathan Black did not

18  exist?

19  A.  No, sir.

20  Q.  Did anybody ever tell you that any kind of impropriety was

21  going on at Bar Works?

22  A.  Absolutely not.

23  Q.  Would you have even agreed to appear there to help them if

24  somebody would have told you such things?

25  A.  Never, ever.  I never would have made the trip to New York,

1   never would have taken phone calls, and never would have done

2   the work that I did preliminary to say, Hey, here's some ideas

3   on what Bar Works can do.

4   Q.  Now, when you were at Bar Works, did you form an opinion as

5   to -- well, how did you find the conduct of Mr. Haddow during

6   the couple of days that you were there?

7            MR. VAINBERG:  Objection.  Vague.

8            THE COURT:  Overruled.  You can answer it.

9   A.  It was erratic, not just -- never knowing if Mr. Haddow was

10  going to show up or not show up.  Most of my dealings were with

11  Zoya, spelled Zoe, who I believe was his wife.  And who -- it

12  became very apparent very quickly that she didn't want me

13  involved.

14           THE COURT:  That she, the wife, didn't --

15           THE WITNESS:  The wife didn't want me involved in

16  helping Bar Works.  It seemed like a little bit of a power

17  struggle, like, Who is this guy?

18           THE COURT:  Did you meet her?

19           THE WITNESS:  Yes, sir.

20  BY MR. GARVIN:

21  Q.  Can you please describe some of the things that you

22  observed when you were in the same, I would say, vicinity of

23  Renwick Haddow's wife, Zoe?

24           THE COURT:  I don't understand your question.

25  Q.  Tell us what you observed the way that Zoe Haddow was

1    conducting business at Bar Works while you were there.

2    A.   When I first walked into Bar Works, I sat down.  And the

3    first thing you're going to do when you go to a co-working

4    place of any kind, because it's kind of like a Starbucks-ish

5    type of thing, where you're going to plug in a computer, a

6    phone, or something.  And I walked in and I sat down at a round

7    table and I went, Oh, okay, I could see how this could be

8    converted into a co-working place.  Yeah, all right.  It was

9    already open.

10            THE COURT:  It was already open?

11            THE WITNESS:  Yeah.

12   A.   So I thought, Okay, this would be great.

13            It didn't kind of seem open, but whatever.

14            I went to try to plug a plug in and couldn't find a

15   plug.  I was like, Wow, a lot of tables here, no plugs.  I

16   guess everybody has really long battery life in New York City.

17            And so I followed this bright orange cable up the

18   wall, which was this extension cable that I could finally get

19   plugged into at the inn.

20            I asked the guy that was behind the bar at the time,

21   and I was like, Where do you plug in anything?

22            And he's like, Oh, there's the extension cord.

23            And I was like, This one extension cord that goes all

24   the way up?

25            He said, Yes.  Okay.

1          And I was like, Oh, cool.

2          I said, so what do you guys do for drinks here?  I see

3     that you give complimentary coffee and soft drinks.  I'm like,

4     There's a cooler here with four cans of Coke in it.  I'm, like,

5     Did you guys already have a bunch of people through this

6     morning taking all the cans of Coke?

7          And the poor kid behind it says, No, no, no.  Because

8     if we put more, then the members will take them.

9          And I went, What?

10          That was echoed with Zoya saying the same thing.  I

11     was like, You should just fill that up so it looks good.

12     Because this looks kind of weird; it looks like my dormitory

13     refrigerator on a good day.

14          But so she said the same thing.  No, well, if we put

15     them in there, then the people will take more than one.

16          I'm like, Okay.  You're getting membership off these

17     people.

18     Q.  How did you find that type of management?  Did you form an

19     opinion about it?

20     A.  Yeah, I was just -- it was a head-scratcher.  Going, Okay.

21     Well, you've got something that could be cool here, but I guess

22     you don't want it to be, because that's just Customer Service

23     101.

24     Q.  And did you ever have a productive sit-down meeting with

25     Renwick Haddow?

1    A.  I never sat down one-on-one with Mr. Haddow, no.

2    Q.  And what about sitting down with him with a few other

3    people?

4    A.  Yes.

5    Q.  And please describe how that went.

6    A.  Just bizarre.  Just erratic.  Like Mr. Haddow was just --

7    yeah, didn't -- didn't flow, didn't make a lot of sense,

8    different conversations that I was a part of, because there was

9    only two or three.

10   Q.  And during these conversations with Mr. Haddow, did you

11   form an opinion as to whether or not he actually wanted to use

12   your services?

13   A.  It became pretty apparent pretty quickly that Mr. Haddow --

14   and, in fact, I think his words were, I need the Belfort

15   scripts.

16             And I went what?  The what?

17             He said, You know, the Jordan Belfort scripts.

18             And I'm like, For membership?

19             So he wanted all of my, you know, decades of

20   experience in selling health club memberships.  Because in

21   co-working, you're selling effectively the same kind of way;

22   it's a monthly membership type of scenario.  Because I became

23   fairly proficient at it over the decades, so sayeth our stock

24   price at Fitness First, that that's really all he was

25   interested in.  In fact, I even -- there were some sales guys

1    that I think were selling investment, not membership, as part

2    of Bar Works, who kept getting -- when they found out who I

3    was, they were like, So do you have our leads?  Are you the one

4    giving us our leads?

5            I'm like, What?  No.  No.  I'm here on membership.

6            But they kept saying, Hey, where are our leads?  And

7    where are our scripts?  That's pretty much --

8    Q.  Did it become apparent that Renwick Haddow wanted to take

9    your information and give it to his wife to conduct the actual

10   work?

11   A.  Absolutely.

12           MR. VAINBERG:  Objection.  Speculation.

13           THE COURT:  Sustained.  Strike the answer.

14   Q.  Based upon your conversations and the questions that were

15   posed to you by Renwick Haddow, what --

16           THE COURT:  Excuse me.

17           MR. GARVIN:  Yes, sir.

18           THE COURT:  I thought he had no conversations with

19   Mr. Haddow, other than perhaps in the group.

20           MR. GARVIN:  Let me back up on that.

21           Thank you, your Honor.

22   Q.  When you were in a group -- when we get a feel for -- when

23   we say the word "group," was it a few people or a lot of

24   people?

25   A.  No, just a few.

1   Q.  Who were those few people?

2   A.  Just Mr. Haddow, Zoya, and a couple of people that worked

3   for them.

4   Q.  And did you have an opportunity for Mr. Haddow to ask you

5   questions?

6   A.  Yes.

7   Q.  And when he asked you the questions, what feeling, if any,

8   did you have as to what his objective was?

9   A.  It kind of felt like -- I don't know.  I felt like an

10  outsider from the day I walked in.  My visit was short and, I'm

11  going to say, abrupt, because it was like somebody that didn't

12  want my help, but wanted my information.

13              THE COURT:  How long?

14              THE WITNESS:  Two days.

15              THE COURT:  No, how long was your meeting?

16              THE WITNESS:  Oh, meetings there were several little

17  meetings, like 10 minutes, 15 minutes.  Nothing was ever super

18  long with Mr. Haddow.

19  Q.  Did you have an opportunity while you were in New York to

20  spend some time with Neil Storey and Jim Moore?

21  A.  I did.

22  Q.  And can you tell us, the ladies and gentlemen of the jury,

23  whether or not they were satisfied or happy with the conduct of

24  Mr. Haddow during this trip?

25              MR. VAINBERG:  Objection.

1            THE COURT:  Sustained.

2   Q.  To your understanding, based upon your observations, did

3   you at any time --

4            THE COURT:  Did you meet with Storey and Moore and

5   Haddow together?  Was that what happened?

6            THE WITNESS:  No.  Mr. Haddow was very elusive with a

7   number of the meetings with all -- everyone together.

8            THE COURT:  So you never met with him with them?

9            THE WITNESS:  No.

10            THE COURT:  So just so I understand, you met with his

11   wife?

12            THE WITNESS:  Yes, sir.

13            THE COURT:  And who else?

14            THE WITNESS:  I'm not sure of the other people's

15   names; people that were selling I believe it to be investments

16   now and a couple of the people that were working inside the

17   facility.

18            THE COURT:  But how did you start the conversations?

19   You walked in and said, I'm Sean Phillips, to his wife?

20            THE WITNESS:  Yes.  I walked in, his wife wasn't

21   there, and I said, I'm Sean Phillips, and I'm here to meet Zoya

22   and Renwick.  And then Zoya came in and brought along her

23   business and came over and spoke to me briefly.  And it was --

24   it was, again, very erratic.  It wasn't just, Hey, let's sit

25   down and let's pick Sean's brain for the information.  Again, I

1    had gone in and had already given these guys basically Power

2    Point presentations on, Hey, here's my -- my overview of what I

3    think can be done with a brand like this from a membership

4    sales point of view.  And that was met with almost disdain, in

5    my opinion, when I got there.

6         Not that I'm the pied piper of pied pipers, but I have

7    sold more memberships than anybody else on the planet in the

8    health club business.  So when I walked in as somebody who

9    could help a very young organization, I was definitely met with

10   almost contempt.  It was bizarre.  Like, We don't want you

11   here.  That's my opinion.

12        MR. VAINBERG:  Objection as to the characterization.

13   Move to strike that portion of the testimony.

14        THE COURT:  Overruled.  I'll allow it.

15   BY MR. GARVIN:

16   Q.  Now, after you experienced that with Zoe Haddow and Renwick

17   Haddow, did you have an opportunity to meet with Mr. Storey and

18   Mr. Moore?

19   A.  Yes, I did.

20   Q.  And did you convey to them how you had been treated?

21   A.  Yes.

22   Q.  And did they have a reaction when they heard how you had

23   been treated?

24   A.  They were embarrassed.  They were apologetic.

25   Q.  And you had mentioned earlier that you had an opportunity

1    to meet with the Dolphin investment people; I think it was

2    David Lilley and others.  Is that correct?

3    A.  Correct.

4    Q.  And what, if anything, came out of your getting an

5    opportunity to meet with them?

6    A.  My opportunity to meet with them and get to know them was

7    based on Mr. Haddow not joining us at the table, at dinner the

8    one evening, the only evening we went to dinner.  And Jim and

9    Neil excusing themselves early, which I didn't realize why

10   until now, because they just were embarrassed about how the

11   evening went.

12        And so I ended up -- actually, I don't drink; I'm

13   allergic to alcohol.  So I end up walking down into the

14   basement bar with three guys from a multi million-dollar fund

15   in England to what I'm thinking is, Oh, gosh, I get to

16   entertain these guys.  But it turned into a really nice

17   friendship, so it was actually a nice meeting.

18   Q.  And this is the same evening that Renwick Haddow was

19   physically in the same premises, but he was 30 or 40 feet away

20   and would not come to the table?

21   A.  That is correct.

22   Q.  And you could actually see --

23   A.  From where I was sitting, I could see where he was

24   standing, yes.

25   Q.  And you knew it was Renwick Haddow?

1   A.  Yes, because I had met him earlier that day.

2   Q.  You had met him earlier that day --

3           THE COURT:  When did you meet him?

4           THE WITNESS:  The first day that I got there, later on

5   in the day after I met his wife.

6           MR. GARVIN:  Your Honor, I have no further --

7   Q.  Oh, I want to make it very clear.  Did you ever end up

8   doing any business with Bar Works?

9   A.  No, sir, I did not.

10  Q.  Did you ever go back to Bar Works?

11  A.  No, I did not.

12  Q.  Did you ever have any meetings with Renwick Haddow after

13  that one trip?

14  A.  No, I did not.  But I did see my name on their website at

15  one point as somebody who was doing work with them.

16  Q.  And did you ever authorize Renwick Haddow to use your name

17  on his website?

18  A.  Never.  Never did.  Never would.

19  Q.  Sir, just to be clear, before that March trip, you had

20  never been to Bar Works in New York; is that correct?

21  A.  That's absolutely correct.

22  Q.  And after that one trip in March of 2016, you never went

23  back to Bar Works?

24  A.  Never went back.

25  Q.  So this was the sole and only time that you were at Bar

J66VMOO6                     Phillips – direct

1    Works in New York and saw and spoke with Renwick Haddow?

2    A.  I haven't been back to New York City since until yesterday.

3    Q.  And the only other thing that you knew about Bar Works was

4    that Renwick Haddow was using your name on his website without

5    your permission?

6    A.  Correct.

7              MR. GARVIN:  I have no further questions, your Honor.

8              THE COURT:  Cross-examination.

9              Does anybody need a break?

10             Take five minutes.

11             (Jury not present)

12             (Recess)

13             (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

1        (Jury present)

2              THE COURT:  Please be seated, everybody.  Government,

3   cross-examination.

4              DEPUTY COURT CLERK:  Before we begin, I would like to

5   remind you you are still under oath.

6              THE WITNESS:  Thank you.

7              MR. VAINBERG:  Your Honor, at this time the government

8   moves Exhibits 2000 to 2009 and 2011, 2014 into evidence.

9   These are e-mails sent or received by the defendant.

10             THE COURT:  OK, I will allow it.

11             (Government Exhibits 2000 through 2009 received in

12  evidence)

13             (Government Exhibits 2011 and 2014 received in

14  evidence)

15             MR. VAINBERG:  Or related by the defendant.

16  CROSS EXAMINATION

17  BY MR. VAINBERG:

18  Q.  Good afternoon, Mr. Phillips.

19  A.  Good afternoon.

20  Q.  Mr. Phillips you and I have never met before, right?

21  A.  No, sir.

22  Q.  And we have never spoken before, right?

23  A.  No, sir, we have not.

24  Q.  All right.  You're here testifying for Jim Moore, the

25  defendant, right?

1   A.  Yes.

2   Q.  Jim Moore hired you to work at Bar Works, right?

3   A.  Jim Moore asked me to come and take a look at Bar Works to

4   see if it's something that I wanted to use my certain skill set

5   to help.  I was never hired by Bar Works.

6   Q.  Mr. Phillips, you were never hired by Bar Works?

7   A.  Never -- not formally hired by Bar Works.  I went up to do

8   some consulting.

9   Q.  Mr. Phillips, were you paid by Bar Works?

10  A.  I was paid part of my expenses from Bar Works, yes.

11  Q.  Your testimony is that you were only paid a part of your

12  expenses?

13  A.  I was -- I can't remember what exactly I was paid by Bar

14  Works, but I know I had to go and ask for it a few different

15  times.  But I have a daily rate when I go to look at certain

16  things, so it was as an independent contractor.

17  Q.  Mr. Phillips, isn't it true that you were paid $7,500 by

18  Renwick Haddow for your work at Bar Works?

19  A.  I don't remember being paid $7,500.

20  Q.  You don't remember that happening?

21  A.  No, but if you have proof of that, I'm sure I was.  I was

22  doing consulting at that time, so...

23  Q.  Now, before you were hired, as you put it -- you're saying

24  you were not hired by Bar Works; you were only working as a

25  consultant?

J667MOO7                         Phillips - Cross

1   A.   Yeah, I've never signed anything to be on any payroll of

2   any company.

3   Q.   You sent a proposal to Jim Moore, something called

4   "Operation bums on seats."

5   A.   It's a British term, bums on seats.  It's kind of like --

6   but, yeah, I signed a couple different -- I alluded to that

7   earlier in my testimony that there were a couple of decks I had

8   sent, PowerPoint presentations.

9   Q.   And, Mr. Phillips you sent those decks to Jim Moore and

10  Neil Storey, right?

11  A.   I did, because those were my contacts to potentially go up

12  and have a look at Bar Works, yes, sir.

13  Q.   You didn't send those decks to Renwick Haddow, right?

14  A.   I don't remember sending them to Renwick, no.  I didn't

15  have an e-mail for Renwick Haddow at that time.

16  Q.   And after you sent those decks to Jim Moore and Neil

17  Storey, did there come a time when you were told that you would

18  be hired to work for Bar Works?

19  A.   There was a time when I was told that I would be going to

20  New York, yes.

21  Q.   And, Mr. Phillips, isn't it true that Mr. Moore also put

22  you on the board of a company called Our Space?

23  A.   Much later I was involved in Our Space, yes.

24  Q.   Well, you weren't just involved, right?  You were the chief

25  operating officer of Our Space, right?

1   A.  I never was a chief operating officer of Our Space on

2   paper, no, sir.

3            THE COURT:  When were you involved with Our Space?

4            THE WITNESS:  Much after, months after.

5            THE COURT:  Well, roughly a date.

6            THE WITNESS:  I can't remember yesterday's date, sir,

7   so, but let's say six months after my visit to Bar Works.

8   Q.  Let's look at Government Exhibit 1105 in evidence.  And,

9   Mr. Phillips, you're not on this e-mail, but you can see that

10  it's an e-mail from an individual from United Property Invest

11  to Loreley Zavattiero, right?

12  A.  I can see that.

13  Q.  And, Mr. Phillips, you see that an attachment to this

14  e-mail is something called Our Space

15  Space-Miami-INT-UPI(1).pdf?

16  A.  Yeah.

17  Q.  Let's scroll through that attachment, please?  Have you

18  seen any brochures for Our Space?

19  A.  I have seen a few of them.  I don't remember seeing this

20  one.

21  Q.  Let's go to page 36, please.  That's your picture, isn't

22  it?

23  A.  Yeah, that's a striking picture of me, yeah.

24  Q.  Let's blow it up.

25  A.  I see.  I see where it says COO, yeah.

J667MOO7                          Phillips - Cross

1   Q.  You didn't know that they put you as a COO in their

2   brochure?  By they I mean Our Space.

3   A.  I see that now on this one, but I was never formally, as I

4   said earlier, hired as a COO of Our Space on paper.

5            THE COURT:  Today is the first day you've seen this?

6            THE WITNESS:  Today is not the first day I've seen

7   this blurb.  Today is the first day I've seen this deck,

8   whatever you want to call this.

9   Q.  Today is the first day that you've seen that your position

10  at Our Space was described as COO?

11  A.  No, that's the first day I've seen this particular

12  presentation is what I was saying.

13  Q.  Mr. Phillips, didn't you say a few minutes ago that you

14  were hired as COO of Our Space when I asked you that question?

15  A.  I said I was not hired on paper as the COO of Our Space.

16  But Our Space when it first started, I was basically the

17  operations position, yes.

18  Q.  I'm sorry.

19  A.  I was being extremely technical.

20  Q.  You were not hired on paper to be the COO of Our Space?

21  Isn't this a piece of paper with you as the COO of Our Space?

22  A.  It's a digital presentation, yes.

23  Q.  Did you give authorization for your picture and name to be

24  used in the brochure for Our Space?

25  A.  I gave permission for my name to be used with Our Space.

J667MOO7                        Phillips - Cross

1   Q.  That wasn't my question, Mr. Phillips.

2   A.  That's my answer.  They did a number of different

3   brochures, and I did not stop them from using my name in

4   brochures.

5   Q.  Mr. Phillips, did you give authorization for your name to

6   be used in connection with the position COO for Our Space?

7   A.  Yes.

8   Q.  You did do that.

9   A.  Yeah, let's say I did.  Yes, I did.

10  Q.  Did you just say "let's say that," Mr. Phillips?

11  A.  What?

12  Q.  Did you just say "let's say that" before you said "yes, I

13  did"?

14  A.  No, I didn't say that.

15  Q.  All right, Mr. Phillips.  You much money did you get -- you

16  knew that Our Space was associated with Mr. Moore, right?

17  A.  I knew that Our Space was associated with Neil Storey,

18  Mr. Moore and several others, yes.

19  Q.  How much money did you get from Our Space for serving as a

20  COO on paper?

21  A.  I was paid originally $10,000 per month for my consultancy.

22  Q.  And how much money total did you get paid?

23  A.  I actually don't know because they still owe me money.

24  Q.  Well, how much -- you don't know how much you were paid by

25  Our Space?

J667MOO7                        Phillips - Cross

1   A.  Not in total, because I know what I have invoiced and what

2   I haven't received, yes, so they still owe me $100,000.

3              THE COURT:  And you received how much?

4              THE WITNESS:  About 130,000 for my time.

5   Q.  You received $130,000 from Our Space?

6   A.  Well, I traveled a lot for that organization in Europe,

7   yes, and help set up.

8              THE COURT:  You started with them when?

9              THE WITNESS:  Months after visiting Bar Works and

10  finding out that that wasn't --

11             THE COURT:  Well, roughly when did you start with Our

12  Space?

13             THE WITNESS:  Well if I was here in March, it would

14  have been probably May, June time, maybe a little bit later.

15  Q.  And just so we're clear, the company that paid you $130,000

16  was associated with the defendant, right?

17  A.  Yes.

18  Q.  Now, did you understand -- I believe you said on direct

19  examination I really didn't do any work for Bar Works.  Is that

20  accurate?

21  A.  Yeah, I mean I gave them information, but I didn't

22  actually, you know, go to work for that organization, yes.

23  Q.  You understood that a significant benefit from having --

24  from the defendant recruiting you to Bar Works was so they

25  could use your name on investment brochures sent to investors,

1   right?

2   A.  No, I did not know that.

3   Q.  You didn't know?

4   A.  With Bar Works?

5   Q.  Yes, for Bar Works.

6   A.  No.

7   Q.  Well, let's take a step back.  Mr. Phillips, you knew that

8   Bar Works raised money from investors, right?  You knew that.

9   A.  I knew that they were raising money.  I didn't know how

10  they were doing it.  It wasn't part of my involvement at all

11  with that organization.

12  Q.  Did you know that Bar Works was raising money from

13  investors?

14  A.  I met some people when I got to New York; they were raising

15  money for investors, yes.

16  Q.  Did you know that having you on press releases and other

17  marketing materials was a benefit to Bar Works to raise money

18  from investors?

19  A.  I figured that out after I had left New York, yes.

20  Q.  So, you did know that hiring you was a benefit in the

21  investment fundraising aspect, right?

22  A.  I didn't at the time, no, because I didn't know that my

23  name was being used.  I understand that now, yes.

24  Q.  You didn't know at the time that your name was being used

25  in any marketing materials?

J667MOO7                        Phillips - Cross

1   A.  No, sir.  At Bar Works, no, I did not know that.

2   Q.  Let's go to -- let's go to Government Exhibit 2009, please.

3   And, Mr. Phillips, if we can zoom in on the top portion.

4   That's an e-mail from you, right?

5   A.  Yep.

6   Q.  That's an e-mail you're send to go Neil Storey and James

7   Moore, right?

8   A.  Um-hum.

9   Q.  And it's dated February 17, 2016?

10  A.  Correct.

11  Q.  And you are attaching an invoice and a deck here, right?

12  A.  I am.

13  Q.  You remember sending this e-mail and the deck, right?

14  A.  I remember it now, yeah.

15  Q.  Let's take a look at your deck, please.  Can we go to the

16  first page, please.  Let's go to the next slide.  You write

17  there --

18  A.  Yep, I remember that. "

19  Q.  -- "Sean Phillips is currently offering memberships to his

20  vast array of talents and experience, and because he is in

21  presale right now they are only $7500 a month (plus agreed

22  percentages."  You wrote that, right?

23  A.  Yes.

24  Q.  That's you asking for your $7,500, right?

25  A.  Yeah.

1  Q.  And you are also asking for an agreed percentage, right?

2  A.  Yes.

3  Q.  What was that percentage?

4  A.  I don't remember actually, I really don't.

5  Q.  You don't -- what was the percentage supposed to be of?

6  A.  Of membership sales and revenue of membership.

7  Q.  You don't remember what percentage.

8  A.  I think it might have been five percent, but I really

9  don't.  I have tried to put most of the Bar Works thing out of

10  my memory because it didn't serve me.  I don't like carrying

11  around extra baggage, but yeah.

12  Q.  But you had negotiated a percentage of membership sales

13  from Bar Works, right?

14  A.  Yeah, if I ended up working with them, yeah.

15  Q.  Let's go to the next slide.  And let's go to the next.

16  Let's keep going.  The next one.

17          All right.  Let's look at this slide.  You put

18  together this slide, right?

19  A.  Yeah, I put together all the slides in this presentation.

20  Q.  Does this accurately describe what you did for Bar Works?

21  A.  The three distance travel visits, by the way, one, those --

22  Q.  Well, Mr. Phillips, can you just answer my question.  Does

23  this accurately describe what you did for Bar Works?  It's a

24  yes or no question.

25  A.  No.

J667MOO7                    Phillips - Cross

1   Q.  Does not.  What's inaccurate in what you put together on

2   this slide?

3   A.  Because this is previsit to New York City, and this is a

4   tongue-in-cheek.  If you read through the entire deck -- which

5   I'm sure everybody has got to -- there is a lot of humor in

6   here, and so it's basically saying -- at this point I'm getting

7   a little like, hey, guys, are you going to shit or get off the

8   pot -- excuse me French -- and so I'm saying here are the

9   things that I've front-loaded for this organization, so that's

10  what I'm saying, so yes.

11              THE COURT:  You did that when?  When did you

12  front-load all of this?

13              THE WITNESS:  Well, you saw the date of the e-mail.

14              THE COURT:  No, I'm just asking you.  When did you do

15  all of this front-loading?

16              THE WITNESS:  In February.  So when I say travel

17  visits, that's to Miami to meet with Jim and with Neil over

18  potentially working together in coworking, and I wrote a press

19  release, and the two different presentations.

20  Q.  Mr. Phillips, what's inaccurate about what you described

21  here?

22  A.  No, it's accurate.  It's vague but it's accurate.

23  Q.  OK.  So now it's accurate?

24  A.  Yes.

25  Q.  Mr. Phillips, you wrote that one of the things you did was

1   a great press release that has peaked interest in the

2   investment community.  You wrote that, right?

3   A.  I just said I wrote the entire thing, yes, so...

4   Q.  And you wrote those words "a press release that has peaked

5   interest in the investment community"?

6   A.  Yeah.

7   Q.  Didn't you just tell us a few moments ago that you had no

8   idea that there were any marketing materials mentioning your

9   presence at Bar Works that went out to investors?

10  A.  Yes, I did.

11  Q.  Was that an inaccurate statement?

12  A.  That's an inaccurate statement.  So, there was a press

13  release.  I apologize, I don't remember writing a press release

14  for this.

15  Q.  All right.  Mr., Phillips, you testified earlier that --

16  now, as a matter of fact, you knew that United Property Group

17  had used press releases with your name to solicit investors,

18  right?

19  A.  I can't remember.  I don't recall anything with United

20  Property.

21  Q.  Mr. Phillips, you got a set of promotional materials from

22  Mr. Haddow as far back as January 2016, right?

23  A.  I don't remember getting anything from Renwick Haddow.  If

24  you have an e-mail that I got, then great.  I don't remember

25  literally getting anything from Renwick, because all of my

J667MOO7                        Phillips - Cross

1    dealings were with Neil.

2    Q.  OK.  Let's look at Government Exhibit 2004 in evidence.

3    And let's look at -- let's start at the bottom of this e-mail,

4    and let's just look at the heading and going all the way down

5    to your name Sean Phillips on the bottom.

6    A.  Can you blow it up a little?

7    Q.  I think we're about to.

8    A.  Thank you.

9    Q.  All right.  This is an e-mail from Passion Makes Profit,

10   sean@passionmakesprofit.com.  That's you, right, sir?

11   A.  Yes.

12   Q.  And you are sending this e-mail on January 13, 2016, right?

13   A.  Yep.

14   Q.  And you're sending it to a number of folks but including

15   James Moore, Neil Storey, Renwick Haddow.

16   A.  Um-hum.

17   Q.  And there is a number of people from United Property Group

18   on this e-mail, right?

19   A.  Right.

20   Q.  And you write to them, "Thank you all for such a warm and

21   inspired welcoming."  Right?

22        THE COURT:  Wait a minute.  Before that the subject

23   matter is Bar Works team vibe.

24        THE WITNESS:  Um-hum.

25        THE COURT:  So, you had a feeling about that in

1    January 13, 2016?

2              THE WITNESS:  So, that would have been a video

3    conference call that I had with the United Property Group

4    people, yeah.  Not a visit or anything, but yeah.  I didn't say

5    I'm looking forward to meeting each of your personally.

6    Q.  Mr. Phillips, you had a video conference call with United

7    Property Group, but you don't know whether or not they were

8    using your name to solicit investors?

9    A.  Yes.  I mean --

10   Q.  Go ahead and answer.

11   A.  Yeah, I don't remember anybody using my name.

12   Q.  Well, except for the press release that peaked interest in

13   the investment community, right?

14   A.  I haven't seen the press release since then, so I'm sure

15   that you have it and you can show people, but ...

16   Q.  Let's go up to -- so this is January 13, 2016, and let's

17   just go up top.  And let's include the entire e-mail going down

18   to Passion Makes Profit.  Do you see an e-mail on January 18,

19   2016 from Neil Storey to Renwick?

20   A.  I do.

21   Q.  And it reads here.  "Hi Renwick.  Below FYI.  Sean has

22   asked if someone can please send him all relevant information

23   and materials currently being used, so he can crack on (he is

24   aware of the February 1 start date but keen to get a head

25   start/:"bums on seats").  Would you kindly arrange this please?

1   Or send to me/Jim to forward on."  Then he gives your e-mail

2   address, right?

3   A.  Yes.

4   Q.  Let's go to the next e-mail.  And this is an e-mail from

5   Renwick Haddow, right?

6   A.  Sure, yeah, it says his name at the top, yeah.

7   Q.  And that's to Neil Storey, to Tahyira Cordner, Jim Moore

8   and Natalie Kent, right?

9   A.  Um-hum.

10  Q.  Mr. Haddow is writing here, "Hi T.  Please see below.  Can

11  you pull out all the promotional material:  Day pass,

12  membership app, member brochure, week pass.  Anything else we

13  use to market to clients.  We are also on a number of

14  websites."

15          Does this refresh you recollection that you were

16  provided materials regarding Bar Works from Renwick Haddow?

17  A.  Yeah, I was provided certain things, yeah, and most of it

18  was go look at the different websites which were different

19  coworking websites -- not coworking, but websites that solicit

20  and try to fill empty spaces in coworking places.

21  Q.  And that was back in January of 2016, right?

22  A.  Yeah.

23  Q.  Now, let's look at Government Exhibit 2003.  In fact,

24  actually let's go to Government Exhibit 2001, please.  Let's

25  blow this up:

 1              Mr. Phillips, this is an e-mail from David Honeyman at
 2   the United Property Group.com to team@unitedpropertyinvest.com.
 3   Do you see that?
 4   A.  Yes, I do.
 5   Q.  It's dated January 13, 2016, right?
 6   A.  Um-hum.
 7   Q.  And the subject is Bar Works press release, number 2,
 8   January 2016.
 9   A.  Um-hum.
10   Q.  Did a press release go out with your name in or about
11   January of 2016?
12   A.  Did a press release go out?
13   Q.  Did a press release --
14              THE COURT:  He's asking you.
15   A.  I don't know.  It may have.  I don't have any recollection
16   of that, but I see the e-mail that I've never seen before.
17   Q.  Do you see the portion of the e-mail that says, "Please get
18   this press release out to your clients immediately regarding
19   the appointment of Sean Phillips" at the top?
20   A.  Yes, sir, I see that in the e-mail.
21   Q.  Mr. Phillips, if you just wouldn't mind letting me finish
22   my question so the court reporter can take it down.
23   A.  Oh, I'm sorry.
24   Q.  "Please get this press release out to your clients
25   immediately regarding the appointment of Sean Phillips - the

1  ex-operations director of Fitness First.  This will help old

2  clients (buyers) be convinced to buy more and convince new or

3  potential clients to get involved.  This should 'blow out of

4  the water' any fears that clients may have that the business

5  will not be a huge success.  You now have the We Work story and

6  the Fitness First story to add to your armoury."

7          Does this refresh your recollection that United

8  Property Group was using your hire or consultancy to promote to

9  clients?

10  A.  I can read the e-mail and see that they were obviously

11  doing that at that time, but ...

12  Q.  Let's go to the next page.  Have you seen this press

13  release before?

14  A.  Yes, I have.

15  Q.  When did you see it?

16  A.  When I wrote that for -- so, if I join forces with Bar

17  Works, it could be used.

18  Q.  You wrote this press release, right?

19  A.  No.  Well, I had some help because I don't know who Kevin

20  Cook is.

21  Q.  Sir, what portions of this press release did you write?

22  A.  Well, the Sean started at Fitness First with over 500

23  company owned, I did.  There is no doubt that the immeasurable

24  commercial value to Fitness First, all of that, that's all from

25  my bio.

1   Q.  Sir, do you see there is a quote in here from cofounder and
2   CEO Jonathan Black?
3   A.  Yeah.  I didn't write that.
4   Q.  But you knew that that was added in the press release,
5   right?
6   A.  Yeah, I don't know who gave me that information, but it was
7   either Zoe or somebody in New York that would have helped that.
8   Or I gave them the front part and they wrote the other bits
9   added in.  I gave my bio to be used, but that was me part of
10  trying to get hired to help this organization.
11  Q.  So, you don't know how this portion of the press release
12  came about?  Is that your testimony?
13  A.  No, I don't.
14  Q.  And, Mr. Phillips, we saw the date on the e-mail was
15  January 13, 2016.  Is it still your testimony that you didn't
16  know that your name was being used on press releases that went
17  out to investors as early as January 2016?
18  A.  I didn't know the dates those went out, but there is
19  obviously a press release with my name on it.
20          THE COURT:  You know it or you didn't know it?
21          THE WITNESS:  At that date?  I don't know what date --
22  I knew that there was a press release; I didn't know who it was
23  going out to.  I know that obviously you had an exhibit that
24  said, you know, and stirred up the investment community.
25          Both of my sales decks that I sent out, those decks

1    were to try to make sure that I got the gig with Bar Works, so

2    it's very forward facing into a more sales point of thing.  But

3    I understand in the cold light of day what is written, the 7500

4    and all of that from what you said earlier, so, yes.

5    Q.  Mr. Phillips, when you say forward facing, does that mean

6    talks about things that hadn't happened yet as if they

7    happened?

8    A.  No.  That's basically saying, hey, if I get involved, here

9    is what can be used, here's my credentials.

10   Q.  OK.  Now, Mr. Phillips, let's look at Government Exhibit

11   2008.  And you can see focusing on the second half of this

12   message, that's the e-mail from you with the deck and the

13   invoice that you sent to Neil Storey and James Moore, right?

14   A.  Yeah.

15   Q.  And you sent that February 17, 2016?

16   A.  Yeah.

17   Q.  So by February you were already invoicing $7500 for your

18   work, right?

19   A.  Yeah, probably.  I mean I know that I had invoiced, so

20   that's the date and there is an invoice attached there, so yes.

21   Q.  And prior to that you had made a proposal to Jim Moore that

22   you get paid $78,000; isn't that right?

23   A.  Yeah, there were a number of different proposals because

24   there were -- you know, nothing was happening.  So, of course,

25   as somebody who is trying to get paid to do a job, you go and

1    say, hey, well, what about this?  What about this?  Hey, how
2    about -- because one of the decks was, hey, hire Sean Phillips
3    for three months at 7500 and here you go, a month, instead
4    of -- or the three months may have been 7800.  I know you guys
5    have had those decks, so ...
6    Q.  But by this point you still hadn't really done anything for
7    Bar Works, right?
8    A.  I don't know what your definition of done anything for Bar
9    Works.
10   Q.  Well I'm using your words, right?  You said you didn't
11   really do anything for Bar Works, right?
12   A.  Sure.  I mean they used my name.
13   Q.  Let's look at the top part.  Do you see an e-mail chain
14   that goes on forwarding your invoice and deck by Neil Storey to
15   AnaKP 2014, which is an email associated with the defendant?
16   Do you see here Neil Storey writes, "Quality.  We need to get
17   him paid quickly, Jim.  We can't risk losing Sean, and I think
18   he's beginning to wonder."
19   A.  Yeah, wondering if I'm ever going to get paid, yeah.
20               THE COURT:  Paid for what?
21               THE WITNESS:  Paid for -- I invoiced.  Because the
22   only way that I was going to do anything was if I could get
23   paid to do it, and so whether it be the decks and giving my
24   membership ideas and everything else -- the whole beginning of
25   this thing was to get involved and help sell memberships in Bar

Works plain and simple.  It's always been the way until I

visited New York.

Q.  Mr. Phillips, do you see Jim Moore responds, "Sure, I

agree.  Renwick will ask 'what is he actually going to do?'

But I agree.  Please give some thought as to how we can have

him turn his decks and pitches into actual member sign-ups."

Do you see that?

A.  Yeah.

Q.  Is it fair to say that at this point the only thing you had

done are some decks and pitches and no work for Bar Works?

A.  A number of different ideas that I had put forward that

could be instantly turned into the entire membership model for

that organization, yes.

Q.  And as of February 17, 2016, isn't it true that Mr. Haddow

didn't even know what you were going to do for the organization

after you were hired by Jim Moore?

A.  I don't know what he knew or didn't know.

Q.  Now, when you started at Bar Works you asked questions

about their membership, right?

A.  Yes.

Q.  That's what you have to do as a future membership director,

right?

A.  Yes.

Q.  How many members did Bar Works have?

A.  I don't recall how many.

1    Q.  Ballpark?

2    A.  Five.

3    Q.  Five members?

4    A.  That's a ballpark, yeah.  I don't know how many they had,

5    because I didn't see any raw or any data showing me the number

6    that they actually had and what they were paying or anything.

7    Q.  When did you learn that there were five members at Bar

8    Works?

9    A.  I never learned how many members Bar Works had.

10   Q.  Well, where did the five that you just gave came from?

11   A.  You asked for a ballpark number.  I gave you a number.  My

12   ballpark could be five, it could be a hundred.  It could be.

13   But the day I spent there I didn't see very many members at

14   all, so I don't know.  I really don't know.

15   Q.  This is important, Mr. Phillips.  What day are you saying

16   you were there?

17   A.  Whatever day it shows in March that I was there.  You have

18   an agenda of the day.  I think it was March 9 or 10, something

19   like that.

20   Q.  OK.  And I think you testified on direct examination you

21   believe that's the first time you went to Bar Works.

22   A.  I've only been to New York to Bar Works one time.

23   Q.  Mr. Phillips, in March 2016 how many members did you see at

24   the Bar Works location?

25   A.  I don't know if they were all members.  Some people were

1    there as part of kind of an event they were having, because

2    some of the members got cleared out on that day, so I really

3    don't know how many members were there.

4            How many did I see?  I saw maybe ten people, but I

5    can't tell you which ones were members and which ones weren't.

6    Q.  Ten people total, right?

7    A.  Well, that were there for any length of time doing any

8    work, but some of those people had come in to meet other

9    people, so really don't know how many members.

10   Q.  And was the defendant there in March the same time that you

11   were?

12   A.  That's when the Dolphin Capital was there and Mr. Moore was

13   there, yes.

14   Q.  Was Mr. Moore at the Bar Works location with you?

15   A.  No, he wasn't at the Bar Works location with me when I

16   first went in there, no.

17   Q.  Had you ever met Mr. Moore at a Bar Works location?

18   A.  Had I ever met him at a Bar Works location?

19   Q.  Yes, sir.

20   A.  I think he was at the Bar Works location at least once

21   during that day that I was there, yeah.

22   Q.  And during the time that you and he were at that Bar Works

23   location, how many members did you see?

24   A.  Again, I couldn't possibly tell you which ones were

25   members, which ones weren't.  There weren't that many people

1   there.

2   Q.  And it's your testimony that despite your job being the

3   person to increase memberships, you can't tell us how many

4   members Bar Works had as of March 2016?

5   A.  My testimony is I never actually saw hard copies of what

6   exactly the members were at Bar Works and proof of payment or

7   anything, so it's speculation.  Somebody could say, yeah, we

8   have 200 members or, yes, we have 50.  I never was given

9   concrete here is our members, here is what they're paying, here

10  is where we are at this moment in time.

11  Q.  Now you testified that as part of that meeting you also

12  went to a bar at some point, right?

13  A.  Went out to dinner.

14  Q.  Was that dinner at a bar or restaurant?

15  A.  Restaurant.

16  Q.  And you testified that you saw Mr. Haddow there, right?

17  A.  I did.

18  Q.  And you knew that it was Mr. Haddow because you had met him

19  earlier that day.

20  A.  Correct.

21  Q.  OK.  And to be clear, your testimony isn't that Mr. Haddow

22  was at the table with you, right?

23  A.  Correct.

24  Q.  He was 40 feet away?

25  A.  He was a good ways away.  He wasn't in earshot at all, no.

1   Q.  And you didn't make eye contact with Mr. Haddow, right?

2   A.  No, sir.

3   Q.  You didn't communicate in any way to each other.  You don't

4   know what he was doing at that restaurant that night if he was

5   there, right?

6   A.  No, I don't.  I just know he was at the bar.

7   Q.  Let's go to Government Exhibit 2011.  If we could just

8   focus on the top half portion here.  Do you see an e-mail from

9   AnaKP, the address associated with Jim Moore, writing,

10  "Morning Renwick.  I suggest we make a list of what we need

11  addressing ASAP and pay this guy right away.  In fairness, we

12  have had him walking around most of the month, so hard for us

13  to complain about his invoice."

14  A.  Did you say walking around?  You mean waiting around?

15  Q.  Waiting around.  I'm sorry, Mr. Phillips.  And that's

16  accurate, right?  You had been waiting around most of the time?

17  Is that accurate, Mr. Phillips, you had been waiting around

18  most of the time?

19  A.  Waiting for payment, yes.

20  Q.  And at the top do you see an e-mail from Mr. Haddow to Neil

21  Storey and AnaKP, it says "paid".

22  A.  Yep.

23  Q.  Does that refresh your recollection that you were paid

24  $7500?

25  A.  It tells me that I was, yeah.

1  Q.  Can we pull up Government Exhibit 2013.  And let's just

2  look on the bottom, please.  This is an e-mail from Bar Works

3  Inc. with the address info@barworks.nyc, and it's signed on the

4  bottom as Renwick.  Do you see that?

5  A.  Yeah.

6  Q.  So you knew that Renwick Haddow was using info@barworks.nyc

7  as an e-mail address?

8  A.  Yeah, I guess.  I mean somebody was, yep.  But I don't know

9  who else has access to info@barworks but, yeah, it looks like

10 Renwick obviously did.

11 Q.  You knew he was using that, right?

12 A.  I see an e-mail.

13 Q.  And Mr. Haddow writes to you here, "Hi Sean.  Good speaking

14 to you the other day.  Hope you are having a good week.  How

15 are things progressing with the Bar Works project?  Is there

16 anything you want to run by me yet?"

17       Did Mr. Haddow ask you what you were doing for Bar

18 Works in February 2016?

19 A.  On his e-mail?

20 Q.  In your recollection, sir.

21 A.  No.

22 Q.  This e-mail does not refresh your recollection that he

23 wanted to know what you had been up to?

24 A.  No.  I mean I was still trying to figure out whether things

25 were going to move forward with Bar Works.

J667MOO7                         Phillips - Cross

1  Q.  Well, you had already invoiced $7500 by the time of this

2  e-mail, right?

3  A.  Yeah.

4  Q.  And let's just scroll up to your response.  Could you

5  read -- that's from you, right?

6  A.  Yeah, no, we read about it earlier in my testimony, yeah.

7  Q.  Could you read what you wrote to Mr. Haddow.

8  A.  "Hi Renwick.  It was great speaking to you and hearing your

9  passion and enthusiasm for the Bar Works rollout.  I don't have

10 anything I need to run by you yet, but I am sure I will after

11 speaking to Zoe on Monday.  I did not get her e-mail address,

12 as I think you accidentally hit an "I" instead of an "O" when

13 sending your e-mail to me, and I just got lucky and I received

14 it.  Zoe was not included on the forwarded e-mail from the

15 server.  If it's easier to use my sean@suresean.com email, then

16 feel free to throw stuff at me that way.  My goal is to

17 simplify the membership sales price (like you have with the

18 pricing model) and the potential members ability to access

19 joining.  After speaking to Zoe at length, I would like to get

20 to New York City quickly therefore and then be able to quickly

21 implement a plan to start meet, greeting and filling seating."

22 Q.  Just a quick question on this one, Mr. Phillips.  Mr.

23 Haddow had introduced his wife to you as Zoe, right?

24 A.  He introduced Zoe.  I'm not sure he introduced her as his

25 wife at that time.

1    Q.  All right.  And we can take that down.

2              Did there come a time when the defendant asked you for

3    advice on how to better pitch leases to investors?

4    A.  Leases to investors?

5    Q.  Work space leases, sir.

6    A.  I don't even know how that works, so ...

7    Q.  You don't know how the investment side of Bar Works was

8    structured in any way?

9    A.  I don't know what a work space lease entails of.

10   Q.  And is that true for Bar Works and Our Space?

11   A.  It's true for -- I don't -- that's not -- that wasn't my

12   lane.  I was there to sell memberships and to use my name to

13   recruit talent for the growth of Our Space.

14   Q.  Is it your testimony that you didn't even know that

15   investors were buying work space leases?

16   A.  I know that investors were investing.  I don't know how

17   they're investing.  There were talk of debentures, talks of

18   different things like that.  But my testimony is I don't know

19   how a work space lease actually works.  People are buying --

20   investing in Bar Works or any other coworking type of thing

21   like that.

22   Q.  Could we pull up --

23   A.  And I am just saying that so you don't ask me technical

24   questions about that, because I'm not going to know.

25   Q.  Well, if you don't know, Mr. Phillips, you can say so.

1    A.  OK.

2    Q.  Can we pull up Government Exhibit 2014.

3           And focusing on this e-mail, do you see at the top

4    this is an e-mail chain between Jim Moore, yourself, Renwick

5    Haddow and Neil Storey?

6    A.  Um-hum.

7    Q.  You see the subject is "Input please".

8    A.  Um-hum.

9           THE COURT:  I think you need to answer for the record.

10   A.  Oh, yes.

11   Q.  And the date is February 23, 2016, right?

12   A.  Yep, that's what it says.

13   Q.  Let's go to bottom of this e-mail chain.  This is an e-mail

14   from Mr. Moore that begins this e-mail chain, right?

15   A.  Yep.

16   Q.  And he writes, "Hi guys.  Can I please get your input on

17   some of the membership/revenue questions in yellow.  I also

18   have a question regarding Time Square ... is the capacity 300

19   members or 300 work paces?  Shouldn't we be saying something

20   like capacity 1,000 members ... 300 at any time - so people do

21   the headline revenue on 1,000 memberships?  Let me have your

22   thoughts please.  Neil and I are on a call tomorrow on this."

23          Do you recall receiving and responding to this e-mail?

24   A.  Yeah, we are talking about capacity of members, yeah.

25   That's why I am on that e-mail, I believe.

1  Q.  You understood that Mr. Moore was talking about how he was

2  going to pitch the work space lease model to investors, right?

3  A.  I just know -- I took this e-mail as capacity of members.

4  And the reason with your head nod like that is because in a

5  health club model what happens is that you have -- I'm sure a

6  lot of people here are members of health clubs and don't go.

7  There are also lots of people who become members of coworking

8  places that end up having a membership or leasing space within

9  there, and they travel for their job, or they go other places,

10 so it leaves a large unfilled capacity.

11         That's why you have a number of health clubs in the

12 word that will have 45 treadmills but only during peak times

13 are they ever filled; a lot of members are doing other things

14 or whatever.  And the same thing -- I think that's the crux of

15 the question is, hey, how many people can you get there at any

16 one time, but do they -- do they all really show up.

17         And so that's the capacity question, OK, Sean, hey,

18 from a membership point of view really what is this?  I mean at

19 Fitness First we sold more memberships than almost anybody on

20 the plant, and the biggest question I used to get is:  What if

21 they all show up at the same time?  And we all know they don't,

22 anybody that's been a member of any fitness --

23 Q.  Mr. Phillips, going back to my question, this is asking for

24 your advice on something that's going to be a pitch to

25 investors, right?

1    A.  I don't know.  Input on membership revenue questions is

2    what I gave my input on.

3    Q.  OK.  Mr. Moore writes here that he wants people to do the

4    headline revenue on 1,000 memberships, right?

5    A.  That's what it says, yeah.

6    Q.  That means he wants to take the amount that you can charge

7    each member.  And you know how much Bar Works was charging,

8    right?

9    A.  No, I can't remember.

10   Q.  That's something you would have found out?

11   A.  I can't remember what they were charging.

12   Q.  Does around $500 sound accurate?

13   A.  I don't know.  I'm not sure; they had different potential

14   membership, but, fine, we can use 500 if you want to.

15   Q.  Well, whatever amount that Bar Works said they would be

16   charging members, people could multiply that amount by the

17   total amount of capacity, right?

18   A.  Sure.  There are a number of different ways that people can

19   I'm sure figure that out, but yeah.

20   Q.  And that would tell investors how much money a Bar Works

21   location could bring in, right?

22   A.  Yeah, at capacity I guess you could probably do that math

23   and say, oh, gee.

24   Q.  And you understood that the investors were supposed to be

25   paid out of membership money, right?

1   A.  I don't know honestly how the investors got paid.

2   Q.  All right.  Well, let's look at your response to this

3   e-mail.  You suggested to the defendant that he use the number

4   of work spaces instead of the total number of potential

5   members, right?

6   A.  Yeah, it's kind of what I just explained, that, you know,

7   the number of people can be greater, so that's why.

8   Q.  And where you wrote "I'm not sure the 300 at any one time

9   adds any value to an investor," it's still your testimony that

10  you had no idea that this was about an investor pitch?

11  A.  No, no, I'm saying I don't know how it's being sold.  What

12  I'm saying is the 300 at any one time, again, I'm looking at a

13  membership point of view, so 300 at any one time and the word

14  "capacity" in these is what I'm looking at.  So, that's my

15  testimony plain and simple.  Obviously, all of this stuff here

16  is asking how they use that information towards investors, so I

17  understand that, yeah.

18  Q.  You did understand that this was geared towards a pitch for

19  investors, right?

20  A.  I understood this was a question about membership that was

21  being used for an investment.

22  Q.  And let's just go up to Mr. Moore's response.  What did the

23  defendant write to you?

24  A.  "Hi Sean.  Thanks for this.  Appreciated.  As it is for a

25  lease investor pitch may stick with the capacity number ..."

1    OK.

2    Q.  Does that refresh your recollection that you are talking

3    about how to pitch leases to investors, right?

4    A.  That's great, but I still don't know what that lease is, so

5    that's -- but, yes, it says that, yeah.

6    Q.  And Mr. Moore wanted to stick with the higher 1,000

7    capacity number rather than the lower 300 work space number,

8    right?

9    A.  A typical salesperson would want to do that, but people

10   understand that, yeah, that's the capacity.  So, like I just

11   explained earlier, you could think on the larger side of things

12   that, yeah, OK, you could actually get 1,000 people in there

13   because of what I've just said and so, yeah, yes, you're

14   correct.

15   Q.  Mr. Phillips, is it your hope that by testifying here today

16   for the defendant that you will get paid $100,000 you believe

17   you're owed by Our Space?

18   A.  I'm never getting that money.

19   Q.  Why aren't you ever getting that money?

20   A.  Because I don't believe that Our Space that's based in

21   Dubai is ever going to give me a dime, and so -- yeah, I'm not

22   here for that reason at all, but thank you --

23            MR. VAINBERG:  Nothing further.

24   A.  -- for bringing up a painful subject.

25            THE COURT:  It's quarter to five.  I think we're going

1    to have to end for today, so we will pick up in the morning

2    with any further questioning of Mr. Phillips.

3              So, we will say good evening to everybody and proceed,

4    and we will see you tomorrow at 9:15.

5              Just for the jury's benefit, anymore witnesses for the

6    defense after Mr. Phillips?

7              MR. GARVIN:  Yes, your Honor, one.

8              THE COURT:  One more?  OK, thanks.

9              (Jury not present)

10             THE COURT:  OK.  So we will see you tomorrow morning.

11             Let's get a sense of the length of the next witness.

12             MR. GARVIN:  I think it would be approximately the

13   same length, your Honor, as this witness, and I believe that

14   this witness probably only has ten or 15 minutes on redirect.

15             THE COURT:  On redirect, OK.  Well, with as late as

16   we've gone, I don't like to keep this jury.

17             MR. GARVIN:  I'm not questioning.

18             THE COURT:  So we will pick up 9:15, and you will get

19   your questions.

20             He knows that you and he can't communicate between now

21   and --

22             MR. GARVIN:  I don't know if he knows that, but he is

23   going to definitely know that.

24             THE COURT:  OK, see you tomorrow.

25             Well, let's see.  So, it seems to me we're going to

1   get to the charge conference tomorrow morning.

2              MR. GARVIN:  Yes, sir.

3              THE COURT:  We can do that really early, and then we

4   will be ready to roll.  I'll meet you at 8 o'clock, and we will

5   knock out the charge conference, and then we can finish by

6   noon.

7              MR. BELL:  Judge, I've got child care responsibilities

8   in the morning.

9              THE COURT:  Well, you've got a great assistant right

10  here; he can cover for you at the charge conference.

11             MR. BELL:  OK.

12             THE COURT:  OK, see you tomorrow.  So I will meet you

13  here in the courtroom at 8.

14             MR. GARVIN:  Your Honor, there was an issue with the

15  juror?

16             THE COURT:  We're going to tell that juror that they

17  don't have to be here tomorrow.

18             MR. GARVIN:  Yes, your Honor.

19             THE COURT:  And Mr. Moore needs to be at the charge

20  conference?

21             MR. GARVIN:  No, sir.

22             THE COURT:  Can you waive his appearance?

23             MR. GARVIN:  Yes, I am waiving his appearance for the

24  charge conference tomorrow morning.

25             THE COURT:  So, we will ask Mr. Moore be brought back

J667MOO7                    Phillips - Cross

1    at 9:15.  Thanks.  OK.  I will see everybody tomorrow.

2              (Adjourned to July 7, 2019 at 9:15 a.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

INDEX OF EXAMINATION

Examination of:                                  Page

 RENWICK HADDOW

Cross By Mr. Garvin . . . . . . . . . . . . . 500

Redirect By Mr. Vainberg . . . . . . . . . . 551

Recross By Mr. Garvin . . . . . . . . . . . 559

 NEIL HENDELMAN

Direct By Mr. Bell . . . . . . . . . . . . . 560

 JASON RIVERA

Direct By Mr. Bell . . . . . . . . . . . . . 582

FATIMA HAQUE

Direct By Mr. Vainberg . . . . . . . . . . . 607

Direct By Mr. Vainberg . . . . . . . . . . . 627

Cross By Mr. Garvin . . . . . . . . . . . . 635

Direct By Mr. Garvin . . . . . . . . . . . . 646

Cross By Mr. Vainberg . . . . . . . . . . . 670

                    GOVERNMENT EXHIBITS

Exhibit No.                                  Received

 1250    . . . . . . . . . . . . . . . . . . 560

 550     . . . . . . . . . . . . . . . . . . 562

 1255 . . . . . . . . . . . . . . . . . . . 564

 500 through 526 . . . . . . . . . . . . . . 564

 527 . . . . . . . . . . . . . . . . . . . . 566

 528 . . . . . . . . . . . . . . . . . . . . 569

 310X  . . . . . . . . . . . . . . . . . . . 573

172X     . . . . . . . . . . . . . . . 578

811, 811-A through 811-F, 812, 813-A, . . . . 605
           815, 1253

806, 806-A through 806-Q, 807, 1258   . . . . 606

808, 809, 810, 1259   . . . . . . . . . . . 607

800   . . . . . . . . . . . . . . . . . 609

807A, 807C, 807I, 807K, 808M and 807O   . . . 639

2000 through 2009   . . . . . . . . . . . 670

2011 and 2014   . . . . . . . . . . . . . 670