J67VMOO1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

              v.                        18 CR 759 (RMB)

JAMES MOORE,

              Defendant.                JURY TRIAL

------------------------------x

                                        New York, N.Y.
                                        June 7, 2019
                                        9:45 a.m.

Before:

                   HON. RICHARD M. BERMAN,

                                        District Judge


                         APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
BY:  MARTIN BELL
     VLADISLAV VAINBERG
     Assistant United States Attorneys


DAVID M. GARVIN, PA
     Attorney for Defendant

ALSO PRESENT:
Nathaniel Cooney, Paralegal for U.S. Attorney's Office
Special Agent Jordan Anderson, FBI
Alexandra Garvin, Law Clerk for Defense
Arlene Garvin, Paralegal for Defense
```

J67VMOO1

```
1              (Trial resumed; jury not present)

2              (At sidebar)

3              MR. GARVIN:  Your Honor, we have an inquiry.

4              Yesterday the Court read one of the stipulations which

5    was on the prior felony.

6              THE COURT:  Yes.

7              MR. GARVIN:  It was typed up.  But we didn't know if

8    it was being submitted to the jury.

9              THE COURT:  It would be.

10             MR. GARVIN:  Okay.

11             THE COURT:  As the other stipulations are.

12             MR. GARVIN:  So we respectfully ask -- we've discussed

13   this matter, as we have previously talked about.  We would

14   respectfully ask if it could be amended.

15             THE COURT:  Let me get my copy.

16             This is the one that begins --

17             MR. BELL:  "I expect you to hear evidence that

18   Mr. Moore was previously convicted."

19             THE COURT:  Oh, yes, okay.

20             MR. GARVIN:  If it's going to go back, we would

21   respectfully ask the Court to amend it as shown by removing

22   those four or five words and adding the comma.

23             THE COURT:  Removing the words "or that it was part of

24   a."

25             MR. GARVIN:  Yes.
```

J67VMOO1

| | |
|---|---|
| 1 | THE COURT:  You're both agreeable to that? |
| 2 | MR. BELL:  We're fine with that, your Honor. |
| 3 | THE COURT:  Okay.  I'm happy to do that. |
| 4 | Do you want me to advise the jury -- |
| 5 | MR. GARVIN:  I don't -- |
| 6 | THE COURT:  -- that I've changed the stipulation? |
| 7 | MR. GARVIN:  I don't feel it's necessary.  I'm not |
| 8 | requesting it be reread. |
| 9 | MR. BELL:  That's fine with us, your Honor. |
| 10 | THE COURT:  But the one that goes in there shall be |
| 11 | different. |
| 12 | MR. GARVIN:  Yes. |
| 13 | THE COURT:  Okay. |
| 14 | MR. GARVIN:  Thank you, your Honor. |
| 15 | THE COURT:  You're very welcome. |
| 16 | (In open court) |
| 17 | THE COURT:  We're still waiting for one juror -- |
| 18 | MR. GARVIN:  Yes, sir. |
| 19 | THE COURT:  -- who called and said he was running |
| 20 | late.  Should, from what I understood, be here any minute. |
| 21 | (Pause) |
| 22 | THE COURT:  Just for the record, I'm handing out the |
| 23 | revised jury instructions following our charge conference this |
| 24 | morning.  So I ask you to look them over.  And if you have any |
| 25 | remaining objections, either side will put them on the record |

J67VMOO1

1   after you've had a chance to take a look at them.

2           MR. BELL:  Thank you, Judge.

3           MR. GARVIN:  Thank you.

4           THE COURT:  And also for the record, I'm giving you a

5   revised stipulation of parties dated June 6, which was

6   yesterday, 2019, which I believe on consent of both the

7   government and the defense amends somewhat the stipulation that

8   we discussed yesterday; is that correct?

9           MR. GARVIN:  Yes, sir.

10          MR. BELL:  Yes, Judge.

11          THE COURT:  And it's your intention that I not

12  re-review this stipulation with the jury, but that when we

13  submit the stipulations and the other evidence to the jurors, I

14  give them the revised version.

15          MR. GARVIN:  That's correct, your Honor.

16          MR. BELL:  That's fine with us if it's fine with

17  Mr. Garvin.

18          THE COURT:  Okay.

19          (Pause)

20          MR. BELL:  Your Honor, we are ready on the charge, if

21  your Honor is.

22          THE COURT:  I am.

23          Are there further changes or objections?

24          MR. BELL:  So I think that there is one -- there are

25  two things, your Honor.  One on page 25.

J67VMOO1

1          THE COURT:  On page 25?

2          MR. BELL:  Yes, your Honor.  On page 25 of the charge,

3    Mr. Garvin noticed -- and I agree -- that on the very first

4    line of the page, we had all had the words "against the

5    defendants" coming out.

6          THE COURT:  Page 25, the first line at the top?

7          MR. BELL:  Yes, your Honor.

8          THE COURT:  "I have given you"?

9          MR. BELL:  No, no, no.  Page 25 of the new version of

10   the charge that we have.  The page numbers are a little bit

11   different because the font size is different.

12         THE COURT:  Okay.  Yes.

13         MR. BELL:  So that page begins:  "You will recall that

14   I have admitted into evidence."  And the next three words, by

15   both Mr. Garvin's and my count from the charge conference, come

16   out, "against the defendants."

17         THE COURT:  Fair enough.

18         Mr. Garvin, right?

19         MR. GARVIN:  Yes, sir.

20         THE COURT:  Okay.

21         MR. BELL:  The only other substantive change that I

22   had would come on page 38 of the new charge.

23         THE COURT:  Hold on.  Yes.

24         MR. BELL:  And so under "statements of the defendant,"

25   the sentence currently reads:  "There has been evidence that

J67VMOO1

|  |  |
|---|---|
| 1 | the defendant made statements to the United States Securities |
| 2 | and Exchange Commission."  We realized that the post-arrest |
| 3 | statement would also fit this category, the video.  And so we |
| 4 | were just going to add to the Securities and Exchange |
| 5 | Commission, "and to law enforcement."  That should cover both. |
| 6 | MR. GARVIN:  Yes. |
| 7 | THE COURT:  That's okay? |
| 8 | MR. GARVIN:  Yes. |
| 9 | THE COURT:  Okay. |
| 10 | And so I'm going to make both those changes. |
| 11 | But as far as the government is concerned, do you have |
| 12 | any further objections to the jury charges? |
| 13 | MR. BELL:  We do not, your Honor. |
| 14 | THE COURT:  And those that you just did raise, these |
| 15 | two, I will make those changes. |
| 16 | MR. BELL:  Thank you, Judge. |
| 17 | THE COURT:  Then I turn to the defense. |
| 18 | You may have some objections remaining to the charges |
| 19 | and, if so, you're free and encouraged to put them on the |
| 20 | record at this point. |
| 21 | MR. GARVIN:  Yes, sir. |
| 22 | The defense objects to the conscious avoidance |
| 23 | instruction on page 29. |
| 24 | THE COURT:  Hold on.  Let me just find it. |
| 25 | MR. GARVIN:  Of the new set. |

J67VMOO1

1        THE COURT:  In its entirety?

2        MR. GARVIN:  Yes, your Honor.

3        We had previously discussed with the Court that in

4   this particular case, the evidence is that Mr. Haddow testified

5   that he told Mr. Moore that he -- that Jonathan Black did not

6   exist, and that he was, in fact, Jonathan Black.

7        This is not the typical case where someone hands

8   somebody a suitcase, and the person says, What's in it?  And he

9   says, You don't want to know.  And he says, You're right.  But

10  he gets on a plane in Medellin, Colombia and lands in Miami.

11  And when authorities approach him to take the suitcase, he

12  can't say, Well, I didn't know that the suitcase was full of

13  drugs.

14        THE COURT:  I understand.

15        So I should have said, if I haven't already -- and I

16  may not have -- that prior to this current conversation we're

17  having, we did, in fact -- myself, the government, and the

18  defense -- have a charge conference this morning starting at 8

19  a.m. -- and I appreciate everybody sacrificing being there --

20  at which time we went over the jury charges in detail, and that

21  was off the record.

22        But I did say -- and I always do -- that after we have

23  our final charges, if anybody has any objection to them, I

24  would allow them, of course, to put them on the record.

25        So defense counsel, as he did in the charge

J67VMOO1

1    conference, is objecting to the inclusion of the charge on page

2    29 entitled "Conscious Avoidance."

3            Did you want to say anything in response?

4            MR. BELL:  Only to note on the record this time, your

5    Honor, that a conscious avoidance charge is appropriate here

6    for at least the following reason:  If the jury were to, as

7    Mr. Garvin will ask them to, credit his argument that the

8    conversation between Mr. Haddow and Mr. Moore that Jonathan

9    Black isn't real and that he's Jonathan Black, that that

10   conversation didn't happen, Mr. Moore would still be left with

11   all of these email conversations in which he would have had to

12   essentially deliberately avert his gaze in much the same way as

13   the person with the suitcase.

14           Therefore, the conscious avoidance charge is

15   appropriately included, because the jury can just as reasonably

16   conclude that set of conduct and averment.

17           THE COURT:  So over the objection of the defense,

18   conscious avoidance has been included in the charge in the set

19   of instructions.

20           Mr. Garvin, any other objections?

21           MR. GARVIN:  No, sir.

22           THE COURT:  Otherwise you're okay with the charges?

23           MR. GARVIN:  Yes.

24           THE COURT:  Okay.  Then we'll make these final two

25   changes that you have agreed to, and then we will have our

J67VMOO1

 1    final set.

 2              MR. BELL:  Judge, may I also ask, for the record, for

 3    your chambers to email a Word version of that to us just for

 4    our files?

 5              THE COURT:  Yes.

 6              MR. BELL:  Thank you.

 7              THE COURT:  So it was page 25, Mr. Bell, and page 38?

 8              MR. BELL:  Yes, your Honor.

 9              THE COURT:  I've got them both.

10              We're going to call that juror who called and said he

11    was running late but on his way and just see if he responds.

12              (Pause)

13              THE COURT:  He said he's one block away.

14              (Pause)

15              (Jury present)

16              THE COURT:  Please be seated, everybody.  We'll pick

17    up with what's called redirect examination of Mr. Phillips by

18    Mr. Garvin.

19              THE LAW CLERK:  Mr. Phillips, I'd like to just remind

20    you that you're still under oath.

21              THE WITNESS:  Yes.

22              MR. GARVIN:  Thank you, your Honor.

23              THE COURT:  You bet.

24              (Continued on next page)

25

J67VMOO1                          Phillips - redirect

1              MR. GARVIN:  Good morning, your Honor, ladies and

2      gentlemen.

3      SEAN VINCENT PHILLIPS,

4           called as a witness by the Plaintiff,

5           having been duly sworn, testified as follows:

6      REDIRECT EXAMINATION

7      BY MR. GARVIN:

8      Q.  Good morning, Mr. Phillips.

9      A.  Good morning.

10     Q.  Mr. Phillips, yesterday you had an opportunity to speak a

11     little bit about a company called Our Space.

12              Do you recall that?

13     A.  I do.

14     Q.  And during that period of time, counsel for the United

15     States asked you some questions about Our Space and, in

16     particular, showed you Government's Exhibit 1105.

17              Do you recall that, sir?

18     A.  I do.

19     Q.  Now, can you please tell us to the best of your knowledge

20     who operates Our Space?

21     A.  Our Space is operated by a gentleman named Kevan Halliwell.

22     Q.  And to your knowledge, is Mr. Halliwell an owner of Our

23     Space?

24     A.  I believe he is.  Absolutely.

25     Q.  And is this a picture of Mr. Halliwell?

J67VMOO1                          Phillips - redirect

1    A.  Yes, it is.

2              THE COURT:  Could you turn that -- yes.

3    A.  It's still a picture of him.

4    Q.  And is he, to your knowledge, the CEO of the company?

5    A.  Yes.

6    Q.  And is he, to your knowledge, the owner of the company?

7    A.  To my knowledge, yes.

8    Q.  So you were asked yesterday if Our Space owes you any

9    money.  Do you recall that?

10   A.  I do.

11   Q.  And so does Mr. Halliwell owe you money?

12   A.  Yes, he does.

13   Q.  And does your testimony here have anything whatsoever to do

14   with Mr. Halliwell?

15   A.  None at all.

16   Q.  Is your testimony here influenced in any way by the fact

17   that Mr. Halliwell owes you money?

18   A.  Absolutely not.

19   Q.  I'd like to show you Government's Exhibit 2000.  This is an

20   exhibit that is -- the auto focus is taking -- there we go.

21   And it's an email that is dated November 21st from Ana KP,

22   which has been identified as Mr. Moore, to Mr. Haddow regarding

23   Sean Phillips and Sean pitch.  Do you see that, sir?

24   A.  I do.

25   Q.  And does that -- I'm showing you the next page of the

J67VMOO1                          Phillips - redirect

1   document.  Does that refresh your memory as to approximately

2   when you were approached to do some type of work with Bar

3   Works?

4   A.  Yes.

5   Q.  And would that be on or about November 21st?

6   A.  Yes, sir.

7   Q.  And to be clear for the ladies and gentlemen, that would be

8   2015; is that correct?

9   A.  Correct.

10          THE COURT:  Could you just flip that to the second

11  page?

12          MR. GARVIN:  Yes, sir.

13          THE COURT:  Maybe Mr. Phillips could explain what the

14  significance of this page is, if we get it in focus.

15          MR. GARVIN:  There we go.

16          THE WITNESS:  The significance?

17          THE COURT:  Yes.

18          THE WITNESS:  It's basically kind of like the --

19          THE COURT:  Well, just say line-by-line what it means.

20          THE WITNESS:  Name of the company.  Well, it was me

21  doing individual work, so that would be me.  Project title was

22  five-day week in three, which basically was me saying that you

23  were going to get a lot of value out of me.  Estimated project

24  start date and end dates are pretty self-explanatory.

25          THE COURT:  So what are they?

1              THE WITNESS:  December 1st, 2015 was the estimated

2      project start date; the estimated project end date is February

3      29, 2016.  Person that would be the project manager would be

4      myself.  Contact phone number is 859-227-6688.  And the email

5      is sean@ijustgotbetter.com.

6              THE COURT:  Thank you.

7              THE WITNESS:  You're welcome.

8              MR. GARVIN:  Thank you, your Honor.

9      BY MR. GARVIN:

10     Q.  So, Mr. Phillips, would it be accurate to say that this was

11     a proposal for you to do consulting work commencing on or about

12     December 1st, 2015?

13     A.  Yes.

14     Q.  And did you at that time estimate that the project would

15     end on or about February 29th, 2016?

16     A.  Yes.

17     Q.  So it looks to be approximately a three-month period of

18     time that the project would take?

19     A.  That's correct.

20     Q.  Is that correct?

21     A.  Yup.

22     Q.  Now, were there some delays in you receiving your initial

23     retainer?

24     A.  Yes.  There were delays all along, but, yeah.

25     Q.  And I'm showing you now Government's Exhibit 2002.  And see

J67VMOO1                        Phillips - redirect

1    if we can focus in a little bit.

2              At the very top it says from "Passion Makes Profit,

3    sean@passionmakesprofit."  Is that your email address, sir?

4    A.  Yes, sir.

5    Q.  And it's to a whole bunch of people; is that correct?

6    A.  Yes, it is.

7    Q.  And can you please tell the ladies and gentlemen what was

8    the approximate date that that was written?

9    A.  January 13th, 2016.

10   Q.  And it says:  Wow, thank you all for such a warm and

11   inspired welcoming.

12             So approximately two months later, were you still just

13   being welcomed to Bar Works?

14   A.  I was being welcomed to potentially do some work with Bar

15   Works, yeah.  This is all still part of the kind of beginning

16   process.

17   Q.  Okay.  And as we saw in Exhibit 2000, that document is

18   dated November 21st; correct?

19   A.  Correct.

20   Q.  And now we are in January -- actually, January 13th of

21   2016, approximately two months later, right?

22   A.  Correct.

23   Q.  Now, I'm going to show you Government's 2005.  And this is

24   an email from Tahyira Cordner at Bar Works; is that correct?

25   A.  Yes.

J67VMOO1                        Phillips - redirect

1   Q.  And is it to you?

2   A.  Yes.

3   Q.  Is it dated January 18th of 2016?

4   A.  Yes, it is.

5   Q.  And at that point, does she say -- well, first, was Tahyira

6   in New York City?

7   A.  Don't know.  I assume so.  I was told so.

8   Q.  Well, let me go back.  Does it say "tahyira@barworks.nyc"?

9   A.  Yes, it does, in her email.

10  Q.  Hi, Sean.  Nice to meet you (electronically of course).  I

11  have attached our current marketing materials as per your

12  request.

13          As of that date, had you met Tahyira personally,

14  face-to-face?

15  A.  No, absolutely not.

16  Q.  And as of that date, had you been to New York City to see

17  the actual Bar Works location?

18  A.  No, I hadn't.  Nope.

19  Q.  Had you been to New York City for Bar Works for anything?

20  A.  No, sir.

21          THE COURT:  Was your meeting with her from video or --

22          THE WITNESS:  I didn't have a meeting with her.

23          THE COURT:  She said she met you electronically.

24          THE WITNESS:  Electronically through email.

25          THE COURT:  Email, not video.

1          THE WITNESS:  Just email.

2   BY MR. GARVIN:

3   Q.  I'm now showing you Government's Exhibit 2009.

4          Is this an email from you, Sean Phillips?

5   A.  Yes, it is.

6   Q.  And is it dated February 17th of 2016?

7   A.  Yes, it is.

8   Q.  And is this the document that attaches what is referred to

9   as a deck?

10  A.  Yes.

11  Q.  What does that mean, "deck"?

12  A.  A deck is a presentation deck, which could be a Power Point

13  presentation or keynote presentation or a PDF or whatever.

14  Q.  All right.  Does it say, Please find two files attached,

15  one info deck and one invoice?

16  A.  Yes.

17  Q.  As of that date, had you been paid your initial retainer?

18  A.  I don't believe so, no.

19  Q.  Is this part of the materials that were referred to as a

20  deck?

21  A.  Yes, sir.

22  Q.  As of February 17th, you attached your invoice.  Were you

23  starting to get frustrated that you hadn't been paid?

24  A.  All along the way it was a little bit like that, but, yes.

25  Q.  And did you tell them that you needed an answer to kill the

1    file or to work the file at any time?

2            MR. VAINBERG:  Objection as to "them."

3            THE COURT:  So I'd also -- the redirect relates

4    directly to the cross.

5            MR. GARVIN:  Yes, sir.

6            THE COURT:  And your question is what?

7            MR. GARVIN:  Whether or not he was becoming frustrated

8    that he hadn't been paid.

9            THE COURT:  I think he said yes.

10   A.  Yes.

11   Q.  Yes, sir.

12           I show you what was shown during cross, Government's

13   Exhibit 213, I believe.  And this is an email from you to

14   Renwick Haddow; is that correct?

15   A.  Yes.

16   Q.  And it says:  It was great to speak to you and hearing your

17   passion and enthusiasm for the Bar Works rollout.

18           As of that time, had you met Renwick Haddow

19   face-to-face?

20   A.  No, sir.

21   Q.  And the date of that is February 19th; correct?

22   A.  Correct.

23   Q.  I'm showing you now Government's Exhibit 133.  This is the

24   agenda for New York City, March 2nd, relating to the Dolphin

25   guys.  And I'm directing your attention to page 2.

1              It says:  Thanks, Nate.  As long as we are there for

2     full days on the 9th and 10th, I don't mind.

3              Did you meet the Dolphin guys on the 9th or 10th of

4     March 2016?

5     A.   I did.

6     Q.   I'm now showing you Government's Exhibit 136.  This

7     document is dated March 6, 2016, agenda for New York City.  It

8     says:  Written by Neil Storey.  We have arranged for Sean

9     Phillips to also be on the ground this week.  I'm sure he'll

10    add strong value to any video marketing collateral you may be

11    planning to put together whilst there.

12             Were you in New York City approximately the week of

13    March 6th through March 10th?

14    A.   Yes.

15    Q.   And was your purpose to be there for Bar Works?

16    A.   Yes.

17    Q.   And was that your only time of ever being there for Bar

18    Works?

19             THE COURT:  So redirect is to just go into the cross,

20    not to reexamine the direct examination.

21             MR. GARVIN:  Yes, your Honor.  I'll move on.

22    Q.   With regards to Mr. Halliwell, you were asked about

23    Mr. Halliwell during your cross-examination.  I'm showing

24    you --

25             MR. VAINBERG:  Objection, your Honor.

1           I don't think Mr. Halliwell came up on

2    cross-examination.  This is beyond the scope.

3           THE COURT:  Do you want to talk to counsel?

4           MR. GARVIN:  I'll rephrase the question.

5           (Counsel conferred)

6    BY MR. GARVIN:

7    Q.  Do you see this is an email to Mr. Halliwell from Jim Moore

8    on April 1st?  And it says:  Latest pictures from Times Square.

9    And the comment is:  The future competition, Bar Works.

10          As of April of 2016, sir, did you understand that Our

11   Space had been formed and it was going to compete with Bar

12   Works?

13   A.  No, I didn't know at that exact time, but it was around

14   just after that that I was approached about Our Space, yes.

15   Q.  And finally, sir, did anyone during this period of time

16   tell you that Jonathan Black did not exist?

17   A.  No, sir.

18          MR. GARVIN:  I have no further questions.

19          THE COURT:  Thank you.

20          Any --

21          MR. VAINBERG:  No recross, your Honor.

22          THE COURT:  Okay.  We will excuse the witness.

23          Thanks very much, Mr. Phillips.

24          (Witness excused)

25          THE COURT:  Let's have the next witness please.

1            MR. GARVIN:  Jens Madsen.  I'll retrieve him.

2            THE COURT:  Yes.  So while we're waiting, we gave you

3    menus for lunch.  It might have been overly optimistic as to

4    where we would be at lunchtime in terms of the trial, but lunch

5    is on me, in any event, wherever we are.  And if we are not

6    ready to begin deliberations, maybe we'll take a shorter lunch

7    and let you go home early, if it looks like it's going to go

8    over to another day, Monday in any event.  Is that fair?

9            JUROR:  Thank you.

10           THE COURT:  Okay.

11   JENS BIRGER MADSEN,

12        called as a witness by the Defendant,

13        having been duly sworn, testified as follows:

14   DIRECT EXAMINATION

15   BY MR. GARVIN:

16   Q.  Good morning, Mr. Madsen.

17   A.  Good morning.

18   Q.  Mr. Madsen, can you tell us a little bit about your

19   occupational background, sir.

20   A.  I am a -- or I was a property developer.  I worked as a

21   sales director and managing director of several companies who

22   developed commercial and residential property in Europe, mainly

23   Denmark and England.

24   Q.  And are you presently retired, sir?

25   A.  I am.

J67VMOO1                       Madsen - direct

1   Q.  Can you tell us if there came a time when you met a

2   gentleman by the name of James Moore?

3   A.  I did.

4   Q.  Do you see Mr. Moore in the courtroom?

5   A.  I can.

6   Q.  And is he sitting to my right at this desk?

7   A.  He is.

8   Q.  He is now standing?

9   A.  Yeah.

10  Q.  Can you please tell the ladies and gentlemen when it was

11  that you met Mr. Moore?

12  A.  It was 20 years ago; 1998, '99.

13  Q.  And at that time, what were you doing?

14  A.  I was working for a property company in central London.  We

15  were developing mainly office space.

16  Q.  Did there come a time when you were familiar with the

17  occupation of James Moore?

18  A.  Yes.  We were introduced to each other through a mutual

19  friend, and Jim was working on some property matters.  Our

20  friend knew that I was involved in property and thought I could

21  give him some advice.

22  Q.  Are you familiar with a company called Inside Track

23  Seminars?

24  A.  Yes, I am.

25  Q.  Can you please describe to us what that company did.

1    A.  It held seminars for people, to teach them how to buy and

2    even develop and sell property or keep as investments.

3    Q.  And how big of an organization was this, if you know?

4    A.  Well, in the beginning it was Jim and his wife; but at the

5    end of it or at its peak, I think there were probably 350, 400

6    employees.

7    Q.  And did you ever work at Inside Track Seminars?

8    A.  No.

9    Q.  Was there a sister company called Instant Access

10   Properties?

11   A.  Yes.  Obviously these people who were taught how to invest

12   in property, the first thing they thought about was how do I

13   get a hold of one.  And Jim realized that there was an

14   opportunity to introduce the seminar students, people, to

15   developers.  And he arranged contacts with developers who had

16   property to sell, and arranged discounts for his seminar

17   students so that they could get in at the right level.  And

18   that became almost a bigger organization than the seminar

19   company.

20   Q.  And did you work at any time for either one of those

21   companies?

22   A.  No, I didn't.  I did supply product for Instant Access

23   Properties; in other words, I found developments in Spain, as

24   it happened, where Instant Access Properties sold those units

25   on behalf of the developer.

1    Q.  So this would be Instant Access Properties members would be

2    buying from independent developers, is that what you're saying?

3    A.  Correct.  Correct.  Yes.

4    Q.  Now, did there come a time when Instant Access Properties

5    and Inside Track had a downturn in business?

6    A.  Yes.  In 2007, we had a worldwide property crash, together

7    with a lot of other crashes.  I think everyone is aware of

8    that.  And at the time property values collapsed and a lot of

9    the things that Instant Access Properties was involved in as

10   much as halved in value.  There was no longer any finance for

11   anyone who was buying properties, especially abroad.  And

12   basically the company collapsed.

13   Q.  While the company was operating, did you observe whether or

14   not the company was doing everything properly?

15   A.  Yes.  I mean to my knowledge, they were.  I never, ever saw

16   anything that made me think there was something that was wrong

17   anywhere.

18   Q.  When all of this happened, the downturn of the business,

19   the crash, do you know if that took any kind of toll on

20   Mr. Moore's marriage?

21   A.  Yeah.  I think his marriage was pretty well washed up

22   before the crash, but it didn't do it any favors.  You know,

23   when you run out of money, you tend to start arguing with your

24   partner, don't you?

25   Q.  Mr. Madsen, did there come a time when Mr. Moore moved from

1   England and moved to Spain?

2   A.  Yes.  They took legal advice.  There were plans to sell the

3   business in the future.  And to be tax efficient, they were --

4   it was suggested by their tax planners that they should create

5   their place of residence in Spain.  And so --

6           THE COURT:  "They" being Mr. Moore?

7           THE WITNESS:  Mr. Moore and his wife and his three

8   children.  And they all moved to Spain, I think it was in about

9   2002, 2003.

10  Q.  Now, in or around 2005/2006, as part of the effort to

11  prepare the company for its ultimate sale, are you familiar

12  whether Mr. Moore opened sister companies by the name of

13  Levinthal or Darrencrest?

14  A.  No.

15  Q.  Did there come a time when you became familiar with a

16  person by the name of Paul Oxley?

17  A.  Yes.

18  Q.  And can you tell us how that happened?

19  A.  I met him at Jim's home for a barbecue.  He was over from

20  Miami.  They were going to sell -- Instant Access was going to

21  sell Oxley's properties in Florida, as I understood it.

22  Q.  You said you were at Mr. Moore's home.

23  A.  Yes.

24  Q.  Did there come a time in or around 2009/2010 that you spent

25  an extended period of time there?

1    A.  Yes.  Unfortunately, the 2008 financial crisis affected all

2    of us.  And in 2010, my home was repossessed.  And Jim was good

3    enough to offer us to come and live in his home in Weybridge in

4    England.  That is in Surrey, England.

5               THE COURT:  So I'm confused.  Did he move to Spain?

6               THE WITNESS:  Jim moved to Spain at the time, but he

7    had a falling out with his wife immediately after they had

8    moved to Spain.  She packed up the children and her belongings

9    and moved back to England.  So Jim ended up living in Spain on

10   his own much against the planning, the tax planning, that was

11   put into place.  But that was basically the beginning to the

12   end of their marriage.

13              THE COURT:  But when you moved in with him, that was

14   in Spain or in England?

15              THE WITNESS:  No, this is in 2003 that Jim moved to

16   Spain.  And we're talking 2010 when I moved in with Jim.  But

17   by then he had returned from Spain and was living in England.

18              THE COURT:  I see.

19   BY MR. GARVIN:

20   Q.  Now, when you were living with Jim in England, did you at

21   any time become aware of a person by the name of Renwick

22   Haddow?

23   A.  Yes, I did.

24   Q.  Can you please tell the ladies and gentlemen of the jury

25   how that came about?

J67VMOO1                        Madsen - direct

1    A.  Jim had a piece of land in Barbados that was in arrears;

2    the bank was threatening to take possession of it.  And Jim

3    wanted Renwick to buy it or to refinance it for him and for a

4    project to be put on it and sold.

5    Q.  And were you familiar with what type of project that was

6    discussed?

7    A.  Yes, I was, because I actually did all of the work in

8    respect to that project.  The piece of land, to value it, you

9    need to know what you can build on it.  And I got a local

10   architect to see what the planning allowed to be built there,

11   and he did a project on it.  I did a feasibility study on it.

12   And I had several conversations with Renwick about that

13   feasibility study.

14   Q.  And what type of project was determined to be suitable for

15   that property?

16   A.  It was what we call a part hotel.  It was essentially large

17   hotel rooms laid out as an apartment block with a common

18   reception area and common part swimming pool, so forth, the

19   idea being that you could sell those rooms off, but that you

20   could run it as a hotel.

21          THE COURT:  And what time period is this when you and

22   Mr. Moore and Mr. Haddow were working on this Spain --

23          THE WITNESS:  That was in 2010/2011.

24   Q.  Now, were renderings made of this part hotel?

25   A.  Yes, we had a little brochure made also.

1   Q.  And how much time was actually spent with Mr. Haddow trying

2   to convince him to take the project?

3   A.  I don't know.  Jim and Renwick did all of the talking in

4   respect to the deal.  I did all of the work in respect to

5   putting it together.  But I didn't speak to Renwick more than

6   maybe two, three, four, five minutes on the phone on two or

7   three occasions.

8           THE COURT:  To your knowledge, did Mr. Haddow and

9   Mr. Moore speak regularly?

10          THE WITNESS:  Well, I don't know.  I don't know.

11  Q.  Now, to your knowledge, did Mr. Moore ever go to work for

12  Renwick Haddow in a company called Room to Invest?

13  A.  No.

14  Q.  And were you working or excuse me living with Jim Moore

15  during this period of time?

16          MR. BELL:  Objection.

17  A.  I don't know.

18  Q.  Let me go back and see.

19          During what period of time did you live with Jim

20  Moore?

21  A.  2010/2011.

22  Q.  Ultimately, what happened with the proposed project in

23  Barbados?

24  A.  Nothing.  It never occurred.  And the bank repossessed the

25  land.  And that was the end of it.

J67VMOO1                      Madsen - direct

1   Q.  And was that the end of the conversations with Renwick

2   Haddow?

3   A.  Yes, obviously.

4   Q.  And did you ever --

5            THE COURT:  Wait a minute.

6            What do you mean "obviously"?  You mean with you?

7            THE WITNESS:  Yeah, me.

8            THE COURT:  Oh.

9            THE WITNESS:  Yeah.

10  Q.  And to your knowledge, did Mr. Moore -- after the project

11  had died, did Mr. Moore have any further discussions with

12  Renwick Haddow during that period of time?

13  A.  I have no knowledge of any goings on between Jim and

14  Renwick.

15  Q.  And you're a person who was actually physically living in

16  Mr. Moore's house; correct?

17  A.  Yes, I was.

18  Q.  And would it be fair to say that you had a general

19  knowledge of what Mr. Moore was doing at that time; correct?

20  A.  Yes.

21  Q.  And during that period of time, once this Barbados land

22  deal ended, you do not recall any further communication with

23  Mr. Haddow; is that correct?

24            THE COURT:  That's not what he testified.  He said he

25  didn't know if there were any other communications between

J67VMOO1

1    those two other people.  So he already answered that question.

2              MR. GARVIN:  Yes, your Honor.

3    Q.  You don't recall -- okay.

4              So did there come a time --

5              MR. GARVIN:  May I confer with my client for one

6    moment, your Honor?  Because --

7              THE COURT:  Sure.

8              (Counsel conferred with defendant)

9    BY MR. GARVIN:

10   Q.  Sir, do you remember what year it was that you stopped

11   living with Mr. Moore?

12   A.  It was the 1st of November 2011.

13             MR. GARVIN:  Your Honor, I have no further questions

14   of this witness.

15             THE COURT:  Okay.  Any cross?

16             MR. BELL:  None for Mr. Madsen, your Honor.

17             THE COURT:  Okay.  The witness is excused.

18             Thanks so much, Mr. Madsen.

19             THE WITNESS:  Thank you.

20             (Witness excused)

21             THE COURT:  Any more witnesses?

22             MR. GARVIN:  No, your Honor.  At this time Mr. Moore

23   would rest.

24             THE COURT:  Okay.

25             MR. BELL:  No rebuttal case, your Honor.

J67VMOO1

| 1 | THE COURT:  Okay.  So do you all have the evidence |

that you need or want in the record already?  Anything you're

missing?

MR. BELL:  Your Honor, our record is complete.

Thank you.

MR. GARVIN:  Your Honor, I believe the record is

complete.

THE COURT:  Okay.  So we move to summations.

MR. BELL:  May we have just a quick break to set up?

THE COURT:  Sure.  We'll take two minutes while they

get organized and then we'll start the summations.

Both sides have rested, which means that the

evidentiary portion of the case is finished.

Do you want a break in the meantime?

JUROR:  We can stay.

THE COURT:  Are you all right?

JUROR:  We're fine.  Thank you.

THE COURT:  If anybody does want, you can.

JUROR:  Your Honor, you said we're going to come back

Monday?

THE COURT:  Well, I don't know.

JUROR:  Okay.  If we are going to come back, can I get

the letter?

THE COURT:  Yes.  For sure.

JUROR:  Okay.  Thanks.

1          THE COURT:  It's not in my hands at this moment.

2          JUROR:  I understand.

3          THE COURT:  It's in their hands.

4          MR. BELL:  We are trying.

5          MR. VAINBERG:  The government is ready, your Honor.

6          THE COURT:  Okay.

7          MR. VAINBERG:  Good morning, ladies and gentlemen.

8          THE JURY:  Good morning.

9          MR. VAINBERG:  Over the course of the last week,

10    you've heard all about how in 2015 and 2016, that man, Jim

11    Moore, used his massive agent network at United Property Group

12    to aggressively pitch investments in Bar Works.

13          Moore's agents were given glossy brochures that Moore

14    helped craft.  They got on the phone, on the Internet, and they

15    flooded their investor lists with those brochures.  Mr. Moore

16    fielded questions from agents and investors and did everything

17    he could to get investors to hand over their hard-earned money

18    to Bar Works.  And in that seven months he got over 100

19    investors to send over $7.5 million to Bar Works.

20          But Jim Moore knew something that his investors, his

21    victims, did not.  He knew that Bar Works was run by his old

22    buddy, a notorious fraudster named Renwick Haddow.  Moore knew

23    that Haddow had a history of running investment projects that

24    lost millions of dollars of investor money.  He knew that

25    Haddow was being sued in the UK for allegedly running two

1   illegal investment schemes similar in design to Bar Works.

2           And Moore knew that the investment brochures for Bar

3   Works said nothing about Renwick Haddow.  He knew instead that

4   the investors were told that the CEO of Bar Works is Jonathan

5   Black.  Moore knew that Jonathan Black was Haddow's made-up

6   identity.  He knew exactly why Haddow was using that identity.

7   Because if Haddow were exposed as the man behind Bar Works,

8   well, potential investors would just run far away.  And as

9   you've seen and heard, the defendant actively perpetuated this

10  lie towards agents and investors.

11          And he didn't help his pal Haddow out out of the

12  kindness of his own heart; he became Haddow's business partner

13  and co-conspirator, because Moore wanted half of the Bar Works

14  business.  And in the end, he got at least $1.6 million from

15  Haddow before he double-crossed him and started his own

16  competing investment scheme called Our Space.

17          Now, ladies and gentlemen, you know that the defendant

18  did all this because you've heard the witnesses.  You've seen

19  the documents.  You have an advantage that Moore and Haddow's

20  victims did not.  You have seen the overwhelming evidence.  And

21  as a result, you know the defendant is guilty.

22          Now, this is the government's closing statement.  This

23  is my opportunity to spend some time going over the evidence,

24  walking you through it, and showing you how it proves Jim

25  Moore's guilt beyond a reasonable doubt.

1          Before we begin to review the evidence of the

2     defendant's guilt, I'd like to spend a few minutes talking

3     about what's not in dispute here.

4          Now, in some cases, the parties argue over many key

5     facts.  That's not this case.  Here, the parties agree about

6     almost everything that happened here, with one key difference.

7          So what's not in dispute -- well, it's not in dispute

8     that there was actually a fraud at Bar Works.  Renwick Haddow

9     pleaded guilty to committing that fraud and to conspiring with

10    others.  He admitted his role to it completely on the stand in

11    front of you.

12         It's not in dispute that Bar Works was actually sold

13    through those investment brochures that talked about Jonathan

14    Black and said nothing about Haddow.  One of the most

15    fundamental lies in those brochures was about that fact.  You

16    saw the brochures, you've seen the letters to investors from

17    Jonathan Black, followed by Jonathan Black's biography and his

18    entire business plan for Bar Works.  You've seen the workspace

19    leases purportedly signed by Jonathan Black with investors, and

20    there's certificates of ownership signed by him as well.

21    You've seen how those brochures didn't mention Haddow in any

22    way.

23         And you know who Haddow is.  Let's be clear, Renwick

24    Haddow is a notorious fraudster with a graveyard of Ponzi

25    schemes in his past.  No one disputes that those Ponzi schemes

J67VMOO1                    Summation - Mr. Vainberg

1   earned Haddow a lawsuit and a disqualification and a mountain

2   of bad publicity on the Internet.  So you've seen what any

3   person Googling Renwick Haddow's name would have seen:  the

4   press releases, the lawsuit, the FCA's allegations.  You've

5   seen it all.  And investors didn't have that opportunity,

6   because they didn't know that Renwick Haddow was behind the

7   company.

8            There's also no dispute that just as a matter of fact,

9   Jonathan Black was a fake identity adopted by Renwick Haddow;

10  and that he did that because he knew his name was toxic.  The

11  parties also agree that this lie was highly material to

12  investors who thought they were entrusting their money to a

13  legitimate businessman instead of an infamous conman.

14           THE COURT:  Instead of?

15           MR. VAINBERG:  An infamous conman.

16           And you've heard from two victims:  Loreley Zavattiero

17  and Julian White, who both invested hundreds of thousands of

18  dollars based on lies promoted by the defendant.

19           You saw what happened when Jim Moore set UPG loose on

20  the market with those investment brochures.  You saw the fake

21  urgency pitches and the wildly misleading claims, like how

22  UPG's representative reassured Julian White that UPG delved

23  very deeply into the Bar Works business model when they flew to

24  meet Jonathan and his team in New York; and how the only risk

25  UPG could establish is a World War III doomsday one whereby NYC

1   shut down as a global capital of business and commerce.

2          Now, the victims told you that they never would have

3   invested in Bar Works had they known the truth that Jonathan

4   Black was fake or that the real person behind Bar Works had

5   Renwick Haddow's history.  They wouldn't have done that.  And

6   you know that that would have been the right decision.  Because

7   just like Haddow's past businesses, Bar Works turned out to be

8   just another Ponzi scheme where the business couldn't support

9   itself and investors were paid their guaranteed returns out of

10  new investors' money.  And like all Ponzi schemes, this one

11  ultimately collapsed on itself.

12         You've now heard the truth about how Haddow and Black

13  came to light in an article in January of 2017 that connected

14  the dot between those two people; and how after that the new

15  money dried up, investors couldn't be paid, and everyone lost

16  their money.  None of that is really in dispute.

17         And finally, there's no real dispute that that man,

18  James Moore, was Haddow's business partner at Bar Works.  You

19  know that Moore helped Haddow come up with marketing materials

20  for Bar Works, including the Wealthbuilder concept, in order to

21  get investors to buy multiple leases.  You know that Moore

22  brought in his agent network at UPG that raised over

23  approximately seven and-a-half million dollars from over

24  hundreds of investors.  There's no dispute about what James

25  Moore earned from all of this.  You saw that he received at

1    least $1.6 million from Haddow during his involvement with Bar

2    Works.

3              So if we agree on just about all that, what's really

4    in dispute here?  It's really just one thing.  This entire case

5    just boils down to one question.

6              The defendant claims that despite everything you've

7    seen and everything you've heard, he didn't know that he was

8    involved in a fraud; that he believed that Jonathan Black was

9    real and that, therefore, he was duped, along with all the

10   investors.

11             And so the question for you boils down to this:  When

12   James Moore was pushing his agent network to sell Bar Works,

13   did he know that Jonathan Black was really Haddow?  You've seen

14   a staggering amount of evidence to know the answer is yes.

15             So this closing argument will have three parts.

16             We're going to spend the most time on the first part,

17   what the evidence showed actually happened.  I'm going to be

18   blunt.  If you paid attention to just some of the evidence, you

19   already know what happened here.  Some cases that go to trial

20   are close.  This one is not.  Between the testimony you've

21   heard, the countless smoking-gun emails involving the

22   defendant, the audio and video recordings, the evidence is

23   overwhelming.

24             Part two will focus on the defense's theories of what

25   happened and why Moore's defenses just don't hold water.

1        Now, let's be clear.  James Moore has no burden in

2   this case.  His lawyer doesn't have to prove anything; we do.

3   He doesn't have to even say anything.  The burden of proof is

4   ours, and we embrace it.

5        But when James Moore and his attorney choose to make

6   arguments or cross-examine witnesses or address you as they

7   have, you have the right and the obligation, I would submit, to

8   scrutinize what they are trying to sell you.  So in part 2,

9   I'll just briefly point out why the defense arguments don't

10  have any merit.

11       And finally, I'll talk very briefly about the charges

12  in this case.  James Moore is charged with two crimes:  wire

13  fraud and conspiracy to commit wire fraud.  One for conspiring

14  to defraud investors in Bar Works, and one for actually going

15  through with it.  We'll talk about how the evidence fits the

16  elements of those charges and why he's guilty of both crimes.

17       All right.  So how do you know that Moore knew that

18  those offering materials were fraudulent with respect to who

19  managed Bar Works?

20       Well, first, Moore knew that Haddow had both owned and

21  managed Bar Works; that he was the person who decided

22  everything.  That's almost undisputed at this point.  You've

23  heard Moore admit to the SEC that Haddow controlled the company

24  and he didn't want to share that control with anyone.

25       You saw how the defendant described Bar Works in an

1   email to a potential investment source.  He said:  Bar Works

2   was a co-working company in NYC that is owned and being

3   promoted by a pal of mine.  You know who that pal is, that's

4   Renwick Haddow.

5           You've seen and heard how Moore's partnership with

6   Haddow on Bar Works began.  Moore wanted Haddow's agents, that

7   boiler room at In Crowd Equity, to sell Moore's investment

8   project in Spain.  Haddow told him that he was focusing on a

9   new co-working company called Bar Works.  And then you saw how

10  James Moore ditched his own investment project to team up with

11  Haddow instead.

12          You saw what Moore told Haddow:  I'm right up for

13  doing this with you.  We could collectively sell the shit out

14  of it.

15          But Moore didn't just want to be a glorified sales

16  agent to Haddow.  He told Haddow that his interest was being in

17  business with him.  He told Haddow:  I reckon we can bring a

18  lot to the party if you feel it's worth giving up something to

19  grow fast.  And so along with Moore, the principals of UPG also

20  knew exactly who they were dealing with.

21          Remember that email when UPG finds out that Haddow

22  gave away what they thought was their exclusive right to sell

23  Bar Works to somebody else?  James Robinson from UPG wrote to

24  Moore:  Renwick doesn't really give a flying fuck about

25  anything with integrity.  Well, guess what?  As long as he pays

J67VMOO1                    Summation - Mr. Vainberg

1    on the deals we and our agents do, then I do not care how he

2    runs his projects.

3           And that, ladies and gentlemen, is Moore and UPG in a

4    nutshell.  They knew who was secretly running Bar Works, and

5    they promoted the scheme anyway because of the insane

6    commissions that they would get out of their investors' money.

7           So Moore knew that Haddow ran Bar Works, a fact that

8    was disclosed nowhere in any of the offering documents.  And he

9    also knew that Haddow's name was in the gutter from all the

10   lawsuits and the bad publicity surrounding Haddow's past

11   schemes.  He knew that Haddow got a fresh start in America, as

12   both Moore and Haddow called it.  And he knew why Haddow needed

13   that fresh start.  Haddow told him about the FCA's lawsuits

14   against him for running those African land and carbon credit

15   schemes.

16          Remember how Moore was updating Haddow on the FCA's

17   news release in their case against Haddow?  Moore is the one

18   who puts the "F" word in the subject line of the email.  That's

19   because to Moore and Haddow, the FCA, that's the real dirty

20   word.

21          He says:  See, you're still getting plenty of air play

22   from these guys.  Look at how worried Moore is here, when

23   Haddow says:  It's like a stone in my shoe.  Moore tells him he

24   has a feeling it's about to turn into a blister.

25          And look at what's at the top of Moore's mind:  What

J67VMOO1                    Summation - Mr. Vainberg

1      entity owns Bar Works?  Why does he ask that?  Because he's

2      worried that if Bar Works, his supposed 35 percent interest,

3      the business he's supposed to be a 35 percent owner in, well,

4      if that business is legally owned by Haddow, the FCA might come

5      after it.  Moore knows the FCA is serious, and he knows that

6      this publicity is devastating for Haddow.

7               And it's not just that Moore knows about carbon

8      credits and African land, he knows in September of 2015, right

9      when Haddow is about to launch Bar Works, that it's structured

10     in a very similar way to carbon credits.  Investors purchased

11     leases in some property rather than buying the actual property.

12     No need for a title, pesky things like registration.  Just slap

13     on a certificate and you're good to go.

14               Remember when Haddow sent Moore a copy of one of those

15     draft certificates of ownership and some bare-bones terms and

16     conditions?  Moore flips the documents over to UPG, and they

17     pick up on it right away.  James Robinson tells Moore:  It's

18     obvious that the first attachment is some sort of attempt at a

19     client -- that's their word for investor -- feeling like they

20     hold a deed.  But as it's a certificate, it reminds me of

21     carbon credits in a big way.  But, hey, that worked; so no

22     reason to redesign the wheel being round, I suppose.

23               And it's the same thing about the terms and

24     conditions.  Their quote:  The very simple play that the carbon

25     credits market used.  And hey, if that worked, which it did,

J67VMOO1                   Summation - Mr. Vainberg

1    then no issues from me.  Keep it simple, stupid.

2            Haddow told you that the only thing that worked about

3    carbon credits was that they were able to sell to a lot of

4    investors.  You know what happened to those investors.  They

5    lost their money.

6            But if there was still any doubt that Moore was

7    unaware of Haddow's history, remember Government Exhibit 179.

8            We have these exhibit numbers during the presentation.

9    And if at any point you want to look at something in your

10   deliberations, you can feel free to look at it; they'll go back

11   there with you.

12           Now, in this email, remember what happens here.

13   Haddow has given away his exclusive; Moore asks Haddow about

14   it.  It was given away to a company called Pan Pacific

15   Alternatives.  And Haddow basically tells him, Pan Pacific,

16   that's just one person.  Who cares.

17           So it's still early going here.  It's mid October

18   2015; no Bar Works locations are open yet; UPG hasn't closed

19   any sales yet.  But they did just find out that Haddow is the

20   sort of person who's giving away exclusives left and right to

21   different companies.  Haddow told you that Moore confronted

22   him, he gave his "who cares" answer, and Moore reports that

23   answer back to UPG.

24           And then look at what James Robinson writes to Moore:

25   I wonder if Renwick would care more about people knowing Bar

J67VMOO1                    Summation - Mr. Vainberg

1    Works is his, and his history in carbon credits and lost

2    investments for huge amounts of clients would damage his Bar

3    Works reputation.

4            I mean that's the case in a nutshell.

5            You know from this email alone that Moore and UPG knew

6    that Haddow's history was toxic; and that if investors found

7    out that Haddow was behind Bar Works, it would tank the

8    company.

9            Moore knew that Haddow was running Bar Works; he knows

10   all about the baggage Haddow's name was carrying.  So when

11   Haddow sends him the prospectus, the marketing materials for

12   Bar Works that conceal his name in the business, he knew

13   exactly why Haddow's name wouldn't be there.

14           But you don't have to infer that Moore figured out on

15   his own that Haddow was Jonathan Black, because Haddow told you

16   that himself.  You heard exactly when and how Haddow confirmed

17   for Moore that he was Jonathan Black.

18           Renwick Haddow testified for close to nine hours for

19   three days at this trial about all the things that they did in

20   their fraud for Bar Works.  That account came through crystal

21   clear, and it was extremely damning for the defendant.

22           Haddow candidly walked you through his own past frauds

23   in the UK in extensive detail, including the ones that got him

24   that ban and the civil lawsuit.  He told you about how even

25   after he moved to the U.S. he continued committing crimes,

J67VMOO1                    Summation - Mr. Vainberg

1  raising money from investors through misrepresentations.

2          And he also clued you in on his early dealings with

3  Jim Moore.  You heard how Moore and Haddow started doing

4  business together with Haddow's hotel investment scheme called

5  Room to Invest back in 2009 or so; how they visited each other

6  over the years in Miami and Dubai; and how they reconnected in

7  the summer of 2015.  He told you about how Moore became

8  Haddow's business partner in Bar Works after Moore pitched him

9  on a different opportunity.

10          You heard with your own ears the moment that the

11 defendant learned that Renwick Haddow was Jonathan Black.  In

12 September of 2015, after Haddow sent one of the prospectuses

13 with that identity to Moore, there's no getting around to it.

14 Moore flat-out asked Haddow, Who is Jonathan Black?  And even

15 though Haddow was paranoid -- he didn't want to talk on the

16 phone about this scheme for obvious reasons -- he quickly

17 replied:  It's me.

18          Ladies and gentlemen, you've heard that Jim Moore had

19 no problem with that fact.  He didn't stop working with Haddow.

20 He didn't turn away from Bar Works.  Instead, he decided to get

21 very rich from it.  He negotiated a 35 percent equity stake in

22 Bar Works for himself, and another 30 percent in commission for

23 UPG on all incoming UPG investors.  That's insane commissions

24 for helping to promote this fraud.

25          And Haddow told you about all the other times that the

J67VMOO1                    Summation - Mr. Vainberg

1   Jonathan Black issue came up, like when Moore brought the UPG

2   team to New York to meet Haddow in November 2015.  Haddow

3   described to you the group's dinner at Tao, where everyone

4   relaxed, they had some shots, and then Moore nudged Haddow

5   under the table to discuss their friend.

6           And that's when Haddow also confirmed face-to-face to

7   UPG what they already knew, what Jim Moore had told them, that

8   Jonathan Black was an alias and that it needed to be used with

9   extreme caution.  They discussed email etiquette, which boiled

10  down to basically being very careful to make sure that Jonathan

11  Black seemed like a real person in their emails, just in case

12  those emails ended up in the wrong hands, in the hands of an

13  agent, if somebody forwarded them, or in the hands of the

14  government.

15          He also told them that he had instituted a new

16  Jonathan Black email account to be used with the outside world.

17  And then you saw how that pretense played out.  Moore continued

18  to email Haddow at his renwickhaddow.com email address.  But if

19  he needed a letter from Jonathan Black, he'd send Haddow

20  language that said something like, For Jonathan's approval, or,

21  For Jonathan to respond to a question.  And then Haddow would

22  either feed more of that information or jump on the email chain

23  and respond as Jonathan Black.  Moore continued to cover up for

24  Haddow whenever agents and investors wanted to meet with him.

25          You also heard why Moore left Bar Works sometime

J67VMOO1                    Summation - Mr. Vainberg

1    around June 2015.  It had nothing to do with Sean Phillips and

2    how Haddow supposedly ill-treated him months earlier.  You

3    heard what really happened.  Haddow allowed his other in-house

4    master agent, a man by the name of Sam Aura, to poach agents

5    from UPG; that way, Sam Aura would get the commissions and not

6    UPG.  He deliberately fell behind on paying Moore's

7    commissions.  So Moore got fed up, stole Haddow's business

8    idea, and started Our Space.  Haddow's own agents picked up the

9    slack and Bar Works carried on for about six more months until

10   Haddow was exposed in January 2017, beginning the death spiral

11   of the company.

12            Now, ladies and gentlemen, from the beginning of this

13   trial, the defense has taken shot after shot of Renwick Haddow.

14   Mr. Garvin tried to make you believe that you can't believe

15   him, no matter how much the evidence agrees with everything he

16   has to say.  Folks, there's an obvious answer for this, right?

17   If you credit the testimony of Renwick Haddow, as you have

18   every right to, this trial is over.  Renwick Haddow's testimony

19   gives you enough to convict the defendant on each of the two

20   counts against him.

21            So why should you believe him?

22            Let's set aside the massive amount of evidence that

23   corroborated Renwick Haddow for a moment.  I just want to talk

24   about Haddow on his own.

25            You've heard Mr. Garvin question him at length about

J67VMOO1                    Summation - Mr. Vainberg

1    all of the lies he told to all sorts of people prior to getting

2    arrested.  But keep in mind, the person who told you about all

3    those lies was Renwick Haddow.  The defense doesn't seem to

4    take issue with those truths.  In fact, you can safely assume

5    that they are truths.

6           Mr. Haddow was blunt about why he told so many lies in

7    the past.  He lied to investors to induce them to invest.  He

8    lied to securities regulators -- here and in Great Britain --

9    to cover up those frauds.  He did this all for money.  You know

10   this because Mr. Haddow told you.  And you know that for every

11   lie, there was some incentive, some gain.

12          So let's assume for a moment that Mr. Haddow is still

13   a creature of incentives.  Well, what are his incentives now?

14   His cooperation agreement is in evidence as Government Exhibit

15   171.  And you've heard him discuss what it means.  What it

16   boils down to is simple:  If he tells the truth, he believes

17   that he will get a 5K letter.  If he lies, he gets nothing and

18   he's facing 80 years in prison, plus a potential perjury count.

19   Whatever verdict a jury returns in any trial that he testifies

20   at against any number of people has no bearing on that issue.

21   You can see that in Haddow's words and you can see it in black

22   and white in the agreement itself.

23          Ladies and gentlemen, the agreement that Renwick

24   Haddow has with the government is an incredibly strong

25   incentive for him to tell the truth.  Why on earth would he

1    make up this entire story and take a risk at having the

2    agreement being torn up and risk 80 years in jail?  That would

3    be a colossal catastrophic risk for his future and for the

4    future of his family.

5         But more than that, if Renwick Haddow made up an

6    elaborate pack of lies to implicate an innocent James Moore who

7    just happened to partner up with a fraudster and promote a

8    Ponzi scheme, wouldn't he have found a better way to tell those

9    lies?  Wouldn't the lies have been better lies?

10        Mr. Haddow testified that the Jonathan Black idea was

11   his, even though he had been talking to Moore throughout the

12   summer of 2015 when Bar Works came into being.  He didn't pin

13   it on him.

14        He admitted to you that he lied to Moore about some

15   other things, like how well Bar Works was selling early on, and

16   that he later cheated Moore out of his commissions.  He told

17   you that Moore had nothing to do with the Bitcoin Store, the

18   other scheme that Haddow was running that overlapped with Bar

19   Works for a period of time.  And that's even though Moore

20   visited the In Crowd boiler room where Bitcoin Store was being

21   sold.  He told you Moore had nothing to do with Bitcoin Store.

22        So let's be clear.  Mr. Bell told you in his opening

23   statement that Mr. Haddow is a known fraudster.  He did all

24   kinds of terrible things that made investors lose their money,

25   and he told a lot of lies before he was arrested.

1          But we didn't pick him, ladies and gentlemen.  This is

2    the person that Moore chose to commit his crimes with.  We

3    would have loved to have put up a nun to tell you all about how

4    she conspired with James Moore to defraud investors based on

5    misrepresentations.  But nuns don't do that.  People like

6    Renwick Haddow do.

7          And the question for you isn't whether you like him or

8    you respect him; it's does his testimony line up with all the

9    other evidence in the case.  You bet it does.

10         Now, I know we've shown you more than our fair share

11   of emails, and I promise you I'm not going to go through all of

12   them again.  You've already seen how those emails corroborate

13   Haddow to the T.  You saw the email etiquette in play where,

14   with a wink and a nod, Haddow and Moore would schedule calls

15   for Jonathan, arrange for Jonathan to sign legal documents, and

16   craft detailed answers for Jonathan to give to agents.

17         And you also saw the slipups, the emails where Moore

18   lost his discipline and made it clear that he knew that

19   Jonathan was a fiction.  Any one of those emails, with or

20   without Haddow's testimony, is enough to convict Moore.

21         So let's just look at four of the greatest hits.

22         First you have the honeymoon emails.  Remember the

23   backstory to this?  In February 2016, Moore is trying to get

24   David Lilley, who has his own agent network, to discuss

25   expanding Bar Works internationally.

1          So Moore sends Lilley an email copying the Jonathan

2     Black email account, and Moore sends Lilley biographies of the

3     three "partners" in Bar Works:  Jonathan Black, Neil Storey,

4     and James Moore.  He's not talking about Jonathan Black as if

5     he's some remote CEO, stuck in London, can't be seen, kept away

6     from everybody by Renwick Haddow.  No.  In this email, James

7     Moore talks about Jonathan Black as the primary originator in

8     Bar Works who joined up with Moore and Storey as the product

9     was formed.  He's also a partner of the international expansion

10    team with him.

11         Let's pause.

12         If the defense is that Moore never met or talked to

13    Jonathan Black because Haddow somehow kept him away, what is

14    Jonathan Black suddenly doing being part of Moore's

15    three-headed partnership to expand Bar Works?  And where is

16    Renwick Haddow?  Moore doesn't put him anywhere on this email.

17         So it's clear here that Moore wants Lilley on board

18    first with the Jonathan Black lie, and it sort of works.

19         On page 1 of that same email, after getting these

20    bios, Lilley agrees to fly out to Spain on February 17th to

21    meet with Moore and Storey.  That meeting goes well, and Moore

22    clearly keeps up the Jonathan Black lie; because the next thing

23    you see on March 2nd, 2016 is an email from Lilley to Moore and

24    Storey, saying that they are now coming to New York, and they

25    want to bring some professional video equipment to record some

1    clips with Jonathan.

2              So what does Moore do?  He panics.  He knows Haddow

3    is on his honeymoon in the Bahamas.  That's the separate email

4    chain he has with Renwick Haddow at Haddow's own email address

5    at the top of the screen.  And he knows that Haddow doesn't

6    want to meet with David Lilley.

7              So now Moore forwards Lilley's question to Haddow and

8    Storey and says:  Guys, how do we feel we can overcome the

9    Jonathan issue?  He's on honeymoon?

10             And you know it's a joke, because they all know what

11   Haddow is doing.

12             But the Jonathan issue is real.  Somebody needs to be

13   there in New York to show up as the face of the company if they

14   are going to look serious.  So Haddow tells Moore:  They can

15   meet Sam and Zoe and our new PR.  And Moore knows that

16   ultimately, if they are ever going to get off the ground with

17   Lilley, the person who he wants to expand Bar Works

18   internationally, well, at some point Haddow is going to have to

19   get involved in some shape or other.

20             And so he nudges him:  Would be great to find a way to

21   get you involved, but equally understand your reticence.

22             And then Moore says:  We will need a story as to why

23   Jonathan isn't there.

24             And ladies and gentlemen, this isn't rocket science;

25   it's common sense.  They need a story to make up about

J67VMOO1                    Summation - Mr. Vainberg

1    Jonathan's whereabouts because he isn't meeting David Lilley,

2    because he isn't real.  So Neil Storey then tells David Lilley

3    that they've arranged for Sean Phillips to meet with him and

4    record the clips.

5            Let's talk about the iPhone mixup.

6            Now, that's just one example.  And what happens after

7    this is kind of like an evidentiary gift that keeps on giving,

8    because now it's a week later, and Moore is in New York for

9    their meeting with Lilley.  And he needs to get paper copies of

10   whatever documentation investors get when they get a lease.

11   You can see in the email here that he needs documents ASAP to

12   give to someone at the hotel.  He's rushing.

13           So Moore takes out his iPhone and fires off an email

14   to Tahyira Cordner, one of the admin people at Bar Works,

15   asking for the documents.  You can see on the bottom line where

16   it says "Sent from my iPhone."  Now, that's different from just

17   about every other email you've seen from Jim Moore from his

18   gmail address.  And it's funny, right, because on his iPhone,

19   Moore apparently has Renwick Haddow's email address programmed

20   in under the name "Jonathan Black."  I mean totally devastating

21   proof that Moore knows who Jonathan Black is.

22           And you will remember that in his opening statement,

23   Mr. Garvin tried to front this email with you and presented

24   this concocted defense that Jim Moore meant to send an email

25   like this.  The defense would have you believe that Moore got

1    suspicious and he wanted to call out Haddow as possibly being

2    Jonathan Black.  And I guess he decided that the best way he

3    was going to do that was take out his iPhone, go into his

4    account settings, change the name under Renwick Haddow account

5    profile to Jonathan Black, and then send an email to Haddow's

6    admin staff asking for some documents to be sent to him ASAP,

7    copying Renwick Haddow and, I guess, somewhat hoping that

8    Haddow notices that.

9         This email isn't even directed to Renwick Haddow.  It

10   doesn't say anything to Haddow or to Jonathan Black.  Ladies

11   and gentlemen, that story just make no sense and you know it.

12   This is just a slipup, another devastating example of the proof

13   that Jim Moore knew that Renwick Haddow was Jonathan Black.

14        You know what?  While we've got it up, look at what

15   happens here.  So he needs the documents.  He's in the hotel.

16   And to here he gets the documents prepared, and who does Moore

17   send to get those documents?  He sends Sean running, Sean,

18   that's Sean Phillips.  That's the guy who supposedly had no

19   involvement at all on anything on the investment side of the

20   house.  That's the guy who's running to get investment

21   documents.

22        And can we just talk about Sean Phillips for a hot

23   second?

24        I guess the defense called him because they wanted to

25   bolster their narrative that Moore wanted to run Bar Works as a

J67VMOO1                    Summation - Mr. Vainberg

1   legitimate company, didn't have too many membership, he tries

2   to hire Sean Phillips, Haddow is erratic, doesn't want anyone

3   but his 26-year-old wife involved, really rude to Sean

4   Phillips.  And so that's when Moore decides that he's going to

5   leave Bar Works, because Bar Works isn't serious.

6            And look, that's not the first time the defense has

7   told that story.  James Moore has told that story to the SEC

8   and to federal law enforcement agents in the audio clips, in

9   the video clips that are in evidence.  That's a story for why

10  he got out of Bar Works.

11           Now, first of all, you know that story is contradicted

12  by all the documentary evidence.  You know why Jim Moore left

13  Bar Works.  And more importantly, nothing about that story has

14  anything to do with whether Jim Moore knew that Haddow was

15  Black.

16           And do you remember Sean Phillips on cross?  Have you

17  seen anyone flip-flop on so many things in such a short period

18  of time?

19           First, he didn't know that he was the CEO of a

20  company; and then it turned out that he was the CEO.  He didn't

21  know that he was hired; then it turned out that he was paid

22  $7500 by Bar Works.

23           (Continued on next page)

24

25

J673MOO2                         Summation - Mr. Vainberg

1            MR. VAINBERG:  (Continuing) He told you under oath

2    that he had no idea that Bar Works was using his credentials as

3    a sales pitch to investors.  And then, it turned out that he

4    wrote the press release himself in January that did just that.

5    I'll stop here.  Mr. Phillips doesn't deserve any more of our

6    time.

7            Let's go to the next example.  Remember the e-mails

8    with the agent for the Chinese investors, Nick Reagan?  He is a

9    real agent that's doing real due diligence.  You can see from

10   the e-mails that he wants to make sure that Bar Works doesn't

11   oversell the leases.  Because if you sell investors a lease on

12   every single work space in the location, every single desk, now

13   you've taken on the obligation to pay your 16 percent annual

14   return on every one of those desks.  That's on top of actually

15   using the money to run the business.  So, everyone understands

16   there's not going to be enough money to do that.

17           So Moore decides he needs a letter from Jonathan Black

18   saying there is a maximum number of leases that will be sold at

19   each location.  He drafts the letter, he sends it to Renwick

20   Haddow's e-mail address, and he asks Haddow to get it on headed

21   paper.  That's clear on Government Exhibit 43.  And then, at

22   the same time, Moore e-mails Nick Reagan, blind copying Renwick

23   Haddow so he can see what's going on.  And Moore says that he

24   has asked Jonathan Black the CEO if he would be so kind as to

25   issue a formal legal statement to further clarify that the

J673MOO2                      Summation - Mr. Vainberg

1    company will not oversell leases.

2            So, I mean, just another set of e-mails that totally

3    sinks Moore's defenses.  You know that Moore is lying when he

4    wrote to Nick that he talked to Jonathan Black.  You've seen

5    that he told Haddow to churn that letter.  So what you see here

6    is Moore doing exactly what Haddow testified was part of

7    Moore's role in this fraud.  He's concealing Haddow, and he's

8    putting on the lie that Jonathan Black was in charge.

9            What Moore does leads to real investors losing real

10   money.  You've heard testimony that, following these e-mails,

11   Nick Reagan decided to sign on to sell Bar Works and raise

12   millions of dollars from his investors.

13           Let's go to the F word e-mail.  We've already looked

14   at this one as clear evidence that Moore knew all about

15   Haddow's baggage.  But, remember, too, that it's also the same

16   e-mail where Moore essentially tells Haddow how to be a better

17   fugitive if the need ever comes up.  Look at what he says:  A

18   few important points.  Great lawyers, good barrister, massive

19   distance to special place (hard to get back)."  I mean, Moore

20   is just blurting out in writing that Haddow should consider

21   having a massive distance to a special place, and like if

22   that's not clear, he's putting in parenthesis "hard to get

23   back."  And Haddow replies "I agree with you totally."

24           You've heard from Haddow that this kind of talk didn't

25   come out of the blue.  They had conversations about this issue.

J673MOO2                    Summation - Mr. Vainberg

1    Moore and Haddow had a number of conversations about different

2    jurisdictions, which ones are safe.  And even about one could

3    get a fake passport from Dominica.  So it's no surprise that

4    when Bar Works eventually collapses and Haddow's wife tells him

5    that the FBI is at their house, Haddow decides to camp out in a

6    country that has no extradition treaty with the United States.

7         Do you know any law-abiding businesspeople who talk

8    like that amongst themselves?  Of course not.  That's how

9    co-conspirators talk to each other.

10        Now, if all of those e-mails weren't enough, you have

11   Moore's own statements to the SEC.  Remember, he agreed to be

12   interviewed about Bar Works, and spent most of the interview

13   talking about Renwick Haddow.  But then, when the SEC asked him

14   about Jonathan Black, he hesitated.  And then here's what he

15   said.

16        (Audio recording playing)

17        MR. VAINBERG:  Ladies and gentlemen, Moore tells the

18   SEC he's never met Jonathan Black.  He's never talked to

19   Jonathan Black.  He never even asked to talk to Jonathan Black.

20   You know that directly contradicts what he was telling agents

21   like Nick Reagan for whom Moore was a trusted intermediary

22   between themselves and Jonathan Black.  And it completely

23   contradicts what Mr. Garvin told you in his opening statement,

24   that Moore wanted to talk to Jonathan Black, he kept on asking

25   Haddow, hey, can we meet with Jonathan Black, and Haddow was

J673MOO2                      Summation - Mr. Vainberg

1    just denying him, left and right, access to the CEO.

2            Remember in his opening statement, Mr. Garvin said

3    "Well, Mr. Moore only visited Bar Works here in New York a

4    handful of times.  And you'll learn that when he visited, each

5    time, Haddow told Mr. Moore that Jonathan Black was not here in

6    New York, he was in his office in London."  Did you hear any

7    evidence to that effect?  Did you see any e-mails where Moore

8    is asking Haddow if Moore can meet with Jonathan Black when he

9    goes to New York?  You didn't see anything like that.  You know

10   that narrative is just a concocted defense, fiction, because

11   James Moore knows that Jonathan Black e-mail address.  And if

12   he had really thought that Jonathan Black was real and wanted

13   to meet with him, you'd see conversations and e-mails between

14   Moore and Jonathan Black.  And what you see instead is a lot of

15   James Moore talking to Renwick Haddow about other people that

16   wanted to meet with or talk to Jonathan Black, and what they

17   were going to do to keep that from happening.  Or as Jim Moore

18   put it in an e-mail about the local investor, the guy in Queens

19   who wanted to stop by and asked for a contact name, "Sounds

20   like trouble to me."

21           now, in that e-mail, the UPG representative said that

22   this particular investor was really keen for Bar Works.  He

23   wanted to invest in multiple leases.  And look, just use your

24   common sense.  If you are a legit sales agent, and after you

25   got a client who wants to come in who is really interested in

J673MOO2                    Summation - Mr. Vainberg

1    investing, first thing you'd want to do is get him over.  But

2    Moore knows having a nosy investor who lives in Bar Works'

3    backyard could expose Haddow.  So that's trouble, and he tries

4    to hold the investor off.

5          Now, it also makes perfect sense that Haddow invited

6    Moore into the fraud, when you consider their friendship and

7    their business history together.  Jim Moore wasn't like a

8    brand-new face off the block.  He wasn't some remote agent.  He

9    was somebody Haddow knew for a long time, somebody that Haddow

10   trusted.  He was somebody that Haddow could trust to keep a

11   secret and to keep the fraud going.  He was a friend that

12   Haddow had done lucrative business with before.

13         You've heard all about the about their Room to Invest

14   venture in about 2009 or 2010, which involved fractional

15   interest in hotel rooms.  Investors would buy those interests

16   and receive returns, supposedly from customers using those

17   hotel rooms.  Sound familiar?  That's basically Bar Works in a

18   nutshell.

19         The problem was Moore wanted Room to Invest to sell

20   interest in a hotel in Barbados he owned.  The only problem

21   with that, as Haddow told you, is Moore didn't have a hotel

22   built.  He just had an empty plot of land.  But there he was,

23   ready to take investor money for something that had no ability

24   to pay them for a very long time.  Apparently, that was too

25   much even for Haddow.  He turned down selling the Barbados

property scheme, but invited Moore to partner up with him to

sell investments in two real hotels, in Slovenia and Morocco.

Moore agreed.  And then what did Moore do as Haddow's business

partner in that other venture?  He introduces Haddow to agents

who did the dirty work of pushing the investment product.  And

then, two, he improved the investment offer by adding a

guaranteed return and an incentive for buying multiple units,

and in return, Haddow told what you Moore got.  He got half of

Haddow's profit from Room to Invest.

          Does that sound familiar?  There is no surprise that

Moore was in Haddow's circle of trust when he needed somebody

to help launch Bar Works and get agents to sell Bar Works,

because Moore had been in that circle of trust before with Room

to Invest.

          Haddow also told you about what happened after with

Room to Invest.  It successfully solicited between about 300

and $500,000 from investors, after Moore partnered with Haddow

and before the project went bust.  And then Haddow and Moore,

well, you've heard how their friendship deepened.  They

continued seeing each other, going to Dubai, Miami, London.

Haddow told you that they met on multiple occasions to hang

out.

          Moore admitted the same thing in his interview with

the SEC.  You heard Haddow even invited Moore to his own

wedding, and Moore said he'd go if Haddow could loan him some

J673MOO2                    Summation - Mr. Vainberg

1   money or sell some of his Spanish properties for him.

2           That's not all.  When Moore visits New York in October

3   of 2015, you heard that Haddow took him right into his boiler

4   room at In Crowd Equity.  Remember how Haddow and Jason Rivera

5   described that boiler room?  Room full of degenerates, the Wolf

6   of Wall Street scene.  That's where Haddow took Moore.  That's

7   not a place you would take a casual acquaintance.  That's not a

8   place you take somebody you don't trust.  That's where you take

9   your co-conspirator.

10          And it doesn't even end there.  You've heard when

11  Moore wanted to set up some overseas companies, Haddow

12  introduced him to his own accountant.  The guy who helped

13  Haddow set up a bunch of overseas shell structures so Haddow

14  could launder proceeds of money from his schemes.  You wouldn't

15  introduce somebody who knows all your dirty business to

16  somebody you can't trust, and Haddow trusted Moore.

17          I mean, in fact, and this was just a ridiculous

18  moment, Moore and Haddow were so close, you've seen evidence

19  that Moore even had all sorts of business dealings with

20  Haddow's mom.  Here he is, this is a smack in the middle of the

21  Bar Work fraud in February of 2016, and Moore is writing to

22  Mrs. Haddow about how great Renwick is.  "How refreshing it is

23  to work with somebody who is obviously raised with similar

24  values to me."  and then, after buttering her up, comes the

25  second part.  He is asking her if she can pursue with a

1    detective someone who helped make Moore bankrupt in the U.K.

2              How else do you know Haddow isn't lying when he told

3    you that Moore knew about Jonathan Black?  Look at their

4    positions in Bar Works.  Moore was Haddow's business partner

5    and believed he owned 35 percent of the business.  Again,

6    that's not some remote agent.  That's not someone that Haddow

7    doesn't have a lot of interactions with.  And Haddow needs

8    Moore to know the truth about Jonathan Black, because if he

9    doesn't, then Moore can't do what he is being paid to do.  Talk

10   to the agents, fend people off, and be the front between Haddow

11   and the Jonathan Black face and real people.  Makes perfect

12   sense.

13             But, and I mean, let's also be honest.  This wasn't

14   the greatest secret in the world.  Vincent Lake told you it

15   took him a week to figure it out, just working as a temp at Bar

16   Works.  Now while investors living in countries overseas didn't

17   have a way to do that, and had to rely on materials that UPG

18   sent to them, Vincent Lake, I mean, just saw what was going on.

19   That's why he started collecting documents to expose Haddow,

20   including some of those spreadsheets you saw during trial.

21             If Lake knew, well then, you know that Moore knew, as

22   Haddow's business partner and minority owner of Bar Works

23   itself.

24             That brings me to another point.  The business

25   arrangement.  So you've heard that Moore was getting 35 percent

J673MOO2                    Summation - Mr. Vainberg

1   of commissions and UPG was getting another 30 percent

2   commissions on every dollar of UPG investor money coming in.

3   That's 65 cents of every dollar UPG's investors think is going

4   to Bar Works.  All of that is being diverted, and then Haddow

5   takes his cut, leaving just pennies to go into the actual

6   running of the business.

7           Compare that to the 3 percent that Moore charged on

8   his Instant Access Properties business, which also recruited

9   investors to purchase properties.  Moore knew that no one would

10  give away such an insane commission if the underlying

11  investment was legitimate.  He knew exactly what was going on.

12          Now, I expect when Mr. Garvin gets up, the main thrust

13  of the defense is going to be that Renwick Haddow is a liar and

14  he's lied many times to many people.  And I've addressed that,

15  we've walked through all the corroborating e-mails.  For

16  somebody who is supposed to be a liar you can't trust, there

17  sure is a lot of corroborating independent documentary evidence

18  that backs up everything he's saying.

19          How else do you know that Haddow is telling the truth?

20  Remember those moments during trial when Haddow volunteered

21  damaging information, even when it was hurtful to him?

22  Remember when defense counsel asked Haddow if it was strange

23  for Renwick Haddow to hire the Bukher Law Firm and tell them

24  the client is Jonathan Black.  And Mr. Haddow responded, "I

25  wouldn't call it strange.  I would call it fraudulent."

1    Remember when Mr. Garvin asked if investors lost

2    approximately $38 million?  And then Haddow corrected him and

3    testified it was approximately $50 million.

4         Now, you saw lots of efforts by the defense to trip up

5    Haddow about dates.  Dates when he met with the government,

6    dates when he met with Sean Phillips.  Was any of that

7    consequential in any way?  Of course it wasn't.  On the

8    important events that unfolded in this fraud, Haddow was clear,

9    and he was consistent, and backed up by overwhelming

10   corroborating evidence.

11        Now, the defense may make other arguments to confuse

12   the evidence and try to suggest that Mr. Moore didn't have any

13   intent to defraud investors.  We've walked through a mountain

14   of evidence to show you that's exactly his intent.

15        But there is one more piece you are allowed to

16   consider on that question.  And that, as Judge Berman will

17   instruct you, has to do with the defendant's felony criminal

18   conviction in Florida for misprision of a felony.  You've heard

19   that Moore pleaded guilty to misprision of a felony in February

20   of 2018 in connection with a condo development project that he

21   was promoting in Florida.  You saw from the plea agreement what

22   that means.  He learned of the felony, he didn't report it, and

23   then he concealed it.

24        Now, ladies and gentlemen, you know that Moore's role

25   in Lake Austin was strikingly similar to his role in Bar Works.

1    These were both real estate investment projects and they were

2    funded by individual investors.  And in both schemes, Moore

3    acted as the business partner to the developer, a type of

4    master agent, the person responsible for bringing in investors

5    for marketing the project.  He was completely hands on.

6    Remember that promotional video we played for you in Lake

7    Austin?  That's Jim Moore recording a video, reassuring

8    investors that everything is going to be great and their

9    investment could still be a winner.

10            In both schemes, during Moore's participation,

11   misrepresentations were being made to investors.  In Lake

12   Austin, they were being told that their deposits would stay in

13   escrow, when, in fact, the developer was paying Moore his

14   commissions out of those escrow deposits.  And in both schemes,

15   the developer openly discussed the fraud with Jim Moore.

16            You see in the plea agreement and the factual basis

17   that Mr. Moore admitted that the developer told him that that's

18   what he did.  And Mr. Moore, what does he do next?  He has the

19   crime remain concealed.  And what happened in Bar Works?  He

20   finds out at the beginning of the scheme that Haddow is running

21   it, that Haddow is Jonathan Black, and he doesn't just conceal

22   it, he actively pushes the fraud, he comes up with all sorts of

23   coverups to help Haddow.

24            What's the motivation?  Money.  You've seen how much

25   money he gets for doing those things.

1           When you think about what was Moore's state of mind,

2      what was his knowledge, what was his intent, was he really

3      making a mistake about how he was perceiving things at Bar

4      Works, you can consider this conviction for those purposes.

5           Now, you also remember that in the post-arrest video

6      that was taken when Mr. Moore was arrested for that fraud in

7      February 15 of 2017, he made a number of statements.  So,

8      remember, he is arrested February of 2017.  That's like about a

9      year, little bit less than a year after he leaves the Bar Works

10     operation.  And you remember how evasive he was when he was

11     asked about Bar Works.  He said he hadn't done anything for

12     money since 2010.  He repeats it.  He knows, sitting in that

13     interview, that he had gotten at least $1.5 million from Bar

14     Works.  That's not the sort of money you'd forget you received.

15     But it is only when agents explicitly asked him did you receive

16     wires from Bar Works that he admits Bar Works, and then goes

17     into a whole explanation of what Bar Work was and how he left

18     because Haddow was so mean to Sean Phillips.

19          So, when you think about defense arguments on

20     Mr. Moore's intent and what he was doing, consider those

21     things.

22          I also expect the defense will try to give you an

23     alternative explanation for why those e-mails look the way they

24     do.  I expect they'll cherrypick some of those e-mails where

25     Haddow and Moore and people at UPG are talking about Jonathan

J673MOO2                       Summation - Mr. Vainberg

1    Black as if he is a real person, and suggest to you that that

2    means they all really believed that Jonathan Black was real.

3    That's just them talking about Jonathan Black.  But for some

4    reason, he doesn't show up on any of these e-mails.

5         Look, you know why those e-mails look the way they do.

6    You know Haddow and Moore had worked out so they would talk

7    about Jonathan Black as if he is a real person in case the

8    e-mails got out.  And for example, if Moore needs Haddow to

9    create a letter from Jonathan Black.  That's because they're

10   worried about creating evidence of their fraud.  E-mails are

11   saved, they're stored, they can be forwarded.  All it takes is

12   one e-mail to expose Haddow and Moore.  They were worried that

13   those e-mails might fall into the wrong hands, just like here.

14        So keeping up that pretense that Jonathan Black is a

15   real person on those e-mails, that could help them confuse the

16   issue, and allow either one of them to argue that they didn't

17   know that Haddow was Jonathan Black.  That they didn't act with

18   fraudulent intent.

19        The internal coverup was designed in part for a trial

20   like this one.  It was designed to confuse people looking at

21   those e-mails.  Ladies and gentlemen, don't be confused.  You

22   know exactly why those e-mails were written in that way.

23        You also know that even with all that e-mail

24   etiquette, they slipped up a bunch of times.  The defendant is

25   a prolific e-mailer.  He has a sense of humor.  You saw those

J673MOO2                    Summation - Mr. Vainberg

1    jokey e-mails where he talks about letters from Jonathan Black

2    being signed as from M. Mouse.  Mickey Mouse.  Cartoon

3    character.  Somebody who is fictional, like Jonathan Black.

4    You saw the honeymoon e-mail where he's joking about saying

5    Jonathan Black is on his honeymoon.  You saw him not even

6    noticing that when he's writing from his iPhone, the iPhone has

7    associated Renwick Haddow's e-mail with the Jonathan Black

8    name.

9           The defense explanations for any of those slipups,

10   they make no sense.  We've already talked about the iPhone

11   issue.  We've talked about the e-mail that says the Jonathan

12   issue, the idea that if Jonathan is in the U.K.

13          Again, if you hear arguments asking you to believe --

14   on no evidence presented to you -- that Haddow was telling

15   Moore each time he was visiting New York that Jonathan Black

16   was stuck in London, couldn't meet him, you know that's not

17   true, and you know that you would have expected Moore to ask

18   Haddow questions about that over e-mail.  They e-mailed about

19   everything else.

20          Now, you may hear an argument that Moore's e-mails --

21   you remember there were a couple of e-mails basically to the

22   effect that nobody would be so dumb as to commit a fraud right

23   here in the United States.  That the United States has really

24   stringent securities laws, and if Bar Works was a fraud and the

25   things in the prospectus are not true, that would be the

J673MOO2                    Summation - Mr. Vainberg

1    dumbest thing you could do.  You've seen an e-mail where

2    Mr. Moore writes to UPG that that could land somebody 150 years

3    in prison.  So you may hear arguments that if Moore is writing

4    those things, then he must be believing that he himself is not

5    in on a fraud.

6           Now, you know that there a couple of reasons for those

7    e-mails.  First of all, there are e-mails in which Moore makes

8    it clear that he thinks as long as they don't sell to U.S.

9    investors, that they're okay.  That there is somehow a

10   difference in the law between selling to U.S. investors and

11   selling to investors overseas.  And even though Bar Works is

12   right here in New York, that as long as UPG sells to people

13   outside of the United States, that there is some legal

14   difference around that.   You have seen e-mails that Moore is

15   on that discussed that issue.

16          So one thing you can infer is that when Moore goes out

17   of his way to tell the SEC and to tell people at UPG about

18   those laws, that he thinks he's safe, because they're not

19   selling to U.S. investors.  So even if Haddow is ever exposed

20   as Jonathan Black, that Moore and UPG will be okay because they

21   only targeted foreign investors.

22          Now, you may also hear arguments that the fact that

23   Jim Moore voluntarily produced his documents to the SEC, again,

24   means he has nothing to hide.  And consider these points.

25   First of all, think about how it would look if the SEC called

1    him up, he sat for an interview, they asked him do you have

2    e-mails, he said yes, they asked for those e-mails, and he said

3    oh no, I don't want to give them to you.  You know what that

4    would look like to any regulator or law enforcement agent.

5           You also know that you also can consider the fact that

6    Moore may not know what the government already has.  He may not

7    know if the SEC or any other agency has already gotten his

8    e-mails from some other source, from people he's e-mailing,

9    from a search warrant, from any other place.  If he turns over

10   just a selected set of e-mails, if he holds something back,

11   that's going to look real suspicious when they compare the two

12   things.

13          But most of all, you know that there are two reasons

14   why Moore might have thought that the e-mails would not

15   implicate him in this crime.  One, he knew that he and Haddow

16   followed that e-mail etiquette, and tried to avoid creating

17   e-mails that made it clear that Haddow was Jonathan Black.  He

18   may not have appreciated that among those hundreds of e-mails

19   would be a handful of slipups that made it devastatingly clear

20   that he knew exactly what was going on.

21          Second, as we saw before, he may have had the

22   impression that you could only be liable for fraud in the

23   United States, if you only targeted U.S. investors.

24          Now, I can't predict everything that defense counsel

25   may say to you and I don't need to.  You will have another

J673MOO2                    Summation - Mr. Vainberg

1    opportunity to hear from the government when my colleague

2    Mr. Bell steps up for rebuttal after that.  So with that, let

3    me move you towards the end part of my closing statement and

4    the charges in this case.

5           There are two counts:  Conspiracy to commit wire fraud

6    in Count One, and the substantive crime of wire fraud in Count

7    Two.

8           So, let me start with number two, the wire fraud count

9    first.  I expect Judge Berman will give you instructions before

10   you deliberate, and you should follow Judge Berman's

11   instructions.  I expect that Judge Berman will instruct you

12   that to prove a wire fraud, the government must establish that:

13   First, there was a scheme to defraud one or more persons of

14   money or property by means of false or fraudulent pretenses,

15   representations, or promises.  Second, that the defendant

16   knowingly and willfully participated at some point in the

17   scheme to defraud with knowledge of its fraudulent nature and

18   with a specific intent to defraud.  And third, that in

19   execution of the scheme to defraud, there occurred at least one

20   use of interstate or international wire communications.

21          Again, there is no serious dispute that there was

22   actually a scheme to defraud here in connection with Bar Works

23   investments.  There is also no dispute that interstate wires

24   were used in the execution of the scheme to defraud.  That

25   includes things like e-mails and wire transfers.

J673MOO2                        Summation - Mr. Vainberg

1              So what is at issue is whether the defendant knowingly

2     and willfully participated in that fraud.  And it's clear from

3     all the evidence that the defendant was a knowing and willful

4     participant.  There is overwhelming evidence here that the

5     defendant had direct knowledge of the fraud.

6              Now, I also expect Judge Berman to instruct you on

7     wire fraud conspiracy count.  And on that count, the government

8     must establish that:  First, the charged conspiracy existed;

9     and second, the defendant knowingly and willfully joined the

10    conspiratorial agreement, and therefore became a member of the

11    conspiracy.

12             Based on all the evidence you've heard, it's clear

13    that there was a conspiracy or agreement between Moore on the

14    one side and Haddow on the other to commit this fraud, and you

15    know that the defendant joined that agreement, that conspiracy,

16    knowingly.

17             Let me say just a few brief additional words about the

18    conspiracy count.  First, to find the defendant guilty of

19    conspiracy, you don't need to conclude that he was the leader

20    of the conspiracy or even the worst actor here.  All the law

21    requires, as I expect Judge Berman will instruct you, is a

22    single knowing act by the defendant in furtherance of the

23    conspiracy.  And the evidence against the defendant is

24    overwhelming on that front.

25             Second, I expect the Court will the instruct you that

you don't need to find an explicit agreement between the
defendant and Haddow to commit these crimes.  You don't need to
write down on a piece of paper "you and I agree to commit
frauds together."  That's not how criminals work, and that's
not what the law requires.  Common sense tells you that
participants don't do those things.  They don't jot down and
detail each and every one of the lies they're going to tell.
That's where common sense comes in looking at the evidence,
listening to the testimony, seeing what happened here.

        And finally, I expect Judge Berman will instruct you
on venue, which basically just means that some act in
furtherance of the wire fraud statute, wire fraud scheme, and
the wire fraud conspiracy, occurred here in the Southern
District of New York.  Unlike the elements that I previously
discussed, which require proof beyond a reasonable doubt, this
one only requires a preponderance of the evidence, and that's
clearly satisfied here.  You've heard and seen e-mails between
Jim Moore and Renwick Haddow about meetings that took place
right here in New York, in Bar Works locations in Midtown.
You've seen wires of investor money coming into Bar Works' bank
accounts right here in Manhattan.

        So ladies and gentlemen, you've seen all the evidence
in this case, and I hope I've been able to explain how it all
fits together.  So before I sit down, let me just remind you of
three things that Mr. Bell asked you to do at the beginning of

J673MOO2                    Summation - Mr. Garvin

1   the trial.  Pay close attention to the evidence, listen to

2   Judge Berman's instructions, and use your common sense.

3          We're confident that having now heard all the evidence

4   and seen all the testimony, you will find that the defendant,

5   James Moore, is guilty as charged.  Thank you.

6          THE COURT:  Thank you.  Counsel.

7          MR. GARVIN:  Your Honor, may we have a five-minute

8   recess for use to the restroom and to set up the Elmo?

9          THE COURT:  Sure.  Okay.  Take five.

10         (Jury excused)

11         MR. BELL:  Judge, sorry.

12         (Recess)

13         MR. BELL:  Your Honor, very quickly, I anticipate

14   rebuttal of no longer than 20 minutes, so I think we're well on

15   course for the jury to actually be able to deliberate some

16   today.

17         THE COURT:  I hope so.  We're ready to roll.

18         (Jury present)

19         THE COURT:  Hi, everybody.  Mr. Garvin for the defense

20   summation.

21         MR. GARVIN:  Thank you, your Honor.

22         THE COURT:  You bet.

23         MR. GARVIN:  Good morning, ladies and gentlemen,

24   counsel.

25         Before we start, I think it would be appropriate to

J673MOO2                    Summation - Mr. Garvin

1    recognize this Honorable Court, and to recognize each and every

2    one of the members of the jury.  You know that this is a very

3    important case for the government.  It is everything to

4    Mr. Moore.  But, in another country, this would not take place.

5    And someone would make an allegation, somebody would knock on

6    the door, and Mr. Moore would disappear, and there would be no

7    trial.

8         Each one of you have taken the time from your busy

9    schedules, from your most important affairs.  You've sat here

10   and listened diligently, listening to very tedious discussion

11   by myself, by my colleagues, about this e-mail and that date

12   and this document.  But you sat there and you paid attention

13   because you knew the gravity of the situation.

14        And each one of us, including Mr. Moore, want to be

15   certain that we thank you.  You know that scholars say that in

16   peacetime, there is no more greater service that you can have

17   to your country than to be on a jury.  And you have done that

18   admirably, and you are to be thanked from all of us.

19        Now, I would like to talk about this case just as my

20   colleague did.  And I know that we need to start at what is

21   this case.  It is a case about raising money, and,

22   unfortunately, it is a case about deception.  It is a case

23   about greed.

24        Now, there are a lot of people who raise money for

25   companies.  Many companies, thousands of companies raise money

1  so they can get the initial working capital to go through with

2  their business model and reach their goals, and hopefully, when

3  it works properly, both the people who ran the business and the

4  people who invested in the business benefit.  That is where it

5  started in this case.

6          It started with Mr. Moore calling Renwick Haddow,

7  because he wanted Renwick Haddow to introduce him to sales

8  agents to sell the Monterey property that he wanted to develop

9  in Spain.

10          Now, we have to take a step back and recall who is

11  Renwick Haddow to Mr. Moore.  We realize that Renwick Haddow

12  did not even know Mr. Moore until he was introduced to him some

13  time in 2009 or 2010.  And during that period of time,

14  Mr. Haddow was operating something called Room to Invest where

15  he was selling fractionalized shares of two hotels in Europe.

16          Now, Mr. Haddow says that he saw Mr. Moore during this

17  period of time between five and 10 occasions.  Well, this

18  period of time from 2009 or '10 to the summer of 2015 is

19  approximately five, perhaps six years.

20          So we recognize, we step back and say just how many

21  times was Renwick Haddow in the presence of Jim Moore who prior

22  to 2009 he didn't even know?  And Renwick Haddow answered that

23  question five to 10 times.  That would be approximately one or

24  two times a year on average.  One or two times a year.

25          And we know that on one or two of those occasions, it

1    was because Renwick Haddow was visiting Miami Beach, and Jim

2    Moore lived there with his wife, and so Mr. Moore met him at a

3    restaurant in Miami and took that photo of the two of them

4    while we were there.  And on another occasion, Mr. Haddow

5    claims that he saw Jim Moore in Dubai.  He doesn't say that Jim

6    Moore went to Dubai to meet him.  Quite frankly, that would be

7    preposterous, but he says that he did see Mr. Moore there.

8          And he did say, he claims, that Jim Moore worked with

9    him on Room to Invest and he paid Jim somewhere in the

10   neighborhood of 30,000 pounds, up to 50,000 pounds.  I'm sure

11   that each of you recall that.  He does not have any records of

12   these so-called payments, he does not have any bank records,

13   business records, he doesn't have even any e-mails.

14         Now, counsel said, well, Mr. Haddow was so candid on

15   the stand and that's why he was credible.  Ladies and

16   gentlemen, Mr. Haddow had rehearsed his testimony so many times

17   that he was actually answering questions before the question

18   was completed.  Mr. Haddow was asked to read from the monitor

19   transcripts, and he had this uncanny ability to stop

20   mid-paragraph at the appropriate place where counsel wanted him

21   to stop, without counsel ever saying to him "stop after the

22   second sentence."

23         And Mr. Haddow admitted that he met with the

24   government in excess of 10 times.  But do you know why he

25   admitted that?  Because he was already placed on notice that I

1    was given the notes from each and every one of those meetings.

2    The bottom line is that Mr. Haddow is not stupid.  And he

3    understands that if you want to be successful telling lies,

4    which he has done his entire life, you admit what you know the

5    other person can prove and you deny what you know the other

6    person can't prove.

7             And where was that played here?  When there is an

8    e-mail, he knows I have it, he admits it.  If he says something

9    that's not in an e-mail, he knows I can't possibly prove he's

10   lying yet again.

11            For example, he caused this Bar Works private

12   placement to be sent to Jim Moore in the summer of 2015, and we

13   know that occurred in September and it is dated August.  And

14   then Jim Moore wrote some e-mails about receiving this, and

15   this document is the document that was forwarded to UPG.

16            Okay.  The United States in this case, the government,

17   who has completely bought all of Renwick Haddow's lies, they

18   have completely believed him, they take the position that Jim

19   Moore knew that Jonathan Black didn't exist.  Even though Jim

20   Moore, at best, was an acquaintance of Renwick Haddow who had

21   seen him five to 10 times during the past five to six years.

22   And that when the package went to James Robinson and David

23   Kennedy, the owners of UPG, that they knew that Jonathan Black

24   didn't exist.

25            Ladies and gentlemen, you will hear the jury

J673MOO2                    Summation - Mr. Garvin

1    instructions in this case that this Honorable Court will give.

2    And I have reason to believe that one of those instructions

3    will say that if there are two equal interpretations of what

4    happened, both of them that could be supported by the evidence,

5    that you are to assume the path of innocence.

6           MR. BELL:  Objection, your Honor.

7           MR. GARVIN:  This is a case in which the government

8    has the burden of proving the case beyond a reasonable doubt.

9    And I believe that the Court will give you -- and make no

10   mistake about it.  It's not what I say that matters.  It only

11   matters what this Honorable Court says, when it comes to not

12   only the law, but all decisions concerning this trial.  But

13   given that, I believe that you are going to get an instruction

14   that in part says: "Proof beyond a reasonable doubt must,

15   therefore, be of such a convincing character that a reasonable

16   person would not hesitate to rely and act upon it in the most

17   important of his or her affairs."

18          This is what reasonable doubt is.  Without hesitation

19   in the most important of your affairs.  As I told you in the

20   beginning of this case, and I'm sure that by now you know it to

21   be true, this is a one-witness case, and that witness is

22   Renwick Haddow.  None of the other witnesses that the

23   government put up in this case had anything to say about Jim

24   Moore of any significance.  Most of them had nothing to say.  I

25   believe that Mr. Rivera, if my memory serve me correctly, says

1    he was requested to send some materials by a drop box to

2    Mr. Moore.  That was it.  So the only person that we have is

3    Renwick Haddow.

4             Put your hands around that, and then go to the law,

5    and say could I rely upon this man, knowing what I know, could

6    I do that?  And could I do that with the most important of my

7    affairs and do it without hesitation?

8             You know, most people, when you say most important of

9    your affairs, the first thing that most people say, my family.

10   That's it.  You're talking about my family, that's it.  We stop

11   there.  Can you imagine if Renwick Haddow was involved, Renwick

12   Haddow showed up to you and wanted to take one of your minor

13   children for the day --

14             MR. BELL:  Objection, your Honor.

15             THE COURT:  I'll allow it.

16             MR. GARVIN:  And Renwick Haddow looked you straight in

17   the face and said "don't worry, you can trust me."  I profess

18   to you, ladies and gentlemen, knowing what you know about

19   Renwick Haddow, there is not one person in this entire

20   courtroom that would do it, let alone doing it without

21   hesitation.

22             I profess to you, I propose, that you can not possibly

23   honor your oath to follow this Honorable Court's instructions

24   and say that you would rely on Renwick Haddow for anything, let

25   alone the most important of your affairs without hesitation.

1          I would like to show you that you'll remember

2     Government's Exhibit 18, where Jim Moore on September 22 has

3     gotten the package of materials that we just saw and he says --

4     now he's talking to David Kennedy and Neil Storey.  These are

5     two people he knows.  And you've heard Neil Storey's history.

6     He's not a salesman; he is a former diplomat.  And he says,

7     "I've read this thoroughly.  It's very well put together and

8     using very expensive and specialized lawyers."  How did he know

9     that?  Because that's what Renwick Haddow told him.  He has no

10    reason to be misleading David Kennedy, one of the two owners of

11    United Property, or Neil Storey.  He goes on and talks about

12    that it is a prospectus, and the way it's written is selling

13    securities.  And the definition of securities is very broad in

14    the United States.

15          MR. BELL:  Objection.

16          THE COURT:  Overruled.

17          MR. GARVIN:  But he said that the point is that they

18    have to be telling the truth, because if you aren't telling the

19    truth, you are going to go to jail.  And the exact words that

20    he said, "I think up to 150 years in jail (seriously)."

21          This shows you, ladies and gentlemen, that from the

22    inception, Jim Moore believed the materials that he received

23    from Renwick Haddow.

24          And so what happens?  You heard Renwick Haddow say

25    that when he told Mr. Storey about his history, he downplayed

1   it.  That was the word he used.

2          Now, imagine Mr. Haddow wants Jim Moore to raise money

3   for him and he knows that Jim Moore has been using UPG to try

4   to do the Monterey development, and he knows that UPG has 80 or

5   more employees, brokers to sell this project.

6          Now it comes up, the issue, because as we saw from the

7   e-mails, Mr. Robinson did some research and found the African

8   land issue and the carbon credit issue.  You'll remember that

9   this was under litigation.  And that as we saw, there was an

10  appeal filed, and then the appeal was denied, and what the

11  first step of the litigation was, was to determine if this was

12  a collective investment scheme.

13         When we say collective investment, that means the

14  pooling of other people's money, because that gives

15  jurisdiction to the FCA.

16         Once they get through that step, then the litigation

17  continues on to determine if there were misrepresentations, and

18  that is the search for fraud.  And what did Mr. Haddow tell

19  Mr. Moore?  You'll remember Government's Exhibit 42, when Jim

20  Moore said is -- well, actually, it is Haddow that says "It

21  could be challenged.  If they have the will."  And Mr. Moore

22  wrote back, Well, couldn't everything be challenged?  And this

23  is what Renwick Haddow said:  "Pretty much.  They use it to

24  close down things they think are a fraud, which is what they

25  thought African land was, but turned out it wasn't when they

1    went to court."

2         You see, Mr. Haddow wasn't saying to Jim Moore in the

3    beginning of November 2015, hey, I want to commit a gigantic

4    massive fraud, and I want you to be part of it, and I want

5    James Robinson to be part of a massive fraud who I've never

6    met.  And I want his partner, David Kennedy, to be a part of a

7    massive fraud who I've never met, and jeopardize their business

8    with 80 employees.  That's not what was happening.

9         You've seen Mr. Haddow on the stand.  As this

10   Honorable Court and counsel has said, we've asked you, please

11   do not leave your common sense at the door.  Think of his

12   history as to what he's done for 20 years.  He has lied to

13   everyone.  He has lied to brokers, he has lied to investors, he

14   has lied to the FCA, he's lied to the SEC.  He even lies to his

15   own lawyers.  He uses people's names without asking them.  He

16   makes people's names that don't exist.  This man hired an actor

17   off of Craigslist and then wrote him a script, and then videoed

18   him so that he could defraud other people.

19        Knowing all of that, do you believe in your heart that

20   he told Jim Moore the truth?  Or do you believe in your heart

21   that he told Jim Moore that Jonathan Black was somebody who he

22   knew from a position that he held at Regents 88 20 years ago

23   who is very serious and very busy, but he's asked him to head

24   the company, because he can't.

25        There is no crime with stepping aside and letting

1    somebody else be the CEO.  And that's what he told Jim Moore.

2    And that's what Jim Moore, relying on the information and we

3    saw the e-mail he wrote, believing that this was prepared by

4    lawyers, that's what Jim Moore then presented to UPG, and they

5    relied upon it.

6              So, when they had questions about the African land

7    deal, this is the kind of stuff that they were told.  And now

8    we're in November of 2015.

9              But, you know, before you even get to November of

10   2015, Renwick Haddow shows that he is what he is.  And

11   literally as soon as UPG starts making calls, they get an agent

12   who tells them that he has the exclusive for Bar Works for

13   Europe.  And so, Jim Moore has to write to Renwick Haddow, and

14   say, so who has the exclusive?  And what's the percentage?  And

15   why tell me we can have it if we get some results if you've

16   already given it out?  Now I look an ass in front of everyone.

17             What does this show you?  They're trying to make Jim

18   Moore out to be tied at the hip with Renwick Haddow and to be

19   somehow his best buddy.  Renwick Haddow had no special place

20   for Jim Moore.  He lied to him just like he lied to everyone,

21   and I submit, ladies and gentlemen, just like he's lied to you.

22             The thing is that we all want to believe that we're

23   smarter than the next guy.  Oh, that would never happen to me.

24   I would never believe his lies.  I would never have listened to

25   that.  I would have never invested money with Renwick Haddow.

1    I have to admit that I had those feelings.  But now I realize

2    that if you listened to how smooth he is, it becomes completely

3    understandable how they all fall into his web of deceit and

4    lies.  It's like a siren in the sea that Jason could hear and

5    is running the boat directly to the rocks.  You just can't help

6    it.

7         Jim Moore didn't go to Bar Works until the middle of

8    October.  And what did Jim Moore honestly believe when he saw

9    what was going on there?  He said "I'm extremely

10   encouraged/motivated by what I've seen in Manhattan.  Bar Works

11   have secured an absolute prime location for their first site.

12   I mean fantastic, really.  The footfall outside is incredible.

13   They already have 20 people signed up now (as of this

14   evening)."

15        Who would tell Jim Moore that?  The same person who

16   sat on that stand and told you there were very few, if any,

17   people signed up.  The people who were in the Bar Works that

18   day, I submit to you, were people who worked for Bar Works, so

19   that it would look full so that Jim Moore, when we went through

20   it, as Renwick Haddow said, it only took a few moments, would

21   walk away thinking that it's really something more than what it

22   was.

23        You're going to remember this clearly, I hope, and

24   that is Haddow is on the stand, and he says originally that he

25   told Moore by telephone that Jonathan Black did not exist.

J673MOO2                    Summation - Mr. Garvin

 1   Now, he knows that there is no way to prove that.  If you're

 2   going to fabricate testimony, this is the kind of thing to

 3   fabricate because there is no one who can prove that.

 4          But then he says that Mr. Robinson knew that Jonathan

 5   Black didn't exist.  Well, how could that be if Mr. Robinson

 6   hasn't even met you, Mr. Haddow?  And he said, well, not only

 7   James Robinson, but David Kennedy knew.  Well, how could that

 8   be if he didn't know you?  And Neil Storey knew, and he even

 9   said Sean Phillips knew, and he was not going to vary from the

10   fact that Sean Phillips was there in January.

11          But why was he saying that?  Because he knew he had a

12   problem.  And that problem was that David Honeyman from UPG

13   needed a letter and he didn't know Jonathan Black, so he wrote

14   a letter to Jim and copies to David Kennedy and to James

15   Robinson saying that he needed Jonathan Black to write a letter

16   authorizing or recognizing that Asset Folio was authorized

17   agent to sell Bar Works.

18          Now, if you didn't believe that Jonathan Black

19   existed, why would you be asking these people to get a letter

20   from the person you didn't believe to exist?  That makes no

21   sense.  So, Mr. Haddow told you that when they came to New

22   York, I went over with them that we've got to write what they

23   called etiquette, the Jonathan Black etiquette as been labeled

24   by counsel.  We write these letters pretending like he exists

25   so that later on we can say we thought he existed.  But you

1    guys know he doesn't exist now.  Please understand that that

2    occurred on November 20, and this letter was forwarded on

3    November 16.  So, unless David Honeyman was clairvoyant and

4    could see into the future, he had not received any instructions

5    from anybody.

6         And think about how outrageous this is that he wants

7    you to believe.  He wants you to believe that people who have

8    never met him are going to agree to be part of a massive fraud

9    with him.

10        One of the people who wrote to him was Jim Moore.  And

11   Jim Moore wrote on November 13, again, a week before this

12   so-called meeting where Haddow had a discussion on Jonathan

13   Black etiquette, and he says:  "Morning, Renwick.  Please see

14   the following letter for Jonathan's approval."  And he attached

15   the letter that is prepared and is made out to dear Mr. Stead,

16   that is Government's Exhibit 64.  This is the body of the

17   letter.  That letter wasn't written by Jim Moore.  It was

18   written by a third party and Jim Moore passed it to Renwick,

19   because Renwick was his contact person.  That was the person he

20   knew.  He never met Jonathan Black, he's been told by Renwick

21   that he is busy, keeps a busy schedule, and is in London.  Jim

22   Moore is in Miami.

23        I'm showing you Government's Exhibit 75.  This is

24   dated November 21, and it says from James Robinson, and "It's a

25   great shout Renwick.  Great to meet you, too."  And we see the

1   earlier e-mail is from Mr. Haddow who says "Hi guys.  Good to

2   meet/see you all yesterday."  So, November 21, yesterday would

3   be November 20.  That is how we know that the meeting that

4   Haddow had, the first meeting that Haddow had, was one or two

5   weeks, depending on which letters you're looking at, after

6   those letters were written requesting that Jonathan Black

7   approve the letter and sign off on it.

8          There is another interesting point at this point that

9   we should talk about.  And that is, you remember when Jason

10  Rivera took the stand?  Jason Rivera said that he worked at In

11  Crowd Equity, he had a low opinion of it, and that, ultimately,

12  everyone at In Crowd Equity was let go, but he was given a job

13  so that he could continue working with Bar Works.

14         But, Jason Rivera thought that Jonathan Black was a

15  real person.  For several months, when he was working there, he

16  thought that Jonathan Black was a real person.  Now, think

17  about that.  A person who is working there every day, in New

18  York, believes that there is a person in London whose name is

19  Jonathan Black who is the CEO of the company.  He knows who

20  Renwick Haddow is.  He talks to him.  But he still believes

21  that.

22         And I submit to you, ladies and gentlemen, that if

23  it's reasonable for Jason Rivera to believe that, then why

24  isn't it reasonable for James Robinson to believe that or for

25  David Kennedy to believe that or Neil Storey to believe that or

1    Jim Moore to believe that.

2            The total amount of times that Jim Moore went to Bar

3    Works before he had enough and decided to break away, you can

4    count on one hand.  In fact, it's less than one hand.  He went

5    in October, around October 15, to see it and he wrote the

6    letter we saw.  Then he went back November 18 through

7    November 20, and we've seen those letters, too.  And then he

8    went back for a third time, in March.  And then in March it all

9    fell apart.

10           But, perhaps the letter that is most convincing is a

11   letter that relates to Julian White.  And Renwick Haddow writes

12   to James Robinson, "I have asked JB to discuss that with Julian

13   when they speak."  That is defendant's 5044, dated November 30,

14   2015.  We know that Julian exists because he came here.  And

15   you remember what Julian said?  He spoke with somebody who says

16   they were Jonathan Black.  And he also spoke with somebody who

17   I believe the name was Robert Munden, but I'm not certain of

18   the last name.  I'd have to look it up.  But the point was, he

19   spoke with two different people.  James Robinson wrote him back

20   and said when you say JB, do you mean Jonathan Black?  And he

21   wrote back yes.

22           And then we have December letter.  Without any

23   provocation, we have Mr. Haddow saying, "Hi all.  Just had a

24   catch up with JB."  And then he goes to on to say what JB told

25   him.

1          Okay.  That was written December 21.  James Moore was

2    not in Bar Works in December, neither was James Robinson, Neil

3    Storey, and David Kennedy, nor Sean Phillips.  So, Mr. Haddow

4    will have you believe that they knew that Jonathan Black did

5    not exist.  Or, is what happening here is Mr. Haddow has an

6    agenda?  He has a motivation for what he's saying?  And what

7    he's saying is to benefit himself, and that's what's happening

8    here?  Is what's happening here is he is saying don't believe

9    the e-mails, believe me?

10          Knowing what you know about Mr. Haddow, and his

11   history, is that a reasonable request in a case this important?

12   Don't believe the e-mails.  Believe me.

13          I submit to you, ladies and gentlemen, that it is

14   preposterous that he suggests that he should be believed over

15   the e-mails.

16          Remember when he told you repeatedly he never put his

17   wife's last name there because it was the rough equivalent of

18   putting his name on any document.  This is Defendant's 5050 and

19   there's her name, Zoia Haddow, signed by Jonathan Black.

20   Meaning he signed, Mr. Haddow.  It is just another lie.  And

21   not only that, he is putting that name together with Bar Works

22   as the marketing director.  So he's not just saying, oh, she

23   has some little job and we don't know who she is.

24          When he realized that he put that down, what did he

25   say?  Because I give him credit, the man is not dumb.  What did

1    he immediately say?  Oh, I, I only wrote that for a visa, and

2    it wasn't meant to get out into the public.  The next day,

3    because we had a break, he had come up with a slightly better

4    story, and not the visa.  When I asked him, well, was it the

5    visa?  When I got him to say, yeah, it was the visa, then I

6    said, well, then we're going to defraud the United States

7    immigration service, another government entity.

8            I'm going to tell a very short anecdote.  There was a

9    man who was walking near the railroad tracks, and he heard

10   something rattling.  And he looked over, and he saw it was a

11   rattlesnake.  And he looked closely, and the rattlesnake had

12   somehow gotten himself trapped between the railroad tie and the

13   rail.  And the rattlesnake said to the man, help me, help me, a

14   train is coming, it's going to cut me in half.  Please free me.

15   And the man said you are a rattlesnake, I'm not going to free

16   you, you'll bite me.  And the rattlesnake looked at the man and

17   said, you would be saving my life.  Do you think that I would

18   bite someone who is saving my life?  And the man said you're

19   poisonous, I could die.

20           The rattlesnake could hear the train coming, the

21   whistle blowing, the track vibrating, and said, please, I would

22   never do such a thing to someone who saved me.  Save me.  And

23   at the last second, the man sprinted over, applied pressure to

24   the rail enough to lift it slightly.  The snake got out of the

25   way and the train roared past.

J673MOO2                          Summation – Mr. Garvin

1              Only a few moments went by, and we all know what
2    happened.  That snake bit that man, with poisonous venom.
3              (Continued on next page)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1          MR. GARVIN:  And the man who was now laying on the

2     ground looked at the snake and said, But you told me you

3     weren't going to bite me.

4          And the snake replied, You knew I was a snake.

5          I submit to you that you know who Renwick Haddow is.

6     There is no excuse.  You know that he is capable of lying to

7     virtually anyone with a straight face.

8          Think about what he said to all of us when I asked

9     him, What is more important to you, your money or your freedom?

10    Because he's talking about the difference between a potential

11    80-year sentence and the possibility of credit time served,

12    which would set him free.  Setting him free, that in itself is

13    a scary thought.

14         But he wouldn't answer the question.  He would not

15    answer the question because he knew that if he said, My freedom

16    is more important to me, that would give him a motive to lie.

17    And he didn't want to have a motive to lie.  He wanted to have

18    a motive to tell the truth.

19         So he said, No, no, no, my plea agreement requires me

20    to tell the truth.  And if I don't tell the truth, I won't get

21    my 5K1 letter.  And if I don't get my 5K1 letter, I will not

22    get any hope of credit time served.

23         Of course, what was also pointed out here is this:  To

24    get a 5K1 letter, the only people that are allowed to decide to

25    file that motion or not is the United States.  And that motion

1    requires substantial assistance to the government in

2    investigating or prosecuting a person who committed a crime.

3    So if he comes in here and says that Jim Moore did not commit a

4    crime, we're done.  All the hope of getting out is gone.  And I

5    submit to you, ladies and gentlemen, that the truth was his

6    freedom is more important than money.

7              Think of the outrageous things he has done for money.

8    Think about what he would be capable of doing for his freedom.

9              And he said to all of us, in January of 2016 he

10   remembers it well because Jim Moore wanted him to retire.  Jim

11   Moore wanted to phase him out.  That's code for Jim Moore

12   didn't want him around.  And it's true, Jim Moore did not want

13   Renwick Haddow around; Jim Moore wanted Bar Works to be

14   something more than just a fraud.  Jim Moore wanted it to

15   succeed.

16             Jim Moore; had been promised a 35 percent equity

17   position.  Of course, he got cheated out of that too.  And

18   you'll know that his commissions never came out to be 35

19   percent of what UPG got; you know that never happened.  You do

20   the simple math.  They say that he got a total of $1.6 million.

21   And we know that UPG raised seven and-a-half million dollars.

22   35 percent of seven and-a-half million is not 1.6.

23             What Haddow was doing was he was taking the money and

24   saying, Well, you're paying for your equity.  Of course his

25   equity he had no intentions of ever giving.

1          So Jim Moore wanted him out.  Jim Moore wanted him out

2     and wanted this to be a success.  That was the beginning of the

3     end.  Because Haddow was not going to lose control; Mr. Haddow

4     was going to control everything.

5          And that brings us to Jim Moore was paying out of his

6     pocket to bring the representatives from Dolphin, a sales

7     group.  And Renwick Haddow wants to know, Who are these lot?

8          And Jim Moore tells him, The Dolphin guys.  Neil and I

9     have paid their ticket, etc., to come over.

10         There has been some discussion about this email.  How

11    do we feel we can overcome the Jonathan issue?  He's on

12    honeymoon?

13         Now, ladies and gentlemen, Mr. Haddow said that they

14    had telephone conversations, and you know that they did.

15    Mr. Moore is not writing this because he thinks that Jonathan

16    Black does not exist.  He's writing this because he is paying

17    out of his pocket to bring these people from Europe, and they

18    are coming to see Jonathan Black.  I submit to you that if he

19    knew Jonathan Black didn't exist, he would have told them some

20    excuse and not paid for them to come from Europe.

21         What has happened now is that Haddow has made an

22    excuse and said that Jonathan Black is unavailable, that he's

23    gone back to Europe.  And now Jim Moore, having been told this,

24    writes an email saying:  How do we feel we can overcome the

25    Jonathan issue?  Because he's just been told that Black is

1   unavailable and going back to Europe when Jim Moore is paying

2   for guys to come from Europe to New York.  And now Jim Moore,

3   this is not somebody coming up with an idea; this is somebody

4   who's irritated.  He's on honeymoon?  That was a dig.  That

5   was, What do you want me to tell him, he's on honeymoon?

6        Mr. Haddow wants to do a twist with this and say that,

7   Oh, Mr. Moore is suggesting.  No, he's not suggesting, he's

8   complaining.

9        You'll remember this also.  Mr. Moore says -- Renwick

10  Haddow tells him, Well, Sam is going to meet and Zoe and the

11  new PR.  You're going to keep them occupied.  The idea wasn't

12  to keep them occupied.  I submit to you that Mr. Moore didn't

13  pay for these people to fly all the way from Europe because he

14  wanted to keep them occupied.  That wasn't the idea.  They were

15  supposed to meet Jonathan Black.

16       And so what does Mr. Moore say about this?  Would be

17  great to find a way to get you involved, but equally understand

18  your reticence.  That's not somebody who's trying to hide

19  Renwick Haddow.  I'm sorry.  That's somebody who actually just

20  invited Renwick Haddow to attend, who's invited Renwick Haddow

21  to attend a meeting with sales agents that Mr. Moore was paying

22  for their expenses to get here to assess a business deal with

23  Bar Works.  I don't think that it can even be disputed anymore.

24       You'll recall how much I had to argue, literally

25  argue, with Renwick Haddow as to whether Sean Phillips knew

1    that Jonathan Black did not exist, and whether or not he had

2    been at Bar Works on more than one occasion, and whether or not

3    he had been there in January versus March.

4              So let's go over what he said.

5              He said that he was not there in March; he was there

6    in January.  That was false.  He said that Sean Phillips knew

7    Jonathan Black did not exist.  That was false.  And he said

8    that Sean Phillips was not there in March, and that was false.

9    And as we see here from the emails regarding the agenda, this

10   is the agenda with the Dolphin guys.  It says:  We've arranged

11   for Sean Phillips to be on the ground.  And it tells us the

12   date, Wednesday, March 9th; Thursday, March 10th.

13             Mr. Phillips told you that Mr. Haddow acted peculiar,

14   indifferent, with disdain.  He said:  He made it clear he

15   didn't even want me there.  And when he was sitting with the

16   Dolphin guys at Koi Restaurant, they looked over and they could

17   see 30, 40 feet away Renwick Haddow.  And James Moore went over

18   to Renwick Haddow to encourage him to come over and Haddow

19   refused.  It was insulting.  You'll remember that Sean Phillips

20   said James Moore left early.

21             The evidence, ladies and gentlemen, shows that after

22   that fiasco of Mr. Moore and Mr. Storey paying for these people

23   to come to New York for what was supposed to be Bar Works'

24   benefit, and that Haddow literally refusing to talk to them,

25   and then on top of that, treating Sean Phillips with disdain,

1    all he was worried about was Sean Phillips' script.  You heard

2    Sean Phillips say that, These guys kept on calling me and

3    saying, Do you have the scripts, the scripts for how to get

4    members.  They decided they had enough; they were going on

5    their own.

6          And you'll remember Defendant's Exhibit 5062, the 5062

7    that was the confirmation for the order for the URL for Our

8    Space, which was going to be a competitor in Europe to Bar

9    Works.  And we showed the date that that was purchased was

10   March 16th, less than a week after these meetings that were

11   such a colossal disaster.

12         I want to talk to you about Jim Moore calling out

13   Haddow.  Counsel says, Well, this was sent by an iPhone and it

14   was done hastily and that's why he didn't realize that Jonathan

15   Black was Renwick Haddow.  If you go through these documents,

16   you're going to see that Mr. Moore had an iPad and an iPhone.

17   And they sync up.  And if you have experience with those types

18   of electronics, you'll know this, that has to be done

19   intentionally.

20         And they say, Well, no, it was automatic with the

21   phone.  And no, no, no, this was done intentionally and sent to

22   two people who work closely with Haddow to make sure to get a

23   response.  This is what they call old-fashioned smoking them

24   out.

25         And how do we know that that was done intentionally?

1          On the very next day, Jim Moore wrote to Renwick

2     Haddow.  And look, now it doesn't say Jonathan Black, does it?

3     It says Renwick Haddow.  And it's on March 11th, and he wants

4     payment please.

5          You know what is coming here, right?  What's coming

6     here is I've just called him out, I suspect that he's got

7     hanky-panky with Jonathan Black, I flew these guys all the way

8     in from Europe to meet Jonathan Black, and then he tells me,

9     Oh, Jonathan had to go to Europe.  He can't be bothered.  And

10    then he won't attend the meeting.  And this is my third time

11    here, and I haven't seen Jonathan Black's face, and I'm going

12    to find out.

13         Let's see what he replies.  You know the most telling

14    thing about this?  There was no reply.  There was no reply when

15    he put Jonathan Black, and there was no reply the very next day

16    when he requested payment.

17         And counsel says to you, Well, Jim Moore was

18    double-crossing his partner.  No, no, no.  Jim Moore was

19    getting out.  Jim Moore was getting out and he formed Our Space

20    to do that.  And how do we know he was getting out?  Because on

21    April 1st, he sent Kevan Halliwell, that's the CEO of Our

22    Space, the pictures from Times Square, that's Bar Works

23    pictures from Times Square.  And he says to him, The future

24    competition, Bar Works.  Not a long story.  Right to the point.

25         Yes, Renwick Haddow did not go directly at Jim Moore

1    until June, but Jim Moore was gone in March.  That was the

2    straw that broke the camel's back.  He embarrassed him with

3    Sean Phillips, he wasted his money and an opportunity with the

4    Dolphin guys.  Jonathan Black disappeared for the third

5    consecutive time.  Three strikes, you're out.  He called him

6    out on it.  No reply.  The next day he requested his payment.

7    And within the same week, a new Our Space URL was up and

8    running.  And by April 1st, the new CEO of the new company was

9    told, Here's our competition.

10           Now, did Mr. Haddow say, Oh, all those emails were

11   also written in case four years later we would end up in

12   Manhattan in a courtroom?  Because that's what he told you

13   about the letters that said, Please have Jonathan put this on

14   stationery for his approval.  Those were concocted just in case

15   five years from now we're in a federal courtroom someplace.

16           I submit the common sense will recognize what that is

17   and what that's worth.

18           Jim Moore is out the door, but Haddow never slowed

19   down.  He never missed a beat.  He was stealing everything from

20   UPG through Sam, his in-house sales guy, who he gave the master

21   sales agreement to.  He had a Linked In account that showed

22   some poor guy's picture who never met him and told the world

23   that he was the chief executive officer of Bar Works, Jonathan

24   Black.

25           And think about exactly how this went down, ladies and

1    gentlemen.  Jim Moore wanted to phase him out in January.  I

2    submit to you that was when the beginning of the end for Jim

3    Moore in Renwick Haddow's mind started.  It's Sam was then open

4    season to start taking UPG's clients because it was inevitable

5    that Moore was *persona non grata*, and UPG would follow Moore,

6    not Haddow.

7         Moore is the one who ran a successful, legitimate

8    business from 2000 to 2006 that sold over 30,000 parcels of

9    property, billions of dollars, as we heard from the videotape,

10   Mr. Moore being interviewed.  And remember this:  Mr. Moore was

11   interviewed voluntarily.  He was interviewed twice voluntarily,

12   for two hours with law enforcement, and for over an hour with

13   the SEC.  You only got to see excerpts of it, snippets of it.

14   But he volunteered and answered all the questions.

15        Mr. Moore is long gone.  But as we know, Haddow was

16   not slowing down.  And poor Julian White.  I can answer a few

17   of these questions for you.  Jonathan Black signs the document.

18        Look at the outrageous lies that he tells.  One of the

19   things that he says is:  Yes, we have had lots of corporate

20   hiring space at Bar Works.  We just hosted Showtime for the

21   *Billions* show last week.  Just when you think he cannot be any

22   more outlandish, he goes and outdoes himself.  How does he say

23   that with a straight face?  How does he put that in writing?  I

24   submit to you that Showtime was not at Bar Works for the

25   *Billions* show or any other show.

1          Now, I'd like to talk to you about a separate issue,

2     but it was and is a very serious issue.  And that is Mr. Moore

3     has a conviction.  He's not proud of it, but he has one.  And

4     as you've seen from the documentation, ladies and gentlemen,

5     Mr. Moore entered a plea of guilty in that case, because he was

6     guilty.

7          But if we go through the factual basis here, you're

8     going to learn the circumstances.  And those circumstances are

9     very different than Haddow, worlds apart.  This is a copy of

10    the factual basis, which is a government exhibit; I believe

11    it's 811.

12         But it says that the defendant, James Moore, founded

13    Inside Track Seminars and Instant Access Properties in 2001 and

14    2002 respectively.  Both entities were located in the United

15    Kingdom.  And Inside Track held seminars for individuals

16    interested in learning about investment of real estate, while

17    Instant Access Properties acted as an agent which would

18    introduce individuals who wished to purchase real estate to

19    real estate developers that had units for sale.

20         In this process, one of the developers was Paul Oxley.

21    And from 2001 through 2006, Inside Track and Instant Access

22    were wildly, wildly successful.  You will see that Maesbury

23    Homes was Paul Oxley's construction and development company

24    located in Orlando, Florida.  And you will learn that Instant

25    Access charged a ten percent commission, and that was deemed

1   earned upon Maesbury Homes, in this case the developer, whoever

2   used Instant Access, signing a contract, meaning the

3   developer's contract with the buyers.  And as you read this,

4   you will find out that Paul Oxley was the only person on the

5   bank account because he was a developer and he took everybody's

6   deposit.  The entire 1750 units at Grande Palisades was sold

7   out.

8           The construction was 80 to 90 percent completed, and

9   then the 2007/2008 real estate crash hit and everything.  Not

10  just Paul Oxley, but everybody's project cratered.  And you

11  will find out that Paul Oxley had a $200 million construction

12  loan.  And he had this escrow account with people's deposits.

13  And Paul Oxley had told the people that he would not use their

14  deposit for marketing.  But when he paid Instant Access

15  Properties through Darrencrest, he used the deposit money

16  instead of using the line of credit.  And that was improper.

17  Nobody knew it except for Paul Oxley.

18          But when the crash came, you will learn that the banks

19  foreclosed and they were struggling because they didn't want

20  people to lose their money.  And so Jim Moore did a video.  You

21  saw a two-minute excerpt, because Jim Moore was in it for two

22  minutes.  It's an hour-long or half-hour-long presentation,

23  showed the whole place finished.  You didn't see that.  You saw

24  two minutes of Jim Moore standing in front of the tree.

25          But the point is that you will see here in these

1    documents that Jim Moore tried to participate to save the

2    project.  Because if everybody went through and closed, the

3    project would not go into foreclosure, nobody would lose their

4    money, and the real estate prices would recover -- especially

5    right next to Disney World -- within a couple of years, and

6    everybody would have weathered the storm.

7              Unfortunately, the banks did not allow that to happen.

8              They foreclosed.

9              That is what you saw.

10             Well, after that happened, Mr. Moore found out that

11   there's a law in Florida -- it's not in England, there is no

12   such law in England or 48 of the other states in the United

13   States.  But there's a law in Florida that if you're

14   constructing a condominium, not a home, a condominium, you

15   cannot use the deposit for marketing.  And Paul Oxley did.

16             And how does Mr. Moore know that Paul Oxley did?

17   Because Paul Oxley, after the fact, came to him in or about the

18   fall of 2008 -- and these papers will confirm it; that is the

19   factual basis -- and tried to get him to sign a fraudulent

20   document saying that Darrencrest and Instant Access would

21   refund all of the money.  And Jim Moore didn't understand why

22   he was being asked.  And Paul Oxley had to tell him that I

23   spent a portion -- a significant portion of the money I was

24   supposed to hold in trust on marketing that was paid to Instant

25   Access Properties.  Mr. Moore refused to sign the document; he

1    would not help Paul Oxley commit a fraud.

2           So when Mr. Moore found out the following year that it

3    was against the law, he didn't know what to do.  He didn't tell

4    anybody.  So it remained concealed until the banks finally

5    figured it out.  But Mr. Moore was then charged with a

6    misprision of a felony, which means somebody else committed a

7    crime, you knew about it, but you didn't report it.  That

8    offense does not exist anymore.  But ignorance of the law is no

9    excuse.  And so Mr. Moore pled guilty to that.

10          I submit to you, ladies and gentlemen, that is not

11   relevant to whether or not Mr. Haddow told Mr. Moore in the

12   summer of 2015, approximately six years removed from when

13   Mr. Oxley told Mr. Moore what he had done wrong.  Mr. Haddow

14   had nothing to do with Paul Oxley or the Grande Palisades at

15   Lake Austin.  But when you have no evidence, you try to dirty

16   up the defendant.  You get somebody to say, Well, if he did

17   that, he's capable of doing this.

18          This Honorable Court will instruct you that you cannot

19   use the fact that Mr. Moore was convicted of a crime as

20   evidence of a propensity to commit crimes.  It is of no value

21   to them.  You can use that if you find that it is relevant to

22   whether or not Mr. Moore had absence of mistake when he dealt

23   with Haddow, had a plan or intent or a common scheme with

24   Haddow.  You can take that into account as a factor, but that's

25   the only purpose.  And I'm positive this Honorable Court will

1     make that clear.

2             Defendant's Exhibit 5083 is the culmination of the SEC

3     and the chancery court doing an extremely thorough job, 400

4     pages of transition -- I shouldn't say "transition."  I should

5     say fraudulent behavior of Mr. Haddow.  And it's there for you

6     to see if you need to know more than you already know.

7             I am getting to the very, very end.  And I apologize

8     that this is taking so long.  And again, I want to thank you

9     for your patience, as this is of the utmost importance to

10    Mr. Moore.

11            This is Government's Exhibit 143.  And this is

12    Mr. Moore and Mr. Haddow.  And what Mr. Haddow says on March

13    20th, he says to Mr.  -- now remember, this is four days after

14    Mr. Moore has already registered for Our Space URL and he's out

15    the door.  But listen to what Renwick Haddow -- how conniving

16    he is.  He says:  I agree with you totally.  I am already

17    seeking a good lawyer.  The other two parties look like they

18    are going to defend themselves, so this plays into hand.  He's

19    telling him, This is going to play right into my hand.  It's a

20    poker term.  As the gloves are off, that means in his parlance,

21    any lie is acceptable, and I shall be laying any misselling

22    directly at them.

23            This is his strategy; strategy is to lay it on

24    somebody else.  And that's exactly what he's doing here.  We

25    don't have to guess.  He's told us what his plan is.  This is

1    his defense.  Lay it off on someone else.

2             Now, in this case, the United States, unlike England,

3    they didn't play games.  They arrested him.  So now he has to

4    improvise.  And his improvision is, Well, Mr. Moore -- I had a

5    telephone call with Mr. Moore, and I told him that Jonathan

6    Black didn't exist.  I never had a telephone call -- I never

7    told James Robinson, I never told David Kennedy, but they knew.

8    I told Neil Storey, a diplomat, but I downplayed it, but he

9    knew.  And Sean Phillips knew.

10            This is the snake that's stuck in the tracks.

11            Please don't get bit.

12            I'd like to close with one final two-or-three-minute

13   story that I think is apropos.  It's been told in many, many

14   courtrooms.  And I'm telling you to please rule on the

15   evidence, and that evidence includes who Mr. Haddow is and the

16   emails that he's written.  The United States only wants to

17   focus on the emails that are best for them.

18            There's two sides to this story.

19            So the story is that not too long ago in Florida,

20   there is a severe hurricane in the panhandle of Florida,

21   Category 5 did a devastating amount of damage.  But as that

22   storm was in the ocean approaching, the seas were kicking up on

23   the beach.  And as the storm got closer, the seas got higher.

24   And as the seas kicked up, it started to throw starfish and

25   sand dollars on the beach.  The sand dollars, just a small

white shelled fish that doesn't do anything, like a starfish.
And the starfish could not crawl.  So if they stayed on the
beach too long, they would die.

Well, a young 12-year-old boy happened to be on the
beach and he saw what was happening.  And so he dropped his
bicycle, he ran to the water's edge, and he started picking up
the starfish and throwing them back.  And he worked his way
down the beach, but the waves kept on getting higher, and more
starfish kept getting dumped on the beach to die.  And the
little boy was becoming exhausted, but he just kept on
throwing, and he kept on and he kept on.

While this was all going on, there was a cynic who was
watching him, an older man.  And he watched the boy, but he did
not help.  And the little boy was getting more and more
exhausted.  And finally the cynic could take it no longer and
shouted out, You fool, you cannot hold back the storm.  You
cannot stop what is inevitable.  And besides, what difference
would it possibly make?

At that point, the little boy, with tears running down
his face, totally exhausted and on his knees, held up the last
starfish.  And he said, To this one, it makes all the
difference in the world.

And he threw him back.

Ladies and gentlemen, I am telling you that Renwick
Haddow is the equivalent of the worst Category 5 hurricane that

1    has ever been.  Anyone who gets in his way, like poor Julian

2    White and others, are starfish cast aside.  Unfortunately,

3    James Moore is one of those people who's now been thrown on the

4    beach.

5            I submit to you, knowing who Renwick Haddow is,

6    knowing that it is your duty to find whether there was proof

7    beyond a reasonable doubt, that is, that you could rely upon it

8    without hesitation in your most important affairs, I ask you,

9    isn't it the right thing to throw him back?  I don't mean some

10   kind of jury nullification, I mean because it is supported by

11   the evidence and by the law and it is the right thing to do.

12           Throw him back.

13           Thank you.

14           THE COURT:  Thank you, counsel.

15           So Mr. Bell, you get the last word.

16           MR. BELL:  Would you like for me to go now, your

17   Honor?

18           THE COURT:  If you don't mind.

19           MR. BELL:  Sure.

20           May I take just a moment to set up?

21           THE COURT:  Sure.

22           MR. BELL:  With the Court's permission.

23           THE COURT:  Sure.

24           MR. BELL:  Ladies and gentlemen of the jury, I intend

25   to speak for only 20 minutes today.  I value your time, I value

 1    the very real possibility that at this point you are not only

 2    inpatient, but quite hungry.  And I also recognize that what we

 3    are looking at here is not something that requires very much

 4    time to address again.  You've got some cases that become the

 5    resounding mysteries of federal court.  This is not one of

 6    them.  This is the sort of thing that Judge Judy could bang out

 7    in 20 minutes, and so I will attempt to help you do the same.

 8             It was interesting during Mr. Garvin's remarks how

 9    often he gestured in the general direction of the witness box

10    at a Renwick Haddow who had long since left.  And, of course,

11    it makes sense, because Renwick Haddow's testimony looms

12    incredibly large over Mr. Moore's fate today.  His testimony

13    was clear and his testimony was devastating, devastating to

14    Mr. Moore and to the defense.  And so it's not surprising that

15    so much time was devoted, as Mr. Vainberg predicted, to trying

16    to take him down.

17             At one point, ladies and gentlemen, Mr. Haddow loomed

18    so large that Mr. Garvin created an imagined version of him

19    that stood in the witness box and asked you, Don't believe the

20    emails, believe me.  Don't believe the emails, believe me.

21    But, of course, there's a problem there, ladies and gentlemen.

22    Because if you believe Mr. Haddow, Jim Moore is guilty.  And if

23    you believe the emails, Jim Moore is guilty.

24             The fact of the matter is that the snapshot of this

25    moment is clear.  The defendant has three real problems right

1    now:  Renwick Haddow's testimony, the emails, and your common

2    sense.  Each of those independently and all three of them

3    together point solely in the direction of the defendant's

4    guilt.

5           A lot of what Mr. Garvin told you over the last hour

6    and change was intended to take a whack at one, two, or all

7    three of those problems, to suggest that Renwick Haddow's

8    testimony couldn't be trusted, to suggest that the emails don't

9    say what they actually say, and to suggest that you abandon

10   your common-sense reading of those emails in favor of a story

11   and a circuitous route that takes you somewhere other than the

12   obvious conclusion.

13          So, ladies and gentlemen, I'm going to address those

14   remarks in the context of those three real problems for the

15   defendant.  And I ask you to bear with me for just a few

16   minutes.

17          I mentioned that there was a point where there was an

18   imagined version of Mr. Haddow saying, Don't believe the

19   emails, believe me.  Of course, that's not something that

20   Mr. Haddow actually said.  Here's something that Mr. Haddow

21   actually said that brought all three of those problems into

22   sharp relief:

23          Let's see if this works.  It does.

24          And so why don't we start here.  You'll remember this

25   moment, sir.  Do you have any proof that you told Mr. Moore

1    that you were Jonathan Black?

2            And Mr. Haddow said this, and this encapsulates the

3    case as much as any moment in this trial can.  He said:  There

4    are many confirming emails where we both slipped up on emails

5    between the two of us.  I think there is ample confirmation

6    within the email correspondence between the two of us that Jim

7    Moore clearly knew of Jonathan Black, that Jonathan Black was

8    myself.

9            And Mr. Garvin asks:  Sir, is there an email where you

10   write, I am Jonathan Black?

11           And Mr. Haddow accurately says:  There would never be

12   an email like that.

13           And so here, ladies and gentlemen, we see the

14   collision of all three of Mr. Moore's major problems right now:

15   Mr. Haddow's testimony; the emails, which I submit this trial

16   has only been a weeklong, you haven't forgotten them, they do

17   suggest -- they do not suggest, they demand the conclusion that

18   the defendant knew who Jonathan Black was; and common sense.

19   And so we'll touch on each of these in turn.

20           By the way, that was the transcript at 410, and we'll

21   have some individual exhibit cites.

22           And so, again, what I'll look to do in the time that I

23   have left with you is just talk a little bit about those three

24   problems and why the defense closing didn't put a dent in any

25   of them.

1          Let's talk about problem number one.  Let's talk about

2     the fact that Renwick Haddow's testimony is clear and

3     devastating.  And Mr. Vainberg put this well.  I'm not going to

4     over-harp on the point, but if you credit Renwick Haddow's

5     testimony, as you have every right to, even before you get to

6     any other piece of evidence, then he's guilty, guilty on Count

7     One of conspiracy, guilty on Count One of wire fraud, and this

8     trial is over.

9          I will say it again.

10          If you credit Mr. Haddow's testimony, he's guilty.

11          And so, as predicted, Mr. Garvin took as many shots at

12     Mr. Haddow as he possibly could, some of it in predictable

13     fashion.

14          What did he say?

15          First he said that Mr. Haddow was a fraudster.  You

16     knew this because that's the first thing that we told you at

17     the outset of the trial.  You also know it because Mr. Haddow

18     told you himself.  And, of course, he wants you to believe

19     those parts of Mr. Haddow's testimony.

20          But, ladies and gentlemen, Mr. Vainberg mentioned that

21     he told those lies as part of his frauds in part because he was

22     incentivized to do so.  His incentives now are quite different.

23     And there was this whole weird back-and-forth that went on

24     where Mr. Garvin wanted Mr. Haddow to think about which he

25     liked more, his money or his freedom.

J67VMOO3                        Rebuttal - Mr. Bell

1              Ladies and gentlemen, that is not the choice that
2      Mr. Haddow faces right now.  The choice that Mr. Haddow faces,
3      because of the terms of the cooperation agreement, which you
4      saw and which is in evidence and you can review, is a different
5      choice.  The choice is, Do you want to tell the truth and have
6      an opportunity to see your freedom, or do you want to lie for
7      no particular reason?
8              The incentive structure here is clear.  If Mr. Haddow
9      tells the truth, he gets the benefit of the 5K and the
10     possibility of leniency.  If he lies, he gets nothing and he
11     faces the prospect of up to 80 years in jail without that layer
12     of protection.  All of Mr. Haddow's incentives at this point
13     are aligned with the truth.
14             Once upon a time, when he was actively involved with
15     fraud, including with Mr. Moore, his incentives were aligned to
16     just being able to benefit himself.  Don't get money into the
17     calculus, ladies and gentlemen.  The choice that actually
18     matters right now, the choice that that defendant faced, was
19     truth or a massive absurd risk and the certainty of not having
20     that protection.  So don't get distracted from what the choice
21     actually is.
22             How else do you know that Renwick Haddow is telling
23     the truth?  Ladies and gentlemen, you saw his demeanor, you saw
24     his demeanor over nine hours over the course of three days.
25     You have the opportunity to evaluate that demeanor; that's what

1   assessing the credibility of a witness is.

2           But I submit, ladies and gentlemen, that at all points

3   you saw Mr. Haddow take questions seriously; that he admitted

4   where his conduct sometimes was even worse than what the

5   question suggested, that he was serious, that he was focused,

6   that he was detail-oriented, that he corrected Mr. Garvin

7   sometimes when Mr. Garvin's questions were a little bit off

8   from the facts, and that he came across as credible.

9           And you, ladies and gentlemen, before you get to

10  another item of evidence, have every right to make the

11  determination that Mr. Haddow was credible, that you buy his

12  testimony, and that, as a result, Mr. Moore is guilty.

13          But there's more than that.

14          You have some idea in this trial of what a less than

15  credible demeanor would look like, because you saw Sean

16  Phillips.  Sean Phillips, who, as Mr. Vainberg noted,

17  flip-flopped back and forth on things as simple as whether he

18  had given a particular answer a question or two before.

19          Do you remember that moment just yesterday when

20  Mr. Phillips gave an answer and then followed it up somewhat

21  flippantly with, "Let's say that."

22          And Mr. Vainberg said, I'm sorry, did you just say

23  "let's say that" at the end of your answer?

24          And Mr. Phillips said, No.

25          That's what a noncredible witness looks like.  He was

1    manic, he was all over the place, he was glib.  Mr. Haddow was

2    serious, he was sober, and he took those answers -- took that

3    answering process seriously, and you should credit his

4    testimony.

5           But more than that, ladies and gentlemen, as to the

6    question of whether you should credit Renwick Haddow's

7    testimony, we say this:  At one point Mr. Garvin said in an

8    earlier address, Mr. Haddow doesn't deserve your respect and

9    that nobody should be convicted on his word alone.  We agree

10   with that last part.  Nobody should be convicted, I should say,

11   on Mr. Haddow's word alone.

12          Ladies and gentlemen, nobody has been asking you to.

13   Nobody has been asking you to look at Mr. Haddow in a vacuum.

14   We've asked you from the very beginning of this case to take in

15   his testimony, in light of all the other evidence, particularly

16   the dozens and dozens of emails that make it clear that

17   Mr. Haddow is saying that of course Jim Moore knew about

18   Jonathan Black was true.

19          We've had a relatively short time together.  And

20   perhaps sadly for me, the most memorable part of this trial is

21   going to wind up being my attempts to ask questions of Vincent

22   Lake.  That's not because Vincent Lake was a bad witness; it's

23   because I questioned Vincent Lake in the middle of what felt

24   like a three-hour fire alarm, where we were interrupted about

25   80 times.

1          But thinking about Mr. Lake right now actually prompts

2     an interesting question, and it's this:  If we were sitting in

3     here right now and Renwick Haddow returned to us, he came

4     through those doors right now and said in a slightly more

5     convincing way than our friends on the loudspeaker said, The

6     courthouse is on fire, we've got to get out of here, would you

7     believe him?  You might pause.  Renwick Haddow has lied a whole

8     bunch in his life.  He's committed some frauds.

9          But here's the thing, ladies and gentlemen:  What

10    would happen if after that you saw smoke start pouring in

11    through the crack of the door, you heard a man scream, you

12    heard fire engines start coming up the street in the distance?

13    Here's the thing.  That would be, as the reasonable doubt

14    instruction puts it, a matter of genuine and serious importance

15    to your own personal affairs.  Nobody wants to be here when

16    there's a fire.  But, ladies and gentlemen, I submit that you

17    wouldn't hesitate, not just because you believe Renwick Haddow

18    in isolation, but because you appreciate that you're looking at

19    the totality of the evidence, the totality of what you see and

20    hear.

21         And here's the point:  At that point, ladies and

22    gentlemen, you're not going to ignore what your eyes, what your

23    ears, what your nose tell you just because Renwick Haddow is

24    the first person who told it to you, just because he's the

25    person who connected the dots.  You get up and you go.

1          Ladies and gentlemen, why do you believe Renwick

2     Haddow?  You believe Renwick Haddow because what he told you is

3     corroborated by dozens and dozens of emails that make it clear,

4     clear as crystal, that Jim Moore knew what was going on.

5          By the way, I would submit that as much as

6     Mr. Garvin -- and we respect Mr. Garvin; he's doing everything

7     he can for a client in a bad spot.  And to be clear,

8     Mr. Garvin, Mr. Moore, they have no burden; the burden belongs

9     to us until you find that it's been met.  And we embrace that.

10         But, ladies and gentlemen, Mr. Garvin did what he

11    could to gin up a point where Mr. Haddow had been less than

12    truthful on the stand.  And I submit he has come up with

13    nothing, nothing.  There is not a single point of Mr. Haddow's

14    testimony that there is evidence that actually disproves it in

15    any sort of way.

16         (Continued on next page)

17

18

19

20

21

22

23

24

25

1          MR. BELL:  (Continuing) The one I think embarrassing

2     point for Mr. Haddow, the entire nine hours on the stand, was

3     that moment when he couldn't remember his wedding anniversary.

4     And ladies and gentlemen, that doesn't prove he is a liar.  It

5     proves he is a middle aged man.

6          But let's continue.  The second major problem is the

7     e-mails.  And I don't mean to go through all of them right now.

8     I think Mr. Vainberg did more than an adequate job going

9     through the greatest hits of those e-mails.  There are more of

10    them.  The bulk of those e-mails can be found in the zero to

11    100, and 100 to 200 series in the exhibits that you are going

12    to have going back into the jury room with you.  Leaf through

13    them.  Look at the totality of them.  But let's touch on some

14    others anyway.  Here's some excerpts.

15          "I wonder if Renwick would care more about people

16    knowing Bar Works is his and his history in carbon credits and

17    lost investments for huge amount of clients would damage his

18    Bar Works reputation."  This is Government Exhibit 179, it was

19    e-mailed to Jim Moore.  Is there any question?  Is there any

20    question that Jim Moore knew about the history?

21          There is even less of a question because Jim Moore

22    actually e-mailed Haddow a link about his own problems.  The

23    problems with the Financial Conduct Authority, that

24    necessitated the whole Jonathan Black facade in the first

25    place.  Is there really an issue here?  And is there a way to

1    contort yourself through e-mails like this as to suggest any

2    alternate conclusion?  There's not.

3         Here's Jim Moore himself:  "Mate," by the way, at the

4    very beginning of the trial, Mr. Garvin suggested that

5    Mr. Haddow and Mr. Moore weren't friends.  You've seen enough

6    of the e-mails between them where they call each other mate.

7    All the time where they joke, where there are smiley faces,

8    where Mr. Moore is in touch with Renwick Haddow's mom, to know

9    that point is garbage.  But I digress.

10        "Mate," says Jim Moore, "see what you think as to this

11   please.  And if it's okay, let's get it on headed papers a

12   PDF."  This was Government Exhibit 43.  And you know what

13   follows.  An e-mail that Moore has drafted, purportedly from

14   Jonathan Black.  Does he send it to Jonathan Black in order to

15   get that done?  He sends it to Haddow, because he knows that

16   Haddow is Jonathan Black.

17        Is there anything you heard in the defense closing

18   that disrupts the reasonable conclusion, the only reasonable

19   conclusion, that Jim Moore sent that Jonathan Black homework to

20   Renwick Haddow because he knew that Renwick Haddow was Jonathan

21   Black?  Is there any doubt at this point?  There's none.

22        Here's another classic.  "can you please do me another

23   one of these cut and paste letters as below?  Feel free to send

24   back directly to Mr. Honeyman and cc me."  Once again, Jim

25   Moore to Haddow's assistant, enclosing a letter from Jonathan

1    Black that's Government Exhibit 70.  Let me pause for a moment.

2              A JUROR:  I'm sorry.  I'm so sorry.  I have to use the

3    bathroom.

4              THE COURT:  We'll take a break.

5              A JUROR:  Your Honor, do we all have to go?

6              THE COURT:  You don't have to.

7              (Pause)

8              THE COURT:  Okay, Mr. Bell.

9              MR. BELL:  Thank you, your Honor.

10             Before the break, I had started to step away from the

11   e-mails, and to be clear, the e-mails are a reason why -- the

12   reason why, ladies and gentlemen, if you don't want to believe

13   somebody like Renwick Haddow, you don't have to.  You only have

14   to believe your own ability to read.  Because it's all there:

15   Mr. Moore's knowledge, Mr. Moore's active involvement in this

16   conspiracy, it's all there in black and white.

17             But I had stepped away from that for a moment because

18   I saw Mr. Honeyman's name and was reminded of something.

19   Mr. Garvin suggested that you can't believe Mr. Haddow because

20   he "rehearsed" his testimony so many times with the government.

21   That was a term that Mr. Haddow took issue with, and that we do

22   as well.  But he also suggested you can't believe him because

23   his testimony was too good.  That he answered questions before

24   they were done being asked.

25             Ladies and gentlemen, that's because Mr. Haddow is an

1    active listener here, just as you are.  Ladies and gentlemen,

2    you, by the time you had seen a number of e-mails, you, too,

3    were answering questions before they were asked.  I remember

4    the one moment where Mr. Garvin had gotten confused about

5    whether David Kennedy was a person being discussed with respect

6    to UPG.  And one of you jurors, I think it might have been you,

7    No. 10, suggested -- and correctly -- it's not him, it was

8    David Honeyman.  Ladies and gentlemen, we're all jumping in

9    here because what happened was relatively simple.  It's clear

10   in the testimony, it's clear in the documents, and it's clear

11   that Mr. Moore is guilty.

12           But let me jump back in to the e-mails that I was

13   discussing.  Here's another one, it's Government Exhibit 59.

14   Time and time again, this is an e-mail that Jim Moore is on.

15   "It seems there is no wriggle room for something that actually

16   benefits the vendor here.  Basic things that allow people to

17   sell without Renwick being exposed at all."  This isn't the

18   sort of thing where, based on the totality of the evidence that

19   you've seen, Mr. Moore is in a place where he's saying

20   "Exposed?  Well, what do you mean?  What would Mr. Haddow be

21   exposed for?"  You know exactly what the exposure is.  It is

22   the exposure of the alter ego.

23           Then, finally, the classic honeymoon e-mail.  I don't

24   want to call it the most damning e-mail we have, because we've

25   got a whole cartload of damning e-mails that we've gone through

1   a number of times.  This one is sufficiently damning that

2   Mr. Garvin took a slightly different strategy in trying to

3   address it.  He said, well, there was probably a phone call in

4   there in which this other intervening event had happened.  That

5   explains why you don't see any other explanation for this in

6   the e-mail.

7            I want to be clear.  That conversation was made up a

8   half hour ago while Mr. Garvin was talking.  There is no

9   evidence in the record, none, that supports the idea that that

10  call took place, and that that honeymoon exchange thus has any

11  significance, other than the obvious.  That what are you going

12  to say, "he is on his honeymoon" was significant because Haddow

13  had been on his honeymoon at the time, and Haddow was Jonathan

14  Black.

15           And that's an interpretation that's only compounded by

16  what comes just a little bit later in that exchange about the

17  Jonathan issue.  Well, yeah, the Jonathan issue is that he

18  doesn't exist.  About how I can understand why you would be

19  somewhat reticent, yeah, because Renwick Haddow is a known

20  fraudster and you want to keep him away from points of

21  sensitivity as possible.  "But, at the same time," the e-mail

22  goes on, "but I would like it if you could get involved in some

23  way."  Yeah, because Renwick Haddow is the guy who actually

24  calls the shots and knows the answers to things.

25           These were competing impulses that Mr. Moore was

1    dealing with at the time.  But there is nothing about that

2    exchange that suggests anything other than his knowledge that

3    Jonathan Black was Renwick Haddow, including something that's

4    just made up out of whole cloth.  You should disregard that

5    theory entirely.

6              Now, by the way, in that same vein, Mr. Garvin noted

7    that Jason Rivera, who you saw testify yesterday, worked at Bar

8    Works and seemed to be somebody who believed that Jonathan

9    Black was real.  How could it be the case that an employee who

10   is there every day thinks Jonathan Black is real, but Jim

11   Moore, who is for the most part all the way in Great Britain,

12   does not.

13             Ladies and gentlemen, those e-mails I described a

14   moment ago, Jason Rivera isn't on any of them.  Not on the ones

15   that most strongly make it clear that the recipients know, or

16   in Mr. Honeyman's case would eventually know, who Jonathan

17   Black was.  That Jonathan Black and Renwick Haddow were the

18   same person.

19             So, yeah, if you just want to talk about physical

20   proximity, that's fine.  But you are ignoring the fact that all

21   of those e-mails, where they slip up, as Renwick Haddow put it,

22   were e-mails where Mr. Moore was on and Mr. Rivera was not.

23   You should reject that argument.

24             There is a third major problem, of course, for the

25   defendant, and that is common sense.  And it stands to reason,

1    ladies and gentlemen, that there is a principle called Occam's

2    razor in life, that the simplest solution tends to be the

3    accurate one.  It takes effort, it takes contorting to actually

4    tell a story that's not the truth.  The truth here is as it

5    appears to be on those e-mails.

6           And maybe most damning e-mail of them all, by the way,

7    is the one most susceptible to this common sense analysis.  The

8    one where Jim Moore sent out an e-mail in which it is clear in

9    his e-mail system, or at least on his phone, Jonathan Black is

10   the name attached to the e-mail address at RenwickHaddow.com.

11          Ladies and gentlemen, it really doesn't matter how it

12   is that that name got attached to that alias.  If it is the

13   case that this was some sort of brushback pitch, as Mr. Garvin

14   describes, although that seems to be a somewhat farfetched and

15   strained reading, it still meant that at the time that that

16   name was changed, Jim Moore knew that Jonathan Black was

17   Renwick Haddow.

18          I say that it's strange, by the way, because it would

19   be an odd signal to send to somebody in the context of an

20   e-mail to an entirely different person that he just happens to

21   be copied on.  Much more likely is that on one of his devices,

22   at least some point -- and look, if you own an iPhone, syncing

23   is complicated between contacts.  But at some point, Mr. Moore

24   actually had him saved in there,

25   RenwickHaddow@RenwickHaddow.com, as Jonathan Black.

1          But either way, the conclusion is inescapable:  He

2     knew, he knew, he knew.

3          Couple of other things.  There was continued pushback

4     about how on the face of some of these e-mails, Mr. Moore

5     continues to say things like get this to Jonathan, get this to

6     Jonathan.  Mr. Haddow explained the etiquette for you, and it

7     stands to reason than context sometimes explains why people

8     would engage in this sort of misdirection.

9          Go to the right household at Christmastime and you

10    will see parents having whole conversations about how Santa

11    Claus is going to come so that certain audiences can hear.

12    That doesn't mean that mom and dad believe in Santa Claus.

13    What that means is that they are trying to create a show for

14    the right audience.  And in that case, it is whatever kids

15    happen to be nearby.  In this case, it is the possibility that,

16    be it sales agents of a rival sort, or law enforcement, that

17    one day those e-mails could fall into the wrong hands.

18         Now, were they very good at this?  Not really, because

19    you see the slipups.  You see how the truth becomes known.

20         But, ladies and gentlemen, you know very well what

21    those fake efforts at saying, Jonathan, can you get this to

22    Jonathan, actually mean.  Mr. Haddow told you, the e-mails

23    confirm it, and there is no real ambiguity there.

24         Mr. Garvin also drew out the one e-mail that was never

25    supposed to -- or the one letter that was never supposed to be

1    public.  That is the letter that Mr. Haddow wrote as Jonathan

2    Black in order to get his wife at the time, Zoia Haddow, a

3    visa.  Mr. Garvin started to suggest that Mr. Haddow changed

4    his story about that between one day of testimony and the next,

5    but then couldn't actually tell you how, and I don't think that

6    there was an inconsistency there.

7           But in any event, it makes sense that this would be

8    the one occasion where Mr. Haddow, acting as Jonathan Black,

9    actually uses his wife's real name.  Because he's trying to get

10   his wife a real visa, and because it's not something that's

11   going out to investors.  It's something that's going out to a

12   government entity that has to actually punch somebody's real

13   name on a visa in order to give it effect.  This entire theory,

14   ladies and gentlemen, is a misdirection, and not a very

15   compelling one.

16          Ladies and gentlemen, at the end of the day, I'm

17   brought back to the words of two of the great poets really of

18   any day.  William Shakespeare, and the actor Wesley Snipes.

19          William Shakespeare asked What's in a name?  And the

20   answer to Renwick Haddow, to Jim Moore, and to his

21   co-conspirators, was everything.  Everything.

22          There's no question in this case, I don't think it is

23   a matter of any real dispute that Jim Moore appreciated

24   Haddow's history, and what it could possibly mean for their

25   efforts to raise money in Bar Works.  No question about that.

1    There is no question, I submit, given the e-mails that you've

2    seen, the honeymoon e-mail, the e-mail with the name change

3    such that Jonathan Black is attached to Renwick Haddow's e-mail

4    address, there is no question that Moore knew exactly who

5    Haddow was.  And it makes sense because they were in the same

6    boat together, they were in the same venture together, and

7    their chances to make money rose and fall together with this

8    scheme working.

9           You're probably wondering about the second great poet

10   and why I mentioned Wesley Snipes.  Wesley Snipes appeared in a

11   movie called Passenger 57.  It is one of those movies, a

12   lamentably full genre, in which one person has to save a full

13   airplane in danger.  Harrison Ford did it better in Air Force

14   One a few couple years later.  And Wesley Snipes, in a quote I

15   may or may not use at parties now and then, says something to

16   the effect "Always bet on black."

17          The scammers here, including Mr. Moore, bet a

18   significant amount on their ability to make the Jonathan Black

19   lie work.  And for a time, it did.  There is no question, it's

20   not the subject of any dispute, that Bar Works took in north of

21   $38 million as a result.  There is no question that UPG,

22   Mr. Moore's entity, Mr. Moore's sales took in about $7 million

23   of that, and you saw millions of those dollars traced through

24   Mr. Hendelman.  There is no question that Mr. Moore himself

25   profited to the tune of at least $1.6 million.

1          The sad thing about this is that other people bet on

2     black, too.  You heard from Loreley Zavattiero, you heard from

3     Julian White.  You saw the names of all those other people in

4     spreadsheets.  These are people who threw, in individual cases,

5     hundreds of thousands of dollars of their own hard-earned money

6     after a lie.  A lie that allowed these co-conspirators to

7     conceal the fact that the man behind the company that they were

8     investing in was a known fraudster named Renwick Haddow.

9          Renwick Haddow will have his day of reckoning.

10     Renwick Haddow will have his time to account.  He will face a

11     sentencing judge.  But if there is one thing, ladies and

12     gentlemen, you learned from those e-mails, is that he wasn't

13     alone.  He wasn't alone in the knowledge, he wasn't alone in

14     the deception, he wasn't alone in the fraud.

15          That man, ladies and gentlemen, James Moore, was right

16     there with him.  And at one point he made, he and his company

17     UPG, made 65 cents out of every dollar coming out of that

18     fraud.  That's how important his sale agents were to make this

19     work.

20          That's what the truth is, because that's what the

21     evidence tells you.

22          The three problems are still there.  That's what

23     Mr. Haddow tells you, that's what that stack of e-mails that

24     Mr. Garvin tried to interpret creatively told you, and it's

25     what common sense tells you.

1            At the end of the day, ladies and gentlemen, in your

2       hands, the truth seeking operation that is an American jury,

3       those aren't problems.  Those are tools.  Rely on that

4       testimony.  Rely on what those e-mails tell you, not some

5       tortured impossible interpretation of them.  Rely on your

6       common sense.  Hold him accountable.  Find him guilty.

7            THE COURT:  Okay.  So, we've heard a lot today, and

8       let me tell you what's remaining and what our time frame is.

9            So it's about 2:30.  That clock is a little bit fast,

10      but it's about 2:30.  We normally operate until 5 p.m.  If you

11      were deliberating, which you will be, and you needed some more

12      time, you could ask and we could go until later tonight if you

13      wanted to do that.  If you were not finished and if you were

14      not at a verdict and you still needed more time, we could also

15      put it over until Monday.  I understand.  I understand what

16      people want to do, but I don't want anybody to rush.  It is an

17      important matter, so I want to be deliberate.

18           So, I am going to take a 15-minute break now.  We're

19      going in that time collect the evidence and the exhibits that

20      are going back to you in the jury room.  In 15 minutes, I will

21      read you my instructions.  That takes a while.  It takes

22      probably the better part of an hour.  Could be less, I'll try

23      and make it less.  And then, on that schedule, you would be in

24      the jury room with the exhibits somewhere around 4, 4:15.

25           So, I think you have plenty of time.  So you should,

1    as I say, relax, use the restroom if you need to.  And then

2    we'll reconvene at quarter to 3.  And I just want you to bear

3    in mind I think you've got plenty of time.  So I'll see you

4    then.

5              (Recess)

6              (Jury present)

7              THE COURT:  Jurors, you have now heard all of the

8    evidence in the case, as well as the final arguments from the

9    attorneys.  My duty at this point is to instruct you as to the

10   law, and it's your duty to accept these instructions of law and

11   apply them to the facts as you determine them, just as it has

12   been my duty to preside over the trial, and decide what

13   testimony and evidence is relevant under the law for your

14   consideration.

15             On these legal matters, you must take the law as I

16   give it to you.  If any attorney has stated a legal principle

17   different from any that I might state in my instructions, it is

18   my instructions that you must follow.  You should not single

19   out any instruction as alone stating the law, but you should

20   consider the instructions as a whole when you retire to

21   deliberate in the jury room.

22             You will receive a copy of these instructions

23   verbatim, along with the verdict sheet to be filled out by the

24   jury.  You can take that into the jury room with you.

25             Your decision, your verdict, must be unanimous.  You

should not, any of you, be concerned about the wisdom of any

rule that I state, regardless of any opinion that you may have

as to what the law may be or ought to be.  It would violate

your sworn duty to base a verdict upon any view of the law,

other than the one I give you.

Your role, as I said earlier, is to consider and

decide the fact issues in this case.  You, the members of the

jury, are the sole and exclusive determiners of the facts.  You

pass upon the evidence, you determine the credibility or

believability of the witnesses, you resolve whatever conflicts

may exist in the testimony, and you draw whatever reasonable

inferences and conclusions you decide to draw from the facts as

you have determined them, and you also determine the weight of

the evidence.

In determining the facts, you must rely upon your own

independent recollection of the evidence.  In this regard, you

may refer to your notes, if any, that you may have taken during

the trial, but it's your independent recollection that still

control.  Your notes, as I said to you earlier on, are not

evidence.  What the lawyers have said in their opening

statements, in their closing arguments, in their objections or

in their questions is not evidence, and nor is anything I may

have said during the trial or may say during these instructions

about a fact issue to be taken instead of your own independent

recollections.  What I say is not evidence.  In this

1    connection, remember that a question alone put to a witness is

2    never evidence.  The answer is the evidence.  You may not,

3    however, consider any answer where an objection was sustained,

4    and I may have directed you to disregard, or where I directed

5    that the answer be stricken from the record.

6         If there is any difference or contradiction between

7    what any lawyer has said in their arguments to you, and what

8    you decide the evidence showed, or between anything I may have

9    said and what you decide the evidence showed, it is your view

10   of the evidence, not the lawyers and not mine, that governs.

11        I also asked you to draw no inference from the fact

12   that, upon occasion, I may have asked questions of certain

13   witnesses or attorneys.  These questions were intended only to

14   clarify things or to move things along, and certainly were not

15   intended to suggest any opinions on my part as to the verdict

16   you should render or whether any of the witnesses may have been

17   more credible than any of the other witnesses.

18        It's important that you understand that I wish to

19   convey no opinion as to the verdict you should render in this

20   case.  And that if you nevertheless did believe I was conveying

21   an opinion, you would not in any way be obligated to follow it.

22        In determining the facts, you must weigh and consider

23   the evidence without regard to sympathy, prejudice, or passion

24   for or against any party, and without regard to what the

25   reaction of the parties or the public to your verdict might be.

1    I will later discuss with you how to pass upon the credibility

2    of witnesses.

3            The evidence from which you are to decide what the

4    facts are consists of three things:

5            (1) the sworn testimony of witnesses on both direct

6    and cross-examination, regardless of who called the witness;

7            (2) the documents and exhibits that were received in

8    evidence; and

9            (3) any facts or testimony as to which the lawyers

10   have agreed or stipulated.

11           Nothing else is evidence.

12           You should draw no inference or conclusion for or

13   against any party by reason of lawyers making objections or my

14   rulings on such objections.  Counsel have not only the right,

15   but the duty, to make legal objections when they think that

16   such objections are appropriate.  You should not be swayed for

17   or against either side, simply because counsel for any party

18   has chosen to make an objection.  Nor should you be swayed by

19   any ruling that I made on any objection.  Whether or not I may

20   have sustained more objections for one side or the other has no

21   bearing on your function, which is to consider all of the

22   evidence that was admitted.

23           Further, do not concern yourself with what was said at

24   sidebar conferences or during my discussions with counsel.  Nor

25   does it make any difference whether any lawyer or whether I

1   asked for a sidebar conference.  Those discussions related to

2   rulings of law and not to matters of fact.

3         At times I may have admonished a lawyer or a witness

4   or directed a witness to be responsive to questions or to keep

5   his or her voice up.  At times I may have questioned a witness

6   myself or made comments to a lawyer.  Any questions that I

7   asked or instructions or comments that I gave were intended

8   only to move things along or to clarify the presentation of

9   evidence and to bring out something which I thought may have

10  been unclear.

11        You should draw no inferences or conclusion of any

12  kind, favorable or unfavorable, with respect to any witness or

13  any party in the case by reason of any comment, question, or

14  instruction of mine.  Nor should you infer that I have any

15  views as to the credibility of any witness, as to the weight of

16  the evidence, or as to how you should decide any issue that is

17  before you, the jury.  That is entirely your role.

18        If an objection is sustained, you must not speculate

19  as to what might have been said had the evidence been allowed.

20  Nor may you consider in evidence any statement where an

21  objection was made and sustained, even though you may have

22  heard it before the objection and the ruling.

23        The defendant has pled not guilty in this case and to

24  the charges in the indictment.  As a result of his plea of not

25  guilty, the burden is on the prosecution, which is to say, the

J673MOO4                         Jury charge

government, to prove the defendant's guilt beyond a reasonable

doubt.  This burden never shifts to the defendant for the

simple reason that the law never imposes upon a defendant in a

criminal case the burden or duty of testifying himself, or

calling any witness, or of locating or producing any evidence.

          The law presumes the defendant to be innocent of all

the charges against him.  I therefore instruct you that the

defendant is to be presumed by you to be innocent when the

trial began, and at this very moment, and throughout your

deliberations, and until such time, if it comes, that you as a

jury are unanimously satisfied that the government has proved

him guilty beyond a reasonable doubt.

          (Continued on next page)

1          THE COURT:  The presumption of innocence alone is

2      sufficient to acquit the defendant, unless you as jurors are

3      unanimously convinced beyond a reasonable doubt of his guilt

4      after a careful and impartial consideration of all of the

5      evidence in this case.  If the government fails to sustain its

6      burden with respect to any element of a particular count, you

7      must find the defendant not guilty on that particular count.

8          We talked earlier about reasonable doubt.  And I

9      explained at that time that the burden is always upon the

10     government to prove guilt beyond a reasonable doubt.  This

11     burden, as I've said, never shifts to a defendant, for the law

12     never imposes upon a defendant in a criminal case the burden or

13     duty of testifying or calling any witnesses or producing any

14     evidence.  A defendant is not even obligated to produce

15     evidence by cross-examining its witnesses for the government.

16         It is not required that the government prove guilt

17     beyond all possible doubt; the test is one of reasonable doubt.

18     A reasonable doubt is a doubt based upon reason and common

19     sense, the kind of doubt that you would make a reasonable

20     person hesitate -- excuse me.  A kind of doubt that would make

21     a reasonable person hesitate to act.  Proof beyond a reasonable

22     doubt must, therefore, be proof of such a convincing character

23     that a reasonable person would not hesitate to rely and act

24     upon it in the most important of his or her own affairs.

25     Unless the government proves beyond a reasonable doubt that the

1    defendant has committed each and every element of an offense

2    charged in the indictment, you must find the defendant not

3    guilty of that offense.

4          If the jury views the evidence as a whole in the case

5    as reasonably permitting either of two conclusions, one of

6    innocence, the other of guilt, then the jury must, of course,

7    adopt the conclusion of innocence.  The absence of evidence in

8    a criminal case is a valid basis for reasonable doubt.

9          As previously explained to you, we talked briefly

10   about credibility of evidence.  You have now have had the

11   opportunity to observe all of the witnesses, and it's now your

12   job to decide how believable each witness was in his or her

13   testimony.  You are the sole determiners of the credibility of

14   each witness and of the importance of witness testimony.

15         So how do you determine where the truth lies?  You

16   should use all the tests for truthfulness that you would use in

17   determining matters of importance to you in your everyday

18   lives.  You should consider any bias or hostility that a

19   witness may have shown for or against any party, as well as any

20   interest the witness has in the outcome of the case.  It's your

21   duty to consider whether the witness has permitted any such

22   bias or interest to color his or her testimony.

23         You should consider the opportunity the witness had to

24   see, hear, and know the things about which they testified, the

25   accuracy of their memory, their candor or lack of candor, their

J67VMOO5                         Charge

intelligence, the reasonableness and probability of their

testimony, and its consistency or lack of consistency, and its

corroboration or lack of corroboration with other believable

testimony.

You watched the witnesses testify.  Everything a

witness said or did on the witness stand counts in your

determination.  How did the witness appear?  What was the

witness's demeanor while testifying?  Often it's not what

people say, but how they say it that moves us.

In deciding whether to believe a witness, keep in mind

that people sometimes forget things.  You need to consider,

therefore, whether in such a situation the witness's testimony

reflects an innocent lapse of memory or an intentional

falsehood.  That may depend on whether it has to do with an

important fact or with only a small detail.

If you find that any witness has willfully testified

falsely as to any material fact, that is, as to an important

matter, the law permits you to disregard completely the entire

testimony of that witness upon the principle that one who

testifies falsely about one material fact is likely to testify

falsely about everything.

You are not required, however, to consider such a

witness as totally unworthy of belief.  You may accept so much

of the witness's testimony as you deem true and disregard what

you feel is false.  As the sole judges of the facts, you must

decide which of the witnesses you will believe, what portion of their testimony you accept, and what weight you will give to it.

There are two kinds of evidence; one is called direct evidence and the other is circumstantial evidence.

Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally experienced through his or her own senses, something seen, felt, touched, heard, or tasted.  Direct evidence also may be in the form of an exhibit where the fact to be proven is its present existence or condition.

Circumstantial evidence is evidence which tends to prove a disputed fact by proof of other facts.  And there's a simple example of circumstantial evidence which we use in jury instructions, which is follows:

Assume that when you came into the courthouse this morning the sun was shining and it was a nice day.  And assume that the courtroom blinds were drawn, as they appear to be, and you could, therefore, not look outside.  And as you were sitting here, assume further that someone walked into the courtroom with an umbrella that was dripping wet, and then a few minutes later another person came in with a wet umbrella.

Now, on the facts I asked you to assume, you can't look outside the courtroom because the blinds are drawn, and you cannot see for yourself whether or not it's raining, so you

1    have no direct evidence of that fact.  But on the combination

2    of facts which I have asked you to assume, it would be

3    reasonable for you to conclude that it had been raining.  That

4    is all there is to circumstantial evidence.  You infer on the

5    basis of reason and experience and common sense from one

6    established fact the existence or nonexistence of some other

7    fact.

8             Circumstantial evidence is of no less value than

9    direct evidence.  The law makes no distinction between direct

10   evidence and circumstantial evidence, but it simply requires

11   that your verdict must be based on all the evidence presented.

12            The defendant in this case, James Moore, has been

13   formally charged in an indictment.  The indictment contains two

14   counts or two charges.  I will at times refer to each count by

15   the number assigned to it in the indictment.  You should know

16   that there is no significance to the order of these numbers or

17   the specific number of counts charged.  And indeed my

18   instructions will follow a different order than the order in

19   which the various counts appear in the indictment.

20            In your deliberations and in reaching your verdict,

21   you must consider each count separately.  There are two counts,

22   as you've heard in this case.

23            The indictment in this case is not evidence; it merely

24   describes the charges made against the defendant.  It's a set

25   of accusations.  It may not be considered by you as evidence of

1    guilt of the defendant.  Only the evidence or lack of evidence

2    decides that issue.

3         Incidentally, a copy of the indictment will be

4    furnished to you when you begin your deliberations.

5         Count One of the indictment charges that from at least

6    in or about 2015, through at least in or about 2016, the

7    defendant conspired with others to commit wire fraud by

8    soliciting funds for investments in a company called Bar Works,

9    Inc. and related entities; and that he did so through material

10   misrepresentations, which scheme involved the use of wires.

11        Count Two of the indictment charges the defendant with

12   wire fraud itself, which is sometimes called a substantive

13   count.  So conspiracy is in one count and the substantive count

14   is in the other count.

15        In a moment, I will instruct you on each of these

16   charges or counts in more detail.  At the outset, however, let

17   me instruct you that you must consider each individual charge

18   or count separately and evaluate each one on the proof or lack

19   of proof that relates to that charge or that count.

20        As I've just described to you, the indictment contains

21   both a conspiracy count and what is referred to as a

22   substantive count.  Unlike the conspiracy charge, which alleges

23   an agreement to commit a certain offense, the substantive count

24   is based on the actual commission of an offense or aiding

25   others to actually commit that offense.  A conspiracy to commit

1   a crime is an entirely separate and different offense from the

2   substantive crime which may be the object of the conspiracy.

3           The essence of the crime of conspiracy is an agreement

4   or understanding to violate other laws; thus, if a conspiracy

5   exists, even if it fails, it is still punishable as a crime.

6   Consequently, in a conspiracy charge, there is no need to prove

7   that the crime that was the objective of the conspiracy was

8   actually committed.

9           By contrast, the substantive count requires proof that

10  the crime charged was actually committed, but does not require

11  proof of an agreement.  Of course, if a defendant both

12  participates in a conspiracy to commit a crime and then

13  actually commits the crime, that defendant may be guilty of

14  both conspiracy and the substantive crime, as I will instruct

15  you shortly.

16          So let's turn in this instance to the substantive

17  charge in the indictment.  It's more convenient for me to do it

18  this way.  And I think that will become obvious, namely, to

19  start with the substantive count and then to the conspiracy.

20          Count Two charges Mr. Moore in this case with the

21  substantive count of the crime of wire fraud.

22          Specifically, Count Two charges that from at least in

23  or about 2015, through at least in or about 2016, Mr. Moore

24  participated in a scheme to defraud investors by soliciting

25  funds for investment in a company called Bar Works, Inc. and

1    related entities through material misrepresentations in a

2    scheme that involved the use of interstate wires.

3              For this count, the government must prove the

4    following three elements:

5              First, that on or about the dates alleged in the

6    indictment there was a scheme or artifice to defraud or to

7    obtain money or property by materially false or fraudulent

8    pretenses, representations, or promises.

9              Second, Mr. Moore is alleged to have knowingly and

10   willfully devised or participated in the scheme or artifice to

11   defraud, with knowledge of its fraudulent nature and with the

12   specific intent to defraud.  That's the second element of wire

13   fraud.

14             And third is the execution of the scheme that

15   Mr. Moore is alleged to have used or caused to be used via

16   interstate or foreign wires.

17             So let me go over that again quickly, and then in more

18   detail, each of those elements.

19             So I said with respect to Count Two, which is wire

20   fraud, there are three elements:

21             First, the time frame, the dates alleged in the

22   indictment.  During that time frame, there was some scheme or

23   artifice to defraud or obtain money or property by materially

24   false or fraudulent misrepresentations; second, it includes the

25   element of knowingly or willfully devising or participating in

1   that scheme or artifice to defraud; and third, it requires the

2   use of interstate or foreign wires.

3          So here are those three elements in more detail:

4          The first element the government has to prove beyond a

5   reasonable doubt as to wire fraud is that there was either a

6   scheme or artifice to defraud or to obtain money or property by

7   means of false or fraudulent pretenses, representations, or

8   promises.  The government must prove the existence of either

9   type of scheme; it need not prove both to satisfy the first

10  element of the wire fraud statute.  A scheme or artifice is

11  simply a plan, device, or course of conduct to accomplish an

12  objective.

13         "Fraud" is a general term.  It includes all the

14  possible means by which a person seeks to gain some unfair

15  advantage over another person by false representations, false

16  suggestions, false pretenses, or concealment of the truth.

17  And, thus, a scheme to defraud is a plan to deprive another

18  person or entity of money or property by trick, deceit,

19  deception, or swindle.  The scheme to defraud is alleged to

20  have been carried out by making false or fraudulent statements,

21  representations, claims, and documents.

22         A statement, representation, claim, or document is

23  false if it is untrue when made and was then known to be untrue

24  by the person making it or causing it to be made.  A

25  representation or statement is fraudulent if it was falsely

1   made with the intention to deceive.  A statement may also be

2   fraudulent if it contains half-truths or if it conceals

3   material facts in a manner that makes what is said or

4   represented deliberately misleading.  The deception need not be

5   premised upon spoken or written words alone.  The arrangement

6   of the words or the circumstances in which they are used may

7   convey the false and deceptive appearance.

8          These false representations and pretenses must be

9   related to a material fact or matter.  We use the word

10  "material" to distinguish between the kinds of statements we

11  care about and those that are of no real importance.

12         A material fact is one that would have been

13  significant to a reasonable person and a prudent person in

14  relying on the representation or statement or failure to

15  disclose in making a decision.  That means if you find the

16  particular statement of fact to have been untruthful before you

17  can find that the statement or omission to be material, you

18  must also find that the statement or omission was one that

19  would have mattered to a reasonable person in making such a

20  decision.

21         In particular, you must find that the statement or

22  omission was one that would have mattered to a reasonable

23  person in a pecuniary or monetary way.  Actual reliance by the

24  person on the representation is not required; it is sufficient

25  if the misrepresentation is one that is capable of influencing

1    the person's decision and is intended by the defendant to do

2    so.

3            In addition to proving that a pretense,

4    representation, promise, or statement was false or fraudulent

5    and related to a material fact, in order to satisfy this first

6    element of wire fraud, the government must prove that the

7    alleged scheme contemplated depriving another of money or

8    property.  The government is not required to prove that the

9    scheme or artifice to defraud actually succeeded; that is, the

10   government is not required to prove that the defendant realized

11   any gain from the scheme or that the intended victim suffered

12   any loss or harm as a consequence of the fraudulent scheme.

13           So we're still in the first element of wire fraud.

14   And I am saying that you must find that the statement or

15   omission was one that would have mattered to a reasonable

16   person in a pecuniary or monetary way.  And I'm repeating

17   somewhat.  Actual reliance by the person on the representation

18   is not required; it is sufficient if the misrepresentation is

19   one that is capable of influencing the person's decision and is

20   intended by the defendant to do so.

21           In addition to proving that a pretense,

22   representation, promise, or statement was false or fraudulent

23   and related to a material fact, in order to satisfy this first

24   element, the government must prove that the alleged scheme

25   contemplated depriving another of money or property.  The

1    government is not required to prove that the scheme or artifice

2    to defraud actually succeeded; that is, the government is not

3    required to prove that the defendant realized any gain from the

4    scheme or that the intended victim suffered any loss or harm as

5    a consequence of the fraudulent scheme.  The question for you

6    to decide -- you, the jurors -- is whether there was such a

7    scheme, not on the consequences of the scheme.  Whether or not

8    the scheme actually succeeded is not a question you may

9    consider in determining whether such a scheme existed.

10          So that's the first element.  Remember I said there

11   were three.  Here's the second element of wire fraud:

12          The government must prove, second, that the defendant

13   devised or participated in the fraudulent scheme knowingly,

14   willfully, and with the specific intent to defraud.  The words

15   "devised" and "participated" are words that you are familiar

16   with and, therefore, I do not need to spend much time defining

17   those words for you.

18          To devise a scheme to defraud is to concoct or plan

19   it.  To participate in a scheme to defraud means to associate

20   oneself with it, with the scheme, with a view and intent toward

21   making it succeed.  While a mere onlooker is not a participate

22   in a scheme to defraud, it is not necessary that the

23   participant be someone who personally and visibly executes the

24   scheme to defraud.

25          To act knowingly, which is what we are talking about

1    in the second element, means to act voluntarily and

2    deliberately, rather than mistakenly or inadvertently.  To

3    prove that the defendant acted with specific intent to defraud,

4    the government must prove that he acted with the intent to

5    deprive investors of something of value, here, the funds to be

6    invested in a company called Bar Works and its related

7    entities.

8           In order to satisfy this second element, it is not

9    necessary for the government to establish that the defendant

10   originated the scheme to defraud; it is sufficient if you find

11   that the scheme to defraud existed, even if it was originated

12   by another person; and that the defendant, while aware of the

13   scheme's existence, knowingly participated in it.  It is also

14   not required that the defendant participate in or have

15   knowledge of all of the operations of the scheme.  The guilt of

16   the defendant is not governed by the extent of his

17   participation.

18          It's also not necessary that the defendant have

19   participated in the alleged scheme from the beginning.  A

20   person who comes in at a later point with knowledge of the

21   scheme's general operation, although not necessarily all of its

22   details, and intentionally acts in a way to further the

23   unlawful goals, becomes a member of the scheme and is legally

24   responsible in all that may have been done in the past in

25   furtherance of the criminal objective and all that is done

1    thereafter.  Even if a defendant participated in the scheme to

2    a lesser degree than others, he is nevertheless equally guilty,

3    so long as that defendant became a member of the scheme to

4    defraud with knowledge of its general scope and purpose.

5            Before the defendant may be convicted of the fraud

6    charged here, he must also be shown to have acted knowingly and

7    willfully and also with a specific intent to defraud.

8    "Knowingly" means to act voluntarily and deliberately, rather

9    than mistakenly or inadvertently.  In other words, the

10   defendant's acts must have been the product of his conscious

11   objective rather than the product of a mistake or accident or

12   mere negligence or some other innocent reason.  "Willfully"

13   means to act voluntarily and with a wrongful purpose.

14           A defendant acted with the intent to defraud if he

15   engaged in or participated in the fraudulent scheme with some

16   realization of its fraudulent or deceptive character, and with

17   an intention to be involved in the scheme to defraud, and to

18   help it succeed with the purpose of causing harm to a victim.

19   The government need not prove that the intended victims were

20   actually harmed, only that such harm was contemplated.

21           A person is presumed to intend the natural and

22   probable consequences of his or her actions.  So when the

23   necessary result of the person's scheme is to injure others,

24   fraudulent intent may be inferred from the scheme itself.

25   Direct proof of knowledge and fraudulent intent is not

required.

The ultimate facts of knowledge and criminal intent, though subjective, may be established by circumstantial evidence based upon a person's outward manifestations, his or her words, conduct, acts, and all the surrounding circumstances disclosed by the evidence and the rational or logical inferences that may be drawn from them.  Circumstantial evidence, as I mentioned before, if believed by the jury, is of no less value than direct evidence.  In either case, the essential elements of the crime must be established beyond a reasonable doubt.

As a practical matter then, in order to sustain the charges against the defendant, the government must establish beyond a reasonable doubt that he knew that his conduct as a participant in the scheme was calculated to defraud and, nonetheless, he associated himself with the alleged fraudulent scheme for the purpose of causing some loss to another.

That was the second element of wire fraud.  Remember, I said there are three.  Here's the third:

The third and final element of wire fraud is that the government must establish beyond a reasonable doubt the use of an interstate or international wire communication in furtherance of the scheme to defraud.  Wire communications include telephone calls, emails, and text messages.  The wire communication must pass between two or more states as, for

1    example, a telephone call or email between New York and New

2    Jersey.  The use of the wires need not itself be a fraudulent

3    representation; it must, however, further or assist in the

4    carrying out of the scheme to defraud.

5              It's not necessary for the defendant to be directly or

6    personally involved in the wire communication, so long as the

7    communication was reasonably foreseeable in the execution of

8    the alleged scheme to defraud in which that defendant is

9    accused of participating.

10             In this regard, it is sufficient to establish this

11   third element of the crime of wire fraud if the evidence

12   justifies a finding that the defendant caused the wires to be

13   used by others.  This does not mean that the defendant must

14   specifically have authorized others to, for example, make a

15   call or send an email.  When one does an act with knowledge

16   that the use of the wires will follow in the ordinary course of

17   business, or where such use of the wires can reasonably be

18   foreseen, even though not actually intended, then he causes the

19   wires to be used.

20             So those are the three elements of wire fraud.

21             Before we get to the conspiracy, which is in Count One

22   of the indictment, the conspiracy to commit wire fraud, there's

23   one other concept I want you to understand, and that's called

24   aiding and abetting.  You'll see when you get the instructions

25   in the jury room, it starts on page 21.

1          So in addition to charging the defendant with the

2     substantive count of wire fraud, the substantive count I have

3     just instructed you on also charges Mr. Moore with what is

4     called aiding and abetting.

5          For example, if the government proves beyond a

6     reasonable doubt that Mr. Moore committed the wire fraud

7     alleged in Count Two, then you need not consider aiding and

8     abetting with respect to that count.  If, however, you find

9     that the government did not prove beyond a reasonable doubt

10    that the defendant engaged in wire fraud, you should consider

11    whether the government has nonetheless proved beyond a

12    reasonable doubt that the defendant aided and abetted someone

13    else in the commission of wire fraud as alleged in that count.

14         Under the federal aiding and abetting statute, whoever

15    quote aids, abets, counsels, commands, induces, or procures the

16    commission of an offense is punishable as a principal.  A

17    person who aids and abets another to commit a substantive crime

18    is just as guilty of that crime as if he or she had personally

19    committed it.  You may thus find Mr. Moore guilty if you find

20    beyond a reasonable doubt that the government has proven that

21    someone else committed the substantive offense -- wire fraud is

22    what we're talking about -- and that Mr. Moore willfully and

23    knowingly associated himself in some way with the crime, and

24    willfully and knowingly sought by some act to help the crime

25    succeed.  Participation in a crime is willful if action is

1    taken voluntarily and intentionally.

2            So the first requirement of aiding and abetting

3    liability is that somebody else has committed the crime at

4    issue.  The defendant cannot be convicted of aiding and

5    abetting if nobody committed the underlying crime.  But if you

6    do find that the underlying crime at issue -- wire fraud in

7    this case -- was committed by someone other than the defendant,

8    you should consider whether the defendant aided or abetted the

9    person who actually committed the wire fraud.

10           The mere presence of the defendant in a place where a

11   crime is being committed, even coupled with knowledge that a

12   crime is being committed, is not enough to make him or her an

13   aider or abettor.  A defendant's acquiescence in the criminal

14   conduct of others, even with guilty knowledge, is not enough to

15   establish aiding and abetting.  An aider and abettor must have

16   his own affirmative interest in the criminal venture.

17           To determine whether the defendant aided and abetted

18   the commission of the crime, ask yourself these questions:  Did

19   someone other than the defendant commit the crime at issue?  If

20   no, please go on to the next count.  There is no aiding and

21   abetting.  But if the answer is yes, ask yourself:  Did the

22   defendant participate in the crime charged as something that he

23   wished to bring about?  Ask yourself:  Did he associate himself

24   with the criminal venture knowingly and willfully?  And ask

25   yourself:  Did he seek by his actions to make their criminal

1    venture succeed?  If so, the defendant is an aider and abettor

2    and, therefore, he is guilty of the offense under consideration

3    which we are talking about here as wire fraud.  If not, then he

4    is not an aider and abettor and he is not guilty of that

5    offense.

6           So now we come to the conspiracy count.  It's actually

7    Count One in the indictment.  We're dealing with it second here

8    because I think it's easier to understand the difference

9    between the conspiracy count and the wire fraud substantive

10   count.

11          So conspiracy to commit wire fraud.

12          I've already explained to you that a conspiracy to

13   commit is a crime entirely separate and different from the

14   substantive crime which may be the object of the conspiracy.

15          Now I've discussed the substantive count charged in

16   the indictment, that is the wire fraud count, and I will now

17   discuss the elements of the wire fraud conspiracy also charged

18   in the indictment.

19          Count One charges Mr. Moore with conspiracy to commit

20   wire fraud.  In order to sustain its burden of proof on this

21   charge, the government must prove beyond a reasonable doubt the

22   following elements:

23          First, that the charged conspiracy existed; and

24   second, that the defendant intentionally joined and

25   participated in the conspiracy during the applicable time

1    period.

2              Let's talk about the first element first.

3              The first element is the conspiracy -- is the

4    existence of a conspiracy.  A conspiracy is an agreement or an

5    understanding by two or more persons to accomplish one or more

6    unlawful objectives by working together.  In order for the

7    government to satisfy this element, you need not find that the

8    alleged members of the conspiracy met together and entered into

9    any express or formal agreement.  Similarly, you need not find

10   that the alleged conspirators stated in words or in writing

11   what the scheme was, its objective or purpose, or every precise

12   detail of the scheme with the means by which its object or

13   purpose was to be accomplished.

14             What the government must prove is that there was a

15   mutual understanding, either spoken or unspoken, between two or

16   more people to cooperate with each other to accomplish the

17   unlawful objective alleged, which, for the purpose of this

18   count, the unlawful objective, is wire fraud.  So the objective

19   of the conspiracy is wire fraud.

20             You may, of course, find that the existence of an

21   agreement to commit wire fraud has been established by direct

22   proof.  However, since conspiracy is, by its very nature,

23   characterized by secrecy, you may also infer its existence from

24   the circumstances of this case and the conduct of the parties

25   involved.  In a very real sense then, in the context of the

1    conspiracy charge, actions often speak louder than words.  In

2    this regard, you may, in determining whether an agreement

3    existed here, consider the actions and statements of all of

4    those who you found or find to be participants as proof that a

5    common design existed on the part of the persons involved in

6    the conspiracy to act together to accomplish an unlawful

7    purpose.

8          You will recall that I have admitted into evidence the

9    acts and statements of others.  The reason for allowing this

10   evidence to be received against the defendant has to do with

11   the nature of the crime of conspiracy.  A conspiracy is often

12   referred to as a partnership in crime.  Thus, as in other types

13   of partnerships, when people enter into a conspiracy to

14   accomplish an unlawful end, each and every member becomes an

15   agent for the other conspirators in carrying out the

16   conspiracy.

17         Accordingly, the reasonably foreseeable acts,

18   declarations, statements, and omissions of any member of the

19   conspiracy and in furtherance of the common purpose of the

20   conspiracy are deemed under the law to be acts of all members,

21   and all of the members are responsible for such acts,

22   declarations, statements, and omissions.  If you find beyond a

23   reasonable doubt that the defendant was a member of the

24   conspiracy charged in the indictment, then any acts done or

25   statements made in furtherance of the conspiracy by persons

 1   also found by you to have been members of that conspiracy may

 2   be considered against the defendant.  This is so even if such

 3   acts were done and statements made in the defendant's absence

 4   or without his knowledge.

 5        So I said there were two elements to conspiracy.  Here

 6   is the second element:

 7        If you find that the government has proven beyond a

 8   reasonable doubt that the conspiracy charged existed, then you

 9   must consider the second element.  The second element is that

10   the government must prove beyond a reasonable doubt in order to

11   establish the offense of conspiracy that Mr. Moore knowingly

12   and voluntarily became a member of the alleged conspiracy.

13   I've already instructed you on the definition of "knowingly,"

14   and you should apply that definition here too.

15        In deciding whether the defendant was, in fact, a

16   member of the conspiracy, you should consider whether the

17   defendant knowingly joined the conspiracy.  Did he participate

18   in it with knowledge of its unlawful purpose and with the

19   specific intention of furthering its objective?

20        It is important for you to note that Mr. Moore's

21   participation in the conspiracy must be established by

22   independent evidence of his own acts or statements may be --

23   must be -- as well as those of the other alleged

24   co-conspirators and the reasonable inferences that may be drawn

25   from them.

1          Let me say that again.

2          It is important for you to note that Mr. Moore's

3   participation in the conspiracy must be established by

4   independent evidence of his own acts or statements, as well as

5   those of other alleged co-conspirators and the reasonable

6   inferences that may be drawn from them.

7          A defendant's knowledge is a matter of inference from

8   the facts proved.  In that connection, I instruct you that to

9   become a member of the conspiracy, the defendant need not have

10  known the identities of each and every other member, nor need

11  he have been apprised of all of their activities.  Moreover,

12  the defendant need not have been fully informed as to all of

13  the details and scope of the conspiracy in order to justify an

14  inference of knowledge on his part.  Furthermore, the defendant

15  need not have joined in all of the conspiracy's unlawful

16  objectives.

17         The extent of a defendant's participation has no

18  bearing on the issue of guilt.  A conspirator's liability is

19  not measured by the extent or duration of his or her

20  participation.  Indeed, each member may perform separate and

21  distinct acts and may perform them at different times.  Some

22  conspirators play major roles, while others play minor roles in

23  the scheme.  An equal role is not what the law requires.  In

24  fact, even a single act may be sufficient to draw a defendant

25  within the ambit of the conspiracy.

1          I want to caution you, however, that a defendant's

2     mere presence at the scene of the alleged crime does not by

3     itself make him or her a member of the conspiracy.  Similarly,

4     mere association with one or more members of the conspiracy

5     does not automatically make that defendant a member.  A person

6     may know or be friendly with the criminal without being a

7     criminal himself.  Mere similarity of conduct or the fact that

8     they may have assembled together and discussed common aims and

9     interests does not necessarily establish membership in the

10    conspiracy.

11         I also want to caution you that mere knowledge or

12    acquiescence without participation in the unlawful plan is not

13    sufficient.  Moreover, the fact that the acts of a defendant,

14    without knowledge, merely happen to further the purposes or

15    objectives of the conspiracy does not make the defendant a

16    member.  More is required under the law.

17         What is necessary is that the defendant must have

18    participated with knowledge of at least some of the purposes or

19    objectives of the conspiracy and with the intention of aiding

20    in the accomplishment of those unlawful ends.  The government

21    is not required to prove that the members of the alleged

22    conspiracy were successful in achieving any or all of the

23    objects of the conspiracy.

24         Count One, which we are now talking about, even though

25    second, is the conspiracy count.  Let me spend a couple of

1    minutes on the object of the conspiracy.

2              The wire fraud scheme that is alleged to be an object

3    of the conspiracy which is charged in Count One, is the use of

4    the interstate or international wires, for example, through

5    phone calls, email communications, or text messages, in

6    furtherance of a scheme to defraud investors with respect to

7    Bar Works.  I explained the elements of this object earlier

8    when I talked about it in the context of the substantive

9    offense that is charged in the indictment, which is the reason

10   I did the substantive count before I did the conspiracy count.

11             Specifically, I explained earlier what it means to

12   knowingly employ a device, scheme, or artifice to defraud.  And

13   those earlier explanations apply here too in the conspiracy

14   count.

15             Again, it's not necessary for you to find that the

16   agreement was ever expressed orally or in writing, but the

17   government does have to prove that there was a mutual

18   understanding between at least two people.

19             The next instruction has to do with a concept in law

20   which is called conscious avoidance, and it appears starting on

21   page 28.

22             As I've explained, all the counts charged require the

23   government to prove that Mr. Moore acted knowingly; both counts

24   require that.

25             In determining whether the defendant acted knowingly,

1    you may consider whether the defendant deliberately closed his

2    eyes to what otherwise would have been obvious.  I would like

3    to point out that the necessary knowledge on the part of the

4    defendant with respect to any particular charge cannot be

5    established by showing that the defendant was careless,

6    negligent, or foolish; however, one may not willfully and

7    intentionally remain ignorant of a fact which is material and

8    important to his conduct in order to escape the consequences of

9    criminal law.

10          Thus, if you find beyond a reasonable doubt that the

11   defendant was aware that there was a high probability a crime

12   was being committed, but that the defendant acted with

13   deliberate disregard of the facts, you may find the defendant

14   acted knowingly; in other words, a defendant cannot avoid

15   criminal responsibility for his own conduct by deliberately

16   closing his eyes or remaining purposefully ignorant of facts

17   which would confirm to him that he was engaged in unlawful

18   conduct.

19          On the other hand, good faith is a complete defense to

20   the charges in this case.  If the defendant believed in good

21   faith that he was acting properly, even if he was mistaken in

22   that belief, and even if someone was injured as a result of his

23   conduct, there would be no crime.

24          In considering whether or not the defendant acted in

25   good faith, you are instructed that a belief by the defendant,

if such belief existed, that ultimately everything would work

out in the end, does not necessary mean that the defendant

acted in good faith.  If the defendant knowingly participated

in the scheme for the purpose of soliciting funds for

investment in a company called Bar Works by materially false or

fraudulent pretenses, representations, or promises, causing

some financial or property loss to another, then no amount of

honest belief on the part of the defendant that the scheme

would work out will excuse fraudulent actions or false

representations by the defendant.

Acting with intent to defraud means engaging or

participating in a fraudulent scheme with some realization of

its fraudulent and deceptive character, and with an intention

to be involved in the scheme to defraud and to help it succeed

with the purpose of causing harm to the victim.  Actual

financial harm includes denying a person or entity of access to

money.

If a defendant deliberately supplies materially false

information in order to obtain money, but believes that no harm

will ultimately accrue to the person from which he obtained the

money, that is, that the victim will be better off having

entered an investing relationship with the defendant, that

belief that no harm will result, or even the fact that no harm

results, is no defense.  Thus, if you find that the defendant

intended to inflict harm by obtaining money fraudulently, you

1    may find that the defendant acted with the intent to defraud.

2            It is also unimportant whether a victim might have

3    discovered the fraud, had the victim probed further.  If you

4    find that a scheme or artifice to defraud existed, it's

5    irrelevant whether you believe that a victim was careless,

6    gullible, or even negligent.  Negligence, carelessness, or

7    gullibility on the part of the victims is no defense to a

8    charge of wire fraud.

9            Venue.  I think you've heard this mentioned during the

10   course of the prior proceedings in our case.

11           With respect to any given count that you are

12   considering, the government, in addition to proving the

13   essential elements of that charge, must also prove that at

14   least one act in furtherance of the charge occurred within the

15   Southern District of New York.  This is called establishing

16   venue.

17           The Southern District of New York includes all of

18   Manhattan and the Bronx, as well as Westchester, Rockland,

19   Putnam, Dutchess, Orange, and Sullivan Counties.  The

20   government does not have to prove that a completed crime was

21   committed within the Southern District of New York or that any

22   defendant was ever in the Southern District of New York; it is

23   sufficient to satisfy this venue requirement if any act in

24   furtherance of the crime charged occurred in this district.

25   The act itself may not necessarily be a criminal act, and the

1    act need not have been taken by the defendant, so long as the

2    act was part of the crime that you find the defendant

3    committed.

4           Unlike the elements of the other offenses, that is to

5    say, conspiracy and substantive wire fraud, which must be

6    proven beyond a reasonable doubt, the government is only

7    required to prove venue by what's called a preponderance of the

8    evidence.  "Preponderance of the evidence" means that it is

9    more probable than not that some act in furtherance of the

10   crime that you are considering occurred in this district.

11          We're getting there.

12          Variance in dates and times.

13          As we have proceeded through the indictment, you have

14   noticed that it refers to various dates and times.  It does not

15   matter if the indictment provides that specific conduct is

16   alleged to have occurred on or about a certain date, month, or

17   time, and that the evidence indicates that, in fact, it was on

18   a different date, month, or time.  The law only requires a

19   substantial similarity between the dates alleged in the

20   indictment and the date established by the testimony and the

21   exhibits.

22          You've heard evidence here that prior to appearing in

23   court, witnesses may have discussed the facts of the case and

24   their testimony with attorneys.  Although you may consider this

25   fact when you are evaluating a witness's credibility, I should

1    tell you that there is nothing either improper or unusual about

2    a witness meeting with lawyers before testifying, so that the

3    witness can be aware of the subjects he or she will be

4    questioned about and can focus on those subjects and have the

5    opportunity to prepare or review relevant exhibits before being

6    questioned about them.

7              You've also heard testimony here of law enforcement

8    officers.  The fact that a witness may be employed by the

9    government as a law enforcement official does not mean that his

10   or her testimony is necessarily deserving of more or less

11   consideration or greater or lesser weight than that of an

12   ordinary witness.  At the same time, it is quite legitimate for

13   defense counsel to try to attack the credibility of a law

14   enforcement witness on the grounds that his or her testimony

15   may be colored by a personal or professional interest in the

16   outcome of the case.  It's your decision, jurors, after

17   reviewing all of the evidence, whether to accept the testimony

18   of the law enforcement witnesses and to give that testimony the

19   weight you find it deserves.

20             You've also heard from a witness in this case,

21   Mr. Renwick Haddow, who testified that he pled guilty to

22   criminal charges.  He testified pursuant to an agreement to

23   cooperate with the government.  The law allows the use of

24   accomplice testimony; indeed, it is the law in federal courts

25   that the testimony of an accomplice may be enough in itself for

1    conviction if the jury finds that the testimony establishes

2    guilt beyond a reasonable doubt.

3            It is also the case, however, that accomplice

4    testimony is of such a nature that it must be scrutinized with

5    great care and viewed with particular caution when you decide

6    how much of that testimony to believe.  I've given you some

7    general considerations about assessing the credibility of

8    witnesses, and I will not repeat them all here; nor will I

9    repeat all the arguments made on both sides.

10           Nevertheless, let me say a few things that you might

11   want to consider during your deliberations on the subject of

12   accomplice testimony.

13           You should ask yourselves whether Mr. Haddow would

14   benefit more by lying or by telling the truth.  Was the

15   witness's testimony made up in any way because he believed or

16   hoped that he would somehow receive favorable treatment by

17   testifying falsely?  Or did he believe that his interests would

18   best be served by testifying truthfully?

19           If you believe that Mr. Haddow was motivated by hopes

20   of personal gain, was the motivation one that would cause him

21   to lie or was it one that would cause him to tell the truth?

22   Did this motivation color his testimony?  In sum, you should

23   look at all of the evidence in deciding what credence and what

24   weight, if any, to give an accomplice witness.

25           Mr. Moore did not testify in this case.  Under our

1  Constitution, a defendant has no obligation to testify or to

2  present any evidence, because it is the government's burden, as

3  we've said, to prove a defendant guilty beyond a reasonable

4  doubt.  That burden remains with the government throughout the

5  entire trial and never shifts to a defendant.  A defendant is

6  never required to prove that he is innocent and, therefore, you

7  must not attach any significance to the fact that Mr. Moore did

8  not testify.  No adverse inference against Mr. Moore may be

9  drawn by you because he did not take the witness stand, and you

10 may not consider it against Mr. Moore in any way in your

11 deliberations in the jury room.

12       There are people whose names you may have heard during

13 the course of the trial that did not appear in court to

14 testify.  I instruct you that each party had an equal

15 opportunity or lack of opportunity to call any of those

16 witnesses.  Therefore, you should not draw any inferences or

17 reach any conclusions as to what they would have said if they

18 had been called as witnesses in this case.

19       You should remember my instruction, however, that the

20 law does not impose on the defendant in a criminal case the

21 burden or duty of calling any witnesses or producing any

22 evidence whatsoever; and that the burden always rests with the

23 government to prove a defendant's guilt beyond a reasonable

24 doubt.

25       You may not draw any inference, favorable or

1   unfavorable, towards the government or the defendant from the

2   fact that any person other than the defendant is not on trial

3   here.  You also may not speculate as to the reasons why other

4   persons are not on trial.  Those matters are wholly outside the

5   jury's concern and have no bearing on your function as jurors.

6           You've heard references in the arguments in this case

7   to the fact that certain investigative techniques were employed

8   or used by the government, and that certain others were not

9   used.  There's no legal requirement that the government use any

10   specific investigative techniques to prove its case.  However,

11   you may consider these facts in deciding whether the government

12   has met its burden of proof.  As I told you, you should look at

13   all of the evidence and the lack of evidence in deciding

14   whether the defendant is guilty or not guilty.

15           The government has offered evidence that the defendant

16   has a prior conviction for separate conduct from the charges in

17   the indictment.  In that connection, I remind you that the

18   defendant is not on trial for committing acts that are not

19   alleged in the indictment.  You may not consider this evidence

20   as a substitute for proof that the defendant committed any of

21   the crimes charged in the indictment, nor may you consider this

22   evidence as proof that the defendant has a criminal personality

23   or bad character.  This evidence about the defendant was

24   admitted for the limited purposes I will describe, and you may

25   consider it only for those limited purposes.

1              THE COURT:  First, if you find that the defendant did

2    engage in the other conduct, then you may, but you need not,

3    infer that the defendant was the person who committed the acts

4    charged in the indictment, or that the acts charged in the

5    indictment, and the other conduct, were part of a common plan

6    or scheme, committed by the defendant.

7              Second, if you determine that the defendant committed

8    any of the acts charged in the indictment, then you may, but

9    you need not, draw an inference that the uncharged acts are

10   evidence of the background to or development of the charged

11   crimes.

12             These separate acts of the defendant may not be

13   considered by you for any purpose, other than what I've just

14   explained to you.  Specifically, you may not use this evidence

15   to conclude that because the defendant committed the other

16   acts, he must have also committed the acts charged in the

17   indictment.

18             You've heard that the defendant made certain

19   statements in which he claimed that his conduct was consistent

20   with innocence, and not with guilt.  The government claims that

21   these statements in which the defendant exonerated or

22   exculpated himself were false.

23             If you find that the defendant made a false statement

24   in order to divert suspicion from himself, you may, but are not

25   required to, infer that the defendant believed that he was

1    guilty.  You may not, however, draw the conclusion on the basis

2    of this alone that the defendant is in fact guilty of the

3    crimes with which he's charged in the indictment.

4         Whether or not evidence as to a defendant's statements

5    shows that he believed that he was guilty and the significance,

6    if any, to be attached to any such evidence, are matters for

7    you, the jury, to decide.

8         There has been evidence in this case that the

9    defendant made statements to the United States Securities and

10   Exchange Commission and to law enforcement.  Evidence of these

11   statements was properly admitted in this case, and may properly

12   be considered by you.  You are to give the statements such

13   weight as you the jurors feel they deserve in light of all the

14   evidence.

15        Now, some of the exhibits that were admitted into

16   evidence in this case were in the form of charts and summaries.

17   For these charts and summaries that were admitted into

18   evidence, you should consider them as you would any of the

19   other evidence.

20        In this case, you've also heard evidence in the form

21   of stipulations of testimony.  A stipulation of testimony is an

22   agreement between the parties, that is to say, the government

23   and the defense, that if called as a witness, the person would

24   have given certain testimony.  You must accept as true the fact

25   that the witness would have given that testimony.  However,

1    it's still for you, the jury, to determine the effect to be

2    given to that testimony.

3         You also heard evidence in the form of stipulations

4    that contain facts that were agreed by the parties to be true.

5    In such cases, you must accept those facts as true.

6         We have, among the exhibits received in evidence, some

7    documents that are redacted.  "Redacted" means that part of the

8    document or tape was taken out.  You are to concern yourself

9    only with the part of the item that has been admitted into

10   evidence.  You should not consider any possible reason why the

11   other part has been redacted or deleted.

12        In determining whether the government has proven the

13   charges beyond a reasonable doubt, you should not consider the

14   question of possible punishment in the event you were to find

15   the defendant guilty on one or both counts.  Under our system,

16   sentencing or punishment is exclusively the function of the

17   Court.  It is not your concern as jurors, and you should not

18   give any consideration to that issue in determining what your

19   verdict will be.

20        So now, ladies and gentlemen, you're about to go into

21   the jury room and begin your deliberations.  All of the

22   exhibits have been collected and will be brought in to the jury

23   room at the start of your deliberations.

24        If you want any of the testimony read back, you may

25   also request that.  But please remember that if you do ask for

testimony, the court reporter must search through his or her

notes, and the lawyers must agree on what portions of testimony

may be called for, and if they disagree, I must resolve those

disagreements.  That can be a time-consuming process, so please

try to be as specific as you possibly can in requesting

portions of the testimony, if you do so.

          Your requests for testimony, and in fact, any

communication with the Court from the jury room, should be made

to me in writing, signed by your foreperson -- I'll come back

to this -- and given to one of the marshals who will be outside

the door.  In any event, do not tell me or anyone else how the

jury stands on any particular issue until after a verdict is

reached.

          We have made up forms for jury notes so you don't have

to scribble it down on a blank piece of paper.  We'll give you

those to take into the jury room also.

          Let me get back, as I said, I mentioned foreperson.

And I'm going to say this again in a minute.  What I'd like you

to do soon after you get into the jury room, before you begin

your deliberations, is to -- and if you've not already done

so -- select someone to be the foreperson for the jury.  The

foreperson will preside over the deliberations, and speak for

you here in open court.  The foreperson has no greater voice or

authority than any other juror.  The foreperson will send out

any notes, and when the jury has reached a verdict, he or she

1    will notify the marshal that the jury has reached a verdict.

2    So I'd like you to do that first.  send me a note indicating

3    who the foreperson is.

4           The government, to prevail, must prove the essential

5    elements of any crime charged beyond a reasonable doubt as

6    already explained to you in these instructions and in the

7    preliminary instructions on day one.  If it succeeds, your

8    verdict should be guilty on that charge.  If it fails, your

9    verdict should be not guilty.

10          A verdict must be unanimous.  Your verdict must

11   represent the considered judgment of each juror.  Whether your

12   verdict is guilty or not guilty, it must be unanimous.  Your

13   function is to weigh the evidence in the case, and determine

14   whether or not the defendant is guilty based solely upon such

15   evidence.

16          Each juror's entitled to his or her opinion.  Each,

17   should, however, exchange views with his or her fellow jurors.

18   That is the very purpose of jury deliberation, to discuss and

19   consider the evidence, to listen to the arguments of fellow

20   jurors, to present your individual views, to consult with one

21   another, and to reach an agreement based solely and entirely on

22   the evidence, if you can do so without surrendering your own

23   individual judgment.

24          Each of you must decide the case for yourself, after

25   consideration, with your fellow jurors, of the evidence in the

1    case.  But you should not hesitate to change an opinion that,

2    after discussion with your fellow jurors, appears incorrect.

3    If, after carefully considering the evidence and the arguments

4    of your fellow jurors, you hold a conscientious view that

5    differs from others, you are not required to change your

6    position simply because you are outnumbered.  Your final vote

7    must reflect your conscientious belief as to how the issues

8    should be decided.

9         I'm also going to give you to take into the jury room

10   a verdict sheet or form to be filled out by the jury when you

11   reach your verdict.  The purpose of the questions on the form

12   is to help us, the Court and counsel, to understand what your

13   findings are.  I will hand this form which contains a set of

14   questions to the clerk, who will give it to you, so that you

15   may record the decision of the jury with respect to each

16   question.  It isn't very long.

17        No inference is to be drawn from the way the questions

18   are worded as to what the answers should be.  The questions are

19   not to be taken as any indication that I have any opinion as to

20   how they should be answered.  I have no such opinion, and even

21   if I did, it would not be binding on you.

22        Before the jury attempts to answer any question, you

23   should read the entire set of questions, I think it's really

24   only one page, and make sure that everybody understands each

25   question.  Before you answer the questions, you should

1    deliberate in the jury room and discuss the evidence that

2    relates to the questions you must answer.

3           When you have considered the questions thoroughly, and

4    the evidence that relates to those questions, record the

5    answers to the questions on the form that I'm giving you.

6    Remember, all answers must be unanimous.

7           So now we're just about finished with these

8    instructions to you, and I thank you for your patience and

9    attentiveness.  Please remember that no single part of these

10   charges is to be considered in isolation.  You're not to

11   consider any one aspect of these charges out of context.  The

12   entire charge is to be considered as an integrated statement

13   and to be taken together.

14          Finally, I say this, not because I think it's

15   absolutely necessary, but because it is the tradition of this

16   Court.  I remind the jurors to be polite and respectful to each

17   other, as I'm sure you will be during the course of your

18   deliberations, and so that each juror may have his or her

19   position made clear to all the other jurors.

20          I remind you once again that your oath is to decide

21   without fear or favor, and to decide the issues based solely on

22   the evidence and my instructions on the law.  Thank you.

23          So, at this point if the lawyers could just come up

24   here for one second and then I am going to have the jurors go

25   into the jury room.

1          (At the sidebar)

2          THE COURT:  Does anybody have any objections to the

3    reading of the instructions as opposed to the content of them

4    which we discussed earlier?

5          MR. GARVIN:  No, your Honor.

6          MR. BELL:  No, your Honor.

7          (In open court)

8          THE COURT:  We'll ask the marshal to come up, please.

9    And we're going to swear in the marshal who will accompany the

10   jurors to the jury room.

11         (Marshal sworn)

12         THE COURT:  So now I'm going to ask the jurors, with

13   the exception of the last juror, to go with the marshal into

14   the jury room.  That would be the juror waving her hand

15   good-bye.

16         (Jury begins deliberations.  Time noted 4:14 p.m.)

17         THE COURT:  The exhibit rack is ready to go?

18         MR. GARVIN:  Your Honor?

19         THE COURT:  So please be seated.

20         Thank you as well.  It turns out you are an alternate

21   juror for this jury.  And alternate jurors are every bit as

22   important as the other jurors, so we thank you for your

23   service.  I'm going to let you go home, of course, and Chelsea

24   will ask you if you have anything in the jury room that she

25   should retrieve for you.

1          A JUROR:  Yes.

2          THE COURT:  Why don't you figure that out.  One more

3    thing for the juror.  I'm not going to discharge you as a

4    juror.  It's Friday.  I don't know if they'll reach a verdict

5    today or if they'll need to come back on Monday.  And who knows

6    what happens over the weekend, if someone gets sick or not, in

7    which case we would have to call upon you for Monday.  So if

8    you would continue to follow my instructions over the weekend,

9    and I will call you, we will call you one way or another on

10   Monday to tell you whether you're needed or not as a juror.

11         A JUROR:  Great.

12         THE COURT:  Thanks so much.

13         (Alternate juror not present)

14   MR. GARVIN:  Your Honor, I had noticed that during the

15   Court's reading, the Court had discovered a typo and had

16   corrected it.  I don't know if the jury instructions that just

17   went back still have the typo or not on page 13.  The word

18   "investments" instead of "misrepresentations."  So, I was

19   trying to bring that to your attention before those jury

20   instructions got distributed.  If the Court were inclined --

21         THE COURT:  I didn't notice, to be honest with you,

22   that you were.  Where is it?

23         MR. GARVIN:  I believe the Court caught the error on

24   page 13.

25         THE COURT:  I did.  I don't remember where it is.

1    MR. GARVIN:  Page 13, at the very bottom, next-to-last

2    line it says "through material investments."  It should say

3    "through material misrepresentations."  Instead of the word

4    "investments."  I noted that the Court had caught it as it was

5    reading it.

6    THE COURT:  Do you mind if I advise the jurors of that

7    word change with a note?

8    MR. BELL:  Perhaps the most economical way to do it,

9    Judge.  Would be to just send in a new page 13 with a note.

10   THE COURT:  That's very complicated.  We have to take

11   them all apart.

12   MR. BELL:  No, you wouldn't necessarily, Judge.

13   THE COURT:  Just one page?

14   MR. BELL:  Just one page, just send it in, and says

15   this is a corrected page.

16   THE COURT:  Is that all right?

17   MR. GARVIN:  That's fine.

18   THE COURT:  Sure.  I think I'm going to send an

19   accompanying note though, explaining.

20   MR. BELL:  Judge, we have looked over your note and

21   both agreed that it is suitable to go in.  Thank you very much.

22   THE COURT:  Sure.  And Chelsea, take that right in

23   there.

24   And so I have a note from the jury which says that the

25   jury foreperson is Juror No. 4, that is Scott Rothpearl.  I'll

1    make this a court exhibit.

2              It's 4:25.  If I haven't heard from them by a quarter

3    to five as to timing or anything else, I'll probably send them

4    a note and say how long do you want to continue deliberating

5    today.

6              MR. BELL:  That's fine, Judge.  We're not going

7    anywhere.  I think it's late enough in the day.

8              (Recess pending verdict)

9              (At 5:10 p.m., a note was received from the jury)

10             THE COURT:  The jury has advised that they have

11   reached a verdict.  And we're going to call them in and Chelsea

12   will poll the jury.

13             (Jury present.  Time noted 5:15 p.m.)

14             THE DEPUTY CLERK:  Will the foreperson please stand.

15   Please listen carefully as I read the questions on the verdict

16   sheet, and advise us of the jury's answers.

17             As to Question No. 1, Count One, conspiracy to commit

18   wire fraud, how does the jury find?

19             THE FOREPERSON:  The jury finds guilty.

20             THE DEPUTY CLERK:  As to Count Two, wire fraud, how

21   does the jury find?

22             THE FOREPERSON:  The jury finds guilty.

23             THE DEPUTY CLERK:  Thank you.  You may be seated.

24             Juror No. 1, is this your verdict?

25             JUROR:  Yes.

1          THE DEPUTY CLERK:  Juror No. 2, is this your verdict?

2          JUROR:  Yes.

3          THE DEPUTY CLERK:  Juror No. 3, is this your verdict?

4          JUROR:  Yes.

5          THE DEPUTY CLERK:  Juror No. 4, is this your verdict?

6          JUROR:  Yes.

7          THE DEPUTY CLERK:  Juror No. 5, is this your verdict?

8          JUROR:  Yes.

9          THE DEPUTY CLERK:  Juror No. 6, is this your verdict?

10          JUROR:  Yes.

11          THE DEPUTY CLERK:  Juror No. 7, is this your verdict?

12          JUROR:  Yes.

13          THE DEPUTY CLERK:  Juror No. 8, is this your verdict?

14          JUROR:  Yes.

15          THE DEPUTY CLERK:  Juror No. 9, is this your verdict?

16          JUROR:  Yes.

17          THE DEPUTY CLERK:  Juror No. 10, is this your verdict?

18          JUROR:  Yes.

19          THE DEPUTY CLERK:  Juror No. 11, is this your verdict?

20          JUROR:  Yes.

21          THE DEPUTY CLERK:  Juror No. 12, is this your verdict?

22          JUROR:  I'm 13, but yes.

23          THE COURT:  One juror was excused, so you became Juror

24    No. 12 or 5 I guess.  It doesn't matter.

25          JUROR:  Yes.

1      THE DEPUTY CLERK:  The jury has been polled.  The

2  verdict is unanimous.

3      THE COURT:  Okay.  Well, then, so, what remains is for

4  me to say thanks to the jury.  You were very attentive and it

5  was a pleasure to work with you.  And enjoy your weekend.

6      JUROR:  Thank you.

7      THE COURT:  If you remain just for a minute in the

8  jury room, I'll come back and just thank you in person.  But I

9  won't hold you up, I promise.

10      (Jury dismissed)

11      (Pause)

12      THE COURT:  So, in light of the jury verdict, we have

13  some more that we have to do, and that is to order a

14  presentence investigation report.  And counsel, do you wish to

15  be present in connection with any interview of Mr. Moore?

16      MR. GARVIN:  Your Honor, I would respectfully request

17  the opportunity to attend by telephone.

18      THE COURT:  I'll put that down.  I don't know how that

19  works.  Because you'll be in Florida, you mean?

20      MR. GARVIN:  Yes, sir.  I have in the past obtained

21  permission, I have to call in.

22      THE COURT:  To S.D.N.Y.?

23      MR. GARVIN:  To the number provided to the probation.

24  The problem is, in this case, because Mr. Moore will be

25  incarcerated, I don't know if that will be permitted.  If it's

1   not permitted, then I will come up to attend.

2           THE COURT:  So I'm going to order that a presentence

3   investigation report be prepared.  This is usually a 90-day

4   process or so.  But I'm putting down that counsel wishes to be

5   present by phone, so there should be no interview of Mr. Moore

6   unless counsel is given the opportunity to be present one way

7   or another.

8           Well, you'll be in touch with Mr. Moore, I take it.

9   So, between the two of you, I don't exactly know how you get

10  alerted as to the date, but I'm sure you will be.

11          So, I usually advise people that they be cooperative

12  with the probation department who prepares this report,

13  Mr. Moore, of course consulting with your attorney.  Both the

14  good things and the not-so-good things, because if they ask you

15  something and you answer and they find contradictory

16  information, that would be a negative situation.  But, just

17  give you that heads up.

18          So I'm going to schedule a sentencing.  Let me ask

19  this.  How is September 5 for you, counsel?

20          MR. GARVIN:  Your Honor, may I respectfully request it

21  be a little later in September I have to be in another matter

22  that is presently scheduled to begin September 5 in

23  Indianapolis.

24          THE COURT:  How much time do you need for that?

25          MR. GARVIN:  If it could be about the 15th of

1    September.

2              THE COURT:  How about Monday, September 16.  Does that

3    work?

4              MR. GARVIN:  Yes, sir, that works.

5              THE COURT:  Okay.  And we'll say 10 a.m.

6              So back to the presentence report, I should mention

7    that the report is generally important as to any sentencing

8    decision that's made.  And so, that's the reason I suggested,

9    Mr. Moore, that you tell them whatever they ask, consulting

10   with your attorney, the good things and the not-so-good things.

11   Because if you fail to disclose something they were to ask

12   about and they find out themselves, they might say you were not

13   being truthful, and that would not be helpful to you.

14             You, Mr. Moore, and your counsel and the government

15   counsel will have the right and opportunity to examine this

16   presentence report before the sentencing date and to file

17   written objections to it.  So I urge you both, Mr. Moore and

18   his counsel, to review it carefully and discuss it before

19   sentencing.  If there are any mistakes in the report, please

20   point them out, in this case to Mr. Garvin, so he can point

21   them out to me before the sentencing and so that I don't

22   proceed on the basis of mistaken information.

23             So we have our hearing date.  Let me set a date for

24   submission if counsel want to make any summations.

25             Mr. Garvin, how about August 23 for any written

 1  submissions.  Does that work for you?

 2          MR. GARVIN:  Yes, that works.

 3          THE COURT:  And for the government, August 30.  Is

 4  that fine?

 5          MR. BELL:  It is, Judge.

 6          THE COURT:  We're saying defense submissions in

 7  writing by August 23, and the government submission a week

 8  thereafter.

 9          Did counsel have anything further they wanted to add?

10          MR. VAINBERG:  Just one thing, your Honor.  Our

11  understanding is that Mr. Moore is currently in custody on the

12  prior conviction.  I'm not sure when the time for that

13  conviction runs out.  So, to the extent that's going to happen

14  within the next three months, we would just move to have a

15  detention order in place to make sure he's not released.

16          THE COURT:  Does it expire in the next --

17          THE DEFENDANT:  November 11, your Honor.

18          THE COURT:  Oh.

19          MR. GARVIN:  I don't think that will be an issue.

20          THE COURT:  You know what?  Why don't you look into

21  it, and if you need anything from me, an order or something

22  like that, you'll let me know Monday.

23          MR. VAINBERG:  Okay.

24          THE COURT:  I would imagine that Mr. Moore will be

25  detained here in the Southern District until the sentencing

1   date.  Is that your understanding?

2           MR. VAINBERG:  I'm actually not sure if, absent a

3   detention order from your Honor, if he wouldn't just be taken

4   back to Florida to BOP.  That might be another reason.

5           MR. BELL:  He's here on a federal writ.  We will get a

6   better sense of what that means, your Honor, and we'll

7   communicate with you via letter on Monday.

8           THE COURT:  That's fair.  I'm sure nothing will happen

9   in the interim with respect to the writ.  All right.  Anything

10  further from Mr. Garvin?

11          MR. GARVIN:  No, your Honor.  Not at this time.

12          THE COURT:  Okay.  So when the government advises me,

13  of course you'll be copied on correspondence with respect to

14  writ status, etc.

15          MR. BELL:  Your Honor, at the risk of perhaps saying

16  too much, there is one lingering matter.  I know Mr. Garvin as

17  a placeholder made a motion pursuant to Rule 29.

18          THE COURT:  Oh.  Yes.  So, thank you for reminding me.

19  There is a motion, a Rule 29 motion.  Did anybody wish to be

20  heard in support of the motion?

21          MR. GARVIN:  No, sir.

22          THE COURT:  Do you want to be heard in opposition?

23          MR. BELL:  Only to note very briefly, Judge, that

24  given the nature of the charges, it is our belief that the

25  testimony of Mr. Haddow alone, which the jury had every right

J673MOO5                          Verdict

 1   to credit, would serve to establish each of the elements of

 2   each of the crimes charged.

 3           THE COURT:  And you're remembering that the motion was

 4   made at the close of the government's case.

 5           MR. BELL:  That's correct.

 6           THE COURT:  So this is the motion that was pending as

 7   of that time.  And I agree with you, there was sufficient

 8   evidence presented at that time, that is to say the date of the

 9   motion, for the motion to be denied.  And respectfully, that

10   motion is denied.

11           All right then.  Thank you very much, everybody.

12           MR. BELL:  Thank you, your Honor.

13           MR. GARVIN:  Thank you, your Honor.

14           (Trial concluded)

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    INDEX OF EXAMINATION

 2   Examination of:                       Page

 3   SEAN VINCENT PHILLIPS

 4   Redirect By Mr. Garvin . . . . . . . . . . . 717

 5   JENS BIRGER MADSEN

 6   Direct By Mr. Garvin . . . . . . . . . . . . 727

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
</pre>