J8QHMOOC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          18 Cr. 759 (RMB)

JAMES MOORE,

                                        Conference
            Defendant.

------------------------------x

                                        New York, N.Y.
                                        August 26, 2019
                                        12:24 p.m.


Before:

                HON. RICHARD M. BERMAN,

                                        District Judge


                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
MARTIN BELL
VLADISLAV VAINBERG
     Assistant United States Attorneys

MICHAEL GRUDBERG
     Attorney for Defendant

ALSO PRESENT:   STEPHANIE SCANNELL-VESSELLA, BOP Counsel
                DR. ELISSA MILLER, Chief Psychologist MCC

1          THE COURT:  Let me recount some of the background

2     factors that led up to today's conference, and then we'll go

3     from there.

4          On June 7 of this year, 2019, Mr. Moore was convicted

5     following the jury trial of two counts: (1) conspiracy to

6     commit wire fraud and (2) the substantive count of wire fraud.

7     Sentencing was scheduled initially for September 16 at

8     10:00 a.m.

9          On June 21, 2019, I received a pro se submission from

10    Mr. Moore in which he alleged that his counsel was ineffective,

11    and he requested his release from incarceration.

12         By memo dated June 24, 2019, I denied the application

13    for release and directed Mr. Garvin, who was his counsel at the

14    time, and the government to respond to Mr. Moore's pro se

15    submission.

16         By letter dated June 26, 2019, Mr. Garvin moved for

17    leave to withdraw as counsel of record for Mr. Moore.  By

18    motion dated July 19, 2019, Messrs. Michael Grudberg and Robert

19    Heim of the law firm Tarter Krinsky & Drogin advised the Court

20    that they had been engaged to represent Mr. Moore, and they

21    moved to substitute themselves as counsel in the case and for

22    the Court to grant permission for Mr. Garvin to withdraw as

23    counsel.

24         I did, in fact, grant the application on July 22,

25    2019, and I set a conference for July 25, 2019.  During that

1    conference, I set the date of September 17, 2019, at noon to

2    permit new counsel to familiarize themselves with the case.  I

3    also indicated that I would reset the sentencing date at the

4    next court conference.

5              More recently, on August 21, 2019, I received two pro

6    se submissions from Mr. Moore.  One alleges that he is in

7    imminent danger of being killed in here.  I guess he's

8    referring -- not I guess.  He's referring to the MCC, and he

9    goes on to say, "They've come close two or three times now.  I

10   need moving anywhere out of this prison urgently.  Please help

11   me."

12             I endorsed that letter as follows.  I wrote that the

13   BOP and the Assistant United States Attorneys please look into

14   this matter forthwith and advise me of their findings.

15   Conference will be held on Monday, August 26, which is today,

16   at 11:00 a.m.  We've rescheduled the matter for noon.  On

17   August 22, I think Ms. Murray of my chambers advised BOP and

18   counsel of the change in time of the conference.

19             On August 21, 2019, Bureau of Prisons staff attorney

20   Stephanie Scannell-Vessella advised Ms. Murray that the BOP's

21   psychologists asked them to reach out to Mr. Moore's defense

22   counsel to consider a forensic study for Mr. Moore.  That's

23   something we'll talk about a little further in a moment.

24             The other pro se submission requests permission to

25   appear pro se effective immediately.  I think we'll start,

1    actually, with that application in a minute or two.

2           Then on August 22, 2019, I received three pro se

3    submissions from Mr. Moore.  The first two were repetitive of

4    the prior pro se submissions.  The third describes in some

5    depth or detail -- "depth" is not the correct word -- in some

6    detail threats, I guess would be the best way to describe it,

7    that he feels he is receiving from outside the prison or

8    perhaps from within the prison.  I don't know where, actually,

9    or how they're being transmitted, but anyway, I directed BOP,

10   the assistants again, and defense counsel to respond, and which

11   they have done.

12          So the first question here I think we have to deal

13   with is Mr. Moore's application to appear pro se.  What's the

14   basis of that, Mr. Moore?

15          THE DEFENDANT:   Thank you, your Honor.  I think at

16   this point in time it would be in my best interest to thank

17   Mr. Grudberg.

18          THE COURT:  You don't have to go into that.  I just

19   want to know the basis of you feeling you're able to represent

20   yourself pro se in this proceeding.

21          THE DEFENDANT:  I think for today's hearing --

22          THE COURT:  Are you a lawyer, first of all?

23          THE DEFENDANT:  No, your Honor, I'm not.

24          THE COURT:  Do you have any legal training?

25          THE DEFENDANT:  None whatsoever, your Honor.

J8QHMOOC

1      THE COURT:  So how is it that you feel that you can

2  represent yourself in today's proceeding or at sentencing,

3  which is coming up?

4      THE DEFENDANT:  Being quite frank, your Honor, the

5  reason that I sent the pro se letters, I marked them as such

6  was so that I knew that letters from me could get out the

7  facility, and that's why I marked them in the way that I marked

8  them on the envelopes.

9      THE COURT:  I'm just asking a simple question of what

10  it is in your background that makes you believe -- you have a

11  right, by the way, to represent yourself.  Frankly, if you ask

12  me, which you're not, and that's perfectly fine, I think it's a

13  bad idea, but I'm trying to be persuaded by you that it's a

14  good idea.

15      THE DEFENDANT:  Thank you, your Honor.

16      At the risk of being accused of wasting the Court's

17  time, which I would never want to do, the pro se letters were

18  sent, from my perspective, for want of a better expression a

19  life raft, as a way to ensure that I could get a message

20  outside.  My intention was then to ask your Honor to consider

21  appointing me a Federal Defender.

22      THE COURT:  Well, so there's a whole process of that.

23  I don't know that you qualify for having a federal defender,

24  and I don't know why you wanted to relieve this counsel.  This

25  would be your third counsel.  My recollection from the facts

1    that came out during the course of the trial suggest that you

2    would not be qualified to have Federal Defenders represent you,

3    but put that aside for the moment.  You'd have to fill out an

4    application -- affidavit, by the way, in which you'd have to

5    indicate your resources, and if you qualify, we could take the

6    next step.  But it's hard for me to -- well, just that.

7              What's wrong with your current attorney?

8              THE DEFENDANT:  I just feel, your Honor, right now

9    that it's in my best interest to change attorneys and make a

10   clean break from everybody that's been associated with me

11   previously.

12             THE COURT:  All right.  Counsel, did you want to --

13   thanks, Mr. Moore.

14             THE DEFENDANT:   Thank you.

15             MR. GRUDBERG:  Thank you, your Honor.

16             Under the circumstances, I don't think it's wise for

17   me to say very much.  I would just say, in terms of the factual

18   background of the last three or four days since your Honor

19   issued the order, counsel for the MCC has worked with us to try

20   to arrange a telephonic contact.  I happened to be out of town

21   for family reasons.  That could not go forward.  I don't

22   understand all the whys and wherefores of that.  I did have a

23   brief opportunity to speak with Mr. Moore before we came out

24   today, but other than that, I think because of the uncertainty

25   as to whether it would be appropriate for me to advocate to the

7

J8QHMOOC

1    Court other than to answer factual questions for your Honor

2    consistent with the privilege and to the best of my ability, I

3    think I would prefer not to take any position at this point.

4            THE COURT:  Whether you want to remain or not?

5            MR. GRUDBERG:  As I said to Mr. Moore, we are prepared

6    to remain, subject to working out the other issues on the

7    Court's agenda for today and, of course, subject to Mr. Moore's

8    willingness, but I am not in this moment making any motion to

9    withdraw based upon any conflict theory as things now stand.

10           THE COURT:  OK.

11           MR. GRUDBERG:  Thank you, Judge.

12           THE COURT:  I don't know if anybody else feels able to

13   respond, but if anybody has something that they think they can

14   say.

15           MR. VAINBERG:  The government has no position.

16           THE COURT:  Some of your letters, Mr. Moore, have

17   been rather extreme.  Can you hear me?

18           THE DEFENDANT:  Not quite, your Honor.  I'm sorry.

19           THE COURT:  Some of your letters to the Court have

20   been rather extreme and somewhat alarming.  I don't know if

21   there's any basis in fact to some of the things you're saying,

22   and I still don't really understand why someone who has

23   had retained -- this is the second set of counsel -- why one

24   would think that they need new counsel, but that's obvious that

25   you do.  As I say, if you qualify for new counsel, appointed

1    counsel, it's not clear to me that they would or could be

2    Federal Defenders.  We'd have to ask them, but if you qualify,

3    you'd have to take whomever was up on the, what we call, CJA

4    list for that day, just so you know how the process works.  We

5    can defer that issue for the moment.

6         I'm going to ask Mr. Grudberg, and I'm sure he'll

7    consent, to remain for the moment, certainly for today's

8    proceeding, and going forward till we sort of get to the bottom

9    of this matter.

10        In the materials there are these allegations about

11   threats to Mr. Moore's safety, etc., etc., and so we did ask

12   the Bureau of Prisons to look into this matter, and I would

13   like to ask them what they conclude or found with respect to

14   the allegations that his life is in danger and he has to be

15   moved, first of all, holding aside the issue about his legal

16   representation for the moment.

17        MS. SCANNELL-VESSELLA:  Thank you, your Honor.

18   Stephanie Scannell-Vessella for the federal Bureau of Prisons.

19        The SIS, Special Investigative Services, they're the

20   department that generally investigates any allegations of

21   threats against inmates and other situations at the prison.

22   They first encountered Mr. Moore on August 2.  That was after a

23   referral from psychology.  Mr. Moore had expressed some

24   concerns with his safety.  So the SIS lieutenant interviewed

25   him, and he told our SIS lieutenant that he didn't feel safe at

1    MCC because -- I'm sorry.

2              THE COURT:  No, no, it's fine.  Go ahead.

3              MS. SCANNELL-VESSELLA:  He didn't feel safe at MCC due

4    to the English mafia attempting to have him killed.  And the

5    SIS lieutenant obviously dug a little bit with that, and

6    Mr. Moore said he believed his attorney was involved in the

7    plot as well as some of the staff and inmates.  He also alleged

8    that the royal family was involved.

9              THE COURT:  This was at the time of prior counsel's

10   participation or Mr. Grundberg's?

11             MS. SCANNELL-VESSELLA:  It was August 2, so I'm not

12   sure.

13             MR. GRUDBERG:  That was within my representation.

14             THE COURT:  I got it.

15             You also mentioned, I thought, at the beginning of

16   your remarks that SIS had gotten a referral from psychology?

17             MS. SCANNELL-VESSELLA:  Correct.

18             THE COURT:  How did psychology get involved?

19             MS. SCANNELL-VESSELLA:  So psychology, first, they had

20   encountered him.

21             DR. MILLER:  Few times before that.

22             MS. SCANNELL-VESSELLA:  I'm sorry, Judge.  This is

23   Dr. Elissa Miller.  She's our chief psychologist at MCC.

24             THE COURT:  Maybe I could hear just a minute from you,

25   doctor, what your interactions have been with Mr. Moore, and

J8QHMOOC

1    how they came about.

2              DR. MILLER:  So Mr. Moore started referring himself to

3    our department at the end of June.  He self-referred a couple

4    of times with some symptoms of anxiety and concerns that people

5    related to his case might be on his unit and --

6              THE COURT:  Meaning other inmates?

7              DR. MILLER:  Yes.

8              THE COURT:  Other prisoners?

9              DR. MILLER:  Yes, that might be involved with his

10   case.  And he was saying that he was set up for his current

11   charge, and he was talking about the roles multiple individuals

12   played in his incarceration.  So he appeared a little bit

13   suspicious and anxious.

14             THE COURT:  Do you have a date for his first contact?

15             DR. MILLER:  That was 6/26.

16             THE COURT:  June 26?

17             DR. MILLER:  Yes.

18             THE COURT:  So that would be roughly two weeks after

19   the trial?

20             DR. MILLER:  Yeah.  Is that correct?

21             THE COURT:  I think that's right, yes.

22             DR. MILLER:  And then on 7/11 he had self-referred

23   again.

24             THE COURT:  Did he come to you before that date or was

25   that the first date?

J8QHMOOC

1      DR. MILLER:  I think that was the first real contact

2  that we had.  He brought himself to our attention.

3      THE COURT:  I get it.

4      DR. MILLER:  And then on 7/11 he referred himself

5  again and was reported to appear anxious, and he was talking

6  about the history of his case and how he believes he's being

7  unfairly accused of something he didn't do and --

8      THE COURT:  At that time he would have already been

9  convicted of something.  July?

10      DR. MILLER:  Yes.

11      THE COURT:  You're saying July 11?

12      DR. MILLER:  Right.  But I think what he had expressed

13  was he took a plea, and he said he was having a hard time with

14  that because he didn't feel he did what he pled out to and --

15      THE COURT:  In this case?

16      DR. MILLER:  Yes.  Well, that's what I believe he was

17  referring to while he was in jail.

18      THE COURT:  OK.

19      DR. MILLER:  And that --

20      THE COURT:  Yes, I recall.  I recall the testimony.

21  Was there not a prior plea by Mr. Moore in Florida perhaps?

22      MR. VAINBERG:  In Middle District of Florida, yes,

23  your Honor.

24      THE COURT:  Got it.

25      DR. MILLER:  So he took the plea instead of facing

1    life, and he did note that he had fired his paid attorney and

2    now had a new attorney.  He appeared anxious at that time when

3    he was being interviewed, and he had expressed that venting

4    about these difficulties made him feel better.  So we weren't

5    overly concerned at that point in time.

6              THE COURT:  Based on his comments to you?

7              DR. MILLER:  Yes.  That was 7/11.  Then 7/24, we

8    decided to follow up.  Maybe he did appear a little anxious, so

9    we said, let's just check on him and make sure he's OK.  Then

10   he said that when he was going to be deported back to England,

11   he feared he would be killed by people that are connected with

12   his case there, and he was very fearful.

13             THE COURT:  He didn't come to you with this.  This is

14   when you contacted him?

15             DR. MILLER:  When we followed up.

16             THE COURT:  To find out?

17             DR. MILLER:  Because he was anxious the session

18   before.

19             THE COURT:  Got it, yes.

20             DR. MILLER:  And he had stated while he was there that

21   he thought inmates were connected to people on the outside that

22   are somehow connected to his case, so some persecutory ideas.

23   That was on 7/24.  Then on 8/2 -- we have an email, an inmate

24   to psychology email box so they can email our department.  This

25   is when it came a little more concerning.  That was on 8/2.  At

J8QHMOOC

1    the same time the lieutenant, SIS, spoke with him, he sent an

2    email saying in caps, "He was very frightened by the way things

3    are developing and progressing, and he needs to be able to

4    speak with someone before things go too far."

5              THE COURT:  Got it.

6              DR. MILLER:  So, of course, we followed up with him,

7    and we let SIS know about this, about his concerns regarding

8    his safety and security.  He said he did not want protective

9    custody at that time when he spoke to SIS.  However, he said

10   he's fairly certain his emails are being hacked and his

11   situation is complicated, and he noted the involvement of

12   Bulgarians and Russians being after him and that inmates here

13   are connected to those individuals on the outside.  So at that

14   point, we started getting a little more concerned.  We followed

15   up with him again where he continued to report --

16             THE COURT:  When you say you got a little more

17   concerned, so you --

18             DR. MILLER:  That there might be some mental health

19   symptoms rather than just bona fide anxiety, you know, that

20   people experience while they're incarcerated.  We started

21   seeing some persecutory ideas and increased levels of anxiety.

22             THE COURT:  When that occurred, did you say, come back

23   next --

24             DR. MILLER:  Oh, yeah, we scheduled him for a

25   follow-up, and that's why we have all these sessions with him.

1          THE COURT:  I get it.  How many sessions would you say

2     you've had with him so far?

3          DR. MILLER:  I wrote that down.  One, two, three,

4     four, five -- six prior to him being placed on psychological

5     observation, where he is right now.  He's been on that from

6     8/20 until the present.

7          THE COURT:  I see.  What does that entail?

8          DR. MILLER:  That entails placement in a cell where

9     he's constantly observed.  He's not on suicide watch because

10     he's not an imminent threat to suicidality at this time, but he

11     does display mental health symptoms that make us concerned for

12     him to be on a housing unit because when someone is paranoid or

13     has persecutory ideas, it may upset other inmates that may harm

14     him or he may harm someone else and because he thinks that they

15     are against him in some way, and I didn't want him placed in

16     the SHU because he was having some mental health problems.  So

17     I thought it would be better if we kept him downstairs, and we

18     referred him for a more extensive psychiatric evaluation which

19     would involve the forensic study, not realizing he was in

20     pretrial at that time.

21          THE COURT:  Not realizing that?

22          DR. MILLER:  Well, when you have a pretrial study, we

23     do competency to stand trial and criminal responsibility type

24     evaluations.  In this case we still have appropriate

25     evaluations we can do with him if you should order it, but we

J8QHMOOC

do have our concerns because he continues to express these

persecutory ideas, along with additional new persecutory ideas.

We had him seen by the psychiatrist.  I'm going through all my

notes.  But on 8/7 we saw him and then we saw him again on

8/14, and then we referred him to psychiatry because of our

concerns, to see if he could benefit from some psychotropic

medication to decrease his anxiety and the thoughts he was

having at the time.

So he was seen by Dr. Okafor.  That was on 8/15.  And

during the course of the session, Dr. Okafor stated:  "After

thorough discussion, he refused to take suggested formulary BOP

psychotropic medication that might benefit him."  So he

recommended that psychology continue to follow him closely.  So

he refused to take the medication at that time, but Dr. Okafor

also had seen the same presentation that we did and gave him a

diagnosis suggestive of some thought processes that were

persecutory in nature.  And we need to obviously rule out, as

you said before, what is factual and what is not factual, what

might be a false belief.

THE COURT:  Yes.

DR. MILLER:  So, yes.

THE COURT:  Do any of your work or tests, either that

you've given or might give, deal with the question of whether

he is capable of representing himself in this litigation going

forward?  Have you drawn any conclusion as to that?

J8QHMOOC

1        DR. MILLER:  Well, that's why we wanted him to get one

2   of those forensic studies, because then they can spend a great

3   deal of time with him.  They can administer various

4   psychological tests, personality, clinical tests, and tests to

5   rule out what might be true/not true, what's based in reality,

6   what's not, and observe him over a period of time and really

7   study him.  So we thought that that would be beneficial.

8        Now, we have done competency to participate in his

9   sentencing.  I have personally done those types of evaluations

10   in the past.  We can also do another type of --

11        THE COURT:  You did that for him, for Mr. Moore?

12        DR. MILLER:  No, no, I've done this in the past

13   with --

14        THE COURT:  Oh.

15        DR. MILLER:  Even though he's not in pretrial, there's

16   other types of evaluations, and we can also do just a basic

17   study and do a conceptualization treatment recommendation that

18   will let me know how we could address those needs in the Bureau

19   of Prisons.

20        THE COURT:  OK.  So that's very helpful.

21        Anybody else want to share a thought?  You don't have

22   to.

23        MS. SCANNELL-VESSELLA:  Did you want to hear anything

24   else about SIS's determinations, Judge?

25        THE COURT:  Do their determinations go to his ability

J8QHMOOC

1    to represent himself?

2              MS. SCANNELL-VESSELLA:  No, I don't think so.

3              THE COURT:  So that's number one.  Number two, just

4    generally, did they find any threat, actual threat, or do they

5    conclude, maybe they don't, but if they do, do they conclude

6    one way or another whether these threats appear realistic or

7    unrealistic or --

8              MS. SCANNELL-VESSELLA:  They have not found any

9    credible threat at MCC, and their recommendations are kind of

10   consistent with psychology's observations of Mr. Moore as well.

11             THE COURT:  And the move of his -- is he alone, did

12   you say, or does he have a cellmate?

13             DR. MILLER:  No, he's alone on psychological

14   observation where he's one on one with somebody watching him.

15             THE COURT:  I got it.

16             All right.  Mr. Moore, you want to add anything?  You

17   don't have to.

18             THE DEFENDANT:  No, I would like to, your Honor, if I

19   may.

20             We seem to be omitting the most recent event which

21   happened six days ago where I found myself in the unfortunate

22   position of being in a cell with two people trying to coax me

23   or tempt me into the cell with the offer of a free telephone

24   call, a free cell phone call in this instance.  One of them was

25   a very large guy, 350 pounds, who has repeatedly tried to get

J8QHMOOC

1    me in a cell on my own, you know, puts his arm around me and

2    says:  Come on, you want to use the phone?  And trying to get

3    me in the cell.  Meanwhile, the other one reaches for a rope

4    which is tied to the ventilator.  And I'm in the cell now

5    between two people, and I realize almost instinctively that

6    this is a very, very serious situation.  And the guy's going

7    for the rope and the other --

8              THE COURT:  So what happened?

9              THE DEFENDANT:  And I -- and I ducked down and back

10   out of the cell, and I said -- I couldn't process it.  I said,

11   "I think it's a little early for a call."

12             THE COURT:  It's what?

13             THE DEFENDANT:  It's a little early for a telephone

14   call.  It was about 9:15 to 9:20.  And I went straight down to

15   the unit manager's office, and I actually called Mr. Vainberg's

16   office and left a message on his voice mail, which at the end

17   would have been something like this because I was extremely

18   shook up.

19             Later on the same day, on that day, early in the

20   morning and prior to that over the weekend, a number of things

21   had taken place which just struck me as odd, and in here now I

22   know it will sound paranoid especially after the views that

23   have been raised, but people started asking to borrow things

24   off me, you know.  And that's unusual in a prison because

25   people don't -- because they don't get them back typically.

J8QHMOOC

1   The guy I had gone in the cell with, I'd only gone in the cell

2   with on the Friday night before, and he asked if he could

3   borrow, you know, some food, which amounted to $6.  Somebody

4   else asked if they could repay $12 later.  Somebody else on the

5   Monday morning, a guy who was washing a towel for me, came to

6   me and said could he get paid up front $3 for washing a towel.

7   And I know all this seems very bizarre with small numbers, but

8   in prison they're significant.  And I said no.  I was just --

9   it was just all very odd.  Then, of course, when this happened,

10  I thought maybe that was what it was about.

11          A new guy had come in the night before.  The big guy

12  who appeared in the cell was from the original unit I'd been

13  placed on when I was admitted into the prison, which was called

14  11 South, and from the original tier.  The guy who was admitted

15  the night before came and sat in front of me, staring at me,

16  and said, "You know, I've got seven children at home," and I

17  said, "Yes, they're -- these prison sentences are very

18  difficult with family," and so on.  I asked him what he'd done,

19  how he ended up there.  He said he was a collector for the --

20  collector for drug dealers.  Just a very frightening-looking

21  guy.  He'd arrived on the tier that opposite my cell on the

22  Monday night.

23          On the Monday around about midday, there was what's

24  known as mainline in the prison where the warden, assistant

25  warden, and so on, all arrive, and the unit manager's there

J8QHMOOC

1    also.  The unit manager said that he'd done an inspection, and

2    the units were particularly untidy, and so he was ordering

3    what's known as a modify, which means you are locked behind the

4    gates of the tier with 15 other people.  For me, that would

5    have meant, having just gone through this extremely traumatic

6    experience, I would have been locked in with the guy who did it

7    and the particularly frightening guy who'd arrived the night

8    before.

9              THE COURT:  So going back to that experience, did

10   anybody harm you physically during the course of that

11   experience?

12             THE DEFENDANT:  No, but there was a rope tied up in

13   the cell.

14             THE COURT:  Yes, but --

15             THE DEFENDANT:  They tried to get me in the cell.

16             THE COURT:  Yes, I got all that.  I just want to know

17   if anybody hurt you.

18             THE DEFENDANT:  No, they didn't because I didn't give

19   them chance, your Honor.

20             THE COURT:  What did you do, run out?

21             THE DEFENDANT:  Yes.  And I --

22             THE COURT:  Did anybody try to stop you from going out

23   of the cell?

24             THE DEFENDANT:  I ducked down because he got his hand

25   across my back.  So I dropped down and just backed up and went

J8QHMOOC

1    and left and got out of the way.

2              THE COURT:  OK.  All right.  I don't mean to cut you

3    off.  I think for purposes of today's proceeding --

4              THE DEFENDANT:   Your Honor, may I say one very

5    important thing?

6              THE COURT:  Yes.

7              THE DEFENDANT:  The same big guy the week before, when

8    I'd just been moved to this unit, had come in my cell on the

9    Friday morning at around 7:30, uninvited, unauthorized, with

10   the lights off.  And when I caught him coming in the cell, I

11   was using the bathroom.  That's why he didn't see me.  And I

12   went outside, and I said, "What are you doing in my cell?"  And

13   he immediately said to me, "You've got more charges, haven't

14   you?  You've got hidden charges?"

15             I said, "What are you talking about?"

16             "You were on a unit with my codefendant, Mr. Haddow."

17             "You know that I don't have more charges."

18             He said, "Yes, you do.  You're a chomo.  You're a

19   child molester.  You're a sex trafficker.  You've been

20   trafficking young girls for prostitution, age 11 and 12," and

21   this is in front of four or five very big body building-type

22   white American guys on Tier 2.

23             And he carried on, he said, "There's all sorts of

24   stories about your branding them with horse irons," and he

25   said -- I said, "Listen, whoever has said this, you take me to

J8QHMOOC

1    them right now." And he said, "An officer told me." I said,

2    "If an officer told you, take me right now."

3              THE COURT: I get it.

4              All right. So here's what I would like to accomplish,

5    and I'm not going to be able to do it today -- oh, Mr. Vainberg

6    and Mr. Bell, did you want to add anything? You don't have to.

7              MR. VAINBERG: I don't think so, your Honor.

8              THE COURT: Just answer this question. In any of your

9    investigation or -- that may be the wrong term, but looking

10   into this matter, did you come up with any credible evidence

11   that Mr. Moore was in danger?

12             MR. VAINBERG: We did not, your Honor.

13             THE COURT: OK.

14             MR. VAINBERG: And --

15             THE COURT: I'm sorry.

16             MR. VAINBERG: Just for the record, given what we've

17   heard, there are no hidden charges lodged against Mr. Moore for

18   sex trafficking or any other thing.

19             THE COURT: I get it.

20             So, Mr. Moore, there's two issues that I have. The

21   immediate question is whether you were going to be pro se or

22   continue with your current counsel or have other counsel

23   appointed, and resolution of that issue has two aspects. One

24   is the financial. You'd have to fill out an affidavit that you

25   qualified, and I don't know if you do, and it would be under

1    oath subject to the penalties of perjury.  That's number one.

2              Number two is I think it's prudent to have some

3    psychological evaluation to help me determine whether the

4    psychologist or psychiatrist at the MCC believes that you would

5    be able to represent yourself.

6              Do you have any problem going through that evaluation?

7              THE DEFENDANT:  Not at all, your Honor, and I'm very

8    comfortable where I am because I feel safe being on my own.

9              Your Honor, may I address Mr. Vainberg's point about

10   no extra charges?

11             THE COURT:  I have enough for today.  I have enough

12   for today.

13             So, defense counsel who is still counsel of record,

14   maybe you could assist in that effort, and I think I certainly

15   would not relieve you as counsel until we determine who the

16   next counsel is going to be, if any.

17             MR. GRUDBERG:  Your Honor, I'm of course prepared to

18   remain available to the Court and available to Mr. Moore.  I

19   think it would be wisest under the circumstances -- we do have

20   an ability to connect through the Bureau of Prisons' email

21   system.  I would be inclined to follow Mr. Moore's lead in

22   terms of the degree to which he wishes my advice and assistance

23   with regard to the two components that your Honor has

24   identified, one, the financial affidavit aspect of seeking

25   legal aid or panel counsel and, two, the whys and wherefores of

J8QHMOOC

1   what sounds like a medical psychiatric evaluation specifically

2   directed to the question of whether Mr. Moore has impediments

3   of that kind to his ability to advocate for himself.

4           THE COURT:  Those are exactly the issues I want to

5   deal with first.

6           MR. GRUDBERG:  I, of course, understand and am

7   prepared to remain in the case unless and until discharged.

8   The second part of it, in terms of the nature and depth of my

9   assistance to Mr. Moore, I am 100 percent willing to assist him

10  in those respects.  I guess I'm somewhat uncertain as to how to

11  go forward with him, and I think the appropriate thing would be

12  for me to await his contact by the CorrLinks email system or

13  some other manner.

14          THE COURT:  You can contact him.  I don't anticipate a

15  lot of effort in this short term.  One, I think with respect to

16  appointed counsel, it's a form.

17          MR. GRUDBERG:  Right.

18          THE COURT:  I don't know if you have it or the BOP has

19  it or someone will get that to Mr. Moore, and he can fill that

20  out.  But, second, I don't think you would have a huge role to

21  play in any evaluation of his competency other than to perhaps

22  respond to a question about how long will it take, for

23  example --

24          MR. GRUDBERG:  Right.

25          THE COURT:     -- what does the process entail, but I do

J8QHMOOC

1    think that psychology and BOP staff would know how to follow up

2    with Mr. Moore, and I take it you're going to follow up with

3    him --

4             DR. MILLER:  Every day.

5             THE COURT:  -- going forward at least --

6             DR. MILLER:  Every day while he's on psych obs.  If he

7    goes for the study, we'll keep him on the entire time.

8             THE COURT:  How long do you think it will take to have

9    a study like that accomplished?

10            MS. SCANNELL-VESSELLA:  Judge, I think it depends

11   because there's 3552 which is -- 3552(b), which allows the

12   Court to order basically more information that would assist it

13   with sentencing preparation, but because I don't know that --

14   since this isn't competency to stand trial or anything like

15   that, it doesn't fit into one of the kind of nice 4241,

16   4242 boxes.

17            THE COURT:  Yes, but seems to me that, from what I've

18   heard from psychology, they could form an opinion as to whether

19   or not they feel he's competent to represent himself.

20            DR. MILLER:  You can do a 4241, sorry, and specify in

21   the 4241 that you want not competency to stand trial but

22   competency to participate in his sentencing proceedings.

23            THE COURT:  Yes.  So if you would submit that to me, a

24   proposed form of -- I take it you're looking for an order from

25   the Court --

J8QHMOOC

1              MS. SCANNELL-VESSELLA:  Correct.

2              THE COURT:  -- to initiate this process.  I'd be happy

3    to do it.

4              MS. SCANNELL-VESSELLA:  OK.

5              THE COURT:  It's not a lengthy document, I don't

6    think.

7              MS. SCANNELL-VESSELLA:  No.

8              THE COURT:  If you could draft one up, I'll take a

9    look and maybe modify it or not once that happens, and I'd be

10   happy to do it today if you got it to me today.  How long does

11   such an evaluation, you think, likely take?  I'm trying to

12   figure out when we should come back here.

13             MS. SCANNELL-VESSELLA:  I think it depends a bit

14   because it's bed space, because it's going to have to be done

15   either -- it would be done at a forensic site.

16             So what do you think?

17             DR. MILLER:  It would depend on --

18             THE COURT:  Out of the BOP, you mean?

19             DR. MILLER:  At one of our medical centers.

20             MS. SCANNELL-VESSELLA:  No.

21             DR. MILLER:  It might be beneficial for him to be

22   evaluated just -- they've never seen him before and he hasn't

23   been on psych obs with us for a period of time in getting that

24   opinion.  The 4241 will move faster than the 3552, because the

25   4241, we have 30 days, where the 3552, you have 60 days.

J8QHMOOC

1        THE COURT:  As soon as you get it to me, I'll sign it.

2        Counsel, does that sound OK to you?

3        MR. GRUDBERG:  It does, your Honor.

4        I wanted to clarify.  Mr. Moore has reminded me my

5    prior remarks about email communications, I think, are no

6    longer operative given his current conditions at the BOP -- or

7    at the MCC as described by my colleagues.  I would be prepared

8    to go down and meet with him in person this week.  I tried that

9    last week.  I think there was apparently some confusion, but

10   Ms. Scannell-Vessella has indicated that was a miscommunication

11   or something, so there should not be anything about his current

12   conditions of confinement that should prevent his being

13   produced to me in the lawyer's visiting room, and I will go

14   down this week to meet with him.

15       THE COURT:  I'm sure counsel for BOP will help you

16   with that.

17       MR. GRUDBERG:  I will give her advance notice, Judge.

18       THE COURT:  Mr. Moore, is that OK with you, that

19   arrangement?

20       THE DEFENDANT:  Certainly, your Honor.

21       THE COURT:  I would ask you -- it doesn't sound like

22   it would compromise you in any way to cooperate with your

23   attorneys and with the attorneys for the BOP and the psychology

24   staff.  It's mostly a BOP analysis that I'm looking for.  I

25   don't think your attorney has a whole lot to do in that

J8QHMOOC

1  process.

2          THE DEFENDANT:  I understand, your Honor.  Thank you.

3          THE COURT:  So it's agreeable to you.

4          Yes, Mr. Bell?

5          MR. BELL:  Two quick things, your Honor.  One, it may

6  be worth our perhaps collectively checking in with your Honor

7  by letter at a date certain once we have a better sense of the

8  logistical requirements, the examination that's going to be

9  done at another site in particular, just so we can both keep

10 things going while reacting to whatever the realities are.

11         THE COURT:  Probably what I'll do, I think I will do

12 now, is to set a date, just so we don't lose track of

13 everybody, for us all to come back here.  It will be 30 days

14 out plus, I guess, give or take.

15         MR. BELL:  OK.

16         THE COURT:  Then if anything happens in the interim, I

17 would ask all or any of you to let me know if you think it's

18 should be brought to my attention.

19         MR. BELL:  The other thing that I was going to note,

20 just in case things go that way, and we recognize that they

21 won't necessarily, is that we believe that the Federal

22 Defenders would actually be conflicted from Mr. Moore's case.

23 So that would presumably be --

24         THE COURT:  Did you say "conflicted"?

25         MR. BELL:  Conflicted, yes, your Honor.

J8QHMOOC

1          THE COURT:  I think he said they will have a conflict.

2          And why is that, you think?

3          MR. BELL:  I don't want to get too detailed here, but

4     they had an interest with respect to other witnesses, another

5     witness involved in the investigation.

6          THE COURT:  All right.

7          MR. BELL:  So that would presumably go to the CJA

8     wheel if we were to go that far.

9          THE COURT:  I got you.

10          MR. BELL:   We recognize that it may not.

11          THE COURT:  I get it.  So let's then set a date.  How

12     is Wednesday, October 2, 2019, for a status conference?  But my

13     hope is and expectation that we'll be quite far along, and on

14     that date, BOP would be able to tell me what they think about

15     the viability of Mr. Moore representing himself.

16          MS. SCANNELL-VESSELLA:  Yes, Judge.

17          THE COURT:  I add, this is just for whatever it's

18     worth, Mr. Moore, even if you are able to do it, in my own

19     experience -- again, I'll start by saying you have the right to

20     represent yourself if you wish.  I feel in this instance or in

21     this case that it wouldn't, would not, be in your best

22     interest, but it's your determination, assuming that there's no

23     impediment for you making decisions.

24          THE DEFENDANT:  Thank you, your Honor.  My interest is

25     to pursue a clean sheet, not to go pro se.  That was merely a

1  means of ensuring my message got out of the facility.

2         THE COURT:  I got it.  Why don't you give some thought

3  to whether there is a viable way you could go forward with

4  Mr. Grudberg, as among other options that might be available to

5  you.  What Mr. Bell is saying, he doesn't think Federal

6  Defenders would be able to pick up your case, but we don't know

7  that for sure.  If you were eligible and able, it would be a

8  CJA lawyer.

9         Let's say 11:00 a.m. on October 2.  I'm going to put

10  down for BOP recommendation re pro se status.

11         Mr. Bell, if you all find out something and defense

12  counsel is available or known earlier than that, just let me

13  know.  Otherwise, the sentencing date, the current sentencing

14  date, is vacated.  The status conference will be Wednesday,

15  October 2, at 11:00 a.m., devoted principally to the issue of

16  whether or not BOP psychology believes that Mr. Bell is

17  capable -- I don't know if "capable" is the right word or

18  "competent" is the right word to represent himself, but you'll

19  figure it out.

20         MR. VAINBERG:  Your Honor, just to confirm what I

21  think you've just said, so it sounds like the confines of the

22  mental health evaluation is whether Mr. Moore is competent to

23  represent himself, not competent in any other broader sense, is

24  that accurate?

25         THE COURT:  Well, I leave that up to BOP and

J8QHMOOC

1    Mr. Moore.  If they want to go beyond that or -- and

2    particularly if Mr. Moore is having some psychological issues

3    not related to the competence necessarily, you and he figure

4    out a way to treat them perhaps or --

5         DR. MILLER:  That would be included in that report.

6    We always include treatment recommendations.

7         THE COURT:  OK.  Great.

8         DR. MILLER:  Yeah.

9         THE COURT:   Yes, sir.

10        MR. GRUDBERG:  Judge, just one other item.  I think on

11   the September conference we had anticipated setting a date.

12   For the purposes of the probation department, I wanted to

13   advise the Court that Ms. Tyler of probation has conducted the

14   presentence interview.  There are obviously a number of open

15   items pending with her.  It is my understanding she is away on

16   vacation this week.  What I would propose to do would be for me

17   to reach out to her and give her a summary of this process and

18   the schedule going forward and ask her to be in touch with the

19   Court if she had any questions as to where things were.

20        THE COURT:  Or with BOP counsel.  So we're putting not

21   a hold so much on the presentence investigation report, but we

22   would certainly want that report when it's finalized to include

23   all of these issues that we've been discussing.

24        MR. GRUDBERG:  Yeah, I just do think, for the purposes

25   of his participating in this process, I think under the

J8QHMOOC

1    circumstances it would be appropriate to table it while this

2    review is underway.

3              THE COURT:  OK.

4              MR. GRUDBERG:  Thank you, Judge.

5              THE COURT:  We're saying that that's on hold for now.

6              Good to see you all.  I'll see everybody on October 2

7    at 11:00 a.m.  Thanks a lot.

8              MR. GRUDBERG:  Thank you, your Honor.

9              MR. VAINBERG:  Thank you.

10             (Adjourned)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25