K2BTMOOC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

           v.                          18 CR 759 (RMB)

JAMES MOORE,

                Defendant.

------------------------------x
                                       New York, N.Y.
                                       February 11, 2020
                                       9:30 a.m.

Before:

                  HON. RICHARD M. BERMAN,

                                       District Judge

                        APPEARANCES

GEOFFREY S. BERMAN
     United States Attorney for the
     Southern District of New York
VLADISLAV VAINBERG
     Assistant United States Attorney

TARTER, KRINSKY & DROGIN
     Attorneys for Defendant
MICHAEL GRUDBERG
```

1       (Defendant not present)

2       THE COURT:  I take it Mr. Moore is not here; probably
3   too late notice or something to get him, but I think that's
4   fine.  I just wanted to get a status from you all.

5       MR. VAINBERG:  Yes, your Honor.  Just at the outset,
6   the government would like to apologize for not having Mr. Moore
7   produced today.

8       THE COURT:  It's no problem.

9       MR. VAINBERG:  There was a failure on our part.  We
10  understand he could be made available at 4 o'clock, but we're
11  able to proceed.  And I know Mr. Grudberg had some
12  conversations last night about proceeding here today.

13      THE COURT:  So is it okay, counsel, to waive his
14  appearance?

15      MR. GRUDBERG:  As I said to Mr. Vainberg, your Honor,
16  I did reach out on Corrlinks to see if I could get a waiver of
17  today's appearance from Mr. Moore.  Unfortunately, I don't have
18  a simple answer to that, but as I said to Mr. Vainberg, what it
19  adds up to is so long as the Court is not taking any action
20  today and we're just providing the update I think the Court is
21  interested in, then I'm prepared to proceed.

22      THE COURT:  What is Corrlinks?

23      MR. GRUDBERG:  It's I think a commercial name for the
24  email vendor both for counsel and for family members that the
25  inmate can sign up for.

1           THE COURT:  So that is always -- that means that the
2    inmate can always have contact with you and/or family by email?
3           MR. GRUDBERG:  I won't bore with you the flies in that
4    ointment; sometimes you don't get the alerts from the system
5    when the client emails you.  It is not a privileged email
6    system for purposes of counsel, but it's a relatively 24-hour
7    communication system.
8           THE COURT:  And is it privileged for family?  I'm
9    curious.
10          MR. GRUDBERG:  I don't think there's any
11   confidentiality that attaches to it for any user.  You get
12   those warnings when you sign on.  You can arrange -- if time
13   permits, arrange for a privileged call through a counselor, but
14   it's best not to use Corrlinks for truly privileged
15   communications.
16          THE COURT:  And Corrlinks -- first I'm hearing it,
17   actually; long time, years?
18          MR. GRUDBERG:  I would say about a decade, your Honor.
19          THE COURT:  Okay.  And is that the preferred way, so
20   to speak, for counsel and defendant to correspond?
21          MR. GRUDBERG:  I use it as a stopgap.  If there's
22   something serious to talk about, I get on the train, but it
23   does help for purposes of updates.
24          THE COURT:  Right. Okay.  Of course, when you go
25   there person to person, that is privileged.

1      MR. GRUDBERG:  That is.

2      THE COURT:  Got it.

3      MR. GRUDBERG:  Thank you, Judge.

4      THE COURT:  So I have been following this.  I read the
5 forensic report, and I just wasn't clear where you all are at,
6 and I thought I would just ask for a status update.

7      MR. VAINBERG:  So your Honor, obviously we have
8 digested the forensic report which we got the morning of the
9 last conference.  It is in some way a report that sort of tugs
10 in two different directions.  We noticed from the government's
11 side there's a number of what I would call positive findings in
12 the report regarding Mr. Moore's cognitive abilities, his
13 abilities to understand what is going on.  It notes that his
14 sort of current delusions did not exist during the trial but
15 are newly developed, notes his abilities to express himself to
16 counsel and others, to understand the PSR process, to
17 understand his sentencing exposure, the guidelines.  It notes
18 that there are no indications of a prior history of mental
19 illness or these sort of delusions in his past.

20      And then it sort of describes his complaints of a
21 potential conspiracy to set him up and the sorts of letters
22 that your Honor and counsel have received from Mr. Moore, and
23 then sort of concludes as a bottom line, as a result of that,
24 he's not competent to proceed.  That finding is somewhat
25 curious because the order that your Honor signed, of course, on

August 26 simply requested an examination as to whether he's competent to proceed pro se towards sentencing. It looks like the psychologist sort of took the assignment in a different fashion and issued an order that sort of talks about competency writ large for these proceedings, but nonetheless, here we are.

What the government has been trying to understand with the Bureau of Prisons is the process by which Mr. Moore can receive treatment within the confines of a restoration order, which is what Dr. Kissin recommends, or outside of it. What we understand BOP's position is is that now there is a finding by a BOP psychologist that he's not competent, that the next appropriate step should be the issuance of a 2241(d) order which would begin the restoration process.

The way that process would work, according to who we have talked to, is that Mr. Moore would be designated to one of three facilities that deal with mental restoration of male inmates. So that would be FMC Butner in North Carolina, USMCFP Springfield in Missouri, or FMC Fort Worth in Texas. At any of those intuitions the restoration team would include at least one assigned social worker, a psychologist and a psychologist, that team would monitor Mr. Moore's progress, adjust his medication or treatment as necessary, and issue a final report once he's restored to competency. That team would be able to consult with FMC Devins where he was evaluated, but they would be making their own independent decisions as to his condition

1    and his competence going forward.

2    We have also asked about the possibility of this Court
3    issuing a general order for Mr. Moore to receive treatment sort
4    of outside the confines of that process.  And that's really an
5    area where we're still trying to get some more information
6    whether that's feasible or not.  Our understanding is that the
7    BOP's sort of concerns with that kind of order is that although
8    there are psychiatrists at the MCC, for example, who are
9    forensic psychologists, they don't do restorations and they're
10   not in a position to opine on competency.  They could treat him
11   but wouldn't be able to sort of state as a legal matter he's
12   now competent.  And because there's a competency sort of
13   finding, there's a concern that they're not in a position to
14   treat him and sort of figure out the interplay between those
15   two issues.

16   And their other concern is because outside of the
17   restoration process there wouldn't be a mechanism to find that
18   he has been restored to competency.  There's also not an
19   ability for them to require Mr. Moore to take medication
20   outside of a 2241(d) order.  So that's why the BOP's suggestion
21   is that the Court issue a 2241(d) order.  Like I said, there's
22   a few more questions that we have, including the question of
23   whether your Honor would need to find in that order that
24   Mr. Moore is not competent or whether your Honor can sign a
25   2241 order requiring the restoration process to begin without

1     making that finding based on the report.

2              THE COURT:  Just so the record is clear, you're
3     saying, particularly at page 10 of the January 6, 2019 report,
4     I mean there's certainly a lot more in here than I'm referring
5     to, but there is a section on page 10 that says:  However,
6     Mr. Moore's rational understanding of his legal situation
7     appears to be significantly undermined by his symptoms of his
8     mental illness.  It goes on to say there was no indication
9     Mr. Moore was experiencing disordered thinking about his
10    charges until the conclusion of his trial.  However, since his
11    conviction in June 2019, he has become convinced that a case
12    against him is in fact a manifestation of a plot to divert
13    blame from other parties for their illegal activities, and has
14    grown increasingly concerned he will be killed in an effort to
15    prevent him from divulging information about these individuals.
16    His paranoid concerns have spread to include his family members
17    as well as his attorney.  Mr. Moore's preoccupying paranoid
18    ideas have become increasingly encompassing, penetrating all
19    aspects of his daily functioning and driving his thinking
20    vis-a-vis the instant legal case against him.

21             That's essentially what you're referring to about the
22    finding in the report?

23             MR. VAINBERG:  Right.  That is the basis for finding
24    him not competent to proceed.

25             THE COURT:  Okay.  So where do you think this is

1  heading, counsel, or how do we get there?  I assume you want
2  further discussion with Mr. Moore about the report and all
3  these various options.
4            MR. GRUDBERG:  Of course, and I will, your Honor.  I
5  guess in terms of Mr. Moore's reaction to the report and its
6  recommendations, for immediate purposes I would refer back to
7  what he told the Court the last time we were together.  I
8  believe he is open and desires to have the treatment that is
9  recommended.
10           With respect to the choice between particulars that
11 Mr. Vainberg has raised, I haven't had the opportunity to talk
12 with him about one means of an order versus another, but it is
13 my understanding that he's open to take medication.  Again,
14 without coming back to merits of the report of, all I would say
15 that without taking issue with the observation that Mr. Moore
16 is able to go back and forth about objective mechanics of the
17 next phase of the proceeding, it has been my experience -- and
18 your Honor has received the correspondence that detail it --
19 that when these moments emerge when Mr. Moore becomes more
20 agitated about his personal safety, it can be consuming.  So I
21 think we have a little bit of on or off situation that we're
22 confronting here, and hopefully, of course, treatment would
23 address that.
24           The other thing is I haven't had a chance to discuss
25 with him -- it sounds like from what BOP counsel is reporting,

1    that the official places at which teams exist to render this
2    treatment are all far from the courthouse.  I think bottom line
3    is he wants and needs that treatment, so wherever it is, it is,
4    but I would like to be able to get some information from BOP
5    staff as to how people in his setting are transported in an
6    ordinary non-medical setting.  That can be a long process
7    stopping at county courthouses -- excuse me, county jails along
8    the way, and I think that would be less than helpful for
9    somebody in his situation, but obviously we don't make those
10   rules.
11              THE COURT:  They don't have anything like that in Fort
12   Dix, for example, closer at hand?
13              MR. VAINBERG:  We're told that those are the only
14   three facilities that are currently doing restorations.
15              THE COURT:  Butner and what are the other two?
16              MR. VAINBERG:  It's Butner, North Carolina,
17   Springfield in Missouri, and Fort Worth in Texas.
18              THE COURT:  Okay. Next steps, what do you think?  And
19   how much time before we take the next steps?
20              MR. VAINBERG:  Well, so from the government's side, we
21   need to iron out some of the logistics with the BOP about the
22   form of the order that we may recommend to your Honor.  And I
23   think from Mr. Grudberg's side he needs to speak with his
24   client and understand the logistics of the transport issues so
25   he could explain that.

K2BTMOOC

1    THE COURT:  In developing that proposed order, you'll
2  meet and confer with defense counsel?
3    MR. VAINBERG:  Yes.  If I may have a moment to confer
4  with Mr. Grudberg on the timeline?
5    THE COURT:  Sure.  One small note, this report on page
6  one is I think it's a typo or mistake, it says January 6, 2019,
7  it's obviously I think 2020.  Right?
8    MR. VAINBERG:  Yes.
9    MR. GRUDBERG:  Right.
10    THE COURT:  So I will make that change on mine and for
11  the record.
12    Sorry, didn't mean to interrupt.  And I do have one
13  more question for defense counsel, but it can wait.
14    (Pause)
15    MR. VAINBERG:  We have just conferred, and we think
16  that we can be in a position to report back within
17  approximately a week.  So perhaps Thursday next week, if that
18  day works for the Court.
19    THE COURT:  You want Thursday next week, which is the
20  20th?
21    MR. GRUDBERG:  The 20th.
22    THE COURT:  How about 11:30 on that day?
23    MR. VAINBERG:  That works for the government.
24    THE COURT:  Okay.  So I wanted to ask:  Is there
25  family interaction with him?

K2BTMOOC

1   MR. GRUDBERG:  Telephonic, your Honor.  I know there
2   is some reference in the substance of the report to his
3   children.  They all live in the United Kingdom, they're all in
4   Europe.  He has remarried, his wife is -- I don't believe she's
5   in this country.  She has family of her own in South America.
6   They're in frequent touch telephonically.
7   THE COURT:  There's nobody who is visiting him except
8   for yourself is what I'm trying to say.
9   MR. GRUDBERG:  That's correct.
10   THE COURT:  Okay.  Then I will see you on the 20th at
11   11:30.
12   MR. VAINBERG:  Thank you, your Honor.
13   MR. GRUDBERG:  Thank you.
14   THE COURT:  Thanks so much.
15   (Adjourned)