UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                              Plaintiff,

            -against-

JAMES MOORE,

                              Defendant.

Case No. 18 Cr. 759 (RMB)

**SENTENCING MEMORANDUM ON BEHALF
OF DEFENDANT JAMES MOORE**

Michael J. Grudberg
Tarter Krinsky & Drogin LP
1350 Broadway, 11th Floor
New York, New York 10018
Tel.: (212) 216-8000
Fax.: (212) 216-8001
mgrudberg@tarterkrinsky.com
*Counsel for Defendant James Moore*

Dated: October 13, 2021

## TABLE OF CONTENTS

PAGE

I.    PRELIMINARY STATEMENT ............................................................1

II.   MR. MOORE'S BACKGROUND AND CHARACTER ......................................2

III.  THE OFFENSE CONDUCT .................................................................7

IV.   THE PRESENTENCE REPORT.............................................................8

V.    SENTENCING ANALYSIS...................................................................9

      A.  Sentencing Principles................................................................9

      B.  There Is No Basis Presented for an Obstruction of Justice Enhancement.......10

      C.  The Record Does Not Support a Role in the Offense Adjustment .................13

      D.  The 2B1.1 Loss Amount Should Not Exceed $7.5 Million............................15

      E.  The Sam-Aura Sentence and Relative Culpability ...........................................16

      F.  The Misprision of Felony Conviction Overstates Mr. Moore's
          Real Criminal History ................................................................20

      G.  Mr. Moore's Time Served to Date Has Been Extraordinarily Punitive...........27

VI.   CONCLUSION...................................................................................31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

Bronston v. United States,
 409 U.S. 352 (1973)....................................................................................................12

Dean v. United States,
 137 S. Ct. 1170 (2017)................................................................................................9

Itani v. Ashcroft,
 298 F.3d 1213 (11th Cir. 2002) ...............................................................................26

Koon v. United States, 518 U.S. 81, 109 (1996) ...............................................................28

Mendez v. Barr,
 960 F.3d 80 (2d Cir. 2020)........................................................................................26

Nelson v. United States,
 555 U.S. 350 (2009)....................................................................................................9

United States v. Alcius,
 952 F. 3d 83 (2d Cir. 2020)........................................................................................20

United States v. Booker,
 543 U.S. 220 (2005)....................................................................................................9

United States v. Carty,
 264 F.3d 191 (2d Cir. 2001)......................................................................................28

United States v. Cavera,
 550 F.3d 180 (2d Cir. 2008)(en banc).......................................................................9

United States v. Christensen,
 18 F.3d 822 ...............................................................................................................30

United States v. Ghailani,
 733 F.3d 29 (2d Cir. 2013).......................................................................................20

United States v. Hertular,
 562 F.3d 433 (2d Cir. 2009)................................................................................15, 17

United States v. Ingram,
 721 F.3d 35 (2d Cir. 2013)(Calabresi, J., concurring)..............................................21

United States v. Johnson,
    567 F.3d 40 (2d Cir. 2009)......................................................................9

United States v. King,
    402 F.2d 694 (9th Cir. 1968) ................................................................26

United States v. Lara,
    905 F.2d 599 (2d Cir. 1990)..................................................................30

United States v. Lucas,
    745 F.3d 626 (2d Cir. 2014)..................................................................31

United States v. Mishoe,
    241 F.3d 214 (2d Cir. 2001)............................................................21, 22

United States v. Rodriguez,
    492 F. Supp. 3d 306 (S.D.N.Y. 2020)..................................................28

United States v. Salvador,
    No. 98 Cr. 484, 2006 WL 2034637 (S.D.N.Y. July 19, 2006) ...................28

United States v. Sanpedro,
    352 F. App'x 482 (2d Cir. 2009) .........................................................28

United States v. Stewart,
    590 F.3d 93 (2d Cir. 2009)......................................................................9

United States v. Torres,
    No. 01 Cr. 1078, 2005 WL 2087818 (S.D.N.Y. Aug. 30, 2005)................28

**Statutes**

18 U.S.C. § 3553(a) .................................................................................9

18 U.S.C. § 3553(a)(2)..............................................................................9

18 U.S.C. § 3553(a)(2)(A)-(D) ..................................................................9

18 U.S.C. §3584.....................................................................................31

**Other Authorities**

Timothy Williams, et al., "'Jails are Petri Dishes': Inmates Freed as the
    Virus Spreads Behind Bars," N.Y. Times (Mar. 30, 2020) .........................29

Defendant James Moore, by his counsel, respectfully submits this Sentencing Memorandum (together with exhibits including appended letters) pursuant to the Court's Individual Rules of Practice for Criminal Case Sentencing Proceedings, in connection with his sentencing, scheduled for October 27, 2021.

## I.    PRELIMINARY STATEMENT

Mr. Moore was convicted at trial of felony crimes, and recognizes that the Court has an obligation to consider the Sentencing Guidelines, weigh the statutory factors, and impose a sentence that is sufficient but not greater than necessary to accomplish the purposes of sentencing. We respectfully submit that there are several factors counseling in favor of a sentence substantially below the range generated by the advisory Guidelines. Mr. Moore is not a young defendant, and has made a long and successful business career for himself in ventures that were both legitimate and well known; his troubles are recent and his past successes did not attract, but could never have avoided, enforcement scrutiny. His prior federal conviction is only a technical exception to this theme, as it markedly overstates the seriousness of his criminal history. Another defendant charged under this same indictment, but sentenced by another Judge of this Court, received a below-Guidelines sentence of 48 months, and that person's role in the scheme is by all objective criteria more culpable. The recommended adjustments for role in the offense and supposed obstruction are not factually or legally sustainable. Finally, his incarceration to date – now some two years relating solely to this case – has been unusually harsh because of the rigors of COVID-era confinement (including in the MCC), the unique and acute impact of his mental health stresses since 2019, and his separation from friends and family abroad. This is a serious case, but we urge

the Court to consider the serious punishment already imposed by circumstance, and to gauge the likelihood of Mr. Moore's redemption by the estimable life he has already led.

## II.      MR. MOORE'S BACKGROUND AND CHARACTER

James Moore is 60 years old. Until the recent conviction that brings him before this Court for sentencing, his life has been marked by hard work, steady perseverance, gentle understanding and active attention to the people around him. Although he stands convicted of a large-scale fraud with numerous victims and significant individual losses, that narrative stands in contrast to the life he has led – chartering legitimate businesses through his own creativeness and initiative, some of them vastly successful, and all unblemished by scandal, much less prosecution; and raising and providing for his family, through easy times and hard, contributing emotional support beyond the material. This is a serious case, but it should not obscure the admirable (and long) road Mr. Moore has walked to get here.

He was born in Sheffield, England in December 1960. His mother stayed home to raise him and his sister and two brothers, while his father worked for an engineering concern. It was a caring and secure, middle-class upbringing, and Mr. Moore eventually pursued higher education, earning a bachelors–level certificate from what was then called Sheffield Polytechnic Institute.  Only Mr. Moore and one brother survive; he lost his elder brother to leukemia in 2008 and his sister, also to cancer, during his incarceration in 2019.

In business, Mr. Moore was from the beginning a self-starter. His early ventures were marked by his recognition of new and unique opportunities, and his courage to sell himself along with his product. He started his own fitness equipment rental business, together with his brother Robert. After selling his interest to Robert, he began work as a marketing advisor to a fragrance company, L'Arome, which he eventually grew into a multi-

million dollar sales operation with international reach. He also marketed "Y2K" solutions software, through a company called Continua Systems, in the two years preceding the end of the millennium.  Each of these businesses became the market leader in the UK.

In the midst of this, in the mid-1990s, he had taken an entrepreneurial turn, buying and selling renovated properties, and generally educating himself about real estate investing. This grew into his most innovative and successful business, The Instant Access Group. The venture was born of Mr. Moore's realization that there was really no resource in the UK for individual investors to learn about real property acquisition. Because purchasing residential property for rental income or resale, rather than personal occupancy, was not a common undertaking at that time, Mr. Moore decided in approximately 2000 to develop and offer a series of seminars to teach the basic principles. That initial venture came to be called Inside Track Seminars, and quickly took off, reaching hundreds of students weekly in its first few years of operation.

Mr. Moore also realized that participants in the seminars would want opportunities to evaluate and purchase for themselves, and he therefore developed Instant Access Properties, which acted as a sales agent for multiple property developers around the world. These businesses were quintessentially in the public eye, enormously successful and never the subject of law enforcement scrutiny. They connected real brick-and-mortar properties with bona fide buyers, closing title on over 30,000 homes in less than a decade, with an aggregate market value exceeding $5 billion. The Group became the largest seller of real property in the UK, and once established became highly sought-after by the development community. At peak, the companies employed almost 400 persons.

Mr. Moore brought in an experienced management team as the companies grew, including a veteran of the Virgin conglomerate to be CEO, and retained a major investment bank and Ernst & Young to advise on a potential sale of the business. Although Instant Access briefly entertained offers – from a UK bank, a Dutch company and one of the founders of the Hard Rock chain – exceeding £80 million, the world financial crisis, marked by the wholesale collapse of residential real estate values, completely undermined the business model, and the companies went into receivership, but not before Mr. Moore put £4.5 million of his own funds into the companies in an effort to stave off the worst.[1]

The collapse of the Instant Access Group coincided with the collapse of his marriage, as he and his first wife reached the end of a bitter divorce litigation shortly thereafter. The financial terms of the decree, atop the business reverses, were a significant hardship for Mr. Moore, but harder still was the impact on his children. He had married Kim Purkiss, who had three children from a prior marriage, in October 1998, and they had three sons of their own: Jonathan, Christopher and William, now 30, 25 and 21 respectively. (He also has a daughter Danielle, from a brief prior relationship, now 32.)

Included among the attachments to this memorandum (at Exhibit 1) are letters from each of his sons. Read together, they tell a story of genuine admiration and gratitude for a parent who has always been there for them, in spite of the distance of international business, marital separation and legal troubles. They recall his simplicity: during tight money times, going to the grocery late at night to buy discounted produce and freezing it to stretch the

---

[1] To give the Court a sense of Mr. Moore's positive relationship with the employees of these companies, we attach from the docket of his prior case a letter written by Cherrie Keene, who came to Instant Access from a go-nowhere job and became a home-owner and sincere admirer of Mr. Moore. (Exhibit 1)

budget; returning six months after the fact to a kebab shop on his next visit home, to repay the owner for a sandwich he unthinkingly ordered without the UK currency to pay for it; always listening to audio books to improve himself.

They also recount many examples of thoughtfulness and charity. They all describe the holidays in Spain that he organized for his dying brother, filling the house there with extended family, so that all could comfort him and carry his memory. Jonathan notes his father's guiding him through difficult times, including episodes of physical bullying at school; his father has been "truly a rock" in his life. They recall him opening their home to relatives in need, providing money to save his sister-in-law's home from auction, and always treating his three stepchildren as his own. William recounts his father flying trans-Atlantic the next day to visit him after a call in which he shared that he was struggling.

All the boys mention his impact on the people he touched in his real estate business, noting that whenever they travel with him they are approached by former seminar students or employees, thankful for setting them on course to their own independence and professional success. The letters also describe an unusually gentle person, especially with animals. William particularly recalls his father stopping to rescue an injured bird, and on another occasion having a sincere discussion with him – after William had taken up air rifles as a hobby – about whether he ought to follow through on his plan to shoot pigeons. His father shared his own anecdote about his real remorse at having done the same as a boy. Although he told him "the choice was [his] to make," William "didn't shoot the pigeon."[2]

---

[2] Shaun Taylor, a longtime friend, also notes Mr. Moore's "love, empathy and support in moments of need," like the death of Mr. Taylor's father, through which Mr. Moore would "talk for hours" to bear him along. He also describes his generosity to charities and the homeless.

Finally, they note what a thrill it was to connect with their father, via video-call facilities at a Raleigh, North Carolina jail on his return trip from Butner; for Christopher it was an "elating moment," for William "incredible … to see his face after so long."

Mr. Moore's eldest, Dani, was also able to relay thoughts about her father by e-mail. She particularly recalls a teenage friend of the family, whose parents lived abroad, being welcomed into their home for months "to get on her feet," one way in which he encouraged her and her siblings "to think of how lucky we are for what we have."  She also is expecting her first child, and looks forward to sharing with her dad his first grandchild.

Also included is a letter from Mr. Moore's wife, Karina Pena. They met more than ten years ago in Florida, and were married in April 2012, living and working together up until his arrest and incarceration. She has spent most of the time since his arrest as a caregiver for her ailing father in his country. Her letter recites her spouse's "abundance" of human attributes: "protective, supportive, a good communicator, compassionate, compromising, loyal, honest, dependable, humorous and most definitely selfless." Perhaps most poignantly she describes his care for her wheelchair-bound mother during her convalescence, and the support he always offered her through the years of her mother's illness, saying she would not have made it through "without his support, help and strength." She also notes the strain she has seen, on both father and children, from the separation resulting from prison walls, geographic distance and the challenges of the pandemic. Like the sons, she remarks on his consistent "kindness and generosity," noting that she has "never heard him criticize anyone or anything."

### III.     THE OFFENSE CONDUCT

The Court presided over the 2019 trial, but we offer a brief summary for context. Mr. Moore was convicted of a wire fraud conspiracy and one substantive wire fraud count in connection with his involvement in the promotion of investment interests in Bar Works, a shared workspace environment, comparable to the then-highly favored "We Work" business model, and designed to charge an occupancy fee to its business tenants. Investors were offered the opportunity essentially to lease a particular space in one of the Bar Works sites, to be managed by the company, and were to receive a percentage of the revenues attached to that space, together with a guaranteed return of their original investment. The gravamen of the fraud was that although Bar Works was created and managed by a UK transplant named Renwick Haddow, investors were told that the business was run by a non-existent CEO, "Jonathan Black," invented to keep Haddow off the paperwork, owing to his searchable history of regulatory sanctions and civil litigation in prior investment schemes. Haddow became a pleading cooperator and testified at trial regarding Mr. Moore's history with the company and communications between them, principally conversations and electronic messages regarding Black, the fictional chief executive. The government argued, and the jury apparently determined, that Mr. Moore was aware of and sustained that deception.

The record reflects that Mr. Moore's role was in many ways limited. Although the government pointed to early conversations between him and Haddow, and highlighted his supposed contributions and ideas, it is not disputed that Haddow hatched the Bar Works scheme on his own. Moore had nothing to do with the preparation of the offering documents, for instance. Moreover, Mr. Moore and United Property Group, a sales network that he

introduced to Haddow, left the project long before its demise, having participated in some $7.5 million out of the scheme's $57-plus million in investments. Furthermore, although testimony and documents reflect Moore and Haddow discussing a "partnership" between them in the venture, Haddow admitted that there was never any contract between them to effect an actual equity stake, and no stock or other evidence of shared ownership. Haddow would invoke Mr. Moore's "equity" to chisel down his commissions by applying contributions for supposed capital expenses, but there was never any partnership between them. Moore was also an absentee from the day-to-day operations, visiting only on a handful of dates from overseas, and never taking any managing or supervisory role over company employees – this in contrast to Sam Aura, the principal sales coordinator of Bar Works investments, responsible for the vast majority of invested dollars and an everyday presence at the company offices.

## IV.    THE PRESENTENCE REPORT

The PSR calculates the Guidelines as follows. Grouping the conspiracy and wire fraud offenses under Section 2X1.1, the Base Offense Level is 7. Specific Offense Characteristic increases are recommended for a claimed fraud loss of $57.5 million (22 levels), substantial financial hardship to five or more victims (4 levels) and sophisticated means (2 levels). Adjustments are also added asserting Mr. Moore was a manager or supervisor of criminal activity involving five or more, or otherwise extensive (3 levels), and for his supposed obstruction of justice (2 levels). The PSR's Total Offense Level is thus 40. Mr. Moore has objected to a loss amount over $7.5 million, and to the manager-supervisor and obstruction adjustments. He submits that the Total Offense Level should be 31. His formal objections to the draft PSR are attached as Exhibit 2.

## V.     SENTENCING ANALYSIS

### A.     <u>Sentencing Principles</u>

In <u>United States v. Booker</u>, 543 U.S. 220, 245 (2005), the Supreme Court held that the Sentencing Guidelines are "effectively advisory." Accordingly, sentencing proceedings in the federal system treat the Guidelines range as the "starting point and the initial benchmark." <u>United States v. Johnson</u>, 567 F.3d 40, 51 (2d Cir. 2009)(internal quotes omitted)(citing <u>Gall v. United States</u>, 552 U.S. 38, 49 (2007)). The sentence imposed must be "sufficient, but not greater than necessary," to accomplish the "four identified purposes of sentencing: just punishment, deterrence, protection of the public, and rehabilitation." <u>Dean v. United States</u>, 137 S. Ct. 1170, 1175 (2017)(internal alterations omitted); <u>see also</u> 18 U.S.C. § 3553(a). The sentencing court should not "presume that a Guidelines sentence is reasonable." <u>United States v. Cavera</u>, 550 F.3d 180, 189 (2d Cir. 2008)(en banc); <u>Nelson v. United States</u>, 555 U.S. 350, 352 (2009)("The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable.")(emphasis in original) As is by now well familiar, "the Guidelines are only one of the factors to consider when imposing sentence." <u>United States v. Stewart</u>, 590 F.3d 93, 153 (2d Cir. 2009).

The purposes that a court must weigh in crafting a sufficient sentence are set out in 18 U.S.C. § 3553(a)(2). Specifically, the court must consider "the need for the sentence imposed . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense . . . to afford adequate deterrence to criminal conduct . . . to protect the public from further crimes of the defendant; and . . . to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]" 18 U.S.C. § 3553(a)(2)(A)-(D). In addition, the

court shall consider: "the nature and circumstances of the offense and the history and characteristics of the defendant," 3553(a)(1); "the kinds of sentences available," 3553(a)(3); "the kinds of sentence and the sentencing range established for the . . . the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines[,]" 3553(a)(4); "any pertinent [Guidelines] policy statement[,]" 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 3553(a)(6); and "the need to provide restitution to any victims of the offense." 3553(a)(7).

### B.   There Is No Basis Presented for an Obstruction of Justice Enhancement

The PSR (at ¶¶ 48-49, 56-58) recommends a two-level enhancement for obstruction of justice. Because neither cited specification of Mr. Moore's conduct supports the enhancement, it should be rejected. We respectfully submit that the exchanges highlighted were not affirmative attempts by Mr. Moore to derail any investigation. A subject-matter overlap with issues later implicated at trial does not mean that a defendant can be faulted for not volunteering, or for failing to answer questions that were not asked.  His statements were literally true and had no effect on any investigation, then-existing or in the future.

The first specification relates to Mr. Moore's voluntary phone interview, from Spain, with the SEC in August 2016. The relevant questions and answers derive from the SEC Staff's inquiries about Bar Works management. There is no way the exchange could be read to have misled the Commission to the effect that Bar Works was managed by "Jonathan Black," to the exclusion of Haddow – the crux of the prosecution's fraud case here – because Mr. Moore testified exclusively and at great length that this was Haddow's business, and

that he had never met or even spoken to any Jonathan Black.  Nevertheless, the PSR suggests (at ¶ 48) that Mr. Moore "repeatedly lied" to the effect that Jonathan Black was a "real person."  The relevant examination was as follows:

> Q       []Okay, all right, so with respect to Bar Works, did you ever – was there a – did you have any understanding that there was a management team in place, or executives running it?
>
> A       I was told that – Mr. Haddow had told me that he'd previously worked with a company called, I think, Regent Inns PLC, in the UK. And they happened to roll out a business called Walkabout, Walkabout Bars. You know, I was vaguely aware of Walkabout, because it was quite a fast-growing business in – I can't remember, probably the mid '90s. But you know, it was one of those things that I was vaguely aware of, because I had seen it on the High Street; it had cropped up in various different places. And he told me that he'd got a chap from Regency Inns (sic) by the name of Jonathan Black to add all this up for him.
>
> Q       Okay. That was Regency Inns?
>
> A       Regency Inns, PLC (sic).
>
> Q       Did you ever meet Mr. Black?
>
> A       No, I didn't, unusually. No.
>
> Q       Did you ever talk to him?
>
> A       No, I didn't.
>
> Q       What did you understand his role to be?
>
> A       We understood his role initially was CEO – or rather, initially we understood his role as CEO.
>
> Q       But so did you ever then –
>
> MS. KRISHNAMURTHY: Did you ever ask to speak to Mr. Black?
>
> MR. MOORE: No, I didn't. I don't know whether anyone else did, but I didn't, no.
>
> Q       Okay. Were there any – did you understand there to be any other executives in place?
>
> A       No. I never understood anyone else to be in place, other than Mr. Haddow.
>
> Q       Okay.

A        And his wife, of course. Sorry.

See Exhibit 3, August 11, 2016 SEC transcript, at 69-71.

Thus, Mr. Moore stated only that Haddow had said that the Bar Works CEO was a former employee of Regent Inns named Jonathan Black, and that he, Moore, had never met or spoken with such a person. He conceded that Black's absence from the scene was "unusual," and added that Haddow and his wife were the only "executives in place" at the company. All of these statements were literally accurate. If the SEC Staff were not then aware that "Black" was a fiction – and neither the PSR nor the government has clarified that – the statements could have contributed to a misleading impression that he was an actual person, but no question about Mr. Moore's belief in that regard was ever directly put.  Cf. Bronston v. United States, 409 U.S. 352, 359 (1973)(in perjury prosecution "[a] jury should not be permitted to engage in conjecture whether an unresponsive answer, true and complete on its face, was intended to mislead or divert the examiner").  Moreover, his testimony as a whole left no doubt that Bar Works was the vehicle of one man, Renwick Haddow, such that Black's corporeal existence vel non was not material to the question of the company's actual management, because it was clear that "Jonathan Black" was, either way, a compete nonentity.

The second alleged basis is similarly off the mark. Mr. Moore volunteered to speak to investigators, this time in custodial conditions, after Miranda warnings, following his Florida arrest. The only claimed instance of deception is his apparent initial denial that he had "done anything for money since 2010." He never denied an association with Bar Works, and indeed confirmed it as soon as the subject was raised by agents. He never was a Bar Works employee, and the invoices presented to that company were not from Moore, but from Universal Voice Tech, his wife's company through which they had participated in

various ventures, both related and unrelated to Bar Works. Any value Mr. Moore received for his Bar Works involvement went in the first instance to the company, not to him personally. Again, his statements to the agents were not only literally true, but more than understandable under the circumstances, given that the agents' inquiries about earnings "since 2010" were obviously background questions in an arrest interview concerning an unrelated set of facts. Mr. Moore immediately and accurately confirmed the source of monies when related documents were presented to him by agents. That is hardly obstructive conduct.

Moreover, neither of these scenarios involved sworn testimony. The Commentary to Guideline 3C1.1, at Application Notes 4 and 5, plainly states that "making false statements, not under oath, to law enforcement officers" will not ordinarily warrant application of the adjustment, and cannot support it in the absence of a showing that the conduct "significantly obstructed or impeded the official investigation or prosecution of the instant offense." Neither the PSR nor the government's response to Mr. Moore's objections makes any attempt to substantiate such an impact. As noted, whether or not the SEC investigators in August 2016 were aware of questions as to Black's existence, Moore's testimony made clear that that person had no involvement in Bar Works, and the testimony could not have caused them to follow any false leads or overlook any apparent problem associated with an absent "CEO". As for the interviewing agents in Florida, their version of events is the *opposite* of actual obstruction: they knew the truth all along, and only confronted Moore with what they claimed to be an evasion.

### C.   The Record Does Not Support a Role in the Offense Adjustment

The PSR (at ¶ 67) recommends a three-level upward adjustment for Role in the Offense, based on Mr. Moore's supposed role as a "manager or supervisor" of criminal

activity involving five or more persons. The report does not offer any factual support for the proposition that Mr. Moore "managed" Bar Works or supervised any person involved in the scheme, and the adjustment is not supported.

Mr. Moore does not ignore the testimony that he discussed at various stages the possibility of being Haddow's "business partner." Haddow used that term on-and-off in their correspondence, and so did he. But there was never any legal or practical reality to those discussions. Mr. Moore had no title at Bar Works, no employment relationship, no e-mail account, and no contract of any kind governing his hoped-for profits. His so-called "equity" was just words, used by Haddow to slash his commission invoices for his supposed "share" of capital outlays; there were never any stock certificates even printed, much less tendered, and no other manifestation of any ownership stake. (Trial transcript, "Tr." at 441). He visited the premises from overseas on only a handful of days, and never gave direction to any Bar Works employee. Haddow had sole control of the bank accounts. Tr. 242, 502.  Moore certainly had no control over Sam Aura, who competed surreptitiously with UPG for sales and agents.[3]

Neither did Mr. Moore supervise or manage anyone at Universal Property Group. UPG negotiated and received its own compensation for bringing investors to Bar Works, and its network of agents existed before the Bar Works involvement, and answered to James Robinson and David Kennedy, the company's managers. There is no evidence of Moore supervising that sales force, or recruiting any person to be a part of it. He merely introduced

---

[3] Aura, the "right hand man" and "manager" of the vast majority of Bar Works' sales, appears not to have received *any* upward adjustment for Role in the Offense. July 20, 2020, Sentencing Memorandum Regarding Defendant Savraj Gata-Aura ("Gov't Aura Memo"), Case No. 1:18-cr-00759 JSR, ECF Doc. No. 120, at 11-12. (Attached as Exhibit 4.)

the company to Haddow. In order to support the imposition of a manager-supervisor enhancement, there must be a showing that the defendant "exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or supervise lower-level participants." United States v. Hertular, 562 F.3d 433, 448-49 (2d Cir. 2009)(quoting United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002)). Here Mr. Moore did not "control" anyone in the operation. He introduced UPG, but the government clearly saw that company's principals as full blown participants in the fraud, separately compensated. Moore also had no relationship on this record with "lower-level participants," either supervisory or recruiting. Finally, this Court need not parse whether being Haddow's "business partner" constituted management or supervision, because the record shows that title was sometimes a promise but never a fact.

### D.    The 2B1.1 Loss Amount Should Not Exceed $7.5 Million

Mr. Moore has objected to the recommended 22-level enhancement in the 2B1.1 fraud table (PSR § 63). Because his responsibility should be limited to the $7.5 million related to the sales activities involving UPG prior to his terminating his association with Bar Works, the correct Specific Offense Characteristic is 2B1.1(b)(1)(J), for loss exceeding $3.5 million, and the enhancement should be 18, not 22. Loss under 2B1.1 is the greater of actual or intended loss, actual being "reasonably foreseeable pecuniary harm that resulted from the offense," while intended is "the pecuniary harm that the defendant purposely sought to inflict." Commentary, Applic. Note 3(A)(i) and (ii).

Under either approach, Mr. Moore should not be held accountable for sales that were intentionally made without his knowledge by others – principally Sam Aura – in competition with the UPG network, the vast majority of which occurred after he terminated his association with Haddow. Unlike Aura, Moore had no access to a database of all Bar

Works leases sold; he was completely removed from the other sale activity.  And, in spite of the never-consummated talk about partnership, Mr. Moore's *only* compensation from the relationship was on a commission basis. Although he knew of Aura's surreptitious efforts to supplant or pilfer from UPG, he could draw no conceivable benefit from Aura's activities, because far from being in league with him and other sellers to whom Haddow had offered "exclusive" deals, he was completely on the outside of those sales. Haddow may have benefitted from Aura's activities, but Moore stood to make nothing, no matter how much investment traffic Aura generated. It is artificial and unfair to see them as "co-conspirators" under these circumstances. If anything, Haddow undertook separate conspiracies to market Bar Works investments, and Moore was never a part of the larger one.

### E.    The Sam-Aura Sentence and Relative Culpability

Mr. Moore, as the Court will recall, was the sole defendant in his 2019 trial. However, both the trial testimony and the PSR included considerable background concerning the role of his codefendant, Savraj Gata-Aura, who pleaded guilty before and was sentenced by Judge Rakoff.[4]  We submit that in determining a just and reasonable sentence for Mr. Moore this Court should consider the relative roles played by the two respecting Renwick Haddow's operation. Aura knew more, stayed longer, was responsible for significantly greater investor dollars, and lied directly and flagrantly to those investors, even after Haddow's role in the business was exposed to the public at large. His participation was more central and more culpable, and his 2020 sentence should inform and, we respectfully suggest, mark the upward range of, necessary punishment for Mr. Moore.

---

[4] Because mentions of Gata-Aura in the trial record generally were to "Sam Aura," as he was apparently called throughout his association with Bar Works, we adopt that denomination here for consistency.

Sam Aura entered a plea of guilty on November 18, 2019 (after Mr. Moore's conviction at trial), pursuant to a plea agreement, to a single count of conspiracy to commit wire fraud. PSR ¶6. On July 27, 2020, Judge Rakoff sentenced Aura, principally to 48 months' imprisonment, 3 years' supervised release, $2,988,225.00 in forfeiture and (some months later) almost $40 million in restitution. Id.

Aura was unquestionably an architect and manager of the Bar Works scheme, from beginning to end. Both Haddow, in his testimony at trial, and the government, in their sentencing submission to Judge Rakoff, described him as a manager of the operation. See 2019 trial transcript ("Tr."), Haddow testimony at Tr. 333 (referring to Aura as "sales manager" or "sales director" who was "in charge of establishing a sales network for Bar Works"); Gov't Aura Memo at 26 ("He grew to become the manager of Bar Works' entire fraudulent sales operation.") No such claim can be made of Mr. Moore, or even the broader UPG sales network he introduced, who came to learn that they were *competing* with Aura and others during the half-year they marketed Bar Works investment interests. Aura worked on a daily basis with Haddow at 47 West 39th Street, the Bar Works office and original co-working location – interacting regularly with other employees, using company staff for his sales support, maintaining a Bar Works e-mail account, seeing "how the business was run." Gov't Aura Memo at 7. Moore, by contrast, lived abroad, visited seldom, and per Haddow was on site "very few days." Tr. at 476.

Indeed, Aura maintained a database of every individual purchaser of Bar Works investments, a resource apparently not available even to Haddow, at least at the time of his arrest, as the government requested and received it from Aura post-plea. PSR ¶ 30 and note 1; Gov't Aura Memo at 7 (Aura "keenly aware of investor money coming in") and

note 4. Moore never had access to this breadth of sales data, through a database or otherwise. As the government acknowledges, Sam Aura was in no wise a subordinate or employee of Jim Moore, competing as he did with the UPG network that Moore introduced throughout their period of overlap, both for potential investors and for individual sales agents. Gov't Aura Memo at 7. Haddow actually admitted that he knew of Aura's poaching and preferred that investors come in through him, as it would save Haddow having to pay the higher commission structure to both UPG and Moore. Tr. 388-89, 446-47. There is also no question that Haddow viewed Aura as a trusted and senior front man. He volunteered "Sam" as a potential representative, in lieu of the unavailable Jonathan Black, to meet potential master agent David Lilley in the "honeymoon" series of e-mail exchanges, Tr. 380-82, and Aura appeared on the radio program "School for Startups" in April 2016, lying to the audience about the company's source of operating capital. Gov't Aura Memo at 9.

The government recognizes that Aura "was, by far, the largest and most important source of investments into the scheme[.]" Gov't Aura Memo at 14. The network under his direct supervision apparently generated approximately $40 million of Bar Works' total investor receipts of $57.5 million, against some $7.5 million attributable to the UPG team. Compare PSR ¶¶ 28, 39. Moreover, it appears that Aura's prior fraudulent project, "Park First," an offering of interests in commercial parking facilities, may have been the inspiration for Haddow's packaging Bar Works as a lease-leaseback with a guaranteed return, as it was "a business model strikingly similar" to the Bar Works structure. Gov't Aura Memo at 5. In short, as a person of responsibility in the operation, Sam Aura was "Haddow's functional right hand man." Id. at 1.

The record of Aura's culpable and predatory state of mind is also considerable. He lied directly to investors and potential investors, including a meeting with an existing Chinese investor *after* Haddow's role as the reality behind "Jonathan Black" had been revealed in the media, a meeting in which he floated a fictitious story that Haddow had only helped "Jonathan" at the outset, but was "gone a long time ago[,]" Gov't Aura Memo at 10-11; PSR ¶ 34, and he collaborated with Haddow in the end game to bring in phony ownership-management. Gov't Aura Memo at 11. He also established offshore companies to launder his Bar Works proceeds through an accountant introduced by Haddow. PSR ¶ 32. The same person was introduced to Moore, but he did not go forward. Compare PSR ¶ 28. Aura also invented false profit figures to disseminate to investors, PSR ¶ 31, and knowingly sold leases in excess of the physical capacity of the related location. Gov't Aura Memo at 8. Also, unlike Moore, Aura worked for a short stint in Haddow's pre-Bar Works "Bitcoin Store" sales operation, actually manning the phones in the "boiler room" that, per Haddow, Moore only briefly saw. Gov't Aura Memo at 4-5.[5] Finally, Aura personally profited from the Bar Works scheme to the tune of approximately $3 million. PSR ¶ 39.

We submit that in spite of the trial testimony regarding Haddow's and Moore's use of the term "business partner," that legally meaningless term was for practical purposes meaningless in fact: Moore never had any equity in the business, any contractual right of

---

[5] Although it appears Aura did not receive a Guidelines adjustment for obstruction of justice, the government noted for sentencing that in two 2017 meetings with investigators he "substantially minimized his own role in the offense and his own misrepresentations to investors." Gov't Aura Memo at 7 note 4. Moreover, although the government did not assert that the particular offering was necessarily fraudulent, it did bring to the sentencing court's attention Aura's having organized "U.S. Parking Investments," an apparent American clone of the Park First investment concept, and his sale of interests in that venture, even *after Haddow had been arrested*, noting their "serious concerns" about what the conduct might suggest as to Aura's potential recidivism. Gov't Aura Memo at 27.

control (or anything else), any capacity to direct Bar Works employees or any day-to-day awareness of the company's affairs. Aura did everything Moore ever did, contributing to a needed external sales function to push Haddow's offerings out to the public. But he did it to an order of magnitude more than fivefold greater than UPG's brief involvement, and he did much more: lying to the faces of investors, laundering money, walking the halls of the business and directing its staff, promoting the leases personally in the media. He worked in Haddow's high pressure Bitcoin sales floor before taking over and "managing" that function for Bar Works.

A complete and reasonable analysis of Mr. Moore's punishment must measure Sam Aura, his role and his judgment of sentence. We recognize that the Second Circuit has held that Section 3553(a)(6) requires attention to avoiding *national* disparities among similarly situated offenders, and that the Guideline does not itself compel weighing codefendants within a particular case, see United States v. Alcius, 952 F. 3d 83, 89 (2d Cir. 2020); United States v. Ghailani, 733 F.3d 29, 55 (2d Cir. 2013), but we believe that a complete assessment of the nature and circumstances of the offense, as well as the need to promote respect for the law, inevitably counsels judges to apply such yardsticks to codefendants as a matter of routine. We believe that Aura's conduct is neither fleeting nor mild in comparison to Mr. Moore, and urge the Court to consider their relative roles as part of the process.

### F.     The Misprision of Felony Conviction Overstates Mr. Moore's Real Criminal History

As discussed, owing to his prior felony conviction in the Middle District of Florida for misprision, Mr. Moore has received a total criminal history score of three, placing him in criminal history category II. Because under all of the circumstances of that offense – Mr. Moore's only prior crime – that category overstates the seriousness of his past criminal

record, we submit that the Court should consider a downward departure to category I pursuant to Guidelines Section 4A1.3(b)(1), authorizing such a departure where "reliable information indicates that the criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes." Such a departure has been referred to as a "horizontal departure, as it results in a move from right to left on the sentencing grid." United States v. Ingram, 721 F.3d 35, 39 (2d Cir. 2013)(Calabresi, J., concurring)(quoting United States v. Mishoe, 241 F.3d 214, 217 (2d Cir. 2001)). A 4A1.3(b) departure must be based on "individualized consideration of the circumstances of a defendant's case." Mishoe, 241 F.3d at 218. In the alternative, because of the unique background and history of the misprision conviction, we submit that the Court could entertain a downward variance in consideration of those circumstances.

The Florida conviction was related to Mr. Moore's involvement, beginning in the early 2000's, in the marketing of vacation units in a property called Grand Palisades at Lake Austin, near Orlando, Florida. Although the PSR suggests that "Moore's role in the Lake Austin scheme was similar to that in Bar Works," PSR ¶ 45, because he acted as some manner of "partner" with the promoters and organized a network of sales agents to offer the interests, the similarities are incidental, and Mr. Moore was not involved in any "scheme." The Lake Austin project was based on the actual construction of vacation condominiums near the Disney resorts, and Mr. Moore, through his longtime and successful business Instant Access Properties, was selling title to those actual units in construction, to non-U.S. buyers who would hold them largely as investment properties. This was Moore's core business, and there was no misrepresentation by him or anyone affiliated with IAP

respecting the actual product for sale, just one of myriad real estate opportunities in a then-thriving market.

As is obviously implied by the offense of conviction, Mr. Moore was ultimately charged for failing to report *someone else's* misconduct. The PSR accurately reports that "misrepresentations were made" related to the Lake Austin project, id, but they were not made by James Moore. His plea in the case included a negotiated allocution, attached to the plea agreement, that recited his history with the project and the timeline of his learning, after the fact, that Paul Oxley, one of the general partners of Lake Austin Properties, had misled investors and lenders about his use of buyer escrow funds for purposes not permitted under Florida law. See, attached as Exhibit 5, Middle District of Florida Case No. 6:17-cr-00187-RBD, Plea Agreement, ECF Doc. No. 288 at pp. 14-17.

Per the negotiated statement, Mr. Moore met Oxley in 2003 and began marketing Florida condos offered by Oxley's company through Instant Access Properties for a sales commission. In 2004, Oxley began planning for the Grand Palisades project at Lake Austin, and formed a limited partnership called Lake Austin Properties. Moore, as a limited partner, believed he was to receive 34% of the proceeds in consideration of his marketing efforts through IAP (in addition to the commissions IAP were to receive through Darrencrest, a sales entity), but the partnership was controlled and managed day-to-day by the general partners. Id.

IAP produced approximately 1,750 individual buyers for the project, each of whom signed a purchase and sale agreement and returned it directly to Lake Austin Properties in Florida. IAP, through the sales entity, received its negotiated commissions for these sales in the ordinary course. In the meantime, Oxley had applied for a large construction loan from

a U.S. bank, with many other banks participating, essentially as a lender syndicate. In 2008, when the real estate market collapsed, buyers who had made deposits declined to close on the units, the construction loan went into default, and the property was sold at a loss to the bank syndicate. The offense conduct concerns Oxley's actions when individual investors inquired of Oxley regarding the return of their deposits. Oxley had caused Lake Austin Properties to represent to buyers that, consistent with Florida law, no part of the deposits would be used for marketing or sales expenses. Critically, the agreed factual–basis allocution recites that these false statements on the part of Lake Austin Properties were "[u]nbeknownst to Mr. Moore." Plea Agmt. at 16.

In the fall of 2009, Mr. Moore met with Oxley at Oxley's office, and the latter presented him with a document he had prepared, on behalf of the sales entity, for Mr. Moore's signature. That document stated, falsely, that the sales entity had agreed that the commissions it had received for condominium sales were refundable to Lake Austin Properties. When Moore declined to sign the false representation and inquired of Oxley what it was all about, Oxley asserted that if Moore did not sign it he, Oxley, would likely go to jail, and stated that he had illegally used buyer deposits to pay the sales commissions. The agreed allocution confirms that Moore did not know of this conduct on Oxley's part, and of the proscription in Florida law, until late 2009 and early 2010. Id. Mr. Moore's failure to report this confession to authorities was the gravamen of his offense.

The Lake Austin prosecution had begun on a grander scale. Mr. Moore was arrested at the airport in Miami, returning to his home there, in February 2017, and was charged under an indictment with a bank fraud conspiracy and 18 substantive fraud counts, alleging misrepresentations to lenders, including false statements regarding the partnership's use of

escrow funds to pay sales commissions. PSR ¶ 46.[6] Mr. Moore had three codefendants, charged in every count, but the case collapsed rapidly as to all of them. One saw all charges dismissed, another was admitted to a pretrial diversion program, and Mr. Moore and another were offered the single-count misprision pleas in full satisfaction of the indictment. ECF Docs. Nos. 244, 261, 270. The district judge upbraided the prosecutor at Mr. Moore's plea hearing, delivering a "piece of unsolicited advice . . . that you should do your case preparation/investigation pre-indictment, not post-indictment." Transcript of Plea, ECF Doc. No. 361.

We recognize that Mr. Moore received a serious sentence from that same district judge, principally 18 months' imprisonment. We respectfully urge, however, that the reasons articulated by the sentencing court were at some remove from Mr. Moore's actual conduct. Judge Dalton noted that victims had lost their down payments as a result of Oxley's fraud, and that the original indictment had created "false hopes" of a recovery for them, undermining confidence in the system; he also noted that Oxley was a fugitive from U.S. jurisdiction; he wondered whether Mr. Moore did not have a business "obligation to make [him]self informed" of Oxley's practices and Florida restrictions, lamenting that Mr. Moore "never bothered to read the contracts or look into the law"; he expressed disappointment (after briefing by the parties) that the law would not allow a restitution order to be imposed for the misprision offense for the lost deposits, saying he would impose it if he could; he explained that in spite of the "relatively minor nature of the offense" and the "unraveling of the Government's case," Mr. Moore deserved sterner punishment because he was

---

[6] Notably, Mr. Moore agreed upon arrest to sit for a multi-hour interview with agents, in which he explained to them inter alia that he had no role in Oxley's dealings with U.S. banks regarding Lake Austin loans.

"motivated by self-interest" and knew, when he learned of Oxley's fraud, that "he had been the beneficiary" of it; he faulted Mr. Moore for not returning his commissions, and for not notifying authorities when there might theoretically have been some partnership funds to defray losses. See, attached, Exhibit 6, October 24, 2018, sentencing minutes, Middle Dist. Fla. ECF Doc. No. 349, at 16-23.

It is certainly understandable that Judge Dalton focused his sympathies on the victims who lost their deposits owing to Oxley's conduct, and his critique of Mr. Moore's due diligence in the moment is perhaps fair comment, but the Court's observations were largely unconnected to Mr. Moore's actual and limited offense conduct. The fraud was Oxley's, about which the prosecution ultimately agreed Moore knew nothing at the time. By the time Oxley confessed, when Moore rejected his perfidious gambit to avoid responsibility, the deposits had already been squandered and the project was in foreclosure. Moreover, Mr. Moore's commissions were not improperly received; he and IAP were entitled to their agreed compensation for bringing real buyers to a real development, one that collapsed only in the face of the market implosion like so many others. Investor losses were caused solely by Oxley's misapplications; there was never a demand, or even a legal basis, for Mr. Moore to return his earned commissions. Moreover, the commissions were not sitting in some bank account; they had been expended in the ordinary course to defray IAP operating expenses, including employee salaries.

Whatever possible difference prompt reporting by Moore to law enforcement might have made, we submit that the judge's criticism of his silence overlooks the real peril that would have confronted him in reporting a partner in a business from which he had profited. There is no need to guess about the risk: the prosecution's original approach to the

transactions yielded a titanic fraud indictment. That that prosecution collapsed after the true facts became clear does not gainsay the caution that would have been warranted in any consideration of blowing a whistle. See, e.g., United States v. King, 402 F.2d 694, 697 (9th Cir. 1968) (analyzing misprision defendant's dilemma, as a potentially targeted aider and abettor, if he were to report information about others knowledgeable as to the offense; applying Hoffman link-in-the-chain Fifth Amendment principles).

Finally, we note that there is no indication in the record of what conduct on Mr. Moore's part satisfied the critical element under the misprision statute, marking the difference between ordinarily permissible silence about another's crime and a felony offense: an affirmative act to conceal the other's crime. See Itani v. Ashcroft, 298 F.3d 1213, 1216 (11th Cir. 2002)(Misprision "require[s] both knowledge of a crime and some affirmative act of concealment or participation.")(quoting Branzburg v. Hayes, 408 U.S. 665, 696-97 (1972)). "[M]ere failure to report a known felony would not violate [the misprision statute]." Itani, 298 F.3d at 1216 (citing United States v. Johnson, 546 F.2d 1225, 1227 (5th Cir. 1977)). Although he answered in the affirmative when polled by the judge at his plea as to each of the elements, Plea Transcript, ECF Doc. No. 361 at 19, there were no facts developed there, in the Factual Basis incorporated in the Plea Agreement, or in the PSR to substantiate what action if any he took to conceal anything. The allocution states only that he "did not report" Oxley, and "permitted the crime to remain concealed." Factual Basis, Plea Agreement at 17.[7]

---

[7]  We note also the ongoing debate, in the immigration arena, whether misprision even constitutes a crime of moral turpitude. See e.g., Mendez v. Barr, 960 F.3d 80, 87 (2d Cir. 2020)("We, of course, readily concede that some individuals who violate § 4 intend to defraud and some act with vile or base motives. . . . [T]he statute can be violated in ways

We do not ask this Court to second-guess the sentencing judge's considered analysis in a matter in which numerous investors suffered significant losses. Our only focus is on the actual offense described in that record, for what it reveals about the relative gravity of Mr. Moore's past misconduct. Although there is obviously no disputing that the prosecution was disposed of as a felony, we submit that under all of the circumstances Mr. Moore's actions were much less serious than most felony offenses, he agreed to plead guilty to resolve a much broader and unjustified set of charges in an ill-conceived indictment, and his conduct did not exceed what in most settings is not a crime at all – learning of another's offense and remaining silent about it for whatever reason. We urge the Court to consider a 4A1.3 departure, or a corresponding variance, to address these unique factors.

### G.        Mr. Moore's Time Served to Date Has Been Extraordinarily Punitive

We also urge the Court to consider the unique combination of circumstances that made Mr. Moore's presentence incarceration unusually harsh. Specifically, we submit that his age, pre-existing medical conditions, and confinement for part of the pandemic in the MCC have made the time to be credited to any term of incarceration more stressful and severe than it would have been under ordinary circumstances. Moreover, his mental health struggles – again experienced most acutely at the MCC – have, quite apart from the procedural delays and necessary travel for evaluation and restorative treatment, caused him genuine anguish in an environment in which care resources are limited and the solace of friends and family impossible. Whether on the basis of COVID-era authorities, prior departure caselaw contemplating especially taxing conditions of pretrial confinement, or simple consideration of the Section 3553 factors, we believe the Court is authorized to and

---

that do not involve such motives because the statute criminalizes conduct that is not in all instances fraudulent or base or vile.")

should weigh the impacts of Mr. Moore's punishment to date in determining a just sentence.[8]

As an initial matter, the Second Circuit has long held that "pre-sentence confinement conditions may in appropriate cases be a permissible basis for downward departures." United States v. Carty, 264 F.3d 191, 196 (2d Cir. 2001)(citing Koon v. United States, 518 U.S. 81, 109 (1996)(observing that certain departure theories are not categorically barred by the Sentencing Guidelines). See also United States v. Salvador, No. 98 Cr. 484, 2006 WL 2034637 at *4, (S.D.N.Y. July 19, 2006)(departure in consideration of particulars of time served in Dominican Republic pending extradition); United States v. Torres, No. 01 Cr. 1078, 2005 WL 2087818 at *2 (S.D.N.Y. Aug. 30, 2005); Cf. United States v. Sanpedro, 352 F. App'x 482, 486 (2d Cir. 2009)(harsh conditions in Colombian jail).

Separately, courts have recognized that the pandemic has made the experience of incarceration more severe. Judge Rakoff, for instance, in the context of a compassionate release petition, observed that in part because of lockdowns and restrictions COVID-19 "has made . . . incarceration harsher and more punitive than would otherwise have been the case." United States v. Rodriguez, 492 F. Supp. 3d 306, 311 (S.D.N.Y. 2020). Those conditions, compounded for those with certain medical conditions by the "risk of suffering severe health consequences" in the event of contracting COVID, mean that "the actual severity of [] sentence as a result of the COVID-19 outbreak exceeds what the Court anticipated at the time of sentencing." Id (quoting United States v. Mel, No. TDC-19-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020). As Judge Engelmayer observed in handing down a

---

[8] We also note that Mr. Moore's citizenship and immigration status disqualify him from assignment to a minimum-security camp and from participating in certain time-reducing programs like BOP's "RDAP" classes for substance abuse treatment.

COVID-era sentence, "prison is supposed to be punishment, but it is not supposed to be trauma[.]" United States v. Aracena de Jesus, 1:20-cr-019 (PAE), (July 1, 2020)(remarks quoted in N.Y. Daily News, "Brutal Conditions in NYC Jails During COVID Pandemic Caused Federal Judges to Impose Lighter Sentences: Analysis," Jul. 11, 2021).

Mr. Moore is 60 years old. He was diagnosed in 2016 with COPD, and has intermittently needed to use a respiratory inhaler to address symptoms.  He has also been treated for coronary artery disease.  (See Exhibits 7 and 8, records of treating pulmonologist and cardiologist circa 2016.) As counsel discussed with the Court in early 2020, before the Court expedited Mr. Moore's transfer to FCI Butner for psychiatric restoration treatment, he was confined in the MCC as a high-risk candidate for COVID infection. Contemporary conditions there are well familiar to the Court. See Timothy Williams, et al., "'Jails are Petri Dishes': Inmates Freed as the Virus Spreads Behind Bars," N.Y. Times (Mar. 30, 2020), https://www.nytimes.com/2020/03/30/us/coronavirus-prisons-jails.html. Prior to the onset of the COVID crisis, Mr. Moore had already been subject to a facility-wide lockdown of over two months owing to a firearm having been smuggled in.

When the COVID restrictions set in, they were particularly severe and of questionable effectiveness. He was confined for several weeks, until his transfer, with fifteen other inmates to a single, crowded unit, with one toilet, one shower and no access to protective masks or even soap, much less hand sanitizer or cleaning supplies. Even after his transfer to Butner, one of the principal medical facilities in the system, he was essentially in isolation for his entire stay there because of the pandemic protocols, with three one-hour intervals per week out of solitary in which he would have to choose whether to shower, access a computer, attempt a telephone call, etc. Thankfully, Mr. Moore has not contracted

the virus. Nevertheless, his persistent concern about his heightened exposure, the limits to available treatment if he did become ill, and the harsh institutional conditions significantly heightened the rigors of this custodial interval.

The Court will also recall the history of Mr. Moore's psychiatric symptoms. As noted in the report of Dr. Miriam Kissin (Exhibit 9 hereto), who evaluated him at the FMC Devens in Massachusetts, he experienced severe anxiety and fear for his life, suffering under delusional ideas that organized criminal elements wanted to harm or kill him, and that his friends, family and counsel were plotting against him. It is not hyperbole to say that he suffered agonies when these delusions were at their worst. We submit that the particular effect of these symptoms, arising during his confinement at the MCC, exacerbated his already harsh experience of that facility, and made his stay there inevitably more punitive, even though that "punishment" was not intended or caused by anyone. We submit that the Court may and should factor the impact of Mr. Moore's symptoms under Section 3553, but even prior to <u>Booker</u>-era sentencing, courts considered mental and emotional conditions present to an unusual degree in weighing downward departures.  <u>See</u> Guidelines Section 5H1.3; <u>United States v. Lara</u>, 905 F.2d 599, 603-04 (2d Cir. 1990); <u>United States v. Christensen</u>, 18 F.3d 822, 824 note 4 (9th Cir. 1994)(collecting cases).

In short, the unexpected conditions related to COVID, combined with the emotional and psychic pain of his isolating paranoiac experiences, have made the last two years more impactful, as a measure of retribution and related deterrence, than they would otherwise be.

The Court may weigh these impacts looking forward, and we respectfully suggest they merit consideration.[9]

## VI.   CONCLUSION

October 27 is a serious day for Mr. Moore. The jury has spoken and consequences must follow. We submit however that there is much in the record and in the man to justify the swiftest possible return to his family and productive life. He has worked hard and done well in the legitimate business world. He has raised children who have cherished his guidance and his big heart and are anxious to have him back in their lives. Finally, he has already served some very hard time for reasons no one could have anticipated, and the retribution and deterrence inherent in that service is necessarily more powerful. Mr. Moore

---

[9] Also, as noted, Mr. Moore will on the date of sentencing have served almost exactly two years to be credited to whatever term of incarceration the Court would impose. He surrendered to the BOP on his Middle District of Florida conviction in September 2018, and that sentence was satisfied on November 1, 2019. (PSR ¶ 74) Thus, he has served approximately 24 months' time applicable to the instant offense. Factoring in the Bureau's complex good-time formula, which results in credits of 47 days per year absent disqualifying behavior, Mr. Moore has already served the practical equivalent of a 27-month term. But we submit that the unique timeline of his federal prosecutions has resulted in a stacking of sentences that would not necessarily have occurred if either court were in a position to exercise discretion to run the sentences concurrently. For instance, if Mr. Moore did not develop his symptoms occasioning delays for evaluation and treatment, this Court would likely have sentenced him early enough such that the sentence could have included a small concurrent overlap with the prior one. More broadly though, we stress that matters might have worked out to allow the sentences — again, only if the Court chose – to overlap substantially or altogether. The offense conduct in both matters was complete before he was arrested on either. The unfortunate fortuity of the order of prosecution, and the unexpected diversions resulting from his psychiatric crisis, have eliminated the possibility. The Court cannot make a sentence retroactively concurrent with an already discharged term, see 18 U.S.C. §3584; United States v. Lucas, 745 F.3d 626, 629-30 (2d Cir. 2014), but concurrent time would have been an option if a substantial portion of one sentence remained when the other was imposed. We believe the Court may consider this unique circumstance in determining a just and reasonable sentence here.

has already begun his journey to a new life. We urge the Court to see that future as it

determines how long justice must delay it.


DATED:      New York, New York
            October 13, 2021


                              Respectfully Submitted,

                              By: /s/ Michael J. Grudberg
                                  Michael J. Grudberg
                                  Tarter Krinsky & Drogin LP
                                  1350 Broadway, 11th Floor
                                  New York, New York 10018
                                  Tel.: (212) 216-8000
                                  Fax.: (212) 216-8001
                                  mgrudberg@tarterkrinsky.com