# EXHIBIT 2



Tarter Krinsky & Drogin LLP
1350 Broadway
New York, NY 10018
P 212.216.8000
F 212.216.8001
www.tarterkrinsky.com

**Michael J. Grudberg**
Partner
212-216-8035
mgrudberg@tarterkrinsky.com

Via Electronic Mail

July 30, 2021

Ashley E. Geiser
U.S. Probation Officer
Southern District of New York
500 Pearl Street, 7th Floor
New York, NY  10007
Ashley_Geiser@nysp.uscourts.gov

Re: <u>United States v. James Moore, No. 1:18 CR 0759 (RMB)</u>

Dear Ms. Geiser:

As counsel for James Moore, the defendant in the above-captioned matter, we submit this letter pursuant to Fed. R. Crim. P. 32(f) to set forth Mr. Moore's objections to the presentence report, as well as certain factual corrections and other information pertinent to the Court's sentencing determination.

**Introductory Information**

By way of correction to the introductory section of the report, Mr. Moore submits as follows. The address and telephone number reflected for the undersigned is not current (and is an artifact on the ECF system of prior employment, preceding this representation). The correct information for Michael Grudberg is: Tarter Krinsky & Drogin LLP, 1350 Broadway, 11th Floor, New York, NY 10018, 212-216-8035 (office), 646-734-8374 (mobile). The cited e-mail address is correct, as is the information for co-counsel Robert Heim. Also, AUSA Martin Bell has since the preparation of the report left the U.S. Attorney's Office and is no longer involved in the case.

To whatever extent it constitutes an actual part of the presentence report, Mr. Moore objects to the statement on the initial page of the pdf draft describing his immigration status as "Illegal Alien." He lawfully entered the United States on February 15, 2017 at the Miami Airport, pursuant to the Electronic System for Travel Authorization ("ESTA") Visa Waiver program.  He intends to seek to remain in this country in spite of his convictions, and will as necessary contest those issues in Immigration Court, but there is no evidence of his having engaged in dishonesty

{Client/085731/1/02450465.DOCX;2 }

or other misconduct to secure his entry, and any overstay was outside his control and resulted from the proceedings initiated by DOJ.

**Part A. The Offense**

Paragraph 16

Mr. Moore objects to the statement that he knowingly facilitated a Ponzi scheme.

Paragraphs 18 and 19

Mr. Moore objects generally to the description of the various UK investigations of Haddow's prior ventures, and to the labeling of those activities as "Ponzi schemes." That term was not in common use in the UK, and Mr. Moore in any event never saw any media account applying such terminology to Mr. Haddow. He was not aware of any criminal prosecution of Haddow (nor was there any to our knowledge), and his understanding of the FCA action against Haddow was limited – he knew it was civil in nature, and he believed that Haddow had an open avenue to appeal any adverse ruling at the time he was dealing with him regarding a possible Bar Works cooperation. Mr. Moore knew nothing of any bitcoin business launched by Haddow. On a visit to New York prior to the Bar Works talks he had seen an office of Haddow's that had a small phone bank, but there were no people in the room, and there was no discussion of bitcoin or any particular venture.

Paragraph 20

Mr. Moore objects to the characterization of the Room to Invest project as an "investment scheme" that "caused investors to lose their money." There was never any UK governmental finding of wrongdoing, or even an inquiry, related to the project (unlike other contemporary Haddow ventures discussed in the PSR). Moreover, Mr. Moore did not "operate" Room to Invest "together" with Haddow. His only exposure to the company was to propose to Haddow that Haddow might use his sales network to market the potential Barbados hotel project Mr. Moore was pursuing in connection with a parcel of development property he had acquired there. Mr. Moore had no managerial involvement with Room to Invest, either formal or informal, and he and Haddow did not ultimately pursue any joint endeavor related to the Barbados property. Mr. Moore was not employed by, had no ownership stake in, and never received any monies from Room to Invest.

Paragraph 21

Mr. Moore objects to the assertion that he was Haddow's "business partner" or that he "helped structure" the Bar Works offering. Mr. Moore had no title with Bar Works, no employment relationship with the company, no ownership, and no contract defining his rights and responsibilities in connection with marketing work. He was a middleman who only "reviewed" materials that Haddow had already drafted, or had appeared to have created with professionals, prior to any discussions between them about possibly working together. He did not have anything to do with the preparation of the certificate – elsewhere described as a derivative of a

prior Haddow business (paragraph 24) – and the "Wealthbuilder" concept is a commonplace incentive to encourage large purchases; even the name is not unique.

Paragraph 24

Mr. Moore objects to the term "prosecuted" as applied to the FCA case against Haddow, as that agency is a civil regulator.

Paragraph 28

Mr. Moore objects to the sentence stating that Haddow introduced him to a corrupt accountant who "helped Haddow set up offshore structures used by Haddow to launder the proceeds of this offense." There is no evidence at all that Mr. Moore himself engaged in money laundering activity or any other improper conduct with this individual, and its inclusion is a confusing and prejudicial non sequitur.  In fact, Mr. Moore affirmatively rejected any involvement in the offshore structures offered by the accountant, unlike Gata-Aura, who apparently retained him to create such vehicles to channel Bar Works receipts.  (PSR ¶32)

Paragraph 40

Although the paragraph concedes that the investors introduced through UPG numbered "over 100" (out of some 800) and constituted approximately $7.5 million total investment (compared to Gata-Aura's total some five times greater), Mr. Moore objects to the unsupported statement that he was Haddow's "business partner," that he was responsible for false marketing, social media and phony certificates, and that he "perpetuated" the Jonathan Black persona. There is no evidence that Moore disseminated any of this to any investor, or that he caused or asked anyone else to do so. Haddow controlled all of these matters, and he had no partner in Mr. Moore. There is no logical basis to restrict Gata-Aura to the monies raised by his own network and at the same time to saddle Mr. Moore with Bar Works' gross investor receipts. Moore had no idea what Gata-Aura was up to, nor where or to whom he and his network might be marketing, especially after he cut ties with Bar Works in early 2016. Mr. Moore did not create the business with Haddow,  never took a role in its management, and walked away many months before its demise. UPG, the agent he introduced, ultimately sold no more than the $7.5 million noted here. That figure is the most for which he could fairly be held responsible.

Paragraph 41

Mr. Moore objects to the inclusion of his Inside Track and Instant Access businesses as "relevant conduct."  Relevant conduct under Guideline Section 1B1.3 includes "acts and omissions" of the defendant or – under certain circumstances of jointly undertaken criminal activity – acts and omissions of other criminal actors "that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection[.]" See USSG §§ 1B1.3(a)(1)(A) and (B).  Mr. Moore's real estate companies were legitimate and successful businesses that he operated for years without regulatory, much less criminal, adjudication.  The companies were "put into bankruptcy" in 2008, like myriad other real estate ventures worldwide, owing to an historic disruption in the market. Prior to the downturn the

business was the subject of acquisition overtures as high as 80 million UK pounds. The business was extremely successful because it was really the first to offer the individual investor an opportunity to participate as a title-owner in residential real estate development. As noted in the PSR, the companies facilitated sales of over 30,000 properties. Its model failed only because the product – residences owned for appreciation and revenue, not for accommodation – dropped drastically in value with no credible forecast for near-term recovery. Nothing nefarious was revealed about the company or its methods; they happened to be very good at selling something that suddenly nobody wanted to buy.

Paragraph 42

Mr. Moore objects to the description of the Room to Invest business and his supposed role in it. There was no adjudication either by a regulatory agency, or in private litigation, of any wrongdoing, and once again the presence of investor losses does not, without more, justify the inclusion of the venture as relevant conduct. More importantly, as noted above, Mr. Moore was not affiliated with the business, and his only involvement with it was to propose that Haddow might help him market the Barbados hotel property in development. That idea did not move forward, and Mr. Moore never managed, or received any value from, the company. Mr. Moore did not "partner" with Haddow in the venture. The only reason he even considered involving Haddow's firm is that he had, through the failure of the Instant Access business in the financial crisis, lost any ability to market through an experienced network of sales agents.

Paragraphs 43–45

Mr. Moore makes the following objections to the recitation of the Lake Austin offense conduct. First, he objects (PSR ¶43) to the statement that Lake Austin Properties was "[t]heir limited partnership" (his and Paul Oxley's). Oxley and Brad Rosser were the controlling General Partners, and Mr. Moore had only an indirect revenue participation, as a _limited_ partner, from his company's marketing efforts. He did not control or manage Lake Austin Properties. He further objects to the statement (PSR ¶44) that "Lake Austin Properties represented" that investor deposits would not be applied to marketing expenses "even though . . . Moore knew" that the investors' money was used to pay Darrencrest commissions. Mr. Moore did not make, and was not aware of, any such representations on the part of Lake Austin Properties, an entity he did not control and did not manage.

Finally, Mr. Moore objects to comparisons between the trial record in the Bar Works case and his supposed role in the Lake Austin "scheme." (PSR ¶45) He did not allocute to participation in any scheme in connection with the Lake Austin project. His offense conduct as admitted was only to have stood silent, rather than informing law enforcement, after Oxley's _post facto_ admission that he, Oxley, had violated the law by applying deposits to Darrencrest commissions. Mr. Moore did not scheme to do that; to the contrary, he had no knowledge of it before Oxley's concession.

Mr. Moore's plea agreement in the Lake Austin case included a "Factual Basis" narrative, negotiated between his counsel and the United States Attorney, essentially setting out his Rule 11 allocution to the misprision offense. _See_ Middle District of Florida, case no 6:17-cr-00187,

ECF Doc. No. 288. That account confirms that Oxley and Rosser, as GP's, "controlled the partnership" and had "authority to make all decisions for the partnership"; that, "[u]nbeknownst to Mr. Moore Lake Austin Properties had represented to the individual buyers that no part of the deposits would be used for marketing or sales expenses" (emphasis added); and that Mr. Moore only learned that such improper representations had been made when Oxley presented him with a false attestation on behalf of Darrencrest that the deposit moneys were refundable, asking that Moore sign it. Moore refused to sign it, and had not previously been aware of the specific Florida law proscription on the use of investor deposits that had been violated by Oxley. The Factual Basis addendum includes no facts suggesting that the Lake Austin development was a fraudulent scheme, or that Mr. Moore was involved in any role similar to the government's case in this prosecution.

Paragraph 47

There has been no adjudication that the Our Space business operated as a corrupt scheme, and no specific facts are offered in the PSR to support such a characterization. Mr. Moore objects to its inclusion as relevant conduct.

Paragraphs 48, 49, 56–58, 68

Mr. Moore objects to the recommendation of a two-level adjustment for obstruction of justice. Neither of the asserted bases for the adjustment is adequately supported.

First, generalized allegations that Mr. Moore "repeatedly lied" to SEC investigators regarding the purported actual existence of Jonathan Black cannot justify an obstruction finding because they are not set forth with specificity, and lack any factual allegation that Mr. Moore then believed Black to be a corrupt invention. Moreover, there is no evidentiary detail offered to support a finding by the Court that Mr. Moore had a specific intent to obstruct a governmental investigation. Although the PSR alleges that the SEC interview in question was a "recorded phone interview," the factual recitation does not describe, even in short form, the particular questions and associated answers that SEC Staff would now claim to be obstructively inaccurate. There is also no showing that Mr. Moore's alleged statement to the effect that he "never asked to speak to Jonathan Black" was not literally true. Neither is there any substantiation of the claim that Mr. Moore told "multiple agents" that he was working with Black. To our knowledge, the only statement that Mr. Moore ever made regarding Black was a single email to a group of potential master licensees, never to any "agent" in touch with the investing public. That investigators may score these vague assertions to be generally inconsistent is a far cry from proving willful misleading conduct. Indeed, without an ability to parse the precise question(s) and answer(s) in context, the Court could not fairly adjudge Mr. Moore to have acted with the requisite specific intent.

We do not possess any audio recording of the SEC interview, but we attach with this response a copy of a transcript prepared by the Commission of the August 11, 2016 call, received by Mr. Heim in connection with his representation of Universal Voice Tech, recipient of the subpoena. In 85 pages of testimony, Mr. Moore is open, candid and consistent with investigators about how he met Haddow, how he came to the Bar Works project, and how he decided to walk away from

it after multiple deceptions and disappointments by Haddow. It bears noting that Mr. Moore volunteered to appear for the interview, from Spain. He could not have been compelled, and he had no reason to protect Haddow's operation, having already parted ways. In the relevant exchange (at pp. 69-71), it is actually Mr. Moore who volunteered the name Jonathan Black, in response to a general inquiry about the nature of the Bar Works "management team in place." But Mr. Moore did not attempt to persuade the investigators that Black was the day-to-day manager of the business, to the exclusion of the reputationally-hampered Haddow – the essence of the prosecution's fraud case here. Rather, he testified that Haddow had only *told* him that he had brought in Black, that he had never personally met Black (conceding that to be "unusual" under the circumstances), that he had only "initially" understood him to be CEO, and that he had never asked to speak to the man. All of this was accurate. He was not confronted with any accusation that Black was a nonexistent front, and he cannot be determined to have "obstructed" by a failure to volunteer any doubts of his own on that subject.

The second alleged basis is similarly deficient. Mr. Moore voluntarily submitted to a post-arrest interview with IRS agents in connection with his prosecution in the Middle District of Florida. The only claimed instance of deception is Mr. Moore's apparent initial denial that he had "done anything for money since 2010." Again, no transcript or other literal rendering of the questioning in context is put forward, but the subject inquiry would appear to have been a background question as to Mr. Moore's recent activities, not a direct exploration of the Bar Works case details (with which the interviewing agents do not appear to have been directly associated). Mr. Moore's lack of obstructive intent is made manifest by his confirming -- in the same interview – that he "obtained money from Bar Works." The IRS agents may portray this accurate statement as Mr. Moore being forced to "admit" this work only after being "explicitly asked about wires going to him," but again the record supports no finding of obstructive animus. Mr. Moore did not directly receive any compensation from Bar Works; funds were sent instead to Universal Voice Tech, the company organized by his wife, through which he drew occasional compensation in the relevant period – for projects related and unrelated to Bar Works. No detail is offered regarding the substance of the "wires" shown to Mr. Moore, but it is uncontested that there were no wires sent to him by Bar Works directly, and any wires to UVT would be consistent with his prior statement. It would appear that the agents showed Mr. Moore some documents relating to his relationship with the company, and he immediately and accurately explained them. Such conduct cannot support the adjustment.

The alleged obstructive conduct is also legally deficient under the plain terms of the relevant guideline. Although supposedly recorded, neither scenario constituted formal testimony. Mr. Moore appeared voluntarily and was not sworn in either instance. The Commentary, at Application Notes 4 and 5 to Guideline 3C1.1, makes clear that "making false statements, not under oath, to law enforcement officers" will not ordinarily warrant application of the adjustment, and cannot do so in the absence of a showing that the conduct "significantly obstructed or impeded the official investigation or prosecution of the instant offense." Thus, even assuming arguendo that there could be a showing of falsity, it is obvious that there was no such effect caused by the conduct relied upon here. The SEC may already have been aware of questions being raised as to "Black's" identity or existence at the time of their inquiries, and in any event, there is no argument that the testimonial exchange had any effect on the investigation of the offenses in this prosecution. The IRS facts are also straightforward; by their own account

the agents claim to have surprised Mr. Moore with their knowledge of what he had earlier supposedly denied. By definition there was no impact at all on any investigation, as they were obviously never misled.

Paragraph 63

Mr. Moore objects to the 22-level enhancement. Because he is at most responsible for the $7.5 million related to the activities of UPG before he terminated his relationship with Bar Works, the proper Specific Offense Characteristic is 2B1.1(b)(1)(J), for a loss exceeding $3,500,000, and the enhancement adds 18 levels. (This is not affected by the observation in paragraph 29 to the effect that investors originally introduced by UPG may have made additional subsequent investments. Mr. Moore would have had no involvement with or knowledge of those purchases, and they logically implicate Gata-Aura or some other sales agent unknown to him.) Loss under 2B1.1 is the greater of actual or intended loss, actual being the "reasonably foreseeable pecuniary harm that resulted from the offense," while intended is the "pecuniary harm that the defendant purposely sought to inflict." Commentary, Applic. Note 3(A)(i) and (ii). Under either analysis the loss is limited to the transactions resulting from the UPG relationship Moore introduced, and cannot include sales operations that were concealed from him and that he had nothing to do with, and therefore could neither foresee nor control.

Paragraph 67

Mr. Moore objects to the recommendation of a three-level adjustment for Role in the Offense. Because he was not a "manager or supervisor" of any person(s) in the Bar Works operation, the adjustment is not warranted.

The report's account of the offense conduct does not reflect Mr. Moore's having directed or controlled the activities of any other alleged member of the scheme. In spite of vague insinuations that he became a "partner" of Haddow, this label is not supported in legal or practical reality. He never entered into any partnership or other legal entity together with Haddow, had no title or position at Bar Works itself, was not identified in any company documents as a manager or even an employee, never had a Bar Works email address, and spent almost no time at the company's offices and gave no instructions to its personnel. He had no involvement with Gata-Aura's sales operation, and is indeed described as having been in competition with it.  He also had no knowledge of or access to the master database Gata-Aura maintained of every Bar Works investor.

Although Moore is said to have "brought in" United Property Group, whose agents solicited investors (Paragraph 22), there is no allegation that he owned or controlled that company, or that he could or did in fact control the actions of its employees. Indeed, UPG and Moore are claimed to have negotiated separate compensation for bringing investors to Bar Works (Paragraph 22), and UPG's "principals" were James Robinson and David Kennedy, and did not include Mr. Moore. We submit that the Offense Conduct section does not include any specific example, or general structural implication, of Mr. Moore telling anyone else what to do. That his role per the government's case was closer to a finder or middleman does not by itself exempt him from liability for these offenses, but it does preclude the application of an adjustment keyed to

recognize the special culpability of those who direct others' misconduct. Mr. Moore did not "manage" or "supervise" anyone, and no role-in-the-offense adjustment is warranted.

In order to support the imposition of the manager-supervisor enhancement, there must be a showing that the defendant "exercised some degree of control over others involved in the commission of the offense or played a significant role in the decision to recruit or to supervise lower-level participants." United States v. Hertular, 562 F.3d 433, 448-49 (2d Cir. 2009) (quoting United States v. Blount, 291 F.3d 201, 217 (2d Cir. 2002). Here there is no record of "control" over anyone. Moreover, there could be no fair suggestion that Mr. Moore had a significant role in a decision to "recruit" UPG personnel, as those persons were already employed by Robinson and Kennedy, their obvious and actual supervisors, and they came to the operation through an agreement reached separate and apart from Moore. Moreover, Mr. Moore's early conversations with Haddow regarding the Bar Works business do not render him a manager or supervisor, irrespective of his mental state, because "th[e] adjustment does not apply to a defendant who merely suggests committing the offense." USSG §3B1.1, Commentary, Applic. Note 4. Mr. Moore of course never "suggested" any offense by Haddow; the point of the commentary is to note that merely being "there at the creation" does not make a boss.

Paragraphs 69 and 72

Because of Mr. Moore's substantive objections to the adjustments for amount of loss, role in the offense and obstruction of justice, he also objects to the Adjusted Offense Level and Total Offense Level, and submits that each should be 31, not 40.

**Part B. The Defendant's Criminal History**

Paragraph 74

See response to paragraphs 43-45, above. Mr. Moore did not control Lake Austin Properties, and he had no knowledge of that entity's misrepresentations until Oxley revealed them post facto.

**Part C. Offender Characteristics**

Paragraph 88

As a correction, Mr. Moore notes that he met his first wife in 1988.

Paragraphs 93 and 94

As noted above, Mr. Moore lawfully entered the United States pursuant to the ESTA program in 2017, immediately prior to his arrest on the Middle District of Florida charges. Also, he did not ever seek to become a citizen of Spain in 2016; instead, he sought residency status both in Spain and in Dubai at that time. He intended to pursue a business venture in Dubai while maintaining a home in Spain. Then-current rules in those jurisdictions required that he spend at least half the year in Spain, but only that he visit Dubai once every six months. He surrendered his U.S. green

card in November of 2016 with the assistance of a U.K. lawyer, because he was intending to reestablish residence in South Florida upon the conclusion of his Dubai business activities.

Paragraph 96

We are forwarding with these objections and corrections copies of medical records received from Dr. Chua regarding Mr. Moore's pulmonary diagnosis and care, together with additional records from a South Florida cardiologist. Also, by way of update, Mr. Moore is now using an inhaler to address his pulmonary condition.

Paragraph 109

Mr. Moore voluntarily surrendered his U.S. green card in November 2016 with the assistance of a U.K. lawyer, and not as a result of his Middle District of Florida arrest in 2017.

Paragraph 139

Mr. Moore objects to the calculation of $57,579790 as joint and several restitution, and reserves his rights to investigate and contest whether and to what extent any victim(s) could establish direct and proximate harm as a result of his convictions pursuant to the MVRA.

**Part D. Sentencing Options**

**Part E. Factors That May Warrant Departure**
**Part F. Factors That May Warrant a Sentence Outside of the Advisory Guidelines System**

Owing to the Court's policy of not receiving from the Probation Office any analysis or recommendation regarding potential bases for departure or variance, Mr. Moore will address those matters only in his submission to the Court, and does not intend any waiver of such arguments by their omission here.

Sincerely yours,

*/s/Michael J. Grudberg*

Michael J. Grudberg

cc: Vladislav Vainberg, AUSA (via e-mail)