**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

**UNITED STATES OF AMERICA**                    :

   **- v. -**                    :

**JAMES MOORE,**                    :                    **18 Cr. 759 (RMB)**

       **Defendant.**                    :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x


## GOVERNMENT'S SENTENCING MEMORANDUM
## <u>REGARDING DEFENDANT JAMES MOORE</u>


DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
Attorney for the United States of America


VLADISLAV VAINBERG
Assistant United States Attorney
- Of Counsel -

**Table of Contents**

I.      Factual Background ...................................................................................................3

        A.      Haddow's History of Prior Ponzi Schemes .................................................3

                1.      Prior Scheme with James Moore ....................................................3

                2.      Other Schemes in the United Kingdom ..........................................3

                3.      Haddow Moves to the United States for a "Fresh Start" and Launches the
                        Bitcoin Store Fraudulent Scheme ...................................................4

        B.      Overview of Bar Works ...............................................................................5

        C.      Moore Partners with Haddow to Sell Bar Works ........................................7

        D.      Moore Helps Haddow Structure the Scheme and Create Fraudulent Investor
                Documents .....................................................................................................9

        E.      Moore Defrauds Investors ..........................................................................11

        F.      Moore Advises Haddow on How to Avoid Arrest .....................................13

        G.      Moore Disguises Bar Works Proceeds ......................................................13

        H.      Moore Creates a Competing Coworking Space Company .........................14

        I.      Moore Obstructs Justice and Continues to Cover Up the Scheme ...........15

        J.      Bar Works Unravels and Haddow Flees.....................................................15

        K.      Moore's Other Relevant Conduct...............................................................16

                1.      Instant Track and Instant Access Properties.................................16

                2.      Room to Invest..............................................................................17

                3.      Moore's Felony Conviction for the Lake Austin Scheme.............17

                4.      Our Space.....................................................................................19

II.     Guidelines Calculation.............................................................................................19

III.    Sentencing Legal Principles ....................................................................................22

IV.     Section 3553(a) Analysis.........................................................................................24

        A.      The Nature and Circumstances of the Offense .........................................24

        B.      History and Characteristics of the Defendant...........................................31

        C.      The Need to Afford Adequate Deterrence .................................................34

V.    The Defendant's Request for a Sentence Equal to Or Lesser Than Gata-Aura's Should Be Rejected..................................................................................................36

VI.   Conclusion .........................................................................................................37

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| - v. - | : | |
| JAMES MOORE, | : | 18 Cr. 759 (RMB) |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

## GOVERNMENT'S SENTENCING MEMORANDUM
## <u>REGARDING DEFENDANT JAMES MOORE</u>

The Government respectfully submits this memorandum for the Court's consideration in connection with the sentencing of defendant James Moore ("Moore" or the "defendant"), which is scheduled for October 27, 2021 following Moore's conviction at trial of wire fraud and conspiracy to commit wire fraud on June 7, 2019.[1]

In 2015 and 2016, Moore helped to design, launch, and expand a massive international Ponzi scheme in a coworking space company called Bar Works.   The scheme, which ran until June 2017, ensnared over 800 victims worldwide who invested over $57 million in coworking spaces that guaranteed an annual return of approximately 14-16% of their investment.   Among other things, investors were deceived about Bar Works' supposed profitability, the particular workspaces they invested in (which largely existed on paper only), and even the basic identity of Bar Works' management.   Specifically, while the Bar Works offering materials represented the company to have been founded and run by CEO "Jonathan Black," Black did not exist.   The real owner and operator of Bar Works was Renwick Haddow, a citizen of the United Kingdom who had previously gained notoriety for operating multiple widely-publicized Ponzi schemes through which investors

---

[1] The trial transcript is denoted as "Tr.".

lost millions of pounds.   Moore knew Haddow and his history well:   in 2009, both men partnered on a scheme selling fractional interests in hotels that—like all other Haddow-operated investment schemes, collapsed, causing investor losses.

To get the Bar Works scheme off the ground, Moore and Haddow struck an agreement through which Moore would obtain a 35% stake in Bar Works.   In exchange, Moore finetuned fraudulent offering documents, provided a crucial front for the operation, and most importantly, channeled his extensive agent network at United Property Group ("UPG") to market Bar Works to unsuspecting investors.   Moore and UPG collectively would obtain 65% of each dollar invested by UPG's recruited investors into Bar Works, leaving only 35% for Haddow's cut, the 14-16% annual interest payments that was guaranteed to the investor for ten years, and the actual supposed operation of the Bar Works business.

Moore was extremely successful at attracting investors to Bar Works through UPG's sales operation.   As Moore himself said, he put Barworks "on the map".   GX 36.   Moore and UPG were so successful, in fact, that he went behind Haddow's back to launch a competing coworking space investment scheme in the summer of 2016, called Our Space.   That decision led to a partnership breakdown between the co-conspirators.

Moore personally received at least $1.6 million from victim funds from Haddow before starting Our Space. And even afterwards, while the Bar Works scheme was still operating, Moore obstructed justice by lying to the Securities and Exchange Commission about Bar Works' fraudulent nature and his own role.

The applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range in this case is 324 to 405 months' imprisonment with a statutory maximum of 240 months on each count.   The Government respectfully submits that in light of the widespread financial devastation caused by this fraud on over 800 people, and Moore's critical role in the fraud, a substantial sentence

2

of imprisonment, of at least 120 months, would be sufficient but not greater than necessary to serve the essential sentencing goals in this case.

**I.**    **Factual Background**

    **A.**    **Haddow's History of Prior Ponzi Schemes**

        **1.**    **Prior Scheme with James Moore**

Haddow had been friends with Moore, a fellow U.K. citizen, for years before launching Bar Works, and they had operated a similar predecessor investment scheme together that caused investors to lose their money. PSR ¶ 20.   As Haddow testified at trial, in approximately 2009, Haddow and Moore partnered on a hotel investment scheme called Room to Invest.   *Id.* Room to Invest offered investors fractional interests in hotel rooms.   *Id.*   Investors would buy these interests and then receive returns supposedly from customers using their hotel rooms.   *Id.*   During the trial, Haddow testified that Moore wanted Room to Invest to sell interests in a hotel in Barbados, even though Moore had not actually built the hotel and thus would have no way of paying investors returns for a long time, if ever.   *Id.*   Haddow turned down selling the Barbados property but invited Moore to partner up with him to sell investments in two real hotels in Slovenia and Morocco. Moore agreed and helped to restructure the investment to make it more attractive to investors by adding a guaranteed return for buying multiple units.   Moore also brought in agents to actually solicit investors.   *Id.* In return, Moore received half of Haddow's profits from the operation.   *Id.*   Room to Invest solicited about 300,000 to 500,000 pounds after Moore partnered with Haddow, before collapsing, resulting in investor losses.   *Id.*

        **2.**    **Other Schemes in the United Kingdom**

Prior to launching Bar Works, Haddow led multiple widely-publicized Ponzi schemes in the U.K. in which investors lost money.   PSR ¶ 18.   In November 2008, the Companies Investigation Branch of the Insolvency Service of the U.K., an agency responsible for investigating serious

corporate abuse in the U.K. disqualified Renwick Haddow from serving as a director of any company registered in the U.K. for a period of eight years, through about November 2016. *Id.* According to an online press release published by a U.K. government and public sector news service in December 2008, Haddow had served as a director of a failed U.K. company whose investors lost all or substantially all of their investments and agreed that he made various misleading statements about its financial position and prospects. *Id.*

In July 2013, the U.K.'s Financial Conduct Authority ("FCA") brought a civil action against Haddow and others for allegedly running various unauthorized collective investment schemes, including a scheme involving African land ventures and another scheme selling investments into carbon credits, that raised £16.9 million in funds through, among other things, misleading statements to investors. PSR ¶ 19. In February 2014, the High Court of Justice, Chancery Division ("High Court") ruled, in substance, that the schemes at issue were in fact unauthorized collective investment schemes. *Id.* The ruling was publicized online. *Id.* On or about March 26, 2018, the High Court additionally found that these schemes were unlawfully promoted to the public by false, misleading and deceptive statements and mandated that Haddow and his co-conspirators pay a total of £16.9m in restitution to victims. *See* Press Release, FCA Wins Case Against Capital Alternatives Limited and Others, available online at https://www.fca.org.uk/news/press-releases/fca-wins-case-against-capital-alternatives-limited-and-others (last accessed October 19, 2021). Investors had lost substantially all their money in these schemes.

### 3. Haddow Moves to the United States for a "Fresh Start" and Launches the Bitcoin Store Fraudulent Scheme

In or about October 2014, Haddow moved to the United States for a "fresh start" because, as he testified at trial, he had "very bad reputation in the U.K., for a number of financial misendeavors which was covered on the internet, and it meant that I couldn't really operate further in the U.K." Tr. 201. Once here, Haddow first launched a fraudulent scheme selling investments into a non-

functioning digital cryptocurrency company he created called Bitcoin Store.   Tr. 241-244.   The investments were sold out of a high-pressure boiler room Haddow set up in New York through another newly-created Haddow company called InCrowd Equity, Inc. ("ICE").   *Id.*   Haddow recruited aggressive salespeople through Craigslist postings and managed the boiler room himself. Investors in Bitcoin Store were provided a "Private Placing Memorandum" that falsely touted that Bitcoin Store had generated gross sales of $7.56 million through April 30, 2015.   *Id.* In fact, the company did no business, Bitcoin or otherwise.   *Id.*   The offering documents intentionally omitted Haddow's name entirely and set forth fictional biographies about Bitcoin Store's non-existent management.   *Id.*   From approximately May 2015 through December 2015, Haddow's boiler room raised over $700,000 from investors, who lost substantially all their money.   *Id.*

B.   **Overview of Bar Works**

In July 2015, Haddow created Bar Works, a Manhattan-based company which purported to adapt former bars, restaurants and other spaces into coworking venues with "workspaces" for rent to the public in exchange for a membership fee.   PSR ¶ 13.   Over the course of the next two years, Bar Works opened multiple locations in New York City, as well as in San Francisco and elsewhere. *Id.*

Haddow and co-conspirators including James Moore and Savraj Gata-Aura,[2] raised over $57 million dollars from investors in Bar Works.   PSR ¶ 16-17, 38. The investments were structured as a ten-year "lease" and reciprocal "sub-lease" on individual workspaces in different Bar Works locations.   PSR ¶ 17.   To purchase a lease on a single workspace, investors paid a purchase price,

---

[2] On November 18, 2019, Gata-Aura appeared before the Honorable Jed S. Rakoff and pleaded guilty to conspiracy to commit wire fraud in connection with the Bar Works scheme, under docket S1 18-CR-759-002 (JSR). Although not signed to a cooperation agreement, Gata-Aura made efforts to cooperate with the Government and provided extensive financial information pertaining to the victims of the scheme to aid the Government's forfeiture efforts. On July 27, 2020, the Judge Rakoff sentenced Gata-Aura principally to 48 months' imprisonment.   Haddow has not yet been sentenced.

ranging from $22,000 to $30,000, and then would generally "sub-lease" their workspaces back to a Bar Works affiliate.   *Id.*   Bar Works, or its affiliate, agreed to pay each investor a guaranteed monthly "rental" fee for the lease's duration, regardless of whether a paying customer could be obtained for the investor's workspace.   *Id.*   The guaranteed yearly rent represented about 14-16% of the investor's investment.   In addition to the rent payments, Bar Works promised to return each investor's investment back at the end of ten years.   *Id.* The revenue to support these investor guarantees was supposed to come from paying members utilizing Bar Works' workspaces; beginning with its first offering documents, Bar Works claimed that it was "profitable."

Because Haddow earned extensive notoriety and online publicity as the architect of multiple Ponzi schemes that were being actively prosecuted by regulators in the United Kingdom, Haddow could not use his own name in connection with marketing materials for Bar Works.   Instead, just as he did with the Bitcoin Store scheme, Haddow invented a fictional CEO, now named "Jonathan Black" to be the public face of the business.   "Jonathan Black" issued press releases and statements to investors, signed investor leases and certificates, and when necessary, even communicated directly (on the phone only) to investors.   "Jonathan Black" had a fake Linked-in page and a detailed biography in Bar Works' offering materials.   The marketing materials did not mention Haddow at all.

The Bar Works offering documents also falsely represented that the company was profitable. It claimed, among many other things, that the first Bar Works location that opened in October 2015 at 47 West 39th Street in Manhattan was "already profitable."   But Bar Works only had a small handful of paying customers.   Even with heavy discounts to minimize the appearance of vacant offices, the paying membership business was sparse. These customers' subscription fees failed to cover Bar Works' rent and company expenses, much less return any money for investors.   Indeed, as Haddow testified, Bar Works was never profitable as a business.   Tr. 205.

The investment was initially sold in 2015 as an investment in equity or convertible loan notes of Bar Works itself, marketed through Haddow's own boiler room at ICE.   Attempting to sell Bar Works through his personal boiler room carried significant risk, however, and made it difficult for Haddow to rapidly expand the sales operation.   In late 2015, Haddow closed the boiler room, and restructured the investment opportunity as the purchase of a lease/sublease into workspaces that he would attempt to sell through professional agent networks that targeted potential investors worldwide in exchange for a commission.

### C.      Moore Partners with Haddow to Sell Bar Works

Moore had maintained a friendship with Haddow following their partnership on the Room to Invest scheme.   The two men visited each other over the years in Miami and Dubai.   Haddow even invited Moore to Haddow's wedding.   In the summer of 2015, Haddow described his ICE boiler room operation to Moore. Tr. 257.   Moore initially asked Haddow if he would use the boiler room to sell Moore's own then-operative real estate investment project in Spain.   *Id.*   Haddow declined, explaining that he was focusing his efforts on preparing to sell investments in the new coworking space venture called Bar Works.   Moore expressed interest in partnering on that project and told Haddow that he had an agency network called United Property Group that they could use to sell Bar Works to investors.   Tr. 257-259.   Moore made clear, however, that he would only come in as a true partner in the business.   As he wrote to Haddow in the ensuing days,   "My interest is in being in business with you. I'm not good at the glorified sales agent bit. I reckon we can bring a lot to the party if you feel it's worth giving something up to grow very fast." Tr. 269, GX 3.   On a call, after sending Moore a prospectus referring to Jonathan Black, Haddow told Moore that Haddow was Jonathan Black.  PSR ¶ 23.   Moore continued pursuing the deal.  Tr. 184.   Haddow agreed to make Moore a partner in the scheme and business itself.

In October 2015, Moore visited Haddow in New York and the co-conspirators further

negotiated their partnership.   The following month, Moore brought UPG's other principals to New York to meet with Haddow and discuss how UPG would sell Bar Works, which by then had launched its first location.   Moore negotiated an agreement with Haddow through which UPG would receive a 30 percent commission for each investor it recruited.   PSR ¶ 22.   Moore had a secret side deal with Haddow, through which Moore and Haddow would split the remaining investor money, 50-50, amounting to an additional 35 percent commission for Moore personally from UPG-recruited investors.   *Id.*   As a true partner, Moore's 35% cut would be reduced pro-rata by business expenses to open new locations.   In total, unbeknownst to investors, Moore and UPG would collectively be paid 65 percent of each UPG-recruited investors' money that was purportedly going toward the running of the Bar Works business.   *Id.*   As the trial evidence showed, this meant that investors would necessarily be paid their "guaranteed" returns out of other investors' money and that Bar Works operated as a classic Ponzi scheme.   *Id.*

Moore was able to extract 65% of the investors' money from Haddow because he knew that Haddow desperately needed two things: a professional agent network that could push Bar Works on unsuspecting victims, and a small group of trusted insiders who could act as a front and insulate Haddow from agents and investors while vouching for Jonathan Black.   These insiders knew about Haddow's history and his need to conceal himself.   As Moore put it in an email to another insider, Neil Storey, who asked about Jonathan Black the day before UPG's face to face meeting with Haddow:

> Ahem.
> Let Renwick explain that for you tomorrow…
>
> Ex. A
>
> I see an unusual opportunity…
> Renwick "needs" some more help - now or later.
> Has a few issues of his own that could prove awkward for him moving forward..
> thats where I see we can add huge value…

Ex. B.

When UPG's principals discovered that Haddow had offered another agent a distribution right that competed with UPG's, "exclusive" sales right to other agencies, they discussed their leverage over Haddow.  One of the UPG principals wrote to Moore and others: "I wonder if Renwick would care more about people knowing Bar Works is his and his history in carbon credits and lost investments would damage his Bar Works reputation."  PSR ¶ 25.  The principal also separately reiterated to Moore that "Renwick does not give a flying fuck about anything with integrity. Well, guess what, as long as he pays on the deals we and our agents do then I do not care how he runs his projects." *Id.* Ultimately, Moore and UPG did not expose Haddow, and joined the scheme to defraud investors.

### D.    Moore Helps Haddow Structure the Scheme and Create Fraudulent Investor Documents

In his sentencing submission, Moore claims that his role in Bar Works was "in many ways limited" and that he "had nothing to do with the preparation of the offering documents, for instance." Def. Mem. 7.  Not so.   Moore's attempts to minimize his involvement are belied by the trial record, other documentary evidence, and Moore's own contemporaneous statements during the scheme.

For example, in Moore's correspondence with other UPG principals in March 2016, Moore stated that "I was instrumental in putting the BarWorks product together - that[']s the only reason I was able to put the deal together for us (UPG) that I did."   *See* Ex. C.[3]  Moore also stated that "the lease concept was mine," referring to Bar Works' change from selling shares in the company, to leases in workspaces.   *Id.* Moore cited his structuring of Bar Works as a lease offering as an example of his "ingenuity as developer[]", justifying his requested renumeration from UPG (separate from

---

[3] The Government respectfully request permission to redact the personal identifying information certain other individuals not otherwise referenced in this memorandum.

the $1.6 million Moore received directly from Haddow).

Other emails plainly show that Moore and other UPG principals provided input on drafts of Bar Works documentation that would be sent to scheme victims, whom they euphemistically called "clients." PSR § 24. Tellingly, they internally commented on the similarity between the investor-facing documentation that would be used in Bar Works to documents of the same type used in Haddow's prior Ponzi schemes. *Id.* Haddow testified that he modeled the Bar Works "certificate" that would be given to investors on the certificate he used in his carbon credits scheme that was civilly prosecuted by the FCA, which in turn had been modeled on the certificate he and Moore used in Room to Invest. Tr. 286-87. The certificates were meaningless and gave no real property interest. PSR ¶ 24. In September 2015, Haddow sent Moore a draft Bar Works certificate to be signed by Jonathan Black; Moore then forwarded it to two UPG principals for review. One of the principals replied, "Its obvious that the first attachment is some sort of attempt at a client [i.e. investor] feeling like they hold a deed, but as it's a certificate it reminds me of carbon credits in a big way, but hey that worked so no reason to redesign the wheel being round I suppose. . . . The T&C's appear to be a rather simple, yet crude, attempt at a form of contract for a buyer. Again, the very simple play that the carbon credit market used when it came to client facing documentation. Again, if that worked, which it did, then no issues from me, K.I.S.S." *Id.* As Haddow testified, the carbon credits investments generally, and his scheme in particular, were all "scams" and what "worked" in that scheme was that "[i]t was very successful in terms of selling to investors." Tr. 286.

Moore came up with other ways to structure the Bar Works offering to make it easier to recruit agents and induce investors to invest. He created the "Wealthbuilder Program" through which investors who purchased multiple workspace leases would be guaranteed higher returns, reaching 16 percent a year for investments upwards of $100,000 or more. PSR ¶ 21. Moore presented this program to Haddow in person during one of their face to face meetings in New York.

Moore provided input on exactly how much supposedly guaranteed interest investors should be offered.   Haddow incorporated the program into all of Bar Works offering materials.

### E.        Moore Defrauds Investors

In calls, emails, and face to face meetings, Moore and Haddow openly discussed the mechanics of how to maintain the Jonathan Black façade and conceal Haddow's involvement from investors.   PSR ¶ 25. For example, one investor ("Victim-1") who invested $600,000 testified that a UPG agent connected him to speak to "Jonathan Black" as part of the investor's due diligence. PSR ¶ 26.   As emails and Haddow's testimony showed, behind the scenes, Moore, the UPG principals, and Haddow arranged for Haddow to speak to the investor as "Jonathan Black."   *Id.* Moore, Haddow, and other co-conspirators developed "email etiquette" through which they would treat Black as a real person over email in case the emails ever got into the wrong hands.   *Id.*

UPG's agent network predominantly recruited investors located outside the United States— victims who could not easily visit the locations, verify claims about the business, and see their workspaces for themselves.   When those victims or other interested parties insisted on visiting Bar Works in New York or asked to meet with "Jonathan Black," Haddow and Moore schemed about having other Bar Works employees meet them.   PSR ¶  26.   Moore represented to these third parties that he was speaking to Jonathan Black, and vouched for Black and Bar Works, to entice them to invest in or distribute Bar Works' offering.   *Id.* For example, in March 2016, Moore e-mailed Haddow that certain potential marketing partners whom he was attempting to persuade to sell Bar Works leases wanted to meet Jonathan Black in New York and record some marketing clips with "Jonathan".   PSR ¶  27.   Moore jokingly wrote to Haddow, "Guys How do we feel we can overcome the Jonathan issue…?? He's on honeymoon…!?!?"??. [sic]   At the time, as Moore knew, Haddow was on his real-life honeymoon. Haddow, under his real name, wrote back, "They can meet Sam [Aura] and Zoe [Haddow's wife] and our new PR. That should be enough and you guys can

keep them occupied." *Id.* Moore replied, "We will need a story as to why Jonathan isn't there".   *Id.*

Between approximately October 2015 and June 2016, Moore succeeded in having UPG launch Bar Works as a sought-after investment opportunity, and recruit over 100 individual victims who invested approximately $7.5 million into Bar Works. PSR ¶ 28.   As Moore knew, UPG's agents were disseminating misrepresentations about Jonathan Black and the viability of the business. For example, in November 2015, when Moore and UPG principals met with *Haddow* in New York to discuss how to run the scheme, maintain the Jonathan Black fiction, and divide the proceeds, UPG's employee agents were reassuring investors that UPG's principals had met with *Jonathan Black*, had done their due diligence, and concluded that Bar Works was a safe investment short of a "World War III" type scenario.   When Victim-1 emailed UPG questions about Jonathan Black and the safety of the investment as part of his due diligence, a UPG agent represented that:

> The CEO, Jonathan Black, has a sterling reputation and was previously the finance director and comptroller for Regent Inns PLC. In regards to security then, as far as we can tell, having delved very deeply into the Bar Works model (when my directors flew to meet Jonathan and his team in NYC, they visited the building, and looked at some of the competitor spaces -- We Work sites) that the investment is not only safe, but very much a game changer for any individual's portfolio. It would be similar to investing in a property next to Piccadilly Circus and being very much a part of the fundraising for the first round. In that regard, the benefit is being in before the economies of scale kick in. The incentive certainly seems to benefit the early bird, which is a key reason why my investors are buying in numbers and procuring multiple leases. The only risk we can establish is a World War III doomsday one whereby NYC shut down as a global capital of business and commerce. The chance of that is massively unlikely, just as unlikely as it would be for us at home here in London.

> Tr. 165-166, GX 1142.

Subsequently, when the same investor asked to speak to Jonathan Black directly before making a $600,000 investment, Moore, UPG and Haddow coordinated to have Haddow speak to him as Black.   As Haddow testified, he called James Moore immediately afterwards, giggling about the ruse:

> . . . I was very excited because this guy sounded very interested; it looked like he was going to potentially invest upwards of 600,000, maybe even more. He was offering maybe up to a million dollars, so I was very excited that I had made a big

contribution in this conversion. So, I rang up Jim and said to him that Jonathan has just got off the phone with [Victim-1] and he's had a really good call. And Jim's immediate response was, you mean you did. I said, no, no, Jonathan did. And then I giggled and laughed about it a little bit, and we moved on to another subject.

Tr. 356-357.

### F.    Moore Advises Haddow on How to Avoid Arrest

Befitting his role as Haddow's partner in crime, Moore even occasionally gave Haddow advice about how to flee from the United States to evade law enforcement if needed.   Haddow testified that he had been concerned about potentially facing criminal charges in the United Kingdom for his prior schemes and consulted with Moore whether Haddow would be protected by living in the United States.   Tr. 387. As Haddow recalled, Moore stated that Haddow would not be protected in the United States and "we discussed different ideas of, you know, avoiding being arrested." *Id.* Moore mentioned to Haddow a scheme that was running in Dominica that issued passports.   *Id.*   In March 2016, in the middle of the Bar Works scheme, Moore e-mailed Haddow a link to the FCA's most recent press release about the civil case against Haddow and offered the following advice:

> " . . . A few important points:-
> Great lawyers
> Good barrister
> Massive distance to special place (hard to get back)"

Tr. 386, GX 143

Haddow testified that he understood Moore's reference to a "special place" to mean "finding a location to disappear off to if things got hot" and make it "[h]ard for whoever is after me to get me back."   Tr. 386-387.   During the Bar Works scheme, Haddow purchased a property in Morocco that he considered to be precisely that kind of "special place".   Tr. 398.

### G.    Moore Disguises Bar Works Proceeds

Although not charged with money laundering, Moore took several steps to disguise the proceeds of the Bar Works scheme.   Moore asked Haddow to route Moore's 35% profit share from

UPG-recruited investors through a company owned on paper by Moore's wife.   PSR ¶  28.

Haddow sent at least $1,599,257.46 of investors' money to Moore through this way.   *Id.*   Moore

also sought Haddow's advice on setting up offshore entities.   Haddow used a particular U.K. based

accountant to set up such entities to launder Bar Works funds. Tr. 375. Haddow introduced the

defendant to this accountant because Moore was "after a similar structure to what I had" including

transferring proceeds outside of the United States.   Tr. 375-376.   The Government is not aware if

Moore ultimately made use of such entities prior to ending his partnership with Haddow.

        **H.**      **Moore Creates a Competing Coworking Space Company**

        Proving the adage that there is no honor among thieves, Moore and Haddow double-crossed

each other and fell out in the summer of 2016.   After giving away 65% of each UPG-recruited

investor's investment to Moore and UPG – and bringing in over $7 million in investments from

UPG's victims, Haddow began to increasingly rely on Gata-Aura to recruit competing agents to

UPG who would bring investors for a lower overall commission of approximately 30-35% split

between Gata-Aura and the agents.   Haddow began slowing commission payments to UPG and

delaying partnership profits to Moore.   He permitted Gata-Aura to poach agents and investors being

pursued by UPG.   As disputes arose about competing commission claims on particular victims

between UPG and agents working with Gata-Aura, Moore wrote to Haddow:

> "We shouldn't be competing with Sam [Gata-Aura] or you. He's blatantly stolen
> from under our noses time and time again, and mate, you've done nothing to stop
> it. And you should have. If anything is unforgivable here, that's it. Deliberately
> fucking your business partner who helped you put this on the map."   Tr. 391, GX
> 36

        In turn, Moore, UPG and other collaborators, secretly planned to launch their own

competing coworking investment scheme called Our Space.   By July 2016, UPG had

shifted its agents to sell Our Space investments instead of Bar Works.   Those agents

continued to target investors to whom they previously sold Bar Works.   And despite not

selling Bar Works anymore, Moore continued to abet the ongoing Bar Works scheme into 2016 and 2017 by affirmatively lying about it to federal investigators.

### I.     Moore Obstructs Justice and Continues to Cover Up the Scheme

Mindful of his own exposure, Moore continued to facilitate the Bar Works scheme even after shifting UPG to sell the competing investment project Our Space.   In 2016 and 2017, while the Bar Works scheme was still operating, Moore lied repeatedly to federal agents about the scheme and his role.   On August 11, 2016, Moore participated in a recorded phone interview with the Securities and Exchange Commission about Bar Works.   PSR ¶ 48.   When asked explicitly about Jonathan Black, Moore portrayed Black as a real person acting as the CEO of Bar Works but   with whom Moore never asked to speak.   *Id.*   In reality, Moore knew Black was fake, and Moore himself represented to certain agents and potential marketers that he was working directly to Jonathan Black in emails sent just months prior to the SEC's interview. *Id*

On February 15, 2017, Moore was interviewed by Internal Revenue Service (IRS) agents following his arrest for a separate investment scheme in connection with a development project in Florida called Lake Austin.   PSR ¶ 49.   In that videotaped interview, Moore attempted to hide his involvement in Bar Works (and Our Space) entirely, by claiming he had not done anything for money since 2010.   *Id.*   In fact, as Moore knew, he had gotten at least $1.6 million from Haddow for Bar Works alone.   *Id.*   Moore admitted to obtaining money from Bar Works only when explicitly confronted by agents about wires going to him. *Id.*

### J.     Bar Works Unravels and Haddow Flees

In January 2017, a media investigative report was published on the internet exposing Haddow as the architect of Bar Works, together with a history of his prior U.K. schemes.   PSR ¶ 35.   The report also provided evidence that Jonathan Black was fictitious.   In the coming months, new investor money dried up.   *Id.* In April 2017, Haddow stopped making payments to investors. In June

2017, Haddow was criminally charged and Bar Works began to close its locations.

Consistent with Moore's earlier advice to Haddow to make plans to have "[m]assive distance to special place" from which he would be "hard to get back" (GX 143), Haddow fled the United States in June and ultimately made his way to his property in Morocco.   Tr. 396-397.   He was arrested in Morocco the following month, detained, and extradited to the United States in April 2018.

At the time of its collapse, the Bar Works scheme raised at least $57,579,790 from at least 811 investors. PSR ¶ 38.

### K.    Moore's Other Relevant Conduct

The defendant is a recidivist real estate fraudster who has operated and participated in numerous real estate ventures in the United States and abroad, many of which ended with the same common outcome for investors.   The ventures collapsed and investors lost money.

### 1.    Instant Track and Instant Access Properties

The defendant founded the British property investment companies Instant Track Seminars (ITS) and Instant Access Properties (IAP) in 2001 and 2002, respectively.   PSR ¶ 41. Inside Track held seminars for individuals interested in learning about investing in real estate.   *Id.*   As seen in a BBC special on Inside Track, Moore promoted these seminars, which cost the public as much as 5,000 pounds to attend, with clips of himself in a helicopter and driving a convertible, while claiming that it would be "very easy" for the investor to recoup their admission fees from a future deal.   *See* https://www.youtube.com/watch?v=r_sEJJZL4-Q (BBC Inside Track episode at 2:10) (last accessed October 20, 2021).   IAP then acted an as agent facilitating purchases of real estate property to those investors.   PSR ¶ 41.   IAP claimed to have vetted various buy-to-let properties and negotiated discounts from developers of upwards of 15 percent of the market value of those properties, in exchange for approximately 3 percent of the purchase price in commission from investors.   *Id.* Many investors alleged that what they received instead were overpriced properties.   *See generally*

https://www.youtube.com/watch?v=r_sEJJZL4-Q (BBC Inside Track episode).   The developers whose properties IAP marketed were located throughout Europe and the United States.   PSR ¶ 41. IAP facilitated sales of over 30,000 properties in the 2000s, prior to being put into bankruptcy along ITS in 2008. *Id.*

### 2.      Room to Invest

As described above, in approximately 2009, Haddow and Moore partnered on a hotel investment scheme called Room to Invest.   PSR ¶ 42.   Moore restructured the investment to make it more attractive to investors by adding a guaranteed return for buying multiple units and brought in agents to solicit investors.   *Id.* Moore received half of Haddow's profits from the operation.   *Id.* Room to Invest solicited about 300,000 to 500,000 pounds after Moore partnered with Haddow, before collapsing, resulting in investor losses. *Id.*

### 3.      Moore's Felony Conviction for the Lake Austin Scheme

The following facts in the PSR are drawn from Moore's agreed upon statement of facts in connection with his guilty plea to misprision of a felony in *United States v. Moore et al.*, 17 Cr. 187, (M.D. Fla. 2017), filed on the docket in the instant case as ECF No. 148-6.   In or about 2004, Moore entered into a limited partnership with Paul Oxley, a developer based in Florida.   PSR ¶ 43.   Their limited partnership, called Lake Austin Properties, would construct condominiums at the Grand Palisades at Lake Austin, in Florida.   *Id.*   Lake Austin Properties entered into an agreement with a company named Darrencrest to act as its exclusive real estate agent. *Id.* Darrencrest in turn entered an agreement with IAP to be its subagent.   *Id.* Under the agreement, Darrencrest was to receive a 10 percent commission for each buyer it referred through IAP to Oxley and Lake Austin Properties within seven days of Lake Austin Properties receiving the buyer's signed purchase agreement and deposit. *Id.* Darrencrest paid IAP from its commissions. *Id.*

17

Darrencrest and IAP channeled approximately 1,750 individual buyers to the project.   PSR ¶ 44.   These investors provided a deposit and received a purchase/sales agreement.   *Id.*   To finance the project, Lake Austin Properties also applied for and received construction loans from various lenders.   *Id.*   In 2008, after the loans defaulted, the project was foreclosed upon.   *Id.*   In 2009, investors inquired about their escrow funds.   *Id.*   Lake Austin Properties represented that no part of the investors' deposits would be used for marketing or sales expenses, even though, as Moore knew, investors' money was used to pay virtually all of the commissions earned by Darrencrest and Moore. *Id.* Lake Austin Properties represented that no part of the investors' deposits would be used for marketing or sales expenses. *Id.* During the Fall of 2009, Oxley stated to Moore that he had illegally used deposit money that should have been held in escrow to pay virtually all the commissions earned by Darrencrest.   *Id.* Moore then realized what Oxley had done in connection with the financing for the development.   *Id.* Shortly thereafter, in late 2009 or early 2010, Moore learned that Florida law prohibited developers from using any portion of a deposit for the purchase of a condominium to be paid for marketing or selling expenses. *Id.* Moore knew that a crime had been committed by Oxley. *Id.* However, Moore did not report the crime to law enforcement. Instead, Moore permitted the crime to remain concealed. *Id.*

As evident above, Moore's role in the Lake Austin's scheme was similar to that in Bar Works. Both were types of real estate investment projects, funded by individual investors and in both schemes, Moore acted as a business partner to the owner of the scheme and a type of master agent. Moore was responsible for marketing the project and bringing in investors through sub-agents, in exchange for commissions. During Moore's participation in the Lake Austin and Bar Works schemes, misrepresentations were made to investors. In Lake Austin they were told their deposits would stay in escrow when in fact, the scheme operator was paying their money to Moore as commissions.

18

On February 15, 2017, Moore was arrested pursuant to an Indictment charging him and others with one count of bank fraud conspiracy in violation of 18 USC §1349 and eighteen counts of bank fraud in violation of 18 USC §1344. *United States v. Moore et al.*, 17 Cr. 187, Doc. No. 12, (M.D. Fla. 2017). PSR ¶ 46. The charges related to, among other things, misrepresentations made to Lake Austin Properties' lenders, including the fact that down payments were not kept in escrow but were instead expended on commissions. *Id.* On February 5, 2018, Moore was permitted to plead guilty to a Superseding felony Information charging him with Misprision of a Felony, namely that in November 2009, having knowledge of the commission of the bank fraud and conspiracy to commit bank fraud described above, Moore concealed that information and failed to notify a judge or other person in civil authority in the United States. *Id.* On August 27, 2018, Moore was sentenced to principally 18 months' incarceration. *Id.*

### 4.    Our Space

Beginning in the Spring of 2016, Moore and other principals at UPG, as well as the future management of Our Space, began planning to copy the Bar Works model and launch their own coworking space investment project.  Critically, Moore did not leave Bar Works because of any discomfort with the misrepresentations in that particular scheme; he left to generate more money and better control over his own copy-cat offering.  Moore, UPG and other management for Our Space launched the offering in or about June of 2016. PSR ¶ 47. According to online reporting whose accuracy the defendant has not contested, Our Space raised an estimated $30 million from investors prior to becoming defunct and causing millions in investor losses. *Id.*

## II.    **Guidelines Calculation**

The Government agrees with the Probation Office's calculation of the Guidelines.

Applying the 2018 Guidelines Manual, Moore's total offense level under the Guidelines is 30, calculated as follows:

- The applicable Guidelines manual for Count One is the November 1, 2018 manual.

- Counts One and Two, conspiracy to commit wire fraud and the substantive crime of wire fraud, are grouped together pursuant to U.S.S.G. § 3D1.2(c)

- The Guideline applicable to the offense charged in Count One is U.S.S.G. § 2B1.1.

- Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level is 7.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(L), because the loss resulting from the offense exceeded $25,000,000 but was less than $65,000,000, 22 offense levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(2)(B), because the offense resulted in substantial financial hardship to 5 or more victims, 4 offense levels are added.

- Pursuant to U.S.S.G. § 2B1.1(b)(10), because a substantial part of the fraudulent scheme charged in Count One was committed from outside the United States and the offense involved sophisticated means and the defendant intentionally engaged in or caused the conduct constituting sophisticated means, 2 offense levels are added.

- Pursuant to U.S.S.G. § 3B1.1(b), because the defendant was a manager or supervisor of the Bar Works Scheme and the criminal activity involved five or more participants or was otherwise extensive; therefore, 3 offense levels are added. USSG §3B1.1(b).

- Pursuant to U.S.S.G. §3C1.1 because the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and the obstructive conduct related to the defendant's offense of conviction and any relevant conduct, or a closely related offense, 2 offense levels are added.

Moore contends that the loss amount should be decreased to the approximately $7.5 million directly contributed by UPG's recruited investors rather than the entire approximately $57 million loss amount for the scheme. Def. Mem. 15-16. However, the entire loss from the scheme was reasonably foreseeable to Moore as part of the jointly undertaken criminal activity, pursuant to U.S.S.G. §1B1.3(a)(1)(B). Moore knew—and complained about—other agents competing with UPG to sell Bar Works. Those other agents solicited investors with the same offering materials that Moore helped create—including the Wealthbuilder Program and the lease concept that he claimed he came up with. Further, as described at length above, Moore, unlike Gata-Aura, acted in the

20

capacity of Haddow's business partner and part-owner of the entire Bar Works business.   The fact that Haddow ultimately did not honor that partnership and pay Moore all of what he believed he was owed, does not make the losses of the scheme any less foreseeable to Moore.

Moore also objects to the application of a three-level enhancement pursuant to U.S.S.G. §3B1.1(b) his role in the offense and contends that the adjustment is not warranted because Moore was not a "manager or supervisor" of any persons in the Bar Works operation and did not have direct or control the activities of any other alleged member of the scheme. Def Mem. 13-15. Moore appears to concede that the criminal activity involved five or more participants or was otherwise extensive. The record establishes that Moore was both, Haddow's business partner on the Bar Works business, and a principal at UPG with respect to the Bar Works business, who believed he was entitled to a 50% stake of UPG along with Storey.   *See* Ex. C.   Simply put, Moore negotiated on behalf of UPG to sell Bar Works and in fact caused Bar Works' lower level agents to sell the product.   Those agents were in turn given fraudulent offering memoranda prepared with Moore's assistance to solicit money from victims.   Moore also recruited lower level employees, like Bar Works' membership coordinator, Sean Phillips whom Moore subsequently brought over as the Chief Operating Officer of Our Space.   Tr. 649-652; 672, 675. The Government agrees with the Probation Office that Moore plainly "played a significant role in the decision to recruit or to supervise lower-level participants," warranting the enhancement.   PSR ¶ 67 & p.37.

Moore's last objection to the Guidelines arises from the application of the two-level enhancement for obstruction of justice for separately lying to the SEC about Jonathan Black's existence, and for lying to agents from the IRS about his income from Bar Works. The defendant contorts the record—and common sense—by incredibly arguing that his answers to the SEC were technically true.   To take an example, when asked about his understanding of the management team of Bar Works, Moore stated that Haddow "told me that he'd got a chap from Regency Inns (sic) by

the name of Jonathan Black to add all this up for him."   That was not true.   Haddow testified at trial about the first time he and Moore spoke about the Jonathan Black that appeared in marketing materials for Bar Works: "[W]e spoke about the prospectus in general, and one of the questions he asked me was who is Jonathan Black. I said it's me. And I just left it at that."   Tr. 289.   Moore was also asked by the SEC, "Did you ever ask to speak to Mr. Black?" to which he responded, "No, I didn't. I don't know whether anyone else did, but I didn't, no."   But in fact, putting aside that Black was fictitious, during the course of the scheme, Moore at times copied the Jonathan Black email address on his correspondence with others and described Black as a direct collaborator with Moore. *See* Ex. D (copying Jonathan Black email address to a potential marketing partner and describing "Jonathan [as] the primary originator of barworks prior to us becoming involved (at the formation stage) with this small and tight team who were previously responsible for successful roll out of walkabout bars in uk.").   Likewise, Moore's statement to the IRS that he received no income post 2010 was literally false and plainly meant to conceal his criminal proceeds from Bar Works.

These misrepresentations were highly material.   Moore made the misrepresentations to the SEC in August 2016 and it was not until June 2017, that the SEC and the U.S. Attorney's Office's parallel investigations culminated with the filing of charges against Haddow, which in turn ended the Bar Works scheme. In the period of time after Moore's misrepresentations to the SEC, the scheme drew millions of additional dollars from victims.

Moore's criminal history category is II.   PSR ¶ 76.   Based on an offense level of 40 and a criminal history category of II, the applicable Guidelines range is 324 to 405 months' imprisonment with a statutory maximum of 240 months.

## III.   Sentencing Legal Principles

The Guidelines are no longer mandatory, but they still provide important guidance to the Court following *United States* v. *Booker*, 543 U.S. 220 (2005), and *United States* v. *Crosby*, 397

F.3d 103 (2d Cir. 2005).   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark."   *Gall* v. *United States*, 552 U.S. 38, 49 (2007).   The Guidelines range is thus "the lodestar" that "anchor[s]" the district court's discretion.   *Molina-Martinez* v. *United States*, 136 S. Ct. 1338, 1345-46 (2016) (quoting *Peugh* v. *United States*, 133 S. Ct. 2072, 2087 (2013)) (internal quotation marks omitted).

After making the initial Guidelines calculation, a sentencing judge must consider the factors outlined in Title 18, United States Code, Section 3553(a), and "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, 18 U.S.C. § 3553(a), which are: "a) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for that offense; b) the need to afford adequate deterrence to criminal conduct; c) the need to protect the public from further crimes by the defendant; and d) the need for rehabilitation."   *United States* v. *Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(2)).

Under Section 3553(a), "in determining the particular sentence to impose," the Court must consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the statutory purposes noted above; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range as set forth in the Sentencing Guidelines; (5) the Sentencing Guidelines policy statements; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense.   *See* 18 U.S.C. § 3553(a).

In light of *Booker*, the Second Circuit has instructed that district courts should engage in a three-step sentencing procedure.   *See Crosby*, 397 F.3d at 103.   First, the Court must determine the applicable Sentencing Guidelines range, and in so doing, "the sentencing judge will be entitled to find all of the facts that the Guidelines make relevant to the determination of a Guidelines sentence

and all of the facts relevant to the determination of a non-Guidelines sentence."   *Id*. at 112; *see also*

*United States* v. *Corsey,* 723 F.3d 366, 375 (2d Cir. 2013) ("Even in cases where courts depart or

impose a non-Guidelines sentence, the Guidelines range sets an important benchmark against which

to measure an appropriate sentence.").   Second, the Court must consider whether a departure from

that Guidelines range is appropriate.   *Crosby*, 397 F.3d at 112.   Third, the Court must consider the

Guidelines range, "along with all of the factors listed in section 3553(a)," and determine the sentence

to impose.   *Id.*   In so doing, it is entirely proper for a judge to take into consideration his or her

own sense of what is a fair and just sentence under all the circumstances.   *United States* v. *Jones*,

460 F.3d 191, 195 (2d Cir. 2006).

## IV.   Section 3553(a) Analysis

The Government respectfully submits that a substantial sentence of incarceration is necessary

to reflect the seriousness and aggravated nature of Moore's crimes, provide just punishment, afford

general and specific deterrence, and promote respect for the law.

### A.   The Nature and Circumstances of the Offense

The scope and magnitude of Moore's crime warrants a substantial sentence of incarceration

of at least 120 months.[4]   The defendant played a critical role in the scheme.   As the Bitcoin Store

boiler room experience showed, Haddow could not sell Bar Works with his own employees on any

meaningful scale.   He needed access to hundreds of professional agents with thousands of leads

around the world.   Given his notoriety and the use of the "Jonathan Black" pretense, Haddow also

---

[4] In recommending a below-Guidelines sentence, the Government takes into account Moore's arguments about his recent mental health and physical condition.   The defendant does not argue that any of his conditions cannot be treated by the Bureau of Prisons and the defendant has in fact been receiving close care, including by being moved to a different facility than one that appeared to trigger his mental condition.   We note that Moore's mental health condition appeared only after trial and did not appear to prevent Moore from skillfully and successfully targeting investors with misrepresentations.

could not be the direct contact with these agents.    Accordingly, Haddow relied on a small group of co-conspirators—people who knew the truth about Haddow, his sordid history, and "Jonathan Black"— to recruit and serve as intermediaries for agents and investors in exchange for massive commissions.    Only one such co-conspirator, James Moore, was an actual partner in the criminal business scheme itself rather than a mere master agent.    Moore brought to the criminal scheme decades of experience selling real estate investments to the public, and a built-in professional agency network at UPG which he could influence to sell Bar Works at the expense of other potential investments.    In so doing, he put Barworks "on the map".    GX. 36.    Moore was Haddow's principal point of contact for UPG and his sounding board on other matters related to the scheme itself, including how to structure Bar Works, what to offer to pay investors, who to use as a front to conceal Haddow, and even how to become a fugitive if other authorities came after Haddow or Bar Works' assets.

Moore was not innocently drawn into a legitimate business venture that happened to turn criminal through other people's actions.    He knew who he was dealing with.    He made the decision to team up with a notorious Ponzi scheme operator being sued by a British regulator for leaving hundreds of victims with losses of over £16.9 million in his wake.    He knew that Haddow kept opening new companies in whatever fields seemed likely to attract investor attention – going from offering investments in rice harvests and carbon credits in Africa, to running a boiler room selling Bitcoin investments, and now to offering investments in coworking spaces, popularized by the rise of legitimate companies like WeWork.    Moore knew about Haddow's black track record that left only investor losses in his wake, and he knew why Haddow couldn't use his real name in connection with Bar Works.    More than that, Moore operated a prior scheme with Haddow himself: Room to Invest, which predictably ended in failure and investor losses.

Furthermore, Moore knew that based on UPG's 30% deal with Haddow and Moore's secret additional override, 65% of victim funds would be siphoned to himself and UPG.    Basic math told him that the remaining amount—even if somehow preserved by Haddow—would pay for at most approximately two years of guaranteed 14-16% investor returns, leaving nothing to invest into the business itself, or pay the remaining eight guaranteed years to the victims.    Moore knew that this was a Ponzi scheme on steroids, designed to extract the most amount of money as quickly as possible before collapsing.    Moore did not stay for the collapse; he collected $1.6 million before starting over with a copy-cat coworking space investment project.

The defendant's decision to join the scheme was not a one-time mistake or a fleeting lapse in judgment.    Time and time again, Moore made conscious choices to continue to facilitate frauds on countless individual victims, and to cover up his fraud with lies and deception.    Moore was copied on emails sent by UPG to Bar Works with every new recruited victim.    He invoiced for those victims.    He recruited potential marketing partners to sell Bar Works in even more locations. He worked tirelessly to fine-tune pitch materials to go to agents.    And every time he did that, he made a separate, conscious choice to steal from the victims.    And he made that choice repeatedly over the course of close to a year, leaving Bar Works only to launch a competing coworking space investment project. This systematic, methodical, and egregious conduct supports a substantial sentence of incarceration.

Remarkably, the victims are largely absent in the defendant's narrative of his role in this scheme.    While many of the victims cannot fly to New York and personally address the Court at sentencing due to the ongoing coronavirus pandemic, they have submitted over 90 letters and statements describing the devastating impact of this fraud and urging the Court to hold the perpetrators accountable.    A review of the victim impact statements is a haunting tour of the

varying kinds of human wreckage that can only exist in the wake of a fraud of international scope and dimension.

One victim, who lost $500,000, describes the horrific financial, mental, and physical damage of this fraud on his family:

> The impact was devastating for my own company and, above all, my family. That money was my savings after many years of hard work. In mid-May 2017[,] I discovered the fraud had taken place and on May 23rd, 2017 my daughter was born 5 weeks premature due to the stress my wife was experiencing after what happened with Bar Works. . . . We were saving money for our first house and for our growing family. After what happened with Renwick Haddow and Bar Works, our dreams had to be put aside. I'm still trying to recuperate the huge loss and also recover from the stress and immense pain caused by this scam. I moved to the US from Italy because I wanted to leave a country where criminals only receive a slap on their wrist as punishment. I wanted to live in a country where the system protects its people. That's why I decided to invest in the American economy. I recently started the process to become an American citizen because I still believe in this country and its system. I have spoken with many other victims around the world and they are still suffering a lot as well, after what happened with Renwick Haddow and Bar Works. I strongly hope that Renwick Haddow will pay the for the consequences of his crimes and all the damages that he caused me, my family and others.
>
> (Statement 3, ███████ Ltr.)

Another couple shares how this fraud robbed them of years of hard work and planning for their family's future:

> I am a 46 year-old female, my husband is 9 and we have a 5 years old son. We are hardworking IT professionals who decided to save most part of our income for our retirement and for our son's university tuition. Every dollar has been hard earned with extra hours and being away from home. The trade-off of saving money for the future was curtail our current lives comfort and dreams. Future objectives made it worth it. Knowing that we have lost the hard earned dollars on the BarWorks investment made us feel so hopeless and depressive that it has been very hard to recover. It has been almost impossible to cope with the fact that all the effort made in the past was worthless and that it will take at least 20 years to recover financially. Our objective of slowing down so we could spend more time to our kid is not possible anymore. We just hope justice is done so no one else has to go thru this pain.
>
> (Statement 6, ███████ Ltr.)

As Moore knew, the Bar Works investment was deliberately structured to incentivize victims to invest money into multiple leases to obtain the highest rental payments.   Because those payments were unconditionally guaranteed by Bar Works—and spurred by other lies about the company's profitability and its management—some victims pooled and borrowed money from family members, multiplying the scheme's devastation.   For example, one victim who borrowed money from his retired parents and brother to qualify for the highest guaranteed return, "hardly got 1 or 2 very small payments from this investment, then the money stopped coming. I contacted Bar Works and their UK agents' company many times but every time they give different excuse. . . .I lived in hell for months before I could break the news to my parents and my brother who lent me the money. This news was devastating to my parents as this money was their retirement money and for my brother, this was a big portion of his life time savings. This was the worst experience of my life; not only I lost my money and my family money. It also stressed the relationship with my parents and brother." (Statement 8, ███ Ltr. at 1-2.)   Another couple who invested $125,000, including $25,000 that they borrowed and are still paying back "went through a range of emotions: distress, anger, physical anger and emotional stress to the point when [a spouse] began to lose large amounts of her hair." (Statement 28, ███ Ltr. at 1).

The victims are a diverse cross section of people of all ages, backgrounds, and life circumstances around the world.   They include parents who invested money from their children's savings to provide for a better future:   "When the scam was revealed with a broken heart I had to tell their children their money was gone."   (Statement 26, ███ Ltr. at 1).   A divorced father whose resulting financial straits were compounded further by the COVID-19 pandemic and can now barely afford to see his children.   (Statement 30, ███ Ltr. at 1).   A recent refugee from the war in Yemen who saw a chance at stable income dissipate.   (Statement 63, ███ Ltr.)   A retired couple in Dallas whose $205,000 investment into eight Bar Works leases at three locations was

"planned to be main source of our retirement income." (Statement 1, ███ Ltr.).   A younger couple in Lebanon that had to painfully delay having children while struggling to make ends meet after losing their investment (Statement 69, ████ Ltr.)

For many victims, the mental toll of losing their life savings, or money meant to secure their children's education future, has brought on profound depression and sent their life into a tail spin from which they have not recovered.   For example, one victim writes that the loss "affected both my family and work life, on many occasions even thought of suicide came to my mind. . . . This financial scam affected me mentally so much that my performance at workplace started falling terribly. At one point of time I was best performing employee since I joined the company in 2013, but from mid-2017 my performance at workplace started deteriorating . . . [and] in July 2019 I was made redundant by my company. For last 6 months I am without work and very frankly this scam has shattered my confidence so much that I am afraid of even meeting any recruitment consultant." (Statement 10, ██████ Ltr.).

Victims previously comfortable are now "living paycheck to paycheck" (Statement 18, ██████ Ltr.), or worse.   The damage travels across generations.   Some victims' families have had to reduce their medical insurance (Statement 15, ████ Ltr.), and struggle to pay for health needs for themselves or their family (Statement 24, █████ Ltr.)   They have been forced to back to their parents' home at age 50, (Statement 72, ████ Ltr.), or file for bankruptcy while experiencing post-traumatic stress syndrome caused by this scam (Statement 76, █████ Ltr.)

There are older people, pensioners whose days in the workforce have concluded, with no means of repaying their debts.   There is the septuagenarian woman in Great Britain who, sensing a golden opportunity, brought her mother, son, and daughter into Bar Works; the family has lost a combined half million pounds.   (Statement 44, █████ Ltr. at 1).   Several retired victims, who have lost much of the money meant to secure their retirement, have now been forced to go back to the

workforce and strain to find job opportunities in the current climate.   We highlight for the Court the letter from a retired couple in the United States, who worked their entire life to build a real estate business, and upon their retirement, generously shared one-third of the proceeds from its sale with their dedicated employees.   (Statement 17, ███████ Ltr.).   Having now lost much of their remaining hard-earned money to this scam, they are experiencing clinical depression, and "out of necessity are both now seeking employment once again. Unfortunately, at our ages, we are far less than marketable."   *Id.*   As Mr. Zimmerman puts it, "If I live to be 100, as my mother, grandmother, grandfather have, I will likely do so in significant poverty because of these monsters who have no conscience. My wife the same. There are no words to help any judge or jury feel the pain and the darkness of deep depression that such a loss causes. However, we hope that our words might somehow help our pain and frustration to be at least understood and that the devastation of the future we now face because of this loss is considered as a final sentence is levied against those found guilty or who have admitted to such guile and corruption."   *Id.*

Indeed, the sheer diversity of woe in Moore's wake distinguishes him from many other types of white collar fraudsters in this District.   This is not a case in which the measures of harm verge on the theoretical.   The defendant stole from hundreds of real people using false pretenses. He did it on a grand enough scale to have caused tens of millions of dollars in damage.   His sentence should reflect the reality of the pain he caused.

The victims of this fraud reside not only in the United States, but approximately sixty other countries.[5]   A theme running through their letters is the trust they place in the United States justice

---

[5]  The addresses associated with the victims include the following countries or territories:   Andorra, Argentina, Australia, Austria, Azerbaijan, Bangladesh, Belgium, Brazil, Bulgaria, Canada, the Canary Islands, the Cayman Islands, China, Congo, Cote d'Ivoire, Cyprus, Czech Republic, Denmark, Egypt, England, France, Germany, Greece, Hong Kong, India, Indonesia, Ireland, Israel, Italy, Jamaica, Jordan, Kazakhstan, Kuwait, Lebanon, Liechtenstein, Malaysia, Malta, Mexico, Netherlands, New Zealand, Nigeria, Pakistan, the Philippines, Poland, Portugal, Qatar, Russia, Saudi

30

system to hold fully accountable the people who robbed them of their savings.  They "strongly believe that the most free and fair US Justice system will do justice by punishing the criminal appropriately[.]" (Statement 10, ███████ Ltr.).  They ask the Court to recall the immense harm deliberately brought by Haddow and Moore on hundreds of innocent, unsuspecting victims when it evaluates the defendant's complaints about the consequences of his conviction in his bid for leniency.

### B.   History and Characteristics of the Defendant

Moore is a sixty-year old defendant facing his second federal felony conviction relating to fraud in the sale of investments.  Unlike many defendants sentenced by this Court who present extremely difficult personal backgrounds, Moore was fortunate to report growing up in a loving and supportive home, and retaining the support of his wife and children following this conviction.  PSR ¶ 60.  Possessing keen intelligence, entrepreneurial drive, and extraordinary marketing skill, Moore created an extremely successful series of seminars and real estate buying companies in the 2000s that generated millions of dollars.  Def Mem. 7.  Put simply, there was no need or justification for Moore to turn to fraud.  What is clear, is that beginning in approximately 2009, and running through the better part of the next decade, Moore repeatedly advanced at least four investment projects that each either simply lost investors money or were propelled by outright fraud. Moore escalated his misconduct from simply helping to market Room to Invest, to committing a misprision of a felony in connection with escrow misuse in Lake Austin, to working hand in hand with the architect of Bar Works, and finally to creating from the ground the mirror image of Bar Works, called Our Space.

Moore has submitted letters principally from family members attesting to his positive

---

Arabia, Scotland, Singapore, South Africa, Spain, Sweden, Switzerland, Taiwan, Thailand, United Arab Emirates, United Kingdom, United States, and Uzbekistan.

personal qualities, and expressing surprise at his arrest and conviction.   It is, of course, appropriate for the Court to take these letters into account in connection with sentencing.   However, the Government asks that, in so doing, the Court consider the following four points.   First, the attestations to Moore's positive personal qualities do not distinguish him from other similarly situated white-collar defendants—individuals who, despite having many opportunities and a network of people who love and support them, nonetheless choose to steal and defraud.   As Judge Marrero astutely observed, this collection of letters:

> falls into a pattern advanced by a subset of the white collar criminal. . . . The list of their achievements and virtues is long and impressive. Let us count the ways. At home, they are good family men and women, caring spouses, loving parents, loyal and reliable to friends. At work, they are looked up to as outstanding professionals and business partners. To their community's charities and public causes they are generous patrons and sponsors.

*United States* v. *Regensberg*, 635 F. Supp. 2d 306, 308 (S.D.N.Y. 2009), *aff'd*, 381 F. App'x 60 (2d Cir. 2010).   Similarly, [whatever he does] while commendable, are not atypical for an educated white-collar offender and do not warrant a downward departure or variance.   *See United States* v. *Vrdolyak*, 593 F.3d 676, 682-83 (7th Cir. 2010) ("[I]t is usual and ordinary, in the prosecution of similar white-collar crimes . . . to find that a defendant was involved as a leader in community charities, civic organizations, and church efforts," and the defendant "should not be allowed to treat charity as a get-out-of-jail card" (citation and internal quotation marks omitted)); *United States* v. *Crouse*, 145 F.3d 786, 792 (6th Cir. 1998) (defendant's civic contributions, not atypical for a prominent businessman, did not support nine-level downward departure); *United States* v. *Morken*, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's charitable and other good works did not justify departure from Guidelines); *United States* v. *Haversat*, 22 F.3d 790, 796 (8th Cir. 1994) (defendant's charitable and volunteer activities did not make him atypical).

Second, the letter writers' attestations to Moore's positive qualities have diminished value because Moore has demonstrated an extraordinary ability to deceive his family and friends about his

criminal activities.   Indeed, the letters themselves are proof of this ability, as Moore appears to have successfully kept every person close to him out of the loop for the duration of a multi-million dollar fraud that would consume most of his time.   He lied to agents and promoted lies to victims.   Not much weight can be assigned the observations of people who, notwithstanding their fondness for the defendant, were clearly kept in the dark about who the defendant really was during the course of this scheme.

Third, to the extent that Moore or the letter writers suggest that his humiliation and loss of social or professional standing as a result of his convictions warrant a lighter sentence, this claim should be rejected.   Any notion that successful white-collar criminals should be sentenced more lightly than defendants of a lower socioeconomic status cannot not be countenanced.   "It is impermissible for a court to impose a lighter sentence on white-collar defendants than on blue-collar defendants because it reasons that white-collar offenders suffer greater reputational harm or have more to lose by conviction."   *United States* v. *Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012) (citing U.S.S.G. § 5H1.2); *see also United States* v. *Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence of one day with credit for the day of processing, the district court relied heavily on the fact that Musgrave had already 'been punished extraordinarily' by four years of legal proceedings, legal fees, the likely loss of his CPA license, and felony convictions that would follow him for the rest of his life. '[N]one of these things are [his] sentence. Nor are they consequences of his sentence'; a diminished sentence based on these considerations does not reflect the seriousness of his offense or effect just punishment." (citation omitted)); *United States* v. *Kuhlman*, 711 F.3d 1321, 1329 (11th Cir. 2013) ("The Sentencing Guidelines authorize no special sentencing discounts on account of economic or social status.").   As the Seventh Circuit has observed:

> [N]o "middle class" sentencing discounts are authorized. Business criminals are not to be treated more leniently than members of the "criminal class" just by virtue of being regularly employed or otherwise productively engaged in lawful economic

> activity. It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States* v. *Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) (citation omitted).

Finally, as discussed above, this is *not* a case where the offense conduct was wildly aberrant or prompted by a brief lapse in judgment and where, as a result, it might be appropriate to give more weight to the defendant's otherwise law-abiding life. In fact, the defendant's history shows him to be a real estate fraudster who was more than happy to team up for the second time with another notorious recidivist fraudster on a blatant Ponzi scheme.

Accordingly, even crediting the testimonials Moore has submitted in connection with sentencing—and the Government does not in any way question their sincerity—the defendant has shown himself to be a skilled and sophisticated liar, and not someone who deserves any benefit of the doubt with respect to this Court's judgment of his character.

## C.     The Need to Afford Adequate Deterrence

One of the paramount factors that the Court must consider in imposing sentence under Section 3553(a) is the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Courts have generally recognized that "white collar crime . . . requires heavy sentences to deter because it is potentially very lucrative." *United States* v. *Hauptman*, 111 F.3d 48, 52 (7th Cir. 1997). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States* v. *Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotation omitted). "Defendants in white collar crimes often calculate the financial gain and risk of loss, and white collar crime therefore can be affected and reduced with serious punishment." *Id.*

There is also a heightened need for specific deterrence in this case.   As noted, the defendant was motivated by greed, undeterred by the potential consequences.   When Room to Invest collapsed and investors lost money, Moore knew the likely outcome of a project run by Renwick Haddow. When he learned that the real estate developer in Lake Austin was lying to investors about how their escrow money was used, Moore continued with that project, with no consequences until his 2017 arrest.   When he learned that Haddow ran the African Land and Carbon Credits schemes through which investors lost £16.9 million pounds, he was not deterred from teaming up with Haddow again. He knew that the FCA was actively suing Haddow and his accomplices for those frauds.   He knew that Haddow left the United Kingdom for a "fresh start" with new schemes in the United States.   He knew that those schemes were initially being sold out of a boiler room in Manhattan.   He knew that the United States heavily regulated securities fraud.   None of that mattered to the defendant.   Far from being deterred by Haddow's history, Moore saw the opportunities for massive profits and sought to join him.   And despite it being obvious from the beginning that Bar Works could only sustain itself with new investors' money, Moore did not hesitate to expand the Ponzi scheme and later to copy the idea.

To be clear, the Government cannot currently state whether Our Space has engaged in any investment fraud.   However given the defendant's history, the similarity of this business to Bar Works, and the defendant's decision to copy a known scam to solicit investors, the Government has serious concerns about the defendant's willingness and ability to continue to defraud investors after serving his sentence.   The Government respectfully submits that a significant prison sentence is necessary to truly impress upon Moore the wrongfulness of his actions and deter him from future misconduct.

**V.     The Defendant's Request for a Sentence Equal to Or Lesser Than Gata-Aura's Should Be Rejected**

The defendant invokes the below-Guidelines 48-month sentence imposed by the Honorable Jed S. Rakoff on Gata-Aura in 2020, and suggests that it should "mark the upward range of, necessary punishment for Mr. Moore."   Def. Mem. 16.   The Government disagrees and respectfully submits that Moore's aggravated misconduct, his prior criminal history, and his refusal to accept responsibility all counsel in favor of a significantly longer sentence than Gata-Aura.

As an initial matter, as Haddow's business partner, Moore occupied the highest position in the criminal hierarchy other than Haddow.   Moore was compensated like a partner, earning 35% equity on incoming UPG investors separate and apart from any internal compensation he received from UPG's 30% commission.   Put another way, after paying UPG 30%, Haddow *split* the remaining investor funds with Moore 50-50.   Gata-Aura on the other hand, was simply a master agent, earning approximately a 5-10% override on each agent whom he could persuade to sell Bar Works, with no additional separate compensation.

Part of the reason Haddow agreed to pay Moore and UPG that enormous commission was because UPG came with a built-in stable of employee agents who could immediately pivot to sell the product given to them.   Moore had significant control and influence over UPG and could ensure, as he later claimed, that he would put Bar Works "on the map".   More and other UPG principals supervised that operation, justifying the managerial enhancement that was not applied to Gata-Aura. While Gata-Aura told lies to individual agents and investors, Moore advanced hislies through the force of an entire organization.   Both men provided Haddow with input on the offering documents. But Moore's contributions, such as the Wealthbuilder Program and the lease concept, profoundly impacted how Bar Works was structured and drove up investor amounts.

It is true that Gata-Aura ultimately oversaw a much greater amount of investments and received approximately $1.4 million more from Haddow than Moore by the end of the scheme.   But

that is all a byproduct of Moore's decision to disassociate with Bar Works in order to help run a substantially similar coworking space investment project, leaving Gata-Aura to became the leading master agent channeling investments into Bar Works.

Second, Moore told clear lies to the SEC and IRS during the course of the Bar Works scheme, warranting an obstruction enhancement.   Gata-Aura minimized his conduct in proffers, as the Government candidly shared with the sentencing court, but his conduct did not rise to obstruction.

Third, Gata-Aura had no criminal history prior to Bar Works.   Moore, on the other hand, stands convicted of his second investment-related felony in the United States.

Fourth, as the Government reported in its sentencing memorandum related to Aura, Aura quickly accepted responsibility post-charge, pleaded guilty, and provided notable assistance to the Government in locating relevant victim financial information.   Moore, on the other hand, provided no assistance and proceeded to trial despite overwhelming documentary and testimonial evidence of his guilt.

Finally, in light of Gata-Aura's assistance, the Government sought a below-Guidelines sentence of 60-97 months.   We respectfully submit that Moore should be sentenced to a significantly greater term of at least 120 months incarceration.   .

## VI.   **Conclusion**

On the facts of this case, a sentence of at least 120 months is appropriate and just.   Such a sentence would adequately reflect the seriousness of Moore's conduct, provide just punishment, and send a message to would-be fraudsters that a substantial jail term is the likely consequence of such criminal conduct.   By contrast, Moore's requested sentence below four years is wholly unjustified, would be perceived by the public as a slap on the wrist, and would fail to serve the essential sentencing goals of affording deterrence and promoting respect for the law.   Moore also should be ordered to pay forfeiture of $ $1,599,257.46 and restitution totaling $57,579,790 to the victims as

set forth in the PSR.

Dated: New York, New York
       October 20, 2021

                                        Respectfully submitted,

                                        DAMIAN WILLIAMS
                                        United States Attorney

                          By:     _____/s/_____
                                        Vladislav Vainberg
                                        Assistant United States Attorney

cc:   Defense counsel (via ECF)

38