

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

November 12, 2021

**ECF**

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

      Re:    <u>United States</u> v. <u>James Moore</u>,
             18 Cr. 759 (RMB)

Dear Judge Berman:

     As directed by the Court, the Government respectfully submits this letter addressing the Court's questions at the sentencing conference held on November 9, 2021, with respect to certain differences[1] in the Guidelines computations and respective forfeiture and restitution obligations between defendant James Moore ("Moore") and co-defendant Savraj-Gata Aura ("Gata-Aura"), who was sentenced by Judge Jed Rakoff on July 27, 2020. Moore was convicted at trial, while Gata-Aura pleaded guilty pursuant to a plea agreement dated November 1, 2019.

**Victim-Related Enhancement**

     Consistent with his plea agreement, Gata-Aura received a two-level enhancement because the offense involved ten or more victims, pursuant to United States Sentencing Guideline ("U.S.S.G.") § 2B1.1(b)(2)(A), but not the alternative four-point enhancement for financial hardship for five or more victims currently being sought for Moore under U.S.S.G. §2B1.1(b)(2)(B).

---

[1] In addition to the differences discussed further in this letter, Gata-Aura was not subject to an obstruction of justice enhancement under U.S.S.G. § 3C1.1, as Moore should be, based on Moore's lies to the Securities and Exchange Commission ("SEC"). In response to direct questions by the SEC, Moore lied about his supposed non-interactions with Jonathan Black at a recorded interview that took place while, as Moore knew, the scheme was active and the SEC was investigating Bar Works. *See* PSR ¶¶ 56-58, 68, and p. 36, Gov't Sent. Ltr. 15, 21-22. These lies were highly material, concealing the fact that Moore knew that Haddow was masquerading as Black and that Moore himself was pretending to be working with Black in emails to unsuspecting third parties just months earlier. These lies were told with the plain purpose of obstructing any civil and criminal investigation into Moore's own conduct. The fact that they were made to the SEC, rather than to criminal investigators, does not remove them from the ambit of the enhancement. *See United States v. Bennett*, 252 F.3d 559, 566 (2d Cir. 2001) ("Bennett contends that his offense level should not have been increased for obstructing justice, U.S.S.G. § 3C1.1, because he obstructed only the SEC investigation, and not his criminal prosecution. However, the enhancement applies to efforts to obstruct an 'official investigation,' *id.* cmt. n. 4(d), which includes investigations that occur prior to the indictment.") *See also United States v. Valente*, 688 F. App'x 76, 80 (2d Cir. 2017) (affirming application of U.S.S.G. § 3C1.1 to defendant who obstructed SEC civil investigation, which obstruction was committed with the purpose of thwarting a subsequent criminal investigation.)

The reason for this disparity is simple. At the time Gata-Aura's plea agreement was entered, the Government had not received all of the victim impact statements, some of which describe substantial financial hardship experienced by certain victims. The Government shared all the letters—once received—with the Probation Office and the sentencing court for consideration at Gata-Aura's sentencing. However, the Government stood by the Stipulated Guidelines Range agreed to by the parties in the plea agreement based on the information available at the time of that agreement.

Here, approximately two years later, in the absence of any plea agreement, and based on the information available at the time of Moore's sentencing, the alternative four-level increase based on the substantial financial hardship suffered by five or more victims is plainly appropriate. *See, e.g.*, Sent Ltr. 3 (describing "devastating . . . impact" of loss of savings "after many years of hard work," loss of ability to purchase home and grow family); Sent. Ltr. 6 (describing loss that "will take at least 20 years to recover financially"); Sent. Ltr. 8 (describing loss of parents "retirement money" and brother's "big portion of his life time savings"); Sent. Ltr. 69 (couple who painfully delay having children while struggling to make ends meet after losing their investment); Sent. Ltr. 17 ("If I live to be 100, as my mother, grandmother, grandfather have, I will likely do so in significant poverty because of these monsters who have no conscience. My wife the same. There are no words to help any judge or jury feel the pain and the darkness of deep depression that such a loss causes."). The financial hardship enhancement should be imposed pursuant to U.S.S.G. §2B1.1(b)(2)(B).

**Managerial Role Enhancement**

Moore, unlike Gata-Aura, is correctly subject to a three-level managerial role enhancement because he was a manager or supervisor of the Bar Works Scheme, and the criminal activity involved five or more participants or was otherwise extensive. *See* U.S.S.G. §3B1.1(b).

As Haddow's business partner in 2015 and 2016, Moore occupied the highest position in the criminal hierarchy other than Haddow. *See generally* Gov't Sent. Ltr at 7-13, 36-37. Moore was compensated like a partner, earning a personal 35% equity on criminal proceeds obtained from incoming UPG investors. Put another way, after paying UPG 30%, Haddow *split* the remaining 70% of UPG investor funds with Moore 50-50. Gata-Aura, who was not subject to the managerial enhancement, was simply a master agent, earning approximately a 5-10% override on each agent whom he could persuade to sell Bar Works, with no additional separate compensation.

Further, part of the reason Haddow agreed to pay Moore and UPG that enormous collective 65% commission at Bar Works' infancy was because UPG came with a built-in stable of employee agents who could be directed to immediately pivot to sell the investment product given to them. Moore had significant control and influence over UPG and could ensure, as he later claimed, that he would put Bar Works "on the map" by causing UPG's employees to sell Bar Works. UPG employed more than five sales agents who received guidance and sold Bar Works to unsuspecting investors. Moore and other UPG principals supervised that operation, justifying the managerial enhancement. Gata-Aura, by contrast, did not employ his own sales force, but rather enticed independent sales agents to sell Bar Works for commissions. Gata-Aura did not supervise those

independent agents, did not pay them salaries, and could not require them to sell Bar Works, as UPG required of its employed and supervised agent staff. Accordingly, the Government did not seek a managerial enhancement for Gata-Aura.

**Restitution**

Under the Mandatory Victim Restitution Act, restitution by a particular defendant in a covered conspiracy offense is owed to "any person directly harmed by the defendant's criminal conduct in the course of the . . . conspiracy," 18 U.S.C. § 3663A(a)(1) and (2). *See United States v. Reifler*, 446 F.3d 65, 135 (2d Cir. 2006) ("the district court cannot properly order restitution under the MVRA unless the victim's harm resulted from the offense of conviction, including, with respect to a conspiracy offense, the defendant's conduct in the course of the conspiracy"). Under 18 U.S.C. § 3664(h), where a court finds that more than one defendant "contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant."

The difference in restitution amounts being attributed to Moore and Gata-Aura is based on their different roles in the conspiracy and contribution to victim losses. In his plea agreement, Gata-Aura agreed to be responsible for restitution of $39,972,000, which represents losses from victims recruited by Gata-Aura or by sub-agents from whom Gata-Aura received a personal commission. On December 11, 2020, Judge Rakoff issued a restitution order, ordering that Gata-Aura pay restitution in the amount of $39,972,000 to the victims of the Bar Works scheme, and making "Gata-Aura's liability for restitution . . . joint and several with any other defendant ordered to make restitution for the offenses in this matter, up to $39,972,000, including . . . the defendants in the following cases who have not yet been sentenced," listing co-defendants Renwick Haddow and James Moore. ECF. No 135, *United States v. Gata Aura,* 18 Cr. 759 (JSR).[2] The cap on Gata-Aura's total restitution payment was rationally based on Gata-Aura's comparatively limited role in the scheme as a whole, as compared to Moore, and the direct harms caused by Gata-Aura. Although Gata-Aura's prominence grew after Moore's falling out with Haddow and towards the end of the scheme, he functioned principally as a master-agent, who sought out independent sales agents to persuade them to sell Bar Works and received commissions on whichever investors were recruited that way.

Moore, on the other hand, should be responsible for the entire losses of the whole scheme because as a ringleader and Bar Works equity owner, he played a critical role in crafting and advancing the scheme. He made it clear to Haddow at the beginning of the scheme, "[m]y interest is in being in business with you. I'm not good at the glorified sales agent bit. I reckon we can bring a lot to the party if you feel it's worth giving something up to grow very fast." Gov't Sent. Ltr. At 7. Haddow agreed. Moore subsequently helped design the offering materials used by Gata-Aura and others to pitch investors. As described at length in the Government's sentencing submission at pp. 9-11, Moore admitted that "I was instrumental in putting the BarWorks product together," and that "the lease concept was mine," referring to Bar Works' change from selling shares in the

---

[2] The schedule of victims filed under seal along with Gata-Aura's restitution order listed all of the known victims of the Bar Works offense, amounting to $57,579,790 in losses. Gata-Aura's payment obligation to those victims, however, was capped at $39,972,000.

company, to leases in workspaces. Moore provided input on drafts of Bar Works documentation that would be sent to scheme victims. PSR § 24. He created the "Wealthbuilder Program" through which investors who purchased multiple workspace leases would be guaranteed higher returns, reaching 16 percent a year for investments upwards of $100,000 or more. PSR ¶ 21. Moore presented this program to Haddow in person during one of their face to face meetings in New York in 2015, when the scheme was being structured. Haddow incorporated the program into all of Bar Works offering materials, which were used to recruit all investors, including by Gata-Aura.

Consistent with the position advocated by the Government here, courts have differentiated between the restitution amounts attributable to co-defendants in fraud schemes depending on whether they were a ringleader of the entire scheme, like Moore, or were akin to sales personnel more narrowly responsible for specific amounts of obtained victim funds, like Gata-Aura. *See, e.g.*, *United States v. Marsh*, No. 10-CR-0480, 2011 WL 5325410, at *16 (E.D.N.Y. Oct. 26, 2011) ("The restitution owed by the *sales representative defendants* will be capped at the amount of money that they were directly responsible for bringing into Gryphon in the form of fees, either individually or in cooperation with others. . . . As the *ringleaders*, Kenneth and Nicole Marsh are responsible for the full amount.") (emphasis added); *Cf. United States v. Broadbent*, 225 F. Supp. 3d 239, 241 (S.D.N.Y. 2016) (discussing four restitution amounts imposed on co-conspirators in a fraudulent invoice scheme, with ringleader insider at victim company responsible for $1.088 million, and three other co-conspirators at outside companies each responsible for respective invoices they submitted, together totaling $1.088 million).

**Forfeiture**

The respective forfeiture amounts attributed to Gata-Aura and Moore are based simply on the different amounts of Bar Works scheme proceeds that were sent by Renwick Haddow to each co-defendant during the course of their active involvement in the scheme. *See Honeycutt v. United States,* -- U.S. ---,137 S. Ct. 1626, 1635 (2017) (holding that here is no "joint and several liability" for forfeiture among members of a criminal conspiracy, unless the individual conspirator "acquired" or "personally benefit[ed]" from the forfeitable property). Gata-Aura was paid $2,988,225. Moore was paid at least $1,599,257.46 prior to having a falling out with Haddow and launching a competing co-working space investment project.

                                          Respectfully submitted,

                                          DAMIAN WILLIAMS
                                          United States Attorney for the
                                          Southern District of New York

                            By:  _____
                                          Vladislav Vainberg
                                          Assistant United States Attorney
                                          (212) 637-1029

cc:  Michael Grudberg, Esq. (by ECF)