

Tarter Krinsky & Drogin LLP
1350 Broadway
New York, NY 10018
P 212.216.8000
F 212.216.8001
www.tarterkrinsky.com

Michael J. Grudberg, *Partner*
212-216-8085
mgrudberg@tarterkrinsky.com

November 17, 2021

**VIA ECF**

The Honorable Richard M. Berman
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, NY 10007-1312

      Re: United States v. Moore, No. 1:18-cr-00759-RMB

Dear Judge Berman:

      Per the schedule set by the Court at the November 9, 2021 hearing in this matter, Defendant James Moore submits this response to the government's November 12 submission addressed to certain questions posed by the Court regarding positions taken by the government in connection with the sentencing of co-defendant Savraj Gata-Aura (Mr. "Gata-Aura") by Judge Rakoff in July 2020. We incorporate by reference our discussion of these issues at pp. 16-20 of our original sentencing memorandum (ECF Doc. No. 148), as we submit that the critical exercise respecting Mr. Gata-Aura is to measure his real offense conduct against Mr. Moore's.

**Section 2B1.1(b) Victim Enhancement**

      As the Court observed, Mr. Gata-Aura, per his plea agreement, received a two-level enhancement under § 2B1.1(b)(2)(A) for an offense involving ten or more victims, but not the four levels implicated by a finding of financial hardship for five or more victims, per § 2B1.1(b)(2)(B), that the government now seeks for Mr. Moore. The government explains the difference by reference to the apparent absence of victim impact statements at the time of the November 2019 plea agreement, suggesting that it stood by the deal struck in that agreement even though several such statements were received before Mr. Gata-Aura's sentencing hearing.

      We do not know the timing of the government's acquisition of information regarding the relative financial hardships of investors in Bar Works, but we submit that it would have been possible to make a determination as to the applicability of the enhancement prior to signing a plea

agreement with Gata-Aura in November 2019. As far as we can reconstruct, the first collection of victim impact statements was transmitted to the Court and the parties by the Victim-Witness Coordinator on July 7, 2020. That transmission included some 70 statements, almost all of which were sent to the government by Bar Works victims between March and May 2020, apparently at the request of the Coordinator. The only statement in that group that predated Mr. Gata-Aura's plea was Statement No. 50, dated July 28, 2017, which had been sent in the first instance to SEC investigators. Thus, it would appear that the statements themselves were solicited in preparation for the Gata-Aura sentence, which – owing to the delays from Mr. Moore's competency evaluation and restoration – was the first Bar Works sentence, and which moved from an original March 2020 date to the eventual July hearing.

Whether or not the actual victim statements were on the table at the time of the Gata-Aura plea deal, the basic framework and magnitude of the scheme – hundreds of victims, $57 million in investor losses – had long been clear. Mr. Moore's own trial had already occurred in June of that year. Haddow was charged in a sealed complaint on June 29, 2017, some two years before the Moore trial, and presumably following some period of investigation. See Haddow docket, No. 1:19-cr-00340-LTS, ECF Doc. No. 1. Two victims testified at the Moore trial (tr. 59-102, 146-192). Moreover, Bar Works victims and their experiences were in fact a central focus of the government's sentencing presentation to Judge Rakoff. See July 22 Sentencing Memorandum, Exhibit 4 to Mr. Moore's October 13 Memo, at pp. 16-22. The government cited nineteen separate victim statements in their submission – including all five of the statements referenced in the current letter – and argued that Gata-Aura had made "conscious choices to continue to facilitate frauds on hundreds of individual victims," further urging that "[h]is sentence should reflect the reality of the pain he cause[d]." Id. at pp. 15, 21.

The omission of the four-level victim hardship adjustment was, as the government acknowledges, a matter of bargaining between the parties, adhered to by the prosecution despite the torrent of contrary facts available to the sentencing court. We do not believe, however, that it is fair or persuasive to account for the differential treatment as a fortuity of timing. After all, Mr. Moore was, in the immediate aftermath of his conviction, scheduled to be sentenced in September 2019. It seems unlikely that the Office's collection of victim impact statements would have waited until spring 2020 had that date remained operative. Mr. Gata-Aura may have benefited from the delay, but the delay does not obscure his real offense conduct, the ultimate point of comparison with Mr. Moore. See Barber v. Thomas, 560 U.S. 474, 482 (2010)(in passing Sentencing Reform Act, Congress sought inter alia "increased sentencing uniformity")(citing Mistretta v. United States, 488 U.S. 361, 367 (1989); USSG §§ 1A3, 1A4 policy statements. Unlike Mr. Moore, Mr. Gata-Aura interacted directly with and lied to victims. See, e.g. Gov't Gata-Aura Memo at pp. 10-11. The procedural happenstance of the timing of victim narratives should not obscure this Court's appraisal of the defendants' relative culpability.

**Supervisory Enhancement**

Under Guidelines § 3B1.1(b) a defendant is subject to a three-level enhancement if he is a "manager or supervisor" of criminal activity involving five or more participants (or otherwise extensive). The government's explanation of Mr. Gata-Aura's having eluded this enhancement both minimizes its own prior assessment of that defendant and resorts to vague labels to apply the increase to Mr. Moore.

As the prosecution would now have it, Mr. Gata-Aura was a mere way station between Haddow and the "independent" sub-agents who sold investment interests to victims. He may have "enticed" them to make sales, but because he was not their employer he could not "require" them to promote the fraud. We submit this proves too much. Indeed, those remote sellers, like Gata-Aura himself, were only "required" to sell Bar Works leases if they wanted to make money. The reality is that he recruited those independent agents and directly profited from their every sale. The government did not shy from calling this conduct management in its sentencing submission. Gov't Gata-Aura Memo at pp. 26, 28 ("He grew to become the manager of Bar Works' entire fraudulent sales operation." "Gata-Aura was the day-to-day manager of a multimillion dollar component of an even greater fraud[.]") He was Haddow's "functional right hand man, and the force that brought nearly $40 million of investors' money through an extensive agent network[.]" Id. at p. 1. Unlike James Moore, he had direct knowledge of the company's actual revenues, and maintained a database tracking each individual victim's investment. Id. at pp. 2, 7. As Haddow acknowledged, Mr. Gata-Aura was "***in charge*** of establishing the sales network" for investments in the scheme. Id. at p. 8, quoting trial testimony (emphasis added). His supervisory involvement also spanned the entire fraud, moving from the original "Bitcoin Store" scam, Id. at p. 5, to the Bar Works end game, where he and Haddow together cooked up lies about phony new "leadership" at the company. Id. at p. 11. Gata-Aura also worked daily at Bar Works premises and gave direction to company staff. Id. at p. 7.

Mr. Moore did not work at Bar Works, instead visiting New York on only a handful of days, as Haddow conceded at trial. The government offers no evidence that he was even known by most of the rank-and-file employees, much less that he was their supervisor. Although the government confers on him the status of "highest position in the criminal hierarchy other than Haddow," there is no explication of this supposed hierarchy, and little reason in the record to conclude that there was any "hierarchy" at all. Despite their conceded, but never consummated, discussions about "partnership" and equity stakes, Haddow and James Moore did not co-manage a traditional criminal enterprise. Haddow was the enterprise. He and Mr. Moore struck an understanding about the *commissions* that he and UPG would receive for investments they brought to Bar Works, but there is no suggestion that Moore did (or could) give direction to any other person in the Bar Works organization or, critically, that he had (or even sought) any entitlement to profits from sales away from UPG – the vast majority of the scheme proceeds. The percentages cited in the government's letter are exactly that – commission understandings – no less, but no more. When Mr. Moore learned that Haddow had lied to him from the outset about "exclusive" sales rights, in part to conceal Gata-Aura's own competing role, Moore complained and soon left altogether, while the operation carried on to generate another $50 million. Obviously, Mr. Moore was never in any chain-of-command that included Gata-Aura, and the government does not and cannot suggest that there was any continuing role, or any attempt to obtain "partnership" returns, after Moore and UPG walked away.

It is also unfairly artificial to suggest that Mr. Moore supervised individual UPG sales agents. The company was managed by its principals, James Robinson and David Kennedy. There is no evidence of Moore "requiring" UPG employees to sell Bar Works interests, or anything else for that matter. Moreover, unlike Gata-Aura, he never recruited individual agents. Mr. Moore does not dispute that he was an early participant in the Bar Works operation, or that he was paid a significant fee for bringing in UPG for its interval of sales. He does deny actually *supervising* the activities of other actors, and that is the crux of the enhancement.

**Restitution**

The government's submission buttresses the essential proposition that justifies a restitution judgment in this case below the $57 million sought: A defendant's conviction for a fraud conspiracy does not, by itself, require that person to bear joint and several responsibility for the entire loss. Whether via plea or after trial, the Court may apportion the defendant's exposure to reflect the duration and dollar-magnitude of his own conduct.

Because the issues are inevitably intertwined, we start with the proposition that the Court must first determine the loss amount to be applied to the § 2B1.1 loss table. Mr. Moore maintains, for the same reasons applicable to the restitution analysis, that he should be responsible only for the approximately $7.5 million attributable to UPG sales before he and that company walked away from Bar Works. While a court may sentence a defendant based on the reasonably foreseeable acts of his co-conspirators, it must first make two "particularized findings": that the scope of the activity to which he agreed was broad enough to include the co-conspirator conduct, and that the co-conspirator's relevant conduct was foreseeable to him. See United States v. Getto, 729 F.3d 221, 234 (2d Cir. 2013)(citing United States v. Johnson, 378 F.3d 230, 236 (2d Cir. 2004); United States v. Studley, 47 F.3d 569, 574-75 (2d Cir. 1995)).

Again, notwithstanding the labels employed by the government, the essence of Mr. Moore's conduct was to connect the UPG sales network with Haddow and his product. He did not know that Haddow was also soliciting other networks and other sellers, including Gata-Aura, Pan Pacific in the UK (tr. 323), and apparently others. Moore at the outset had no idea that these competitors existed and Haddow's dishonesty about his multiple "exclusives" drove Moore's departure from the relationship. Thus, the government's "ringleader" was both ignorant of and undermined by the members of his supposed "ring." He certainly had no control over their activities and did not benefit from their sales – quite the opposite. Only by the most tortured definition of the word can Gata-Aura and his counterparts be deemed "co-conspirators" at all.

The government alludes to puffery on Mr. Moore's part, in the context of his squabbling with UPG associates for relative credit in their ventures, to the effect that "the lease concept was [his]." But it is not disputed that offering Bar Works interests in the form of a lease was Haddow's own idea. The government elicited that testimony on his direct examination. See tr. 253 (". . . I came up with the idea of selling an asset rather than shares, so where people would buy a lease over the desk or work space.") Similarly, the "Wealthbuilder" concept – whereby investors could earn a higher return by making a larger investment – is hardly a novel marketing strategy, and Haddow's scheme was well-hatched by the time Mr. Moore ever referenced it. We have elsewhere discussed Mr. Moore's supposed "equity" stake: he never had legal rights in any of the entities operated by Haddow, and received only a partial payment of his commission invoices, *never* any owner's distribution. In short, Haddow and Gata-Aura, operating Bar Works from start to finish, were by the government's lights both avid and experienced fraudsters. They did not need Mr. Moore to make their scheme work, and they collected the plain majority of its receipts after his departure.  As for marketing documents, although Mr. Moore was shown certain materials, Haddow frankly acknowledge that he had phonied up the lawyers and accountants in the PPM, an action Moore had nothing to do with (Tr. 500-01).

4

For these reasons, the cases cited by the government justify a restitution judgment below the total loss, and more so for Mr. Moore than for Gata-Aura. The <u>Broadbent</u> scheme, like this one, featured a central beneficiary of the fraud operating with the assistance of separate conspirators. The restitution arrangement capped each of the secondary players at the dollar total of his own false filings. In <u>Marsh</u>, Judge Weinstein carefully analyzed the relative culpability of multiple defendants in particulars that are instructive here: recognizing that defendants involved longer in the scheme were more culpable; noting that an otherwise senior member of the fraud did not have direct interaction with victims; capping sellers at the amount they were responsible for bringing in. <u>See</u> 2011 WL 5325410, at ** 5-6, 16.

\* \* \*

The Court has elsewhere heard our basic argument about Mr. Gata-Aura's sentence – that Court may and should consider his real relative fault in weighing Mr. Moore's punishment. We submit that the general answer to each of the Court's questions is that Guidelines calculations are affected by plea negotiations. But we believe the most important differentiator of sentencing outcomes – acceptance of responsibility by the pleading defendant – is diminished here, because, as the government noted to Judge Rakoff, Gata-Aura both minimized his role in proffers and continued marketing questionable investments even after Haddow's exposure. Haddow himself will be sentenced by Judge Swain. He is a cooperator, and was incarcerated from July 2017 until his COVID-related bail in April 2020, including several months in a Moroccan jail, so he will likely argue for the time-served sentence that he testified was his best possible outcome. We of course concede that 5K cooperation makes comparisons imperfect, but downstream cooperation by the chief wrongdoer is unusual. We simply ask the Court to locate Mr. Moore's significant but finite conduct in the broader frame.[1]

Respectfully submitted,

/s/ *Michael J. Grudberg*

Michael J. Grudberg

cc: AUSA Vladislav Vainberg (via ECF)

---

[1] We note the government's discussion (in its footnote 1) of the proposed § 3C1.1 obstruction enhancement. For reasons we have articulated and will supplement at the sentencing hearing, such an adjustment is legally and factually inappropriate.