M21AAMOOS                    Sentence

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

                v.                        18 CR 759 (RMB)

JAMES MOORE,

                Defendant.

------------------------------x

                                          New York, N.Y.
                                          February 1, 2022
                                          10:00 a.m.


Before:

                    HON. RICHARD M. BERMAN,

                                          District Judge


                         APPEARANCES

DAMIAN WILLIAMS
     United States Attorney for the
     Southern District of New York
VLADISLAV VAINBERG
     Assistant United States Attorney

MICHAEL GRUDBERG
     Attorney for Defendant Moore

1          (Case called)

2          THE COURT:  So you recall that we began the sentencing

3     on November 9, 2021.  There were some additional questions

4     raised and information to be submitted in writing which has

5     occurred.  So that aspect of being able to continue is taken

6     care of.

7          Let me just ask at the outset, we're obviously not in

8     a courtroom in New York.  We're having a video sentencing.

9     Mr. Moore is in Pennsylvania.  Others are elsewhere.  I just

10    want to know from defense counsel if you all have discussed

11    this?  I'm pretty sure you have, with Mr. Moore proceeding in

12    this fashion and waiving any rights that Mr. Moore might have

13    to require that we have a sentencing occur in a S.D.N.Y

14    courtroom.  And that is principally because of the difficulties

15    created by the COVID pandemic.

16         MR. GRUDBERG:  We have discussed it, Judge Berman,

17    including in person in one of my visits to Philadelphia.  I

18    think it would be appropriate to have Mr. Moore affirm that for

19    the record but it is my understanding that he is prepared to

20    proceed and waive his physical appearance.

21         THE COURT:  Mr. Moore, is that correct?

22         THE DEFENDANT:  Correct, your Honor.

23         THE COURT:  And in my own view, I think if we delay

24    this further there would be harm to the interests of justice.

25    That's personal but it's your call ultimately, Mr. Moore, and

1   you are okay with proceeding today by video conference?

2               THE DEFENDANT:  I am definitely okay with it, your

3   Honor.

4               Thank you.

5               THE COURT:  Okay.  So, as you know, I think you all

6   know that the element or the criteria that we rely on in

7   sentencing are found at 18 U.S.C. Section 3553(A) and I've

8   reviewed those criteria and those factors several times now and

9   certainly before today.  And they include the nature and the

10  circumstances of the crime or the offense, the history and

11  characteristics of the defendant, the need for the sentence

12  imposed to reflect the seriousness of the offense and to remote

13  respect for the law, to provide a just punishment, to afford

14  adequate deterrence to criminal conduct, to protect the public

15  from further crimes, to provide the defendant with needed

16  educational or vocational training, medical care, or other

17  correctional treatment in the most effective manner.

18              And just to interject there, another reason for the

19  postponement of the sentencing is so that Mr. Moore could

20  receive some medical care and that has occurred.  I think that

21  took him to -- Well, I'll get to that in a moment.  But that is

22  one of the reasons also this sentencing has taken somewhat

23  longer than we perhaps would have liked.  We look at the kinds

24  of sentences available.  We look at the kinds of sentence and

25  the sentencing range established under the sentencing

1      guidelines.  Those are no longer mandatory but we,

2      nevertheless, start with a guidelines calculation as a point

3      reference.  We look at policy statements that may have been

4      issued by the United States Sentencing Commission.  We seek to

5      avoid unwarranted sentence disparities among similarly situated

6      defendants and we need to provide for restitution.

7              So starting with the guidelines, my determination is

8      that the offense level in this matter is 38 and that the

9      sentencing guidelines range which is not mandatory just

10     advisory is 262 to 327 months of incarceration based also on a

11     criminal history category of two.  The 38 number comes as

12     follows:

13             The base offense level is seven.  The total loss

14     enhancement is plus 22.  There's an additional enhancement for

15     substantial hardship to five or more persons.

16             I note that Mr. Moore would also qualify for a

17     two-level enhancement because the offense involved ten or more

18     victims.  However, under United States Sentencing Guidelines

19     2B1.1 the Court is directed to impose the greatest enhancement

20     applicable in the case which is the four-level enhancement that

21     I just mentioned.  Due to the substantial financial hardship

22     suffered by five or more individual victims.

23             There's a further enhancement plus two for substantial

24     part of the scheme occurring outside the U.S. and/or involving

25     sophisticated means.  There's an additional enhancement of plus

1    three for manager or supervisor and activity involving five or

2    more participants.  So that is how I derive the 38.  The

3    presentence report provides a two-level enhancement for

4    obstruction of justice in that in their own evaluation in that

5    Mr. Moore repeatedly according to probation lied to the

6    Securities and Exchange Commission, federal law enforcement

7    agents including stating that Jonathan Black was a real live

8    person.  He was described as the CEO of Barworks, B-A-R, works,

9    W-O-R-K-S and also for lying to an IRS agent following his

10   arrest with respect to comments involving a separate investment

11   scheme.

12          With regard to the SDE statements, the defense objects

13   to this enhancement and argues that it was a voluntary

14   interview of Mr. Moore that he had had with the SEC while he

15   was in Spain.  Defense counsel also argues that the statements

16   Mr. Moore made to the SEC were literally true in that

17   Mr. Haddow, H-A-D-D-O-W, said that Barworks' CEO was Jonathan

18   Black, and also that Mr. Moore never met Jonathan Black and

19   also that Mr. Haddow and his wife were the only executives in

20   place at Barworks.

21          The defense states that these statements had no impact

22   on any SEC investigation.  And with respect to the IRS

23   statements the defense states that there was an initial

24   deception that he had not done anything for money since 2010

25   but that he did not deny an association with Barworks.  Defense

argues that none of the statements were sworn testimony in

addition.

So, I'm going to, and as you can tell by the

mathematical calculation I'll side with the defense with

respect to this enhancement discussed in the presentence

report, I'm going to deny it as not warranted.

With regard to the statements made to the IRS agent, I

note that the conversation was following his arrest on a

separate offense.  And with regard to the statements to the

SEC, I'm giving Mr. Moore the benefit of the doubt in that I'm

finding that the defendant made false statements and/or

omissions to the SEC but that the defendant did not provide

materially false, in my judgment, statements to a law

enforcement officer that significantly obstructed or impeded

the official investigation or prosecution of the instant

offense as is required under Sentencing Guidelines 3C1.1.

Continuing:

According to the presentence report the total amount

of the fraud in this case is $57,579,790, and that there were

811 investors who were identified and that the victims reside

in the U.S. and 60 other countries and or territories as found

in the presentence report at paragraph 50.

The Court also notes that its offense level and

guidelines calculations differs from that of co-defendant

Savraj, S-A-V-R-A-J.  That's one name.  Separate middle name,

M21AAMOOS                    Sentence

1   Gata, G-A-T-A, and family name, Aura, A-U-R-A, Savra Gata Aura.

2          The defense in its letter dated November 17, 2021,

3   argues that the differences that resulted from the government's

4   plea agreement with Savra Gata Aura, is neither fair nor

5   persuasive to account for a differential treatment.

6          My opinion is that there is significant difference

7   between Mr. Moore and Mr. Aura's case.  As everybody's aware,

8   Mr. Moore was convicted following a jury trial and Mr. Aura

9   pled guilty before Judge Rakoff pursuant to a plea agreement.

10  I've calculated the offense level and the guidelines based upon

11  the facts and evidence as I perceive them.

12          I've taken into consideration in my example of my

13  determination of the appropriate sentence the advisory

14  guidelines calculations with respect to these two defendants,

15  that is, Mr. Aura and Mr. Moore as, for example, as you will

16  see, by imposing a below guidelines sentence in Mr. Moore's

17  case.  So in considering the guidelines and all of the other

18  factors at 18 U.S.C. Section 3553(a) the following stands out:

19          During the course of this evaluation or this summary,

20  I will, in addition to adhering to the 18 U.S.C. 3553(A)

21  factors, also on occasion mention or discuss objections the

22  defendant has raised to the presentence report, if I don't

23  specifically mention one of those objections, the Court has

24  considered all of them and if it's not mentioned it's been

25  denied as without merit.

1          Mr. Moore was found guilty, as I said before,

2   following a jury trial of conspiracy to commit wire fraud and

3   wire fraud.  At the outset, the Court would like the record to

4   reflect that it is very familiar with the details of the

5   offenses as I presided over that jury trial in which case

6   Mr. Moore was convicted.

7          So just let me note here, and I will come back to them

8   later on, in addition to all the other submissions from defense

9   counsel and from the government and from the probation

10  department, many letters have been submitted to the Court from

11  victims in this case including one that, and this is a quote

12  from one of those letters, goes as follows:

13          "To those who make the decision or penalties that

14  Mr. Haddow and associates are assessed with, there are truly no

15  words that can articulate the depth of the devastation that

16  such a blow has brought to our lives.  To simply find

17  Mr. Haddow and give a token sentence does not appeal by justice

18  to those of us who's very existence has been impacted by his

19  greed and avarice.  If I live to be 100 as my mother,

20  grandmother, grandfather have, I would likely do so in

21  significant poverty because of these monsters who have no

22  conscience.  My wife, the same.  There are no words to help any

23  judge or jury feel the pain and darkness of deep depression

24  that such a loss causes."

25          I am going to refer to other of the letters later on.

1    This is an important factor in sentencing which is to hear from

2    victims and that's, perhaps, a representative of a sample.

3              Mr. Moore is 60 years old.  He's married and has four

4    adult children from two prior relationships.  He's a citizen of

5    the United Kingdom and has a residency status in Spain.

6    Mr. Moore has a college education.  He speaks conversational

7    French and Spanish.  The defense has objected to the

8    presentence report classification of Mr. Moore as an illegal

9    alien although defendant entered, I assume, that is what the

10   presentence report is referring to.  Although, I don't believe

11   that this is a big issue and it certainly is not in my

12   determination as to what the sentence should be.  But I think

13   the facts are that Mr. Moore entered legally as a result of his

14   offenses and he is in the united states longer than he was

15   authorized to be here and as such, he does not have legal

16   status in the U.S. I guess.  But as I say, I am just addressing

17   that concern.  It's not of great significance to me in the

18   determination of the sentence.

19             Mr. Moore's wife remains supportive of him.  As I

20   understand she's been living in Colombia for approximately the

21   past 18 months taking care of her ill and elderly father.

22   Mr. Moore maintains a good relationship with his sons and a

23   decent relationship with his daughter.  Mr. Moore, I

24   understand, had a somewhat contentious divorce with a former

25   wife and as a result he no longer has a relationship with her

1   three adult children who resided with them when they were

2   together.

3       Mr. Moore, as I alluded to before, but here in a

4   little more detail, has health issues to be sure including high

5   cholesterol, coronary artery disease, hyperlipidemia, chronic

6   obstructive pulmonary disease and mitral regurgitation, mitral,

7   M-I-T-R-A-L, regurgitation.

8       He also has suffered from mental health issues while

9   incarcerated and I referred to this a few minutes ago.  This

10   led to his being transferred to FMC Devens, D-E-V-E-N-S --

11   that's a Bureau of Prisons facility -- for the purposes of

12   psychological, forensic examination.

13       He ultimately received a restorative treatment at FMC

14   Butner, B-U-T-N-E-R, and eventually placed in Philadelphia, the

15   BOP site in Philadelphia FDC Philadelphia, where he is today.

16       Mr. Moore has some substance abuse history that

17   includes alcohol.  He participated in and completed an alcohol

18   rehab program in Arizona.  Probation states that while

19   incarcerated Mr. Moore has not incurred any disciplinary

20   sanctions and while incarcerated he has completed programs.

21   Healthy Minds is one.  Mind Strength is another.  Introduction

22   To Drugs is another.  At the time of the presentence report

23   that was being prepared, Mr. Moore was participating in a

24   gender equality program and a Personal Health Journey program.

25       Probation refers to the scheme that underlies the

1   convictions here in which Mr. Moore participated as a Ponzi

2   scheme, to which the defendant objects to the use of the term

3   "Ponzi scheme".  As evidenced during the trial these are the

4   facts as I saw them.

5       Mr. Moore and others solicited investors to invest in

6   ownership of office space called "Barworks", which would be

7   leased out to the public in exchange for a membership fee.  The

8   investors of the spaces were guaranteed rental fees for the

9   spaces that were rented to the public.  The investor owners

10  received their commissions from other investments.  In the

11  Court's view this was a huge fraud.  Whether you call it a

12  Ponzi scheme or something else, he was convicted of conspiracy

13  and fraud itself and that's certainly what happened.

14      The purported owner of Barworks was Jonathan Black.

15  But Mr. Black was a fictitious, not a real person.  A man named

16  Renwick, R-E-N-W-I-C-K, Haddow, H-A-D-D-O-W, who was a

17  co-conspirator in this conspiracy could not appear on any

18  materials affiliated with Barworks because in the United

19  Kingdom he was banned from such affiliation for prior activity

20  and behavior.  Mr. Haddow had served as a director of a failed

21  United Kingdom company whose investors similarly lost all

22  and/or most of their investment due to Mr. Haddow's fraudulent

23  conduct.

24      You can find this discussion in the presentence report

25  Paragraphs 18 to 24.

1          Mr. Moore utilized an entity called United Property

2     Group to solicit investors before Barworks.  For each investor

3     recruited United Property Group received a commission and so

4     did Mr. Moore.  Mr. Moore and Mr. Haddow appeared to have had a

5     falling out in 2016.  Mr. Moore and United Property Group began

6     another workspace lease project called Our Space, O-U-R, space.

7     In its sentencing submission it cannot currently state whether

8     Our Space has engaged in any investment fraud.  In or about

9     January of 2017 Mr. Haddow was publicly reported as being in

10    control of Barworks.  Thereafter, there were very few new

11    investors.  Then in or about April 2017, the investors stopped

12    being paid commissions.

13          Mr. Moore also founded investment property companies,

14    one called Instant Track Seminars, and another called Instant

15    Access Properties in 2001 and 2002.  Seminars taught

16    individuals about investing in real estate and instant access

17    properties facilitated purchase of investment properties.

18          In or about 2008 Mr. Moore and Mr. Haddow were also

19    involved in a hotel investment scheme in which they were

20    soliciting investors to invest in hotels in Slovenia and

21    Morocco.  Investors lost money in these projects as well.

22          See paragraph 42 of the presentence report.

23          Mr. Moore has one prior conviction called "misprision

24    of a felony".  This conviction related to the conviction and

25    investment in condominiums in Grand Palisades in Lake Austin in

1    Florida.  Probation describes this scheme as similar to that of

2    Barworks.

3            The Court notes that Mr. Moore's conviction is not, in

4    this instance is not a fraud or a theft conviction.  And

5    although, the schemes may be similar, the defendant's

6    conviction for a misprision of a felony concealing his

7    knowledge of another's fraud is a different animal, so to

8    speak, a different classification prong.

9            In addition to his real estate related employment,

10   Mr. Moore has been employed in the perfume industry and also

11   rented fitness equipment and tanning beds in a joint venture

12   with his brother.  According to the presentence investigation

13   report, Mr. Moore has a negative monthly cash flow of

14   $2,122.20.  Although, it should be noted that included among

15   his assets are three properties in Miami that are rented.

16   These properties may be in the defendant's wife's name.  I'm

17   unclear about that.  And according to a premarital agreement,

18   may not be able to be claimed by the defendant.

19           By submission dated October 13, 2021, the defense

20   requests a below guidelines range sentence.  The defense asks

21   the Court to consider, among other things, Mr. Moore's age, his

22   physical and mental health, his family, the sentence imposed on

23   co-defendants Savra Gata Aura which was a 48-month sentence.

24   And the defense also asks me to consider the harsh conditions

25   of confinement during the COVID-19 pandemic, as well as the

M21AAMOOS                         Sentence

1    complete inability his family has had to visit him during his

2    term of imprisonment.

3         The defense describes Mr. Moore's home and family life

4    and his prior work history.  The defense describes the

5    defendant's work ethic and business acumen.  The defense has

6    included as part of its sentence, among other things, the

7    Securities and Exchange Commission interview and Mr. Moore's

8    medical records, Dr. Miriam Kissin's forensic evaluation;

9    letters from defendant's children, Jonathan Moore, Christopher

10   Moore, William Moore and Danielle Davy-Moore, as well as a

11   letter from his wife Karina Pena and from a friend, Shawn

12   Taylor.  Defense counsel also included a letter from Cherrie

13   Keene, a former employee.  Ms. Keene's letter was originally

14   submitted to the Florida court and Mr. Moore was sentenced on

15   the misprision of felony conviction.

16        Mr. Moore also included a letter.  Defense has also

17   included the letter was submitted to probation that contained

18   the defendant's objections to the presentence report and the

19   defense included the government's sentencing memorandum in the

20   case of Savraj Gata Aura, also Mr. Moore's plea agreement and

21   sentencing transcript in his Florida case.

22        The letters of support generically and generally is

23   and oversimplification of the entirety of those records will be

24   included in this sentencing transcript.  But in summary, the

25   letters of support are positive in favor of Mr. Moore.  They

1    describe a father who was a role model for his children, who

2    instilled in his children the value of working hard, of helping

3    others and of thinking out of the box.  Mr. Moore was described

4    as a kind and compassionate man to people and to animals.  This

5    is the summary of these letters in support, also, as a figure

6    head in his family and as a source of inspiration to the family

7    and others.

8           In his own letter the Court dated May 13, 2021,

9    Mr. Moore downplays his role in the offenses of but does

10   apologize to the victims of the offenses.  He has also attached

11   a letter from a friend of his, Peter Cookson, C-O-O-K-S-O-N,

12   who speaks highly of Mr. Moore and his ability and talent as a

13   businessman.

14          In the government submission which is dated October

15   20, 2021, the government includes and states that the

16   sentencing guideline range is 324 to 405 months, as contrasted

17   with my calculation of 262 to 327 months.  At the same time,

18   the government fully submits that in light of the widespread

19   financial devastation caused by this fraud and over 800 people

20   and Mr. Moore's critical role in the fraud, a substantial

21   sentence of imprisonment of at least 120 months would be

22   sufficient but not greater than necessary to serve the

23   essential sentencing goals in this case.  The government argues

24   that Mr. Moore was Mr. Haddow's business partner in the

25   Barworks business.  He was also a principal at the company I

1   referred to earlier on UPG.  Mr. Moore negotiated on behalf of

2   UPG to sell Barworks and he caused Barworks agent to sell

3   Barworks product.

4           The government contends, and it was demonstrated at

5   trial, that Mr. Moore played a significant role in recruiting

6   and/or supervising lower level participants.  The government

7   states "the defendant's decision to join the scheme was not a

8   one-time mistake or a fleeting lapse in judgment.  Time and

9   time again Mr. Moore made conscious choices to continue to

10  facilitate frauds on countless individual victims and to cover

11  up his fraud with lies and deception".

12          The government also states that "part of the reason

13  Mr. Haddow agreed to pay Moore UPG an enormous commission was

14  because UPG came with a built-in stable of employee agents who

15  could immediately pivot to sell the product given to them."

16          The government argues that it has "serious concerns

17  about the defendant's willingness and ability for that matter

18  to continue to defraud investors even after serving his

19  sentence."

20          The government respectfully submits that a significant

21  prison sentence is necessary to truly impose upon Mr. Moore the

22  wrongfulness of his actions and to deter him from future

23  misconduct.

24          Co-defendant Savraj Gata Aura was sentenced to 48

25  months and three years of supervised release by Judge Rakoff.

1    After pleading guilty to conspiracy to commit wire fraud,

2    Savraj Gata Aura was also required by Judge Rakoff to pay

3    $39,972,000 in restitution and $2,988,225 in forfeiture.  The

4    government noted that Mr. Savraj Gata Aura proffered with the

5    governmental although, ultimately a cooperation agreement was

6    not entered into.  According to the government Gata Aura

7    provided an extensive report of the investor database and bank

8    records in order to help the victims of the scheme ultimately.

9           By letter dated November 12, 2021, the government

10   explains the following:

11          This is a quote.  The difference in restitution

12   amounts being attributed to Moore and Gata Aura is based on

13   their different roles in the conspiracy and contribution to

14   victim loss.  In his plea agreement Gata Aura agreed to be

15   responsible for restitution in the amount of $39,972,000 which

16   represents losses from victims recruited by Gata Aura or by

17   subagents from whom Gata Aura received a personal commission.

18   And the government states Mr. Moore on the other hand should

19   be -- this is in differentiating between Gata Aura and

20   Mr. Moore -- the government says that Mr. Moore, on the other

21   hand, should be responsible for the entire losses of the whole

22   scheme because as a ring leader and Barworks equity owner, he

23   played a critical role in crafting and advancing the scheme.

24          With respect to the differential in forfeiture between

25   Mr. Gata Aura and Mr. Moore, the government states the

1    respective forfeiture amounts attributed to Gata Aura and Moore

2    had based simply on the different amounts of Barworks scheme

3    proceeds that were sent by Renwick Haddow to each co-defendant

4    during the course of their active involvement in the scheme.

5          Gata Aura was paid $2,988,225.  Mr. Moore was paid

6    $1,599,257.46 prior to having a falling out with Haddow and

7    launching competing co-working place investment project.

8          Co-conspirator Renwick Haddow who testified pursuant

9    to a cooperation agreement at the trial of Mr. Moore has not

10   yet been sentenced.  His case remains pending before Judge

11   Swain under docket 19 CR 340.

12         As I said before, I received many letters in, I think

13   it was in excess of 90.  By the way, noting that none of those

14   letters mentioned James Moore by name.  Some do mention Renwick

15   Haddow, Jonathan Black and or Savraj Gata Aura.  Some letters

16   also mention a civil action 17 CV 5386.  According to the

17   docket that matter was entitled Zavattiero, v. Barworks and was

18   dismissed in May of 2018 for failure to prosecute by Judge

19   Schofield.  And according to the docket sheet as well, it was a

20   related case Almozairee v. Haddow, 17 CV 5386 that was also

21   dismissed by Judge Schofield for failure to prosecute,

22   dismissed on October 12, 2018.

23         These letters, getting back to the letters that have

24   been submitted, are written from people residing all over the

25   world, letters describing how the victims trusted that their

1   investment was an investment in the United States and how

2   knowing the United States was involved, they were sure it was

3   valid.  Many victims describe how profound the losses were to

4   them and to their families.

5            There were some additional quotes in addition to one

6   that I quoted before from one of the letters here.  Here are

7   some additional quotes.  Here is a letter writer stating that:

8            "I invested my lifetime savings in Barworks.  My

9   health started deteriorating and most of the time I remanded

10  loss with lots of negative thoughts.  It affected both my

11  family and work life.  On many occasions, even thoughts of

12  suicide came to my mind."

13           Another said:

14           "I have lost all my savings as a result of this

15  Barworks fraud."

16           Another said:

17           "Since I became aware of the situation my life has not

18  been the same.  I lost a considerable amount of money and since

19  then I have been battling depression."

20           Another says:

21           "I have lost all my life's savings in Barworks scam --

22  capital letters SCAM -- and still paying off the debt.  This

23  fraud put me end compression which took a lot of time after

24  doctors' consultancies.  We are you living in a trauma since

25  April 2017 when we realized this is a fraud."

1          Another letter says:

2          "I consider myself as one victim within several

3   victims in the world due to the fraud Ponzi scheme done by

4   Renwick Haddow, owner of Barworks New York.  He destroyed

5   everything in my life as well as my family."

6          Just a few more quotes.

7          "The very worst thing is that I decided to invest my

8   mother's money in Barworks too.  And I told my son, daughter an

9   sister about the investment.  Together we lost over half a

10  million pounds.  This was money which had been very hard

11  earned, plus a legacy from my husband to my son and daughter.

12  My daughter is suffering from depression partly because of this

13  and my son feels guilty every single day because he has lost

14  the money his father left him.  I had power of attorney for my

15  elderly mother.  So I feel I have deprived her of lifetime

16  savings by making a decision to invest in Barworks."

17         Another says that:

18         "Financially, I have never recovered from the loss."

19         Another says that:

20         "Such loss of hard earned and saved monies over my

21  lifetime is devastating considering my age of 77 years has

22  taken a mental toll emotionally.  I am humiliated being lied to

23  scammed and defrauded by this man in such a dishonest manner."

24         One more.

25         "This was all my savings planned for my retirement.

1   This investment was to make sure that I created a secure

2   income, built a foundation for my retirement.  Now everything

3   is gone."

4          Finally, by way of the evaluation of 3553(a) factors,

5   I note that Mr. Moore was arrested in the Middle District of

6   Florida on August 27, 2018.  He surrendered to the Bureau of

7   Prisons on September 24, 2018, to begin serving an 18-month

8   sentence for his Middle District of Florida misprision

9   conviction under docket 17 CR 187.  His Florida term of

10  imprisonment was satisfied on November 1, 2018.  He has been

11  continuously incarcerated since September 24, 2018.

12          There is an order of restitution that has been

13  submitted to me and I have signed -- not to jump is ahead --

14  just to tell you that there is a signed order of restitution in

15  the amount of $57,579,790 to the victims of the offenses

16  charged in Counts One and Two, which Mr. Moore was convicted.

17          The names, addresses and specific amounts owed to each

18  victim are set forth in the schedule of victims and so let me,

19  as I mentioned and referred today in my evaluation of the

20  sentencing factors, of course I also received and referred to

21  the presentence investigation report that on or about April 2,

22  2021, together with the addendum dated August 9, 2021 and the

23  sentencing recommendation approved August 9, 2021.

24          I've also received correspondence, some of which has

25  been referred to dated May 13, 2021, by Mr. Moore, dated

1   October 13, 202 1 from Mr. Grudberg and dated October 20, 2021

2   from AUSA Valadislav Vainberg.

3          I've also received victim impact statements from and

4   other impact statements from probation.  The number of impact

5   statements exceeds 90.

6          So, let me ask at this time, Mr. Moore, whether he and

7   his counsel have had the opportunity to read and discuss the

8   presentence investigation report, as well as the addendum and

9   the sentencing recommendation starting with counsel first.

10         Have you each read and discussed with the other the

11   presentence investigation report?

12         MR. GRUDBERG:  We have, your Honor.

13         THE COURT:  Mr. Moore, did you go over that

14   presentence report with your counsel?

15         MR. VAINBERG:  I did, your Honor.

16         MR. GRUDBERG:  I would note for the record, judge, you

17   made reference to sentencing recommendation.  I don't recall

18   the PSR including a specific sentencing recommendation.

19         THE COURT:  They typically don't.  They typically

20   don't.  And I usually asked ask them not to.

21         MR. GRUDBERG:  I just wanted to clarify that for the

22   record.  I apologize.

23         THE COURT:  Now, do either of you have any remaining

24   objections to the presentence report other than what I've

25   previously noted?

1          MR. GRUDBERG:  Your Honor, I know that you have

2   decided all of the contested issues with respect to the

3   sentencing guidelines calculation.  I think our arguments on

4   those are a matter of record.  Your Honor has reviewed them.

5   So I don't see a reason to make further argument on this

6   record.

7          THE COURT:  Okay.  How about Mr. Moore?  Any further

8   objections from you?

9          THE DEFENDANT:  No, your Honor.  I concur with my

10  counsel.

11         THE COURT:  Okay.  So I will return the presentence

12  report correspondence to the probation department which is our

13  practice.  And at this point I am happy to hear from defense

14  counsel in this order, and then from Mr. Moore and then from

15  the government if they wish to be heard.

16         MR. GRUDBERG:  Thank you, your Honor.

17         I guess I will start by saying I'm well aware of the

18  passage of time here.  I met Mr. Moore shortly after his

19  conviction in June of 2019.  We've all lived through several

20  turns in the road here attributable to the pandemic,

21  attributable to Mr. Moore's own circumstances, and frankly, of

22  course, to may own personal medical circumstances.

23         I do thank the Court.  I thank Mr. Vainberg and thank

24  Mr. Bell, his former colleague.  Most of all thank Mr. Moore

25  for his patience in my own personal circumstances.

1          I guess recognizing that the Court has put

2     considerable work into the review of voluminous papers here, I

3     just want to emphasize a few things.  Principally among them,

4     your Honor, is that we are here to evaluate as always in the

5     3553 sentence what sentence will be sufficient but not greater

6     than necessary to achieve the ends of justice, to deter, to

7     punish, to protect the public at large.

8          I would ask the Court to focus on Mr. Moore's status

9     as a 60-year-old offender who comes before the Court for what I

10    will call his first real second chance.  Your Honor's discussed

11    the Florida conviction or Middle District of Florida

12    conviction.  I will address it briefly and I emphasize his age,

13    not just to suggest that he is somehow infirmed or enfeebled.

14    In spite of his medical challenges, I think we all agree he is

15    in pretty good shape.  I suggest instead, judge, that at 60

16    years he has lived a long public and legitimate business

17    career.

18          As the Court recounted, he has been involved in

19    several in entrepreneurial businesses selling real products to

20    real people, literally to thousands of customers over the

21    years.  This is not to minimize the conduct set out in the

22    trial over which your Honor presided, but I would bring to the

23    Court's attention a long career lived in ways that in spite of

24    his prior association with Mr. Haddow that was emphasized at

25    trial, he has no prior scrapes either with criminals or

1    frankly, with regulatory authorities in a long successful and I

2    would emphasize public business career.

3          I recognize, of course, as your Honor has stated, that

4    there is the prior felony conviction.  I won't belabor it.  I

5    know that the Court is well familiar with the papers.  I would

6    though emphasis that in spite of his status as a felony

7    conviction and in spite of a serious sentence imposed by the

8    district judge down there, I think for a number of reasons that

9    item of criminal history seriously overstates the conduct

10   involved and his criminal history as such.

11         Again, your Honor knows what misprision is.  It does

12   address and relate only to his failure to report another

13   person's criminal conduct.  Mr. Moore's role in that series of

14   transactions was to sell real brick and mortar condominiums to

15   real buyers in the 2008 financial crisis.  That project, like

16   many others, failed.  His erst while partner was not convicted

17   but was involved with the series of bank fraud which Mr. Moore

18   had nothing to do.  But I would emphasize to the Court that

19   those apartments are real.  They up and running to this day.

20   They're two miles from the front gates of Disney World and

21   Mr. Moore and his colleagues in the UK sold, again, real

22   investments to real people, some 1700 of them.

23         I'd also like your Honor to discuss what I think has

24   been a point of emphasis in the government's sentencing papers.

25   And that is to suggest that Mr. Moore in his association with

1    Mr. Haddow and otherwise, is in some sense some kind of

2    recidivist fraudster.  Again, he stands now before the Court

3    for his second sentence.  But in connection with two unrelated

4    offenses, both of which were complete in terms of their conduct

5    before he was arrested on that.  This is his first second

6    chance, so to speak.  The room to invest hotel business that

7    Mr. Haddow did testify about, there is no documentary evidence

8    of Mr. Moore being a partner in that.  He did come to Mr.

9    Haddow with an opportunity that he wished Mr. Haddow to pursue

10   with respect to marketing a potential hotel property in

11   Barbados.  It had not yet been constructed but it is not

12   unusual for investments like that to be sold pre-construction.

13   Again, there is documentary evidence of any receipt of proceeds

14   by that in connection with Slovenian properties or anything

15   else.

16           With respect, as your Honor observed, to the Our Space

17   investment that was organized in the aftermath of Mr. Moore's

18   involvement with Barworks, I would emphasize a couple things.

19   one, the government's own acknowledge.  As your Honor pointed

20   out, that they're unable to say that this was a fraud.  But

21   also Mr. Moore's own removed from the events of that promotion

22   because it was really hardly up and running before he was

23   arrested in connection with his Florida situation.

24           Finally, with respect to the Lake Austin property

25   again, I won't belabor, with regard to Mr. Gata Aura, I

1    recognize again that the Court has reviewed or initial

2    submission on that and that the Court put questions to the

3    parties with respect to the differences in the guidelines

4    calculation.  I would submit in general, your Honor, as I've

5    argued in our papers that Mr. Gata Aura by all objective

6    measures was a more culpable participant in the Barworks fraud

7    in terms of his direct involvement and lies to, personal lies

8    to investors in the business.  He was there throughout the

9    course of Mr. Haddow's fraudulent scheme.  I should say their

10   shared fraudulent scheme.  He started with the Bitcoin scam

11   prior to the launch of Barworks and continued to the very

12   endgame of Barworks and then he covered stories with

13   Mr. Haddow.

14        I do recognize that the system credits acceptance of

15   responsibility and discount is in order and I'm sure that Judge

16   Rakoff did consider that.  But I would submit to the Court,

17   that that order of magnitude and we can only guess about

18   Mr. Haddow's own sentence and it is, of course, going to be

19   affected by Section 5K cooperation credit.  Nevertheless, he is

20   the architect of the scheme.  He is the real recidivist here.

21   And I think it is likely that he will not receive much

22   additional time when sentenced by Judge Swain.

23        Briefly, with respect to the victims, your Honor, I

24   will say only this.  Mr. Moore did choose to exercise his right

25   to defend himself at trial.  It was my perspective and my

1   advice to him that under the circumstances having defended

2   himself and indeed, as the Court mentioned, he did make

3   reference to, in his personal letter to the Court, with respect

4   to his remorse for those victims.  But it is generally my

5   approach, your Honor, to recognize the importance of the voice

6   of victims, but rather than to comment on or participate in

7   their voice, simply to allow them to play their role and to

8   speak their truth to the Court.  That was our approach here.

9           Finally, with respect to the nature of time that

10  Mr. Moore has spent in incarceration, I recognize that many of

11  the factors that we have emphasized to the Court are nobody's

12  fault.  They To COVID.  they relate it his emotional and

13  psychic experience of symptoms for which he was referred to

14  Devens and to Butner.  And again, with the circumstances

15  removed from his support network in the UK and from his wife,

16  given her own family challenges, it has been a difficult time

17  for him, anxious, isolated and lonely.  Again, I recognize

18  that's not part of the program but if what we're focused on

19  here, Judge Berman, is the effect on a human being of the

20  experience of incarceration and what that might mean in terms

21  of lessons learned and the likelihood of recidivism.

22          Respectfully disagreeing with my colleague who

23  observed that four years is somehow a slap on the wrist, I do

24  think he has served very significant time so far and just ask

25  the Court again to focus on that parsimony clause that that

1    punishment is sufficient but not greater than necessary.

2            I know that Mr. Moore does wish to address the Court.

3    So unless your Honor has some questions for me, I would defer

4    to him.

5            THE COURT:  Mr. Moore.

6            THE DEFENDANT:  Thank you, your Honor.

7            I appreciate the seriousness of today and I'd like to

8    start by reading.

9            THE COURT:  A few things.  I think he is in a venue

10   that has got an echo to it.  It sounds like, I am hearing what

11   the court reporter is hearing.  So, if you could speak, I would

12   suggest, slower, particularly, slower and if you can a little

13   bit louder.

14           Is there a microphone there or is it --

15           THE DEFENDANT:  I don't see one.  So, I guess it's

16   built-in.  At the risk of standing too close, how is that?

17           THE COURT:  Well, that is better.  We can't see you as

18   well but I think for the purposes of the court reporter, we see

19   you well enough and that is much more likely to lead to a very

20   accurate record.

21           THE DEFENDANT:  Whatever you need to get the best

22   result, your Honor.

23           THE COURT:  Well, that's excellent.

24           THE DEFENDANT:  Okay.  I'll start afresh.

25           Your Honor, I appreciate the seriousness of today and

1   the task ahead of you.  I'd like to start by reiterating my own

2   reserved apologies to the victims and the distress that this

3   has caused them.  As for me, I've definitely learned a tough

4   lesson as a result of the substantial length of time I've spent

5   in pretrial prisons now in my fourth year of incarceration.

6   For anyone who suggests that my experience is a slap on the

7   wrists, I respectfully disagree and I'm asking your Honor here

8   today to consider the time I've already spent in prison

9   sufficiently deterrent and punishment for my error.

10          Your Honor, it's been brutal and soul destroying.

11  I've gone from literally fighting for my life in some instances

12  in New York, to being punished by the endless and pointless

13  boredom of 23 hour a day lockdowns in other locations.  I've

14  already done some very tough time.  I certainly don't need any

15  more of either experience in order to have learned my lesson.

16          The government claims that a business I helped to

17  start, Our Space, was modeled on Barworks, which it wasn't.  it

18  was modeled on Wing Work, which was the seventh most valuable

19  business starter in the United States at the time, valued at

20  $16 billion.

21          The government also erroneously states that I

22  continued with Lake Austin after discovering the misdeeds of --

23  That's simply not true, your Honor.  Neither does it make any

24  sense.  My company's role as marketer had come to an end at

25  least two years prior.

1         Coming now to room to invest also mentioned by

2 Mr. Haddow and the government, my involvement was zero.  And

3 any and every regard other than to introduce a product to

4 Mr. Haddow and of course in his imagination.  In short, your

5 Honor, I am here today or should be, only for my very brief

6 role in Barworks, which in any event was substantially less

7 than Mr. Haddow originator and driving force or his real

8 business partner and right-hand man, Mr. Gata Aura, in stark

9 contrast to the serious fraudster that the government seeks to

10 paint me as.

11         For over 35 years I've invested my time building up

12 well-known respected grand leading businesses, your Honor.

13 I've helped create over eight thousand full-time jobs between

14 the United Kingdom and the U.S.A., over 50,000 part-time jobs,

15 required over 50 million happy retail customers for those

16 businesses.  I'm proud of my past achievement, your Honor, from

17 starting my business life as a 22-year-old featured on the

18 finals of an apprentice styled TV show in the UK, I help build

19 up three markets leading businesses in areas as perfume,

20 software and finally, real estate education, all of which were

21 problem free from a regulatory perspective.  In the software

22 business the U.S. governments itself was one of our main

23 clients.

24         Education however became the pinnacle of my success

25 today with my flagship business, Inside Track Seminar, helping

1    hundreds, if not thousands, of professional people retire early

2    and/or wealthy in many instances.  While being retired and away

3    from the business almost four years myself as one of the around

4    120 real estate developers that my management team vetted and

5    dealt with, unfortunately, was Paul Oxwood, which led to my

6    original plea to misprision.  The time -- inside track as a

7    result of the great recession led to my introduction to Mr.

8    Haddow because I'll no longer have a sales channel for real

9    estate developments myself not even caring of that introduction

10   until he presented to me with -- in late 2015 because of the

11   difficulty I now find myself in.

12           When I met him he was definitely blinded by the

13   staggering success of -- work at the time.  However, my first

14   and only business relationship with Haddow ended almost as soon

15   as it had begun with me moving on to help form Our Space, a

16   business itself modeled on Weworks -- and Barworks.  And with

17   its structure designed by leading UK financial services lawyers

18   and complying with all local regulations.  In any event,

19   because of my arrest I was prevented from participating beyond

20   the initial offerings of the ventures in the business and the

21   successful opening of its first office location.

22           So, hopefully you can see in determining my rightful

23   sentence, your Honor, not a serial fraudster but a serial

24   entrepreneur who has successfully navigated, negotiated with

25   and dealt honestly with thousands of people throughout his 35

1    years plus business career.

2            In closing, your Honor, I'd like to thank you for

3    considering all the factors in my case including the human ones

4    I mentioned here.

5            I'd also especially like to thank my wife, Karina, for

6    patiently standing by me and believing in me throughout this

7    nightmare.  Also, of course, my children, Daniel, Jonathan,

8    Christopher and William, who've individually and collectively

9    supported me in valuable ways and never stopped believing in my

10   good character.

11           After almost four years, kids, I hope to see you again

12   soon.

13           Finally, your Honor, I'm in your hands.  I sincerely

14   hope that you can sentence me for the true minimal extent of my

15   error as a whole person and not as the evil criminal mastermind

16   I seemingly to present by the government and the punishment you

17   decide upon is more in line with the very short interval of

18   time I was involved with Haddow before completely cutting ties

19   with him, rather than that requested by the government.

20           Naturally, your Honor, you'll fully appreciate and

21   understand that I hope after almost four long years that in

22   itself brings you to determine that my punishment to date is

23   sufficient deterrent.  The substantial time I've already served

24   has given me the message loud and clear and that you sentence

25   me today to time served, please, your Honor.

1          Thank you.

2          COURTROOM DEPUTY:  Judge Berman, sorry to interrupt.

3   I sent you an email, if you have a minute.

4          THE COURT:  I did see it.  Yes.

5          So what Christine is referring to is the Pennsylvania

6   BOP is urging us to move along, I guess.  I don't feel any, I

7   think we'll move at the pace that is appropriate.  This is a

8   serious occasion today and we have to take the time that's

9   necessary to come up with a fair sentence.

10          Mr. Vainberg.

11          MR. VAINBERG:  Your Honor, the Court is very

12  intimately familiar with the facts of this case as evidenced by

13  your Honor's recitation and your presiding over the trial.

14  I'll be fairly brief.  I do want to address the government's

15  specific concerns about specific deterrence in this case.  And

16  the opportunity the Court has to keep the community safe from

17  Mr. Moore when he does leave prison.

18          As your Honor knows, Mr. Moore was not a young man in

19  his 20s who joined this scheme as some sort of fleeting

20  mistake.  As has been made clear, he was in his 50s.  He was

21  skilled.  As he has just told you, he spent over 30 years

22  honing his skills on how to sell real estate to investors.

23  He's very good at it.  Part of what makes him very good is his

24  ability to craft and design investment projects that would

25  entice investors to invest their hard earned money.  Your Honor

has seen that Mr. Moore was not deterred by close to a decade

of experiences in which investors lost money.  He was not

deterred by his affiliation with Mr. Haddow in Room to Invest

which Mr. Haddow testified investors lost money.  He knew

exactly who he was dealing with because he then saw Mr. Haddow

be civilly prosecuted by the SCA for running a 60 million pound

Ponzi scheme in the United Kingdom.  He was not deterred by

teaming up with a developer in the Lake Cause Austin case who

had promised investors' money would stay in escrow, when in

fact they were being paid to Mr. Moore.  That's the deposits

that should have stayed in escrow that were paid instead to

Mr. Moore.  He was not deterred when he found out that

Mr. Haddow had a boiler room in New York and was about to

launch a new business called Barworks.  Instead, he had reached

out to try to join that process.  He saw how much money it

could bring.

        You have seen emails, your Honor, during trial in

which he told Mr. Haddow that he wasn't in it to be a glorified

sales agent, someone like Mr. Aura, for example.  He wanted to

be partner.  And what Mr. Moore did to advance this scheme

makes him the second most culpable person who will be sentenced

in this case after Mr. Haddow.

        Mr. Moore helped design the scheme in his own words by

changing the concept of the investment from investment into the

stock of Barworks into leases so that people would have a

1   feeling that they're actually investing workspace leases in

2   Manhattan.  Of course, what they were given were certificates

3   that were worthless pieces of paper with numbers on them.  He

4   came up with that concept according to himself.

5           He also designed the marketing program and wealth

6   builder concept which raised the returns that people were

7   promised to 16 percent a year guaranteed if they would invest

8   as much as $100,000.  He took credit for that in e-mails over

9   and over and that was successful.

10          And third, he knew that Mr. Haddow could not use his

11  own name and that the value they would bring -- again, this all

12  over emails -- was acting as a front and by bringing UPG in.

13  He tried to expand Barworks internationally with e-mails with

14  potential agents and partners who would open up international

15  Barworks locations.  E-mails showing every investor coming in

16  on UPG.  He knew the frauds and he was extremely callus in

17  participating in this fraud.

18          What do I mean by that?  It wasn't that he just knew

19  that some money was coming in.  He knew about specific

20  investors.  Your Honor may remember at trial one investor,

21  Julian White, testified, a victim, about investing six hundred

22  thousand dollars in the scheme and that he had done he could

23  with his due diligence.  He looked at LinkedIn pages for

24  Jonathan Black that were fake.  He sent emails to the UPG agent

25  who recruited him, who had assured him that UPG's principals

had traveled to New York, met with Jonathan Black, done their

due diligence and found that short of a World War III scenario,

this was a safe bet.  Then he asked to speak to Jonathan Black

in person.  And of course, Mr. Moore and Mr. Haddow and other

principals set that up so that Mr. Haddow masqueraded as

Jonathan Black.

          You've seen in our submission what happened right

after that call.  Mr. Haddow calls out Jim Moore and he

testifies, I was very excited because this guy sounded very

interested.  It looked like he was going to potentially invest

upwards of six hundred thousand, maybe even more.  He was

offering maybe up to a million dollars.  So I was very excited

that I had made a big contribution in this conversation.  So I

rang up Jim and said to him that Jonathan has got off the phone

with Julian White and he's had a really good call.

          And, your Honor, remember they're giggling about

this -- according to Mr. Haddow's testimony -- and Jim's

immediate response was, you mean you did?  I said no, no.

Jonathan did.  And then I giggled and laughed about it a little

bit and we moved on to another subject.

          Your Honor has also seen that the defendant has not

shown any real sincere remorse about his role in this offense.

He's apologized just minutes ago for the victims for the

distress this has caused them.  What is the "this"?  He has not

spoken about his own role in the conduct.  He has not

M21AAMOOS                    Sentence

1    acknowledged his own role in crafting the scheme and selling

2    the scheme and pushing these lies.  And he's complained to your

3    Honor about being punished "by endless boredom" in prison.  But

4    as your Honor's seen, there are over 800 people who are being

5    punished every day who are facing depression, medical

6    illnesses.  And that punishment is not going to end when

7    Mr. Moore exits prison.  Their punishment with stay with them

8    for the rest of their life.

9           So, your Honor, the government believes that a

10   significant sentence of incarceration is necessary in this case

11   to deter Mr. Moore and to protect the victims from this --

12   offenses.

13          I'll say one last thing.  As you've seen the way

14   Mr. Moore operates, his name is not going to be on any offering

15   memorandum in the future if he decides to run another

16   investment scene.  He is not the UPG agent on the phone giving

17   his name.  He is able to operate in this world without the

18   victim even knowing who he is.  That's why the victims, in

19   writing their letters, they know about -- because of the

20   publicity.  They didn't know that there was a Jim Moore behind

21   the scenes earning 60 percent commissions from UPG, crafting

22   the materials and supervising the operation on the UPG side.

23          So for that reason, nothing short of a significant

24   prison sentence in the government's view will keep the public

25   safe from this defendant.

1          Thank you, your Honor.

2          THE COURT:  Okay.  So now I am going to impose the

3     sentence and I am going to adopt first the findings of fact in

4     the presentence report with, if any changes that have been

5     mentioned.

6          And I'll ask the defense if there are any further

7     objections to that report?

8          MR. GRUDBERG:  None other than the ones we've briefed,

9     your Honor.

10         THE COURT:  Mr. Moore, any further objections?

11         THE DEFENDANT:  (Inaudible).

12         THE COURT:  Anything further from the government?

13         MR. VAINBERG:  No, your Honor.

14         THE COURT:  I am going to preview the sentence and

15    then impose it.  I'll make this comment at outset.  I have been

16    through the 3553(A) factors and I don't want anybody to

17    misunderstand.  Almost all of them almost all of them argue for

18    a significant sentence.  So, it's not one.  It's not two.  Not

19    even three.

20         The nature and the circumstances of the crimes

21    convicted are breathtaking in nature.  They swindle beyond --

22    you know I have been a judge for a long time and I've seen a

23    lot of swindles, so to speak, but this one is breathtaking.

24    The fictitious head of the company, extraordinary.

25         also, the history and characteristics of Mr. Moore, he

is an experienced financier, a dealmaker.  He knows federal

regulations are at play in these kinds of matters.  And you

would think that someone with his experience would know better,

know substantially better than to participate in this

conspiracy.

So I think it's a very serious, two very serious

crimes.  The conspiracy itself by the way, the conspiracy, of

course, which has been proven, brings in other people and other

people's activity.  I think the sentence needs to reflect the

very great seriousness of the offense.  A significant sentence

is critical to promote respect for the law and to provide a

just punishment and to afford adequate deterrence to this

breathtaking criminal conduct, to protect the public to be sure

from further crimes of the defendant.  Not so much to provide

the defendant with a needed educational or vocational training

or medical care or other correctional treatment in the most

effective manner.  Although, we have made sure that his

physical and mental health concerns could be addressed as much

as possibly could.

So, I've looked at the kinds of sentencings available.

I've looked at the sentencing guidelines and the range.  I am

going to impose a sentence that is considerably less than my

own computation of the guideline range.

The issue of disparities among similarly situated

defendants, the fact that different judges approach things in

1    different ways, that's somewhat significant.  But what really

2    is significant as has been said by several people, is that

3    there's a vast difference between someone who pleads guilty and

4    who endeavors to cooperate even though there is no cooperation

5    agreement.

6           And someone who goes to trial, which Mr. Moore has

7    every right had every right to do but he also exposed all of

8    this unbelievable and I say again breathtaking swindle behavior

9    for everybody to see, I think that there's a world of

10   difference between Mr. Moore and someone who has pled guilty.

11   Of course we do need to provide for restitution.

12          So all of that, where that gets me is I intend to

13   impose a sentence of 140 months of incarceration.  The offense

14   level is 38 and the criminal history category is two.  That is

15   well below the lowest end of that guideline range which is 262

16   months to the top of the range which is 327 months.

17          I intend to impose a term of supervised release

18   following incarceration of three years subject to the mandatory

19   conditions which are that he not commit another federal, state

20   or local crime;

21          That he not illegally possess a controlled substance;

22          That he refrain from any unlawful use of a controlled

23   substance.

24          He is required to submit to one drug test within 15

25   days of placement on supervision and at least two unscheduled

1    drug tests thereafter, which may be directed by the probation

2    officer.

3              In addition, he'll be required to comply with what are

4    called the standard conditions numbers one through 12, which

5    are set forth in pages 44 and 45 of the presentence report, and

6    which include, among other things, that he may not possess and

7    must not possess, own or have access to a firearm, ammunition,

8    destructive device or dangerous weapon or anything that was

9    designed or was modified for the specific purpose of causing

10   injury to another person.

11             And plus the following special conditions, which the

12   Court finds are reasonably related to the factors set forth at

13   18 3553(a (1), (A) (2) (B), (A) (2) (C), (A) (2) (D) in which

14   the Court also finds involve no greater deprivation of liberty

15   than is reasonably necessary for the purposes set forth in

16   Sections 3553(a) (2) (B), (A) (2) (C) and (A) (2) (D), and are

17   consistent with pertinent policy statements issued by the

18   Sentencing Commission at 28 U.S.C. Section 994 (A).

19             And these are the special conditions, that Mr. Moore

20   be supervised in his district of residence, that report to the

21   probation department within 48 hours of release from custody

22   and that he participate in a program approved by the probation

23   office for substance abuse, which program shall include testing

24   to determine whether he has reverted to the use of alcohol or

25   drugs.  He may be required to contribute to the cost of

services rendered by a co-payment in an amount to be determined

by the probation officer based on such factors as ability to

pay or availability of third-party payment.

He is also required to participate during the term of

his supervision in weekly individual, therapeutic counseling by

a licensed therapist.  And here too, he may be required to

contribute to the cost of services rendered as by a co-payment

in an amount to be determined by the probation officer.

He shall also cooperate with the Department of

Homeland Security, Bureau of Citizenship and Immigration in

connection with any proceeding -- to determine his status in

the United States and he'll be required to abide by BCIS rules,

regulations and laws.

I am imposing a fine in the amount of $50,000.  The

guideline range fine is $50,000 to $115,169.58.

Probation I noticed did not recommend a fine.  I think

a fine required.

Restitution, I said to you before that I signed the

scheduled restitution sum $57,579,790.

During the term of incarceration if defendant is

engaged in a BOP non-UNICOR work program, he shall pay $25 per

quarter toward the criminal financial penalties.  If the

defendant participates in the BOP's UNICOR program as a grade

one through four, he shall pay 50 percent of his monthly UNICOR

earnings toward the criminal financial consistent with BOP

1   regulations at 28 CFR 545.1 1.

2          If any portion of the financial penalties remains

3   unpaid at the time of his release from incarceration the

4   remainders are to be paid during the term of supervision in

5   monthly installments of 20 percent of gross monthly revenue.

6          In concluding this schedule, I've considered the

7   factors set forth at 18 U.S.C. Section 3663 (A) (1) (B) (i) and

8   18 U.S.C. Section 3664 in imposing this restitution

9   requirement.

10          I've considered the amounts of loss sustained by the

11   victims as a result of the offense, the financial resources of

12   defendant, financial and earning ability of defendant and his

13   dependents and such other factors, as I've deemed appropriate.

14   The forfeiture in the amount of $1,599,257.46, a special

15   assessment of $200 is which is mandatory pursuant to 18 U.S.C.

16   Section 3013.

17          Briefly, the reasons for this sentence, the sentence

18   is way below the guideline range of 262 to 327 months.  At 140

19   months it is way lower than the lowest end of that guideline

20   range.  The offense level is 38.  The criminal history category

21   is two.  And I believe that this sentence is appropriate given

22   the seriousness of the offense and the international scope, its

23   blatancy and I think it needs for the punishment and deterrence

24   and the other factors of 3553(a) which I mentioned before and

25   incorporate here by reference.

M21AAMOOS                     Sentence

1          I've considered all of them, the nature and

2     circumstances of the crimes, Mr. Moore's history and

3     characteristics.  I've imposed the sentence to reflect the

4     seriousness of the crimes, to promote respect for the law and

5     to provide a just punishment, to afford adequate deterrence to

6     criminal conduct, to protect the public from further crimes of

7     the defendant and to provide the defendant with needed

8     educational or vocational training, although, that hardly seems

9     necessary, but medical care, yes, if need be or other

10     correctional treatment in the most effective manner.

11          So I will give the opportunity to defense counsel,

12     Mr. Moore and the government to say anything they want to add

13     before I actually impose that sentence.

14          MR. GRUDBERG:  Your Honor, I don't know the Court's

15     practice with respect to making recommendations or not to the

16     Bureau of Prisons with respect to possible facilities.  If your

17     Honor is so inclined, I would ask the Court to recommend the

18     FCI Miami which is a low security institution, because

19     Mr. Moore's wife does have access to real estate in the Miami

20     area, I think that would best facilitate visitation with him.

21     I believe that's his preference.  I would ask him to affirm

22     that.  It's been a while since we've spoken about it.

23          THE COURT:  I will make a recommendation FCI Miami.

24          MR. GRUDBERG:  Thank you, your Honor.

25          THE COURT:  You bet.

1          Mr. Moore, anything further before I actually impose

2     the sentence?

3          THE DEFENDANT:  Nothing that I could say without

4     speaking to counsel first, your Honor.

5          THE COURT:  Okay.  Mr. Vainberg?

6          MR. VAINBERG:  Mo, your Honor.

7          THE COURT:  Did you want to speak to counsel at this

8     time?

9          THE DEFENDANT:  I would like to if I may, your Honor.

10          THE COURT:  I don't know if that can be arranged with

11     Pennsylvania.

12          But Christine or Jessica, do you happen to know if

13     there is the ability to put them in a virtual conference room?

14          COURTROOM DEPUTY:  Yes, judge.  Chris McShea can do

15     that.

16          MR. MCSHEA:  We cannot, actually.  Their access is

17     turned off.  I can't break them out.

18          THE COURT:  Okay.  Well, I'm afraid I can't.

19          THE DEFENDANT:  Okay.

20          THE COURT:  So you can remain seated, Mr. Moore, given

21     the circumstances of where you're located.

22          The guideline range is 262 to 327 months.  Having

23     considered the Sentencing Reform Act of 1984, as well as the

24     United States Sentencing Guidelines and, particularly, all the

25     factors at 18 U.S.C. Section 3553(a), it is my judgment that

M21AAMOOS                          Sentence

1    you be committed to the custody of the Bureau of Prisons to be

2    imprisoned for a term of 140 months.  That is to be followed by

3    three years of supervised release subject to the mandatory and

4    the standard and special conditions that I mentioned before and

5    incorporate that conversation in reference here by reference.

6    That includes weekly therapeutic concerning and cooperation

7    with Homeland Security and the other special conditions.

8              I am imposing a $50,000 fine.  Restitution, I've

9    signed the order that I discussed before with the victims

10   information and addresses.  The restitution sum is $57,579,780

11   and the payment scheduled is incorporated here by reference to

12   the one that I mentioned before.

13             Forfeiture in the amount of $1,599,257.46, $200

14   special assessment.

15             And as I stated earlier on at various places in the

16   sentencing, I believe that this sentence is appropriate given

17   all of the factors at 18 U.S.C. Section 3553(a) including

18   without limitation the seriousness of the offenses and needs

19   for punishment and deterrence.

20             Does either counsel know of any legal reason why this

21   sentence should not be imposed as so stated?

22             MR. VAINBERG:  None from the government.

23             MR. GRUDBERG:  No, your Honor.

24             THE COURT:  Then I hereby order the sentence to be

25   imposed as so stated.

1          Mr. Moore, you have the right to appeal this sentence.

2     If you are unable to pay the cost of an appeal, you have the

3     right to apply for leave to appeal in forma pauperis.  If you

4     request, the clerk of court will prepare and file a notice of

5     appeal in your behalf immediately.

6          Do you understand your appeal rights?

7          THE DEFENDANT:  If I understand correctly, your Honor,

8     you're saying that I need to tell you now if I wish to appeal?

9          THE COURT:  No, no.  I'm not saying that.  I'm saying

10    you have the right to appeal.  You probably want to discuss any

11    appeal with your counsel.  I'm just saying do you understand

12    that you have the right to appeal is really what I'm asking.

13          THE DEFENDANT:  Thank you.

14          THE COURT:  Does the government need to dismiss any

15    open counts in this case?

16          MR. VAINBERG:  No, your Honor.

17          THE COURT:  Do you want to add anything to today's

18    sentencing proceedings, starting with the government?

19          MR. VAINBERG:  No, your Honor.

20          THE COURT:  How about defense counsel?

21          MR. GRUDBERG:  Not at this time, judge, no.

22          Thank you.

23          THE COURT:  Okay.  I think that covers everything.

24          Anything that was omitted in terms of substance in a

25    sentencing proceeding?

M21AAMOOS                        Sentence

1            MR. VAINBERG:  No, your Honor.

2            We thank you for your time and your attention to this

3    matter.

4            THE COURT:  How about defense counsel?

5            MR. GRUDBERG:  Your Honor, as we've noted before,

6    other than the arguments we've set forth in the papers, I have

7    nothing to add with respect to today's proceeding.

8            I guess, I have one technical question for Mr. McShea.

9    We've previously discussed the possibility of connecting me

10   with Mr. Moore once the record closes here.  I don't know

11   whether that's possible but I thought I'd inquire

12           MR. MCSHEA:  I unfortunately don't think that is.

13   They have mag court starting in six minutes and I need to clean

14   the room and get everything ready.

15           MR. GRUDBERG:  Understood.

16           MR. MCSHEA:  Sorry about that okay.

17           THE COURT:  Thank you, Mr. McShea.

18           We've concluded our work for today, everybody, and we

19   are adjourned.

20           Thank you.

21           (Adjourned)

22

23

24

25